APPEAL,TYPE–D

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: <u>1:26–cv–01690–PLF</u>
### *Internal Use Only*

| | |
|---|---|
| NEW YORK TIMES COMPANY et al v. DEPARTMENT OF DEFENSE et al | Date Filed: 05/18/2026 |
| Assigned to: Judge Paul L. Friedman | Jury Demand: None |
| Cause: 05:702 Administrative Procedure Act | Nature of Suit: 440 Civil Rights: Other |
| | Jurisdiction: U.S. Government Defendant |

**Plaintiff**

**NEW YORK TIMES COMPANY**    represented by   **KatieLynn Boyd Townsend**
GIBSON DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
213–229–7839
Email: <u>ktownsend@gibsondunn.com</u>
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Theodore J. Boutrous , Jr.**
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229–7804
Fax: (213) 229–6804
Email: <u>tboutrous@gibsondunn.com</u>
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JULIAN E. BARNES**    represented by   **KatieLynn Boyd Townsend**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Theodore J. Boutrous , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**DEPARTMENT OF DEFENSE**    represented by   **James R. Powers**
*also known as*                                U.S. DEPARTMENT OF JUSTICE
DEPARTMENT OF WAR                               Federal Programs Branch, Civil Division
1100 L Street NW
Room 11218
Washington, DC 20005

(202) 353–0543
Fax: (202) 616–8470
Email: james.r.powers@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael Benjamin Bruns**
DOJ–Civ
1100 L St NW
Washington, DC 20005
202–514–4011
Email: michael.bruns@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sarah Welch**
DOJ–Civ
Civil Division
950 Pennsylvania Ave.
Ste 3612
Washington, DC 22202
202–514–3180
Email: sarah.e.welch@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**PETE HEGSETH**                          represented by **James R. Powers**
*in his official capacity as Secretary of*              (See above for address)
*Defense*                                               *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Michael Benjamin Bruns**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Sarah Welch**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**SEAN PARNELL**                          represented by **James R. Powers**
*in his official capacity as Chief Pentagon*            (See above for address)
*Spokesman*                                             *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Michael Benjamin Bruns**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Sarah Welch**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**TIMOTHY PARLATORE**                    represented by   **James R. Powers**
*in his official capacity as Special Advisor*              (See above for address)
*to the Secretary of Defense*                             *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Michael Benjamin Bruns**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Sarah Welch**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/18/2026 | 1 | COMPLAINT *for Declaratory and Injunctive Relief* against DEPARTMENT OF DEFENSE A/K/A DEPARTMENT OF WAR, PETE HEGSETH, TIMOTHY PARLATORE, SEAN PARNELL ( Filing fee $ 405 receipt number ADCDC–12427306) filed by THE NEW YORK TIMES COMPANY, JULIAN E. BARNES. (Attachments: # 1 Exhibit 1 – Interim Policy [37–3], # 2 Exhibit 2 – Revised Policy Email [37–6], # 3 Exhibit 3 – October Policy [1–1], # 4 Exhibit 4 – September 18 Policy [1–5], # 5 Exhibit 5 – Parnell Letter to RCFP [1–3], # 6 Exhibit 5–1 – Redlined Acknowledgment [1–4], # 7 Exhibit 6 – RCFP Letter to Parnell [1–2], # 8 Exhibit 7 – Jason Crow Press Release, # 9 Exhibit 8 – Transcript of DOW Press Briefing, # 10 Exhibit 9 – Pete Hegseth Press Briefing – CSPAN, # 11 Exhibit 10 – Forbed Article re: James O'Keefe Asks About Identifying Anti–Trump DOD Members, # 12 Exhibit 11 – AP News Article re: Questions from new Pentagon press corps, # 13 Exhibit 12 – DOW Rapid Response X Post, # 14 Exhibit 13 – Cam Higby X post re: Press presence in Pentagon, # 15 Exhibit 14 – Wah Post Article re: Pentagon's new 'right–wing' press corps, # 16 Exhibit 15 – NYTimes Article re: Pentagon press corps support of Trump, # 17 Exhibit 16 – Scott Nover X Post re: Laura Loomer's tip request, # 18 Exhibit 17 – Scott Nover X Post re: Laura Loomer's tip request (cont.), # 19 Exhibit 18 – Laura Loomer X post re: Tip requests, # 20 Exhibit 19 – Sean Parnell X Post re: Announcmenets of new press corps., # 21 Exhibit 20 – Wash. Post Article re: Hegseth policy change on communications, # 22 Exhibit 21 – NYTimes Article: Fraidy–Cat at the Pentagon, # 23 Exhibit 22 – CBS News Article re: Declining new press requirements after 60 years, # 24 Exhibit 23 – Wash. Posrt Article re: Hegseth's legal fixer, Tim Parlatore, # 25 Exhibit 24 – Hegseth X Post re: Waving goodbye at reporters' refusal to sign, # 26 Exhibit 25 – NYTimes Article: Inside Hegseth's Effort to Limit Press Access at the Pentagon, # 27 Exhibit 26 – DOD News Article: Pentagon correspondent recalls 9/11, # 28 Exhibit 27 – Fox News Article re: Pentagon angry for |

| | | |
|---|---|---|
| | | report on Hegseth's security, # 29 Exhibit 28 – Joel Valdez X Post re: Safety risk from report on Hegseth's security, # 30 Exhibit 29 – Wash. Post Article re: Hegseth team ordered to stop polygraph tests, # 31 Exhibit 30 – Hegseth Press briefing on Iraon war – PBS, # 32 Exhibit 31 – Politico Article re: Parlatore's conflict–of–interest, # 33 Exhibit 32 – James O'Keefe X Post re: DOD officials criticism of Trump/Hegseth, # 34 Exhibit 33 – Spectrum News Article re: Hegseth blames media for second signal chat, # 35 Exhibit 34 – PBS Article re: Second Signal chat, # 36 Exhibit 35 – Pete Hegseth X Post re: Signal chat war plans, # 37 Exhibit 36 – Sean Parnell X Post re: Urging accountability for the NYTimes' lies, # 38 Exhibit 37 – AP Article: More news outlets lose Pentagon workspaces, # 39 Exhibit 38 – NBC Article re: Pentagon media rotation program, # 40 Exhibit 39 – Updated Physical Control Measures May 2025, # 41 Exhibit 40 – Cam Higby X Post re: Reporters creating a hostile work environment, # 42 Exhibit 41 – Sean Parnell X Post re: New Interim Policy, # 43 Exhibit 42 – Erik Wemple X Post re: Parlatore's press briefing, # 44 Summons, # 45 Summons, # 46 Summons, # 47 Summons, # 48 Summons, # 49 Summons, # 50 Civil Cover Sheet)(Boutrous, Theodore) (Entered: 05/18/2026) |
| 05/18/2026 | 2 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by THE NEW YORK TIMES COMPANY (Boutrous, Theodore) (Entered: 05/18/2026) |
| 05/18/2026 | 3 | NOTICE OF RELATED CASE by JULIAN E. BARNES, THE NEW YORK TIMES COMPANY. Case related to Case No. 25–04218. (Boutrous, Theodore) (Entered: 05/18/2026) |
| 05/18/2026 | 4 | NOTICE of Appearance by KatieLynn Boyd Townsend on behalf of JULIAN E. BARNES, THE NEW YORK TIMES COMPANY (Townsend, KatieLynn) (Entered: 05/18/2026) |
| 05/19/2026 | | Case Assigned to Judge Paul L. Friedman. (zjm) (Entered: 05/19/2026) |
| 05/19/2026 | 5 | SUMMONS (6) Issued Electronically as to DEPARTMENT OF DEFENSE, PETE HEGSETH, TIMOTHY PARLATORE, SEAN PARNELL, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(zjm) (Entered: 05/19/2026) |
| 05/22/2026 | 6 | MOTION for Preliminary Injunction by JULIAN E. BARNES, NEW YORK TIMES COMPANY. (Attachments: # 1 Memorandum in Support, # 2 Declaration of Theodore J. Boutrous, Jr., # 3 Exhibit 1 – News Article, # 4 Exhibit 2 – News Article, # 5 Exhibit 3 – Book Excerpts, # 6 Exhibit 4 – News Article, # 7 Exhibit 5 – News Article, # 8 Exhibit 6 – Court Procedures, # 9 Exhibit 7 – Article, # 10 Exhibit 8 – Article, # 11 Exhibit 9 – Webpage, # 12 Exhibit 10 – Webpage, # 13 Exhibit 11 – News Article, # 14 Exhibit 12 – News Article, # 15 Exhibit 13 – News Article, # 16 Exhibit 14 – News Article, # 17 Declaration of Julian E. Barnes, # 18 Declaration of Robert Burns, # 19 Declaration of Chris Meagher, # 20 Declaration of Pete Williams, # 21 Exhibit – Williams Declaration A – Email, # 22 Text of Proposed Order)(Boutrous, Theodore) (Entered: 05/22/2026) |
| 05/22/2026 | 7 | NOTICE of Appearance by Michael Benjamin Bruns on behalf of All Defendants (Bruns, Michael) (Entered: 05/22/2026) |
| 05/22/2026 | 8 | CERTIFICATE OF SERVICE by JULIAN E. BARNES, NEW YORK TIMES COMPANY . (Boutrous, Theodore) (Entered: 05/22/2026) |
| 05/22/2026 | 9 | Consent MOTION for Briefing Schedule by DEPARTMENT OF DEFENSE, PETE HEGSETH, TIMOTHY PARLATORE, SEAN PARNELL. (Attachments: # 1 Text of |

