**NOT YET SCHEDULED FOR ORAL ARGUMENT**

**No. 26-5253**

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

NEW YORK TIMES COMPANY, *et al.*,
Plaintiffs-Appellees,

v.

DEPARTMENT OF DEFENSE, also known as DEPARTMENT OF WAR, *et al.*,
Defendants-Appellants.

---

On Appeal from the United States District Court
for the District of Columbia

---

**EMERGENCY MOTION FOR STAY PENDING APPEAL
BY JULY 16, 2026**

---

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney
  General*

BRAD HINSHELWOOD
JACK STARCHER
SEAN R. JANDA
*Attorneys, Appellate Staff
 Civil Division, Room 7260
 U.S. Department of Justice
 950 Pennsylvania Avenue NW
 Washington, DC 20530
 202-514-3388*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................... 1

STATEMENT ................................................................................................. 4

ARGUMENT ..................................................................................................10

I.    The Escort Requirement Does Not Reflect Unconstitutional
      Retaliation Against Plaintiffs ...................................................................10

      A.    The Escort Requirement Is Not an Adverse Action That
            Would Deter Any Reasonable Journalist from Speaking ............12

      B.    Plaintiffs Have Failed to Establish the Requisite Causal
            Link Between the Escort Requirement and Plaintiffs'
            Protected Activity ..........................................................................17

II.   A Stay Pending Appeal Is Warranted .......................................................24

CONCLUSION ...............................................................................................27

CERTIFICATE OF COMPLIANCE

**INTRODUCTION**

The Department of War recently adopted a policy requiring that all journalists be escorted by authorized Department personnel inside the Pentagon. It is undisputed that this policy is viewpoint neutral, has been equally applied to all journalists accessing the Pentagon, and has not prevented any journalist from obtaining access to carry out newsgathering activities. Indeed, in many respects, the policy reflects access requirements similar to those for entering all manner of secure government buildings. The policy thus plainly comports with the First Amendment: "government office building[s]" are quintessential "nonpublic forums," and access to such buildings "can be restricted as long as the restrictions are viewpoint neutral and reasonable." *Ateba v. Leavitt*, 133 F.4th 114, 122-23 (D.C. Cir. 2025) (quotation omitted).

Less than three months ago, the New York Times Company and Julian Barnes, a Times reporter, obtained an order blocking the escort policy based on a judgment in a prior suit. This Court swiftly stayed that order, explaining that the escort requirement is a proper "generally applicable requirement" and that the government had serious interests in ensuring that journalists not leverage unescorted Pentagon access into an ability to "obtain and

disseminate sensitive information, jeopardizing national security." *See New York Times Co. v. U.S. Dep't of Def.*, 2026 WL 1179440, at *2-3 (D.C. Cir. Apr. 27, 2026) (per curiam).

Undeterred, the same plaintiffs returned to the same district court seeking the same injunction against the same policy in a new suit. And notwithstanding this Court's previous stay, the district court obliged plaintiffs' request. This time, the court concluded that the escort requirement reflects unconstitutional retaliation against plaintiffs.

But plaintiffs' retaliation claim is nonsensical. In a typical retaliation case, a plaintiff claims that the government has taken some specific, substantial adverse action against that plaintiff to punish the plaintiff for exercising his constitutional rights and to chill the plaintiff (and others) from similarly exercising those rights in the future. Nothing about that typical retaliation claim maps onto this case. The escort requirement applies not to plaintiffs specifically but instead to the Pentagon press corps as a whole. It does not single out any journalist, much less based on the substance of that journalist's reporting. It does not punish anybody, instead simply restricting journalists' access to sensitive spaces. And only the timid journalist indeed

2

would be chilled in his reporting by the prospect of having to comply with the escort requirement applicable to all journalists.

In straining to accept plaintiffs' retaliation claim, the district court mangled the relevant legal framework at every step. The court disregarded the government's consistent national-security explanation for the escort requirement, concluding instead—largely based on statements from various individuals spread over many months and unrelated to the challenged policy—that the requirement must have been motivated by some ill-defined retaliatory animus. The court nowhere explained how the requirement could even be conceptualized as an adverse action targeted at plaintiffs. And the court permitted the minor logistical burdens that the escort requirement imposes on journalists to stand in for the chill that the law requires.

Compounding its errors, the district court then disregarded the Department's determination that journalists' previous unescorted access to the Pentagon contributed to regular unauthorized disclosures of classified and other highly sensitive information. Notwithstanding the national-security imperative of safeguarding such information (and the conceded lack of any freestanding First Amendment right for reporters or others to wander the halls of secure government buildings), the court determined that

3

the equities and the public interest justified an injunction requiring plaintiffs' unescorted access to the Pentagon. That result is untenable, and the injunction should be stayed pending appeal. The government requests that the Court enter that relief by **Thursday, July 16, 2026,** when the district court's administrative stay expires.

### STATEMENT

1. The Secretary of War has jurisdiction over the Pentagon and is required to protect the Pentagon's buildings, grounds, and property, including by prescribing regulations to ensure the safe, efficient, and secure operation of the Pentagon. *See* 10 U.S.C. § 2674. Pursuant to that authority, the Secretary has long adopted regulations restricting access to the Pentagon to ensure the orderly and secure conduct of Department business within the building. 32 C.F.R. § 234.3(a).

Under those regulations, only employees and other authorized persons may enter the Pentagon, while others who wish to enter require an invitation or the consent of authorized personnel. 32 C.F.R. §§ 234.3, 234.4. For members of the press who want access to the Pentagon, the Department has established a process allowing journalists to obtain a Pentagon Facility Alternate Credential (PFAC), which allows them special privileges.

2. The Department has explained that it "is an unacceptable risk to national security for sensitive, controlled or classified information to regularly reach journalists." App.90. The "[u]nauthorized disclosure of operational plans, intelligence assessments," and other sensitive information "puts American lives in danger, allows our enemies to adjust their tactics ahead of our operations, and risks compromising our ongoing operations." *Id.*

Thus, in October 2025, to better safeguard such information, the Department implemented a new policy, which (among other things) set out requirements for maintaining a PFAC, including that PFAC holders not "induce unauthorized disclosures" of controlled or classified information. App.90-91; *see also* App.7-8. The New York Times Company and Julian Barnes—a Times reporter— challenged that policy; the district court ultimately vacated the policy and enjoined its enforcement against the plaintiffs. *See New York Times Co. v. Department of Def.*, -- F. Supp. 3d --, 2026 WL 788689 (D.D.C. Mar. 20, 2026).

Shortly after that relief was entered, the Department adopted the Interim Policy challenged here. The Department has explained that the Interim Policy was adopted "to address the risk to the security of sensitive controlled and classified information within the Pentagon, and the risks that

the unauthorized disclosure of that information would carry for the Nation's security," that would exist if the Department was forced to "return to the pre-October" status quo of journalists' broad ability to physically access the Pentagon without significant limits. *See* App.91. As relevant here, the Interim Policy addresses that national-security risk by requiring that PFAC holders be "escort[ed] by authorized [Department] personnel" when they enter the Pentagon. App.46-47.

The Department adopted this escort requirement because of changes it had observed in unauthorized disclosures of classified and sensitive information following the October Policy. Before that policy, PFAC holders regularly obtained such information—"often monthly, and sometimes multiple times per month"—including "information relating to operational plans, intelligence assessments, diplomatic communications, and force posture decisions." App.88. But the frequency with which the Department learned of such disclosures "dropped dramatically" after October 2025, when many journalists surrendered their PFACs and were thus no longer physically present in the Pentagon. App.89.

Based in part on this experience, the Department determined "that unescorted access to the Pentagon was a significant contributing factor to the

6

frequency with which controlled and classified information was reaching journalists." App.88-89. Such access allowed journalists to loiter "near sensitive spaces within the Pentagon" and "observe activity patterns—such as which officials were meeting, when, and in what configuration—that could be used to identify individuals with access to specific sensitive information and to time inquiries accordingly." *Id.* For example, journalists often congregated "in close proximity to the office space for the Joint Chiefs of Staff," and journalists "frequently used their access to closely monitor activity in and out of the Joint Staff spaces." App.89.

3. Following the adoption of the Interim Policy, the plaintiffs in the earlier suit sought relief from the policy through a motion to "enforce" the judgment in the original suit. The district court agreed, concluding that certain provisions of the Interim Policy (including the escort requirement) violated its judgment and enjoining the Department from enforcing those provisions against the plaintiffs. *See New York Times Co. v. Department of Def.*, -- F. Supp. 3d --, 2026 WL 962252 (D.D.C. Apr. 9, 2026).

The Department appealed and sought a stay of the district court's injunction to the extent it applied to the Interim Policy's escort requirement. This Court granted that motion. *See New York Times Co. v. U.S. Dep't of*

*Def.*, 2026 WL 1179440 (D.C. Cir. Apr. 27, 2026) (per curiam). This Court explained on the merits that the escort requirement is a "generally applicable requirement that" is likely "not invalid for violating" the "constitutional principles underlying" the district court's previous judgment. *Id.* at *3. And it credited the government's explanation, based on its experience, that "unescorted access to the Pentagon will increase the risk that journalists obtain and disseminate sensitive information, jeopardizing national security." *Id.* at *2.

Since that stay order in April, the escort requirement has been in effect. Over that time, dozens of reporters—including Barnes and other New York Times PFAC holders—have "repeatedly accessed the Pentagon" for various journalistic activities, including to attend media events and press conferences and to interview Department officials. App.60-61. And the record reflects that under the Interim Policy, "no PFAC holder has been unable to enter the Pentagon because of an inability to arrange an escort." *Id.* Indeed, although Barnes has asserted that the escort requirement is "logistically burdensome," he has also averred that he continues to report on the Pentagon and that the escort requirement "has not eliminated [his] ability to report stories that rely on non-public information." App.93-96.

8

4. Undeterred by this Court's staying the injunction against the escort policy, the New York Times Company and Barnes—the same plaintiffs as in the previous suit—brought this suit. Plaintiffs again challenge the Interim Policy's escort requirement, which they contend violates the First and Fifth Amendments and the APA's reasoned decisionmaking requirements. *See* Dkt. No. 1, at 37-48.

Plaintiffs moved for a preliminary injunction against enforcement of the escort requirement. The district court granted that motion. On the merits, the court addressed only plaintiffs' First Amendment retaliation claim. *See* App.16. The court concluded that the escort requirement constitutes an improper attempt by the Department to retaliate against plaintiffs for their constitutionally protected newsgathering activities. *See* App.16-31. In reaching that conclusion, the court did not dispute that the escort requirement is facially viewpoint neutral, has been applied equally to all journalists holding PFACs regardless of their viewpoint, and has not prevented any PFAC holder from accessing the Pentagon upon request.

On the equities, the district court concluded that plaintiffs had shown irreparable harm because "the escort requirement burdens"—though does not eliminate—plaintiffs' "ability to engage in newsgathering." App.32. And

the court believed this harm to plaintiffs' First Amendment activities outweighed the Department's national-security interest in safeguarding classified and sensitive information, largely because the government "may not act unlawfully even in pursuit of desirable ends." App.33 (quotation omitted). In reaching that conclusion, the court did not seriously grapple with this Court's previous stay decision crediting those same national-security interests in granting a stay pending appeal.

5. The government moved in district court for a stay of the preliminary injunction pending appeal. The court granted a fourteen-day administrative stay—which runs through July 16, 2026—but otherwise denied that motion in an order with no additional reasoning. *See* App.38.

## ARGUMENT

A stay pending appeal is warranted. The government is likely to succeed on the merits of its appeal, the government will face irreparable injury absent a stay, and the balance of equities and public interest support a stay. *See Nken v. Holder*, 556 U.S. 418, 426 (2009).

## I.    The Escort Requirement Does Not Reflect Unconstitutional Retaliation Against Plaintiffs

The Pentagon is the headquarters of a Department that, by its nature, deals with highly sensitive materials that relate to the nation's defense and

national security. Thus, as the district court did not dispute, the Pentagon is a non-public forum—that is, "government property that is not by tradition or designation a forum for public communication." *Ateba v. Leavitt*, 133 F.4th 114, 121-22 (D.C. Cir. 2025) (quotation omitted) (discussing the White House Press Area). And there is, of course, no freestanding right for journalists or other members of the public to wander the halls of the Pentagon at their leisure. The established rule for such non-public fora is that the government is "not required to open such spaces for any speech at all," but if it does, access "can be restricted as long as the restrictions are viewpoint neutral and reasonable." *Id.* at 122-23 (quotation omitted). The escort requirement plainly meets those baseline requirements, and the district court did not conclude otherwise. *Cf.* App.22 n.5 (disregarding precedent regarding journalists' lacking any First Amendment right to have the government facilitate their reporting because the relevant question is not whether "the Department's action itself violates the First Amendment").

Instead, plaintiffs argued, and the district court agreed, that the escort requirement—which is concededly viewpoint neutral, has been equally enforced across the Pentagon press corps, and does not prevent any journalist from accessing the Pentagon for his work—reflects

unconstitutional retaliation against plaintiffs. To make out such a claim, plaintiffs would need to demonstrate that they "engaged in conduct protected under the First Amendment," that the Department "took some retaliatory action sufficient to deter a person of ordinary firmness in [plaintiffs'] position from speaking again" against them, and that "a causal link" existed between the retaliation and the protected activity. *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (quotation omitted). They have not met that burden.

### A. The Escort Requirement Is Not an Adverse Action That Would Deter Any Reasonable Journalist from Speaking

1. Even setting aside questions about the Department's motivations in enacting the escort requirement, plaintiffs' retaliation claim fails as a matter of law because the requirement is not the sort of material adverse action that would deter any reasonable journalist from exercising his First Amendment rights. It is not targeted at some subset of journalists who have engaged in expression with which the Department disagrees. Instead, it applies to all PFAC-holding journalists seeking access to the Pentagon, without regard to the substance of those journalists' past or future reporting.

Thus, it is unsurprising that plaintiffs do not assert that they—or, for that matter, any other journalist subject to the escort requirement—have "cower[ed] silently" in the face of the requirement. *Houston Cmty. Coll. Sys.*

*v. Wilson*, 595 U.S. 468, 479 (2022). To the contrary, they have continued to engage in gathering and publishing the news as they did before, "despite the inconvenience" of the escort requirement. *Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 419 (4th Cir. 2006). And that makes sense. The escort requirement is an easily satisfied condition on access to a government building. *Cf. Ateba*, 133 F.4th at 121 (describing escort requirement for White House Press Area as simply an "inconvenience" that "differs significantly from the burden imposed by licensing schemes that preclude some speakers from using a forum altogether").

Even more fundamentally, no journalist could reasonably be deterred from engaging in particular reporting by the prospect of being subject to the same access requirements as all other journalists. Even in the context of discriminatory access determinations—that is, "giving preferential access to some reporters and refusing to give access to" other reporters—courts have held that "the adverse impact of such conduct is objectively *de minimis*." *Baltimore Sun*, 437 F.3d at 418-19. In the "rough and tumble political arena," it is hard to fathom "that a reporter of ordinary firmness can be chilled by a politician's" failure to provide access that the reporter seeks. *Id.* at 419 (quotation omitted). That is only more true in the context of the

13

neutral, generally applied escort requirement. *Cf. ACLU of Md., Inc. v. Wicomico County*, 999 F.2d 780, 785-86 (4th Cir. 1993) (per curiam) (concluding that no "sufficiently adverse" retaliatory action occurred where prison warden withdrew a paralegal's special access and instead subjected the paralegal's prison visits to the "more stringent set of restrictions" applicable "to any paralegal or other non-professional visitor").

Indeed, in these circumstances, it is hard to understand the escort requirement as inflicting "sufficiently adverse action to give rise to an actionable First Amendment claim" at all. *Wilson*, 595 U.S. at 477. It is not, in any relevant sense, similar to the targeted adverse actions that typically spawn retaliation claims, such as "an arrest, a prosecution, or a dismissal from governmental employment." *Id.* Plaintiffs' attempt to fit their objections to a neutrally applied regulation governing journalists' access to the government's own property into the framework of a retaliation claim reflects a fundamental category error.

2. In response, the district court did not dispute that the escort requirement is neutral and has been applied to all journalists regardless of the substance of their reporting. Nor did the court identify any example of plaintiffs—or any other journalist—choosing to self-censor their own

14

reporting in an attempt to avoid application of the requirement. Instead, the court concluded that the requirement constitutes adverse action sufficient to deter a journalist from engaging in expressive activity almost entirely because, in the court's view, the requirement "encumber[s]" or "burden[s]" journalists' ability to engage in their newsgathering. App.18-22.

In focusing on that general encumbrance, the district court got the inquiry wrong. The extent to which the government's regulation of access to a forum burdens the speech occurring within that forum might be relevant to a normal First Amendment claim. But it is not relevant to plaintiffs' retaliation claim, which asks not whether the government's regulation of the forum is unconstitutional in the first instance but instead whether the government's otherwise constitutional regulation was impermissibly adopted to punish plaintiffs for their speech.

In other words, the relevant question is whether plaintiffs have been "singled out" and "punish[ed]" "in retaliation for" their expressive activity, *Tao v. Freeh*, 27 F.3d 635, 639 (D.C. Cir. 1994) (quotation omitted)—and have been punished so severely that the prospect of such punishment would "deter a person of ordinary firmness" from "speaking again," *Aref*, 833 F.3d at 258 (quotation omitted). Here, it is doubtful that even the discriminatory

application of an escort requirement could deter an ordinary journalist from engaging in his normal reporting, as explained. But regardless, the neutral application of that requirement to all journalists plainly does not reflect a retaliatory singling out that would cause an ordinary journalist to refrain from reporting that the Department does not like.

Moreover, the district court's focus on the general burdens of the escort requirement is fundamentally incompatible with normal First Amendment rules governing non-public fora. It is undisputed that the Department has a substantial interest in regulating visitors' (including journalists') access to the Pentagon to ensure the safety, security, and orderly operation of the important functions conducted within that building. But any access restriction will necessarily encumber to some degree journalists' ability to engage in unfettered reporting inside the Pentagon. That encumbrance is no different from the encumbrance reporters face at numerous other government buildings that do not allow unescorted access. Allowing it to serve as the basis for a retaliation claim would improperly risk "constitutionaliz[ing] virtually every day-to-day interchange between the press" and the Department. *Baltimore Sun*, 437 F.3d at 417. And it would undermine the fundamental rule that the Department may properly impose

16

reasonable, nondiscriminatory access restrictions on a non-public forum like the Pentagon—indeed, may prohibit access to the building altogether. *Ateba*, 133 F.4th at 121-23.

### B. Plaintiffs Have Failed to Establish the Requisite Causal Link Between the Escort Requirement and Plaintiffs' Protected Activity

In any event, plaintiffs have not properly established that their expressive activity caused the Department to adopt the escort requirement. As the Supreme Court has explained, to make that showing, a party claiming unconstitutional retaliation must demonstrate that "the impetus to retaliate" is "the but-for cause" of the official action. *Hartman v. Moore*, 547 U.S. 250, 260 (2006). Plaintiffs cannot meet that burden.

1. The record establishes the Department adopted the escort requirement to further its important interest in preventing the unauthorized disclosure of classified and other sensitive materials—not out of some desire to retaliate against plaintiffs (or other journalists) for their expressive activity. Start with the Interim Policy itself. That Policy is devoid of any indication that it was issued in retaliation for journalists' protected conduct. To the contrary, it explains that the Department adopted the Interim Policy (including the escort requirement) to "preserv[e] the Department's

17

legitimate security interests and its statutory obligation to ensure the safe, efficient, and secure operation of the Pentagon" in the face of the district court's vacatur of the October Policy's requirements. App.40. And the face of the policy reflects the Department's nonretaliatory conclusion that "unescorted access to the Pentagon cannot be responsibly maintained" in current conditions. App.41.

That nonretaliatory impetus is further bolstered by the evidence in the record, in which the relevant Department official has explained the specific motivations for the escort requirement. As the record reflects, before adoption of the escort requirement, the Department concluded that journalists' previous unescorted access had meaningfully contributed to the regular unauthorized disclosures of classified and sensitive information that pre-dated the October Policy. In particular, the Department determined that journalists had been able to use their sweeping access to loiter in key areas of the Pentagon, observing activity around extremely sensitive spaces such as the Joint Chiefs of Staff's working space and using those observations to better hone their efforts to induce unauthorized disclosures of sensitive information. And consistent with that determination, the Department experienced a dramatic decline in journalists' obtaining classified and

18

sensitive information after the October Policy, when many journalists ceased physically accessing the Pentagon. *See generally* App.88-89.

Based on that experience, the Department determined that continuing to permit "unescorted access to the Pentagon for PFAC holders" would likely lead to the "same pattern of regular breaches of information security" that the Department had observed before the October Policy. App.90. The escort requirement was thus "specifically designed to address this assessment of risks to the security of information in the Pentagon, and thus to the nation's security." *Id.* Nothing about that reasonable explanation bespeaks any retaliatory animus against plaintiffs.

Finally, the relevant nonretaliatory basis for the escort requirement is only confirmed by the contours of the policy and its implementation. As explained, there is no dispute that the policy—both on its face and in its implementation—neutrally applies to all journalists holding PFACs, regardless of the substance of their previous reporting. And it is undisputed that the need to arrange an escort has not actually prevented any journalist, including plaintiffs, from accessing the Pentagon. It is a strange form of retaliation indeed that adopts neutral and minimally burdensome requirements applicable to all reporters.

19

2. The district court's reasons for disregarding this nonretaliatory explanation in favor of the court's supposition that the escort requirement reflects a retaliatory impetus do not withstand scrutiny on their own terms. And they certainly do not provide any firm basis to disregard the "presumption of agency regularity" that properly attaches to the Department's own explanation for its adoption of the escort requirement. *Media Matters for Am. v. FTC*, 2025 WL 2988966, at *9 (D.C. Cir. Oct. 23, 2025) (per curiam).

First, the district court focused on various "statements by Department officials expressing disdain for reporting by The Times and other 'legacy' media outlets." App.23-24. But the Department—like any other speaker—is entitled to express its disagreement with reporting by the Times and other outlets. And the court failed to identify any substantial nexus between the statements and the escort requirement specifically: the identified statements come from many different actors, are spread across a full year, and do not themselves reference the escort requirement at all. *See id.*

Beyond that, the district court's theory of retaliation based on these statements is illogical—again, the escort requirement does not apply only to "The Times and other 'legacy' media outlets," App.23-24, but instead to all

journalists holding PFACs who wish to access the Pentagon. The court nowhere persuasively explained how such a neutral policy applicable to all media outlets is most logically explained by a desire to retaliate against some specific media outlets.

