**ORAL ARGUMENT NOT YET SCHEDULED**
**No. 26-5253**

## United States Court of Appeals
## For the District of Columbia Circuit

---

DEPARTMENT OF DEFENSE A/K/A DEPARTMENT OF WAR, ET AL.,

*Defendants-Appellants*,

v.

THE NEW YORK TIMES COMPANY, ET AL.,

*Plaintiffs-Appellees*.

---

On Appeal From The United States District Court
For The District Of Columbia, No. 1:26-cv-1960-PLF,
The Honorable Paul L. Friedman

---

**OPPOSITION OF PLAINTIFFS-APPELLEES THE NEW YORK TIMES COMPANY AND JULIAN E. BARNES TO MOTION FOR STAY**

Susan M. Pelletier
Eric Brooks
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036-5306
(202) 955-8500
SPelletier@gibsondunn.com
EBrooks2@gibsondunn.com

Theodore J. Boutrous, Jr.
Katie Townsend
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
TBoutrous@gibsondunn.com
KTownsend@gibsondunn.com

*Counsel for Plaintiffs-Appellees*
*The New York Times Company and*
*Julian E. Barnes*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

1. **Parties and amici.** All parties, intervenors, and *amici* appearing in this court are listed in Appellants' Certificate as to Parties, Rulings, and Related Cases, Document #2181846 (July 6, 2026).

2. **Rulings under review.** References to the rulings at issue appear in Appellants' Certificate as to Parties, Rulings, and Related Cases, Document #2181846 (July 6, 2026).

3. **Related cases.** This case was not previously before this Court. There is one pending related case in this Court: *New York Times Co. v. U.S. Department of Defense*, No. 26-5113 (D.C. Cir.).

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Plaintiff-Appellee The New York Times Company ("The Times") discloses that it is a publicly traded company, it has no parent company, and no publicly held corporation owns ten percent or more of its stock. The Times is a global media organization focused on creating and distributing high-quality news and information.

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............ ii

CORPORATE DISCLOSURE STATEMENT ....................................................... ii

INTRODUCTION ................................................................................................... 1

STATEMENT ......................................................................................................... 3

LEGAL STANDARD ............................................................................................. 6

ARGUMENT .......................................................................................................... 7

I.    The Department Is Not Likely to Prevail on the Merits. ............................... 7

   A.    The district court did not clearly err in finding a causal link between the escort requirement and Plaintiffs' First Amendment activities. ..... 7

   B.    The district court did not clearly err in finding the escort requirement to be an adverse action. ................................................................... 13

   C.    The district court did not abuse its discretion in entering a preliminary injunction. ................................................................................... 16

II.   The Department Has Not Shown "Certain and Great" Irreparable Harm. ..... 17

III.  A Stay Will Substantially Injure Plaintiffs and Is Contrary to the Public Interest. ............................................................................................................. 18

CONCLUSION ..................................................................................................... 19

## TABLE OF AUTHORITIES

Page(s)

### Cases

*Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs.*,
 816 F. Supp. 3d 27 (D.D.C. 2026)..................................................................15

*Beatty v. Trump*,
 No. 26-5224 (D.C. Cir. July 8, 2026) .............................................................17

*Chaplaincy of Full Gospel Churches v. England*,
 454 F.3d 290 (D.C. Cir. 2006)........................................................................18

*Crawford-El v. Britton*,
 523 U.S. 574 (1998)...........................................................................................8

*Dep't of Com. v. New York*,
 588 U.S. 752 (2019).........................................................................................10

*Endocrine Soc'y v. Fed. Trade Comm'n*,
 2026 WL 1257289 (D.D.C. May 7, 2026).......................................................16

*Geleta v. Gray*,
 645 F.3d 408 (D.C. Cir. 2011).........................................................................11

*Glob. Health Council v. Trump*,
 153 F.4th 1 (D.C. Cir. 2025)..........................................................................6, 7

*Houston Community College System v. Wilson*,
 595 U.S. 468 (2022).........................................................................................16

*Huthnance v. District of Columbia*,
 722 F.3d 371 (D.C. Cir. 2013)...........................................................................7

*Jenner & Block LLP v. U.S. Dep't of Just.*,
 784 F. Supp. 3d 76 (D.D.C. 2025)..................................................................14

*KalshiEX LLC v. Commodity Futures Trading Comm'n*,
 119 F.4th 58 (D.C. Cir. 2024)..................................................................1, 6, 17

*Karem v. Trump*,
 960 F.3d 656 (D.C. Cir. 2020)....................................................................16, 19

i

*Mahmoud v. Taylor*,
  606 U.S. 522 (2025)......................................................................................19

*Media Matters for Am. v. Fed. Trade Comm'n*,
  2025 WL 2988966 (D.C. Cir. Oct. 23, 2025)............................................8, 9, 11

*Media Matters for Am. v. Paxton*,
  138 F.4th 563 (D.C. Cir. 2025)..........................................................7, 8, 15, 19

*N.Y. Times Co. v. Dep't of Defense*,
  2026 WL 788689 (D.D.C. Mar. 20, 2026) ......................................................3

*New York Times Co. v. Dep't of Def.*,
  824 F. Supp. 3d 27 (D.D.C. 2026)....................................................................5

*New York Times Co. v. Dep't of Def.*,
  No. 26-5113, 2026 WL 1179440 (D.C. Cir. Apr. 27, 2026) ...............................6

*Perry v. Sindermann*,
  408 U.S. 593 (1972)......................................................................................15

*Sherrill v. Knight*,
  569 F.2d 124 (D.C. Cir. 1977)........................................................................19

*Suarez Corp. Indus. v. McGraw*,
  202 F.3d 676 (4th Cir. 2000) ..........................................................................14

*The Baltimore Sun Co. v. Ehrlich*,
  437 F.3d 410 (4th Cir. 2006) ..........................................................................16

*Toolasprashad v. Bureau of Prisons*,
  286 F.3d 576 (D.C. Cir. 2002)........................................................................14

*Zerilli v. Smith*,
  656 F.2d 705 (D.C. Cir. 1981)........................................................................19

**INTRODUCTION**

Nothing in Defendants' Motion for Stay demonstrates their entitlement to that "extraordinary" relief. *KalshiEX LLC v. Commodity Futures Trading Comm'n*, 119 F.4th 58, 63 (D.C. Cir. 2024) (citation omitted). From its opening paragraph, the Motion blatantly misrepresents the district court's rulings and the record, including the substance of this Court's previous stay ruling, and misstates the legal issues before this Court. Defendants improperly ignore the district court's detailed factual findings, which are dispositive and subject to review only for clear error. And they misleadingly present their post-hoc, pretextual claim of a supposed "national-security" justification for the escort requirement—an assertion fully considered and thoroughly rejected below—as though it were an unassailable fact merely "disregarded" by the district court. Mot. at 3.

To begin, it is far from "undisputed" that the Department's Interim Policy, including its escort requirement, is "viewpoint neutral," as the Department falsely states. Mot. at 3. As The Times averred in its complaint and argued in its preliminary injunction motion, the escort requirement is an unreasonable and viewpoint discriminatory restriction on access to and use of a nonpublic forum that burdens only those willing to report independently on the Department and violates the First Amendment. Dkt. 1 at 38–49, Dkt. 6-1 at 31–36; *see also* App. 3, 16. In granting The Times's motion, the district court expressly "did not reach" those arguments because it did not need to. App. 16. The factual record before the district court amply established The Times's likelihood of success on the merits of its independent claim that the Department concocted the escort requirement in retaliation for The

Times's journalism and successful efforts to vindicate its constitutional rights in litigation. As the district court correctly found, Plaintiffs were entitled to preliminary injunctive relief based on that claim alone. App. 16.

To the extent The Times's retaliation claim is not "typical," as Defendants assert, Mot. at 2, that is only because Defendants' retaliatory actions are so extraordinary. The district court correctly found that the Department's imposition of the escort requirement in direct response to an order requiring it to *restore* The Times's Pentagon access is an "adverse action"—one that inflicts harms that are "far from trivial" and go well beyond "mere inconvenience," App. 18, 32–33 & n.8. That finding is "amply support[ed]" by evidence, including the testimony of experienced Pentagon reporters and former Pentagon Public Affairs officials, *see* App. 18–21— evidence ignored by the Department. The district court's factual findings of retaliatory motive, too, are based on "compelling evidence connecting the imposition of the escort requirement to [The Times's] protected speech." App. 22. These findings are not clearly erroneous; they are supported by "powerful evidence." App. 24.

Moreover, Defendants fail to demonstrate that they will suffer irreparable harm absent a stay. Their abstract, theoretical claims of a need to protect "sensitive" information are wholly speculative and, indeed, belied by the district court's factual findings and the evidence. App. 28–30. The escort requirement is unprecedented in the Pentagon's history. And the preliminary injunction does not give Times journalists any greater access to the Pentagon than they had for decades before October 2025, when the Department first implemented an unconstitutional press credentialing policy (the "October Policy") designed "to weed out disfavored journalists" and

2

news organizations including, specifically, The Times from the Pentagon "based on editorial viewpoint." *N.Y. Times Co. v. Dep't of Defense*, 2026 WL 788689, at \*14 (D.D.C. Mar. 20, 2026).  Nor does it give Times journalists "access to sensitive spaces" or to "classified or sensitive information," as Defendants disingenuously suggest.  Mot. at 2, 3, 5–8, 10, 17–25, 27.  As the district court found: "Journalists, of course, do not 'have access to sensitive or classified information simply by being in [the Pentagon] without an escort.'"  App. 28–30 (quoting Williams Decl. ¶ 21). The preliminary injunction merely restores the historical status quo, *see* App. 4, to staunch the irreparable harm inflicted on The Times and, in turn, the public by Defendants' escalating, retaliatory efforts to curtail independent newsgathering and reporting about the Department and its leadership.

In short, it is Defendants who have "mangled" the "relevant legal framework," Mot. at 3—not to mention this Court's earlier stay ruling, the district court's factual findings, and the evidence.  And their insistence that the escort requirement is the norm in "secure government buildings" is flatly wrong.  Mot. 1.  Congress, the White House, the Supreme Court, the State Department, the Justice Department, and this Court all permit credentialed journalists to move about unrestricted parts of their buildings without an official minder.  *See* Dkt. 6-1 at 26.  The Department has made itself an outlier—and it did so for an unlawful reason that violates the First Amendment.  Defendants' Motion should be denied.

## STATEMENT

For decades, journalists from The Times and other news organizations "have covered the United States military and other defense activities from inside the

Pentagon." App. 4. Far from being "an all-classified military command post," the Pentagon "is the world's second largest office building." *Id*. at 5. Parts of it "resemble a mall," "often crowded with visitors." *Id*. at 5. It has "long been staffed by a thousand or more non-Department employees" including, among others, "cleaning and maintenance professionals" and "retail and cafeteria workers, who move around areas of the building unescorted every day." *Id*. Until the Interim Policy, "[c]redentialed journalists" also had unescorted access to, among other areas "the Pentagon Press Briefing Room and the corridors linking the many press offices within the building[.]" *Id.* at 4.

Following Secretary Hegseth's confirmation, Department officials openly complained about news coverage they disliked and launched unprecedented actions with respect to the press. *Id*. at 6. In October 2025, Department officials issued a policy permitting them to immediately suspend a journalist's credentials for any reason, including based on a discretionary determination that a journalist posed "a security or safety risk." *Id*. at 5–8. The October Policy decreed that the receipt, publication, or "solicitation" of any "unauthorized" information could result in such a determination. *Id.* Journalists from The Times and virtually every other news organization that covers the Department refused to subject themselves to the October Policy and lost their credentials as a result. *Id.*

Plaintiffs brought a constitutional challenge to provisions of the October Policy and, on March 20, 2026, the district court granted summary judgment in Plaintiffs' favor on First and Fifth Amendment grounds (*NYT I*). *Id.* at 9–10. The court concluded, *inter alia*, that the October Policy was "unreasonable and viewpoint

4

discriminatory" in violation of the First Amendment on the basis of "voluminous and undisputed record evidence" that showed "the October Policy's true purpose and practical effect[ was] to weed out disfavored journalists," *id.* at 10, unwilling to publish "only stories that are favorable to or spoon-fed by Department leadership," *New York Times Co. v. Dep't of Def.*, 824 F. Supp. 3d 27, 49 (D.D.C. 2026). The court vacated the challenged provisions, enjoined their enforcement against The Times, and ordered the Department to "immediately reinstate" the credentials and access of Barnes and six other Times reporters. App. 10.