| | | |
|---|---|---|
| | | Proposed Order)(Bruns, Michael) (Entered: 05/22/2026) |
| 05/26/2026 | | MINUTE ORDER granting 9 Consented to Motion for Scheduling Order. Defendants shall file their opposition to plaintiffs' motion for a preliminary injunction on or before June 4, 2026. Plaintiffs shall file their reply on or before June 9, 2026. The parties shall appear for a hearing on plaintiffs' motion for a preliminary injunction at 10:00 a.m. on Friday, June 12, 2026, in Courtroom 29 in the William B. Bryant Annex to the E. Barrett Prettyman Courthouse at 333 Constitution Avenue N.W., Washington, D.C. 20001. Signed by Judge Paul L. Friedman on May 26, 2026.(lccm) (Entered: 05/26/2026) |
| 05/26/2026 | | Set/Reset Deadlines: Opposition due by 6/4/2026 and Replies due by 6/9/2026. Motion Hearing set for 6/12/2026 at 10:00 AM in Courtroom 29A– In Person before Judge Paul L. Friedman. (tj) (Entered: 05/26/2026) |
| 06/04/2026 | 10 | NOTICE of Appearance by Sarah Welch on behalf of All Defendants (Welch, Sarah) (Entered: 06/04/2026) |
| 06/04/2026 | 11 | Memorandum in opposition to re 6 MOTION for Preliminary Injunction filed by DEPARTMENT OF DEFENSE, PETE HEGSETH, TIMOTHY PARLATORE, SEAN PARNELL. (Attachments: # 1 Exhibit 1 (Field Manual), # 2 Exhibit 2 (Valdez Declaration), # 3 Exhibit 3 (Parnell Declaration))(Welch, Sarah) (Entered: 06/04/2026) |
| 06/08/2026 | | MINUTE ORDER: The Court will connect the public–access telephone line for the hearing scheduled for Friday, June 12, 2026 at 10 a.m. Any member of the public or media may access the public–access line by dialing (833) 990–9400 and using meeting ID 492497252. As a reminder, any use of the public–access telephone line requires adherence to the general prohibition against recording, livestreaming, and rebroadcasting of court proceedings (including those held by videoconference). Violation of these prohibitions may result in sanctions, including removal of court–issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court. Signed by Judge Paul L. Friedman on June 8, 2026.(lccm) (Entered: 06/08/2026) |
| 06/09/2026 | 12 | REPLY to opposition to motion re 6 Motion for Preliminary Injunction,,, / Reply Brief in Support of Plaintiffs' Motion for Preliminary Injunction filed by JULIAN E. BARNES, NEW YORK TIMES COMPANY. (Attachments: # 1 Declaration (Supplemental) of Theodore J. Boutrous Jr., # 2 Exhibit 1 – Max Frankel Affidavit, # 3 Exhibit 2 – NYTimes Article 1, # 4 Exhibit 3 – WSJ Article, # 5 Exhibit 4 – NYTimes Article 2, # 6 Exhibit 5 – CNN Video, # 7 Exhibit 6 – Washington Post Article, # 8 Declaration (Supplemental) of Julian E. Barnes, # 9 Declaration of Richard W. Stevenson)(Boutrous, Theodore) (Entered: 06/09/2026) |
| 06/12/2026 | | Minute Entry for Motion Hearing held on 6/12/2026 before Judge Paul L. Friedman: The matter was before the Court on Plaintiffs' Motion 6 for Preliminary Injunction. Theodore J. Boutrous, Jr., Katielynn B. Townsend, Susan Pelletier, and Eric Brooks present on behalf of plaintiffs. Sarah Welch present on behalf of defendants. The motion was briefed, argued, and taken under advisement. Defendants' request to respond to new evidence submitted in plaintiffs' reply brief 12 is GRANTED. Defendants shall file their response on or before Wednesday, June 17, 2026. Plaintiffs shall file a response not to exceed five pages. (Court Reporter: Tammy Nestor)(mhp) (Entered: 06/12/2026) |
| 06/12/2026 | | MINUTE ORDER: Defendants shall file their response to plaintiffs' 12 reply on or before June 17, 2026. Plaintiffs shall file their response of up to five pages on or before |

| | | |
|---|---|---|
| | | June 18, 2026. Signed by Judge Paul L. Friedman on 6/12/2026. (mhp) (Entered: 06/12/2026) |
| 06/17/2026 | 13 | SUPPLEMENTAL MEMORANDUM to re 6 MOTION for Preliminary Injunction filed by DEPARTMENT OF DEFENSE, PETE HEGSETH, TIMOTHY PARLATORE, SEAN PARNELL. (Welch, Sarah) (Entered: 06/17/2026) |
| 06/18/2026 | 14 | SUPPLEMENTAL MEMORANDUM to re 6 MOTION for Preliminary Injunction filed by JULIAN E. BARNES, NEW YORK TIMES COMPANY. (Boutrous, Theodore) (Entered: 06/18/2026) |
| 06/24/2026 | 15 | NOTICE of Appearance by James R. Powers on behalf of All Defendants (Powers, James) (Entered: 06/24/2026) |
| 06/30/2026 | 16 | ORDER granting 6 Plaintiffs' Motion for a Preliminary Injunction. Plaintiffs shall post a bond in the amount of $1.00 on or before July 7, 2026. See Order for details. Signed by Judge Paul L. Friedman on June 30, 2026. (lccm) (Entered: 06/30/2026) |
| 06/30/2026 | 17 | OPINION granting 6 Plaintiffs' Motion for a Preliminary Injunction. See Opinion for details. Signed by Judge Paul L. Friedman on June 30, 2026. (lccm) (Entered: 06/30/2026) |
| 07/01/2026 | | DEPOSIT of Bond in the amount of $ 1.00, Receipt Number 212152. (zjm) (Entered: 07/01/2026) |
| 07/02/2026 | 18 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 16 Order, Memorandum & Opinion, 17 Order, Memorandum & Opinion by TIMOTHY PARLATORE, PETE HEGSETH, DEPARTMENT OF DEFENSE, SEAN PARNELL. Fee Status: No Fee Paid. (Welch, Sarah) (Entered: 07/02/2026) |
| 07/02/2026 | 19 | MOTION to Stay re 16 Order, Memorandum & Opinion, 17 Order, Memorandum & Opinion *Pending Appeal* by DEPARTMENT OF DEFENSE, PETE HEGSETH, TIMOTHY PARLATORE, SEAN PARNELL. (Welch, Sarah) (Entered: 07/02/2026) |
| 07/02/2026 | 20 | ORDER granting in part and denying in part 19 Defendants' Motion for Stay Pending Appeal. See Order for details. Signed by Judge Paul L. Friedman on July 2, 2026. (lccm) (Entered: 07/02/2026) |

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| THE NEW YORK TIMES COMPANY, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DEPARTMENT OF DEFENSE, a/k/a <br> DEPARTMENT OF WAR, *et al.*, <br><br> *Defendants*. | Civil Action No. 26-1690 (PLF) |

## NOTICE OF APPEAL

PLEASE TAKE NOTICE that all Defendants hereby appeal to the United States Court of

Appeals for the District of Columbia Circuit from this Court's June 30, 2026 opinion and order

granting a preliminary injunction (ECF Nos. 16 and 17).


DATED: July 2, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

*/s/ Sarah Welch*
SARAH WELCH
Senior Counsel to the Assistant Attorney General
U.S. Department of Justice
Civil Division
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
(202) 514-3180
sarah.e.welch@usdoj.gov

*Counsel for Defendants*

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE NEW YORK TIMES COMPANY, )
et al., )
                       )
           Plaintiffs, )
                       )
      v. )           Civil Action No. 26-1690 (PLF)
                       )
DEPARTMENT OF DEFENSE, et al., )
                       )
          Defendants. )

## ORDER

For the reasons set forth in the Opinion issued this same day, it is hereby

ORDERED that Plaintiffs' Motion for a Preliminary Injunction [Dkt. No. 6] is

GRANTED; it is

FURTHER ORDERED that Defendants are preliminarily enjoined from

implementing or enforcing the following provisions of the policy pertaining to Pentagon

Facilities Alternate Credentials ("PFACs") that was issued by the Department of Defense on

March 23, 2026 as a revised "Pentagon Reservation In-Brief for Media Members" ("In-Brief")

attached to a Memorandum for Senior Pentagon Leadership entitled "Implementation of Revised

Media In Brief" (collectively, the "Interim Policy") [Dkt. No. 1-1] against Mr. Barnes or any

persons who hold, will hold, or will apply for a PFAC, who are employed by, working on behalf

of, or otherwise associated with The New York Times:

- The escort requirement and related access limitations set forth on pages 2-3 of the

     In-Brief, under the heading "New Media Physical Security Restrictions on the Pentagon

Reservation," to the extent not currently enjoined by New York Times Co. v. Department of Defense ("NYT II"), Civil Action No. 25-04218 (PLF), 2026 WL 962252 (D.D.C. Apr. 9, 2026); and

- The section on pages 4-5 of the In-Brief under the heading "Escort Privileges and Procedures," to the extent not currently enjoined by NYT II. It is

FURTHER ORDERED that Plaintiffs shall post a bond in the amount of $1.00 by July 7, 2026.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 6|30|26

2

9

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| THE NEW YORK TIMES COMPANY, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 26-1690 (PLF) |
| DEPARTMENT OF DEFENSE, et al., | ) ) | |
| Defendants. | ) ) | |

OPINION

This matter represents the third installment in the ongoing dispute between

The New York Times ("The Times") and its journalist Julian E. Barnes, and the Department of

Defense (the "Department") under the leadership of Secretary of Defense Pete Hegseth, over the

latter's attempt to curtail media access to the Pentagon.[1]  This Court previously determined that a

---

[1]    The documents reviewed by the Court in connection with the pending motion include:  Complaint for Declaratory and Injunctive Relief ("Compl.") [Dkt. No. 1] and Exhibits [Dkt. Nos. 1-2 to 1-50]; Memorandum for Senior Pentagon Leadership: Implementation of Revised Media In-Brief ("Interim Policy") [Dkt. No. 1-1]; Plaintiffs' Motion for a Preliminary Injunction [Dkt. No. 6] and Exhibits [Dkt. Nos. 6-1 to 6-22]; Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction ("Mem.") [Dkt. No. 6-1]; Declaration of Theodore J. Boutrous, Jr. ("Boutrous Decl.") [Dkt. No. 6-4]; Declaration of Julian E. Barnes ("Barnes Decl.") [Dkt. No. 6-17]; Declaration of Robert Burns ("Burns Decl.") [Dkt. No. 6-18]; Declaration of Chris Meagher ("Meagher Decl.") [Dkt. No. 6-19]; Declaration of Pete Williams ("Williams Decl.") [Dkt. No. 6-20]; Defendants' Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction ("Opp.") [Dkt. No. 11] and Exhibits [Dkt. Nos. 11-1 to 11-3]; Declaration of Joel Manuel Valdez in Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction ("Valdez Decl.") [Dkt. No. 11-2]; Declaration of Sean Parnell in Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction ("Parnell Decl.") [Dkt. No. 11-3]; Reply Brief in Support of Plaintiffs' Motion for Preliminary Injunction ("Reply") [Dkt. No. 12] and Exhibits [Dkt. Nos. 12-1 to 12-9]; Supplemental Declaration of Theodore J. Boutrous Jr. ("Supp. Boutrous Decl.") [Dkt. No. 12-1]; Supplemental Declaration of Julian E. Barnes ("Supp. Barnes Decl.") [Dkt. No. 12-8]; Declaration of Richard W. Stevenson

press credentialing policy issued by the Department in October 2025 (the "October Policy") violated both the First and Fifth Amendments to the U.S. Constitution.  See N.Y. Times Co. v. Dep't of Def. ("NYT I"), Civil Action No. 25-4218 (PLF), 2026 WL 788689, at *12, *18-19 (D.D.C. Mar. 20, 2026).  The Court vacated and set aside the unconstitutional provisions of the October Policy, and it entered a permanent injunction barring the Department from implementing or enforcing those provisions "to deny, suspend, revoke, or not renew" the press credentials—known as Pentagon Facilities Alternate Credentials or "PFACs"—of any journalist from The Times.  Id. at *20.  It also ordered the immediate reinstatement of the PFACs that Times reporters had long held.  See id.