And the district court's reliance on these general statements, unconnected to the escort requirement specifically, to find the requisite retaliatory animus leads to untenable conclusions. Indeed, if the court's analysis were correct, the New York Times (or any other "legacy" outlet) could rely on these same statements to bring a First Amendment retaliation claim against the Department's decision to adopt *any* new regulation of the press within the Pentagon—even (as here) a neutral, minimally burdensome access regulation. That outcome does not comport with the reality of the Department's substantial national-security interest in the orderly operation of the Pentagon (and the safeguarding of sensitive information) or with the Pentagon's undisputed status as a non-public forum.

Second, the district court expressed skepticism about the national-security explanation offered by the Department, believing that explanation was "conspicuously absent" from the Interim Policy. App.26. But the court's skepticism is misplaced. As explained, the Interim Policy itself articulates

the basic national-security rationale underlying the escort requirement. And there is nothing impermissible about the Department's offering declarations in this litigation to flesh out those specific national-security considerations. Indeed, this Court has already credited the same general explanation similarly offered through litigation affidavits in determining to grant a stay of the previous injunction. *See New York Times Co. v. U.S. Dep't of Def.*, 2026 WL 1179440, at *2 (D.C. Cir. Apr. 27, 2026) (per curiam). Nor has the court identified any material inconsistency between the explanation in the Interim Policy and the more complete explanation offered in litigation as might cause a court to reasonably question the sincerity of the Department's explanation.

The district court's skepticism is only further belied by the eminently sensible nature of the Department's conclusions, contra the court's beliefs (at App.28-29). It is not hard to imagine how a journalist might leverage his unescorted access to observe activity in sensitive areas and thereby to develop leads and pursue access to classified or sensitive information that Department personnel are not permitted to disclose. Indeed, consistent with that reality, escort requirements and other access restrictions are common in federal (and other) buildings, as explained. This Court, for example, maintains extensive non-public areas around the judges' chambers where

journalists are, of course, not free to wander unescorted or loiter in hopes of picking up non-public information. The Department's adoption of a similar modest escort requirement is plainly aimed at similarly reducing the potential unauthorized disclosure of sensitive information.

Nor is the Department's explanation undercut by the fact that other civilian employees—such as cafeteria workers—are not subject to the same requirements. *See* App.30. As explained, the Department adopted the escort requirement against its background experience of journalists' regularly obtaining classified and other sensitive information through unauthorized disclosures. There is no record evidence to suggest any similar pattern of disclosures to cafeteria workers, baristas, or other authorized non-Department employees who are permitted to access the Pentagon without an escort. And, of course, that makes sense. The entire premise of plaintiffs' suit is that they seek to develop sources, pursue non-public information, and engage in reporting such information to the public. It is thus no surprise that the Department would be more concerned about the possibility of journalists' using their unescorted access to seek out classified or sensitive information than cafeteria workers' doing the same.

## II.    A Stay Pending Appeal Is Warranted

The remaining factors—irreparable harm, the balance of harms, and the public interest—likewise favor the requested stay. The threatened harm to the government plainly outweighs any limited harm to plaintiffs of being escorted around the Pentagon rather than roaming at will.

First, as this Court has already concluded in staying the same district court's previous injunction against the same policy, the Department's interest in safeguarding sensitive and classified information from unauthorized disclosure suffices to support the entry of interim relief. *See New York Times*, 2026 WL 1179440, at *2.

The injunction threatens irreparable injuries to the government and the public. The injunction compels the Department to allow plaintiffs to roam the Pentagon unescorted, notwithstanding the Department's judgment that continuing to allow that kind of unfettered physical access poses national-security risks by threatening the unauthorized disclosure of classified and other highly sensitive information. As this Court has recognized, courts should "not lightly override the Department's judgments on matters involving national security." *Anthropic PBC v. U.S. Dep't of War*, 2026 WL 1042943, at *3 (D.C. Cir. Apr. 8, 2026) (per curiam); *see also Center for Nat'l*

*Sec. Stud. v. U.S. Dep't of Just.*, 331 F.3d 918, 927 (D.C. Cir. 2003) ("[W]e have consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review.").

Here, the record reflects that the Department's changes in its access policy were made in response to concrete concerns about the frequency with which sensitive information, including highly classified national defense information, was reaching journalists. App.88-89. The Department concluded that regular, unauthorized dissemination of such information "posed serious risks to national security." App.90. And "restoring unescorted access to the Pentagon for PFAC holders" will, in the Department's judgment, "result in a return to the same pattern of regular breaches of information security that that unescorted access had previously permitted." *Id.*

The harms associated with the injunction are exacerbated because the Secretary unquestionably has statutory authority to impose restrictions to ensure the Pentagon's security. *See* 10 U.S.C. § 2674. The district court's order, which prohibits the Executive Branch from carrying out lawful authority, thus imposes an inherent irreparable harm by working "an improper intrusion by a federal court into the workings of a coordinate

25

branch of the Government." *Immigration & Naturalization Serv. v. Legalization Assistance Project of the L.A. Cnty. Fed'n of Lab.*, 510 U.S. 1301, 1305-06 (1993) (O'Connor, J., in chambers).

By contrast, plaintiffs will suffer little cognizable harm if the Department's escort requirement is permitted to continue in effect. There is no dispute that, as explained, members of the press (like other members of the public) have no freestanding constitutional right to unescorted access to secure federal buildings. And plaintiffs do not suffer substantial harm by being given reasonable, escorted access to the Pentagon to perform their work. Indeed, to the contrary, this Court previously concluded that a journalist was not harmed by delays in obtaining a pass that would afford him unescorted access to the White House because he could obtain escorted access in the interim. *Ateba*, 133 F.4th at 117, 127.

The record provides further support for that conclusion. As explained, it is undisputed that neither plaintiffs nor any other PFAC holder has been denied requested access because of the escort requirement. *See* App.60-61. And indeed, Barnes himself has declared that, even after implementation of the escort requirement, he has retained his "ability to report stories that rely on non-public information." App.96. In the end, plaintiffs' complaints reduce

to the proposition that the escort requirement is assertedly "logistically burdensome." App.93. But whatever logistical burdens the requirement may impose on plaintiffs are plainly outweighed by the strong national-security interests in protecting sensitive information.

## CONCLUSION

For the foregoing reasons, the Court should stay pending appeal the district court's injunction by July 16, 2026.

Respectfully submitted,

BRETT A. SHUMATE
   *Assistant Attorney General*
ERIC D. MCARTHUR
   *Deputy Assistant Attorney*
   *General*
BRAD HINSHELWOOD
JACK STARCHER

/s/ *Sean R. Janda*
SEAN R. JANDA
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7260*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 514-3388*
   *sean.r.janda@usdoj.gov*

July 2026

# CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5190 words. This motion also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in CenturyExpd BT 14-point font, a proportionally spaced typeface.

/s/ Sean R. Janda
SEAN R. JANDA

# APPENDIX

# TABLE OF CONTENTS

**Page**

District Court Opinion (June 30, 2026), Dkt. No. 17................................... App.1

District Court Order (June 30, 2026), Dkt. No. 16.................................... App.36

District Court Order (July 2, 2026), Dkt. No. 20..................................... App.38

Memorandum for Senior Pentagon Leadership (Mar. 23, 2026),
    Dkt. No. 1-1 ..................................................................... App.39

Declaration of  Joel Manuel Valdez (June 4, 2026), Dkt. No. 11-2.......... App.58

Declaration of Sean Parnell (June 4, 2026), Dkt. No. 11-3....................... App.86

Supplemental Declaration of Julian E. Barnes (June 9, 2026),
    Dkt. No. 12-8 ................................................................... App.92

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| THE NEW YORK TIMES COMPANY, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 26-1690 (PLF) |
| DEPARTMENT OF DEFENSE, et al., | ) ) | |
| Defendants. | ) ) ) | |

OPINION

This matter represents the third installment in the ongoing dispute between

The New York Times ("The Times") and its journalist Julian E. Barnes, and the Department of

Defense (the "Department") under the leadership of Secretary of Defense Pete Hegseth, over the

latter's attempt to curtail media access to the Pentagon.[1]  This Court previously determined that a

---

[1]      The documents reviewed by the Court in connection with the pending motion include:  Complaint for Declaratory and Injunctive Relief ("Compl.") [Dkt. No. 1] and Exhibits [Dkt. Nos. 1-2 to 1-50]; Memorandum for Senior Pentagon Leadership: Implementation of Revised Media In-Brief ("Interim Policy") [Dkt. No. 1-1]; Plaintiffs' Motion for a Preliminary Injunction [Dkt. No. 6] and Exhibits [Dkt. Nos. 6-1 to 6-22]; Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction ("Mem.") [Dkt. No. 6-1]; Declaration of Theodore J. Boutrous, Jr. ("Boutrous Decl.") [Dkt. No. 6-4]; Declaration of Julian E. Barnes ("Barnes Decl.") [Dkt. No. 6-17]; Declaration of Robert Burns ("Burns Decl.") [Dkt. No. 6-18]; Declaration of Chris Meagher ("Meagher Decl.") [Dkt. No. 6-19]; Declaration of Pete Williams ("Williams Decl.") [Dkt. No. 6-20]; Defendants' Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction ("Opp.") [Dkt. No. 11] and Exhibits [Dkt. Nos. 11-1 to 11-3]; Declaration of Joel Manuel Valdez in Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction ("Valdez Decl.") [Dkt. No. 11-2]; Declaration of Sean Parnell in Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction ("Parnell Decl.") [Dkt. No. 11-3]; Reply Brief in Support of Plaintiffs' Motion for Preliminary Injunction ("Reply") [Dkt. No. 12] and Exhibits [Dkt. Nos. 12-1 to 12-9]; Supplemental Declaration of Theodore J. Boutrous Jr. ("Supp. Boutrous Decl.") [Dkt. No. 12-1]; Supplemental Declaration of Julian E. Barnes ("Supp. Barnes Decl.") [Dkt. No. 12-8]; Declaration of Richard W. Stevenson

**App.1**

press credentialing policy issued by the Department in October 2025 (the "October Policy")

violated both the First and Fifth Amendments to the U.S. Constitution.  See N.Y. Times Co. v.

Dep't of Def. ("NYT I"), Civil Action No. 25-4218 (PLF), 2026 WL 788689, at *12, *18-19

(D.D.C. Mar. 20, 2026).  The Court vacated and set aside the unconstitutional provisions of the

October Policy, and it entered a permanent injunction barring the Department from

implementing or enforcing those provisions "to deny, suspend, revoke, or not renew" the press

credentials—known as Pentagon Facilities Alternate Credentials or "PFACs"—of any journalist

from The Times.  Id. at *20.  It also ordered the immediate reinstatement of the PFACs that

Times reporters had long held.  See id.

The next business day, the Department issued another press credentialing policy

(the "Interim Policy").[2]  The Interim Policy, among other things, announced that the designated

area of the Pentagon from which journalists had long worked—known as the "Correspondents'

Corridor"—would be closed effective immediately, meaning that for the first time in decades,

journalists would not be permitted to work from Pentagon grounds.  See Interim Policy at 3;

Boutrous Decl. at Ex. 2.  In addition, and of particular relevance here, the Interim Policy

announced that going forward, credentialed journalists would be prohibited from entering the

Pentagon altogether unless specifically invited to attend a press conference or a prearranged

interview—and even then, only if escorted by an authorized Department official at all times.  See

Interim Policy at 3.

---

("Stevenson Decl.") [Dkt. No. 12-9]; Defendants' Supplemental Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction ("Defs. Supp. Br.") [Dkt. No. 13]; and Supplemental Brief in Support of Plaintiffs' Motion for Preliminary Injunction [Dkt. No. 14].

[2]     The pin cites to the Interim Policy in this opinion correspond to the ECF-generated page numbers of the PDF attached as Exhibit 1 to the Complaint.

**App.2**

The Times quickly moved to compel compliance, arguing that these and other provisions of the Interim Policy flouted the Court's prior opinion and order.  After full briefing and a hearing on the plaintiffs' motion, the Court entered an order enjoining the enforcement of the escort requirement and the other challenged provisions of the Interim Policy.  See N.Y. Times Co. v. Dep't of Def. ("NYT II"), Civil Action No. 25-4218 (PLF), 2026 WL 962252, at *10-11 (D.D.C. Apr. 9, 2026).  The Department then sought and obtained a narrow stay allowing it to implement the Interim Policy's escort requirement while its appeals of this Court's decisions are pending.  See N.Y. Times Co. v. U.S. Dep't of Def., No. 26-5113, 2026 WL 1179440, at *1-3 (D.C. Cir. Apr. 27, 2026).  In issuing the stay, the D.C. Circuit did not address the lawfulness of the Interim Policy's escort requirement.  See id.  Instead, a majority of the divided motions panel concluded that the Department was likely to demonstrate that the escort requirement fell outside the scope of this Court's initial merits order, which did not address that requirement.  See id. at *3.

In this new lawsuit, the plaintiffs ask the Court to preliminarily enjoin the escort requirement that remains in effect on the grounds that it is retaliatory, unreasonable, and viewpoint discriminatory in violation of the First Amendment and an arbitrary and capricious agency action under the Administrative Procedure Act (the "APA").  See Mem.  The Department opposes the plaintiffs' motion.  See Opp.  The Court held a hearing on the motion on June 12, 2026.  Having carefully considered the parties' written submissions, their oral arguments, and the relevant authorities, the Court will grant the plaintiffs' motion for a preliminary injunction.

**App.3**

## I.  FACTUAL AND PROCEDURAL HISTORY

*A. The Long History of the Media and the Pentagon*

For many decades, journalists from news organizations across the country, including reporters with The Times, have covered the United States military and other defense activities from inside the Pentagon.  See NYT I, 2026 WL 788689, at *2; Compl. at Ex. 22; Barnes Decl. ¶ 8; Burns Decl. ¶ 3.[3]  The enduring presence of media members in the Pentagon "has enhanced the ability of journalists and news organizations to keep Americans informed about the U.S. military while posing no security or safety risk to Department property or personnel," as the Department has acknowledged.  NYT I, 2026 WL 788689, at *3.

Credentialed journalists have long enjoyed unescorted access to the Pentagon Press Briefing Room and the corridors linking the many press offices within the building, among other areas.  See Barnes Decl. ¶¶ 8-10; Meagher Decl. ¶ 4; Compl. at Ex. 21.  This access has come with myriad advantages, including that it has allowed reporters to cover official press briefings, even those called on short notice or without notice, and to ask questions of Department officials before, during, and after those briefings.  See Barnes Decl. ¶ 8; Burns Decl. ¶¶ 7-8; Compl. at Ex. 21.  The access also has permitted journalists to have organic semiformal and informal conversations with Department officials and personnel.  See Barnes Decl. ¶ 9; Burns Decl. ¶¶ 9-11.  Journalists from The Times and other media outlets could, for example, "stake out Jim Mattis, a defense secretary in President Trump's first term, when he picked up his clothes at an in-house dry cleaners and have an off-the-record chat as he walked back to his office, shirts slung over his shoulder" or "might bump into the chairman of the Joint Chiefs of

---

[3]    The facts set forth in NYT I were undisputed.  See NYT I, 2026 WL 788689, at *2 n.2.

**App.4**

Staff at a Pentagon Starbucks and have a conversation that could turn into a story." Compl. at Ex. 21, Maureen Dowd, Opinion, Fraidy-Cat at the Pentagon, N.Y. TIMES (Oct. 18, 2025). In addition, beginning in the 1970s, the Department provided reporters with dedicated office space in the Pentagon—known as the Correspondents' Corridor—where reporters could maintain desks and network booths. See Boutrous Decl. at Ex. 2; Williams Decl. ¶ 19; Burns Decl. ¶ 5.

To understand the historical ability of journalists to move through the Pentagon unescorted, it is helpful to have some context. The Pentagon is the world's second largest office building, with about six-and-a-half million square feet of floor space. Claudette Roulo, 10 Things You Probably Didn't Know About the Pentagon, U.S. DEP'T OF WAR (Apr. 16, 2024), https://perma.cc/N9GU-ZWDA. It "includes areas that resemble a mall and are often crowded with visitors and non-military employees." Barnes Decl. ¶ 10. "For example, there is a food court, a pharmacy, a sit-down restaurant, a bank, a dry cleaner, and a chocolate shop in the Pentagon." Id. The Pentagon has long been staffed by a thousand or more non-Department employees, including cleaning and maintenance professionals, contractors, consultants, representatives of other government agencies, and retail and cafeteria workers, who move around areas of the building unescorted every day. See Boutrous Decl. at Ex. 3; Meagher Decl. ¶ 5. In short, the Pentagon is not an "all-classified military command post." Burns Decl. ¶ 14.

*B. The Recent History of the Media and the Pentagon*

Pete Hegseth was confirmed as Secretary of Defense on January 24, 2025. See NYT I, 2026 WL 788689, at *2. "Before and during Secretary Hegseth's confirmation process, news outlets, including The Times, reported extensively on his background, including allegations of past sexual assault, excessive drinking, and marital infidelity, as well as questions about his lack of relevant experience." Id. Secretary Hegseth and other Department officials "have

5

**App.5**

complained openly about reporting that they perceive as unfavorable to them and the Department." Id. Following Secretary Hegseth's confirmation, the Department began taking unprecedented actions with respect to journalists covering the Department and its leadership. Just weeks after the confirmation, for example, the Department announced that it would be requiring several news outlets—specifically, The Times, NBC News, Politico, National Public Radio, CNN, The Hill, and The War Zone—to leave their dedicated workspaces in the Pentagon as part of a new "rotation" system. Compl. at Ex. 37; see also id. at Ex. 29 (describing Secretary Hegseth's "use of polygraph tests to search for people leaking information to the news media").

In March 2025, the editor-in-chief of The Atlantic reported that Secretary Hegseth and other top officials had inadvertently included him in a group chat on the messaging platform Signal in which officials disclosed details regarding imminent U.S. airstrikes in Yemen. See Boutrous Decl. at Ex. 4. That same month, a journalist with The Times reported that Secretary Hegseth also had shared details about U.S. plans to strike Yemen in a second private Signal group chat that included Defendant Timothy Parlatore, a Senior Advisor to Secretary Hegseth, as well as Secretary Hegseth's wife and brother. See Compl. at Exs. 31, 33. Following this reporting, Defendant Sean Parnell, the Assistant to the Secretary of Defense for Public Affairs, called The Times "garbage," and Secretary Hegseth accused The Times of "slashing and burning people to ruin their reputations." Id. at Ex. 33, 36. Both Mr. Parnell and Secretary Hegseth specifically criticized The Times' choice of sources for its reporting, including the use of anonymous sources. See id. Other officials made similar remarks in response to reporting on the Department, such as referring to journalists as "scum" and calling for their "severe punishment." Id. at Exs. 27, 28; see also NYT I, 2026 WL 788689, at *13.

6

**App.6**

*C. The October Policy and The New Pentagon Press Corps*

In May 2025, the Department issued a memorandum entitled "Updated Physical Control Measures for Press/Media Access Within the Pentagon," which outlined new restrictions on journalists' physical access to specific areas within the building. See Compl. at Ex. 39. The Department did not identify any breach of physical security or other incident necessitating these new restrictions, instead explaining that the "updated security measures" were "needed to reduce the opportunities for in-person inadvertent and unauthorized disclosures." Id.; see NYT I, 2026 WL 788689, *3-4. Four months later, in September 2025, the Department issued a memorandum entitled "Implementation of New Media In-brief," which purported to implement the "Updated Physical Control Measures" (the "September Policy"). See Compl. at Ex. 4. The September Policy stated that "[a]ll members of the press issued a [PFAC] w[ould] be required to read and sign a new in-brief form outlining information security requirements, the new physical control measures, and [Department] expectations of their compliance with safety and security requirements." Id. It further provided that a journalist's credentials could be "denied, revoked or not renewed" if the journalist was "reasonably determined to pose a security or safety risk to [Department] personnel or property" and that such a determination could be "based on the unauthorized access, attempted unauthorized access, or unauthorized disclosure of" Department information. Id. The Times and other news outlets objected to the September Policy as incompatible with the First Amendment and the responsibilities of the press, and they advised the Department that their journalists could not sign it. See NYT I, 2026 WL 788689, at *5.

Despite those objections, in October 2025, the Department issued a substantially similar final policy. See Compl. at Ex. 3. The October Policy reiterated the Department's view that "access [to the Pentagon] is a privilege subject to the discretion of government authorities."

7

**App.7**

Id. The October Policy provided that a PFAC "may be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to [Department] personnel or property," and that "[s]uch determination may be based on factors including, but not limited to, the unauthorized access, attempted unauthorized access, or unauthorized disclosure of" Department information "based on a reasonable assessment informed by the unique facts and circumstances of each case." Id. Specifically, the October Policy stated that if a journalist "solicit[s] the disclosure of such information or otherwise encourage[s] [Department] personnel to violate laws and policies concerning the disclosure of such information," the Department may deem the journalist a "security or safety risk." Compl. at Ex. 3. The October Policy provided that "solicitation" in violation of the policy "may include direct communications with specific [Department] personnel or general appeals, such as public advertisements or calls for tips," and it cited "an advertisement or social media post by an individual journalist or media outlet that directly targets [Department] personnel to disclose non-public information without proper authorization" as an "example" of what "would constitute a solicitation that could lead to revocation" of a PFAC. Id. Such "non-public information," according to the October Policy, "may include, but is not limited to, information protected by the Privacy Act, information that is law enforcement-sensitive, and certain operational security information." Id.

In addition, the October Policy included an "Acknowledgment" for journalists to sign, requiring them to affirm that they "received, read, and understand" the policy. Compl. at Ex. 3. Most journalists who held PFACs when the October Policy was issued, including those from The Times, The Wall Street Journal, The Washington Post, CNN, and Fox News, refused to sign the Acknowledgment. See NYT I, 2026 WL 788689, at *6, *14. As a result, the journalists were required to hand in their PFACs. See id. at *6.