The very next business day, the Department issued the Interim Policy, closing and physically dismantling the Correspondents' Corridor, the Pentagon's dedicated press workspace, and prohibiting credentialed journalists from even entering the Pentagon without an official escort. App. 12. The Department pointed to the district court's purported vacatur of "the October Policy's security screening provisions" as its justification. App. 26.

Maintaining that the Department had violated the district court's injunction, The Times moved to compel its compliance. The district court granted that motion, finding that Defendants had violated its order "to restore [Plaintiffs'] access to the Pentagon." *Id.* at 13. The court rejected the justification offered by the Department"—"that [its] order had removed all security screening authority"—as "nonsense," and enjoined the challenged parts of the Interim Policy, including the escort requirement. *Id.* A divided panel of this Court issued a narrow stay of that ruling on the ground that the Department was likely to show that the escort requirement was outside the scope of the district court's earlier injunction and that the district

court had yet to address whether it "independently violates the First or Fifth Amendment." *New York Times Co. v. Dep't of Def.*, No. 26-5113, 2026 WL 1179440, at *3 (D.C. Cir. Apr. 27, 2026).

Plaintiffs filed the instant action to challenge the Interim Policy on its merits. Plaintiffs sought a preliminary injunction to bar enforcement of the escort requirement—the only challenged portion of the Interim Policy not currently enjoined as to The Times—on the grounds that it is (1) unconstitutional retaliation, (2) an unreasonable and viewpoint-discriminatory restriction on access to and use of a nonpublic forum in violation of the First Amendment, and (3) a violation of the Administrative Procedure Act. Dkt. 6-1. On June 30, the district court granted that motion, finding that Plaintiffs were likely to succeed on their retaliation claim and that the other preliminary injunction factors favored relief. App. 16–34.

## LEGAL STANDARD

A stay is an "extraordinary" remedy. *KalshiEX*, 119 F.4th at 63 (citation omitted). It requires a "strong showing" that the applicant is likely to succeed on the merits, will face "certain and great" irreparable harm absent a stay, and that a stay would not substantially injure other parties and would serve the public interest. *Id.* at 63–64. A district court's decision "to grant a preliminary injunction" is reviewed "for abuse of discretion, its legal conclusions de novo and its findings of fact for clear error." *Glob. Health Council v. Trump*, 153 F.4th 1, 12 (D.C. Cir. 2025).

## ARGUMENT

### I.   The Department Is Not Likely to Prevail on the Merits.

A First Amendment retaliation claim has three elements: a plaintiff "engaged in conduct protected under the First Amendment," "the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in [plaintiff's] position from speaking" or engaging in that conduct again, and "a causal link between the exercise of a constitutional right" and the "adverse action." *Media Matters for Am. v. Paxton*, 138 F.4th 563, 584 (D.C. Cir. 2025); *see* App. 16–17; Mot. 12. The Department does not dispute that Plaintiffs' "reporting on public issues [is] [a] quintessential First Amendment activit[y]," or that their lawsuit challenging the October Policy "is a form of expression protected by the First Amendment." App. 17 (citations omitted and alterations in original). It argues only that the district court was wrong to find that Plaintiffs will likely succeed on the other two elements of their retaliation claim. But Defendants cannot show, as they must, that any of the district court's findings amount to "clear error." *Glob. Health Council*, 153 F.4th at 12. Indeed, Defendants do not even acknowledge—let alone try to satisfy—that applicable standard. *Huthnance v. District of Columbia*, 722 F.3d 371, 377 n.3 (D.C. Cir. 2013) (reproving appellants for "barely mention[ing]" the relevant standard of review). Defendants' arguments are meritless.

> ### A. The district court did not clearly err in finding a causal link between the escort requirement and Plaintiffs' First Amendment activities.

The Department ignores the "compelling evidence connecting the imposition of the escort requirement to [Plaintiffs'] protected speech," App. 22, and asks this

Court to conclude, based on nothing more than the Department's say-so, that it lacked a retaliatory motive. But the "[i]mproper intent" element of a First Amendment retaliation claim is "a pure issue of fact," *Crawford-El v. Britton*, 523 U.S. 574, 589 (1998), subject to review only for clear error. And, far from being clearly erroneous, the district court's finding of a causal connection between The Times's First Amendment activities and the escort requirement is supported by powerful—indeed, overwhelming—evidence.[1]

It is well-settled that a "defendant's expression of hostility to the protected speech" can support a finding of retaliatory motive. *Media Matters for Am. v. Fed. Trade Comm'n*, 2025 WL 2988966, at *8 (D.C. Cir. Oct. 23, 2025). Here, everywhere it turned, the district court found "myriad statements by Department officials expressing disdain for reporting by The Times." App. 23. For example, Assistant to the Secretary of Defense for Public Affairs Sean Parnell called The Times a "propaganda machine" and its reporting "garbage." *Id.*; Supp. App. 4. Secretary Hegseth accused it of "slashing and burning people to ruin their reputations." App. 23. More recently, he called The Times's reporting "unpatriotic," and compared the "'legacy Trump-hating press' to the biblical 'Pharisees' who 'held counsel against [Jesus].'" App. 14, 24; Supp. App. 2. These are not mere "express[ions of] disagreement" with The Times's reporting. Mot. 20. They are expressions of "animosity" toward Plaintiffs' "protected speech," App. 24, that flaunt the Department's retaliatory motive.

---

[1] In fact, the district court found that the Department's retaliatory motive was a "but-for cause" of the escort requirement, App. at 22–31—subjecting Plaintiffs' claims to an even more demanding standard than the "causal link" this Court's precedent requires, *Media Matters*, 138 F.4th at 584.

Defendants object that no Department officials expressly connected their hostility to The Times's reporting to the escort requirement. Mot. 20. But the law does not require an explicit admission of guilt. *See Media Matters*, 2025 WL 2988966, at *8. And the fact that the district court considered statements attacking The Times that were made by "many different actors" and "spread across a full year," Mot. 20, is hardly a point in the Department's favor. *See Media Matters*, 2025 WL 2988966, at *1–2, 6–7 (citing years of statements by government officials as evidence of retaliation). The "consistent stream of derisive comments" from the Department "beginning shortly after" Secretary Hegseth's confirmation "and continuing through the present" alone supports the district court's finding of retaliatory motive. App. 23.

But that is not the only evidence supporting that finding. As the district court expressly found, App. 26–27, the causal link between the escort requirement and The Times's First Amendment activities is further confirmed by the Department's transparent efforts to invent a non-retaliatory explanation for the escort requirement after the fact. When the government feels the need to make up a motive for its actions, that is compelling evidence that its real motive is unlawful. *See Media Matters*, 2025 WL 2988966, at *7 ("[e]vidence of pretext" shows retaliation). That is precisely what occurred here. While the Department complains that the district court supposedly "disregarded" its "determination" that unescorted access to the Pentagon enables journalists to "observe activity patterns" and thereby identify potential sources of "sensitive" information, Mot. 3, 7 (citation omitted), and thereby obtain such information, the district court fully considered and rejected that proffered, post-hoc rationale. It found it neither credible nor convincing but rather "suspicious" and

"facially dubious," App. 25–31—findings amply supported by the record (a record that was not before the stay panel in *NYT I*, see *infra* at 18). Neither the district court nor this Court are "required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (internal quotation omitted).

The rationale now relied on by the Department "[wa]s conspicuously absent from the Interim Policy itself." App. 26. When the Department announced the escort requirement, it claimed it was necessary because the district court's order in *NYT I* had supposedly stripped the Department of the "ability to screen PFAC holders for security risks." *Id.* (quoting Interim Policy, Dkt. 1-1 at 3). But that was obvious "nonsense." *Id.* at 13. The district court's order did not eliminate the Pentagon's security screening procedures and every credentialed Times reporter had already been screened. *Id.* at 13, 26. Only after the district court pointed this out did the Department—for the first time in a stay motion—offer its new "activity patterns" theory. *Id.* at 25. That theory is not a "more complete explanation" that "flesh[es] out" the justification offered in the Interim Policy. Mot. 22. It is an entirely different explanation that contradicts its earlier explanation, as the district court's factual findings make clear. App. 26–27. Defendants' claim that the court did not "identif[y] any material inconsistency between the explanation in the Interim Policy" and the post-hoc explanations it "offered in litigation" is simply false. Mot. at 22.

Moreover, the Department's explanations continue to change. In opposition to The Times's preliminary injunction motion, Parnell submitted a declaration asserting that he had determined the escort requirement was necessary to fill a gap left

10

by the absence of a "prohibition" on credentialed journalists "soliciting unlawful disclosures of sensitive information." App. 27–28. As The Times pointed out, however, that makes no sense: the escort requirement was included in the Interim Policy alongside just such a "prohibition"; it was not "absen[t]" from the Interim Policy. *Id.* Accordingly, as the district court found, "it simply cannot be, as the Department now insists, that the escort requirement was necessary to 'fill in the gap.'" *Id.* at 28. Notably, in its stay motion filed last week, the Department took yet another tack, arguing that the escort requirement was part of a "belt-and-suspenders approach," Dkt. 19 at 4—the precise opposite of its gap-filling explanation from a month earlier. "[S]hifting and inconsistent justifications are 'probative of pretext.'" *Geleta v. Gray*, 645 F.3d 408, 413 (D.C. Cir. 2011) (citation omitted). "[T]he district court did not err in considering … [this] relevant evidence of pretext" here. *Media Matters*, 2025 WL 2988966, at \*7.

The district court also considered the Department's proffered explanation on its own terms. App. 28. It considered Press Secretary Kingsley Wilson's claim that beginning in October 2025 she received fewer calls from journalists about "sensitive" information (a term she did not define), App. 25, and assumed that was because journalists without Pentagon access were obtaining "sensitive" information less frequently. The district court found Wilson's claims less persuasive than evidence submitted by The Times showing that it published *more* stories containing nonpublic information about the Department *after* October 2025, App. 29, and properly concluded that an "observation of a decrease in contacts about 'sensitive or classified

11

information' does not necessarily correspond to a decrease in instances of journalists obtaining such information." *Id.* That finding is not clear error.

Finally, the "timing of the imposition of the escort requirement immediately after the Court ordered The Times journalists' PFACs restored" is indisputably "suspicious" and provides powerful confirmation of the Department's retaliatory motive. App. 27–28, 31. Before that order was issued, the Department was not concerned with credentialed journalists' unescorted Pentagon access, a tradition dating back 80 years. One business day after it was ordered to restore that access for Times reporters, the Department issued the Interim Policy closing, "effective immediately," the Correspondents' Corridor and imposing the escort requirement. App. 2. As the district court found, if the Department had truly thought credentialed journalists' unescorted access to the Pentagon posed a national-security risk, it would not have "vigorously advocate[d] for that [policy] to continue" up until the day it was ordered to restore access to The Times. *Id.* at 27. It is hard to fathom a clearer link between the escort requirement and the Department's intent to deprive The Times of the value of the press credentials it had won back through litigation.

Not only is this evidence enough to find a retaliatory motive, App. 27, it underlines why the Department's argument that the escort requirement is generally applicable does not speak to whether it is retaliatory, *see* Mot. 17–19. The Department's first choice was to exclude disfavored "legacy" media, including The Times, from the Pentagon while including individuals who were, in Wilson's words, "on board and willing to serve" the administration. App. 10, 14. Only when the district court enjoined that unconstitutional effort and restored The Times's access did the

Department impose the escort requirement. That it applies generally is not evidence of a non-retaliatory motive; it merely shows that the Department's desire to punish and chill independent newsgathering and reporting took priority.

In sum, in finding the requisite causal connection between the escort requirement and The Times's First Amendment activities the district court relied on a "constellation of undisputed facts," including repeated expressions of hostility by Department officials, "the timing of the imposition of the escort requirement," and "the fact that the Department [did] not offer[] a facially sound, nonretaliatory basis for imposing [it]." App. 31. That finding is correct, not clear error.