The next business day, the Department issued another press credentialing policy (the "Interim Policy").[2]  The Interim Policy, among other things, announced that the designated area of the Pentagon from which journalists had long worked—known as the "Correspondents' Corridor"—would be closed effective immediately, meaning that for the first time in decades, journalists would not be permitted to work from Pentagon grounds.  See Interim Policy at 3; Boutrous Decl. at Ex. 2.  In addition, and of particular relevance here, the Interim Policy announced that going forward, credentialed journalists would be prohibited from entering the Pentagon altogether unless specifically invited to attend a press conference or a prearranged interview—and even then, only if escorted by an authorized Department official at all times.  See Interim Policy at 3.

---

("Stevenson Decl.") [Dkt. No. 12-9]; Defendants' Supplemental Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction ("Defs. Supp. Br.") [Dkt. No. 13]; and Supplemental Brief in Support of Plaintiffs' Motion for Preliminary Injunction [Dkt. No. 14].

[2]    The pin cites to the Interim Policy in this opinion correspond to the ECF-generated page numbers of the PDF attached as Exhibit 1 to the Complaint.

The Times quickly moved to compel compliance, arguing that these and other provisions of the Interim Policy flouted the Court's prior opinion and order. After full briefing and a hearing on the plaintiffs' motion, the Court entered an order enjoining the enforcement of the escort requirement and the other challenged provisions of the Interim Policy. See N.Y. Times Co. v. Dep't of Def. ("NYT II"), Civil Action No. 25-4218 (PLF), 2026 WL 962252, at *10-11 (D.D.C. Apr. 9, 2026). The Department then sought and obtained a narrow stay allowing it to implement the Interim Policy's escort requirement while its appeals of this Court's decisions are pending. See N.Y. Times Co. v. U.S. Dep't of Def., No. 26-5113, 2026 WL 1179440, at *1-3 (D.C. Cir. Apr. 27, 2026). In issuing the stay, the D.C. Circuit did not address the lawfulness of the Interim Policy's escort requirement. See id. Instead, a majority of the divided motions panel concluded that the Department was likely to demonstrate that the escort requirement fell outside the scope of this Court's initial merits order, which did not address that requirement. See id. at *3.

In this new lawsuit, the plaintiffs ask the Court to preliminarily enjoin the escort requirement that remains in effect on the grounds that it is retaliatory, unreasonable, and viewpoint discriminatory in violation of the First Amendment and an arbitrary and capricious agency action under the Administrative Procedure Act (the "APA"). See Mem. The Department opposes the plaintiffs' motion. See Opp. The Court held a hearing on the motion on June 12, 2026. Having carefully considered the parties' written submissions, their oral arguments, and the relevant authorities, the Court will grant the plaintiffs' motion for a preliminary injunction.

3

## I. FACTUAL AND PROCEDURAL HISTORY

### A. The Long History of the Media and the Pentagon

For many decades, journalists from news organizations across the country, including reporters with The Times, have covered the United States military and other defense activities from inside the Pentagon.  See NYT I, 2026 WL 788689, at *2; Compl. at Ex. 22; Barnes Decl. ¶ 8; Burns Decl. ¶ 3.[3]  The enduring presence of media members in the Pentagon "has enhanced the ability of journalists and news organizations to keep Americans informed about the U.S. military while posing no security or safety risk to Department property or personnel," as the Department has acknowledged.  NYT I, 2026 WL 788689, at *3.

Credentialed journalists have long enjoyed unescorted access to the Pentagon Press Briefing Room and the corridors linking the many press offices within the building, among other areas.  See Barnes Decl. ¶¶ 8-10; Meagher Decl. ¶ 4; Compl. at Ex. 21.  This access has come with myriad advantages, including that it has allowed reporters to cover official press briefings, even those called on short notice or without notice, and to ask questions of Department officials before, during, and after those briefings.  See Barnes Decl. ¶ 8; Burns Decl. ¶¶ 7-8; Compl. at Ex. 21.  The access also has permitted journalists to have organic semiformal and informal conversations with Department officials and personnel.  See Barnes Decl. ¶ 9; Burns Decl. ¶¶ 9-11.  Journalists from The Times and other media outlets could, for example, "stake out Jim Mattis, a defense secretary in President Trump's first term, when he picked up his clothes at an in-house dry cleaners and have an off-the-record chat as he walked back to his office, shirts slung over his shoulder" or "might bump into the chairman of the Joint Chiefs of

---

[3]   The facts set forth in NYT I were undisputed.  See NYT I, 2026 WL 788689, at *2 n.2.

4

Staff at a Pentagon Starbucks and have a conversation that could turn into a story."  Compl. at

Ex. 21, Maureen Dowd, Opinion, Fraidy-Cat at the Pentagon, N.Y. TIMES (Oct. 18, 2025).  In

addition, beginning in the 1970s, the Department provided reporters with dedicated office space

in the Pentagon—known as the Correspondents' Corridor—where reporters could maintain desks

and network booths.  See Boutrous Decl. at Ex. 2; Williams Decl. ¶ 19; Burns Decl. ¶ 5.

To understand the historical ability of journalists to move through the Pentagon

unescorted, it is helpful to have some context.  The Pentagon is the world's second largest office

building, with about six-and-a-half million square feet of floor space.  Claudette Roulo, 10

Things You Probably Didn't Know About the Pentagon, U.S. DEP'T OF WAR (Apr. 16, 2024),

https://perma.cc/N9GU-ZWDA.  It "includes areas that resemble a mall and are often crowded

with visitors and non-military employees."  Barnes Decl. ¶ 10.  "For example, there is a food

court, a pharmacy, a sit-down restaurant, a bank, a dry cleaner, and a chocolate shop in the

Pentagon."  Id.  The Pentagon has long been staffed by a thousand or more non-Department

employees, including cleaning and maintenance professionals, contractors, consultants,

representatives of other government agencies, and retail and cafeteria workers, who move around

areas of the building unescorted every day.  See Boutrous Decl. at Ex. 3; Meagher Decl. ¶ 5.  In

short, the Pentagon is not an "all-classified military command post."  Burns Decl. ¶ 14.

### B. The Recent History of the Media and the Pentagon

Pete Hegseth was confirmed as Secretary of Defense on January 24, 2025.  See

NYT I, 2026 WL 788689, at *2.  "Before and during Secretary Hegseth's confirmation process,

news outlets, including The Times, reported extensively on his background, including allegations

of past sexual assault, excessive drinking, and marital infidelity, as well as questions about his

lack of relevant experience."  Id.  Secretary Hegseth and other Department officials "have

5

complained openly about reporting that they perceive as unfavorable to them and the Department." Id.  Following Secretary Hegseth's confirmation, the Department began taking unprecedented actions with respect to journalists covering the Department and its leadership. Just weeks after the confirmation, for example, the Department announced that it would be requiring several news outlets—specifically, The Times, NBC News, Politico, National Public Radio, CNN, The Hill, and The War Zone—to leave their dedicated workspaces in the Pentagon as part of a new "rotation" system.  Compl. at Ex. 37; see also id. at Ex. 29 (describing Secretary Hegseth's "use of polygraph tests to search for people leaking information to the news media").

In March 2025, the editor-in-chief of The Atlantic reported that Secretary Hegseth and other top officials had inadvertently included him in a group chat on the messaging platform Signal in which officials disclosed details regarding imminent U.S. airstrikes in Yemen.  See Boutrous Decl. at Ex. 4.  That same month, a journalist with The Times reported that Secretary Hegseth also had shared details about U.S. plans to strike Yemen in a second private Signal group chat that included Defendant Timothy Parlatore, a Senior Advisor to Secretary Hegseth, as well as Secretary Hegseth's wife and brother.  See Compl. at Exs. 31, 33.  Following this reporting, Defendant Sean Parnell, the Assistant to the Secretary of Defense for Public Affairs, called The Times "garbage," and Secretary Hegseth accused The Times of "slashing and burning people to ruin their reputations."  Id. at Ex. 33, 36.  Both Mr. Parnell and Secretary Hegseth specifically criticized The Times' choice of sources for its reporting, including the use of anonymous sources.  See id.  Other officials made similar remarks in response to reporting on the Department, such as referring to journalists as "scum" and calling for their "severe punishment." Id. at Exs. 27, 28; see also NYT I, 2026 WL 788689, at *13.