8

**App.8**

Within days of the enactment of the October Policy, Mr. Parnell took to his official X account to "announce the next generation of the Pentagon press corps."  Compl. at Ex. 19.  New PFAC recipients included the National Pulse, which was described by its editor-in-chief as "an industry mag/site for MAGA world"; Laura Loomer, an "influential pro-Trump activist"; and former congressman Matt Gaetz, President Trump's one-time choice for Attorney General of the United States, who is now affiliated with One America News.  Compl. at Exs. 11, 15.  Many new recipients had expressed ideological agreement with and support for the Trump administration or indicated that they did not intend to report critically on the Pentagon. See id. at Ex. 15; NYT I, 2026 WL 788689, at *6.  For example, Libby Emmons, the editor-in-chief of Human Events and The Post Millennial who requested four passes for her staff after "receiv[ing] an unsolicited invitation to apply for credentials," stated that "[t]here should be a place for reporting on what they are doing without always trying to expose the dark underbelly." Compl. at Ex. 15.  Tim Pool, whose outlet, Timcast Media, also received a credential, explained that his is "not an investigative news organization" and that he did "not intend to maintain a significant presence in the Pentagon."  Id.  Mr. Parnell described these "[n]ew media outlets" willing to sign onto the October Policy as those who "circumvent the lies of the mainstream media and get real news to the American people."  Id. at Ex. 19.  He also wrote that those outlets' "reach and impact collectively are far more effective and balanced than the self-righteous media who chose to self-deport from the Pentagon."  Id.

### D. The Challenge to the October Policy

On December 4, 2025, The Times and Mr. Barnes filed suit to challenge certain provisions of the October Policy.  See Complaint, NYT v. Dep't of Def., Civil Action No. 25-4218-PLF (Dec. 4, 2025), Dkt. No. 1.  The parties filed and briefed cross-motions for

**App.9**

summary judgment, and the Court held a hearing on March 6, 2026.  On March 20, 2026, the Court granted the plaintiffs' motion for summary judgment and denied the Department's cross-motion.  See NYT I, 2026 WL 788689, at *2.  The Court held that the challenged provisions of the October Policy violated the First and Fifth Amendments.  On the plaintiffs' challenge under the Fifth Amendment, the Court concluded that the October Policy was so vague and standardless as to violate the Due Process Clause.  See id. at *8-12.  On the plaintiffs' challenge under the First Amendment, the Court concluded that the October Policy was both unreasonable and viewpoint discriminatory.  See id. at *13-17.  The latter conclusion rested on the "voluminous" and "undisputed" record evidence, which "reflect[ed] the [October] Policy's true purpose and practical effect: to weed out disfavored journalists—those who were not, in the Department's view, 'on board and willing to serve'—and replace them with news entities that are."  Id. (citation omitted).

        In considering the appropriate remedy, the Court determined, based on the Department's express concession, that "[t]he regular presence of PFAC holders at the Pentagon . . . pos[es] no security or safety risk to Department property or personnel."  NYT I, 2026 WL 788689, at *5.  The Court flatly rejected the Department's assertion that vacatur of the October Policy's unlawful provisions "would 'compromise the safety of the Pentagon,'" concluding that the assertion was "unfounded."  Id. at *18.  The Court therefore vacated the unconstitutional provisions of the October Policy as to all regulated parties, enjoined the Department from enforcing those provisions against the plaintiffs, and ordered the Department to immediately reinstate PFACs to Mr. Barnes and the six other Times journalists who held credentials prior to the October Policy's adoption.  See id. at *19-20.

**App.10**

*E. The Interim Policy*

On Monday, March 23, 2026—the next business day after the Court issued its opinion and order vacating and enjoining the enforcement of the October Policy—the Department announced the Interim Policy. See Interim Policy; NYT II, 2026 WL 962252, at *1-2. In an email to counsel for The Times, Mr. Parlatore provided a copy of that "revised policy," which consists of a "Pentagon Reservation In-Brief for Media Members" (the "In-Brief"), an accompanying "Memorandum for Senior Pentagon Leadership" from Mr. Parnell (the "Memorandum"), and an Appendix. See Interim Policy; Compl. at Ex. 2. The Memorandum states that the Department "disagrees with the Court's decision and is pursuing an appeal," but "[i]n the interim," the Interim Policy will be in effect to "preserv[e] the Department's legitimate security interests and its statutory obligation to ensure the safe, efficient, and secure operation of the Pentagon Reservation." Interim Policy at 2. The Memorandum further states that the Interim Policy "addresses the provisions the Court vacated while retaining all physical access restrictions, conduct requirements, and security measures that were not at issue in the litigation." Id. In addition, the Memorandum asserts that "[t]he Court characterized the original Policy's provisions in ways the Department believes were inaccurate" and that the Interim Policy "includes targeted clarifications to correct these mischaracterizations." Id.

The Interim Policy, in pertinent part, provides that going forward, "PFACs may be denied, revoked, or not renewed if a person meets any of the criteria set forth in Appendix A." Interim Policy at 10. Appendix A outlines certain "[c]onduct-[b]ased [g]rounds" to deny or revoke a PFAC, including that the holder engaged in the "intentional inducement of unauthorized disclosure" of nonpublic information. Id. at 14. The Interim Policy made clear that "[t]o correct the Court's mischaracterization" of the October Policy in its merits opinion, "the Department has

11

**App.11**

replaced the term 'solicitation' with 'intentional inducement of unauthorized disclosure.'" Id.  In an interview with The Times shortly after the Interim Policy's issuance, Mr. Parlatore confirmed that the Interim Policy "us[es] more words to say the same thing" as the October Policy had said. NYT II, 2026 WL 962252, at *5.

In addition, the Interim Policy provides that "[e]ffective immediately, the Correspondents' Corridor is closed" and that "[a] new press workspace . . . in an annex facility outside the Pentagon . . . will be available when ready."  Interim Policy at 3.  It does not, however, indicate when that space will be ready.  See id.  The Interim Policy further provides that moving forward, PFAC holders will be able to access the Pentagon only "for scheduled press briefings, press conferences, and interviews arranged through public affairs offices" and only if they are "escort[ed] by authorized [Department] personnel at all times."  Id.  Pursuant to the Interim Policy, "all journalist access to the Pentagon will require [an] escort," and "[w]hen in the Pentagon," PFAC holders "must remain with [their] escort at all times."  Id. at 3, 7.  No more than "three visiting media members from the same media outlet" may obtain "escort privileges." Id. at 8-9.  The Interim Policy provides that the reason for the new escort requirement is that "following the Court's vacatur of the [October] Policy's security screening provisions, the Department determined that unescorted access to the Pentagon cannot be responsibly maintained without the ability to screen PFAC holders for security risks."  Id.

*F. The Challenge to the Interim Policy*

On March 24, 2026, the plaintiffs moved the Court to compel the Department to comply with its merits order vacating and enjoining the enforcement of certain provisions of the October Policy.  See Motion to Compel Compliance, N.Y. Times Co. v. Dep't of Def., Civil Action No. 25-4218-PLF (Mar. 24, 2026), Dkt. No. 37.  The Court held a hearing on

12

**App.12**

March 30, 2026, and it granted the plaintiffs' motion on April 9, 2026.  See NYT II, 2026 WL

962252, at *2.  The Court determined that the Department's effort to "cut off all PFAC holders'

meaningful access" to the Pentagon was a "transparent" attempt to circumvent the Court's order

requiring "the Department to restore the plaintiffs' access to the Pentagon."  Id. at *8-9

(emphasis omitted).  The Court rejected the "justification offered by the Department for this

sudden change—that the Court's order had removed all security screening authority—as

"nonsense."  Id. at *7.  The Court enjoined the Department from enforcing the Interim Policy

against The Times's journalists and ordered that Mr. Barnes and the other Times reporters be

allowed "to access the Pentagon in a manner commensurate with the access provided to PFAC

holders on March 20, 2026, following" the Court's merits order.  Id. at *11.

　　　　　The Department appealed the Court's March 20 and April 9, 2026 orders, and it

sought a limited stay pending appeal to allow it to implement only the escort requirement of the

Interim Policy.  See Emergency Motion for Stay Pending Appeal, N.Y. Times Co. v. Dep't of

Def., No. 26-5113 (D.C. Cir. Apr. 13, 2026).  A divided motions panel of the D.C. Circuit

granted that stay request, concluding that the Department was likely to succeed in demonstrating

that the escort requirement was not within the scope of this Court's original merits order and thus

could not be enjoined through a motion to enforce that order.  See N.Y. Times Co. v. U.S. Dep't

of Def., 2026 WL 1179440, at *3 (D.C. Cir. Apr. 27, 2026).  The panel emphasized that it was

not addressing the lawfulness of the Interim Policy on the merits, explaining that "because the

challenge to the Interim PFAC Policy was presented in a motion to compel compliance," this

Court did not have the opportunity to determine whether "the escort requirement independently

violates the First or Fifth Amendment."  Id.

13

**App.13**

*G. The Current Status of the Media and the Pentagon*

In the weeks since the plaintiffs moved to compel compliance with this Court's merits order, the vitriolic statements by Department officials toward the media have continued. For example, in April 2026, in a statement directed to the "American media" while addressing the ongoing war in Iran, Secretary Hegseth referred to the "endless stream of garbage" and "the relentlessly negative coverage that [journalists] just can't help peddling," stating that "sometimes it's hard to figure out what side some of [the journalists] are actually on." Compl. at Ex. 9. He continued to compare the "legacy Trump-hating press" to the biblical "Pharisees" who "held counsel against [Jesus]" and "scrutinized every good act in order to find a violation, only looking for the negative," and he asserted that the journalists' "hardened hearts . . . are calibrated only to impugn." Id. That same month, Secretary Hegseth referred to The Times's reporting as "incredibly problematic" and "incredibly irresponsible and unpatriotic." Id. at Ex. 8. In May 2026, President Trump responded to a question from a Times reporter about the war in Iran by stating: "We've had a total victory, except by people like you that don't write the truth. . . . I actually think it's sort of treasonous what you write. But you at The New York Times and CNN, I would say are the worst." Boutrous Decl. at Ex. 5.

In June 2026, when asked by a reporter about a proposed $1.8 billion "weaponization fund," President Trump responded by stating that "the fake news like CNN [and] like The New York Times" have "abused our people so badly," telling the reporter, "You should be ashamed of yourself." Supp. Boutrous Decl. at Ex. 5. In an interview that aired that same month, President Trump told a reporter from NBC's "Meet the Press" that she was either "crooked" or "stupid," continuing, "You ought to straighten out your press." NBC NEWS, Trump Says 'I'd Pay' Anti-Weaponization Fund Applicants 'the Kind of Money They Deserve',

14

**App.14**

(YouTube, June 7, 2026), https://perma.cc/79NS-BA3G.  Later that month, Secretary Hegseth accused a journalist with CBS of "peddl[ing]" a "manufactured story" and "trying to put words in [his] mouth . . . to create a headline."  Transcript: Defense Secretary Pete Hegseth on "Face the Nation with Margaret Brennan," June 14, 2026, CBS NEWS, https://perma.cc/4UUT-HNSB.

### H. The Challenge to the Escort Policy

On May 18, 2026, the plaintiffs filed a new lawsuit to challenge the Interim Policy's prohibition on unescorted access to the Pentagon, which is currently in effect and being implemented by the Department.  See Compl.  On May 22, 2026, the plaintiffs moved for preliminary injunctive relief, arguing that they are likely to show that the escort requirement violates the First Amendment and the APA and that the remaining preliminary injunction factors weigh in their favor.  See Mot.  The plaintiffs' motion has been fully briefed and argued, and it is ripe for decision.

### II. LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Winter v. Nat'l Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).  The balance of equities and public interest factors merge when the government is a party.  See Nken v. Holder, 556 U.S. 418, 435 (2009).

15

**App.15**

### III. DISCUSSION

*A. The Plaintiffs Have Shown a Likelihood of Success on the Merits*

The Court begins with the "most important" preliminary injunction factor: whether the plaintiffs "have established a likelihood of success on the merits." Aamer v. Obama, 742 F.3d 1023, 1038 (D.C. Cir. 2014); see Bailey v. Fed. Bureau of Prisons, Civil Action No. 24-1219 (PLF), 2024 WL 3219207, at *3 (D.D.C. June 28, 2024). "In First Amendment cases, the likelihood of success will often be the determinative factor." Media Matters for Am. v. Paxton, 138 F.4th 563, 584 (D.C. Cir. 2025) (quoting Green v. U.S. Dep't of Just., 54 F.4th 738, 745 (D.C. Cir. 2022)).

The plaintiffs contend that they are likely to establish that the Interim Policy's escort requirement violates the First Amendment twice over: because it was issued to retaliate against the plaintiffs for exercising their constitutional rights, and because it is an unreasonable and viewpoint discriminatory restriction on access to a nonpublic forum. See Mem. at 24-36. They also argue that they are likely to establish that the escort requirement is arbitrary and capricious in violation of the APA. Because the Court determines that the plaintiffs have shown that they are likely to succeed on their retaliation claim, the Court will not reach the plaintiffs' alternative arguments. See Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs. ("Am. Acad."), 816 F. Supp. 3d 27, 60 n.12 (D.D.C. 2026) (taking the same approach).

To prevail on the merits of their First Amendment retaliation claim, the plaintiffs must prove that "(1) [they] engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in [their] position from speaking again; and (3) a causal link between the exercise of a constitutional right

16

**App.16**

and the adverse action taken against" them.  Media Matters for Am. v. Paxton, 138 F.4th at 584

(alterations in original) (quoting Aref v. Lynch, 833 F.3d 242, 258 (D.C. Cir. 2016)).

### 1. Protected Speech

On the first element, the Department wisely does not dispute that the plaintiffs

have engaged in activity protected under the First Amendment.  The plaintiffs' "reporting on

public issues [is] [a] quintessential First Amendment activit[y]."  Media Matters for Am. v.

Paxton, 138 F.4th at 584; see N.Y. Times Co. v. Sullivan, 376 U.S. 254, 269 (1964) ("The

general proposition that freedom of expression upon public questions is secured by the First

Amendment has long been settled by our decisions.").  And their lawsuit challenging the October

Policy, too, "is a form of expression protected by the First Amendment."  In re Halkin, 598

F.2d 176, 187 (D.C. Cir. 1979), overruled on other grounds by Seattle Times Co. v.

Rhinehart, 467 U.S. 20, 29-33 (1984); see Jenner & Block LLP v. U.S. Dep't of Just., 784 F.

Supp. 3d 76, 94 (D.D.C. 2025) (explaining that "courtroom advocacy on behalf of [one's] chosen

causes . . . is [at] the very core of the First Amendment's protection of 'litigation as a vehicle for

effective political expression and association'" (quoting In re Primus, 436 U.S. 412, 431

(1978))).  The plaintiffs thus undoubtedly will succeed in establishing the first element of their

retaliation claim.

### 2. Adverse Action Sufficient to Deter

Turning to the second element, the plaintiffs have demonstrated that the

imposition of the escort requirement is an adverse action that would chill a speaker of "ordinary

firmness."  Media Matters for Am. v. Paxton, 138 F.4th at 584.  This "bar is not a high one."

Jenner & Block LLP v. U.S. Dep't of Just., 784 F. Supp. 3d at 95 n.7.  "[E]ven minor forms of

**App.17**

retaliation can support a First Amendment claim, for they may have just as much of a chilling effect on speech as more drastic measures." Sanders v. District of Columbia, 85 F. Supp. 3d 523, 535 (D.D.C. 2015) (alteration in original) (quoting Smith v. Fruin, 28 F.3d 646, 649 n.3 (7th Cir. 1994)); see also Tao v. Freeh, 27 F.3d 635, 639 (D.C. Cir. 1994) (observing that the First Amendment protects against "even an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . when intended to punish her for exercising her free speech rights" (quoting Rutan v. Republican Party of Ill., 497 U.S. 62, 76 n.8 (1990))). Of course, the Department's actions here are far from trivial. This Court determined in the context of the plaintiffs' motion to compel that the abrupt closure of the Correspondents' Corridor and elimination of unescorted access to the Pentagon for credentialed journalists substantially encumber the ability of those journalists to do their jobs. See NYT II, 2026 WL 962252, at *8-9; see also N.Y. Times Co. v. U.S. Dep't of Def., 2026 WL 1179440, at *6 (Childs, J., dissenting) ("Reporters can hardly verify sources, gather information, or speak candidly with Department personnel with an escort looming over their shoulders.").

The evidence presented in this litigation amply supports the same conclusion, thereby establishing that the escort requirement is an adverse action that "would deter persons of ordinary firmness from exercising their First Amendment rights." Media Matters for Am. v. Paxton, 138 F.4th at 581. Mr. Barnes testified, for example, that before the escort requirement, "reporting from the Pentagon often necessitated speaking to upwards of a dozen officials and other personnel from different press offices in a given day, sometimes in response to rapidly developing events." Barnes Decl. ¶ 9. The "most helpful conversations with Public Affairs staff," in Mr. Barnes' experience, "cannot be planned or scheduled in advance" and "vary depending on which staff are present or available to speak, what the latest news is, or what

18

**App.18**

information was shared in an immediately preceding conversation." Id. Prior to the escort requirement, Mr. Barnes was "able to walk from press office to press office throughout the day" to gather newsworthy information, and doing so was "integral to [his] reporting about the Department, national security, and United States intelligence agencies." Id. ¶¶ 11, 29. Mr. Barnes testified: "Those conversations strengthened my reporting by giving me more context and often a more nuanced understanding of the issues; those conversations also helped me to understand and incorporate the U.S. military's perspective in my reporting." Supp. Barnes Decl. ¶ 5. Robert Burns, a veteran reporter with The Associated Press, similarly testified that reporting from within the Pentagon gave him opportunities for "semi-formal" and "informal interactions" with Department officials. Burns Decl. ¶¶ 10-11. For example, Mr. Burns testified that "Secretary Donald Rumsfeld would invite reporters into his office on weekend mornings for wide-ranging, off-the-record discussions" separate from any scheduled press briefings or interviews. Id. ¶ 10. These sorts of less formal interactions "proved invaluable" to Mr. Burns' reporting. Id. ¶ 11.

Former Assistant Secretary of Defense for Public Affairs Chris Meagher testified that when he worked for the Department, "[r]eporters would visit the desks of different press operations officers, depending on what questions the reporters had or the topics they wanted to discuss," and they "frequently visited" the various "public affairs offices as part of their work." Meagher Decl. ¶¶ 7-8. "[D]oing so required that [the journalists] be able to move through hallways in the Pentagon unescorted" because the "offices and staff were located throughout the Pentagon building . . . in different wings and on different floors." Id. ¶ 8. Mr. Meagher testified that "regular, informal interactions between Defense Department staff and reporters [were] mutually beneficial" because they allowed staff to "correct misunderstandings early in the

19

**App.19**

reporting process and anticipate stories that might be controversial for the Department." Id. ¶ 12.
These regular interactions also allowed staff to "build relationships with reporters that were built
on trust and rapport." Id.  In Mr. Meagher's experience, that relationship-building "was
important because it helped give reporters confidence that the information [the Department was]
providing was accurate and gave them opportunities to confirm and verify the accuracy of the
information." Id.  Former Assistant Secretary of Defense for Public Affairs Pete Williams
similarly testified that the "regular presence of reporters in the Pentagon" was advantageous
because it "helped develop respect and trust between those reporters and Department officials."
Williams Decl. ¶ 8.

Now, by contrast, the default is that reporters are not present within the Pentagon.
Mr. Barnes and other reporters must make "separate appointment[s]" and obtain escorts for
"each separate conversation" with public affairs staff.  Barnes Decl. ¶ 24.  Once the scheduled
appointment is completed, the reporter is escorted out of the building and is not permitted to
speak with any other officials or visit any other offices.  Id. ¶ 29.  In other words, there are no
longer opportunities for the semiformal or informal interactions that reporters and former
Department officials alike testified were critical.  Moreover, the escort requirement, in
Mr. Barnes' estimation, leads to reporters spending "hours of [the] day just waiting and walking
back and forth" between the Pentagon and the off-grounds library from which they are now
expected to work.  Id. ¶ 29.  Mr. Barnes testified that "[t]his is time-consuming and burdensome,
and it has substantially reduced [his] amount of interaction with staff from the Public Affairs
Offices."  Id. ¶ 24.  He elaborated:  "Going through a sometimes-lengthy process of scheduling
official appointments in order to ask even one or two questions to an official—even assuming
that request is granted and that official does not have to reschedule—does not allow for

20

**App.20**

meaningful engagement with Department personnel on a timeline consistent with news reporting." Id. ¶ 29.  In Mr. Barnes' view, "[w]ith the escort requirement in place, going to the Pentagon is rarely worthwhile."  Supp. Barnes Decl. ¶ 7.  Mr. Barnes testified that "[i]f not for the escort requirement, [he] would go to the Pentagon more frequently, just as [he] did before October 2025."  Id.

This testimony of the ways in which "[t]he escort requirement has made it exceedingly challenging to speak with press officials and other personnel in person, and to otherwise cover the Department and the U.S. military from Pentagon grounds," Barnes Decl. ¶ 25, surely clears the "relatively modest" bar to constitute adverse action that would deter persons of ordinary firmness from exercising their First Amendment rights.  Endocrine Soc'y v. Fed. Trade Comm'n, Civil Action No. 26-512 (JEB), 2026 WL 1257289, at *10 (D.D.C. May 7, 2026); see Jenner & Block LLP v. U.S. Dep't of Just., 784 F. Supp. 3d at 95 n.7.  This evidence largely goes unaddressed by the Department.  In response to the plaintiffs' evidence, the Department points to testimony from Acting Press Secretary Joel Manuel Valdez that since the imposition of the escort requirement, sixty reporters have accessed the Pentagon to attend media events, and "no PFAC holder has been unable to enter the Pentagon because of an inability to arrange an escort."  Valdez Decl. ¶ 6.  But the plaintiffs' point is not that the work of journalists has been hindered because escorts have not been made available when requested.  Rather, the plaintiffs maintain that their ability to interview varied sources from across the Department, engage in spontaneous conversations, and develop relationships with sources—which the record evidence demonstrates are essential aspects of covering the Pentagon—is inescapably burdened

21

**App.21**

by the requirement to obtain, in advance, an escort for each and every visit to the Pentagon.[4]
These consequences of the escort requirement are not ones that ordinary people would "lightly
disregard." Endocrine Soc'y v. Fed. Trade Comm'n, 2026 WL 1257289, at *10 (quoting First
Choice Women's Res. Ctrs., Inc. v. Davenport, 146 S. Ct. 1114, 1127 (2026)); see also Am.
Acad., 816 F. Supp. 3d at 53. The plaintiffs therefore are likely to prevail on the second prong of
their retaliation claim.[5]

### 3. Causal Link

On the third element, the plaintiffs have marshaled compelling evidence
connecting the imposition of the escort requirement to their protected speech. The D.C. Circuit
has explained in the context of First Amendment retaliation that circumstantial evidence "is
equally as probative as direct evidence in proving illegitimate intent." Media Matters for Am. v.
Fed. Trade Comm'n ("FTC"), No. 25-5302, 2025 WL 2988966, at *8 (D.C. Cir. Oct. 23, 2025)
(per curiam) (quoting Bailey v. Ramos, 125 F.4th 667, 685 (5th Cir. 2025)). "[S]uch
circumstantial evidence, including proximity in time between the protected speech and

---

[4]    Mr. Valdez testified that since the Interim Policy was implemented, journalists
from "[o]utlets including The Associated Press, CNN, The Daily Mail, The Washington Post,
The Wall Street Journal, and CBS News have requested PFACs and were approved but have yet
to pick up their badges from the Pentagon." Valdez Decl. ¶ 3. As the plaintiffs point out,
however, the logical implication of Mr. Valdez's testimony is that those outlets, whose
journalists used to regularly report from the Pentagon, no longer believe the PFACs to have
much value. See Reply at 23.