### B. The district court did not clearly err in finding the escort requirement to be an adverse action.

The evidence also "amply supports" the district court's finding that the "consequences" of the escort requirement "are not ones that ordinary people would 'lightly disregard.'" App. 18, 22 (internal quotations omitted). By requiring credentialed journalists to have "escorts for each separate conversation" and leave the Pentagon "[o]nce the scheduled appointment is completed," the Interim Policy forecloses an entire method of newsgathering: "semiformal or informal interactions that reporters and former Department officials alike testified were critical" to journalists' reporting. App. 20; *see also* Dkt. 11 at 43 (Defendants conceding that the escort requirement curtails Plaintiffs' "right to engage in *spontaneous* newsgathering"). As Barnes testified, the Department's imposition of the escort requirement rendered his press credential effectively worthless, Supp. App. 14. And his view is one apparently shared by reporters at other news outlets who "used to regularly report from the Pentagon" but who, following the imposition of the Interim Policy, "have yet to

pick up their [restored] badges." App. 22 n.4. "Determining whether a plaintiff's First Amendment rights were adversely affected by retaliatory conduct is a fact intensive inquiry." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000). And the district court got it right; it did not clearly err in finding, on the factual record before it, that Plaintiffs "surely clear[]" the "relatively modest bar" required to demonstrate that the escort requirement is an adverse action. App. 21; *see also Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76, 95 n.7 (D.D.C. 2025) (explaining that the "bar" to showing adverse action in a retaliation case "is not a high one") (citation omitted).

The Department does not acknowledge, let alone address or even submit to this Court, the testimony of former Pentagon Public Affairs officials and experienced Pentagon reporters relied on by the district court that squarely forecloses its claim that the escort requirement imposes only "minor logistical burdens." Mot. at 3. Instead, the Department attempts to sidestep the district court's factual findings by rewriting the relevant legal standard. None of its arguments have merit.

First, the Department suggests that the escort requirement cannot be an "adverse action" if it is reasonable and viewpoint neutral. Mot. 1, 10–12, 16–17, 21. But that conflates Plaintiffs' retaliation claim with Plaintiffs' separate claim—expressly not reached by the district court, *see* Dkt. 6-1 at 38—that the escort requirement is an unreasonable and viewpoint discriminatory restriction on access to and use of a nonpublic forum. Even if the escort requirement were reasonable and viewpoint neutral (it is not), an adverse action need not be inherently unlawful to be actionable. *Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 585 (D.C. Cir. 2002).

"An ordinarily permissible" action can be unconstitutional if it was "performed in retaliation for the exercise of a First Amendment right." *Id.*; *see Perry v. Sindermann*, 408 U.S. 593, 597 (1972).[2]

Second, the Department observes that Times journalists have not "cower[ed] silently" before the escort requirement.  But whether an action is adverse for purposes of a retaliation claim is judged by an "objective" test:  whether a person of "ordinary firmness" would be chilled from exercising First Amendment rights.  *Media Matters for Am. v. Paxton*, 138 F.4th 563, 581 (D.C. Cir. 2025); *see* Mot. 12–15. The Department's attempt to "convert[ that] legally objective test into a subjective one" would "basically strip constitutional rights away from the most principled speakers." *Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs.*, 816 F. Supp. 3d 27, 53 (D.D.C. 2026).  An ordinary journalist or news organization threatened with the loss of an entire method of newsgathering based on the substance of their journalism or their willingness to defend their constitutional rights in court would most certainly feel a chill.  And, in any event, the Department's argument ignores the fact that the escort requirement has demonstrably chilled—if not frozen—countless "informal and unplanned conversations" that, prior to its imposition, took place at the Pentagon on a regular basis.  Supp. App. 46.

Defendants' insistence that the escort requirement cannot be an "adverse action" because Times reporters are "subject to the same access requirements as all

---

[2] For the same reasons, the Department is incorrect to the extent it suggests a retaliation claim is unavailable in circumstances when viewpoint discrimination is permissible.  Even if that were the law, it is undisputed that the Pentagon's press areas are a nonpublic forum in which viewpoint discrimination is prohibited.

other journalists," Mot. 12–15, is likewise irrelevant.  Defendants offer no reason in law or logic why a punishment is less punishing because others must suffer too.

The Department's cases are not to the contrary.  *The Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410 (4th Cir. 2006), which Defendants did not cite below, is neither binding nor instructive.  The Fourth Circuit concluded that a government official's decision not to grant interviews to particular journalists was not actionable, including because a decision to grant an interview necessarily involves the official's own First Amendment rights.  *Id.* at 413.  That is a far cry from a policy that strips Plaintiffs' press credentials—credentials they have a constitutionally protected liberty interest in, *see Karem v. Trump*, 960 F.3d 656 (D.C. Cir. 2020)—of their value.  And *Houston Community College System v. Wilson*, 595 U.S. 468, 475 (2022), involved a "purely verbal censure."

### C. The district court did not abuse its discretion in entering a preliminary injunction.

The district court correctly determined that Plaintiffs satisfied the other preliminary injunction factors, by showing they "[w]ill [s]uffer [i]rreparable [h]arm" absent such relief and that "[t]he balance of equities and public interest" weigh in their favor.  App. 31–34.  These findings, which the Department does not challenge, are well supported by the record.  The district court found that Plaintiffs "'easily clear[ed] the irreparable-harm requirement'" by "'mak[ing] it apparent that [their] constitutional rights are violated."  App. 32 (quoting *Endocrine Soc'y v. Fed. Trade Comm'n*, 2026 WL 1257289, at *14 (D.D.C. May 7, 2026)).  And the district court concluded that those "constitutional interests of great significance" outweighed any countervailing equitable or public interest considerations presented by the

16

Department.  App. 33–34.  Defendants' conclusory attempts to minimize the harm to Plaintiffs' constitutional rights, *see* Mot. at 13; App. 32 n.8, fail to demonstrate that the district court abused its discretion.

## II.     The Department Has Not Shown "Certain and Great" Irreparable Harm.

The preliminary injunction lifts the escort requirement only for credentialed journalists with The Times.  App. 36–37.  The Department must therefore show that restoring the unescorted access of seven specific Times reporters while its appeal is pending will cause "certain and great" irreparable harm.  *KalshiEX LLC*, 119 F.4th at 64.  The Department cannot make that showing when all those reporters would regain is the same access they previously had, and the same access currently enjoyed by thousands of other civilians who work at the Pentagon.  App. 30.  Indeed, as the district court pointed out, "[t]he notion that reporters should be treated worse than baristas, short order cooks, dry cleaners, or any other civilians given access to the Pentagon, surely is a perverse reading of the First Amendment."  *Id.*

Further, the Department cannot establish irreparable harm based on a claimed "security" rationale the district court factually rejected.  *See Beatty v. Trump*, No. 26-5224 (D.C. Cir. July 8, 2026).  The Department argues that unauthorized disclosures of "sensitive" information pose a risk to national security but, as the district court found, the escort requirement does not prevent such disclosures.  App. 29.  That finding was based on detailed evidence from The Times that rebutted rank speculation from the Department.  Defendants did not even attempt to identify a single example of "sensitive" information that it even suspects a Times reporter obtained merely by observing "activity patterns" in the building.

17

The Department's factually rejected argument does not merit special "national security" deference. *See* Mot. 24–25. The Department's status as a military agency does not mean any claim it makes in litigation, no matter how farfetched or pretextual, must be credited. And an official's conjecture about how journalists might gather information does not require any specialized national-security background or expertise. Overall, the Department's abstract theorizing that the unescorted presence of Times reporters suddenly poses a security risk based on Wilson's recollection of how many reporters contacted her office is "far too speculative to warrant preliminary injunctive relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 298 (D.C. Cir. 2006).

Nor does the stay panel's opinion in *NYT I* counsel a different result. At that point, the Department had just offered its "activity patterns" explanation for the first time, The Times had not yet introduced evidence to rebut it, and the district court had not yet considered and rejected it. A panel majority found that while the Department's proffered declaration "supported its claim that [the escort requirement] furthers important national security interests," given the burdens on Plaintiffs' newsgathering, "the balance of equities and the public interest did] not strongly favor either party." Stay Op., 2026 WL 1179440, at *2–3. If the balance was in equipoise then, it tips decisively against the Department now.

## III.    A Stay Will Substantially Injure Plaintiffs and Is Contrary to the Public Interest.

A stay would irreparably injure Plaintiffs by depriving them of relief necessary to remedy the Department's violation of their First Amendment rights. App. 31–32. The loss of First Amendment freedoms is always an irreparable injury.

*Mahmoud v. Taylor*, 606 U.S. 522, 569 (2025); *see also Media Matters*, 138 F.4th at 585 (retaliation "in response to the[] exercise of . . . First Amendment rights" constitutes irreparable harm).  And here, as the district court found, the escort requirement imposes concrete harms by denying Times reporters opportunities to ask questions and interact with sources—opportunities that once lost, are lost forever. App. 32; *see also Sherrill v. Knight*, 569 F.2d 124, 129–30 (D.C. Cir. 1977).  *Ateba*, 133 F.4th at 117–21 is not to the contrary. It did not involve a retaliation claim and found only that being escorted from the White House gates to the press areas inside was not an irreparable harm.  *Id.*; App. 32–33.

The public interest, too, weighs heavily against a stay.  The "enforcement of an unconstitutional law is always contrary to the public interest." *Karem*, 960 F.3d at 668.  And, here, the public has a separate, powerful "interest protected by the first amendment in assuring that restrictions on newsgathering be no more arduous than necessary." *Sherrill*, 569 F.2d at 129–30.  The press's function "as a vital source of information" for the public "is weakened whenever the ability of journalists to gather news is impaired." *Zerilli v. Smith*, 656 F.2d 705, 710–11 (D.C. Cir. 1981).

## CONCLUSION

The Department's Motion should be denied.

Dated:  July 10, 2026

Respectfully submitted,

*/s/ Theodore J. Boutrous, Jr.*

Theodore J. Boutrous, Jr.
Katie Townsend
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
TBoutrous@gibsondunn.com
KTownsend@gibsondunn.com

Susan M. Pelletier
Eric Brooks
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036-5306
(202) 955-8500
SPelletier@gibsondunn.com
EBrooks2@gibsondunn.com

*Counsel for Plaintiffs-Appellees The New York Times Company and Julian E. Barnes.*

20

# <u>CERTIFICATE OF COMPLIANCE (RULE 32(G)(1))</u>

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,197 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Microsoft Word in 14-point Times New Roman, a proportionally spaced typeface.

*/s/ Theodore J. Boutrous, Jr.*
Theodore J. Boutrous, Jr.

# SUPPLEMENTAL APPENDIX

**TABLE OF CONTENTS**

**Page**

Exhibit 9, Dkt. 1-10 …………………………………………….. Supp. App. 1

Exhibit 36, Dkt. 1-37 ……………………………………………… Supp. App. 3

Declaration of Julian E. Barnes, Dkt. 6-17 …………………………... Supp. App. 5

Declaration of Robert Burns, Dkt. 6-18 …………………………….. Supp. App. 16

Declaration of Chris Meagher, Dkt. 6-19 …………………………... Supp. App. 25

Declaration of Pete Williams, Dkt. 6-20 ……………………………. Supp. App. 32

Exhibit A to Williams Declaration, Dkt. 6-21 ……………………….. Supp. App. 40

Declaration of Richard W. Stevenson, Dkt. 12-9 …………………… Supp. App. 42

# EXHIBIT 9

**This Exhibit serves as a Notice of Filing under Local Civil Rule 5.4(e)(1).  It preserves a link to a publicly posted video on youtube.com.  The original .mp4 file can be made available to the Court upon request.**



Supp. App.2

# EXHIBIT 36

**This Exhibit serves as a Notice of Filing under Local Civil Rule 5.4(e)(1).  It preserves a link to a publicly posted video on X.com.  The original .mp4 file can be made available to the Court upon request.**

USCA Case #26-5253    Document #2182828    Filed: 07/10/2026    Page 32 of 78



Post

**Sean Parnell** ✔ 🔲
@SeanParnellASW

There should be accountability for liars! Especially within the media.

The NYT is a propaganda machine that should IMMEDIATELY retract their lies!

The days of the Pentagon just allowing these fake narratives to spread is over.



8:19 AM · Mar 21, 2025 · **643.7K** Views

Home

Explore

Notifications

Chat

Grok

Bookmarks

Creator Studio

Premium

Profile

More

Supp. App.4

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

THE NEW YORK TIMES COMPANY, *et al.*

                                    *Plaintiffs,*

            v.                                          Civil Case No. 26-cv-01690-PLF

DEPARTMENT OF DEFENSE, *et al.*,
                                    *Defendants.*

### <u>DECLARATION OF JULIAN E. BARNES</u>

I, Julian E. Barnes, hereby declare as follows:

1.      I am over the age of 18 and make this declaration based upon my personal knowledge and experience.  If called to do so, I could and would competently testify to these matters under oath.