*C. The October Policy and The New Pentagon Press Corps*

In May 2025, the Department issued a memorandum entitled "Updated Physical Control Measures for Press/Media Access Within the Pentagon," which outlined new restrictions on journalists' physical access to specific areas within the building. See Compl. at Ex. 39. The Department did not identify any breach of physical security or other incident necessitating these new restrictions, instead explaining that the "updated security measures" were "needed to reduce the opportunities for in-person inadvertent and unauthorized disclosures." Id.; see NYT I, 2026 WL 788689, *3-4. Four months later, in September 2025, the Department issued a memorandum entitled "Implementation of New Media In-brief," which purported to implement the "Updated Physical Control Measures" (the "September Policy"). See Compl. at Ex. 4. The September Policy stated that "[a]ll members of the press issued a [PFAC] w[ould] be required to read and sign a new in-brief form outlining information security requirements, the new physical control measures, and [Department] expectations of their compliance with safety and security requirements." Id. It further provided that a journalist's credentials could be "denied, revoked or not renewed" if the journalist was "reasonably determined to pose a security or safety risk to [Department] personnel or property" and that such a determination could be "based on the unauthorized access, attempted unauthorized access, or unauthorized disclosure of" Department information. Id. The Times and other news outlets objected to the September Policy as incompatible with the First Amendment and the responsibilities of the press, and they advised the Department that their journalists could not sign it. See NYT I, 2026 WL 788689, at *5.

Despite those objections, in October 2025, the Department issued a substantially similar final policy. See Compl. at Ex. 3. The October Policy reiterated the Department's view that "access [to the Pentagon] is a privilege subject to the discretion of government authorities."

7

Id.  The October Policy provided that a PFAC "may be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to [Department] personnel or property," and that "[s]uch determination may be based on factors including, but not limited to, the unauthorized access, attempted unauthorized access, or unauthorized disclosure of" Department information "based on a reasonable assessment informed by the unique facts and circumstances of each case."  Id.  Specifically, the October Policy stated that if a journalist "solicit[s] the disclosure of such information or otherwise encourage[s] [Department] personnel to violate laws and policies concerning the disclosure of such information," the Department may deem the journalist a "security or safety risk."  Compl. at Ex. 3.  The October Policy provided that "solicitation" in violation of the policy "may include direct communications with specific [Department] personnel or general appeals, such as public advertisements or calls for tips," and it cited "an advertisement or social media post by an individual journalist or media outlet that directly targets [Department] personnel to disclose non-public information without proper authorization" as an "example" of what "would constitute a solicitation that could lead to revocation" of a PFAC.  Id.  Such "non-public information," according to the October Policy, "may include, but is not limited to, information protected by the Privacy Act, information that is law enforcement-sensitive, and certain operational security information."  Id.

In addition, the October Policy included an "Acknowledgment" for journalists to sign, requiring them to affirm that they "received, read, and understand" the policy.  Compl. at Ex. 3.  Most journalists who held PFACs when the October Policy was issued, including those from The Times, The Wall Street Journal, The Washington Post, CNN, and Fox News, refused to sign the Acknowledgment.  See NYT I, 2026 WL 788689, at *6, *14.  As a result, the journalists were required to hand in their PFACs.  See id. at *6.

Within days of the enactment of the October Policy, Mr. Parnell took to his official X account to "announce the next generation of the Pentagon press corps." Compl. at Ex. 19. New PFAC recipients included the National Pulse, which was described by its editor-in-chief as "an industry mag/site for MAGA world"; Laura Loomer, an "influential pro-Trump activist"; and former congressman Matt Gaetz, President Trump's one-time choice for Attorney General of the United States, who is now affiliated with One America News. Compl. at Exs. 11, 15. Many new recipients had expressed ideological agreement with and support for the Trump administration or indicated that they did not intend to report critically on the Pentagon. See id. at Ex. 15; NYT I, 2026 WL 788689, at *6. For example, Libby Emmons, the editor-in-chief of Human Events and The Post Millennial who requested four passes for her staff after "receiv[ing] an unsolicited invitation to apply for credentials," stated that "[t]here should be a place for reporting on what they are doing without always trying to expose the dark underbelly." Compl. at Ex. 15. Tim Pool, whose outlet, Timcast Media, also received a credential, explained that his is "not an investigative news organization" and that he did "not intend to maintain a significant presence in the Pentagon." Id. Mr. Parnell described these "[n]ew media outlets" willing to sign onto the October Policy as those who "circumvent the lies of the mainstream media and get real news to the American people." Id. at Ex. 19. He also wrote that those outlets' "reach and impact collectively are far more effective and balanced than the self-righteous media who chose to self-deport from the Pentagon." Id.

### D. The Challenge to the October Policy

On December 4, 2025, The Times and Mr. Barnes filed suit to challenge certain provisions of the October Policy. See Complaint, NYT v. Dep't of Def., Civil Action No. 25-4218-PLF (Dec. 4, 2025), Dkt. No. 1. The parties filed and briefed cross-motions for

9

summary judgment, and the Court held a hearing on March 6, 2026.  On March 20, 2026, the Court granted the plaintiffs' motion for summary judgment and denied the Department's cross-motion.  See NYT I, 2026 WL 788689, at *2.  The Court held that the challenged provisions of the October Policy violated the First and Fifth Amendments.  On the plaintiffs' challenge under the Fifth Amendment, the Court concluded that the October Policy was so vague and standardless as to violate the Due Process Clause.  See id. at *8-12.  On the plaintiffs' challenge under the First Amendment, the Court concluded that the October Policy was both unreasonable and viewpoint discriminatory.  See id. at *13-17.  The latter conclusion rested on the "voluminous" and "undisputed" record evidence, which "reflect[ed] the [October] Policy's true purpose and practical effect: to weed out disfavored journalists—those who were not, in the Department's view, 'on board and willing to serve'—and replace them with news entities that are."  Id. (citation omitted).

In considering the appropriate remedy, the Court determined, based on the Department's express concession, that "[t]he regular presence of PFAC holders at the Pentagon . . . pos[es] no security or safety risk to Department property or personnel." NYT I, 2026 WL 788689, at *5.  The Court flatly rejected the Department's assertion that vacatur of the October Policy's unlawful provisions "would 'compromise the safety of the Pentagon,'" concluding that the assertion was "unfounded."  Id. at *18.  The Court therefore vacated the unconstitutional provisions of the October Policy as to all regulated parties, enjoined the Department from enforcing those provisions against the plaintiffs, and ordered the Department to immediately reinstate PFACs to Mr. Barnes and the six other Times journalists who held credentials prior to the October Policy's adoption.  See id. at *19-20.

10

*E. The Interim Policy*

On Monday, March 23, 2026—the next business day after the Court issued its opinion and order vacating and enjoining the enforcement of the October Policy—the Department announced the Interim Policy. See Interim Policy; NYT II, 2026 WL 962252, at *1-2. In an email to counsel for The Times, Mr. Parlatore provided a copy of that "revised policy," which consists of a "Pentagon Reservation In-Brief for Media Members" (the "In-Brief"), an accompanying "Memorandum for Senior Pentagon Leadership" from Mr. Parnell (the "Memorandum"), and an Appendix. See Interim Policy; Compl. at Ex. 2. The Memorandum states that the Department "disagrees with the Court's decision and is pursuing an appeal," but "[i]n the interim," the Interim Policy will be in effect to "preserv[e] the Department's legitimate security interests and its statutory obligation to ensure the safe, efficient, and secure operation of the Pentagon Reservation." Interim Policy at 2. The Memorandum further states that the Interim Policy "addresses the provisions the Court vacated while retaining all physical access restrictions, conduct requirements, and security measures that were not at issue in the litigation." Id. In addition, the Memorandum asserts that "[t]he Court characterized the original Policy's provisions in ways the Department believes were inaccurate" and that the Interim Policy "includes targeted clarifications to correct these mischaracterizations." Id.

The Interim Policy, in pertinent part, provides that going forward, "PFACs may be denied, revoked, or not renewed if a person meets any of the criteria set forth in Appendix A." Interim Policy at 10. Appendix A outlines certain "[c]onduct-[b]ased [g]rounds" to deny or revoke a PFAC, including that the holder engaged in the "intentional inducement of unauthorized disclosure" of nonpublic information. Id. at 14. The Interim Policy made clear that "[t]o correct the Court's mischaracterization" of the October Policy in its merits opinion, "the Department has

11

replaced the term 'solicitation' with 'intentional inducement of unauthorized disclosure.'" Id.  In an interview with The Times shortly after the Interim Policy's issuance, Mr. Parlatore confirmed that the Interim Policy "us[es] more words to say the same thing" as the October Policy had said. NYT II, 2026 WL 962252, at *5.

In addition, the Interim Policy provides that "[e]ffective immediately, the Correspondents' Corridor is closed" and that "[a] new press workspace . . . in an annex facility outside the Pentagon . . . will be available when ready."  Interim Policy at 3.  It does not, however, indicate when that space will be ready.  See id.  The Interim Policy further provides that moving forward, PFAC holders will be able to access the Pentagon only "for scheduled press briefings, press conferences, and interviews arranged through public affairs offices" and only if they are "escort[ed] by authorized [Department] personnel at all times."  Id.  Pursuant to the Interim Policy, "all journalist access to the Pentagon will require [an] escort," and "[w]hen in the Pentagon," PFAC holders "must remain with [their] escort at all times."  Id. at 3, 7.  No more than "three visiting media members from the same media outlet" may obtain "escort privileges." Id. at 8-9.  The Interim Policy provides that the reason for the new escort requirement is that "following the Court's vacatur of the [October] Policy's security screening provisions, the Department determined that unescorted access to the Pentagon cannot be responsibly maintained without the ability to screen PFAC holders for security risks."  Id.

*F. The Challenge to the Interim Policy*

On March 24, 2026, the plaintiffs moved the Court to compel the Department to comply with its merits order vacating and enjoining the enforcement of certain provisions of the October Policy.  See Motion to Compel Compliance, N.Y. Times Co. v. Dep't of Def., Civil Action No. 25-4218-PLF (Mar. 24, 2026), Dkt. No. 37.  The Court held a hearing on

March 30, 2026, and it granted the plaintiffs' motion on April 9, 2026. See NYT II, 2026 WL 962252, at *2. The Court determined that the Department's effort to "cut off all PFAC holders' meaningful access" to the Pentagon was a "transparent" attempt to circumvent the Court's order requiring "the Department to restore the plaintiffs' access to the Pentagon." Id. at *8-9 (emphasis omitted). The Court rejected the "justification offered by the Department for this sudden change—that the Court's order had removed all security screening authority—as "nonsense." Id. at *7. The Court enjoined the Department from enforcing the Interim Policy against The Times's journalists and ordered that Mr. Barnes and the other Times reporters be allowed "to access the Pentagon in a manner commensurate with the access provided to PFAC holders on March 20, 2026, following" the Court's merits order. Id. at *11.