[5]    The Department repeatedly cites the D.C. Circuit's decision in Flynt v. Rumsfeld,
355 F.3d 697, 703 (D.C. Cir. 2004) for the proposition that "[t]he First Amendment does not
require that the government make a reporter's job easier or better." Opp. at 14; see also id. at 12;
Defs. Supp. Br. at 7. That case, however, says nothing of the plaintiffs' likelihood of success on
the second element of their retaliation claim. To satisfy that element, the plaintiffs must show
only that the Department's action is onerous enough to chill a speaker of ordinary firmness—not
that the Department's action itself violates the First Amendment. See Media Matters for Am. v.
Paxton, 138 F.4th at 584. The plaintiffs have established that they are likely to succeed in
making that showing.

**App.22**

government's adverse actions, the defendant's expression of hostility to the protected speech, and the absence of a proffered legitimate alternative explanation for the action can support a finding that protected speech caused the agency's response." Id.

The plaintiffs' evidence of retaliatory motive includes myriad statements by Department officials expressing disdain for reporting by The Times and other "legacy" media outlets. See FTC, 2025 WL 2988966, at *8; see also Nat'l Treasury Emps. Union v. Trump, 780 F. Supp. 3d 237, 255 (D.D.C. 2025) (considering "contemporaneous statements" as evincing the government's "retaliatory motive"); Am. Acad., 816 F. Supp. 3d at 57 (considering "negative . . . public statements against [the plaintiff] by [agency] officials" as probative of causation). The Department protests that many of the statements the plaintiffs identify were made before the October Policy was issued and thus are too "remote in time" to "contaminate" the Interim Policy. Opp. at 22. Perhaps that argument would have some force if the Department officials' hostile statements ceased after, or even were interrupted by, the issuance of the October Policy. What the plaintiffs' evidence shows, however, is a consistent stream of derisive comments beginning shortly after the confirmation of Secretary Hegseth and continuing through the present.

As early as March 2025, for example, Mr. Parnell referred to The Times as "a propaganda machine" and stated that "[t]he days of the Pentagon just allowing these fake narratives to spread is over." Compl. at Ex. 36. Following reporting on Secretary Hegseth's improper use of Signal in May 2025, Mr. Parnell called The Times "garbage," and Secretary Hegseth accused The Times of "slashing and burning people to ruin their reputations." Id. at Exs. 33, 36; see also supra Section I.B (describing similar statements). Immediately after the October Policy was enacted, Mr. Parnell referred to the "lies" of the "self-righteous media who chose to self-deport from the Pentagon." Id. at Ex. 19; see also NYT I, 2026 WL 788689, at 6-7.

23

**App.23**

More recently, as described above, Secretary Hegseth referred to the "endless stream of garbage" and "the relentlessly negative coverage that [journalists] just can't help peddling" and compared the "legacy Trump-hating press" to the biblical "Pharisees" who "held counsel against [Jesus]" and "scrutinized every good act in order to find a violation, only looking for the negative." Compl. at Ex. 9; see also id. at Ex. 8 (Secretary Hegseth calling The Times' reporting "incredibly irresponsible and unpatriotic"); Boutrous Decl. at Ex. 5 (President Trump responding to a question from a Times reporter about the war in Iran by stating: "We've had a total victory, except by people like you that don't write the truth. . . .  I actually think it's sort of treasonous what you write.  But you at The New York Times and CNN, I would say are the worst.").

The Department's attempt to dismiss these statements as innocuous expressions of the officials' "opinions about how [the plaintiffs'] reporting itself might harm national security and whether the reporting is accurate," Opp. at 23, falls flat.  The Department officials' rhetoric demonstrates that they harbored animosity for the plaintiffs because of their protected speech— in Secretary Hegseth's words, their "relentlessly negative coverage" of the Department.  Compl. at Ex. 9.  This rhetoric therefore is powerful evidence of the Department's retaliatory motive. See Am. Acad., 816 F. Supp. 3d at 57; see also Endocrine Soc'y v. Fed. Trade Comm'n, 2026 WL 1257289, at *12 (finding "the [g]overnment's 'expression of hostility' regarding 'the protected speech'" to be "robust circumstantial evidence that retaliation motivated the [government's] actions" (quoting Am. Acad., 816 F. Supp. 3d at 54)).

To establish First Amendment retaliation, however, it is not enough for the plaintiffs to show that retaliation was a motive for the adverse action.  The Department's "improper motive must be a but-for cause of [its] action, 'meaning that the adverse action against the plaintiff[s] would not have been taken absent the retaliatory motive.'"  Comm. on Ways &

24

**App.24**

Means, U.S. House of Reps. v. U.S. Dep't of Treasury, 45 F.4th 324, 340 (D.C. Cir. 2022)

(quoting Nieves v. Bartlett, 587 U.S. 391, 399 (2019)).  "[E]ven if there was retaliatory motive,"

causation is not established if the government is "able to show that it would have [taken the same

action] on nonretaliatory grounds anyway."  FTC, 2025 WL 2988966, at *9; see Mt. Healthy

City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).

         The Department has proffered a supposed nonretaliatory explanation for imposing

the escort requirement through a declaration submitted by Mr. Parnell.  See Parnell Decl.

Mr. Parnell testified that he was told by Pentagon Press Secretary Kingsley Wilson that before

the issuance of the October Policy, her office "was contacted by journalists on a regular basis . . .

regarding information they obtained that was sensitive or classified, including information

relating to operational plans, intelligence assessments, diplomatic communications, and force

posture decisions."  Id. ¶ 4.  "Following the implementation of the [October] Policy," however,

"the frequency with which the Pentagon press office was contacted by journalists regarding

sensitive, controlled or classified information dropped dramatically."  Id. ¶ 8.  Mr. Parnell

determined that "this reduction [in contacts] occurred primarily because many journalists no

longer maintained a persistent, unescorted presence near sensitive spaces in the Pentagon,"

which previously had enabled them to "observe activity patterns" and identify potential sources

of sensitive information.  Id. ¶¶ 6, 9.  He thus concluded that "restoring unescorted access to the

Pentagon for PFAC holders would result in a return to the same pattern of regular breaches of

information security that . . . unescorted access had previously permitted."  Id. ¶ 11.  He

explained: "I reached this conclusion after the Court rejected the October Policy's attempt to

permit PFAC holders to access portions of the Pentagon without an escort, subject to a

requirement that PFAC holders not intentionally induce unauthorized disclosures."  Id. ¶ 12.

25

**App.25**

This "activity patterns" rationale immediately raises suspicions for the simple reason that it is conspicuously absent from the Interim Policy itself, and from the Department's briefing on the plaintiffs' motion to compel compliance with this Court's merits order, including the declarations submitted in opposition to that motion.  See Interim Policy; Defendants' Opposition to Plaintiffs' Motion to Compel Compliance with the Court's Order, N.Y. Times v. Dep't of Def., Civil Action No. 25-4218 (D.D.C. Apr. 10, 2026), Dkt. No. 41.  The Interim Policy provides the following as the justification for the escort requirement: "In assessing the Department's security posture following the Court's vacatur of the [October] Policy's security screening provisions, the Department determined that unescorted access to the Pentagon cannot be responsibly maintained without the ability to screen PFAC holders for security risks."  Interim Policy at 3.  In granting the plaintiffs' motion to compel compliance, the Court dismissed that explanation as baseless because, in fact, "the Court did not 'remove' or 'excise' the Department's authority to screen PFAC holders."  NYT II, 2026 WL 962252, at *7.  Only then, in seeking a partial stay of the Court's compliance order pending appeal, did the Department offer the "activity patterns" rationale through a declaration from Ms. Wilson.  See Declaration of Kingsley Wilson in Support of Defendants' Emergency Motion for Stay Pending Appeal ("Wilson Decl."), N.Y. Times v. Dep't of Def., Civil Action No. 25-4218 (D.D.C. Apr. 10, 2026), Dkt. No. 58-1.[6]

---

[6]    In deciding that the equities and public interest factors of the stay-pending-appeal test favored neither side, a majority of the motions panel determined, based on the Wilson Declaration, that "[t]he Department has . . . supported its claim that [the escort requirement] furthers important national security interests."  N.Y. Times Co. v. U.S. Dep't of Def., 2026 WL 1179440, at *2.  The Court does not understand that determination, which was made in the context of a non-merits element of the stay test and on a different factual record, to bear on this Court's assessment of whether the plaintiffs are likely to succeed on the merits of their retaliation claim.  And even the Department does not appear to assert that the Court is bound by the panel majority's determination.  Cf. Am. Foreign Serv. Ass'n v. Trump, 792 F. Supp. 3d 116, 136

**App.26**

Consideration of the proffered rationale itself only confirms those suspicions. The Department's position, as set forth in the Parnell Declaration, is that the October Policy demonstrated a relationship between unescorted access to the Pentagon's press spaces and the dissemination of sensitive or classified information such that the Department would have imposed the escort requirement absent its animus toward The Times. See Parnell Decl. ¶ 11 (averring that "restoring unescorted access to the Pentagon for PFAC holders would result in a return to the same pattern of regular breaches of information security that that unescorted access had previously permitted"). But the October Policy did not eliminate unescorted access to the press spaces of the Pentagon. The effect of the October Policy was that only certain journalists—those who were not "on board and willing to serve our commander in chief," NYT I, 2026 WL 788689, at *14—no longer had unescorted (or any) access to the Pentagon. The members of the "next generation of the Pentagon press corps," id. at *13, retained the ability to move freely within the Pentagon, and the Department vigorously advocated for that to continue. Only once this Court ordered the Department to restore The Times journalists' access to the Pentagon did the Department suggest that unescorted access was a problem.

The Department protests that the timing of the escort requirement cannot be seen as suspicious because the Department imposed the requirement immediately after, and in direct response to, this Court "vacat[ing] key provisions of the October Policy." Opp. at 21-22. Mr. Parnell testified that "after the Court rejected the October Policy's . . . requirement that PFAC holders not intentionally induce unauthorized disclosures," he determined that "[w]ithout the escort requirement or a prohibition on PFAC holders soliciting unlawful disclosures of

---

(D.D.C. 2025) ("To be sure, the government does not argue that the motions panel's reasoning is binding on the Court, and the Court will not treat it as such." (citations omitted)).

27

**App.27**

sensitive information, . . . the Department has no other effective means of managing th[e] demonstrated, repeated risk to the security of sensitive information within the Pentagon." Parnell Decl. ¶ 12.  In other words, the Department's position is that it viewed the escort requirement as the next best thing to a prohibition on the "solicitation" of sensitive information. The problem with that position is that, along with imposing an escort requirement, the Interim Policy effectively reinstated the "solicitation" prohibition, just using different language.  See NYT II, 2026 WL 962252, at *7.  Indeed, the Interim Policy itself states that "[t]o correct the Court's mischaracterization [of the October Policy], the Department has replaced the term 'solicitation' with 'intentional inducement of unauthorized disclosure.'"  Interim Policy at 14; see NYT II, 2026 WL 962252, at *5 (Mr. Parlatore explaining that the Interim Policy "us[es] more words to say the same thing and to foreclose creative misinterpretations").  Furthermore, in his declaration, Mr. Parnell conflates the "requirement that PFAC holders not intentionally induce unauthorized disclosures" with the "prohibition on PFAC holders soliciting unlawful disclosures of sensitive information," Parnell Decl. ¶ 12, thus making abundantly clear that the Department understood those provisions of the October Policy and the Interim Policy to do the same thing.  The escort requirement, then, was imposed not instead of but in addition to the restriction on "solicitation" (or in the language of the Interim Policy, "inducement").  So it simply cannot be, as the Department now insists, that the escort requirement was necessary to "fill the gap created" by this Court's merits order.  Opp. at 21.

On top of all of that, the Department's proffered rationale is facially dubious. Journalists, of course, do not "have access to sensitive or classified information simply by being in [the Pentagon] without an escort."  Williams Decl. ¶ 21.  The Department does not dispute that fact, asserting instead that unescorted access "logically . . . increases the risk" of journalists

28

**App.28**

obtaining such information.  Opp. at 16 (emphasis omitted).  That supposed logic, however, is far

from self-evident.  To reiterate, the escort requirement is founded upon Ms. Wilson's observation

that her office was contacted less frequently by the press about "sensitive or classified"

information after the implementation of the October Policy and Mr. Parnell's conclusion that the

reduction in contacts was attributable to the journalists who refused to sign onto the October

Policy no longer being able to "observe activity patterns and time their inquiries accordingly."

Parnell Decl. ¶ 9; see Wilson Decl. ¶ 11.  But as the plaintiffs point out, Ms. Wilson's

observation of a decrease in contacts about "sensitive or classified information" does not

necessarily correspond to a decrease in instances of journalists obtaining such information.  See

Reply at 5-6.  Indeed, the plaintiffs have refuted the notion that The Times has obtained less

nonpublic information since the October Policy was put in place, see Stevenson Decl. ¶¶ 16-17,

and the Department does not offer any actual evidence to the contrary.[7]  What is more, the

Department's justification lacks any elucidation of the connection between journalists noticing

Department officials' behavior and obtaining classified information.  Why would it be that the

---

[7]     The Department argues that the Stevenson Declaration's focus on nonpublic information is misplaced because "[m]uch information is non-public but is not classified or controlled unclassified information," for example, "various personnel decisions, such as hiring, firing, and promotion decisions."  Defs. Supp. Br. at 4.  The Department's goal with the escort requirement, it says, was to prevent journalists from obtaining only classified or controlled unclassified information—not the broader universe of nonpublic information.  See id.  There are at least two problems with the Department's argument.  First, Mr. Parnell's declaration itself makes clear that the Department sought to prevent journalists from obtaining not only classified or controlled unclassified information but also "sensitive" information more broadly.  See, e.g., Parnell Decl. ¶ 8 (describing "sensitive, controlled or classified information" (emphasis added)).  Second, and in any event, it stretches credulity to its breaking point to conclude that The Times's recent reporting about, for example, "a growing concern within the Pentagon regarding espionage by Israel," Stevenson Decl. ¶ 17, resembles unclassified and uncontrolled nonpublic information on par with "personnel decisions."  The plaintiffs' evidence therefore undercuts the Department's stated reason for imposing the escort requirement because it supports that the October Policy did not have the effect that the Department purportedly sought to replicate.

29

**App.29**

timing of a journalist's question increases the likelihood that a Department official would disclose classified information?  Is the implication that a Department official is more likely to divulge such information while, say, in line at Starbucks?  Based on what?  The Department offers no answer to these questions.

In that vein, taken at face value, the Department's "activity patterns" rationale seemingly would apply to the much broader set of civilian workers in the Pentagon.  As the plaintiffs point out, "the Pentagon is 'a city in itself with over 23,000 employees,'" including non-Department employees such as "contractors, consultants, representatives of other government agencies . . . , representatives of foreign governments, representatives of congressional committees, cafeteria workers, and employers of Concourse concessions."  Mem. at 33 (alteration in original) (quoting Boutrous Decl. at Ex. 3).  These thousands of civilian employees remain free to move about the Pentagon unescorted on a daily basis and, it would seem, are just as capable of observing officials' behavior or "overhear[ing]" sensitive conversations.  Opp. at 16.  The Department argues that the escort requirement applies only to journalists because it has not made a finding that "the range of other people who access the Pentagon" have "obtained sensitive information," and the Department insists that "[t]he unique nature of the journalistic profession and each journalist's access to both sources of and means for distributing information" justifies the policy.  Id. at 14.  The notion that reporters should be treated worse than baristas, short order cooks, dry cleaners, or any other civilians given access to the Pentagon, surely "is a perverse reading of the First Amendment."  Reply at 4.  And by singling out journalists, the escort policy "undercut[s] the basic assumption of our political system that the press will often serve as an important restraint on government."  Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue, 460 U.S. 575, 585 (1983).

**App.30**

In ordinary circumstances, the Department would be entitled to a "presumption of regularity," meaning the Court would assume that the Department has acted properly and lawfully.  This Court previously has questioned whether such a presumption continues to exist in light of the current administration's extensive pattern of illegal and unconstitutional behavior. See, e.g., Fed. Educ. Ass'n v. Trump, 795 F. Supp. 3d 74, 92 (D.D.C. 2025) ("In just six months, the President of the United States may have forfeited the right to such a presumption of regularity.").  But regardless, the presumption that the Department has acted in good faith "is merely a presumption that may be overcome." Am. Acad., 816 F. Supp. 3d at 59.  The plaintiffs have overcome that presumption in this case based on the "constellation of undisputed facts and circumstances compiled in this still-preliminary record." FTC, 2025 WL 2988966, at *6; see also Am. Acad., 816 F. Supp. 3d at 59.  This "constellation" includes the statements of Department officials from both before and after the enactment of the October Policy, the timing of the imposition of the escort requirement immediately after the Court ordered The Times journalists' PFACs restored, and the fact that the Department has not offered a facially sound, nonretaliatory basis for imposing the requirement.  The Court concludes on the record before it that the plaintiffs are likely to succeed on their First Amendment retaliation claim.

*B. The Plaintiffs Will Suffer Irreparable Harm Absent an Injunction*

Because the plaintiffs have shown a likelihood of success on the merits, "the Court need not belabor the other preliminary-injunction factors." Endocrine Soc'y v. Fed. Trade Comm'n, 2026 WL 1257289, at *14.  That said, the Court concludes that the plaintiffs stand to suffer immediate irreparable harm absent injunctive relief.  As the Supreme Court has held, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Mahmoud v. Taylor, 606 U.S. 522, 569 (2025) (alteration in

31

**App.31**

original) (quoting Roman Catholic Diocese of Brooklyn v. Cuomo, 592 U.S. 14, 19 (2020)); see Karem v. Trump, 960 F.3d 656, 667 (D.C. Cir. 2020) ("As our court has explained, a prospective violation of a constitutional right constitutes irreparable injury for purposes of seeking equitable relief." (citation modified)).  "When a party makes it 'apparent' that its 'constitutional rights are violated,' it easily clears the irreparable-harm requirement to warrant preliminary relief." Endocrine Soc'y v. Fed. Trade Comm'n, 2026 WL 1257289, at *14 (quoting Mills v. District of Columbia, 571 F.3d 1304, 1312 (D.C. Cir. 2009)).  For the reasons explained above, the plaintiffs are likely to succeed in showing that the Department "retaliat[ed] against them in response to their exercise of their First Amendment rights," and "that is . . . an irreparable injury." Media Matters for Am. v. Paxton, 138 F.4th at 585.

Moreover, the plaintiffs' harm is "not merely . . . abstract" or "theoretical" because the plaintiffs' "First Amendment interest depends on [their] ability to freely pursue 'journalistically productive conversations.'" Karem v. Trump, 404 F. Supp. 3d 203, 217 (D.D.C. 2019); see, e.g., Supp. Barnes Decl. ¶ 7 ("To be an effective reporter, I often need to have conversations, follow leads, and ask questions that cannot be planned days or even hours ahead of time.").  The plaintiffs have demonstrated that the escort requirement burdens their ability to engage in newsgathering because it has "substantially reduced" their "amount of interaction with" sources and "made it exceedingly challenging to speak with press officials and other personnel in person." Barnes Decl. ¶¶ 24-25; see supra Section III.A.2.  And because "the news is time-sensitive and occurs spontaneously," those harms "cannot be remedied retrospectively." Karem v. Trump, 404 F. Supp. 3d at 217.[8]

---

[8]    Citing the D.C. Circuit's decision in Ateba v. Leavitt, 133 F.4th 114, the Department argues that the plaintiffs cannot show irreparable harm because they continue to have escorted access to the Pentagon.  See Opp. at 28-29, 36.  In Ateba, the D.C. Circuit

32

**App.32**

*C. The Balance of the Equities and the Public Interest Favor the Plaintiffs*

The balance of equities and public interest factors also weigh in the plaintiffs' favor. On the plaintiffs' side of the scale, there are constitutional interests of great significance. The plaintiffs' "interest in obtaining an injunction mirrors that of every person subject to government power: vindicating the right to be free of retaliation for its protected speech." Endocrine Soc'y v. Fed. Trade Comm'n, 2026 WL 1257289, at *14. "And 'there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional' government action." Media Matters for Am. v. Paxton, 138 F.4th at 585 (quoting Pursuing Am.'s Greatness v. Fed. Election Comm'n, 831 F.3d 500, 511 (D.C. Cir. 2016)). On the Department's side of the scale, while the Department certainly has an interest in protecting national security, it "may not 'act unlawfully even in pursuit of desirable ends.'" Id. (quoting Huisha-Huisha v. Mayorkas, 27 F.4th 718, 734 (D.C. Cir. 2022)); see also Karem v. Trump, 960 F.3d at 668 ("[E]nforcement of an unconstitutional law is always contrary to the public interest." (quoting Gordon v. Holder, 721 F.3d 638, 653 (D.C. Cir. 2013))).