2.      I am a national security reporter with The New York Times ("The Times") and a plaintiff in the above-captioned case.  I make this declaration in support of Plaintiffs' Motion for a Preliminary Injunction.  This Declaration includes information that I previously attested to in multiple previous declarations filed in Case No. 25-cv-4218, at ECF Nos. 10-3, 44-1, 45, and 48-2.

***My career as a reporter.***

3.      I have worked for The Times since June 2018. I reside in the District of Columbia and am assigned to The Times' Washington Bureau.

4.      My work for The Times focuses on the Pentagon, United States intelligences agencies, and international security, among other subjects.  I am one of seven Times reporters who held a Pentagon Facility Alternate Credential ("PFAC") issued by the Department of Defense (the

"Department") as recently as summer or fall 2025.  I was issued a new PFAC by the Department on or around March 24, 2026.

5.      Before I joined The Times, I covered the Pentagon for other news organizations including U.S. News and World Report, the Los Angeles Times, and The Wall Street Journal.

***My access to the Pentagon.***

6.      I first obtained a PFAC in 2004, when I worked for U.S. News and World Report. I held a PFAC continuously from 2004 until August 2025 with the exception of a period of approximately 18 months in 2016 and 2017 when I did not regularly access the Pentagon because I was based in Brussels, Belgium.  After I joined The Times in June 2018, I held a PFAC continuously until August 2025.

7.      When I first obtained a PFAC, I was required to renew it every few months.  After my initial renewals, I was required to renew it only annually.  In my experience, this was typical of reporters who held PFACs:  As long as you had been a continuous PFAC holder for an extended period of time, you would renew on an annual basis.  At no point before August 2025 was my PFAC ever denied, suspended, revoked, or not renewed.  I am also not aware of any incident involving me or any other PFAC holder that occurred during my time covering the Pentagon that placed, or was asserted to have placed, the safety or security of Department personnel or property at risk.

8.      Between 2004 and 2025, I regularly accessed the Pentagon in the course of my work as a national security and intelligence reporter.  As a reporter, there are myriad benefits to being at the Pentagon.  Being onsite at the Pentagon enabled me to attend press briefings held at the Pentagon—which are often held on short notice and sometimes announced less than an hour before they occur.  I also sometimes met with intelligence officials at the Pentagon for background

2

Supp. App.6

briefings or off-the-record discussions related to topics I was covering.  I attended hundreds of press briefings at the Pentagon and had countless discussions at the Pentagon with Department employees and officials.

9.    I also could and would regularly visit the Public Affairs offices of the United States military branches, which are housed at the Pentagon, to converse with Public Affairs staff and ask questions about United States military operations, the Department, or other topics pertinent to my reporting.  There are numerous Public Affairs Offices within the Pentagon.  Among others, the Department of Defense, Joint Staff, Army, Navy, Air Force, and Marine Corps each have their own Public Affairs Office within the Pentagon, each of which is staffed by separate Public Affairs officials whose job is to liaise with the media.  In addition, military intelligence agencies and combatant commands sometimes have public affairs officers within their Pentagon liaison offices.  Many of the most helpful conversations with Public Affairs staff cannot be planned or scheduled in advance: Those conversations may vary depending on which staff are present or available to speak, what the latest news is, or what information was shared in an immediately preceding conversation.  In my experience, reporting from the Pentagon often necessitated speaking to upwards of a dozen officials and other personnel from different press offices in a given day, sometimes in response to rapidly developing events.

10.    I think there is a common misperception that access to the Pentagon necessarily means access to secure areas or places where classified or other sensitive information is discussed.  To the contrary, the Pentagon is a large building that includes areas that resemble a mall and are often crowded with visitors and non-military employees.  For example, there is a food court, a pharmacy, a sit-down restaurant, a bank, a dry cleaner, and a chocolate shop in the Pentagon.  Parts of the Pentagon feature displays of historical information of potential interest to tourists and

members of the general public, and tour groups are common.  In my experience, Department officials are not discussing classified matters in corridors or similarly unsecure locations in the building.  A reporter's mere presence in the building is therefore unlikely to give that reporter access to inadvertent disclosures of classified or sensitive information

11.    Being at the Pentagon and, in particular, the ability to have face-to-face conversations with Pentagon officials and staff, has been integral to my reporting about the Department, national security, and United States intelligence agencies.

12.    In my view, the longstanding tradition of press access to the Pentagon and to its personnel has helped provide the American public with a more in-depth, nuanced understanding of the United States military that has been beneficial to the press, the public, and to the Pentagon itself.  I think that the American public has greater respect for the military because Pentagon leadership has in the past fostered a culture of permitting and even facilitating press access, which has led to a better understanding of military operations among the public.

***The Department's October 2025 policy leads to the loss of my PFAC.***

13.    In May 2025, the Department announced new restrictions on reporters' physical access to certain parts of the Pentagon.  As a result of those restrictions, even with my PFAC, I was no longer able to access spaces within the Pentagon that I had previously accessed routinely for years.  Even with those new restrictions on physical access, however, I continued to report regularly from the Pentagon because it significantly benefitted my reporting to be in the building— both in order to cover formal proceedings, like press conferences, and to converse with Department personnel.

14.    In or around August 2025, I learned that Department leadership was preparing to issue additional new restrictions relating to the press and, specifically, new rules relating to

4

Supp. App.8

reporters' PFACs.  I found this deeply concerning.  In particular, I was concerned that under those new rules, the Department and its leadership would have free rein to suspend or revoke PFACs on the basis of what journalists and news organizations reported, and that if they disliked something I had written for The Times, they would find a basis to suspend or revoke my PFAC.

15.    As I explained in a prior declaration, *see* Case No. 25-cv-4218, at ECF No. 10-3, my PFAC lapsed on August 31, 2025.  I decided not to renew it at that time because I was concerned about the new rules that I understood were going to be put in place by the Department. The Department announced a new PFAC policy in September 2025, and then an updated policy in October 2025, that confirmed my concerns:  The new policy gave Department officials broad discretion to suspend or revoke reporters' PFACs (or to refuse to renew or issue PFACs) if it did not approve of information that a reporter had "solicited," obtained, attempted to obtain, or published.  In October 2025, the Department revoked the PFACs of all reporters who did not agree to sign an "Acknowledgment" attesting that they "underst[ood]" the new policy.  I gave my lapsed PFAC to my colleague at The Times, John Ismay, who handed in my PFAC, along with his, to the Department on October 15, 2025.  All of the reporters at The Times who held PFACs turned them in on October 15, 2025.

**The Department reissues my PFAC but imposes an onerous new "escort" requirement.**

16.    On March 20, 2026, I learned that the district court had granted Plaintiffs' Motion for Summary Judgment and ordered the Department to reinstate the PFACs previously held by me and my colleagues at The Times.  I was enthusiastic about the prospect of regaining access to the Pentagon, which is extremely valuable to my work as a reporter.  I immediately sent an email to the Pentagon Press Office inquiring about how to pick up my reinstated PFAC so that I could

access the Pentagon on the next business day, Monday, March 23.  Lawyers for The Times also sent inquiries asking how reporters from The Times could obtain their reinstated PFACs.

17.    I received an email from the Pentagon saying I could pick up my PFAC on Tuesday, March 24, between 6:00 am and 6:00 pm Eastern time from the Pentagon Press Office. When I arrived around 8:00 am on Tuesday, March 24, a Pentagon public affairs officer told me that despite the email I received they could not give me a pass. Instead, there was a set time between noon and 3:00 pm that the badge office would issue Times reporters new PFACs. The public affairs officer told me this information was supposed to have been included in another email but had inadvertently been omitted. I left and returned to the Pentagon visitor center at approximately 1:00 pm. I was escorted to the badge office where four other Times reporters were waiting to obtain their PFACs. That same afternoon, I was notified by a public affairs officer that the Department of Defense ("Department") had issued a revised "interim" policy (the "Interim Policy") governing PFACs and reporters' access to the Pentagon. When I arrived at the Pentagon visitor center I was handed a copy of the Interim Policy.

18.    After my colleagues and I arrived at the badge office, we were given PFACs by Press Office staff. The new PFACs were different from the ones we had previously held. The Pentagon Press Office staff explained that, pursuant to the Interim Policy, the cards they were issuing to us would no longer give us access to the Pentagon: While our previous PFACs, once scanned, had enabled us to enter through the turnstiles at the Pentagon entrance, we were told that the new PFACs that were issued to us on March 24, 2026 did not.

19.    The Pentagon Press Office staff also told me and my colleagues from The Times that we, along with all other reporters, would no longer be allowed into the Pentagon without an escort from the Department, and that an escort would be provided only for pre-arranged interviews,

press conferences, or other specified types of events. We were also told that we would need to submit a request to attend such events at least one day in advance in order to obtain an escort, and that the request would need to be approved by the Department's Office of Public Affairs.

20. The Pentagon Press Office staff also explained to me and my colleagues from The Times that our PFACs would enable us to access a new press area located in the Pentagon library, which is on the Pentagon grounds but in a separate building. My colleagues and I asked how we could access the library because, to our knowledge, the only way to access it on foot is through a corridor that we were told we could no longer walk through. The Pentagon Press Office staff indicated that they were unsure how we could access the library. They suggested we could use a Pentagon shuttle bus but, as we pointed out, PFAC holders did not have permission to ride on the shuttle bus. Ultimately, the Pentagon Press Office staff told us we needed to come back the next day for further instructions on how to access the library. We were later told that PFAC holders would be given permission to ride on the shuttle bus.

21. It was readily apparent to me that the Pentagon Press Office was unprepared for the changes effectuated by the Interim Policy. It was clear to me that these new rules had been implemented hastily and in response to the Court's March 20, 2026 ruling that required reinstatement of our PFACs.

22. The Interim Policy states that the Correspondents' Corridor—the area in the Pentagon where reporters used to work—is closed effective immediately. Within days of the Interim Policy's announcement, I saw what I understand to be a photograph of the entrance to the Correspondents' Corridor which shows that the old signage, which said "Correspondents' Corridor," has been torn down.

7

23.     For more than 20 years, I have regularly accessed the Pentagon in the course of my work as a reporter.  To my knowledge, this is the first time that the Department has ever barred reporters with PFACs from entering the Pentagon without an escort, a reservation, or an invitation to a specific press conference or event.  No longer being able to access the Public Affairs Offices in the main Pentagon building is particularly frustrating for me.  Before the Department implemented new PFAC rules and restrictions, the staff of these various Public Affairs Offices were frequent sources of information for my reporting.  Those are individuals who are expressly authorized to talk to the press.  In fact, it is in their job description.

24.     To the best of my knowledge, the Department of Defense does not have a team of escorts who are readily available to facilitate reporters' access to the Pentagon.  In my experience, a reporter with a credential must request an interview or meeting with a particular official or Public Affairs Office that he or she wishes to visit and, if that interview or meeting is granted, he or she will be provided an escort for that specific interview or meeting.  As a practical matter, this means that each separate conversation requires a separate appointment:  If I wanted to speak with the Public Affairs staff for the Air Force, for example, then I would need to make an appointment and pre-arrange an escort from that office; if I then wanted to speak to someone from the Joint Staff, I would need to leave the Pentagon (or return to the Library) and make a new appointment in order to obtain a separate escort from *that* office.  This is time-consuming and burdensome, and it has substantially reduced my amount of interaction with staff from the Public Affairs Offices.

25.     The escort requirement has made it exceedingly challenging to speak with press officials and other personnel in person, and to otherwise cover the Department and the U.S. military from Pentagon grounds.

Supp. App.12

26. For example, I submitted a request on March 27, 2026 to interview a Department official. Three days later, on March 30, I was notified that the Department had approved my interview request for the following day, March 31. The press officer later requested that interview be on background—meaning the official would not be on the record. The interview was set for 12:45 p.m., but the press officer recommended I arrive at 12:15 p.m. to navigate security. The press officer entered the information for the visit into the Pentagon system, and I received an automatic confirmation. When I arrived at the Pentagon at 12:10 p.m. on March 31 and showed my driver's license and PFAC to the attendant at the Visitor Center security area, he advised me that anyone with a PFAC could only enter through corridor 8—despite the fact that I had arranged for the escort to meet me in the visitor center. The interview was eventually postponed, and I was immediately escorted out of the building.