The Department appealed the Court's March 20 and April 9, 2026 orders, and it sought a limited stay pending appeal to allow it to implement only the escort requirement of the Interim Policy. See Emergency Motion for Stay Pending Appeal, N.Y. Times Co. v. Dep't of Def., No. 26-5113 (D.C. Cir. Apr. 13, 2026). A divided motions panel of the D.C. Circuit granted that stay request, concluding that the Department was likely to succeed in demonstrating that the escort requirement was not within the scope of this Court's original merits order and thus could not be enjoined through a motion to enforce that order. See N.Y. Times Co. v. U.S. Dep't of Def., 2026 WL 1179440, at *3 (D.C. Cir. Apr. 27, 2026). The panel emphasized that it was not addressing the lawfulness of the Interim Policy on the merits, explaining that "because the challenge to the Interim PFAC Policy was presented in a motion to compel compliance," this Court did not have the opportunity to determine whether "the escort requirement independently violates the First or Fifth Amendment." Id.

13

### G. The Current Status of the Media and the Pentagon

In the weeks since the plaintiffs moved to compel compliance with this Court's merits order, the vitriolic statements by Department officials toward the media have continued. For example, in April 2026, in a statement directed to the "American media" while addressing the ongoing war in Iran, Secretary Hegseth referred to the "endless stream of garbage" and "the relentlessly negative coverage that [journalists] just can't help peddling," stating that "sometimes it's hard to figure out what side some of [the journalists] are actually on." Compl. at Ex. 9. He continued to compare the "legacy Trump-hating press" to the biblical "Pharisees" who "held counsel against [Jesus]" and "scrutinized every good act in order to find a violation, only looking for the negative," and he asserted that the journalists' "hardened hearts . . . are calibrated only to impugn." Id. That same month, Secretary Hegseth referred to The Times's reporting as "incredibly problematic" and "incredibly irresponsible and unpatriotic." Id. at Ex. 8. In May 2026, President Trump responded to a question from a Times reporter about the war in Iran by stating: "We've had a total victory, except by people like you that don't write the truth. . . . I actually think it's sort of treasonous what you write. But you at The New York Times and CNN, I would say are the worst." Boutrous Decl. at Ex. 5.

In June 2026, when asked by a reporter about a proposed $1.8 billion "weaponization fund," President Trump responded by stating that "the fake news like CNN [and] like The New York Times" have "abused our people so badly," telling the reporter, "You should be ashamed of yourself." Supp. Boutrous Decl. at Ex. 5. In an interview that aired that same month, President Trump told a reporter from NBC's "Meet the Press" that she was either "crooked" or "stupid," continuing, "You ought to straighten out your press." NBC News, Trump Says 'I'd Pay' Anti-Weaponization Fund Applicants 'the Kind of Money They Deserve',

14

(YouTube, June 7, 2026), https://perma.cc/79NS-BA3G.  Later that month, Secretary Hegseth

accused a journalist with CBS of "peddl[ing]" a "manufactured story" and "trying to put words

in [his] mouth . . . to create a headline."  Transcript: Defense Secretary Pete Hegseth on "Face

the Nation with Margaret Brennan," June 14, 2026, CBS NEWS, https://perma.cc/4UUT-HNSB.

### H. The Challenge to the Escort Policy

On May 18, 2026, the plaintiffs filed a new lawsuit to challenge the Interim

Policy's prohibition on unescorted access to the Pentagon, which is currently in effect and being

implemented by the Department.  See Compl.  On May 22, 2026, the plaintiffs moved for

preliminary injunctive relief, arguing that they are likely to show that the escort requirement

violates the First Amendment and the APA and that the remaining preliminary injunction factors

weigh in their favor.  See Mot.  The plaintiffs' motion has been fully briefed and argued, and it is

ripe for decision.

### II. LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to

succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary

relief, that the balance of equities tips in his favor, and that an injunction is in the public

interest."  Winter v. Nat'l Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).  The balance of equities

and public interest factors merge when the government is a party.  See Nken v. Holder, 556

U.S. 418, 435 (2009).

## III. DISCUSSION

### A. The Plaintiffs Have Shown a Likelihood of Success on the Merits

The Court begins with the "most important" preliminary injunction factor: whether the plaintiffs "have established a likelihood of success on the merits." Aamer v. Obama, 742 F.3d 1023, 1038 (D.C. Cir. 2014); see Bailey v. Fed. Bureau of Prisons, Civil Action No. 24-1219 (PLF), 2024 WL 3219207, at *3 (D.D.C. June 28, 2024). "In First Amendment cases, the likelihood of success will often be the determinative factor." Media Matters for Am. v. Paxton, 138 F.4th 563, 584 (D.C. Cir. 2025) (quoting Green v. U.S. Dep't of Just., 54 F.4th 738, 745 (D.C. Cir. 2022)).

The plaintiffs contend that they are likely to establish that the Interim Policy's escort requirement violates the First Amendment twice over: because it was issued to retaliate against the plaintiffs for exercising their constitutional rights, and because it is an unreasonable and viewpoint discriminatory restriction on access to a nonpublic forum. See Mem. at 24-36. They also argue that they are likely to establish that the escort requirement is arbitrary and capricious in violation of the APA. Because the Court determines that the plaintiffs have shown that they are likely to succeed on their retaliation claim, the Court will not reach the plaintiffs' alternative arguments. See Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs. ("Am. Acad."), 816 F. Supp. 3d 27, 60 n.12 (D.D.C. 2026) (taking the same approach).

To prevail on the merits of their First Amendment retaliation claim, the plaintiffs must prove that "(1) [they] engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in [their] position from speaking again; and (3) a causal link between the exercise of a constitutional right

16

and the adverse action taken against" them.  Media Matters for Am. v. Paxton, 138 F.4th at 584 (alterations in original) (quoting Aref v. Lynch, 833 F.3d 242, 258 (D.C. Cir. 2016)).

### 1. Protected Speech

On the first element, the Department wisely does not dispute that the plaintiffs have engaged in activity protected under the First Amendment.  The plaintiffs' "reporting on public issues [is] [a] quintessential First Amendment activit[y]."  Media Matters for Am. v. Paxton, 138 F.4th at 584; see N.Y. Times Co. v. Sullivan, 376 U.S. 254, 269 (1964) ("The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions.").  And their lawsuit challenging the October Policy, too, "is a form of expression protected by the First Amendment."  In re Halkin, 598 F.2d 176, 187 (D.C. Cir. 1979), overruled on other grounds by Seattle Times Co. v. Rhinehart, 467 U.S. 20, 29-33 (1984); see Jenner & Block LLP v. U.S. Dep't of Just., 784 F. Supp. 3d 76, 94 (D.D.C. 2025) (explaining that "courtroom advocacy on behalf of [one's] chosen causes . . . is [at] the very core of the First Amendment's protection of 'litigation as a vehicle for effective political expression and association'" (quoting In re Primus, 436 U.S. 412, 431 (1978))).  The plaintiffs thus undoubtedly will succeed in establishing the first element of their retaliation claim.

### 2. Adverse Action Sufficient to Deter

Turning to the second element, the plaintiffs have demonstrated that the imposition of the escort requirement is an adverse action that would chill a speaker of "ordinary firmness."  Media Matters for Am. v. Paxton, 138 F.4th at 584.  This "bar is not a high one."  Jenner & Block LLP v. U.S. Dep't of Just., 784 F. Supp. 3d at 95 n.7.  "[E]ven minor forms of

17

retaliation can support a First Amendment claim, for they may have just as much of a chilling effect on speech as more drastic measures." Sanders v. District of Columbia, 85 F. Supp. 3d 523, 535 (D.D.C. 2015) (alteration in original) (quoting Smith v. Fruin, 28 F.3d 646, 649 n.3 (7th Cir. 1994)); see also Tao v. Freeh, 27 F.3d 635, 639 (D.C. Cir. 1994) (observing that the First Amendment protects against "even an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . when intended to punish her for exercising her free speech rights" (quoting Rutan v. Republican Party of Ill., 497 U.S. 62, 76 n.8 (1990))). Of course, the Department's actions here are far from trivial. This Court determined in the context of the plaintiffs' motion to compel that the abrupt closure of the Correspondents' Corridor and elimination of unescorted access to the Pentagon for credentialed journalists substantially encumber the ability of those journalists to do their jobs. See NYT II, 2026 WL 962252, at *8-9; see also N.Y. Times Co. v. U.S. Dep't of Def., 2026 WL 1179440, at *6 (Childs, J., dissenting) ("Reporters can hardly verify sources, gather information, or speak candidly with Department personnel with an escort looming over their shoulders.").

The evidence presented in this litigation amply supports the same conclusion, thereby establishing that the escort requirement is an adverse action that "would deter persons of ordinary firmness from exercising their First Amendment rights." Media Matters for Am. v. Paxton, 138 F.4th at 581. Mr. Barnes testified, for example, that before the escort requirement, "reporting from the Pentagon often necessitated speaking to upwards of a dozen officials and other personnel from different press offices in a given day, sometimes in response to rapidly developing events." Barnes Decl. ¶ 9. The "most helpful conversations with Public Affairs staff," in Mr. Barnes' experience, "cannot be planned or scheduled in advance" and "vary depending on which staff are present or available to speak, what the latest news is, or what

18

information was shared in an immediately preceding conversation." Id. Prior to the escort requirement, Mr. Barnes was "able to walk from press office to press office throughout the day" to gather newsworthy information, and doing so was "integral to [his] reporting about the Department, national security, and United States intelligence agencies." Id. ¶¶ 11, 29. Mr. Barnes testified: "Those conversations strengthened my reporting by giving me more context and often a more nuanced understanding of the issues; those conversations also helped me to understand and incorporate the U.S. military's perspective in my reporting." Supp. Barnes Decl. ¶ 5. Robert Burns, a veteran reporter with The Associated Press, similarly testified that reporting from within the Pentagon gave him opportunities for "semi-formal" and "informal interactions" with Department officials. Burns Decl. ¶¶ 10-11. For example, Mr. Burns testified that "Secretary Donald Rumsfeld would invite reporters into his office on weekend mornings for wide-ranging, off-the-record discussions" separate from any scheduled press briefings or interviews. Id. ¶ 10. These sorts of less formal interactions "proved invaluable" to Mr. Burns' reporting. Id. ¶ 11.