The Department asserts that entering a preliminary injunction "would fly in the face of the D.C. Circuit's decision to stay the Court's previous injunction." Opp. at 38. That is

---

assumed without deciding that the plaintiff, who had been denied a "hard pass" to enter the White House unescorted, had stated a cognizable First Amendment injury. See Ateba v. Leavitt, 133 F.4th at 120-21. The court emphasized that the plaintiff had "maintained access to the Press Area by using day passes," and it noted that while day pass holders had to "wait for an escort to take them from the White House gate to the Press Area," both hard pass and day pass holders had "the same privileges once they [were] inside the Press Area." Id. at 117, 120. Setting aside the fact that the D.C. Circuit did not—as the Department asserts—conclude that "having to wait for an escort was not enough for a First Amendment injury," Defs. Supp. Br. at 6, the facts of Ateba are a far cry from the situation here, where journalists are permitted to enter the Pentagon only for prearranged interviews or press conferences and only if accompanied at all times by an official minder. The harms to the plaintiffs, as detailed above, are far more than mere "inconvenience[s]." Id. at 121.

33

**App.33**

not so.  The panel order granting the Department a stay pending appeal rested on the conclusion that "[t]he escort requirement was not contemplated by the challenged [October] [P]olicy" such that this Court's "March 20 summary judgment opinion and order did not address that provision or a similar one."  N.Y. Times Co. v. U.S. Dep't of Def., 2026 WL 1179440, at *3.  The majority recognized that because of the posture of the plaintiffs' prior challenge to the Interim Policy, this Court "did not hold that the escort requirement independently violates" the Constitution.  Id. With full briefing on the constitutionality of the escort requirement, the Court now, at least preliminarily, so holds.

### D. The Plaintiffs Must Post a Nominal Bond

Rule 65(c) of the Federal Rules of Civil Procedure states that a "court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  FED. R. CIV. P. 65(c).  This rule provides "broad discretion in the district court to determine the appropriate amount of an injunction bond."  DSE, Inc. v. United States, 169 F.3d 21, 33 (D.C. Cir. 1999).  The plaintiffs ask the Court to order them to post a nominal bond of one dollar, given that the Department "will not 'be forced to absorb any costs as a result of an injunction.'"  Mem. at 45 (quoting Am. Oversight v. Hegseth, 788 F. Supp. 3d 14, 32 (D.D.C. 2025)).  The Department offers no argument in response.  Because the Department has not shown that it "will suffer any 'material monetary injury' from the proposed injunction," the Court will order the plaintiffs to post a nominal bond of one dollar.  Am. Oversight v. Hegseth, 788 F. Supp. 3d at 32 (quoting J.G.G. v. Trump, 786 F. Supp. 3d 37, 83 (D.D.C. 2025)).

**App.34**

## IV. CONCLUSION

This Court has spoken at several points about the critical importance of protecting the freedoms enshrined in the First Amendment, and that evergreen message bears repeating: "Those who drafted the First Amendment believed that the nation's security requires a free press and an informed people and that such security is endangered by governmental suppression of political speech. That principle has preserved the nation's security for almost 250 years." NYT I, 2026 WL 788689, at *1. As our country celebrates its 250th anniversary this very week, that principle must not be abandoned now.

The plaintiffs have shown that the factors governing preliminary injunctive relief weigh in their favor. Accordingly, the Court will GRANT the plaintiffs' Motion for a Preliminary Injunction [Dkt. No. 6]. An Order consistent with this Opinion will issue this same day.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 6\30\26