27. I have only visited the Pentagon one other time since March 23, 2026, when I pre-arranged a background interview with a Department official. I was escorted into the Pentagon by a staff member from the relevant office. When the interview concluded, I was escorted out of the building. I had no opportunity to visit any of the Public Affairs Offices located at the Pentagon or to converse with anyone other than my escort and the specific person I had arranged to interview.

28. Colleagues of mine from The Times, including Greg Jaffe and Helene Cooper, have attended press conferences at the Pentagon since they obtained their reinstated PFACs. I understand they have been required to arrive at least an hour early and to wear wristbands—in addition to the two other identification cards they were already required to wear within the Pentagon—and that their wristbands have been checked repeatedly throughout the scheduled events. This process is the same as the process that was in place for reporters that did not hold a PFAC before the district court issued its March 20, 2026 order. I also understand that, on at least

9

one occasion, reporters from The Times were told that they could not use the bathrooms without being accompanied by an escort because it would present a security risk.

29.     These experiences have confirmed my view that the escort requirement is burdensome and impractical.  Going through a sometimes-lengthy process of scheduling official appointments in order to ask even one or two questions to an official—even assuming that request is granted and that official does not have to reschedule—does not allow for meaningful engagement with Department personnel on a timeline consistent with news reporting.  While I used to be able to walk from press office to press office throughout the day, I now would have to return to the library, call or email for an appointment, and wait for a response and approval, and for arrangement for and arrival of an escort. That means I will be spending hours of my day just waiting and walking back and forth—assuming I can get ahold of press offices and individuals and arrange interviews and be approved for an escort at all. That process will dramatically interfere with my ability to meaningfully engage with anyone from the Department on Pentagon grounds, or to obtain the information necessary to inform the public in a timely manner.

30.     It also seems to me that the Interim Policy serves no discernible purpose.  Neither I nor my colleagues pose any risk to the safety or security of the Pentagon.  And to the extent that the purpose of the Interim Policy is to prevent the disclosure of classified or sensitive information, I do not understand how it will accomplish that goal.  The areas of the Pentagon that journalists were previously able to access unescorted were not areas in which classified or sensitive information is discussed.

31.     In my view, the escort requirement imposed by the Interim Policy makes the reinstated PFACs that were issued to me and my colleagues essentially worthless.  All reporters, whether or not they hold a PFAC, can access the Pentagon if they obtain pre-approval to attend a

Supp. App.14

specific press conference, event, or for a pre-arranged interview. The point of a PFAC is to give journalists who regularly cover the Department, the United States military, and national security the ability to regularly work from the Pentagon. Under the Interim Policy, that is no longer the case. And, as a result of it, I rarely go to the Pentagon at all anymore.

32.    Because of the Interim Policy's unnecessary and burdensome escort requirement, I and other reporters whose job it is to provide independent and probing coverage of the Pentagon and the United States military are being prevented from engaging in routine, lawful newsgathering and reporting onsite. That requirement is thus causing significant harm to reporters like me who cover national security and the Pentagon, to news organizations like The Times, and to the American public.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20 day of May 2026 in ____Washington, D.C.____.

Julian E. Barnes

11

Supp. App. 15

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE NEW YORK TIMES COMPANY, *et al.*,

                                        *Plaintiffs*,

           v.

DEPARTMENT OF DEFENSE, *et al.*,

                                          *Defendants*.

Civil Case No. 26-cv-01690

**DECLARATION OF ROBERT BURNS**

## DECLARATION OF ROBERT BURNS

I, Robert Burns, hereby declare as follows:

1.    I am over the age of 18 and make this declaration based upon my personal knowledge and experience.  If called to do so, I could and would competently testify to these matters under oath.

### My career as a Pentagon reporter.

2.    I retired from The Associated Press ("AP") in May 2022 after 45 years as a reporter. I served as President of the Pentagon Press Association ("PPA") from 2012 until my retirement in 2022.  Over the more than four decades I worked as a journalist, I spent more than thirty years covering national security and the Department of Defense (the "Department").  In 2013, I won the AP Gramling Journalism Award, the AP's highest honor, for my reporting on topics including the high rate of military suicides, attacks on U.S. troops by Afghan allies, and dysfunction in the Pentagon office charged with collecting the remains of wartime MIAs.

3.    I first began reporting from the Pentagon in 1990 when the AP assigned me to cover the implications of the fall of the Berlin Wall.  Thereafter, I reported broadly on national security matters, including assignments covering the White House and U.S. intelligence agencies.  In 1999,

Supp. App.16

I became the AP's full-time Pentagon correspondent. I covered the Pentagon during multiple administrations spanning at least ten Secretaries of Defense.

4.    I reported from the Pentagon frequently over the course of my career. I attended innumerable press briefings, background sessions, briefings specific to certain branches of services within the military, informal gatherings, and other engagements with civilian employees of the Department and military officials on Pentagon grounds.

***Reporters' access to and physical presence in the Pentagon.***

5.    When I began covering the Pentagon in 1990, AP maintained a small workspace in the Pentagon press room that I understood journalists had used since the building's early years. After the September 11, 2001 terrorist attack and the Pentagon's renovation, the press area was relocated, but the basic arrangement remained the same: the Department provided the physical workspace and news organizations supplied their own materials and communications equipment.

6.    In the immediate wake of the September 11, 2001 terrorist attack, the AP had three reporters at the Pentagon around the clock. Over time, that was reduced to two.

7.    Reporting on-site at the Pentagon typically gave me and other reporters different types of opportunities to interact with government officials, including formal press briefings, whether regular or *ad hoc*. During these briefings, representatives from the Department or specific branches of the armed services would provide information and updates to the reporters who were present and would typically take questions. At times, these press briefings were led by the Secretary of Defense. At other times, they were led by senior press officials or leaders from different parts of the Department or branches of the military. These appearances routinely provided detail and nuance beyond what was included in statements issued to the public or press more broadly.

8.      While beneficial, these briefings had some practical limitations:  time for questions was limited, only a portion of substantive topics could be addressed, and questioning of senior officials often produced incomplete information that required follow-up.  Accordingly, I and other reporters routinely engaged in additional and follow-up conversations immediately before or after briefings with senior officials or their aides.  These conversations—sometimes on the record, sometimes on background, and sometimes off the record—in my experience were an essential part of obtaining the detail and clarity necessary to report accurately on defense policy and operations.

9.      Reporting on-site at the Pentagon also gave me access to short-notice and no-notice briefings.  Secretaries of Defense occasionally convened news conferences with little advance warning, sometimes to announce personnel decisions or respond to unfolding events.  Certain Secretaries of Defense, including Secretary Robert Gates, at times provided very short notice— sometimes only an hour or two—before holding a significant press conference.  Reporters who were not already in the building could miss these opportunities entirely.  Physical presence in the building was essential to covering news in real time.

10.     Reporting from the Pentagon also gave me an opportunity for semi-formal interactions with Department officials, including service-specific (*e.g.*, Army or Navy) background briefings, structured meetings outside the press room, and the like.  For example, Secretary Donald Rumsfeld would invite reporters into his office on weekend mornings for wide-ranging, off-the-record discussions.  For those kinds of discussions, being physically present in the building was the only way to attend and to know what transpired.

11.     Finally, physical presence at the Pentagon also enabled informal interactions.  Over time, reporters built professional relationships with mid-ranking and senior officials and could occasionally obtain helpful context or an understanding or sense of developing issues.  On occasion,

for example, trusted officials would indicate that a reporter "might want to stay a little late today," signaling that significant news might emerge. Such cues did not convey sensitive information, but they reflected long-established professional trust. These sorts of informal interactions proved invaluable to me and other reporters, press outlets, and the Department, by ensuring news was timely reported with appropriate precision and nuance.

12. Physical presence also provided intangible situational awareness. Activity within the building—the tone of conversations, movements of personnel, or general atmosphere—often indicated that something significant was occurring before it was publicly announced. After the 2000 attack on a U.S. Navy ship, for example, I sensed the seriousness of the situation immediately upon entering the Pentagon. Remote reporting could not have provided me with that context or allowed me to prepare to report on unfolding events in the same manner.

13. In all, years of reporting from the Pentagon showed me that access for credentialed journalists to the building's unclassified areas is an essential part of keeping the American public informed. To require that journalists be accompanied by a government minder would severely damage their ability to do independent reporting. In my judgment, it would effectively be the same as banning reporters from the building because it would stifle, if not prohibit, the free interaction between reporters and officials that is essential to journalism in a democracy.

14. In addition, the idea that the Pentagon is an all-classified military command post is mistaken. It is the headquarters of a civilian-led government agency, the Department of Defense, with well-known security boundaries that in my experience have always been scrupulously respected by journalists. Across my decades in the Pentagon, reporters, including myself, respected physical and professional boundaries within the building. For example, the National Military Command Center and most of the Joint Chiefs area were off limits, and reporters did not

Supp. App.19

enter offices without invitation.  These longstanding rules were in my long experience at the Pentagon and as President of the PPA consistently adhered to.  I never observed or heard of a reporter attempting to enter a restricted area improperly.

15.    Well-settled professional norms also governed reporter conduct within the Pentagon.  For example, reporters wore Pentagon Facilities Alternate Credentials or, as they are more colloquially known, press badges.  If at any time a reporter's press badge was not visible, the Pentagon's internal police force would remind the reporter to display it.  These reminders were cordial, and reporters followed them without issue.

### *The Pentagon credentialing process.*

16.    Throughout my time at the Pentagon, the credentialing process for Pentagon reporters was straightforward and, as I recall, consistent.  Because the process was never an issue of concern or contention, it is difficult to recall its exact metes and bounds over my more than thirty years covering the Pentagon.  That said, my recollection is that the process generally required reporters to provide a letter confirming their employment and assignment and to undergo standard background checks.  Later—in or around the 2000s—the Department asked reporters to sign a one-page form that set forth some basic, noncontroversial information and building security requirements relating to PFACs.  That form stated, for example, that PFACs "must be visible and worn above the waist at all times while in the Pentagon" and that "[l]ost PFACs should be immediately reported to the Public Affairs Operations."  After September 11, 2001, certain security offices were reorganized, but these changes did not materially affect credentialing for journalists.

17.    As President of the PPA, I expect that I would have been aware of any credentialing issues affecting reporters or news organizations.  I am not aware of any instance in which a qualified Pentagon reporter's credential was denied, suspended, revoked, or not renewed based on

any security or safety issue.  I am also not aware of any instance in which a qualified Pentagon reporter's credential was denied, suspended, revoked, or not renewed based on the content of their reporting.  That is true even of reporting that was critical of Department or other government officials or pertained to the disclosure of sensitive, secret, or confidential information.  To the best of my knowledge and recollection, credentials were revoked only when a reporter was no longer actively reporting from the Pentagon.

18.    During my tenure reporting from the Pentagon, I published a number of stories that were sensitive or could be seen as critical of the Department.  For example, in the mid-2010s, I published a series of articles about systemic problems in the Air Force's nuclear missile enterprise, including inspection failures, morale issues, training deficiencies, and misconduct.  Although that reporting covered extraordinarily sensitive issues and was, at least initially, unwelcome by some officials, I never experienced any threats—direct or indirect—to my credential or access to the Pentagon, and I never perceived any risk that my reporting would trigger retaliation.  In fact, the Department later undertook reviews and instituted reforms to address issues identified in my reporting.

***The Department's new access policy will damage the public's interest.***

19.    As with the original policy, I have grave concerns about the Department's latest policy and what it portends for national defense coverage, the Department, and the American public.  Although I am confident that reporters covering the Department will continue working to uncover and report on important stories to the best of their abilities whether or not physically present at the Pentagon, I also know based on my own experience that the restriction or elimination of meaningful press access to the Pentagon—which the new policy appears designed to accomplish—harms the American public.  It results in reporters with different areas of focus and

Supp. App.21

varied experience being unable to ask timely follow-up questions, attend short-notice briefings, and engage in the informal and semi-formal interactions that have long provided important context.