Former Assistant Secretary of Defense for Public Affairs Chris Meagher testified that when he worked for the Department, "[r]eporters would visit the desks of different press operations officers, depending on what questions the reporters had or the topics they wanted to discuss," and they "frequently visited" the various "public affairs offices as part of their work." Meagher Decl. ¶¶ 7-8. "[D]oing so required that [the journalists] be able to move through hallways in the Pentagon unescorted" because the "offices and staff were located throughout the Pentagon building . . . in different wings and on different floors." Id. ¶ 8. Mr. Meagher testified that "regular, informal interactions between Defense Department staff and reporters [were] mutually beneficial" because they allowed staff to "correct misunderstandings early in the

19

reporting process and anticipate stories that might be controversial for the Department." Id. ¶ 12. These regular interactions also allowed staff to "build relationships with reporters that were built on trust and rapport." Id. In Mr. Meagher's experience, that relationship-building "was important because it helped give reporters confidence that the information [the Department was] providing was accurate and gave them opportunities to confirm and verify the accuracy of the information." Id. Former Assistant Secretary of Defense for Public Affairs Pete Williams similarly testified that the "regular presence of reporters in the Pentagon" was advantageous because it "helped develop respect and trust between those reporters and Department officials." Williams Decl. ¶ 8.

Now, by contrast, the default is that reporters are not present within the Pentagon. Mr. Barnes and other reporters must make "separate appointment[s]" and obtain escorts for "each separate conversation" with public affairs staff. Barnes Decl. ¶ 24. Once the scheduled appointment is completed, the reporter is escorted out of the building and is not permitted to speak with any other officials or visit any other offices. Id. ¶ 29. In other words, there are no longer opportunities for the semiformal or informal interactions that reporters and former Department officials alike testified were critical. Moreover, the escort requirement, in Mr. Barnes' estimation, leads to reporters spending "hours of [the] day just waiting and walking back and forth" between the Pentagon and the off-grounds library from which they are now expected to work. Id. ¶ 29. Mr. Barnes testified that "[t]his is time-consuming and burdensome, and it has substantially reduced [his] amount of interaction with staff from the Public Affairs Offices." Id. ¶ 24. He elaborated: "Going through a sometimes-lengthy process of scheduling official appointments in order to ask even one or two questions to an official—even assuming that request is granted and that official does not have to reschedule—does not allow for

20

meaningful engagement with Department personnel on a timeline consistent with news reporting." Id. ¶ 29.  In Mr. Barnes' view, "[w]ith the escort requirement in place, going to the Pentagon is rarely worthwhile."  Supp. Barnes Decl. ¶ 7.  Mr. Barnes testified that "[i]f not for the escort requirement, [he] would go to the Pentagon more frequently, just as [he] did before October 2025."  Id.

This testimony of the ways in which "[t]he escort requirement has made it exceedingly challenging to speak with press officials and other personnel in person, and to otherwise cover the Department and the U.S. military from Pentagon grounds," Barnes Decl. ¶ 25, surely clears the "relatively modest" bar to constitute adverse action that would deter persons of ordinary firmness from exercising their First Amendment rights.  Endocrine Soc'y v. Fed. Trade Comm'n, Civil Action No. 26-512 (JEB), 2026 WL 1257289, at *10 (D.D.C. May 7, 2026); see Jenner & Block LLP v. U.S. Dep't of Just., 784 F. Supp. 3d at 95 n.7.  This evidence largely goes unaddressed by the Department.  In response to the plaintiffs' evidence, the Department points to testimony from Acting Press Secretary Joel Manuel Valdez that since the imposition of the escort requirement, sixty reporters have accessed the Pentagon to attend media events, and "no PFAC holder has been unable to enter the Pentagon because of an inability to arrange an escort."  Valdez Decl. ¶ 6.  But the plaintiffs' point is not that the work of journalists has been hindered because escorts have not been made available when requested.  Rather, the plaintiffs maintain that their ability to interview varied sources from across the Department, engage in spontaneous conversations, and develop relationships with sources—which the record evidence demonstrates are essential aspects of covering the Pentagon—is inescapably burdened

by the requirement to obtain, in advance, an escort for each and every visit to the Pentagon.[4]

These consequences of the escort requirement are not ones that ordinary people would "lightly

disregard." Endocrine Soc'y v. Fed. Trade Comm'n, 2026 WL 1257289, at *10 (quoting First

Choice Women's Res. Ctrs., Inc. v. Davenport, 146 S. Ct. 1114, 1127 (2026)); see also Am.

Acad., 816 F. Supp. 3d at 53. The plaintiffs therefore are likely to prevail on the second prong of

their retaliation claim.[5]

### 3. Causal Link

On the third element, the plaintiffs have marshaled compelling evidence

connecting the imposition of the escort requirement to their protected speech. The D.C. Circuit

has explained in the context of First Amendment retaliation that circumstantial evidence "is

equally as probative as direct evidence in proving illegitimate intent." Media Matters for Am. v.

Fed. Trade Comm'n ("FTC"), No. 25-5302, 2025 WL 2988966, at *8 (D.C. Cir. Oct. 23, 2025)

(per curiam) (quoting Bailey v. Ramos, 125 F.4th 667, 685 (5th Cir. 2025)). "[S]uch

circumstantial evidence, including proximity in time between the protected speech and

---

[4]    Mr. Valdez testified that since the Interim Policy was implemented, journalists from "[o]utlets including The Associated Press, CNN, The Daily Mail, The Washington Post, The Wall Street Journal, and CBS News have requested PFACs and were approved but have yet to pick up their badges from the Pentagon." Valdez Decl. ¶ 3. As the plaintiffs point out, however, the logical implication of Mr. Valdez's testimony is that those outlets, whose journalists used to regularly report from the Pentagon, no longer believe the PFACs to have much value. See Reply at 23.

[5]    The Department repeatedly cites the D.C. Circuit's decision in Flynt v. Rumsfeld, 355 F.3d 697, 703 (D.C. Cir. 2004) for the proposition that "[t]he First Amendment does not require that the government make a reporter's job easier or better." Opp. at 14; see also id. at 12; Defs. Supp. Br. at 7. That case, however, says nothing of the plaintiffs' likelihood of success on the second element of their retaliation claim. To satisfy that element, the plaintiffs must show only that the Department's action is onerous enough to chill a speaker of ordinary firmness—not that the Department's action itself violates the First Amendment. See Media Matters for Am. v. Paxton, 138 F.4th at 584. The plaintiffs have established that they are likely to succeed in making that showing.

22

government's adverse actions, the defendant's expression of hostility to the protected speech, and the absence of a proffered legitimate alternative explanation for the action can support a finding that protected speech caused the agency's response." Id.

The plaintiffs' evidence of retaliatory motive includes myriad statements by Department officials expressing disdain for reporting by The Times and other "legacy" media outlets. See FTC, 2025 WL 2988966, at *8; see also Nat'l Treasury Emps. Union v. Trump, 780 F. Supp. 3d 237, 255 (D.D.C. 2025) (considering "contemporaneous statements" as evincing the government's "retaliatory motive"); Am. Acad., 816 F. Supp. 3d at 57 (considering "negative . . . public statements against [the plaintiff] by [agency] officials" as probative of causation). The Department protests that many of the statements the plaintiffs identify were made before the October Policy was issued and thus are too "remote in time" to "contaminate" the Interim Policy. Opp. at 22. Perhaps that argument would have some force if the Department officials' hostile statements ceased after, or even were interrupted by, the issuance of the October Policy. What the plaintiffs' evidence shows, however, is a consistent stream of derisive comments beginning shortly after the confirmation of Secretary Hegseth and continuing through the present.

As early as March 2025, for example, Mr. Parnell referred to The Times as "a propaganda machine" and stated that "[t]he days of the Pentagon just allowing these fake narratives to spread is over." Compl. at Ex. 36. Following reporting on Secretary Hegseth's improper use of Signal in May 2025, Mr. Parnell called The Times "garbage," and Secretary Hegseth accused The Times of "slashing and burning people to ruin their reputations." Id. at Exs. 33, 36; see also supra Section I.B (describing similar statements). Immediately after the October Policy was enacted, Mr. Parnell referred to the "lies" of the "self-righteous media who chose to self-deport from the Pentagon." Id. at Ex. 19; see also NYT I, 2026 WL 788689, at 6-7.

23

More recently, as described above, Secretary Hegseth referred to the "endless stream of garbage" and "the relentlessly negative coverage that [journalists] just can't help peddling" and compared the "legacy Trump-hating press" to the biblical "Pharisees" who "held counsel against [Jesus]" and "scrutinized every good act in order to find a violation, only looking for the negative." Compl. at Ex. 9; see also id. at Ex. 8 (Secretary Hegseth calling The Times' reporting "incredibly irresponsible and unpatriotic"); Boutrous Decl. at Ex. 5 (President Trump responding to a question from a Times reporter about the war in Iran by stating: "We've had a total victory, except by people like you that don't write the truth. . . .  I actually think it's sort of treasonous what you write.  But you at The New York Times and CNN, I would say are the worst.").

The Department's attempt to dismiss these statements as innocuous expressions of the officials' "opinions about how [the plaintiffs'] reporting itself might harm national security and whether the reporting is accurate," Opp. at 23, falls flat.  The Department officials' rhetoric demonstrates that they harbored animosity for the plaintiffs because of their protected speech—in Secretary Hegseth's words, their "relentlessly negative coverage" of the Department.  Compl. at Ex. 9.  This rhetoric therefore is powerful evidence of the Department's retaliatory motive. See Am. Acad., 816 F. Supp. 3d at 57; see also Endocrine Soc'y v. Fed. Trade Comm'n, 2026 WL 1257289, at *12 (finding "the [g]overnment's 'expression of hostility' regarding 'the protected speech'" to be "robust circumstantial evidence that retaliation motivated the [government's] actions" (quoting Am. Acad., 816 F. Supp. 3d at 54)).