**App.35**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
                              )
THE NEW YORK TIMES COMPANY,   )
et al.,                       )
                              )
          Plaintiffs,         )
                              )
     v.                       )          Civil Action No. 26-1690 (PLF)
                              )
DEPARTMENT OF DEFENSE, et al.,)
                              )
          Defendants.         )
                              )
```

ORDER

For the reasons set forth in the Opinion issued this same day, it is hereby

ORDERED that Plaintiffs' Motion for a Preliminary Injunction [Dkt. No. 6] is

GRANTED; it is

FURTHER ORDERED that Defendants are preliminarily enjoined from

implementing or enforcing the following provisions of the policy pertaining to Pentagon

Facilities Alternate Credentials ("PFACs") that was issued by the Department of Defense on

March 23, 2026 as a revised "Pentagon Reservation In-Brief for Media Members" ("In-Brief")

attached to a Memorandum for Senior Pentagon Leadership entitled "Implementation of Revised

Media In Brief" (collectively, the "Interim Policy") [Dkt. No. 1-1] against Mr. Barnes or any

persons who hold, will hold, or will apply for a PFAC, who are employed by, working on behalf

of, or otherwise associated with The New York Times:

- The escort requirement and related access limitations set forth on pages 2-3 of the

  In-Brief, under the heading "New Media Physical Security Restrictions on the Pentagon

**App.36**

Reservation," to the extent not currently enjoined by <u>New York Times Co. v. Department</u> <u>of Defense</u> ("<u>NYT II</u>"), Civil Action No. 25-04218 (PLF), 2026 WL 962252 (D.D.C. Apr. 9, 2026); and

- The section on pages 4-5 of the In-Brief under the heading "Escort Privileges and Procedures," to the extent not currently enjoined by <u>NYT II</u>.  It is

FURTHER ORDERED that Plaintiffs shall post a bond in the amount of $1.00 by July 7, 2026.

SO ORDERED.

_____
PAUL L. FRIEDMAN
United States District Judge

DATE: 6|30|26

2

**App.37**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE NEW YORK TIMES COMPANY, et al., | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil Action No. 26-1690 (PLF) ) |
| DEPARTMENT OF DEFENSE, et al. | ) ) |
| Defendants. | ) ) ) |

ORDER

This matter is before the Court on Defendants' Motion for Stay Pending Appeal

[Dkt. No. 19].  Defendants have moved for a stay pending appeal of the Court's preliminary

injunction issued on June 30, 2026 [Dkt. Nos. 16, 17].  In the alternative, defendants request a

fourteen-day administrative stay of the preliminary injunction to allow for orderly briefing at the

U.S. Court of Appeals for the D.C. Circuit.  Upon careful consideration, it is hereby

ORDERED that Defendants' Motion to Stay Pending Appeal [Dkt. No. 19] is

GRANTED in part and DENIED in part.  Defendants' request for a fourteen-day administrative

stay is GRANTED, and the motion is otherwise DENIED.

SO ORDERED.

_____
PAUL L. FRIEDMAN
United States District Judge

DATE:   July 2, 2026

**App.38**

# EXHIBIT 1



**ASSISTANT TO THE SECRETARY OF WAR**

1400 DEFENSE PENTAGON
WASHINGTON, D.C. 20301-1400

PUBLIC AFFAIRS

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP

SUBJECT: Implementation of Revised Media In-Brief

On March 20, 2026, the United States District Court for the District of Columbia vacated certain provisions of the October 6, 2025 PFAC Policy. *See New York Times Co. v. Department of Defense*, No. 25-04218 (D.D.C. Mar. 20, 2026). The Department disagrees with the Court's decision and is pursuing an appeal. In the interim, and without conceding the validity of the Court's analysis, the Department has revised the Policy to comply with the Court's order while preserving the Department's legitimate security interests and its statutory obligation to ensure the safe, efficient, and secure operation of the Pentagon Reservation. 10 U.S.C. § 2674.

The attached documents implement the revised "Pentagon Reservation In-Brief for Media Members," effective March 23, 2026. This memorandum and attachments supersede the "Implementation of New Media In-Brief," dated October 6, 2025.

**Revised Policy.** All members of the press issued a PFAC will receive a copy of the revised in-brief at the time their PFAC is issued or renewed. Receipt of the PFAC and the accompanying in-brief constitutes notice of the Policy's terms. The revised in-brief addresses the provisions the Court vacated while retaining all physical access restrictions, conduct requirements, and security measures that were not at issue in the litigation.

**Clarifications in Response to the Court's Decision.** The Court characterized the original Policy's provisions in ways the Department believes were inaccurate. The revised Policy includes targeted clarifications to correct these mischaracterizations. In particular:

- The Court stated that the Policy's use of the term "solicitation" was ambiguous because "to 'solicit' in the everyday sense means 'to approach (someone) with a request or plea'" and that "a charity requesting donations, a community organizer calling on volunteers, or a journalist asking questions is not a crime." *Id.*, slip op. at 21. The Department agrees that asking questions is not a crime. The original Policy never prohibited asking questions. To correct the Court's mischaracterization, the revised Policy replaces the term "solicitation" with "intentional inducement of unauthorized disclosure" and provides a specific definition tied to identified federal criminal statutes, with a knowledge requirement and six explicit safe harbors for routine newsgathering activities that were never covered by this provision.

- The Court stated that the Policy's "security or safety risk" standard was too vague. While the Department maintains that the original standard, read in context with its enumerated factors, provided adequate notice, the revised Policy replaces this standard with an exhaustive list of specific, enumerated grounds for denial, revocation, or non-renewal of a PFAC, with evidentiary standards consistent with those applied in security clearance

**App.40**

adjudications under Executive Order 12,968. No PFAC may be denied, revoked, or not renewed on grounds not enumerated in the revised Appendix A.

- The Court expressed concern about the absence of processing timelines. The revised Policy includes specific deadlines: 30 days for a final decision where no further inquiry is needed, and 60 days where further inquiry is required.

**Closure of Correspondents' Corridor and Relocation of Press Workspace.** As previously announced in the October 6, 2025 Policy, the Department committed to "upgrade the space used by PFAC holders to a different area that provides WiFi access and cell phone service, as well as increased space for the expanded press corps." The Department is now fulfilling that commitment. Effective immediately, the Correspondents' Corridor is closed. A new press workspace will be established in an annex facility outside the Pentagon and will be available when ready. The Department will notify PFAC holders when the new workspace is operational.

In the interim, PFAC holders will continue to have access to the Pentagon for scheduled press briefings, press conferences, and interviews arranged through public affairs offices. Access to the Pentagon for these events will require escort by authorized DoW personnel at all times. In breaking news situations, PFAC holders will be escorted into the Pentagon by authorized DoW personnel. The Pentagon Briefing Room remains in the Pentagon and will continue to be used for press events.

In assessing the Department's security posture following the Court's vacatur of the PFAC Policy's security screening provisions, the Department determined that unescorted access to the Pentagon cannot be responsibly maintained without the ability to screen PFAC holders for security risks. The revised Policy establishes new security screening standards in the revised Appendix A. Until those standards have been fully implemented and the new workspace is operational, all journalist access to the Pentagon will require escort.

**Notice of Policy.** The original Policy required PFAC holders to sign an Acknowledgement attesting to their receipt, reading, and understanding of the Policy. The Court vacated this requirement. The Department maintains that requiring journalists to acknowledge a constitutional policy is a reasonable administrative measure, and the Court's vacatur was based on its finding that the underlying provisions were constitutionally deficient — a finding the Department disputes and is appealing. Regardless, the revised Policy eliminates the signature requirement. Instead, each PFAC holder will receive a copy of the revised in-brief at the time their PFAC is issued or renewed, and will sign a receipt confirming that they have received their PFAC and a copy of the Policy. Receipt of the PFAC and the accompanying in-brief constitutes sufficient notice of the Policy's terms. No PFAC holder is required to agree with, endorse, or acknowledge understanding of the Policy as a condition of receiving or maintaining a PFAC.

I request your assistance in ensuring that all personnel in your Component are aware of the revised physical access measures, including the requirement to provide escorts for media entering the Pentagon for approved events. If personnel see any news media inside the Pentagon without an escort, they should direct them to the Pentagon Press Operations office and alert PPO at 703-697-5131.

**App.41**

My POC for this action is Sue Gough, Pentagon Press Operations, susan.l.gough.civ@mail.mil or 703-697-1254.

Sean Parnell

Attachments:
As stated

## PENTAGON RESERVATION IN-BRIEF FOR MEDIA MEMBERS

NAME:_____    DATE:_____

The purpose of this briefing is to inform you, as a member of the news media who has been granted access to the Pentagon Reservation and issued a Pentagon Facilities Alternative Credential (PFAC), also known as a Department of War Building Pass or a Pentagon badge, of the rules regarding conduct on the Pentagon Reservation. Failure to comply with the physical access restrictions and conduct requirements set forth in this in-brief may result in loss of access to the Pentagon. Additionally, this briefing informs you of the procedures associated with denying, revoking, or not renewing the issuance of a PFAC, including contesting such a decision (see Appendix A).

General Security

Members of the news media do not possess a legal right to access the Pentagon; rather, such access is a privilege extended by the government. Pursuant to 10 U.S.C. § 2674, the Secretary of War has jurisdiction, custody, and control over, and responsibility for, the operation, maintenance, and management of the Pentagon Reservation. Under this statute, the Secretary is authorized to prescribe appropriate regulations to ensure the safe, efficient, and secure operation of the Pentagon Reservation. 32 C.F.R. Part 234 addresses conduct on the Pentagon Reservation, and section 234.4 of this part makes clear that entering or remaining on Pentagon property without express invitation or consent from those with lawful control is prohibited. The regulation applies "to all persons entering in or on the property" (see 32 C.F.R. § 234.2), including members of the news media, and provides that individuals who violate a Department rule or regulation may be ordered to leave or barred from reentry. Having chosen to extend this privilege, the Department will not deny, revoke, or suspend a PFAC arbitrarily or on the basis of the content or viewpoint of a journalist's reporting.

Be alert for suspicious activity and immediately report any unusual activity and/or circumstances to the Pentagon Force Protection Agency (PFPA) at (703) 697-1001.

Ensure office doors are locked, and property is secure when exiting your office or cubicle.

Every individual entering the building is subject to random metal detector and X-ray inspection of personal belongings. Many events, including those involving the Secretary of War, Deputy Secretary of War, or visiting high-level U.S. government officials or foreign dignitaries, require additional security screenings to which PFAC holders would be subject.

1

**App.43**

Every individual exiting the building, regardless of status (e.g., military Service member, civilian employee, member of the news media), is subject to random checks of personal belongings.

A property pass is required to remove property from the building that is not readily identifiable as personal. When you or other members of your organization (e.g., technicians, photographers) remove equipment owned by your organization, obtain a property pass in advance to avoid problems when exiting the building. Property passes may be obtained in the Pentagon Press Operations (PPO) office, room 2D961, during normal working hours.

PFAC Security

Maintaining the security of your PFAC is an individual responsibility.

PFACS must be visible and always worn above the waist while in the Pentagon, except as noted below during press or other recorded events. Remove or hide your PFAC from view when not in the Pentagon.

Exceptions for press and other events: Do not have your PFAC visible in the following circumstances: when present during an on-camera press briefing; when doing a live-shot in the Pentagon Briefing Room or stand-ups at the Mall Entrance, River Parade Field, or on the Connector Parking Lot hill; when covering honor cordon arrival ceremonies; if on-camera during an open press event on the Pentagon Reservation; or at any other events that will be recorded via photograph or video. For those with a recording studio in the Pentagon, do not have your PFAC visible when recording in your studio.

Lost PFACS should be immediately reported to PPO at (703) 697-5131, or, after normal working hours, to (703) 678-6162 or to OSD.PA.Duty Officer@mail.mil. Normal working hours for PPO on non-holiday weekdays are 7:30 a.m. to 6 p.m. Eastern Time.

Additional Press Identifier Badge

The Additional Press Identifier Badge (APIB) (see Appendix B) must also be visible and always worn above the waist while in the Pentagon. Note that APIBS serve only as an additional visual identifier. APIBS are not credentials and do not confer credentialing or attendance approval for any event.

News Media Physical Security Restrictions on the Pentagon Reservation

2

**App.44**

Effective May 23, 2025, in accordance with Secretary of War Memorandum, "Updated Physical Control Measures for Press/Media Access within the Pentagon," May 23, 2025 (Appendix C), physical security restrictions have been enacted for news media, including those with valid, current PFACS.

Effective March 23, 2026, the Correspondents' Corridor is closed. A new press workspace will be established in an annex facility outside the Pentagon and will be available when ready. The Department will notify PFAC holders when the new workspace is operational. This closure fulfills the Department's previously announced commitment to upgrade the space used by PFAC holders to a different area that provides WiFi access, cell phone service, and increased space for the expanded press corps.

Until the new workspace is operational, PFAC holders will continue to have access to the Pentagon for the following purposes, with escort by authorized DoW personnel at all times:

- Scheduled press briefings and press conferences in the Pentagon Briefing Room;
- Interviews and meetings arranged through OATSW(PA) or the sponsoring public affairs office;
- Press events announced by OATSW(PA), the public affairs office for the Office of the Chairman of the Joint Chiefs of Staff, or the public affairs offices of the Military Departments or Headquarters, U.S. Marine Corps;
- Honor cordons and events at the Pentagon River Terrace Parade Field, the Pentagon Auditorium, and the Pentagon Center Courtyard;
- Other events specifically approved by OATSW(PA).

In breaking news situations, PFAC holders will gather at the Pentagon Library and Conference Center and be escorted into the Pentagon by authorized DoW personnel.

News media are not authorized to be anywhere in the Pentagon at any time without an escort from an authorized DoW official. If personnel see any news media inside the Pentagon without an escort, they should direct them to the Pentagon Press Operations office and alert PPO at 703-697-5131.

As a non-government employee, while a PFAC is your authorized means of entering the Pentagon, a PFAC does not allow you unfettered access to all of the Pentagon. When in the Pentagon, you must remain with your escort at all times.

Public Release of DoW Information and the Protection of Classified National Security Information and Controlled Unclassified Information

3

**App.45**

DoW remains committed to transparency to promote accountability and public trust. However, DoW information must be approved for public release by an appropriate authorizing official before it is released by any military member, DoW civilian employee or contract employee, even if it is unclassified. The Department of War must safeguard classified national security information (CNSI), in accordance with Executive Order 13526 and the Atomic Energy Act, and information designated as controlled unclassified information (CUI), in accordance with Executive Order 13556. CUI may include, but is not limited to, information protected by the Privacy Act, information that is law enforcement-sensitive, and certain operational security information. Beyond CNSI and CUI, additional authorities may restrict the disclosure of certain information. Given the complexities of the various laws and policies concerning disclosure of information, DoW employees are required to have all information cleared for release by an appropriate authorizing official.

Military members, in particular, face potentially severe consequences for disclosing non-public information without proper authorization. Article 92 of the Uniform Code of Military Justice imposes criminal liability on military members who violate a lawful order or regulation.

Both military members and DoW civilian employees also face potential criminal liability under 18 U.S.C. § 1905 for disclosure of confidential information or under the Privacy Act, 5 U.S.C. § 552a, for knowing and willful unauthorized disclosures.

Only authorized persons who have received favorable determinations of eligibility for access, signed approved non-disclosure agreements, and have a need-to-know may be granted access to CNSI. DoW may only provide CUI to individuals when there is a lawful governmental purpose for doing so.

To be clear, the foregoing laws and regulations apply to military members, DoW civilian employees, and contractors. Members of the news media are not required to submit their writings to DoW for approval. Members of the news media remain free to gather information through legitimate means, such as Freedom of Information Act requests, official briefings, questions posed to authorized Department spokespersons and officials, or unsolicited tips, and to publish as they deem newsworthy. The receipt of unsolicited information, including CNSI or CUI, and its subsequent publication, is protected by the First Amendment. Nothing in this in-brief prohibits a PFAC holder from engaging in constitutionally protected journalistic activities, such as investigating, reporting, or publishing stories.

Escort Privileges and Procedures

A PFAC authorizes media members who are U.S. citizens to access the Pentagon with escort by authorized DoW personnel for the purposes described in the "News Media Physical

4

**App.46**

Security Restrictions" section above, and affords escort privileges for up to three visiting media members from the same media outlet who possess appropriate media credentials.

Visiting media members must be entered into the PFPA Visitor Management System (VMS) by the sponsoring U.S. public affairs office no later than one business day in advance for U.S. citizens and no later than three business days in advance for non-U.S. citizens.

PFAC Issuance and Renewals

PFACs may be issued to those media members who require regular access to the Pentagon, who are accessing the building at a minimum monthly visit frequency. See PPO for the current minimum monthly visit frequency. You must continue to meet the minimum access frequency requirement to be reissued a PFAC. There are two probationary periods for an initial PFAC issuance.

An initial PFAC expires in three months, on the last day of the third month. You may submit a request for renewal at the beginning of the month of expiration. Media members who have met the minimum monthly visit frequency requirements during the initial three-month probationary period will generally be approved for a six-month badge.

The second probationary period is for six months. Requests for renewals of a six-month PFAC may be submitted at the beginning of the month of expiration. Media members who have met the minimum monthly visit frequency requirements during the six-month probationary period during both the initial three-month and subsequent six-month probationary periods, will generally be approved for a one-year PFAC.

If the two probationary periods have been completed successfully and all requirements have been met, PFACs will be renewed annually. During annual renewal reviews, if frequency requirements have not been met, PFAC renewals may be denied or revert to 3- or 6-month PFACS.

For all renewals, PFACs expire on the last day of the month of expiration. Renewal requests should be submitted at the beginning of the month of expiration, but not before the start of the month of expiration. Requests received prior to the start of the month will not be processed until the first business day of the month. Due to processing times, renewal requests should be submitted to PPO no later than the middle of the month of expiration to ensure a new badge is available before the old one expires.

Frequency requirements may be waived by OATSW(PA) for a news organization's equipment technicians and some camera crews, if specifically identified and requested by the

**App.47**

bureau chief. For first-time applications, equipment technicians and camera crews must still go through the two probationary periods.

PFACs may be denied, revoked, or not renewed if a person meets any of the criteria set forth in Appendix A, or is not meeting the frequency requirements. See Appendix A for the applicable standards and the process for denying, revoking, or not renewing a PFAC.

Press Parking

Parking on the Pentagon Reservation is restricted to vehicles with permanent parking permits, or which have been cleared for temporary parking for specific days. Vehicles may only be parked in the areas for which they have been cleared.

There is a designated parking area for the news media at the Pentagon. The parking spaces in two lanes of the Connector Lot, located at intersection of Connector Road and Boundary Channel Drive, have been reserved for the press (see Appendix E). These parking spaces are clearly marked with "PRESS" stenciled on the ground.

To access the building, for those with a PFAC, walk north towards Boundary Drive and go up either the stairs or the ramp to the pedestrian bridge. At the security checkpoint, swipe your badge and then show it to the PFPA officer on duty. See the route depicted at Appendix E. The checkpoint opens at 6:00 a.m. and closes at 8:00 p.m. on weekdays. The checkpoint is closed on weekends and federal holidays. All visiting press must go through the Visitor Center at the Pentagon Metro Entrance.

There are a limited number of permanent "P" parking permits for news media members. Those who have such permits may park in designated PRESS spaces with their approved "P" parking permit at any time. News media members with "P" permit are not authorized to park elsewhere on the Pentagon Reservation, except when provided specific guidance to do so for special circumstances (e.g., when the Connector Lot is being re-surfaced, or closed for a special event). For such instances, PPO will provide information on where you may park.

News media members desiring to be issued a "P" parking pass should contact PPO; there is usually a waiting list for available permit.

News media without a "P" parking permit may also park in the PRESS area provided they obtain an approved temporary parking clearance prior to their arrival at the Pentagon. News media should contact the PPO Admin Support Team at 703-697-5131 at least 30 minutes prior to their arrival to request temporary parking clearance, and must provide the PPO with the following information: date requesting to park if not the day of the call, driver's name, email,

6

**App.48**

phone number, media outlet, vehicle make, vehicle model, vehicle color, license plate number, state of registration, vehicle classification (car/truck/motorcycle/etc.), fuel type (gas/diesel/hybrid/electric), and whether it is a personal vehicle or a business vehicle. For repeat visits using the same vehicle, press need only provide date, name, and vehicle license plate. For parking on weekends, call the PPO Duty Officer at 703-678-6162.

News media may request temporary parking clearance for up to 5 days per month. Press can request an exception from the PPO for more days only on a case-by-case basis.

Overnight parking at the Pentagon is not permitted for members of the news media. Overnight parking is considered parking for more than 24 hours at a time.

If you are issued a "P" parking permit, you will be required to return it to the PPO upon completion of your media/press duties, or upon the expiration of the "P" parking permit.

Access on Weekends

If news media need to access the Pentagon on weekends, holidays, or when the pedestrian bridge between the Connector Lot and River Entrance is closed, news media may park in the press parking area and walk along Connector Road to River Road, go through a pedestrian turnstile, and continue walking up the River Road to Mug Handle to get to the River Entrance, which is open 24/7. See Appendix E for a depiction of the route. Note that those without a "P" parking permit must still provide their vehicle information to the PPO Duty Officer at 703-678-6162.

Mall Entrance Temporary Parking

News media crews that are doing a stand-up at the Mall Entrance location may request Mall parking. Mall Entrance parking is by reservation only. News media should contact the PPO Support Team at 703-697-5131 at least two hours prior to their arrival to request Mall Entrance parking clearance and must provide the same information as for regular press parking (see above) with the addition of time and arrival. Note that due to demand, there may be times when parking in the Mall Entrance lot is restricted to four hours per day. Visiting press who need to be at the Pentagon all day should park either in regular press parking or at the Mall Entrance. Parking at the Mall Entrance is by numbered spaces; PPO will provide the numbered parking space for each vehicle when Mall Entrance Parking is requested.

Filming/Photography

**App.49**

Filming, photography, and audio recording on the Pentagon Reservation is prohibited, unless approved in advance. In accordance with 32 CFR § 234.15 - Use of visual recording devices:

(a) The use of cameras or other visual recording devices on the Pentagon Reservation is prohibited, unless the use of such items are approved by the Pentagon Force Protection Agency, the Installation Commander, or the Office of the Assistant to the Secretary of War for Public Affairs.

(b) It shall be unlawful to make any photograph, sketch, picture, drawing, map or graphical representation of the Pentagon Reservation without first obtaining permission of the Pentagon Force Protection Agency or the Office of the Assistant to the Secretary of War for Public Affairs.

Note that this prohibition applies to the use of apps on mobile devices that utilize the front-facing camera lens, such as "FaceTime" or the taking of "selfies."

News media visiting the National Pentagon 9/11 Memorial in their personal capacity, not as a member of the press, may take photos using their personal devices. Filming or photography in the Memorial for a news media interview or to obtain b-roll requires an exception, as described below under Filming/Photography Exception Requests.

Filming/Photography Pre-Approved Exceptions

News media do not need to obtain permission in advance for filming, photography, or audio recording in the following circumstances:

- Press events in the Pentagon Briefing Room.
- Press events announced by OATSW(PA), the public affairs office for the Office of the Chairman of the Joint Chiefs of Staff, or the public affairs offices of the Military Departments or Headquarters, U.S. Marine Corps, that are not located in the Pentagon Briefing Room. Examples would include honor cordons and events at the Pentagon River Terrace Parade Field, the Pentagon Auditorium, and the Pentagon Center Courtyard.
- Unilateral news media stand-ups in the Pentagon Briefing Room, if approved, at the designated stand-up location outside the Mall Entrance, or live or recorded shots inside the network studio rooms in the Correspondent's Corridor.
- Recording audio of off-camera interviews approved and monitored by authorized DoW public affairs personnel.

Filming/Photography Exception Requests

8

**App.50**

The filming/photography exception requests discussed below require public affairs escort from either OATSW(PA) or the sponsoring public affairs office, regardless of whether the news media involved have a current PFAC or are visiting press.

- News media desiring to obtain b-roll or stock footage or photos of the Pentagon interior or exterior must submit a request to PPO a minimum of one week in advance to obtain permission. If this request is in conjunction with a press event sponsored by a public affairs office other than OATSW(PA), submit the request through the sponsoring public affairs office. Requests should include date and times and either the exact location or sufficient information for the public affairs office to determine the best available locations for the footage or photos.
- News media desiring to film DoW officials standing or walking in a corridor in conjunction with an interview must submit a request through the sponsoring public affairs office to PPO a minimum of one week in advance to obtain permission. Request must include date, time, and exact location.
- News media desiring to photograph DoW officials in their offices or conference rooms in conjunction with an interview must submit their request through the sponsoring public affairs office to the security manager for that space.
- News media desiring to obtain b-roll or interview or film anyone inside the National Pentagon 9/11 Memorial must submit a DD Form 2798, "Application/Permit for Use of Space on the Pentagon Reservation," at least one week in advance to the Pentagon Facility Operations Division Special Events Office at whs.pentagon.fsd.mbx.pbmo-special-events@mail.mil.

Filming/Photography from the Press Parking Area

News media desiring to do a stand-up or film from the grassy hill next to the press parking area (see Appendix E) should submit a request to PPO no later than three hours in advance. Requests should include the date, time, and the number of personnel in the crew. Once approved, filming from the grassy hill does not require public affairs escort.

Pandemics, National Health Emergencies, and Other Contingencies

During a declared pandemic or national health emergency, the DoW will protect the workforce while continuing to perform its national security mission. Protecting the workforce may entail the adoption of personal protective measures, restrictions on access to the Pentagon for essential functions only, symptom screenings, or other measures.

In the event of a declared pandemic or national health emergency, news media entering the Pentagon are expected to follow the same personal protective measures as DoW personnel

9

**App.51**

and as required by Health Protection Condition (HPCON) announcements. Failure or refusal to comply may result in a loss of access, ranging from temporary suspension to revocation of PFACS.

Additionally, news media are not considered essential personnel. During a declared pandemic or national health emergency, news media may temporarily be denied physical access to the Pentagon.

During other general emergency contingencies (e.g., fires, active shooters, natural disasters, utility outages), news media physical access to the Pentagon may be temporarily curtailed or denied.

Standards for PFAC Determinations

**Grounds for Denial, Revocation, or Non-Renewal.** A PFAC shall be denied, revoked, or not renewed only on the grounds set forth in Appendix A. No PFAC determination shall be based on the content, viewpoint, or perceived editorial perspective of an applicant's or holder's journalism.

**Intentional Inducement of Unauthorized Disclosure.** The Court in *New York Times Co. v. Department of Defense*, No. 25-04218 (D.D.C. Mar. 20, 2026), characterized the original Policy's use of the term "solicitation" as ambiguous, stating that "to 'solicit' in the everyday sense means 'to approach (someone) with a request or plea'" and that "a charity requesting donations, a community organizer calling on volunteers, or a journalist asking questions is not a crime." *Id.*, slip op. at 21. The Department agrees that asking questions is not a crime. The original Policy never prohibited asking questions. To correct the Court's mischaracterization, the Department has replaced the term "solicitation" with "intentional inducement of unauthorized disclosure."

For purposes of this Policy, "intentional inducement of unauthorized disclosure" means intentionally encouraging, inducing, or requesting that a specific Department employee disclose classified national security information or CUI that the journalist knows that the specific Department employee is not authorized to disclosing under Article 92 of the Uniform Code of Military Justice (10 U.S.C. § 892), 18 U.S.C. § 1905, or 5 U.S.C. § 552a. This is an administrative standard for PFAC determinations; it does not constitute a criminal charge or referral.

A journalist's offer of anonymity or privacy protection to a Department employee in exchange for information shall create a rebuttable presumption that the journalist knew the employee was not authorized to disclose the information sought. This presumption may be

10

**App.52**

rebutted through the procedures set forth in Appendix A by evidence that the journalist did not know that the employee was unauthorized to disclose the information notwithstanding the offer of anonymity.

The following do not constitute "intentional inducement of unauthorized disclosure" under this Policy, notwithstanding the general definition of that term above:

(a) Asking questions of Department personnel who are authorized to speak with the press, including Public Affairs Officers, designated spokespersons, and other personnel speaking on the record in their official capacity, regardless of the subject matter of the question;

(b) Receiving unsolicited information, including classified national security information or controlled unclassified information;