20.     It is also likely that reporting on issues of importance that might otherwise be ignored will be curtailed or eliminated as a consequence of the new policy.  For example, when I was covering the Pentagon, I spent an unusual amount of time reporting on how to recover remains of missing service members.  It was a significant issue to service members' families, though not necessarily a subject of Department press announcements.  But being in the building without extremely burdensome limitations allowed me to have in-depth conversations with individuals responsible for this work and to learn the details and nuances of this and other topics.  In short, effectively excluding a wide range of Defense-beat reporters from the Pentagon or limiting their access will cause their reporting on the Department to lose the depth, scope, and accuracy that comes from observing events as they unfold and speaking directly with officials.

21.     The public will also lose out.  The Department of Defense is the largest federal agency, responsible for global operations, substantial public expenditures, and a wide range of military, personnel, and policy decisions.  Understanding the scope of the Department's activity requires sustained interaction with the officials who carry out this work—sustained interactions that will be inhibited if not completely eliminated by the escort requirement.  With all experienced Pentagon reporters subject to those restrictions, both the sort of institutional knowledge and the coincident relationships they have are at risk of being lost.  If that occurs, reporting will be considerably impoverished to the detriment of the public.  Simply reiterating official statements amounts to little more than stenography and leaves the public less safe and secure and with a narrower and less textured understanding of critical issues and events.

22.     During my career, officials expressed to me on a number of occasions that interactions with reporters across a variety of news organizations helped them understand what issues were receiving attention and why.  In other words, it served as a kind of intelligence-gathering tool for the Department.  In addition, regular formal and informal interactions allowed the Department to clarify misunderstandings, provide additional context, better anticipate how policy decisions might be interpreted publicly, and help ensure its own voice was heard.  These exchanges—after briefings, through periodic background discussions, and so forth—were an important part of how the Department kept its finger on the pulse of reporting and shaped its communications to all cross sections of the American public.  The escort requirement is almost certain to eliminate these types of interactions.

23.     Reporting made possible by physical access to the Pentagon also helped identify structural and personnel issues that the Department was prompted to address and improve.  For example, my reporting on issues within the Air Force's nuclear missile enterprise, although perhaps unwelcome by Department leadership at the time, contributed to the Department's decision to undertake broad reviews and ultimately to reform.  Along similar lines, during my travels with Secretaries of Defense to military bases, servicemembers would sometimes approach me or other reporters to express appreciation for our work.  There are many other such examples, all of which underscore that sustained, informed, and sometimes critical press coverage can illuminate problems and support improvements in readiness, morale, and policy.

24.     In sum, the longstanding press access structure at the Pentagon has benefitted reporters, the Department, and the public.  The escort policy makes accurate reporting more difficult, makes America less informed and less safe—particularly in times of crisis—and ultimately harms both the Department and the American public whom the Department serves.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _20th_ day of May 2026 in ___Reston, Virginia___.

Robert Burns

Supp. App.24

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE NEW YORK TIMES COMPANY, *et al.*,

                              *Plaintiffs*,

          v.

DEPARTMENT OF DEFENSE, *et al.*,
                              *Defendants*.

Civil Case No. 26-cv-01690

**DECLARATION OF
CHRIS MEAGHER**

## DECLARATION OF CHRIS MEAGHER

I, Chris Meagher, hereby declare as follows:

1.    I am over 18 years of age and I make this declaration based upon my own personal knowledge.  If called to do so, I could and would competently testify to these matters under oath.

***My professional background.***

2.    I am a communications professional with more than a decade of experience managing communications and press relations in both the public and private sectors.  For several years prior to that, I also worked as a reporter.

3.    I served as the Assistant to the Secretary of Defense for Public Affairs from September 2022 until January 2025.  In that role, I oversaw communications for the Office of the Secretary of Defense, including public information, internal information, community relations, and press operations.  Prior to becoming Assistant to the Secretary of Defense for Public Affairs, I served as a Deputy Press Secretary at the White House and as Deputy Director for Public Affairs at the Department of Transportation, among other roles.

4.    In my experience as Deputy Press Secretary at the White House, reporters with hard passes had regular, unescorted access to press areas, corridors, and other designated areas within

1

Supp. App.25

the White House.  To my knowledge, during my time at the White House, there was never any safety or security issue that arose from credentialed reporters having that unescorted access.

### *My experience as Assistant to the Secretary of Defense for Public Affairs.*

5.      During my time as Assistant to the Secretary of Defense for Public Affairs, I interacted with reporters who held Pentagon Facilities Alternative Credentials ("PFACs") on a daily basis, and often multiple times a day.   To obtain a PFAC, a reporter would have to apply and undergo a standard background check for security purposes.  During my time at the Department, other non-governmental employees who worked in the Pentagon—including, for example, people who worked at the CVS inside the building, or at one of the restaurants at the food hall located in the Pentagon—also had PFACs and, as a result, had unescorted access to the exact same spaces that journalists with PFACs had unescorted access to.

6.      Reporters with PFACs would frequently stop by the office where I worked to talk with me and with the Defense Department's Press Secretary and Deputy Press Secretary, who both sat in the same suite of offices dedicated to the Public Affairs as I did, in what is known as the E-Ring of the Pentagon.  The press briefing room, where we typically held press briefings every Tuesday and Thursday, was directly across the hallway from my office.  The Defense Department's press operations team also had offices nearby, where we held an additional off-camera press briefing every Monday, and where reporters would frequently stop in to ask the press officers questions.  In the same vicinity, there was a designated area where reporters had offices, sat, and worked.  I frequently encountered and interacted with reporters in these areas, as well as in the hallways.

7.      There are many people who work at the Pentagon whose primary job responsibilities include speaking with the press.  During my time with the Defense Department,

2

Supp. App.26

they included the Press Secretary and Deputy Press Secretary, as well as a team of approximately twenty press operations personnel, each of whom was focused on a specific topical subjects such as Personnel and Readiness or Acquisition and Sustainment; or geographical regions, such as Europe and the Indo-Pacific, for example. Reporters would visit the desks of different press operations officers, depending on what questions the reporters had or the topics they wanted to discuss. For example, a reporter with questions about the war in Ukraine might visit the desks of press operations staff who made up the European Command team.

8.      Each of the armed services, including the Army, Navy, Air Force, Marine Corps, along with the Joint Staff, also had their own communications and public affairs teams, with their own offices and staff. These offices and staff were located throughout the Pentagon building, including in different wings and on different floors from where my office was located, and from where reporters had office space. Reporters frequently visited these public affairs offices as part of their work—and doing so required that they be able to move through hallways in the Pentagon unescorted.

9.      Throughout my time working for the Defense Department, reporters with PFACs always had unescorted access to the Pentagon. Of course, that meant they still had to enter and exit through the same security as everyone else to enter the building, and it does not mean they were able to access private offices or secure locations where sensitive or classified information was kept, viewed, or discussed. In my experience, that kind of information was kept, viewed, or discussed only in rooms called "Sensitive Compartmented Information Facilities," or "SCIFs," that had special information security protocols and required special access. For example, my office was a SCIF, which meant that reporters could not simply walk in at their leisure. They had to leave their phones outside the door and could come in only if I granted them entry, and I would do so

3

Supp. App.27

only after ensuring that no sensitive or classified information was visible or accessible. Similarly, on occasions when we would invite press into the office of the Secretary of Defense, we would take precautions before any reporters entered to ensure that no sensitive or classified information was visible or accessible.

10.    Reporters were clear which areas of the Pentagon they could access and which they could not, and they respected those boundaries. Furthermore, they could not access sensitive or classified spaces without being allowed entry. I cannot recall ever being aware of an incident where a reporter entered an office or secure area that they were not permitted or invited to enter.

11.    I found it very beneficial to have reporters working in the Pentagon. In my experience, it was helpful to be able to assemble reporters quickly for impromptu press briefings, particularly in response to breaking news. For example, in early 2023 there was an incident in which high-altitude balloons, widely reported to potentially be originating from China, were shot down over U.S. airspace. We quickly assembled the reporters who were already in the building and provided them with an update at a press briefing. That enabled us to disseminate accurate, relevant information quickly and efficiently to a broad swath of reporters—and to the American public.

12.    I also found regular, informal interactions between Defense Department staff and reporters to be mutually beneficial. It was useful for my staff and I to hear what questions reporters had and what topics they were interested in, and to get a sense of what stories they were in the process of reporting. Those conversations enabled my staff and I to help correct any misunderstandings early in the reporting process and anticipate stories that might be controversial for the Department. In-person interactions also allowed us to build relationships with reporters that were built on trust and rapport. This was important because it helped give reporters confidence

4

Supp. App.28

that the information we were providing was accurate and gave them opportunities to confirm and verify the accuracy of that information. Building that kind of trust would be more difficult, if not impossible, without regular, face-to-face interaction.

13. In my experience, the Department of Defense was (and, presumably, still is) constantly competing with misinformation propagated by foreign adversaries, particularly with regard to overseas conflicts. When credentialed reporters like The New York Times, among others, have a regular presence in the Pentagon, it helps the Department effectively counter misinformation and prevent it from spreading. For example, there was one instance in which our team learned that a reporter was incorrectly attributing an overseas strike to the United States based on misinformation. My colleague was able to run down the hallway, find that reporter, and provide the reporter with accurate information so that they would not report incorrect information to the public. We would not have been able to do that so quickly and effectively if the reporter had not been working in the Pentagon.

14. I am not aware of any safety or security incident at the Pentagon caused by a credentialed journalist having unescorted access to the building. In my experience, when reporters did obtain sensitive information in the course of their reporting, it was not because they happened to be in the building. Also, when reporters obtained such information, in my experience, they treated it with the utmost seriousness, engaged with us, and were willing to listen to any concerns we may have had about national security or risks to American servicemembers, and sometimes held off on reporting stories or certain portions of stories as a result of those conversations.

15. Many of the reporters who report on the Defense Department, U.S. military, and national security are former servicemembers themselves, have family members who are servicemembers, or have previously reported from active war zones, which gives them a

5

Supp. App.29

heightened appreciation for what our servicemembers do, the dangers that they face, and the potential life and death impact that releasing classified information into the public domain could have. I consistently found that the reporters who worked at the Pentagon had the utmost respect for the U.S. military and its servicemembers and that they made every effort to do their jobs in a way that would not create any safety or security concerns.

16.    In my opinion, the Department of Defense has a responsibility to the American people to ensure that a broad and diverse array of reporters have access to accurate, real-time information about the Department and U.S. military operations. An enormous percentage of the American public's tax dollars are dedicated to the Department of Defense, and every single day leaders at the Department make decisions about whether, when, and how to put servicemembers' lives at risk. The public has a right to know how its money is being spent and how those decisions are being made. For that reason, I believe that the Department of Defense has an obligation to be as transparent as possible with the American public. Regular, unescorted access to the Pentagon for credentialed members of the press is an important means of effectuating and protecting those principles, and it can be done without sacrificing safety or security.

### The Department's Interim Policy

17.    I am familiar with the Interim Policy regarding PFACs and reporters' access to the Pentagon that the Department of Defense put in place in March 2026. As I understand that policy, it prohibits reporters with PFACs from accessing the main Pentagon building unless they first make an appointment to speak with a specific official or attend a specific event, obtain approval, and obtain an escort who will accompany them at all times while they are in the building. This is a dramatic departure from the way things worked when I was Assistant to the Secretary of Defense for Public Affairs.

6

18.    The escort requirement under the Interim Policy strikes me as a cumbersome, inefficient, wasteful use of taxpayer resources, and designed to deter reporters from being in the Pentagon at all.  Additionally, I believe that the current leadership of the Department of Defense is acting against its own self-interest—and against the interests of the U.S. military and the American public—by implementing this policy.  I fear that the Department will be less prepared, less effective, and less able to communicate with the American people as a result of these restrictions on credentialed reporters' Pentagon access.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Dated:  May 21, 2026


_____,_____


_____

Chris Meagher

7

Supp. App.31

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

THE NEW YORK TIMES COMPANY, *et al.*,

                  *Plaintiffs*,

       v.

DEPARTMENT OF DEFENSE, *et al.*,

                *Defendants*.

Civil Case No. 26-cv-01690

**DECLARATION OF
PETE WILLIAMS**

**<u>DECLARATION OF PETE WILLIAMS</u>**

I, Louis Alan (Pete) Williams, hereby declare as follows:

1.      I am over 18 years of age and I make this declaration based upon my own personal knowledge.  If called to do so, I could and would competently testify to these matters under oath.