To establish First Amendment retaliation, however, it is not enough for the plaintiffs to show that retaliation was a motive for the adverse action.  The Department's "improper motive must be a but-for cause of [its] action, 'meaning that the adverse action against the plaintiff[s] would not have been taken absent the retaliatory motive.'"  Comm. on Ways &

Means, U.S. House of Reps. v. U.S. Dep't of Treasury, 45 F.4th 324, 340 (D.C. Cir. 2022) (quoting Nieves v. Bartlett, 587 U.S. 391, 399 (2019)).  "[E]ven if there was retaliatory motive," causation is not established if the government is "able to show that it would have [taken the same action] on nonretaliatory grounds anyway."  FTC, 2025 WL 2988966, at *9; see Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).

The Department has proffered a supposed nonretaliatory explanation for imposing the escort requirement through a declaration submitted by Mr. Parnell.  See Parnell Decl. Mr. Parnell testified that he was told by Pentagon Press Secretary Kingsley Wilson that before the issuance of the October Policy, her office "was contacted by journalists on a regular basis . . . regarding information they obtained that was sensitive or classified, including information relating to operational plans, intelligence assessments, diplomatic communications, and force posture decisions."  Id. ¶ 4.  "Following the implementation of the [October] Policy," however, "the frequency with which the Pentagon press office was contacted by journalists regarding sensitive, controlled or classified information dropped dramatically."  Id. ¶ 8.  Mr. Parnell determined that "this reduction [in contacts] occurred primarily because many journalists no longer maintained a persistent, unescorted presence near sensitive spaces in the Pentagon," which previously had enabled them to "observe activity patterns" and identify potential sources of sensitive information.  Id. ¶¶ 6, 9.  He thus concluded that "restoring unescorted access to the Pentagon for PFAC holders would result in a return to the same pattern of regular breaches of information security that . . . unescorted access had previously permitted."  Id. ¶ 11.  He explained: "I reached this conclusion after the Court rejected the October Policy's attempt to permit PFAC holders to access portions of the Pentagon without an escort, subject to a requirement that PFAC holders not intentionally induce unauthorized disclosures."  Id. ¶ 12.

25

This "activity patterns" rationale immediately raises suspicions for the simple reason that it is conspicuously absent from the Interim Policy itself, and from the Department's briefing on the plaintiffs' motion to compel compliance with this Court's merits order, including the declarations submitted in opposition to that motion. See Interim Policy; Defendants' Opposition to Plaintiffs' Motion to Compel Compliance with the Court's Order, N.Y. Times v. Dep't of Def., Civil Action No. 25-4218 (D.D.C. Apr. 10, 2026), Dkt. No. 41. The Interim Policy provides the following as the justification for the escort requirement: "In assessing the Department's security posture following the Court's vacatur of the [October] Policy's security screening provisions, the Department determined that unescorted access to the Pentagon cannot be responsibly maintained without the ability to screen PFAC holders for security risks." Interim Policy at 3. In granting the plaintiffs' motion to compel compliance, the Court dismissed that explanation as baseless because, in fact, "the Court did not 'remove' or 'excise' the Department's authority to screen PFAC holders." NYT II, 2026 WL 962252, at *7. Only then, in seeking a partial stay of the Court's compliance order pending appeal, did the Department offer the "activity patterns" rationale through a declaration from Ms. Wilson. See Declaration of Kingsley Wilson in Support of Defendants' Emergency Motion for Stay Pending Appeal ("Wilson Decl."), N.Y. Times v. Dep't of Def., Civil Action No. 25-4218 (D.D.C. Apr. 10, 2026), Dkt. No. 58-1.[6]

---

[6] In deciding that the equities and public interest factors of the stay-pending-appeal test favored neither side, a majority of the motions panel determined, based on the Wilson Declaration, that "[t]he Department has . . . supported its claim that [the escort requirement] furthers important national security interests." N.Y. Times Co. v. U.S. Dep't of Def., 2026 WL 1179440, at *2. The Court does not understand that determination, which was made in the context of a non-merits element of the stay test and on a different factual record, to bear on this Court's assessment of whether the plaintiffs are likely to succeed on the merits of their retaliation claim. And even the Department does not appear to assert that the Court is bound by the panel majority's determination. Cf. Am. Foreign Serv. Ass'n v. Trump, 792 F. Supp. 3d 116, 136

26

Consideration of the proffered rationale itself only confirms those suspicions. The Department's position, as set forth in the Parnell Declaration, is that the October Policy demonstrated a relationship between unescorted access to the Pentagon's press spaces and the dissemination of sensitive or classified information such that the Department would have imposed the escort requirement absent its animus toward The Times.  See Parnell Decl. ¶ 11 (averring that "restoring unescorted access to the Pentagon for PFAC holders would result in a return to the same pattern of regular breaches of information security that that unescorted access had previously permitted").  But the October Policy did not eliminate unescorted access to the press spaces of the Pentagon.  The effect of the October Policy was that only certain journalists—those who were not "on board and willing to serve our commander in chief," NYT I, 2026 WL 788689, at *14—no longer had unescorted (or any) access to the Pentagon. The members of the "next generation of the Pentagon press corps," id. at *13, retained the ability to move freely within the Pentagon, and the Department vigorously advocated for that to continue.  Only once this Court ordered the Department to restore The Times journalists' access to the Pentagon did the Department suggest that unescorted access was a problem.

The Department protests that the timing of the escort requirement cannot be seen as suspicious because the Department imposed the requirement immediately after, and in direct response to, this Court "vacat[ing] key provisions of the October Policy."  Opp. at 21-22. Mr. Parnell testified that "after the Court rejected the October Policy's . . . requirement that PFAC holders not intentionally induce unauthorized disclosures," he determined that "[w]ithout the escort requirement or a prohibition on PFAC holders soliciting unlawful disclosures of

_____

(D.D.C. 2025) ("To be sure, the government does not argue that the motions panel's reasoning is binding on the Court, and the Court will not treat it as such." (citations omitted)).

sensitive information, . . . the Department has no other effective means of managing th[e] demonstrated, repeated risk to the security of sensitive information within the Pentagon." Parnell Decl. ¶ 12. In other words, the Department's position is that it viewed the escort requirement as the next best thing to a prohibition on the "solicitation" of sensitive information. The problem with that position is that, along with imposing an escort requirement, the Interim Policy effectively reinstated the "solicitation" prohibition, just using different language. See NYT II, 2026 WL 962252, at *7. Indeed, the Interim Policy itself states that "[t]o correct the Court's mischaracterization [of the October Policy], the Department has replaced the term 'solicitation' with 'intentional inducement of unauthorized disclosure.'" Interim Policy at 14; see NYT II, 2026 WL 962252, at *5 (Mr. Parlatore explaining that the Interim Policy "us[es] more words to say the same thing and to foreclose creative misinterpretations"). Furthermore, in his declaration, Mr. Parnell conflates the "requirement that PFAC holders not intentionally induce unauthorized disclosures" with the "prohibition on PFAC holders soliciting unlawful disclosures of sensitive information," Parnell Decl. ¶ 12, thus making abundantly clear that the Department understood those provisions of the October Policy and the Interim Policy to do the same thing. The escort requirement, then, was imposed not instead of but in addition to the restriction on "solicitation" (or in the language of the Interim Policy, "inducement"). So it simply cannot be, as the Department now insists, that the escort requirement was necessary to "fill the gap created" by this Court's merits order. Opp. at 21.

On top of all of that, the Department's proffered rationale is facially dubious. Journalists, of course, do not "have access to sensitive or classified information simply by being in [the Pentagon] without an escort." Williams Decl. ¶ 21. The Department does not dispute that fact, asserting instead that unescorted access "logically . . . increases the risk" of journalists

28

obtaining such information.  Opp. at 16 (emphasis omitted).  That supposed logic, however, is far

from self-evident.  To reiterate, the escort requirement is founded upon Ms. Wilson's observation

that her office was contacted less frequently by the press about "sensitive or classified"

information after the implementation of the October Policy and Mr. Parnell's conclusion that the

reduction in contacts was attributable to the journalists who refused to sign onto the October

Policy no longer being able to "observe activity patterns and time their inquiries accordingly."

Parnell Decl. ¶ 9; see Wilson Decl. ¶ 11.  But as the plaintiffs point out, Ms. Wilson's

observation of a decrease in contacts about "sensitive or classified information" does not

necessarily correspond to a decrease in instances of journalists obtaining such information.  See

Reply at 5-6.  Indeed, the plaintiffs have refuted the notion that The Times has obtained less

nonpublic information since the October Policy was put in place, see Stevenson Decl. ¶¶ 16-17,

and the Department does not offer any actual evidence to the contrary.[7]  What is more, the

Department's justification lacks any elucidation of the connection between journalists noticing

Department officials' behavior and obtaining classified information.  Why would it be that the

---

[7]    The Department argues that the Stevenson Declaration's focus on nonpublic information is misplaced because "[m]uch information is non-public but is not classified or controlled unclassified information," for example, "various personnel decisions, such as hiring, firing, and promotion decisions."  Defs. Supp. Br. at 4.  The Department's goal with the escort requirement, it says, was to prevent journalists from obtaining only classified or controlled unclassified information—not the broader universe of nonpublic information.  See id.  There are at least two problems with the Department's argument.  First, Mr. Parnell's declaration itself makes clear that the Department sought to prevent journalists from obtaining not only classified or controlled unclassified information but also "sensitive" information more broadly.  See, e.g., Parnell Decl. ¶ 8 (describing "sensitive, controlled or classified information" (emphasis added)).  Second, and in any event, it stretches credulity to its breaking point to conclude that The Times's recent reporting about, for example, "a growing concern within the Pentagon regarding espionage by Israel," Stevenson Decl. ¶ 17, resembles unclassified and uncontrolled nonpublic information on par with "personnel decisions."  The plaintiffs' evidence therefore undercuts the Department's stated reason for imposing the escort requirement because it supports that the October Policy did not have the effect that the Department purportedly sought to replicate.

timing of a journalist's question increases the likelihood that a Department official would disclose classified information?  Is the implication that a Department official is more likely to divulge such information while, say, in line at Starbucks?  Based on what?  The Department offers no answer to these questions.