(c) Publishing calls for tips or other general appeals to the public at large that are not specifically directed at Department personnel;

(d) Developing source relationships outside the Pentagon through independent reporting;

(e) Communicating with Department personnel through official channels for public disclosure of information, including press briefings, press conferences, interviews arranged through public affairs offices, and Freedom of Information Act requests.

(f) Asking questions of any Department employee where the journalist does not know that the employee is not authorized to disclose the information sought.

**Due Process Protections.** Without conceding the validity of the Court's analysis, the revised Policy provides the following protections regarding suspension of a PFAC: Before any PFAC is denied, revoked, or not renewed on the grounds set forth in Appendix A, the applicant or holder shall receive the process set forth in Appendix A, Part B. A PFAC may be immediately suspended if the Director, PFPA, or designee, determines that the holder has engaged in conduct described in Appendix A, Part A and that the nature of the conduct requires immediate action to protect the security of Pentagon personnel, property, or information pending the completion of the procedures set forth in Appendix A, Part B. In such cases, the holder shall receive written notice within 24 hours stating the specific subsection of Part A that applies, and the full procedures described in Appendix A, Part B shall commence immediately.

**No Waiver of Rights.** Nothing in this document requires you to waive any constitutional rights. This in-brief constitutes a description of DoW policies.

**App.53**

**APPENDIX A:** DENIAL, REVOCATION, OR NON-RENEWAL OF PENTAGON FACILITY ALTERNATIVE CREDENTIALS

A. Grounds for Denial, Revocation, or Non-Renewal. The Director, PFPA, or designee, shall deny, revoke, or refuse to renew the PFAC of any person who meets one or more of the following criteria. These are the sole grounds for denial, revocation, or non-renewal of a PFAC based on security considerations. No PFAC shall be denied, revoked, or not renewed on grounds not enumerated in this section.

Conviction-Based Grounds. Conviction of an offense involving:

(1) National defense (such as treason, sabotage, terrorism, or espionage).
(2) The use, attempted use, or threatened use of physical force against another person (such as murder, manslaughter, assault, rape, robbery, or kidnapping) or conduct that presents a serious potential risk of physical injury to another (such as arson, burglary, or the unlawful possession of explosives or firearms).
(3) Unlawful manufacturing or distribution of drugs.
(4) Threatening or harassing communications directed at Department personnel or facilities.
(5) Theft, embezzlement, trespassing, or property destruction on the Pentagon Reservation or other Department facility.
(6) Fraud or deceit in connection with obtaining or maintaining access to a government facility or government information systems.
(7) Engaging in operations and activities that are unsafe, failing to abate an identified hazard, endanger others, or creating a condition immediately dangerous to life or health

A conviction described in subsections (1) through (7) creates a rebuttable presumption that the applicant or holder poses a security risk. The applicant or holder may rebut this presumption by demonstrating, through the procedures set forth in Part C below, that granting or maintaining the PFAC is clearly consistent with the security of the Pentagon Reservation. Factors relevant to rebuttal include the nature and seriousness of the offense, the time elapsed since the conviction, evidence of rehabilitation, and the applicant's or holder's conduct since the conviction. Any doubt as to whether the applicant or holder poses a security risk shall be resolved in favor of the security of the Pentagon Reservation.

Conduct-Based Grounds. Engaging in conduct that would constitute an offense described in subsections (1) through (7) above, or inducement of unauthorized disclosure as defined in the "Standards for PFAC Determinations" section of this in-brief. For a final determination based on conduct, the Director, PFPA, or designee, must find that substantial evidence supports the determination that the conduct described in the applicable subsection occurred. Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support the conclusion. A conduct-based determination does not require a criminal charge, indictment, or conviction. The written determination shall identify:

(g) The specific subsection of this Part A that the conduct would constitute;
(h) The specific facts supporting the determination, including the date, time, location, and nature of the conduct;

**App.54**

(i) The identity of any witnesses or the source of any documentary evidence supporting the determination, to the extent that disclosure would not compromise an ongoing investigation or the safety of any individual; and

(j) The basis for the Director's determination that substantial evidence supports the conclusion that the conduct occurred.

The PFAC holder shall receive the full procedures set forth in Part C below, including the opportunity to contest the factual basis for the determination. A conduct-based determination is subject to the same rebuttable presumption framework as a conviction-based determination: the holder must demonstrate that granting or maintaining the PFAC is clearly consistent with the security of the Pentagon Reservation. Any doubt as to whether the holder poses a security risk shall be resolved in favor of the security of the Pentagon Reservation.

Standard of Review. For conduct-based determinations under this section, the Director, PFPA, or designee, must find that substantial evidence supports the determination that the conduct described in the applicable subsection occurred. For immediate suspension under Part B, the Director, PFPA, or designee, must find probable cause to believe the conduct occurred. For rebuttal of a conviction-based or conduct-based presumption, the applicant or holder must demonstrate that granting or maintaining the PFAC is clearly consistent with the security of the Pentagon Reservation; any doubt as to whether the applicant or holder poses a security risk shall be resolved in favor of the security of the Pentagon Reservation. The final decision of the Director, PFPA, or designee, shall constitute a final agency decision subject to judicial review under 5 U.S.C. § 706(2)(A). These standards are consistent with those applied in security clearance adjudications under Executive Order 12,968.

B. Immediate Suspension. A PFAC may be immediately suspended if the Director, PFPA, or designee, determines that there is probable cause to believe that the holder has engaged in conduct described in Part A and that the nature of the conduct requires immediate action to protect the security of Pentagon personnel, property, or information pending the completion of the procedures set forth in Part C. Probable cause exists when the facts and circumstances known to the Director, PFPA, or designee, are sufficient to warrant a person of reasonable caution to believe that the conduct described in Part A has occurred.

In such cases:

(8) The holder shall receive written notice within 24 hours stating the specific subsection of Part A that applies, the specific facts establishing probable cause, and the basis for the determination that immediate action is required.

(9) The full procedures described in Part C shall commence immediately upon issuance of the written notice.

(10) The immediate suspension shall remain in effect until a final decision is issued under Part C, unless the Director, PFPA, or designee, determines that the basis for the immediate suspension no longer exists.

(11) At the final determination stage under Part C, the Director, PFPA, or designee, must find that substantial evidence supports the determination that the conduct occurred.

13

**App.55**

If the substantial evidence standard is not met, the immediate suspension shall be lifted and the PFAC reinstated.

C. Procedures for Denial, Revocation, or Non-Renewal. If the Director, PFPA, or designee, anticipates that a PFAC might be denied, revoked, or not renewed, the applicant or holder or his or her authorizing official shall be notified in writing by the Director, PFPA, or designee, of the basis for the proposed denial, in as much detail as security considerations permit, citing the specific subsection of Part A that applies. When an individual's PFAC has been denied, revoked, or not renewed pursuant to a final decision under this Part, both unescorted and escorted access to any DoW facility is terminated. This section does not apply to journalists who decide not to renew for reasons unrelated to the criteria in Part A, such as a change in employment or assignment.

(1) The notification of proposed denial, revocation, or non-renewal shall inform the applicant or holder of the right to respond to and rebut any factual basis supporting the proposed denial, revocation, or non-renewal.

(2) The applicant or holder will be allowed 30 days from the mailing date of the proposed denial, revocation, or non-renewal notification to make an appeal appointment with the Director, Pentagon Access Control Branch (PACB).

(3) If the applicant or holder or representative is unable to schedule an appointment within 30 days, an extension for one additional 30-day period will be granted on receipt of a telephone request to PACB for such an extension.

(4) If mitigating information is presented at the appointment to substantiate a reversal of denial, revocation, or non-renewal, the applicant or holder may receive a DoW Building Pass at that time.

(5) If no mitigating information is presented or if information is presented but is insufficient to substantiate the issuance of a DoW Building Pass, the applicant or holder will be allowed 30 days from the appeal appointment to respond in writing to the Director, PFPA, or designee. The response will consist of any explanation or rebuttal considered appropriate by the applicant or holder and must be signed by the applicant or holder or representative under oath or affirmation.

(6) At the time of the filing of the written response to the notification of the proposed denial, revocation, or non-renewal, the applicant or holder or representative may request, and shall be granted, the opportunity to make a personal appearance before the Director, PFPA, or designee, to personally support his or her eligibility for a pass and to rebut or explain the factual basis for the proposed denial.

(7) On the basis of the written or oral response to the proposed denial, revocation, or non-renewal, the Director, PFPA, or designee, shall determine whether further inquiry or investigation on the issues raised is necessary.

(k) If a decision is made that no such inquiry is necessary, a final decision shall be issued within 30 days.

(l) If a decision is made that further inquiry is necessary, the Director, PFPA, or designee, shall conduct such inquiry and issue a final decision within 60 days of the personal appearance.

(8) Upon receipt of the applicant's or holder's written or oral response explaining or rebutting the factual basis for the proposed denial, revocation, or non-renewal, and upon

14

**App.56**

completion of any additional inquiry, a final decision shall be made by the Director, PFPA, or designee. If a final adverse decision is reached, the applicant or holder shall be notified of the final decision in writing. The notification shall state, as precisely as security considerations permit, the factual basis for the denial, citing the specific subsection of Part A that applies.

(9) The decision of the Director, PFPA, or designee, under this section shall constitute a final agency decision subject to judicial review under 5 U.S.C. § 706(2)(A).

[Appendices B through E remain unchanged, except that Appendices D and E shall be updated to reflect the relocation of the press workspace to the Pentagon Library and Conference Center.]

15

**App.57**

# Exhibit 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| THE NEW YORK TIMES COMPANY, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DEPARTMENT OF DEFENSE, a/k/a DEPARTMENT OF WAR, *et al.*, <br><br> *Defendants*. | Civil Action No. 26-1690 (PLF) |

### <u>DECLARATION OF JOEL MANUEL VALDEZ IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>

I, Joel Manuel Valdez, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

### <u>BACKGROUND</u>

1. I am Acting Pentagon Press Secretary within the Office of the Assistant to the Secretary of War for Public Affairs. I make this declaration based upon my personal knowledge and upon my review of information available to me in my official capacity.

2. I have served as Deputy Press Secretary since June 2025 and Acting Press Secretary since May 2026. My official duties include advising the Chief Pentagon Spokesman Sean Parnell and Press Secretary Kingsley Wilson on strategic communication and preparing them for press engagements, including press briefings, television interviews, speeches, and multimedia content for social media. I also serve as the principal liaison between Pentagon Press Operations desk officers and the Press Secretary, drafting responses to political and sensitive press requests, statements, and releases.

1

**App.59**

## THE INTERIM POLICY

3.  On Monday, March 23, 2026, the Department of War adopted and published the Interim Policy. While that policy has been in effect, journalists from numerous outlets who had previously held PFACs, but turned them in following the issuance of the October 2025 policy, have requested and obtained PFACs. Those outlets include The New York Times and USA Today. Outlets including The Associated Press, CNN, The Daily Mail, The Washington Post, The Wall Street Journal, and CBS News have requested PFACs and were approved but have yet to pick up their badges from the Pentagon.

4.  Julian Barnes, a journalist associated with The New York Times, picked up his reinstated PFAC on Tuesday, March 24, 2026. Since then, to the best of my knowledge, he has attempted to enter the Pentagon just twice.

5.  Seven other journalists affiliated with The New York Times hold PFACs. PFAC holders and reporters associated with The New York Times have accessed the Pentagon approximately seven times since March 23, 2026. With the exception of one interview discussed in paragraph 17 below, PFAC holders associated with The New York Times have been able to access the Pentagon for journalistic activities on every occasion they have sought to do so.

6.  The Interim Policy provides that any PFAC holder may enter the Pentagon only with an escort. The escort requirement has functioned smoothly over the six-plus weeks it has been in effect. Since March 23, 2026, 60 reporters, who hold active PFACs or are employees of outlets who have received approval to pick up their PFACs, have repeatedly accessed the Pentagon to attend media events, including press conferences, on or off record interviews, media roundtables, bilateral meetings with press, and more. Across the

2

**App.60**

Pentagon's Office of the Secretary of War, other departments, and all service branches, 24 media events have been held in person at the Pentagon since March 23, 2026. Escorts are readily available for these meetings. As of June 4, 2026, the Pentagon has held five press briefings since March 23, 2026, which is attended by approximately 60 reporters for every briefing and requires multiple escorts to be dispatched. To date, and to the best of my knowledge, no PFAC holder has been unable to enter the Pentagon because of an inability to arrange an escort.

7. Typically, for non-press affiliated visitors to the Pentagon, an escort can only accompany up to three people at a time. Since media events are usually not small in attendance, the host organization (such as the Office of the Assistant to the Secretary of War for Public Affairs or a specific service branch) contacts the Pentagon Force Protection Agency (PFPA) to allow escorts to accompany up to ten people at a time in order to ensure there is never a shortage of escorts. Pentagon staff either volunteer to escort media or are assigned as escorts by those who are hosting the media engagement. Escorts can accompany journalists on impromptu visits to other engagements if those engagements have been approved by their organization.

8. Under the Interim Policy, as before, there are substantial advantages to holding a PFAC rather than applying for a day pass each time a journalist wishes to enter the Pentagon.

9. PFACs grant access to the Pentagon Library and Conference Center (PLC2) and the Corridor 8 Pedestrian Bridge Access Point. PFAC holders can enter the Pentagon grounds and access PLC2 with their PFACs via a pedestrian bridge.

10. Unlike day pass holders, PFAC holders are pre-cleared in the system and do not need to undergo a background check each time they wish to access the Pentagon. A PFAC holder

3

**App.61**

requires only an escort, which can be arranged on short notice, including immediately, if needed. By contrast, a day pass must be requested at least 24 hours in advance.

11. If a PFAC holder in the PLC2 workspace decides to interview a Department official or speak with Public Affairs staff, all the PFAC holder needs to do is contact that official's office or the Pentagon Press Office to arrange the interview, or reach out to the Public Affairs staff member. If the official or staff member is available, a staff member can escort the PFAC holder into the Pentagon immediately, with no waiting period.

**BARNES DECLARATION CLAIMS**

12. I have reviewed the declaration submitted by Julian Barnes in this litigation. This declaration substantially repeats Mr. Barnes's previous declarations, to which I previously responded.

13. Mr. Barnes makes various assertions about the process for picking up his PFAC on March 24 and conversations with Pentagon Press Office staff members he declines to identify. ECF 6-17 at ¶¶ 16-21.

14. In particular, Mr. Barnes reports that he received unclear instructions about how to pick up his PFAC on March 24. ECF 6-17 at ¶ 17. This report omits that, as I previously explained, the Department had informed Mr. Barnes's counsel that Major Andrea Kelly in the Pentagon Press Office would be his point of contact for scheduling pickup, that his colleagues contacted Major Kelly and received proper instructions for PFAC pickup, and that Mr. Barnes arrived at the Pentagon without having communicated or coordinated with Major Kelly or other Pentagon staff. *See* Ex. A at ¶ 7.

15. Mr. Barnes also reports that unnamed Pentagon staff were "unsure," on March 24, how he could access the Pentagon library. ECF 6-17 at ¶ 20. This report omits that, as I

4

**App.62**

previously explained, PPO staff provided Barnes with photos and Google Maps screenshots showing how to access the library on March 25. *See* Ex. A at ¶ 19. I also maintain, as I previously stated, that Mr. Barnes's statement is not accurate. *See id.* at ¶¶ 15-19.

16. Mr. Barnes additionally reports that PFAC holders did not have permission to ride the Pentagon shuttle bus on March 24. ECF 6-17 at ¶ 20. As I previously explained, that is incorrect: Before Mr. Barnes and his colleagues received their PFACs, my office had already arranged for the Pentagon shuttle bus to transport PFAC holders to the Pentagon Library and Conference Center. Ex. A at ¶ 21. And Mr. Barnes and his colleagues were informed that PFAC holders could use the shuttle bus, and that signage would be updated to reflect as much. *Id.* Shuttle bus signage was in fact updated on April 1, 2026.

17. Mr. Barnes also reports that, on March 31, he attempted to enter the Pentagon with his PFAC, but Pentagon staff were confused about access protocols and the interview he had arranged was cancelled. ECF 6-17 at ¶ 26. This report omits that, as I have explained, the interview was postponed because of a routine scheduling conflict wholly unrelated to the Interim Policy, and that the access confusion was a one-off event, not a result dictated or called for by the Interim Policy. Ex. B at ¶¶ 9-10.

18. Last, Mr. Barnes reports that he has not attended a press conference, but that his colleagues have been required to wear wristbands during press conferences and that their wristbands were checked. ECF 6-17 at ¶ 28. This report omits that, as I have explained, those are standard security protocols for events involving the Secretary of War, are not new, and are not restrictions imposed by the Interim Policy. Ex. B at ¶ 12. As for the limitations on restroom breaks that Mr. Barnes reports on behalf of his colleagues, ECF

**App.63**

6-17 at ¶ 28, that report omits that, as I have explained, the closest restrooms to the

Pentagon Briefing Room are located in a restricted area near the Joint Chiefs of Staff

corridor, and escorts are required. PPO staff thus informed reporters of this fact and

recommended that they use the restrooms half an hour before the briefing started, when

escorts are readily available, to avoid delays once the briefing commenced. Ex. B at ¶ 14.

I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

Executed on June 4, 2026 at Washington, D.C.

_____
JOEL MANUEL VALDEZ
Acting Pentagon Press Secretary
Office of the Assistant to the Secretary of War for
Public Affairs
1400 Defense Pentagon
Washington, D.C. 20301-1400

**App.64**

# Declaration Exhibit A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE NEW YORK TIMES COMPANY,
et al.,

                    Plaintiffs,

        v.                                    Civil Action No. 1:25-cv-04218-PLF

DEPARTMENT OF DEFENSE a/k/a
DEPARTMENT OF WAR, et al.,

                    Defendants.

SUPPLEMENTAL DECLARATION OF JOEL MANUEL VALDEZ

I, Joel Manuel Valdez, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

**INTRODUCTION**

1. I am Deputy Press Secretary within the Office of the Assistant to the Secretary of War for Public Affairs (OATSW(PA)). I previously submitted a declaration in this matter on March 27, 2026 (ECF No. 41-3). I submit this Supplemental Declaration in response to the Supplemental Declaration of Julian E. Barnes (ECF No. 44-1, "Barnes Supp. Decl.") filed on March 29, 2026, and the Second Supplemental Declaration of Julian E. Barnes (ECF No. 45, "Second Supp. Barnes Decl.") filed on March 31, 2026.

2. I have personal knowledge of the matters stated herein, and if called as a witness, I could and would testify competently thereto. My official duties include advising the Chief Pentagon Spokesman and Press Secretary on strategic communication, serving as the principal liaison between Pentagon Press Operations (PPO) desk officers and the Press Secretary, and overseeing the implementation of the Department's press access policies.

1

**App.66**

3. Throughout his supplemental declaration, Mr. Barnes attributes various claims to unnamed "Pentagon Press Office staff" and "a Pentagon public affairs officer" without identifying these individuals by name. Barnes Supp. Decl. ¶¶ 6, 7, 8, 9. These sources are unnamed not because they requested anonymity, but because Mr. Barnes did not identify them.

## A. TIMELINE

4. Mr. Barnes's Supplemental Declaration indicated he picked up his PFAC and received a copy of the Interim Policy at around 1pm on "Monday, March 23." Barnes Supp. Decl. ¶ 6. That was incorrect, for two reasons.

5. First, Mr. Barnes could not have received a copy of the Interim Policy at 1:00 PM on Monday, because the policy had not been finalized or adopted at that time. The Interim Policy was not signed until approximately 4:15 PM Eastern on Monday, March 23. The Interim Policy was transmitted to Plaintiffs' counsel promptly upon signing. *See* ECF No. 37-6 (email to Plaintiff's counsel attaching revised policy, received by Plaintiff's counsel at 1:15 PM Pacific time—4:15 PM Eastern time—on Monday, March 23).

6. Second, Mr. Barnes—together with four other New York Times journalists—picked up his PFAC on Tuesday, March 24, not on Monday, March 23. Mr. Barnes corrected the date in his Second Supplemental Declaration.

7. On Monday, March 23, Commander Parlatore sent representatives from The New York Times a point of contact at the Pentagon Press Office — Major Andrea L. Kelly, PPO Operations Officer — to schedule PFAC pickup for Tuesday, March 24. Mr. Barnes's colleagues, New York Times journalists Helene Cooper and John Ismay, contacted Major

2

**App.67**

Kelly to schedule a pickup time and received instructions to pick up their PFACs between 12:00 PM and 3:00 PM.

8. Mr. Barnes did not schedule a pickup time through Major Kelly. Instead, he arrived at the Pentagon at 8:00 AM without having communicated with Major Kelly or other Pentagon staff.

9. Mr. Barnes declares that he "received an email from the Pentagon saying I could pick up my PFAC between 6:00 am and 6:00 pm Eastern time." Barnes Supp. Decl. ¶ 6. The email Mr. Barnes is referring to is an automated notification from the Pentagon Visitor Management System (VMS). PPO submitted Mr. Barnes into the VMS for arrival between 6:00 AM to 6:00 PM in order to ensure scheduling flexibility in the event Mr. Barnes had limited availability and could not pick up his PFAC between 12:00 PM to 3:00 PM.

## B.  GRAPHIC DESIGN AND ACCESS

10. Mr. Barnes declares that the PFACs issued to him and his colleagues were "different from the ones we had previously held." Barnes Supp. Decl. ¶ 7. The PFACs issued on Tuesday, March 24 are the current PFAC version. The appearance of PFACs was updated in October 2025 to include a red banner with "PRESS" reflected in white text. The previous version that Mr. Barnes held did not have this red banner.

11. This graphic design change was announced in the October 6, 2025 Policy, which stated: "The new PFACs will have 'PRESS' clearly imprinted on them in red letters both vertically and horizontally to assist in identifying members of the press within the Pentagon." AR at 2.

**App.68**

12. The access granted by the PFACs issued on March 24 aligns with the Interim Policy. Specifically, the PFACs grant access to the Pentagon Library and Conference Center (PLC2) and the Corridor 8 Pedestrian Bridge Access Point. Access to the main Pentagon building requires escort by authorized Department personnel, consistent with the Interim Policy. The PFACs are configured to reflect the access arrangements described in the Interim Policy.

13. PFAC holders can enter the Pentagon and access PLC2 with their PFACs via a pedestrian bridge. *See* ¶¶ 15-21 below.

14. By Monday, March 23, I personally witnessed confirmation from the Pentagon's library leadership that a temporary workspace for PFAC holders, in PLC2, was ready for use. I was shown the spaces during a walkthrough.

### C. PFAC HOLDERS HAVE UNESCORTED ACCESS TO PLC2

15. Mr. Barnes declares that he and his colleagues "asked how we could access the library because, to our knowledge, the only way to access it on foot is through a corridor that we were told we could no longer walk through" and that "the Pentagon Press Office staff indicated that they were unsure how we could access the library." Barnes Supp. Decl. ¶ 9. Both of these statements are inaccurate, and the information necessary to correct them was available to Mr. Barnes in the policy document he received and from the personnel he had access to.

16. First, the PLC2 is not accessible only through the Pentagon. The PLC2 is accessible via the Corridor 8 Pedestrian Bridge, which connects the Pentagon's North Parking Lot to the PLC2. A PFAC holder does not need to enter the Pentagon to reach the PLC2. The PFAC holder can walk, drive, carpool, rideshare, or take the Pentagon shuttle bus to the North

4

**App.69**

Parking Lot and then cross the Corridor 8 Pedestrian Bridge to the PLC2. Journalists may park in the designated press parking area at the Connector Lot and proceed from there to the North Parking Lot by foot or by shuttle bus. In approaching the PLC2, a PFAC badge holder will be required to present the PFAC badge to access the PLC2 as is required of any and all badge holders with access to the PLC2.

17. Second, PPO staff did not indicate that they were "unsure how [Mr. Barnes and his colleagues] could access the library." PPO staff explained the access options to Mr. Barnes and his colleagues and stated that the decision on how to arrive at the Pedestrian Bridge — whether by walking, driving, or shuttle bus — was up to the journalists.

18. Third, the Interim Policy that Mr. Barnes received itself described PLC2 as the designated workspace and breaking news gathering point. The Interim Policy states that "[i]n breaking news situations, PFAC holders will gather at the Pentagon Library and Conference Center and be escorted into the Pentagon by authorized DoW personnel." ECF No. 37-2 at 7. The Interim Policy further states that "[a] new press workspace will be established in an annex facility outside the Pentagon." ECF No. 37-2 at 7. And the Interim Policy references Appendix D, which "shall be updated to reflect the relocation of the press workspace to the Pentagon Library and Conference Center." ECF No. 37-2 at 15.

19. Fourth, on the morning of Wednesday, March 25—two days before Mr. Barnes signed his Supplemental Declaration—PPO staff provided Mr. Barnes with photos and Google Maps screenshots to show him where to access PLC2.

5

**App.70**

20. Fifth, regardless, Mr. Barnes had multiple avenues to obtain accurate information about PLC2 access. His designated point of contact, Major Kelly, could have answered any questions. Indeed, his colleagues Cooper and Ismay used the designated POC and received proper instructions. Or he could have asked his counsel to confer with counsel for the defendants in this matter to raise concerns or seek clarification. Verifying information should be routine for a veteran Pentagon reporter.

21. Mr. Barnes also declares that "PFAC holders did not have permission to ride on the shuttle bus." Barnes Supp. Decl. ¶ 9. This is incorrect. Before the New York Times reporters received their PFACs, OATSW(PA) had already arranged for the Pentagon shuttle bus to transport PFAC holders to the PLC2. The shuttle bus route includes a stop near the Pentagon Library and Conference Center, as shown on the Pentagon Circulator flyer attached hereto as Exhibit A. Mr. Barnes was told that PFAC holders could use the shuttle bus and that the signage — which currently states "Common Access Card (CAC) required to ride DoD Shuttles" — would be updated to include PFAC holders. Despite being told he could ride the shuttle bus, Mr. Barnes presented the outdated signage to the Court as if it prohibited him from riding. The accommodation was already in place, and Mr. Barnes was informed of it well before he signed his supplemental declaration on March 27.

### D. PFACs PROVIDE SIGNIFICANT ADVANTAGES OVER DAY PASSES

22. Mr. Barnes declares that the reinstated PFACs are "essentially worthless" because "[a]ll reporters, whether or not they hold a PFAC, can access the Pentagon if they obtain pre-approval to attend a specific press conference, event, or a pre-arranged interview."

6

**App.71**

Barnes Supp. Decl. ¶ 13. This is incorrect. There are significant differences between holding a PFAC and obtaining a day pass.

23. A day pass requires at least 24 hours advance notice and a background check conducted by the Pentagon Force Protection Agency (PFPA). A journalist without a PFAC who wishes to attend a press event must submit a request at least 24 hours in advance, undergo a background check, and wait for PFPA approval before being granted access.

24. A PFAC holder, by contrast, is already pre-cleared in the system. A PFAC holder does not need to undergo a background check each time he or she wishes to access the Pentagon. A PFAC holder requires only an escort, which can be arranged on short notice — including immediately, if needed. If a PFAC holder in the PLC2 workspace decides to interview a Department official or speak with Public Affairs staff (which Mr. Barnes "would frequently spend [his] days" doing as a PFAC holder, Barnes Supp. Decl. at ¶ 14), all the PFAC holder needs to do is contact that official's office or the Pentagon Press Office to arrange the interview, or reach out to the Public Affairs staff member. If the official or staff member is available, a staff member can escort the PFAC holder into the Pentagon immediately, with no waiting period.

25. Mr. Barnes declares that reporters "would need to submit a request to attend such events at least one day in advance in order to obtain an escort." Barnes Supp. Decl. ¶ 8. The Interim Policy contains no such requirement for PFAC holders. The 24-hour advance notice requirement applies to day passes — not to PFACs. *See* ECF No. 37-2 at 8-9 (Interim Policy specifying that a PFAC "affords escort privileges for up to three visiting media members from the [PFAC holder's] same media outlet," although such "[v]isiting media members must be entered into the PFPA Visitor Management System (VMS) …

7

**App.72**

no later than one business day in advance for U.S. citizens."). Mr. Barnes apparently did not seek clarification from his designated point of contact or by having his attorneys confer with counsel for the defendants in this matter.

26. To be clear, the Interim Policy does not require PFAC holders to submit requests to attend events or obtain escorts "at least one day in advance."

27. Just this morning, for example, the Department held a press briefing that was announced at approximately 3 PM Eastern yesterday. New York Times journalist and PFAC holder Greg Jaffe attended the press conference. Attending journalists, including Mr. Jaffe, were escorted to and from the press briefing seamlessly.

## E.  THE INTERIM POLICY'S PROVISIONS ARE CLEAR

28. Mr. Barnes declares that the Interim Policy's prohibition on "intentional inducement of unauthorized disclosure" is unclear, and asks whether he would be in violation "simply by asking a Public Affairs representative follow-up questions or seeking clarification in a way that pushes beyond that person's pre-approved talking points." Barnes Supp. Decl. ¶ 16. The answer is no. Safe harbor (a) of the Interim Policy expressly protects "[a]sking questions of Department personnel who are authorized to speak with the press, including Public Affairs Officers, designated spokespersons, and other personnel speaking on the record in their official capacity, regardless of the subject matter of the question." ECF No. 37-2 at 15 (emphasis added). Follow-up questions, probing questions, and questions that push beyond talking points are all "questions" within the meaning of safe harbor (a). The safe harbor contains no limitation on the type, tone, or persistence of questions directed at authorized personnel. The copy of the Interim Policy that Mr. Barnes received makes this clear.

8