***My professional background.***

2.      I am a journalist and former public servant.  I started my career in journalism in the 1970s as a local radio and television broadcaster in Casper, Wyoming, where I grew up, after graduating from Stanford University with a degree in journalism.  I later served as press secretary for then-Congressman Dick Cheney from 1986 until 1989, when I went to work at the Department of Defense (the "Department") under then-Secretary of Defense Cheney.  I served as Assistant Secretary of Defense for Public Affairs, a Senate-confirmed position, from May 1989 until January 1993.

3.      After leaving the Defense Department, I became a justice correspondent for NBC News in late March 1993.  I retired from NBC News in July 2022.  During my nearly 30 years at the network, spanning five U.S. presidential administrations, I covered both the Department of Justice and the Supreme Court of the United States.

1

Supp. App.32

4.      During my time as Assistant Secretary of Defense for Public Affairs, I interacted with reporters at the Pentagon every day, both formally in press briefings, and informally.  My office was just down the hall from where the journalists' workspaces were located.

***My experience as Assistant Secretary of Defense for Public Affairs.***

5.      During my time at the Pentagon, the Department had a process for providing journalists with press credentials—now called Pentagon Facility Alternative Credentials or PFACs—that enabled them to have a regular presence at the Pentagon. My recollection is that the process for obtaining a press credential was relatively straightforward and involved undergoing a background check.  When I was at the Department, we did not decide who was eligible to obtain or maintain a press credential based on whether we thought a particular reporter or news organization would report favorably about the Department or its leadership.

6.      In my experience, it was a tremendous advantage to the Department to have journalists from news organizations that reach a large and broad segment of the American public present in the Pentagon.  During my time as Assistant Secretary of Defense for Public Affairs, I frequently would talk to reporters who were present in the building as their stories were being developed and, in that way, get a sense of what was important to them and what issues would be at the forefront for the American public.  I could also help provide guidance to journalists if I thought they were not headed in the right direction on a story; I could help correct mistakes or misunderstandings or provide additional context where needed.

7.      For instance, during the Gulf War, many of the more experienced Pentagon and national security reporters were reporting from the Gulf, so news organizations had less experienced reporters working at the Pentagon.  It was helpful both for those reporters and for the Department to have them in the building, where they were able to ask questions, confirm facts,

2

and learn information that would help them avoid making mistakes in their reporting. Always, but especially during times of war or national crises, it benefits everyone to ensure that timely, accurate information is being conveyed to the American public.

8.     The regular presence of reporters in the Pentagon also helped develop respect and trust between those reporters and Department officials. While it did not prevent those journalists from writing critical stories about the Department and its leadership, the trust that was built up over time between journalists and Department officials was mutually beneficial. I recall instances where I asked journalists to hold back specific pieces of information they had learned because we believed, if it was made public right away, it would damage operational security. The reporters that I encountered regularly at the Pentagon would often consider and honor those requests. In those situations, it was vital that journalists and Department officials trusted one another.

9.     During my service as Assistant Secretary of Defense for Public Affairs, some Department officials may have found it inconvenient or challenging to have journalists in the building covering the Department and the United States military. For example, there were times when journalists published critical stories or reported information that Department officials believed had come out too soon or wished had not been made public. But Department leadership understood and respected the role of an independent press in our democracy, and cutting off access to the Pentagon for journalists could never stop reporting that was critical of the Department. We would never have considered suspending, revoking, or not renewing a journalist's press credential in response to a critical story. Nor would we have ever considered prohibiting credentialed journalists from being inside the Pentagon without an escort or eliminating their designated workspaces in the building. As detailed above, in my experience, it was a benefit to everyone, including the Department, to have journalists in the Pentagon.

Supp. App.34

10.    During my time as Assistant Secretary of Defense for Public Affairs, I did not encounter any security or safety incident arising out of the presence of a credentialed journalist at the Pentagon. To the contrary, in my experience, journalists were very sensitive to security considerations and cared deeply about the safety of men and women in the United States military. I do not recall the Pentagon suspending, revoking, or not renewing any journalist's press credential because of a safety or security concern.

### *My experience as a journalist covering the Department of Justice and Supreme Court.*

11.    As a correspondent covering the Department of Justice for NBC News, I had a long-term "hard" building pass issued by the Justice Department's Office of Public Affairs and frequently reported from Justice Department headquarters.

12.    As was the case when I was at the Pentagon, when I was covering the Justice Department, credentialed journalists had desks in the building and places where cameras were set up to allow journalists to report live. As a credentialed journalist covering the Justice Department, I could enter through the building through the same entrance used by Justice Department employees, and walk unescorted to areas in the building, including where the offices of the Attorney General and Deputy Attorney General were located, that were not restricted or secure. That was also true when I was covering the Supreme Court. Credentialed journalists were not required to be accompanied by an escort in the Supreme Court. Similarly, when I was Assistant Secretary of Defense for Public Affairs, journalists could go anywhere in the Pentagon where they did not require clearance—only secure areas, like the National Military Command Center, were off limits.

13.    I found it beneficial as a reporter to be in the building both when I was covering the Justice Department and the Supreme Court. I learned things by being there on a regular basis that

4

improved my reporting. Reporters get to know the rhythms of the building and can sense when something newsworthy is happening.

14. When I was covering the Justice Department, being in the building gave me ready access to experts—people who could answer questions about, for example, the wording in a federal criminal statute, and help me better understand how a particular procedure or process worked. By being present in the building, I was also able to quickly verify information, which is critical for good journalism. In my view, trying to cover the Justice Department or the Pentagon without regularly being present in the building is like trying to write a restaurant review without going to the restaurant and trying the food.

### The Department's new "interim" policy harms the American public.

15. I am familiar with changes that have been made by the Department to press access under Secretary Hegseth, and I have read the policy concerning press credentials that was issued by the Department in October 2025 and challenged by The New York Times in prior litigation. I have also read the March 2026 "interim" policy concerning press access to the Pentagon that is at issue in this litigation. Based on my experience both as a journalist and as Assistant Secretary of Defense for Public Affairs, I believe these measures are counterproductive for the Department and will ultimately harm the American public.

16. In early February 2025, after learning that the Department had announced that it would be shifting news organizations out of the Pentagon press room—the area sometimes referred to as Correspondents' Corridor—I wrote to then-chief Pentagon spokesman John Ullyot to share my view that such a move would not be in the Department's best interests. Among other things, I pointed out that when I was in his position, I had found it essential to have journalists close at hand when I needed to reach them to urge corrections, suggest approaches in reporting, or provide

guidance to avoid mistakes.  I also noted that journalists from three of the news organizations singled out to vacate their spaces in the Pentagon—The New York Times, NBC, and NPR—had died covering United States military operations abroad.  A true and correct copy of my email is attached hereto as Exhibit A.

17.    The press credential policy put into the place by the Department in October 2025 was, in my view, even worse and even more counterproductive for the Department.  The policy stated that the Department can take away a press credential if a journalist reports even unclassified information that the Department hasn't approved for release.  That is offensive and counter to the role of an independent press.  Journalists should not risk the loss of their credentials simply because they are doing their job as reporters.  And by promulgating that policy, the Department forced knowledgeable and experienced national security and defense reporters out of the building entirely—journalists from news organizations that reach a large and broad segment of the American public.

18.    After portions of its October 2025 press credential policy were struck down by the district court, the Department went, in my view, even further in the wrong direction by announcing an interim policy that immediately closed Correspondents' Corridor and prohibited credentialed journalists from entering the Pentagon except for press conferences and pre-scheduled interviews, and then only if they are minded at all times by an official escort.  These measures make it impossible for journalists to work at the Pentagon.

19.    From Correspondents' Corridor, journalists could file stories and, for cable and broadcast news, do live shots throughout the day using available remote camera equipment without the need for a camera crew.  Journalists had easy access to press conferences and briefings, including those called on short notice.  And, for urgent stories, journalists had the ability to confirm

Supp. App.37

information and get answers to questions quickly.  For the Department, it is valuable to have press in the building when newsworthy things happen to ensure that accurate information is being disseminated to the public.  Other federal buildings including, in my own experience, the Supreme Court and the Justice Department, have workspace for journalists. That is because it is in the interest of the press, the public, and the government to have journalists there.

20.    The public is best served by having reporters covering the Pentagon who are knowledgeable and informed about the Department and who understand military culture. Reporters gain that knowledge and understanding by working in the building regularly, asking questions, and talking to people face to face.  Prohibiting credentialed journalists from entering the Pentagon unless it is for a scheduled press conference or interview, and only then if they have an official escort, prevents that from happening.  It undermines the reporting process but, even more importantly, it harms the public who benefits from informed reporting.

21.    These measures serve no legitimate national security purpose.  In my experience as Assistant Secretary of Defense for Public Affairs, credentialed journalists moved throughout the building, unescorted, without posing any risk to national security.  The notion that credentialed reporters would have access to sensitive or classified information simply by being in the building without an escort is absurd.  Access to such information is tightly restricted and controlled; it is strictly forbidden to discuss classified matters in Pentagon hallways or other unsecure spaces.  In any event, keeping journalists out of the Pentagon will not stop them from reporting on the Department and its leadership, and will not prevent journalists from obtaining sensitive information from sources.

22.    As fewer Americans have any involvement with or direct connection to the United States military, it is more important than ever for the Department to be transparent and to build

and maintain trust with the American people.  Interacting with the press is an important way to build and maintain that trust.  Unfortunately, the Pentagon's new press credential policy will only undermine it.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated:  May 15 , 2026, Washington, D.C.

_Louis A. Williams_

Louis Alan (Pete) Williams

8

Supp. App.39

# EXHIBIT A

**From:** Pete Williams
**Date:** Monday, February 3, 2026 at 3:20 PM
**To:** john.ullyot
**Subject:** Pentagon rotation policy

Dear John,

I write as a former Assistant Secretary of Defense for Public Affairs to urge you to rethink a plan to shift news organizations in and out of the Pentagon press room. Such a policy would not be in the Defense Department's best interests and would instead be perceived as punitive.

The organizations notified in the January 31 memo to leave their spaces have vastly larger audiences than the four selected to take their places. That will prove to be an impediment when the Secretary or other civilian and military officials have urgent messages to share. In an age when a dwindling number of Americans have any connection to the military services, reaching the broadest possible audience becomes ever more important.

While journalists from the vacating organizations would still have access to the building, as a practical matter the policy would force them to go elsewhere to compile and file their reports. When I was the Pentagon spokesman, I found it essential to have journalists close at hand when I needed to reach them -- to urge corrections, suggest approaches in reporting, or provide guidance to avoid mistakes.

Three of the organizations singled out to vacate their spaces have indisputably earned their stripes in covering the Department of Defense. Seven journalists from New York Times died covering combat in World War II, Vietnam, and Afghanistan. Four NBC journalists died covering US military operations in Vietnam, and David Bloom died while reporting on the Iraq war. National Public Radio lost two journalists in Afghanistan. To now suggest that they leave the press room would be perceived as an affront to that legacy.

Contrast that sacrifice with the memo's stated goal of giving other news organizations an opportunity to report as resident members of the Pentagon press corps, an experience that by the policy's own terms would last a year.

In short, John, the rotation policy won't do the Defense Department any good. It would instead make it more difficult for the President, the Secretary, and you to communicate your message.

Respectfully,

Pete Williams
ASD/PA 1989-1973

1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE NEW YORK TIMES COMPANY, *et al.*,

                              *Plaintiffs,*

        v.

DEPARTMENT OF DEFENSE A/K/A
DEPARTMENT OF WAR, *et al.*,

                              *Defendants.*

Civil Case No. 26-cv-01690 (PLF)

**DECLARATION OF
RICHARD W. STEVENSON**

## DECLARATION OF RICHARD W. STEVENSON

I, Richard W. Stevenson, hereby declare as follows:

1.      I am over the age of 18 and make this declaration based upon my personal knowledge and experience.  I make this declaration in support of Plaintiffs' Motion for Preliminary Injunction in the above-captioned case.  If called to do so, I could and would competently testify to these matters under oath.

2.      I am an editor and Washington bureau chief with The New York Times ("The Times").  I have worked for The Times since 1985, and I have been based in The Times Washington bureau since 1996.

3.      As part of my responsibilities as the Times's Washington bureau chief, I oversee coverage of the federal government, including the Pentagon and the Department of Defense (the "Department" or "Pentagon").  I edit the work of reporters at The Times, including reporters who cover the Pentagon and who have held Pentagon Facility Alternate Credentials ("PFACs").