In that vein, taken at face value, the Department's "activity patterns" rationale seemingly would apply to the much broader set of civilian workers in the Pentagon.  As the plaintiffs point out, "the Pentagon is 'a city in itself with over 23,000 employees,'" including non-Department employees such as "contractors, consultants, representatives of other government agencies . . . , representatives of foreign governments, representatives of congressional committees, cafeteria workers, and employers of Concourse concessions."  Mem. at 33 (alteration in original) (quoting Boutrous Decl. at Ex. 3).  These thousands of civilian employees remain free to move about the Pentagon unescorted on a daily basis and, it would seem, are just as capable of observing officials' behavior or "overhear[ing]" sensitive conversations.  Opp. at 16.  The Department argues that the escort requirement applies only to journalists because it has not made a finding that "the range of other people who access the Pentagon" have "obtained sensitive information," and the Department insists that "[t]he unique nature of the journalistic profession and each journalist's access to both sources of and means for distributing information" justifies the policy.  Id. at 14.  The notion that reporters should be treated worse than baristas, short order cooks, dry cleaners, or any other civilians given access to the Pentagon, surely "is a perverse reading of the First Amendment."  Reply at 4.  And by singling out journalists, the escort policy "undercut[s] the basic assumption of our political system that the press will often serve as an important restraint on government."  Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue, 460 U.S. 575, 585 (1983).

30

In ordinary circumstances, the Department would be entitled to a "presumption of regularity," meaning the Court would assume that the Department has acted properly and lawfully. This Court previously has questioned whether such a presumption continues to exist in light of the current administration's extensive pattern of illegal and unconstitutional behavior. See, e.g., Fed. Educ. Ass'n v. Trump, 795 F. Supp. 3d 74, 92 (D.D.C. 2025) ("In just six months, the President of the United States may have forfeited the right to such a presumption of regularity."). But regardless, the presumption that the Department has acted in good faith "is merely a presumption that may be overcome." Am. Acad., 816 F. Supp. 3d at 59. The plaintiffs have overcome that presumption in this case based on the "constellation of undisputed facts and circumstances compiled in this still-preliminary record." FTC, 2025 WL 2988966, at *6; see also Am. Acad., 816 F. Supp. 3d at 59. This "constellation" includes the statements of Department officials from both before and after the enactment of the October Policy, the timing of the imposition of the escort requirement immediately after the Court ordered The Times journalists' PFACs restored, and the fact that the Department has not offered a facially sound, nonretaliatory basis for imposing the requirement. The Court concludes on the record before it that the plaintiffs are likely to succeed on their First Amendment retaliation claim.

*B. The Plaintiffs Will Suffer Irreparable Harm Absent an Injunction*

Because the plaintiffs have shown a likelihood of success on the merits, "the Court need not belabor the other preliminary-injunction factors." Endocrine Soc'y v. Fed. Trade Comm'n, 2026 WL 1257289, at *14. That said, the Court concludes that the plaintiffs stand to suffer immediate irreparable harm absent injunctive relief. As the Supreme Court has held, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Mahmoud v. Taylor, 606 U.S. 522, 569 (2025) (alteration in

31

original) (quoting <u>Roman Catholic Diocese of Brooklyn v. Cuomo</u>, 592 U.S. 14, 19 (2020)); <u>see</u> <u>Karem v. Trump</u>, 960 F.3d 656, 667 (D.C. Cir. 2020) ("As our court has explained, a prospective violation of a constitutional right constitutes irreparable injury for purposes of seeking equitable relief." (citation modified)).  "When a party makes it 'apparent' that its 'constitutional rights are violated,' it easily clears the irreparable-harm requirement to warrant preliminary relief." <u>Endocrine Soc'y v. Fed. Trade Comm'n</u>, 2026 WL 1257289, at *14 (quoting <u>Mills v. District of Columbia</u>, 571 F.3d 1304, 1312 (D.C. Cir. 2009)).  For the reasons explained above, the plaintiffs are likely to succeed in showing that the Department "retaliat[ed] against them in response to their exercise of their First Amendment rights," and "that is . . . an irreparable injury." <u>Media Matters for Am. v. Paxton</u>, 138 F.4th at 585.

Moreover, the plaintiffs' harm is "not merely . . . abstract" or "theoretical" because the plaintiffs' "First Amendment interest depends on [their] ability to freely pursue 'journalistically productive conversations.'" <u>Karem v. Trump</u>, 404 F. Supp. 3d 203, 217 (D.D.C. 2019); <u>see</u>, <u>e.g.</u>, Supp. Barnes Decl. ¶ 7 ("To be an effective reporter, I often need to have conversations, follow leads, and ask questions that cannot be planned days or even hours ahead of time.").  The plaintiffs have demonstrated that the escort requirement burdens their ability to engage in newsgathering because it has "substantially reduced" their "amount of interaction with" sources and "made it exceedingly challenging to speak with press officials and other personnel in person." Barnes Decl. ¶¶ 24-25; <u>see</u> <u>supra</u> Section III.A.2.  And because "the news is time-sensitive and occurs spontaneously," those harms "cannot be remedied retrospectively." <u>Karem v. Trump</u>, 404 F. Supp. 3d at 217.[8]

---

[8]    Citing the D.C. Circuit's decision in <u>Ateba v. Leavitt</u>, 133 F.4th 114, the Department argues that the plaintiffs cannot show irreparable harm because they continue to have escorted access to the Pentagon.  <u>See</u> Opp. at 28-29, 36.  In <u>Ateba</u>, the D.C. Circuit

*C. The Balance of the Equities and the Public Interest Favor the Plaintiffs*

The balance of equities and public interest factors also weigh in the plaintiffs' favor.  On the plaintiffs' side of the scale, there are constitutional interests of great significance.  The plaintiffs' "interest in obtaining an injunction mirrors that of every person subject to government power: vindicating the right to be free of retaliation for its protected speech." Endocrine Soc'y v. Fed. Trade Comm'n, 2026 WL 1257289, at *14.  "And 'there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional' government action."  Media Matters for Am. v. Paxton, 138 F.4th at 585 (quoting Pursuing Am.'s Greatness v. Fed. Election Comm'n, 831 F.3d 500, 511 (D.C. Cir. 2016)).  On the Department's side of the scale, while the Department certainly has an interest in protecting national security, it "may not 'act unlawfully even in pursuit of desirable ends.'"  Id. (quoting Huisha-Huisha v. Mayorkas, 27 F.4th 718, 734 (D.C. Cir. 2022)); see also Karem v. Trump, 960 F.3d at 668 ("[E]nforcement of an unconstitutional law is always contrary to the public interest." (quoting Gordon v. Holder, 721 F.3d 638, 653 (D.C. Cir. 2013))).

The Department asserts that entering a preliminary injunction "would fly in the face of the D.C. Circuit's decision to stay the Court's previous injunction."  Opp. at 38.  That is

---

assumed without deciding that the plaintiff, who had been denied a "hard pass" to enter the White House unescorted, had stated a cognizable First Amendment injury.  See Ateba v. Leavitt, 133 F.4th at 120-21.  The court emphasized that the plaintiff had "maintained access to the Press Area by using day passes," and it noted that while day pass holders had to "wait for an escort to take them from the White House gate to the Press Area," both hard pass and day pass holders had "the same privileges once they [were] inside the Press Area."  Id. at 117, 120.  Setting aside the fact that the D.C. Circuit did not—as the Department asserts—conclude that "having to wait for an escort was not enough for a First Amendment injury," Defs. Supp. Br. at 6, the facts of Ateba are a far cry from the situation here, where journalists are permitted to enter the Pentagon only for prearranged interviews or press conferences and only if accompanied at all times by an official minder.  The harms to the plaintiffs, as detailed above, are far more than mere "inconvenience[s]."  Id. at 121.

33

not so.  The panel order granting the Department a stay pending appeal rested on the conclusion that "[t]he escort requirement was not contemplated by the challenged [October] [P]olicy" such that this Court's "March 20 summary judgment opinion and order did not address that provision or a similar one."  N.Y. Times Co. v. U.S. Dep't of Def., 2026 WL 1179440, at *3.  The majority recognized that because of the posture of the plaintiffs' prior challenge to the Interim Policy, this Court "did not hold that the escort requirement independently violates" the Constitution.  Id. With full briefing on the constitutionality of the escort requirement, the Court now, at least preliminarily, so holds.

### D. The Plaintiffs Must Post a Nominal Bond

Rule 65(c) of the Federal Rules of Civil Procedure states that a "court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  FED. R. CIV. P. 65(c).  This rule provides "broad discretion in the district court to determine the appropriate amount of an injunction bond."  DSE, Inc. v. United States, 169 F.3d 21, 33 (D.C. Cir. 1999).  The plaintiffs ask the Court to order them to post a nominal bond of one dollar, given that the Department "will not 'be forced to absorb any costs as a result of an injunction.'"  Mem. at 45 (quoting Am. Oversight v. Hegseth, 788 F. Supp. 3d 14, 32 (D.D.C. 2025)).  The Department offers no argument in response.  Because the Department has not shown that it "will suffer any 'material monetary injury' from the proposed injunction," the Court will order the plaintiffs to post a nominal bond of one dollar.  Am. Oversight v. Hegseth, 788 F. Supp. 3d at 32 (quoting J.G.G. v. Trump, 786 F. Supp. 3d 37, 83 (D.D.C. 2025)).

## IV. CONCLUSION

This Court has spoken at several points about the critical importance of protecting the freedoms enshrined in the First Amendment, and that evergreen message bears repeating: "Those who drafted the First Amendment believed that the nation's security requires a free press and an informed people and that such security is endangered by governmental suppression of political speech. That principle has preserved the nation's security for almost 250 years." NYT I, 2026 WL 788689, at *1. As our country celebrates its 250th anniversary this very week, that principle must not be abandoned now.

The plaintiffs have shown that the factors governing preliminary injunctive relief weigh in their favor. Accordingly, the Court will GRANT the plaintiffs' Motion for a Preliminary Injunction [Dkt. No. 6]. An Order consistent with this Opinion will issue this same day.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 6\30\26