**App.73**

29. Mr. Barnes also declares that "many authorized sources, including high-ranking officials and Public Affairs Office staff, often ask for anonymity or agree to speak only on background, with their name withheld — even if they are authorized to speak with me about the information in question." Barnes Supp. Decl. ¶ 17. That situation raises no concerns under the policy, for two reasons. First, even if the presumption applied, safe harbor (a) protects "[a]sking questions of Department personnel who are authorized to speak with the press," "regardless of the subject matter of the question." ECF No. 37-2 at 15. That safe harbor applies whether or not the Public Affairs Office staff member is speaking on background, anonymously, off the record, or on the record with full attribution. Second, the presumption addresses a fundamentally different situation: where the journalist proactively offers anonymity as an inducement to get someone to talk who otherwise would not. When an employee voluntarily chooses to provide information and asks that his or her name not be used, the employee is the initiator of the disclosure — not the journalist. This is consistent with safe harbor (b), which protects "[r]eceiving unsolicited information, including classified national security information or controlled unclassified information." ECF No. 37-2 at 15. Just as the receipt of unsolicited information is protected, so too is the receipt of information from a source who voluntarily discloses and independently requests anonymity.

30. To be clear about how the "intentional inducement" provision operates in practice: the Department does not actively monitor published stories to identify anonymous sources, and the publication of a story with an anonymous source does not necessarily suggest a violation of the policy. For example, the anonymous source may have been a Press Office staffer (as Mr. Barnes says is "often" the case, *see* Barnes Supp. Decl. ¶ 17), the

9

**App.74**

anonymous source may have offered the information to the journalist (*see* ¶ 29 above), or the anonymous source may have been a "source relationship[]" developed "outside the Pentagon through independent reporting (Interim Policy safe harbor (d), ECF No. 37-2 at 15).

31. Department employees receive training on reporting attempted security breaches, including information security breaches. If a Department employee believes that anyone has attempted to induce the employee to disclose information the employee is not authorized to disclose, the proper means to report that attempt is through the Department's security reporting channels.

32. If an employee reports such an attempt, and the report identifies a specific journalist who offered anonymity or privacy protection to induce the employee to disclose information not authorized for release, the presumption may apply. The presumption is rebuttable— the journalist may provide evidence that he or she did not know the employee was not authorized to disclose the information, notwithstanding the offer of anonymity.

33. Critically, because the Interim Policy defines "intentional inducement of unauthorized disclosure" as inducing "a specific Department employee," the Department cannot act on this provision without identifying that specific employee. The publication of a story relying on anonymous sources does not, standing alone, provide the Department with sufficient information to satisfy the "specific Department employee" element. The only way the Department can identify the specific employee is through the employee's own report — not by reading a published story. Without a specific employee report identifying a specific journalist's specific conduct, the Department has no basis for action under this

10

**App.75**

provision. There is no "inquisition panel" that reviews published stories. The enforcement mechanism is employee-initiated, not Department-initiated.

34. Mr. Barnes declares that he does not "know all the various kinds of information that qualify as 'controlled unclassified information'" and that he "would not know how to avoid soliciting that information — other than by avoiding all information-gathering activities altogether." Barnes Supp. Decl. ¶ 18. Safe harbor (f) of the Interim Policy directly addresses this concern. It provides that "asking questions of any Department employee where the journalist does not know that the employee is not authorized to disclose the information sought" does not constitute "intentional inducement of unauthorized disclosure." ECF No. 37-2 at 15. If Mr. Barnes does not know whether information qualifies as CUI, and does not know whether the employee he is speaking with is authorized to disclose it, safe harbor (f) protects him. The intentional inducement provision applies only where the journalist *knows* the employee is prohibited from disclosing the information by "Article 92 of the [UCMJ] (10 U.S.C. §892), 18 U.S.C. § 1905, or 5 U.S.C. § 552a." ECF No. 37-2 at 14. Mr. Barnes's professed lack of knowledge about CUI categories is precisely the situation the safe harbor was designed to address.

### F.   THE DEPARTMENT'S WEEKEND COORDINATION

35. Mr. Barnes declares that "[i]t was readily apparent to me that the Pentagon Press Office was unprepared for the changes effectuated by the Interim Policy" and that "these new rules had been implemented hastily and in response to the Court's March 20, 2026 ruling." Barnes Supp. Decl. ¶ 10. The Department issued PFACs, prepared a workspace, and adopted the Interim Policy within two business days of the Court's order. That the

11

**App.76**

Department moved quickly to comply with a judicial order does not mean it was unprepared — it means the Department took the Court's order seriously and devoted significant resources to compliance on an expedited timeline.

**EXHIBIT**

36. Attached hereto as **Exhibit A** is a true and correct copy of the Pentagon Circulator Service flyer, showing the shuttle bus route including the stop near the Pentagon Library and Conference Center.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 31, 2026 at Washington, D.C.

*Joel Valdez*
JOEL MANUEL VALDEZ
Deputy Press Secretary
Office of the Assistant to the Secretary of War for
Public Affairs
1400 Defense Pentagon
Washington, D.C. 20301-1400

12

**App.77**

# Declaration Exhibit B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE NEW YORK TIMES COMPANY,
et al.,

Plaintiffs,

v.

DEPARTMENT OF DEFENSE a/k/a
DEPARTMENT OF WAR, et al.,

Defendants.

Civil Action No. 1:25-cv-04218-PLF

## SECOND SUPPLEMENTAL DECLARATION OF JOEL MANUEL VALDEZ

I, Joel Manuel Valdez, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as

follows:

### INTRODUCTION

1. I am Deputy Press Secretary within the Office of the Assistant to the Secretary of War for

Public Affairs (OATSW(PA)). I previously submitted declarations in this matter on

March 27, 2026 (ECF No. 41-3) and March 31, 2026 (ECF No. 46). I submit this Second

Supplemental Declaration in response to the Third Supplemental Declaration of Julian E.

Barnes (ECF No. 48-2) filed on April 2, 2026, and the Post-Hearing Brief (ECF No. 48-

1) filed the same day.

2. I have personal knowledge of the matters stated herein, and if called as a witness, I could

and would testify competently thereto.

### MR. BARNES'S ACCOUNT OF THE PLC2 CONVERSATION

3. Mr. Barnes declares that "Mr. Valdez was not present when that conversation took place,

and I stand by the accuracy of my statements." Third Barnes Decl. ¶ 3. I was not present

during Mr. Barnes's conversation with PPO staff on March 24, 2026. However, before

1

**App.79**

submitting my first Supplemental Declaration, I spoke with both PPO staffers who interacted with Mr. Barnes on that day. Both confirmed the account I provided to the Court. My declaration was based on the facts—not on speculation.

### THE MARCH 31 INTERVIEW WITH A SENIOR DEPARTMENT OFFICIAL

4. Mr. Barnes declares that on Monday, March 30, 2026, he scheduled an interview with "a Department official" for Tuesday, March 31, 2026. Third Barnes Decl. ¶ 5. This is correct. In response to an interview request made by Mr. Barnes, a senior Department official granted an interview. OATSW(PA) facilitated the logistics of the interview as a liaison but was not involved in setting the terms of the interview.

5. Mr. Barnes declares that "the press office later requested that interview be on background — meaning he would be an anonymous source." Third Barnes Decl. ¶ 5. To clarify: the senior official's office requested that the interview be conducted on background. This was the official's preference, not a request from OATSW(PA) or the Pentagon Press Office. The decision to conduct an interview on background is a routine matter between the official and the journalist. It is not uncommon for senior Department officials to speak with reporters on background, and the decision to do so is made by the official — not by the press office.

6. This fact is relevant to the anonymity presumption in the Interim Policy. The presumption is triggered when a journalist *offers* anonymity or privacy protection to a Department employee "in exchange for information." ECF No. 37-2 at 14. Here, the official's office requested background treatment — the journalist did not offer it as an inducement. This is precisely the distinction the Interim Policy draws: when the source initiates the request for anonymity, the journalist is not "offering" anything. The presumption does not apply.

2

**App.80**

7.  If that were not enough, the interview is also covered, in its entirety, by safe harbor (e), which applies to "interviews arranged through public affairs offices." ECF 37-2 at 15.

## MR. BARNES'S ESCORT ON MARCH 31

8.  Mr. Barnes declares that on March 31, 2026, he arrived at the Pentagon Visitor Center for his scheduled interview, was told that PFAC holders must enter through Corridor 8, and was unable to meet his escort in the Visitor's Center as planned. Third Barnes Decl. ¶ 6.

9.  This was a one-off event, not a result dictated by the Interim Policy. Mr. Barnes's escort had not been fully briefed on the access procedures for PFAC holders under the Interim Policy. Going forward, OATSW(PA) and PFPA will permit reporters visiting the Pentagon to be escorted through either the Visitor's Center or Corridor 8, reducing the risk for any confusion in the future.

10. Mr. Barnes also declares that "the interview was postponed, and I was immediately escorted out of the building." Third Barnes Decl. ¶ 6. The interview was postponed because the senior official was in a meeting that overlapped with Mr. Barnes's scheduled interview time and could not leave in time to conduct the interview. This was a routine scheduling conflict, not a consequence of the Interim Policy or any restriction on Mr. Barnes's access. The interview has been rescheduled.

## THE MARCH 31 PRESS CONFERENCE

11. Mr. Barnes declares that his colleague's experience of the March 31 press conference was not "seamless" and describes various security requirements, including early arrival, wristbands, and restrictions on restroom access. Third Barnes Decl. ¶ 11.

3

**App.81**

12. The aspects of the press conference about which Mr. Barnes's colleague complains—the arrival time and wristbands—are standard security protocols for events involving the Secretary. They are not new, and they are not imposed by the Interim Policy.

13. As is the case with all bilateral meetings when the Secretary of War is present, reporters who have received confirmation to attend must arrive no later than 7:00 AM Eastern in order to be properly screened. The wristbands indicate to security personnel that the wearer has been screened and does not require additional security checks. These requirements apply to all media — credentialed and non-credentialed alike — and are standard security protocols for events involving the Secretary. In every media advisory announcing a morning press briefing, the email clearly indicates that press must arrive no later than 7:00 AM, briefings begin at 8:00 AM, and reporters must be in their seats no later than 7:30 AM.

14. Mr. Barnes also states that his colleague was "told they need to have an escort to use the restrooms and could not use the restrooms after 7:30 a.m. because it would present a security risk." Third Barnes Decl. ¶ 11. The restrooms nearest to the Pentagon Briefing Room are located down the hall in proximity to the Joint Chiefs of Staff corridor — a restricted area. Journalists require an escort to access that area. PPO staff informed reporters of this logistical reality and recommended that they use the restrooms before 7:30 AM — when escorts were readily available — to avoid delays once the briefing commenced. This was a practical accommodation, not a punitive restriction. The fact that every reporter whose RSVP was confirmed was screened, escorted into the building, and prepared for the press briefing by 8:00 AM confirms that the process functioned as intended.

4

**App.82**

## THE ANONYMITY DISTINCTION IN PRACTICE

15. Mr. Barnes declares that the distinction between a journalist offering anonymity and a source requesting it is "blurry" in practice, and that "conversations sometimes go on and off the record, with it unclear exactly who initiated what." Third Barnes Decl. ¶ 10. The Interim Policy's anonymity presumption addresses a specific, identifiable situation: where a journalist proactively offers anonymity or privacy protection to a Department employee as an inducement to disclose information the employee is not authorized to disclose. It does not address the fluid, conversational dynamics Mr. Barnes describes — where parties negotiate terms of engagement as a conversation unfolds, or where a source independently requests that his or her name not be used.

16. When an employee voluntarily chooses to provide information and asks that his or her name not be used, the employee is the initiator of the disclosure — not the journalist. This is consistent with safe harbor (b), which protects the receipt of unsolicited information. Just as the receipt of unsolicited information is protected, so too is the receipt of information from a source who voluntarily discloses and independently requests anonymity. The presumption addresses a fundamentally different situation: where the journalist proactively offers anonymity as an inducement to get someone to talk who otherwise would not.

17. As I explained in my prior Supplemental Declaration, the Department does not actively monitor published stories to identify anonymous sources. The enforcement mechanism is employee-initiated: if a Department employee believes a journalist has attempted to induce the employee to disclose unauthorized information, the employee reports the attempt through the Department's existing security reporting channels. Because the

5

**App.83**

Interim Policy requires identification of "a specific Department employee," the Department cannot act without a specific employee report identifying a specific journalist's specific conduct. The publication of a story with anonymous sources does not, standing alone, provide the Department with sufficient information to act.

### MR. BARNES'S CHARACTERIZATION OF THE SCHEDULING PROCESS

18. Mr. Barnes declares that "going through a sometimes-lengthy process of scheduling official appointments in order to ask even one or two questions to an official… does not allow for meaningful engagement with Department personnel on a timeline consistent with news reporting." Third Barnes Decl. ¶ 8. As I explained in my prior Supplemental Declaration, PFAC holders are pre-cleared in the system and do not need to undergo a background check each time they wish to access the Pentagon. A PFAC holder requires only an escort, which can be arranged on short notice — including immediately, if needed.

19. To the extent Mr. Barnes experiences delays in scheduling interviews with Department officials, those delays are attributable to the officials' own schedules — not to the Interim Policy. Before the Interim Policy, if Mr. Barnes wished to interview a specific Department official, he still had to schedule through that official's office and wait for the official to be available. The Interim Policy does not change the officials' scheduling process. The only additional step is the escort from PLC2 to the official's office, which can be arranged immediately once the official is available. Mr. Barnes's own experience last week demonstrates this: he scheduled an interview with a senior Department official on Monday and the interview was arranged for Tuesday — with less than 24 hours' notice.

6

**App.84**

20. Mr. Barnes also declares that "Pentagon officials and personnel are not permitted to and do not discuss classified or national-security sensitive information in Pentagon hallways." Third Barnes Decl. ¶ 9. Pentagon officials and personnel are not permitted to discuss classified or national-security sensitive information with reporters in any setting. However, the security concern addressed by the escort requirement is not limited to the verbal disclosure of classified information in hallways. Unescorted access to hallways near sensitive spaces can provide information about activity patterns within the Pentagon — such as which officials are meeting, when, and in what configuration — that may be used to identify and target sources for unauthorized disclosures of non-public information. The escort requirement addresses this broader information-security concern.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 6, 2026 at Washington, D.C.

*Joel Valdez*

JOEL MANUEL VALDEZ
Deputy Press Secretary
Office of the Assistant to the Secretary of War for
Public Affairs
1400 Defense Pentagon
Washington, D.C. 20301-1400

7

**App.85**

# Exhibit 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE NEW YORK TIMES COMPANY, *et al.*,

    *Plaintiffs*,

v.

DEPARTMENT OF DEFENSE, a/k/a
DEPARTMENT OF WAR, *et al.*,

    *Defendants*.

Civil Action No. 26-1690 (PLF)

## DECLARATION OF SEAN PARNELL IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I, Sean Parnell, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

## BACKGROUND

1. I am the Assistant to the Secretary of War for Public Affairs. In this role, I am responsible for advising the Secretary of War and the Deputy Secretary of War on communications strategy and public engagement and serving as the Department of War's Chief Spokesperson. I am the decisionmaker who promulgated the PFAC policy issued on October 6, 2025, and the interim PFAC policy issued on March 23, 2026.

2. I have personal knowledge of the matters stated herein, and if called as a witness, I could and would testify competently thereto. In particular, I have personal knowledge of the basis for adopting the interim PFAC policy I signed and issued on March 23, 2026.

3. Kingsley Wilson, the Pentagon Press Secretary, reports directly to me. I am aware that Ms. Wilson provided a declaration in previous litigation regarding the interim PFAC policy issued on March 23, 2026, explaining that prior to the issuance of the October 2025 PFAC policy, journalists—including PFAC holders—frequently contacted the

1

**App.87**

Department regarding sensitive or classified information they had obtained; that that pattern ceased when many journalists surrendered their PFACs after the institution of the October 2025 policy; and that if the Department were required to afford PFAC holders unescorted access to the Pentagon, a resumption of unescorted access would almost certainly result in a return to the previous pattern of journalists frequently receiving controlled or classified information, including highly classified national defense information. *See New York Times v. Dep't of Defense*, No. 1:25-cv-4218 (D.D.C.), ECF 58-1.

## THE PRE-OCTOBER POLICY PATTERN

4. Because Ms. Wilson reports to me, I was aware of the information that she provided to this Court in connection with previous litigation involving press access to the Pentagon. Before the October 2025 PFAC policy was implemented, Ms. Wilson's office was contacted by journalists on a regular basis—often monthly, and sometimes multiple times per month—regarding information they had obtained that was sensitive or classified, including information relating to operational plans, intelligence assessments, diplomatic communications, and force posture decisions. These contacts came from journalists at multiple news outlets, including The New York Times. Many of these journalists, including New York Times journalists, were PFAC holders. *Id.* at ¶ 4.

5. Controlled unclassified information and classified information reached journalists with a frequency that made me seriously concerned about the security of information within the Pentagon. *Id.* at ¶ 5.

6. Prior to adoption of the interim policy in March 2026, Ms. Wilson advised me, and I concluded, that unescorted access to the Pentagon was a significant contributing factor to

2

**App.88**

the frequency with which controlled and classified information was reaching journalists. Unescorted access allowed journalists to maintain a persistent physical presence near sensitive spaces within the Pentagon. This presence enabled journalists to observe activity patterns—such as which officials were meeting, when, and in what configuration—that could be used to identify individuals with access to specific sensitive information and to time inquiries accordingly. *See id.* ¶ 7.

7.  The Correspondents' Corridor was located in close proximity to the office space for the Joint Chiefs of Staff—the military advisors to the President, National Security Council, Homeland Security Council, and Secretary of Defense. *See* 10 U.S.C. § 151. Journalists, including journalists who regularly contacted the Pentagon press office regarding controlled or classified information they had obtained, frequently used their access to closely monitor activity in and out of the Joint Staff spaces. *Id.* ¶ 8.

8.  Following the implementation of the PFAC Policy in October 2025, the frequency with which the Pentagon press office was contacted by journalists regarding sensitive, controlled or classified information dropped dramatically. It changed from a regular pattern of contacts involving such information to a small number of isolated incidents. *See id.* ¶ 10.

9.  Prior to adoption of the interim policy in March 2026, Ms. Wilson advised me, and I concluded, that this reduction occurred primarily because many journalists no longer maintained a persistent, unescorted presence near sensitive spaces in the Pentagon after they surrendered their PFACs following the implementation of the PFAC Policy. Without the ability to observe activity patterns and time their inquiries accordingly, the systematic pattern was disrupted. *See id.* ¶ 11.

3

**App.89**

## THE INTERIM POLICY

10. It is an unacceptable risk to national security for sensitive, controlled or classified information to regularly reach journalists. The regular pattern of unlawful disclosures prior to October 2025 posed serious risks to national security. Unauthorized disclosure of operational plans, intelligence assessments, force posture decisions, and other obviously sensitive information puts American lives in danger, allows our enemies to adjust their tactics ahead of our operations, and risks compromising our ongoing operations. These disclosures are irreversible: Once compromised, information cannot be recalled.

11. When I adopted the interim policy, I assessed that the combination of unescorted access and the absence of security screening criteria contributed to the frequency with which classified information was reaching journalists. I also agreed with Ms. Wilson that restoring unescorted access to the Pentagon for PFAC holders would result in a return to the same pattern of regular breaches of information security that that unescorted access had previously permitted, especially if we were unable to prohibit journalists from intentionally soliciting unlawful disclosures of information. The escort requirement adopted as part of the Interim Policy was specifically designed to address this assessment of risks to the security of information in the Pentagon, and thus to the nation's security, that would exist if the Department were required to return to the pre-October Policy status quo, under which journalists frequently obtained sensitive information. *See id.* ¶ 9.

12. I reached this conclusion after the Court rejected the October Policy's attempt to permit PFAC holders to access portions of the Pentagon without an escort, subject to a requirement that PFAC holders not intentionally induce unauthorized disclosures. Without the escort requirement or a prohibition on PFAC holders soliciting unlawful

4

**App.90**

disclosures of sensitive information, I concluded that the Department has no other effective means of managing this demonstrated, repeated risk to the security of sensitive information within the Pentagon while still permitting journalists to access the Pentagon.

13. I adopted the escort requirement in response to the Court's rejection of the challenged portions of the October 2025 policy, in order to address the risk to the security of sensitive controlled and classified information within the Pentagon, and the risks that the unauthorized disclosure of that information would carry for the Nation's security, which would exist if the Department had to return to the pre-October Policy status quo.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 4, 2026 at Washington, D.C.

SEAN PARNELL
Assistant to the Secretary of War for
Public Affairs
1400 Defense Pentagon
Washington, D.C. 20301-1400

5

**App.91**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE NEW YORK TIMES COMPANY, *et al.*

        *Plaintiffs,*

  v.

DEPARTMENT OF DEFENSE, *et al.*,
        *Defendants.*

Civil Case No. 26-cv-01690 (PLF)

## SUPPLEMENTAL DECLARATION OF JULIAN E. BARNES

I, Julian E. Barnes, hereby declare as follows:

1. I am over the age of 18 and make this declaration based upon my personal knowledge and experience. If called to do so, I could and would competently testify to these matters under oath.

2. I am a national security reporter with The New York Times ("The Times") and a plaintiff in the above-captioned case. I make this supplemental declaration in support of Plaintiffs' Motion for a Preliminary Injunction.

3. I have worked for The Times since June 2018 and am assigned to The Times's Washington Bureau. My work for The Times focuses on the Pentagon, United States intelligence agencies, and international security, among other subjects. As detailed in my prior declaration filed in this matter, *see* ECF No. 6-17, I am one of seven Times reporters who held a Pentagon Facility Alternate Credentials ("PFAC") issued by the Department of Defense (the "Department") as of fall 2025. I surrendered my PFAC on or about October 15, 2025 due to the Department's new policy regarding PFACs (the "October Policy"), and I obtained a new PFAC in March 2026, on or around the same day the Department implemented a revised PFAC policy (the "Interim Policy").

1

**App.92**

4.       I have reviewed the Declarations of Joel Manuel Valdez and Sean Parnell filed in the above-captioned case.  In his declaration, Mr. Valdez states that since I picked up my reinstated PFAC on March 24, 2026, I have "attempted to enter the Pentagon just twice."  Valdez Decl., ¶ 4. That is correct.  The reason I have not attempted to visit the Pentagon more frequently since March 24 is because of the Interim Policy.  As I explained in my prior declaration, the Interim Policy's escort requirement makes it much more difficult for me to work from the Pentagon:  I have to plan my visit in advance, submit a request for an escort that is linked to a specific event or appointment, wait for my request to be approved, and then wait for the assigned escort to meet me.

5.       But the escort requirement is not merely logistically burdensome.  It has effectively eliminated what made having a PFAC and visiting the Pentagon valuable for purposes of newsgathering and reporting.  As stated in prior declarations, I have been covering national security for more than 20 years.  At times, including, specifically, when I worked as a Pentagon correspondent for the Los Angeles Times and then The Wall Street Journal from 2006 to 2015, I would visit the Pentagon, on average, three or more times in a typical workweek, spending at least half of the workday in the building.  At least once a week I would typically stay for a full workday. On most of those days, I did not have any appointment or scheduled interview.  Instead, I would make a circuit of the Public Affairs offices around the building—moving, for example, from the Navy Public Affairs Office, to the Army Public Affairs Office, sometimes to the Marine Corps Public Affairs Office, then to the Joint Staff Public Affairs Office, the Air Force Public Affairs Office, and finally to the Public Affairs Office for the Office of the Secretary of Defense.  At each stop, I would visit with senior and junior public affairs officers to talk, face-to-face, about stories I was pursuing—articles that were close to being published as well as those that were in earlier or more nascent stages.  And I would ask questions based on who was there.  For instance, if the Navy

2

**App.93**

Public Affairs officer responsible for shipbuilding was in the office, I might ask about the status of the latest warship.  I am always working on multiple stories at any given time, and I would typically discuss several different topics with personnel at the Pentagon on any given day.  Those conversations strengthened my reporting by giving me more context and often a more nuanced understanding of the issues; those conversations also helped me to understand and incorporate the U.S. military's perspective in my reporting.

6.      At The Times, because I cover intelligence, I do not go to the Pentagon quite as frequently as some of my other Times colleagues, or as frequently as I did when I was a Pentagon correspondent.  But, until October 2025, I would still go to the Pentagon frequently in the course of my work.  Prior to October 2025, on most of the days that I went to the Pentagon, I did not have a specific, pre-arranged interview, event, or press conference to attend.  Instead, I went because being at the Pentagon significantly improved my ability to do my job effectively by enabling me to speak, face-to-face, with multiple officials, including especially when I was reporting on breaking or rapidly developing events.

7.      To be an effective reporter, I often need to have conversations, follow leads, and ask questions that cannot be planned days or even hours ahead of time.  Before October 2025, being present at the Pentagon was one of the best ways for me to gain the kind of knowledge and context that is critical to in-depth, informed reporting.  The escort requirement prevents me from doing any of that at the Pentagon.  With the escort requirement in place, going to the Pentagon is rarely worthwhile.  I visit the Pentagon only if I have a scheduled interview, and those are infrequently approved by the Department.  If not for the escort requirement, I would go to the Pentagon more frequently, just as I did before October 2025.

3

**App.94**

8.      I understand that the Department emphasizes, in its briefing, that the October Policy also imposed an escort requirement for certain parts of the Pentagon.  *See* Opp. at 4.  An escort requirement applicable to the entire building, like the one imposed for the first time in the Interim Policy, is categorically different from any restrictions the Department previously had in place.  In my experience covering the Pentagon since 2004, there have always been certain areas of the Pentagon that for legitimate reasons credentialed reporters could not go without an invitation or without being accompanied by someone from the Department. But as a general matter, reporters were still able to freely move through the Pentagon's corridors, visit the various press offices around the building, and do their jobs.  The Interim Policy bars reporters from accessing any part of the Pentagon without an escort.  That restriction is unprecedented.

9.      Last week the Department announced it had re-designated the Pentagon Press Office as a Secure Compartmented Information Facility, or "SCIF."  In my experience, the Pentagon Press Office, consistent with its name and purpose, has traditionally been open to members of the press.  In fact, in the past, including during President Trump's first term in office, the Department would hold morning press gaggles in the Pentagon Press Office.  Some press offices, including the Press Office for the Office of the Secretary of Defense (OSD), had a separate internal room that was designated as a SCIF, but the rest of the Press Office was open and accessible to credentialed reporters without an escort.

10.      Mr. Parnell's declaration states that, according to Pentagon Press Secretary Kingsley Wilson, her office received less frequent contacts from reporters after the October Policy was put in place, and that Ms. Wilson attributed that to reporters having less access to non-public information.  While I can only speak to my own experience, those statements are not true with respect to me or any other reporter with The Times.  At The Times, we practice "no surprises"

4

**App.95**

journalism; we contact the Department to get their perspective and comment any time that we plan to publish a story involving the Department. I adhered to that practice both before and after the October Policy was put in place and have continued to adhere to it since the Interim Policy was put in place. Simply put, I am not contacting the Department any less frequently than I did before the October Policy. Moreover, lacking unescorted access to the Pentagon has unquestionably impeded my ability to pursue the kinds of informal conversations that are important to doing my job well, but it has not eliminated my ability to report stories that rely on non-public information.

11.    Mr. Valdez's declaration repeatedly takes issue with statements in my prior declaration, but it does not actually refute or contradict any of those statements. For example, it is true that I received unclear instructions about how to pick up my new PFAC and that, when I did pick up my new PFAC on March 24, Pentagon Press Office staff expressed uncertainty about how I could access the Pentagon library. *See* ECF No. 6-17 at ¶¶ 17, 20. The fact that I was told to contact a specific Department staff person, *see* Valdez Decl., ¶ 14, or that I received instructions for accessing the Library on a *subsequent day*, *id*., ¶ 15, does not establish that the instructions given to me on March 23 and March 24 were clear. They were not.

12.    Similarly, Mr. Valdez asserts that Pentagon staff's "confusion" about whether and how I could access the building when I came for a pre-arranged interview on March 31, 2026 was a "one-off event." *Id*., ¶ 17. Even if that is true, that confusion—like the uncertainty about how reporters could access the Library and the unclear instructions regarding picking up PFACs— reinforces my view that the Department implemented the Interim Policy in a hasty and haphazard manner after the October Policy was invalidated, for the specific purpose of preventing me and other reporters from The Times from having their unescorted access to the Pentagon restored.

**App.96**

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 9 day of June 2026 in ___Washington, D.C.___

_____
Julian E. Barnes

**App.97**