4.      Since I joined The Times in 1985 until October 2025, The Times has consistently had multiple reporters with PFACs who have regularly accessed the Pentagon in the course of their work.  In my view, as an editor at The Times, the ability of Times reporters to access the Pentagon

1

Supp. App.42

unescorted on a regular basis has enhanced the depth, detail, and quality of The Times's coverage of the Pentagon, the Department, the United States military, and national security issues.  It has enabled Times reporters to speak face-to-face with Department officials, attend press conferences and briefings, ask questions of public affairs staff and Department leadership, develop relationships with Department personnel, and provide immediate, in-person coverage of events that occur at the Pentagon.  To my knowledge, no Times reporter has ever had their PFAC suspended, revoked, or not renewed because the Department concluded they posed a threat to the safety or security of Department personnel or property, or for any issue related to national security or the receipt or publication of classified information.

5.     In my experience, Times reporters who cover the Pentagon and national security have consistently strived to be accurate, independent, probing, and fair in their coverage.  One aspect of those reporters' job is to report on the official pronouncements of the Department and the information that Department leadership wants to convey to the public.  But it is also important that those reporters seek to contextualize, investigate, and fact-check the Department's official pronouncements, which includes gathering and reporting information that may contradict or cast doubt on Department leaders' statements, and to sometimes report information that Department leadership does not intend to make public at all.  All of this reporting is integral to ensuring that the American public understands what its government and military are doing, and to ensuring that Department leaders are accountable for their actions and statements.

6.     For as long I have been a journalist, covering national security or the Pentagon (indeed, covering any aspect of the federal government) has meant learning information that is not public and that may (or may not) be considered "sensitive, controlled or classified."  Sometimes government officials, including officials at the highest levels of government, want non-public

information to be made public.  Sometimes non-public information is provided to reporters not for publication but to provide important context for their reporting.  None of this is new.  It has been true for at least the last 40 years that I have been with The Times.  Nor does it mean that journalists are a threat to national security, as the current leadership of the Department now claims.  To the contrary, the careful work that journalists at The Times and other news outlets undertake to deliver fact-based, independent reporting to the American public—including reporting that relies on information that the Department would characterize as secret—strengthens our democracy and helps safeguard our national security.

7.    Since the fall of 2025, the Department has taken unprecedented step after unprecedented step to restrict access to the Pentagon for credentialed journalists with The Times and other news outlets unwilling to report only what the Department's leadership wants them to report.  I submit this declaration to respond to assertions made by the Department regarding its latest unprecedented restriction: an "interim" policy prohibiting credentialed journalists from being anywhere in the Pentagon without an official escort.  In particular, the Department's claim that barring all unescorted access to the Pentagon prevents journalists from obtaining non-public information is factually incorrect.  And, as detailed below, the principal effect of the Department's new escort requirement has been to impose additional roadblocks to lawful, routine newsgathering and reporting by The Times, in particular, as well as other independent news organizations— journalism that serves the interests of the American public.

8.    In September and October 2025, the Department announced new rules governing reporters' PFACs.  I read the first version of this new PFAC policy shortly after it was announced in September, and read the final policy, as revised, when it was issued in early October.  Among other things, the policy stated that a reporter or news organization who sought out, acquired, or

published information that Department officials had not approved—even if that information was not classified—could be deemed a "security or safety risk" and could lose their PFAC immediately, without warning. That meant that the Department could suspend or revoke a reporter's PFAC if that reporter or his or her news outlet gathered or published information that the Department viewed as unflattering or critical of it or its leadership.  As explained in the prior declaration I submitted to the Court in a separate lawsuit filed by The Times challenging its constitutionality, Case No. 25-cv-4218, at ECF No. 10-5, the Department's October 2025 policy was, in my view, intolerable and inconsistent with The Times's journalistic standards and practices.

9.    Ultimately, all seven Times reporters who held PFACs as of August 2025—Eric Schmitt, Helene Cooper, Greg Jaffe, John Ismay, Carol Rosenberg, Julian Barnes, and Bill Hennigan—decided not to sign the "Acknowledgment" required under the Department's October 2025 policy and were compelled to surrender their PFACs as a result.  Accordingly, beginning in or around October 15, 2025, The Times no longer had reporters at the Pentagon regularly.  Other individuals who were willing to sign the "Acknowledgement"—including Laura Loomer, Mike Lindell, and James O'Keefe, among others—were issued PFACs by the Department shortly thereafter, which gave them unescorted access to Correspondents' Corridor, the Pentagon Press Office, and other areas within the building.

10.    On or about March 20, 2026, I learned that the district court had ordered the Department to reinstate the PFACs previously held by journalists with The Times. I understood the district court's order to require that Times reporters have their access to the Pentagon restored, and I was thrilled that Times reporters would once again be able to report from the building on a regular basis.  While The Times continued to provide in-depth coverage of the Pentagon after October 15, 2025, that reporting was made more difficult and burdensome because no Times

Supp. App.45

reporter had a PFAC. In my view, keeping Times journalists out of the Pentagon is a detriment primarily to The Times's readership, who are deprived of perspectives and information that might otherwise be reported, but also to the Department itself.

11. On or about March 23, 2026, I learned that the Department had issued a revised "interim" policy (the "Interim Policy") governing PFACs and reporters' access to the Pentagon. I reviewed that Interim Policy shortly after it was issued. Among other things, the Interim Policy states that the Correspondents' Corridor—the area in the Pentagon where reporters work—is closed effective immediately, and that no journalist with a PFAC is permitted to enter the Pentagon unless it is for a pre-arranged interview, press conference or other event, and even then, only if the journalist is accompanied by an official escort at all times.

12. I have read the Declaration of Joel Manuel Valdez filed in the above-captioned case. Mr. Valdez's declaration states that the escort requirement has "functioned smoothly," suggests that The Times's reporters who hold PFACs have been able to access the Pentagon without issue since the Interim Policy took effect on or about March 23, 2026 "on every occasion they have sought to do so," and asserts that escorts have been "readily available." Valdez Decl., ¶¶ 5-6. This is inaccurate and misleading because it overlooks the ways in which the escort requirement has made it more cumbersome, more inefficient, and less worthwhile for The Times's reporters to access the Pentagon in the first place. Before October 15, 2025, Times reporters with PFACs often accessed the Pentagon on a regular basis. For example, Eric Schmitt would frequently spend most or all of his workday at the Pentagon. While at the Pentagon, Times reporters would gather information and context for their reporting both through pre-arranged events and interviews and through informal or unplanned interactions. The escort requirement now makes it difficult (if not impossible) for reporters to engage in informal or unplanned conversations at the Pentagon and

5

requires far more effort and advanced planning for any pre-arranged interviews or even to attend press conferences and other scheduled events. As Mr. Valdez acknowledges, Times national security reporters have only accessed the Pentagon a handful of times since March 23, 2026. *See* Valdez Decl., ¶ 5. That is because the escort requirement interferes with the reporters' ability to effectively do their jobs. If not for the escort requirement, in addition to the other constraints imposed by the Department's Interim Policy, including the closure of the Correspondents' Corridor, Times reporters would be at the Pentagon on a regular basis, typically at least several times a week, as they were before October 2025.

13. Mr. Valdez's declaration also states that it is a "standard security protocol[]" for PFAC holders to be issued wristbands, and for Department staff to repeatedly check their wristbands, when they attend press conferences and other scheduled events at the Pentagon. Valdez Decl., ¶ 18. To my knowledge, there was no requirement that PFAC holders wear wristbands at the Pentagon prior to October 2025. There was also no requirement, prior to October 2025, that reporters with PFACs obtain an escort to use the restroom. Nor was there any restriction on *when* reporters were permitted to use the restrooms in the Pentagon. Now, as Mr. Valdez acknowledges, *id*., reporters are being told when to use the restroom and are prohibited from visiting the restroom without an escort. Mr. Valdez's assertion that this is because the "closest restrooms to the Pentagon Briefing Room are located in a restricted area near the Joint Chiefs of Staff corridor" is misleading: Before October 2025, The Times's reporters were able to access those same restrooms, and others throughout the Pentagon, without restrictions.

14. I have also read the Declaration of Sean Parnell filed in the above-captioned case. Mr. Parnell asserts in his declaration that "[f]ollowing the implementation of the PFAC Policy in October 2025, the frequency with which the Pentagon press office was contacted by journalists

6

Supp. App.47

regarding sensitive, controlled or classified information dropped dramatically" and "changed from a regular pattern of contacts . . . to a small number of isolated incidents."  Parnell Decl., ¶ 8. Mr. Parnell also states in his declaration that prior to the Department's implementation of the October Policy, "journalists frequently obtained sensitive information," *id.*, ¶ 11, and suggests that the "escort requirement" in the Interim Policy reduces the frequency with which journalists obtain "sensitive information."  I do not know exactly what Mr. Parnell means by "sensitive, controlled, or classified information" or "sensitive information," particularly because "sensitive information" is not a term defined in the Interim Policy (or the October Policy) or Mr. Parnell's declaration. Further, as explained above, journalists frequently learn information that is not classified but is also not public, and may (or may not) be considered "sensitive," in the course of their reporting. To the extent Mr. Parnell is suggesting that The Times's reporting of non-public information about the Department decreased after October 15, 2025, that claim is demonstrably false.

15.    After Pentagon Press Secretary Kingsley Wilson first made a similar claim in a declaration filed with the D.C. Circuit Court of Appeals on April 10, 2026, The Times set about fact checking it.  To do so, the national security team looked at articles published by The Times beginning in October 2025 to determine whether it was apparent from the face of an article that it included original reporting about the Department that relied on non-public information.  The information we took into account was available to Ms. Wilson when she filed her declaration in April 10, 2026, and was available to Mr. Parnell when he filed his declaration on June 4, 2026.

16.    Between October 15, 2025 and March 31, 2026, The Times published 308 stories about the Department or U.S. military from its Pentagon team; 109 (or 36.5%) of those stories were "scoops"—*i.e.*, original reporting, which includes original reporting that builds or expands on exclusive information other news outlets published.  More than half of those stories—158 (or

51.6%)—relied on non-public information.  In comparison, during the first 123 days of the Trump Administration, *before* Secretary Hegseth had imposed any new restrictions on credentialed journalists' access to the Pentagon, The Times's published 170 stories about the Department or U.S. military from its Pentagon team; 60 (or 35.7%) of those stories were "scoops" and 76 (or 44.7%) of them relied on non-public information.  In other words, the Times broke on average *more* stories about the Department based on non-public information after journalists' Pentagon access was revoked in October 2025.  The frequency with which Times journalists "obtained" non-public information not approved for release by the Department did not "drop[] dramatically," and Mr. Parnell, like Ms. Wilson in her earlier statement, offers no data to support a claim to the contrary.

17.    To give one recent example, on June 6, 2026, The Times published an article by Julian E. Barnes and Eric Schmitt about a growing concern within the Pentagon regarding espionage by Israel.  That article included non-public information that the Department may well have considered "sensitive" or "secret."  To my knowledge, the Times's reporters did not visit the Pentagon in the course of reporting that story.  The notion that the escort requirement will prevent reporters from learning and reporting non-public information is preposterous.  It has not had that effect so far, at least as far as The Times is concerned, and I do not expect that it will have that effect in the future.

18.    Mr. Parnell's declaration also seems to imply that a purported reduction in the frequency with which journalists contact the Pentagon Press Office "regarding sensitive, controlled or classified information" demonstrates a corresponding reduction in journalists' amount of access to such information.  Based on my experience, that assumption is incorrect, at least with respect to The Times.  It is The Times's practice to always engage with Public Affairs

officials at the Department before publishing any story that has potentially sensitive or disputed elements. We have not changed that approach in response to constraints on our reporting imposed by the Department. The Times's journalists continue to contact the Pentagon Press Office to seek information and comment on a regular basis, just as they did before the Interim Policy and before the October Policy. Simply put, there has been no reduction in the frequency of contacts to the Pentagon Press Office by Times journalists as a result of changes in the Department's press access policies.

19.    To the extent that the Department's rationale for the escort requirement is that it prevents reporters from accessing non-public information, that rationale simply does not hold water. It seems clear to me that the principal purpose and intended effect of barring journalists from the Pentagon without an escort is not to stop them from obtaining non-public information, but instead to thwart the basic and essential newsgathering that, prior to Secretary Hegseth's tenure, regularly took place at the Pentagon without posing any threat to national security.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 9th day of June 2026 in Washington, D.C.

Richard W. Stevenson

9