**[ORAL ARGUMENT NOT YET SCHEDULED]**

**No. 26-5253**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

NEW YORK TIMES COMPANY, et al.,

Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF DEFENSE,
also known as DEPARTMENT OF WAR, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Columbia

## BRIEF FOR APPELLANTS

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

BRAD HINSHELWOOD
JACK STARCHER
SEAN R. JANDA
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3388*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

## A.    Parties and Amici

Plaintiffs-appellees are the New York Times Company and Julian E. Barnes. Defendants-appellants are the United States Department of Defense, also known as the Department of War; Pete Hegseth, in his official capacity as Secretary of Defense; Sean Parnell, in his official capacity as Chief Pentagon Spokesman; and Timothy Parlatore, in his official capacity as Special Advisor to the Secretary of Defense.

There were no amici or intervenors in district court nor in this Court as of this filing.

## B.    Rulings Under Review

The rulings under review are the Memorandum Opinion and Order entered in *New York Times Co. v. Department of Defense*, No. 26-cv-1690 (D.D.C.) (Dkt. Nos. 16 & 17), by the Honorable Paul L. Friedman on June 30, 2026. The Memorandum Opinion is not yet published but is available at 2026 WL 1872765.

## C.     Related Cases

This case was not previously before this Court. There is one pending

related case in this Court: *New York Times Co. v. U.S. Department of*

*Defense*, No. 26-5113 (D.C. Cir.).

*/s/ Sean R. Janda*

Sean R. Janda

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION ................................................................................................ 1

STATEMENT OF JURISDICTION ................................................................. 3

STATEMENT OF THE ISSUE ........................................................................ 4

STATEMENT OF THE CASE ......................................................................... 4

    A.    Factual Background ............................................................................4

    B.    Procedural Background .....................................................................11

SUMMARY OF ARGUMENT .........................................................................15

STANDARD OF REVIEW ...............................................................................21

ARGUMENT .......................................................................................................21

I.    Plaintiffs Are Unlikely to Succeed on the Merits of Their Retaliation Claim ................................................................................22

    A.    The Escort Requirement Is Not an Adverse Action That Would Deter a Reasonable Journalist from Speaking .................24

    B.    There Is Not the Requisite Causal Link Between Plaintiffs' Protected Activity and the Escort Requirement ..........................36

II.    The Equitable Considerations Do Not Support the District Court's Preliminary Injunction ..................................................................52

    A.    Plaintiffs Have Not Demonstrated the Requisite Irreparable Harm .................................................................................53

    B.    The Balance of Harms and the Public Interest Weigh Against a Preliminary Injunction .................................................57

CONCLUSION.................................................................................................63

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*ACLU of Md., Inc. v. Wicomico County,*
999 F.2d 780 (4th Cir. 1993) ............................................................... 26

*Alpine Secs. Corp. v. Financial Indus. Regul. Auth.,*
121 F.4th 1314 (D.C. Cir. 2024) ......................................................... 53

*Anthropic PBC v. U.S. Dep't of War,*
2026 WL 1042493 (D.C. Cir. Apr. 8, 2026) ................................... 57, 58

*Aref v. Lynch,*
833 F.3d 242 (D.C. Cir. 2016) ................................................. 23, 27, 35

*Ateba v. Leavitt,*
133 F.4th 114 (D.C. Cir. 2025) ......................... 1, 22, 29, 31, 32, 55

*Baltimore Sun Co. v. Ehrlich,*
437 F.3d 410 (4th Cir. 2006) ................................................. 29, 32, 33

*Benisek v. Lamone,*
585 U.S. 155 (2018) ............................................................................. 53

*Center for Nat'l Sec. Stud. v. U.S. Dep't of Just.,*
331 F.3d 918 (D.C. Cir. 2003) ............................................................. 58

*Crawford-El v. Britton,*
523 U.S. 574 (1998) ............................................................................. 36

*Department of Homeland Sec. v. Regents of the Univ. of Cal.,*
591 U.S. 1 (2020) ................................................................................. 52

*Elrod v. Burns,*
427 U.S. 347 (1976) ............................................................................. 56

*Flynt v. Rumsfeld,*
355 F.3d 697 (D.C. Cir. 2004) ............................................................. 44

*Google, Inc. v. Hood,*
 822 F.3d 212 (5th Cir. 2016) ................................................................ 56

*Grossbaum v. Indianapolis-Marion Cnty. Bldg. Auth.,*
 100 F.3d 1287 (7th Cir. 1996) ........................................ 2, 25, 26, 27, 28, 29-30

*Hanson v. District of Columbia,*
 120 F.4th 223 (D.C. Cir. 2024) ............................................................ 21

*Hartman v. Moore,*
 547 U.S. 250 (2006) .......................................................................... 37

*Holder v. Humanitarian Law Project,*
 561 U.S. 1 (2010) ............................................................................. 59

*Houston Cmty. Coll. Sys. v. Wilson,*
 595 U.S. 468 (2022) ........................................................ 24, 27, 31, 32, 33

*Immigration & Naturalization Serv. v. Legalization Assistance Project of*
 *the L.A. Cnty. Fed'n of Lab.,* 510 U.S. 1301 (1993) ................................ 60

*John Doe Co. v. CFPB,*
 849 F.3d 1129 (D.C. Cir. 2017) ............................................................ 56

*Maryland v. King,*
 567 U.S. 1301 (2012) ........................................................................ 62

*Media Matters for Am. v. FTC,*
 2025 WL 2988966 (D.C. Cir. Oct. 23, 2025) ........................................ 41-42

*Media Matters for Am. v. Paxton,*
 138 F.4th 563 (D.C. Cir. 2025) ............................................................ 56

*New York Times Co. v. Department of Def.,*
 824 F. Supp. 3d 27 (D.D.C. 2026) ..................................................... 6, 7

*New York Times Co. v. Department of Def.,*
 830 F. Supp. 3d 1 (D.D.C. 2026) .......................................................... 10

*New York Times Co. v. U.S. Dep't of Def.*,
  2026 WL 1179440 (D.C. Cir. Apr. 27, 2026) ................ 10, 11, 39-40, 46, 52, 59

*Nieves v. Bartlett*,
  587 U.S. 391 (2019) ................................................................. 28

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................ 21, 58

*Sons of Confederate Veterans v. City of Lexington*,
  722 F.3d 224 (4th Cir. 2013) ................................................. 27

*Tao v. Freeh*,
  27 F.3d 635 (D.C. Cir. 1994) ................................................ 35

*United States v. O'Brien*,
  391 U.S. 367 (1968) ............................................................. 30

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .......................................................... 21, 61, 62

**Statutes:**

10 U.S.C. § 2674 ................................................................. 4, 59

28 U.S.C. § 1292(a)(1) ............................................................. 4

28 U.S.C. § 1331 ...................................................................... 3

28 U.S.C. § 1346(a)(2) ............................................................. 3

**Regulations:**

32 C.F.R. §§ 234.3-234.4 ........................................................ 5

32 C.F.R. § 234.3(a) ................................................................ 4

32 C.F.R. § 234.3(d) ................................................................ 5

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| Department | Department of War |
| J.A. | Joint Appendix |
| PFAC | Pentagon Facility Alternate Credential |
| Secretary | Secretary of War |

## INTRODUCTION

The Department of War recently adopted a policy requiring that all journalists be escorted by authorized Department personnel inside the Pentagon. As the district court did not dispute, this policy is viewpoint neutral, has been equally applied to all journalists accessing the Pentagon, and has not prevented any journalist from obtaining access to carry out newsgathering activities. Indeed, in many respects, the policy reflects access requirements similar to those for entering all manner of secure government buildings. The policy thus plainly comports with the First Amendment: "government office building[s]" are quintessential "nonpublic forums," and access to such buildings "can be restricted as long as the restrictions are viewpoint neutral and reasonable." *Ateba v. Leavitt*, 133 F.4th 114, 122-23 (D.C. Cir. 2025) (quotation omitted).

Nonetheless, plaintiffs—the New York Times Company and Julian Barnes, a Times reporter—have now twice obtained relief from the same district court judge prohibiting implementation of that policy as applied to them. This Court has twice stayed the district court's relief, and this Court should now reverse the preliminary injunction under review here.

That preliminary injunction is premised on the district court's conclusion that the escort requirement reflects unconstitutional retaliation against plaintiffs. But plaintiffs' retaliation claim "fundamentally misconceive[s] the nature of" such claims. *Grossbaum v. Indianapolis-Marion Cnty. Bldg. Auth.*, 100 F.3d 1287, 1294 (7th Cir. 1996). Retaliation claims permit an individual to challenge some "discretionary government actions taken vis-a-vis individual citizens" for impermissible motives. *Id.* They do not allow a plaintiff "to challenge a truly prospective and generally applicable rule that is even-handedly enforced." *Id.* at 1295. Plaintiffs thus cannot claim that the neutral, generally applicable escort requirement is unconstitutionally retaliatory.

The conceptual errors in plaintiffs' claim are only magnified by the district court's mangling of the relevant legal principles at every step as the court sought to shoehorn plaintiffs' claim into the retaliation framework. The court nowhere explained how the requirement could be an adverse action targeted at plaintiffs. The court permitted the minor logistical burdens that the escort requirement imposes on journalists to stand in for the chill that retaliation doctrine requires. And the court disregarded the government's consistent national-security explanation for the escort requirement,

2

concluding instead—largely based on statements from various individuals spread over many months and unrelated to the challenged policy—that the requirement must have been motivated by some ill-defined retaliatory animus.

The result of that cascade of legal errors is untenable, both on the merits and as a balancing of the equities. The district court did not dispute that the Department has a serious interest in regulating access to the Pentagon, a secure government building in which some of this Nation's most sensitive national-security functions take place. Nor did the court question that the even-handed burdens imposed by the escort requirement are substantively constitutional. Nonetheless, the court allowed plaintiffs to use the retaliation framework to sidestep the serious hurdles that any substantive First Amendment claim would be required to clear. And its flawed reasoning would effectively prevent the Department from regulating—in any manner—access to the Pentagon by all manner of media organizations. That result cannot stand.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the jurisdiction of the district court under 28 U.S.C. §§ 1331, 1346(a)(2). *See* J.A. 48. The district court granted plaintiffs' motion

for a preliminary injunction on June 30, 2026. *See* J.A. 1-2. The government filed a timely notice of appeal on July 2, 2026. J.A. 478. This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

The issue presented is whether the district court improperly entered a preliminary injunction prohibiting the Department from implementing its neutral, generally applicable escort requirement as to plaintiffs.

## STATEMENT OF THE CASE

### A. Factual Background

1. The Secretary of War has jurisdiction over the Pentagon and is required to protect the Pentagon's buildings, grounds, and property, including by prescribing regulations to ensure the safe, efficient, and secure operation of the Pentagon. *See* 10 U.S.C. § 2674. Pursuant to that authority, the Secretary has long adopted regulations restricting access to the Pentagon to "ensure the orderly and secure conduct" of Department business within the building. 32 C.F.R. § 234.3(a). One important goal of such restrictions is to safeguard the extremely sensitive and classified information that flows through the Pentagon every day.

Under those regulations, only employees and other authorized persons may enter the Pentagon, while others who wish to enter require an invitation

or the consent of authorized personnel. 32 C.F.R. §§ 234.3-234.4. And any "person or organization desiring to conduct activities anywhere on the Pentagon Reservation" is required to receive a permit from the Department and to abide by any conditions of that permit. *Id.* § 234.3(d). For members of the press who want access to the Pentagon, the Department has established a process allowing journalists to obtain a Pentagon Facility Alternate Credential (PFAC), which allows them special privileges.

2. The Department has explained that it "is an unacceptable risk to national security for sensitive, controlled or classified information to regularly reach journalists." J.A. 423. The "[u]nauthorized disclosure of operational plans, intelligence assessments," and other sensitive information "puts American lives in danger, allows our enemies to adjust their tactics ahead of our operations, and risks compromising our ongoing operations." *Id.*

In October 2025, to better safeguard such information, the Department implemented a new policy regarding media access to the Pentagon. The policy set out requirements for obtaining and maintaining a PFAC. It stated that an individual PFAC holder's credential may "be denied, revoked, or not renewed if [the] person is reasonably determined to pose a security or safety risk to [Department] personnel or property." J.A. 119. And the policy

reflected the Department's view that a reporter's attempt to "solicit the disclosure of" classified or controlled information or to "otherwise encourage [Department] personnel to violate laws and policies concerning the disclosure of such information" might "weigh in the consideration of whether" the reporter "pose[s] a security or safety risk." *Id.* In addition, the October Policy contained a number of requirements for PFAC holders, including certain physical access restrictions—such as delineating areas where PFAC holders were not permitted without an escort. J.A. 112.

Following the issuance of the October Policy, the New York Times Company and Julian Barnes—a Times reporter—challenged portions of the policy under the Constitution and APA. *See New York Times Co. v. Department of Def.*, 824 F. Supp. 3d 27 (D.D.C. 2026). Those challenges focused on the provisions of the policy regarding the potential denial, revocation, or non-renewal of individual PFAC credentials. The plaintiffs did not contend that the separate physical access restrictions contained in the policy were also invalid. *See id.* at 55-56 (listing specific provisions of the October Policy that the plaintiffs challenged).

The district court in that suit ultimately granted the plaintiffs summary judgment, holding that the challenged provisions of the October

6

Policy violated both the First and Fifth Amendments. In reaching those conclusions, the court agreed that the Pentagon is a "nonpublic forum" and that Department may restrict access to the forum if "the restrictions are viewpoint neutral and reasonable." *New York Times*, 824 F. Supp. 3d at 46-47 (quotation omitted). Nonetheless, the court believed that the challenged portions of the policy improperly discriminated based on viewpoint and unreasonably provided Department officials with "unbridled discretion" to deny or revoke PFACs. *See id.* at 47-52 (quotation omitted). And for similar reasons, the court believed that the policy failed to provide "objective and clear standards for determining whether to deny, revoke, or suspend a journalist's PFAC," in violation of journalists' due-process rights. *Id.* at 41-46 (quotation omitted). The court therefore vacated the challenged provisions of the October Policy and enjoined enforcement of those provisions against plaintiffs. *See id.* at 55-56.

3. Shortly after that relief was entered, the Department adopted the March Policy challenged here. The March Policy explains that it reflects revisions to the October Policy intended "to comply with" the district court's "order while preserving the Department's legitimate security interests and its statutory obligation to ensure the safe, efficient, and secure operation of

the Pentagon." J.A. 89. In part, the policy includes changes to the process and permitted bases for denying or revoking a PFAC. Those changes are intended to address the court's concern that the relevant provisions of the October Policy were vague and left the Department with impermissibly broad discretion. *See* J.A. 89-90 (describing these changes).

In addition, the March Policy includes updates to the physical access restrictions that had been included in the October Policy and that went unchallenged by the plaintiffs in the original lawsuit. Of particular relevance here, the March Policy requires that PFAC holders be "escort[ed] by authorized [Department] personnel" when they enter the Pentagon. J.A. 95-96. The Department has explained that this escort requirement is intended "to address the risk to the security of sensitive controlled and classified information within the Pentagon, and the risks that the unauthorized disclosure of that information would carry for the Nation's security," that would exist if the Department was forced to "return to the pre-October" status quo of journalists' broad ability to physically access the Pentagon without significant limits. *See* J.A. 424; *see also* J.A. 89-90 (reflecting the Department's conclusion that the risks of unescorted access were heightened

by the vacatur of requirements in the October Policy that the Department viewed as allowing it to effectively "screen PFAC holders for security risks").

The Department adopted the escort requirement because of changes it had observed in unauthorized disclosures of classified and sensitive information following the October Policy. Before that policy, PFAC holders regularly obtained such information—"often monthly, and sometimes multiple times per month"—including "information relating to operational plans, intelligence assessments, diplomatic communications, and force posture decisions." J.A. 421. But the frequency with which the Department learned of such disclosures "dropped dramatically" after October 2025, when many journalists surrendered their PFACs and were thus no longer physically present in the Pentagon. J.A. 422.

Based in part on this experience, the Department determined "that unescorted access to the Pentagon was a significant contributing factor to the frequency with which controlled and classified information was reaching journalists." J.A. 421-22. Such access allowed journalists to loiter "near sensitive spaces within the Pentagon" and "observe activity patterns—such as which officials were meeting, when, and in what configuration—that could be used to identify individuals with access to specific sensitive information

and to time inquiries accordingly." *Id.* For example, journalists often congregated "in close proximity to the office space for the Joint Chiefs of Staff," and journalists "frequently used their access to closely monitor activity in and out of the Joint Staff spaces." J.A. 422.

4. Following the adoption of the March Policy, the plaintiffs in the earlier suit sought relief from the policy through a motion to "enforce" the judgment in the original suit. The district court agreed, concluding that certain provisions of the March Policy (including the escort requirement) violated its judgment, and enjoined the Department from enforcing those provisions against the plaintiffs. *See New York Times Co. v. Department of Def.*, 830 F. Supp. 3d 1 (D.D.C. 2026).

The Department appealed and sought a stay of the district court's injunction to the extent it applied to the March Policy's escort requirement. This Court granted that motion. *See New York Times Co. v. U.S. Dep't of Def.*, 2026 WL 1179440 (D.C. Cir. Apr. 27, 2026) (per curiam). This Court explained on the merits that the escort requirement is a "generally applicable requirement that" is likely "not invalid for violating" the "constitutional principles underlying" the district court's previous judgment. *Id.* at *3. And it credited the government's explanation, based on its

10

experience, that "unescorted access to the Pentagon will increase the risk that journalists obtain and disseminate sensitive information, jeopardizing national security." *Id.* at \*2.[1]

5. Since that stay order in April, the escort requirement has been in effect. Over that time, dozens of reporters—including Barnes and other New York Times PFAC holders—have "repeatedly accessed the Pentagon" for various journalistic activities, including to attend media events and press conferences and to interview Department officials. J.A. 393-94. And the record reflects that under the March Policy, "no PFAC holder has been unable to enter the Pentagon because of an inability to arrange an escort." *Id.* Indeed, although Barnes has asserted that the escort requirement is "logistically burdensome," he has also averred that he continues to report on the Pentagon and that the escort requirement "has not eliminated [his] ability to report stories that rely on non-public information." J.A. 464-67.

## B. Procedural Background

1. Undeterred by this Court's staying the first injunction against the escort policy, the New York Times Company and Barnes—the same

---

[1] The government's appeal of the district court's judgment and enforcement order in the original suit is proceeding in this Court under No. 26-5113.

plaintiffs as in the previous suit—brought this suit, which was assigned to the same district court judge as the previous suit. In their complaint, plaintiffs challenge various provisions of the March Policy, including the escort requirement. They claim that those provisions violate the First and Fifth Amendments and the APA's reasoned decisionmaking requirements. *See* J.A. 75-86.

2. Plaintiffs moved for a preliminary injunction against enforcement of the escort requirement. The district court granted that motion. On the merits, the court addressed only plaintiffs' First Amendment retaliation claim. *See* J.A. 18. The court explained that to succeed on that claim, plaintiffs were required to demonstrate that they "engaged in conduct protected under the First Amendment"; that the March Policy's escort requirement is an adverse "action sufficient to deter a person of ordinary firmness in" plaintiffs' "position from speaking again"; and that there is a "causal link between" plaintiffs' protected activity and that "adverse action." J.A. 18-19 (quotation omitted).

The district court held that plaintiffs had met those requirements. At the outset, the court concluded that "the escort requirement is an adverse action that would chill a speaker of ordinary firmness." J.A. 19 (quotation

omitted). In reaching that conclusion, the court did not suggest that plaintiffs (or any other reporter) would, or even could, reasonably censor their own reporting to avoid being subject to the generally applicable escort requirement. Instead, the court focused on evidence that the escort requirement "encumber[s] the ability of" journalists to "do their jobs" by foreclosing journalists from engaging in "spontaneous conversations" with Department staff and "develop[ing] relationships with sources." J.A. 20-24. And the court emphasized its view that this prong of the framework is only a "relatively modest bar" that even "trivial" actions may satisfy. J.A. 19-20, 23 (quotation omitted).

Next, the district court concluded the Department's decision to implement the escort requirement was caused by an impetus to retaliate against plaintiffs' protected activity, J.A. 24-—either their "reporting on public issues" or their original "lawsuit challenging the October Policy," J.A. 19 (quotation omitted). To find the relevant retaliatory animus, the court primarily focused on "myriad statements by Department officials" criticizing reporting from The Times "and other 'legacy' media outlets." J.A. 25-26. The court also rejected as pretextual the government's national-security explanation for the escort requirement. In reaching that conclusion, the court

focused on its belief that the explanation was "absent from the [March] Policy itself" and "facially dubious," as well as on the March Policy's issuance "immediately after the Court ordered The Times journalists' PFACs restored." J.A. 28-33.

On the equities, the district court concluded that plaintiffs had shown irreparable harm because "the escort requirement burdens"—though does not eliminate—plaintiffs' "ability to engage in newsgathering." J.A. 34. And the court believed this harm to plaintiffs' First Amendment activities outweighed the Department's national-security interest in safeguarding classified and sensitive information, largely because the government "may not act unlawfully even in pursuit of desirable ends." J.A. 35 (quotation omitted). In reaching that conclusion, the court did not seriously grapple with this Court's previous stay decision crediting those same national-security interests in granting a stay pending appeal.

3. The government appealed and sought a stay of the district court's injunction pending appeal. This Court granted that motion.

In concluding that the government is likely to succeed on the merits of this appeal, this Court explained that plaintiffs had not disputed that the escort requirement is "generally applicable," has been "applied across the

board to all reporters," is being "implemented evenhandedly," and does not have "a distinctively adverse impact on [plaintiffs] or their news reporting ability that is different from the policy's effect on all other covered reporters." Order 2 (July 16, 2026). Based on those undisputed facts, the Court concluded that plaintiffs will not likely be able to demonstrate that the "generally applicable escort requirement" constitutes a "sufficiently adverse action to give rise to an actionable First Amendment claim of retaliation." *Id.* (quotation omitted). Judge Garcia dissented. *See id.* at 6-7 (Garcia, J., dissenting).

## SUMMARY OF ARGUMENT

**I.** The March Policy's escort requirement is a neutral, generally applicable, and minimally burdensome condition on access to the Pentagon— a secure government building and non-public forum to which the government may restrict or even altogether prohibit access. The requirement is thus plainly constitutional as a substantive First Amendment matter, and the district court did not conclude otherwise.

The district court instead erroneously concluded that plaintiffs are likely to succeed in showing that the requirement reflects unconstitutional retaliation against plaintiffs. That conclusion reflected at the outset a

fundamental misunderstanding of retaliation claims, which are not properly available to challenge neutral, generally applicable requirements. And it was wrong even on its own terms. To succeed on their retaliation claim, plaintiffs would need to demonstrate that the escort requirement represents material adverse action against them that would chill an ordinary journalist's expression and that their expressive activity was a but-for cause of the Department's decision to implement the requirement. Plaintiffs are unlikely to succeed at both steps of that analysis.

**A.** Plaintiffs cannot demonstrate that the escort requirement is a relevant adverse action that would lead an ordinary journalist to self-censor.

Most fundamentally, the neutral, generally applicable escort policy is not properly conceived of as an "adverse action" at all. It is indeed wholly unlike the individualized adverse actions—such as arrests, prosecutions, and firings—that commonly form the basis of retaliation claims. Courts have thus consistently rejected retaliation claims targeting such neutral policies. A requirement applied to all speakers cannot logically deter any individual speaker from exercising his rights to avoid application of the requirement. And permitting individual speakers to leverage retaliation claims to challenge neutral requirements risks impermissibly paralyzing government

action, while forcing courts to engage in the hazardous inquiry of probing the motives underlying neutral regulatory requirements. Such inquiry would be particularly problematic in this context because impermissible motives are easy to allege but hard to disprove and because protected activity will often be a legitimate consideration underlying official actions.

Beyond that fundamental conceptual problem, plaintiffs' claim also fails because the escort requirement is minimally burdensome and could not chill any reasonable journalist in his reporting. The escort requirement reflects a neutral limitation on access to the government's own secure facility. Courts have repeatedly recognized in similar contexts that access limitations and escort requirements are minimal inconveniences, especially for journalists operating in the political arena. It is thus not surprising that neither plaintiffs nor the district court have identified any journalist who has even claimed to self-censor in response to the escort requirement.

The district court did not conclude that the requirement would lead any journalist to self-censor but instead relied on its findings that the requirement encumbers journalists' activities, such as by foreclosing them from developing close relationships with sources inside the Pentagon. But those burdens are relevant, if at all, to a right-of-access First Amendment

17

claim. If they do not support such a claim, plaintiffs cannot convert them into the basis of a retaliation claim, which properly evaluates the potential for a chilling effect rather than regulatory burdens generally. And the court's reliance on the policy's burdens is particularly untenable in this context, where there is no dispute that the Department may heavily restrict or even outright prohibit access to the Pentagon.

**B.** In any event, plaintiffs have not demonstrated that their expressive activity was the but-for cause of the Department's decision to adopt the escort requirement. The record establishes that the impetus for the escort requirement was the Department's desire to prevent the unauthorized disclosure of classified and other highly sensitive materials, particularly in light of the district court's vacatur of the Department's previous access requirements. That rationale is evident from the face of the March Policy itself and has been detailed through evidence in the record that demonstrates, with specificity, the bases for the Department's conclusion that unescorted access poses an information-security risk. And the Department's explanation is only further bolstered by the March Policy's adoption immediately after the court's previous vacatur (rather than

immediately after some specific expressive activity on plaintiffs' part) and by the escort requirement's neutral and generally applicable contours.

The district court nonetheless concluded that the Department's proffered explanation was a pretext for retaliatory animus. That was erroneous. In the main, the court relied on various statements expressing disagreement with plaintiffs' and other media outlets' reporting to conclude that the Department harbors animus toward plaintiffs. But the statements in question have no nexus to the escort requirement and provide no firm basis for disregarding the Department's explanation. Indeed, if the court's reasoning were correct, plaintiffs could challenge *any* future access restrictions—no matter how reasonable or neutral—as impermissibly retaliatory. That result cannot be squared with the Pentagon's status as a non-public forum and the Department's indisputable interest in regulating access to ensure the secure and orderly oepration of the important national-security activities inside that building.

**II.A.** The equitable factors independently foreclose the district court's preliminary injunction. Plaintiffs' own averments that the policy has not prevented them from obtaining the access needed to conduct their journalistic activities establish that the escort requirement is nothing more

19

than a minor inconvenience and does not substantially harm—much less inflict the requisite certain and great harm on—plaintiffs' journalistic endeavors. And plaintiffs' claims of abstract First Amendment injury do not suffice in the absence of some concrete, imminent, and great burden on their newsgathering activities.

**B.** Even if plaintiffs had established some irreparable harm, that harm would be outweighed by the government's and the public's interest in implementation of the escort requirement. The preliminary injunction requires the Department to allow plaintiffs to roam the Pentagon—a secure government building—unescorted, notwithstanding the Department's conclusion that such access unacceptably risks the disclosure of classified, controlled, and other highly sensitive information. And the unauthorized disclosure of such information can indisputably have catastrophic consequences for the Nation's security.

The district court's decision bypassed these issues by asserting that there is no legitimate interest in implementing a policy that the court believed was likely unlawful. That not only ignores the cardinal principle that plaintiffs must independently demonstrate that the merits and the equities

support a preliminary injunction, but also improperly disregards the important national-security interests at stake.

## STANDARD OF REVIEW

This Court reviews "the district court's decision whether to grant" a preliminary injunction "for abuse of discretion," with the district court's legal conclusions reviewed de novo and its factual findings reviewed for clear error. *Hanson v. District of Columbia*, 120 F.4th 223, 231 (D.C. Cir. 2024) (per curiam) (quotation omitted).

## ARGUMENT

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To justify that relief, a plaintiff must show that it is "likely to succeed on the merits," that it "is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Id.* at 20. The government's interest and the public interest "merge" when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs fail to meet that burden at each step.

## I. Plaintiffs Are Unlikely to Succeed on the Merits of Their Retaliation Claim

The Pentagon is the headquarters of a Department that, by its nature, deals with highly sensitive materials that relate to the Nation's defense and national security. Thus, as the district court did not dispute, the Pentagon is a non-public forum—that is, "government property that is not by tradition or designation a forum for public communication." *Ateba v. Leavitt*, 133 F.4th 114, 121-22 (D.C. Cir. 2025) (quotation omitted) (discussing the White House Press Area). And there is, of course, no freestanding right for journalists or other members of the public to wander the halls of the Pentagon at their leisure. The established rule for such non-public fora is that the government is "not required to open such spaces for any speech at all," and if it chooses to open them, access "can be restricted as long as the restrictions are viewpoint neutral and reasonable." *Id.* at 122-23 (quotation omitted). The escort requirement plainly meets those baseline requirements, and the district court did not conclude otherwise. J.A. 18; *cf.* J.A. 24 n.5 (disregarding precedent regarding journalists' lacking any First Amendment right to have the government facilitate their reporting because the relevant question is not whether "the Department's action itself violates the First Amendment").

Instead, the district court concluded that the escort requirement—which is viewpoint neutral, has been equally enforced across the Pentagon press corps, and does not prevent any journalist from accessing the Pentagon for his work—constitutes unconstitutional retaliation against plaintiffs. To properly make out such a claim, plaintiffs would need to demonstrate that they "engaged in conduct protected under the First Amendment," that the Department "took some retaliatory action sufficient to deter a person of ordinary firmness in [plaintiffs'] position from speaking again" against them, and that "a causal link" existed between the retaliation and the protected activity. *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (quotation omitted).

The district court's conclusion that plaintiffs had met that burden reflects a fundamental misunderstanding of First Amendment retaliation claims. Such claims may be used to challenge discretionary actions targeted at specific speakers, not to challenge neutral and generally applicable policies. In nevertheless attempting to fit plaintiffs' claim onto these facts, the court badly mangled the elements of a retaliation claim. When those elements are properly understood, plaintiffs have not meet their burden, as the stay panel correctly concluded.

**A.    The Escort Requirement Is Not an Adverse Action Targeted Against Plaintiffs That Would Deter a Reasonable Journalist from Speaking**

Even setting aside questions about the Department's motivations in implementing the escort requirement, that requirement is not the sort of material adverse action targeted against plaintiffs that would deter a reasonable journalist from exercising his First Amendment rights. For one, plaintiffs' attempt to bring a retaliation claim against the neutral, generally applicable escort requirement reflects a fundamental category error. And even if the escort requirement had singled out plaintiffs, it is an easily satisfied condition on access that could not reasonably chill speech. Plaintiffs' retaliation claim thus fails as a matter of law.

1. A plaintiff claiming retaliation in violation of the First Amendment must identify at the outset some material "adverse action," such as "an arrest, a prosecution, or a dismissal from governmental employment." *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022). As the paradigmatic adverse actions identified by the Supreme Court reflect, retaliation claims are a vehicle to challenge "discretionary government actions taken vis-a-vis individual citizens" for impermissible motives.

*Grossbaum v. Indianapolis-Marion Cnty. Bldg. Auth.*, 100 F.3d 1287, 1294 (7th Cir. 1996).

But here, the escort requirement that plaintiffs challenge is not targeted at some subset of journalists who have engaged in expression with which the Department disagrees. Instead, the requirement applies to all PFAC-holding journalists seeking access to the Pentagon, without regard to the substance of any individual journalist's past or future reporting. Plaintiffs' attempt to fit their objections to this neutral, generally applicable regulation into a retaliation claim "fundamentally misconceive[s] the nature of" such claims. *Grossbaum*, 100 F.3d at 1294.

Thus, plaintiffs may not "use a retaliation claim to challenge a truly prospective and generally applicable rule that is even-handedly enforced." *Grossbaum*, 100 F.3d at 1295. For example, in *Grossbaum*, the plaintiffs challenged a policy prohibiting all private displays in the lobby of a city government's building. *See id.* at 1290. The government had adopted that policy after the same plaintiffs had successfully obtained a preliminary injunction against a previous policy prohibiting religious displays, and the plaintiffs claimed that the new policy, although content neutral, reflected impermissible retaliation against the plaintiffs for exercising their rights "to

seek judicial relief" and "to speak in" the building lobby. *See id.* at 1290-91. The Seventh Circuit rejected that First Amendment retaliation claim as a matter of law, holding as a categorical matter that "courts will not sustain a retaliation claim where a plaintiff challenges only the enactment of a prospective, generally applicable rule." *Id.* at 1295. Instead of bringing a retaliation claim against such a regulation, plaintiffs must "attack the substance" of the rule. *Id.*

Other decisions in similar contexts are in accord. For example, the Fourth Circuit rejected the ACLU's claim that a prison official had violated the First Amendment by withdrawing "special accommodation[s]" that had previously been offered to an ACLU paralegal, allegedly in response to the organization's filing of a lawsuit. *See ACLU of Md., Inc. v. Wicomico County*, 999 F.2d 780, 785-86 (4th Cir. 1993) (per curiam). The court explained that subjecting the ACLU's paralegal to the same "reasonable requirements" that were imposed on "any paralegal or other non-professional visitor" did not reflect the material "adverse impact necessary to a retaliation claim," "whether or not it was done in response to filing of a lawsuit." *Id.* Similarly, courts have held that the government may close a designated public forum "to all private speakers" without violating the First Amendment, even in the

26

face of a claim that the government had a "discriminatory motive" in pursuing that course. *Sons of Confederate Veterans v. City of Lexington*, 722 F.3d 224, 230-32 (4th Cir. 2013).

That refusal to permit plaintiffs to challenge neutral policies based on claims of retaliatory motive makes sense. For one, an integral part of any retaliation claim is that the challenged action be sufficiently adverse to "materially inhibit[]" a person's "ability to speak freely," *Wilson*, 595 U.S. at 479, such as by "deter[ring]" him from "speaking again," *Aref*, 833 F.3d at 258 (quotation omitted). But a requirement applied neutrally to all speakers cannot logically deter any given speaker, because no speaker may escape the regulation by self-censoring. And it is in the context of "individualized, discretionary government actions"—not "government rules that affect both majority and minority alike"—where "the government's coercive power is greatest" and thus where concerns of retaliation and chill have purchase. *Grossbaum*, 100 F.3d at 1296.

Relatedly, permitting plaintiffs to bring retaliation claims against neutral regulatory requirements would impermissibly risk "paralyz[ing]" the Executive Branch by threatening a retaliation claim whenever the government "make[s] new policy that is arguably in response to someone's

speech or lawsuit." *Grossbaum*, 100 F.3d at 1295. Because such motive-based claims are "easy to allege and hard to disprove," permitting them may subject any regulating entity to "overwhelming litigation risks." *Nieves v. Bartlett*, 587 U.S. 391, 403-04 (2019) (quotation omitted). That is especially true in the context of First Amendment claims, because "protected speech" can be a "wholly legitimate consideration" underlying official action. *Id.* at 401 (quotation omitted).

Indeed, plaintiffs' claims illustrate the point. It is indisputably true that the Department has a legitimate interest in seeking to prevent the unauthorized disclosure of classified and sensitive information. And consideration of the ways in which reporters have been able to obtain and publish such information is plainly relevant to shaping the Department's regulatory approach to preventing leaks, as is consideration of the ways in which the district court's original judgment might affect reporters' ability to obtain sensitive information. Allowing plaintiffs to pursue a First Amendment claim challenging the Department's neutral regulation on the basis that the decisionmaking process reflected some (in their view, retaliatory) consideration of reporters' newsgathering activities or plaintiffs'

previous lawsuit would be fundamentally at odds with the Department's regulatory authority.

That conclusion is particularly evident in this context, where the Department is regulating—again, in a neutral and generally applicable way—access to a non-public forum. It should be undisputed that the Department has a substantial interest in regulating visitors' (including journalists') access to the Pentagon to ensure the safety, security, and orderly operation of the important functions conducted within that building. But any access restriction will necessarily encumber to some degree journalists' ability to engage in unfettered reporting inside the Pentagon. Allowing that routine encumbrance to serve as the basis for a retaliation claim would undermine the fundamental rule that the Department may properly impose reasonable, nondiscriminatory access restrictions on a non-public forum like the Pentagon—indeed, may prohibit access to the building altogether. *Ateba*, 133 F.4th at 121-23. And it would improperly risk "constitutionaliz[ing] virtually every day-to-day interchange between the press" and the Department. *Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 417 (4th Cir. 2006). If plaintiffs wish to "attack the substance" of the Department's escort requirement, they may do so. *Grossbaum*, 100 F.3d at

1295. But they cannot leverage a retaliation claim to evade the stringent requirements that they would have to meet to succeed on that substantive claim.

And indeed, that result coheres with the Supreme Court's approach to similar First Amendment claims. Thus, the Court has made clear that it will not invalidate a facially neutral statute based on a claim that "the purpose of Congress was to suppress freedom of speech." *United States v. O'Brien*, 391 U.S. 367, 382-83 (1968) (quotation omitted). That rule stems in large part from the Court's recognition that it would be inappropriate to void a statute "which Congress had the undoubted power to enact," and which "could be reenacted in its exact form if the same or another legislator made a 'wiser' speech about it," based on "hazardous" "[i]nquiries into congressional motives." *Id.* at 383-84. As explained, similar principles apply in this context, where plaintiffs seek to challenge a neutral and generally applicable regulation of sensitive government property that the Executive Branch undoubtedly has power to issue in the first instance.

2. Plaintiffs' attempt to make out a retaliation claim in these circumstances is further doomed by the nature of the escort requirement as a minimally burdensome restriction on access to a non-public government

building. That minimal restriction—in contrast to, for example, "an arrest, a prosecution," or a firing, *Wilson*, 595 U.S. at 477—cannot be a sufficiently severe action to chill a journalist of ordinary firmness in his reporting.

To the contrary, this Court has already explained in the analogous context of the White House that the difference between escorted and unescorted access to a non-public government building is little more than a minor inconvenience. Thus, in *Ateba*, the plaintiff journalist lost his White House hard pass; as a result, he was required to use a day pass to access the White House Press Area. And day-pass holders were required to "wait for an escort to take them from the White House gate to the Press Area, which may take up to 45 minutes." *Ateba*, 133 F.4th at 117. In assessing the plaintiff's First Amendment claims challenging the White House's hard-pass policies, this Court made clear that the difference between the unescorted access of a hard pass and the escorted access afforded by a day pass was "merely" one of "convenience," allowing the journalist "to enter more quickly and without an escort." *Id.* at 120-21. And the Court contrasted the "lesser burden" of the day pass's escort requirement with "other cases involving the White House Press Area, which considered only the *denial* of access to that space"—a burden that "differ[ed] significantly" from "the inconvenience of not having a

hard pass that assures preferential access." *Id.* at 121. As a result, this Court expressed some skepticism that the plaintiff had even "state[d] a cognizable injury under the First Amendment." *Id.*

Moreover, in *Baltimore Sun*, the Fourth Circuit held that even *discriminatory* access restrictions on journalists do not give rise to the requisite chill to support a First Amendment retaliation claim. There, the Maryland Governor directed all State Executive Branch employees not to speak with two specific reporters. *Baltimore Sun*, 437 F.3d at 413. The Fourth Circuit rejected the reporters' retaliation claim challenging that directive, explaining that "the adverse impact" of "giving preferential access to some reporters and refusing to give access to" other reporters "is objectively *de minimis*." *Id.* at 418-19. In the "rough and tumble political arena," it is hard to fathom "that a reporter of ordinary firmness can be chilled by a politician's" failure to provide access that the reporter seeks. *Id.* at 419 (quotation omitted); *cf. Wilson*, 595 U.S. at 478 ("In this country, we expect elected representatives to shoulder a degree of criticism about their public service from their constituents and their peers—and to continue exercising their free speech rights when the criticism comes.").

The Fourth Circuit's conclusion applies a fortiori here. If the Governor's access requirement—applied to deny two specific reporters access across the entire State Executive Branch—did not constitute a sufficiently severe adverse action to support a retaliation claim, then neither could the Department's modest and generally applicable escort requirement. And any claim of genuine chill from the escort requirement is impossible to reconcile with this Court's recognition in *Ateba* of the minor inconvenience that such a requirement imposes—or with the fact that escort requirements and other access restrictions are common across non-public, secure government buildings.

Thus, it is unsurprising that plaintiffs do not assert that they—or, for that matter, any other journalist subject to the escort requirement—have "cower[ed] silently" in the face of the requirement. *Wilson*, 595 U.S. at 479. To the contrary, plaintiffs and other Pentagon Press Corps reporters have continued to engage in gathering and publishing the news as they did before, "despite the inconvenience" of the escort requirement. *Baltimore Sun*, 437 F.3d at 419. That inconvenience thus does not give rise to the requisite genuine chill that would be required to support plaintiffs' retaliation claim.

3. In nonetheless concluding that the escort requirement is a material adverse action sufficient to chill an ordinary journalist, the district court did not dispute that the requirement is a neutral, generally applicable restriction on access to the Pentagon. Nor did the court cite precedent recognizing retaliation claims in the context of challenges to analogous generally applicable regulations. Nor did the court identify any journalist who has chosen, or would choose, to self-censor in light of the escort requirement.

Instead, the district court concluded that the requirement constitutes adverse action sufficient to deter a journalist from engaging in expressive activity almost entirely because, in the court's view, the requirement "encumber[s]" or "burden[s]" journalists' ability to engage in their newsgathering. J.A. 20-24. That is so, according to the court, because the requirement may foreclose journalists from engaging in "spontaneous conversations" with Department staff and "develop[ing] relationships with sources." *Id.*

In focusing on that general encumbrance, rather than any propensity for the requirement to chill journalists' speech, the district court applied the wrong test. The extent to which the government's regulation of access to a forum burdens the speech occurring within that forum might be relevant to a

right-of-access claim. But it is not relevant to a retaliation claim, which asks not whether the government's regulation of the forum is unconstitutional in the first instance but instead whether the government's otherwise constitutional regulation was impermissibly adopted to punish plaintiffs for their speech.

In other words, the relevant question is whether plaintiffs have been "singled out" and "punish[ed]" "in retaliation for" their expressive activity, *Tao v. Freeh*, 27 F.3d 635, 639 (D.C. Cir. 1994) (quotation omitted)—and have been punished so severely that the prospect of such punishment would "deter a person of ordinary firmness" from "speaking again," *Aref*, 833 F.3d at 258 (quotation omitted). Here, even the discriminatory application of an escort requirement could not deter an ordinary journalist from engaging in his normal reporting, as explained. But regardless, the neutral application of that requirement to all journalists plainly does not reflect a retaliatory singling out that would cause an ordinary journalist to refrain from reporting that the Department does not like.

The district court's approach was particularly problematic in the context of a non-public forum like the Pentagon. As explained, there is no dispute that the Department may heavily restrict—or even bar altogether—

access to the Pentagon, so long as it does so in a reasonable and viewpoint-neutral fashion. The minor burdens on journalists' newsgathering activities that the escort requirement entails would thus be plainly constitutional as a substantive matter, and the court did not conclude otherwise. By allowing plaintiffs to leverage those minor burdens—rather than any potential for actual self-censorship—as the basis for their retaliation claim, the court effectively allowed them to sidestep the substantive requirements that should govern their First Amendment claim. And the court concluded that the First Amendment had been violated in the absence of any actual or potential inhibition of journalists' expressive choices. *Cf. Crawford-El v. Britton*, 523 U.S. 574, 588 n.10 (1998) ("The reason why such retaliation offends the Constitution is that it threatens to inhibit exercise of the protected right."). That result impermissibly undermines the Department's unquestioned and substantial authority to regulate access to a secure government facility like the Pentagon.

**B. There Is Not the Requisite Causal Link Between Plaintiffs' Protected Activity and the Escort Requirement**

In any event, plaintiffs have not properly established that their expressive activity caused the Department to adopt the escort requirement.

As the Supreme Court has explained, to make that showing, a party claiming unconstitutional retaliation must demonstrate that "the impetus to retaliate" is "the but-for cause" of the official action. *Hartman v. Moore*, 547 U.S. 250, 260 (2006). Plaintiffs cannot meet that burden.

1. The record establishes the Department adopted the escort requirement to further its important interest in preventing the unauthorized disclosure of classified and other sensitive materials—not out of some desire to retaliate against plaintiffs (or other journalists) for their expressive activity. Start with the March Policy itself. That policy is devoid of any indication that it was issued in retaliation for journalists' protected conduct. To the contrary, it explains that the Department adopted the March Policy (including the escort requirement) generally to "preserv[e] the Department's legitimate security interests and its statutory obligation to ensure the safe, efficient, and secure operation of the Pentagon" in the face of the district court's vacatur of the October Policy's requirements. J.A. 89. And the text of the policy reflects the Department's nonretaliatory conclusion that "unescorted access to the Pentagon cannot be responsibly maintained" in light of the district court's vacatur of requirements that the Department

viewed as allowing it to effectively "screen PFAC holders for security risks."

J.A. 90.

That nonretaliatory impetus is further bolstered by the evidence in the record, in which the relevant Department official has explained the Department's reasons for adopting the escort requirement. As the record reflects, before adoption of the escort requirement, the Department concluded that journalists' previous unescorted access had meaningfully contributed to the regular unauthorized disclosures of classified and sensitive information that pre-dated the October Policy. In particular, the Department determined that journalists had been able to use their sweeping access to loiter in key areas of the Pentagon, observing activity around extremely sensitive spaces such as the Joint Chiefs of Staff's working space and using those observations to better hone their efforts to induce unauthorized disclosures of sensitive information. And consistent with that determination, the Department experienced a dramatic decline in journalists' obtaining classified and sensitive information after the October Policy, when many journalists ceased physically accessing the Pentagon. *See generally* J.A. 421-22.

Based on that experience, the Department determined that continuing to permit "unescorted access to the Pentagon for PFAC holders" would likely lead to the "same pattern of regular breaches of information security" that the Department had observed before the October Policy. J.A. 423. The escort requirement was "specifically designed to address this assessment of risks to the security of information in the Pentagon, and thus to the nation's security." *Id.* Nothing about that reasonable explanation bespeaks any retaliatory animus against plaintiffs.

In addition, the March Policy's timing further bolsters the Department's explanation. As explained, the March Policy was issued on March 23, the first business day after the district court vacated the Department's previous October Policy. The natural inference from that timing is that (as the March Policy says) the impetus for the policy was the vacatur itself and the Department's determination that it was necessary to respond to the vacatur by revising its requirements to "comply with the Court's order while preserving the Department's legitimate security interests." J.A. 89. As this Court has confirmed, that desire reflects a legitimate policymaking determination: "an agency may respond to an adverse ruling by adopting a revised policy," *New York Times Co. v. U.S.*

*Dep't of Def.*, 2026 WL 1179440, at *3 (D.C. Cir. Apr. 27, 2026) (per curiam). By contrast, the timing undermines the district court's inference that the impetus for the policy was some desire to retaliate against plaintiffs for some unspecified previous (perhaps weeks- or months-old) reporting.

Finally, the relevant nonretaliatory basis for the escort requirement is only confirmed by the contours of the policy and its implementation. As explained, there can be no reasonable dispute that the policy—both on its face and in its implementation—neutrally applies to all journalists holding PFACs, regardless of the substance of their previous reporting. And it is undisputed that the need to arrange an escort has not actually prevented any journalist, including plaintiffs, from accessing the Pentagon. It is a strange form of retaliation indeed that adopts neutral and minimally burdensome requirements applicable to all reporters.

That conclusion is particularly evident given the district court's apparent theory of retaliation in this case. For one, the court's view was not that plaintiffs' specific speech caused the Department to adopt the escort requirement but rather than the requirement reflects a desire to retaliate against the "legacy" media generally. J.A. 25. But on that theory, plaintiffs themselves would still be subject to the escort requirement today even if

40

their own speech had been entirely in keeping with the Department's putative wishes. Plaintiffs' speech thus was not, even on the district court's own theory, a but-for cause of the Department's adoption of the requirement.

Relatedly, the district court's theory and relief would lead to an anomalous result. On the court's reasoning, a subset of journalists—plaintiffs and potentially other "legacy" media—must be exempted from the neutral, generally applicable escort requirement, but other journalists and media organizations could not bring a retaliation claim and could not receive a similar exemption. In other words, the court has employed the First Amendment has a vehicle for providing some journalists court-ordered special treatment based on their previous speech. That result turns the First Amendment on its head.

2. The district court's reasons for disregarding this nonretaliatory explanation in favor of the court's supposition that the escort requirement reflects a retaliatory impetus do not withstand scrutiny on their own terms. And they certainly do not provide any firm basis to overcome the "presumption of agency regularity that [courts] do not lightly discard," which properly attaches to the Department's own explanation for its adoption of the escort requirement. *Media Matters for Am. v. FTC*, 2025 WL 2988966, at *9

41

(D.C. Cir. Oct. 23, 2025) (per curiam) (quotation omitted). *But see* J.A. 33 (district court explaining that it "has questioned whether such a presumption continues to exist" for the Trump Administration).

a. In the main, the district court focused on various "statements by Department officials expressing disdain for reporting by The Times and other 'legacy' media outlets." J.A. 25-26. But the Department—like any other speaker—is entitled to express its disagreement with reporting by the Times and other outlets. And the court failed to identify any nexus between the statements and the escort requirement specifically. To the contrary, the identified statements come from many different officials, including speakers (like the President) who the court did not conclude had any role in the development or implementation of the escort requirement at all. *See id.* The statements are spread out across a full year, with the court cherry-picking statements months apart (and up to a full year before the escort requirement's adoption) as evidence of some overwhelming animus. *See id.* And not a single statement cited by the court itself references the March Policy or the escort requirement or otherwise connects the Department's purported animus to the adoption of this specific policy. *See id.*

Beyond that, the district court's theory of retaliation based on these statements is illogical—again, the escort requirement does not apply only to "The Times and other 'legacy' media outlets," J.A. 25-26, but instead to all journalists holding PFACs who wish to access the Pentagon. The court nowhere persuasively explained how such a neutral policy applicable to all media outlets is most logically explained by a desire to retaliate against some specific media outlets—rather than by the Department's own explanation regarding the need to mitigate security risks posed by unescorted journalists generally.

The district court's reliance on general statements unconnected to the escort requirement to find the requisite retaliatory animus also leads to untenable conclusions. Indeed, if the court's analysis were correct, the New York Times (or any other "legacy" outlet) could rely on these same statements to bring a First Amendment retaliation claim against the Department's decision to adopt *any* new regulation of the press within the Pentagon—even (as here) a neutral, minimally burdensome access regulation. That outcome does not comport with the reality of the Department's substantial national-security interest in the orderly operation

43

of the Pentagon (and the safeguarding of sensitive information) or with the Pentagon's undisputed status as a non-public forum.

That is particularly true given the combination of the district court's reliance on these statements and its separate view that minimal burdens on newsgathering sufficed to turn the escort requirement into a material adverse action susceptible to a retaliation claim. Taking those two prongs of the court's analysis together, the court has effectively provided plaintiffs and other legacy media outlets with a "per se right of access to" the Pentagon because "such access might lead to more thorough or better reporting"—a right that the First Amendment does not recognize. *Flynt v. Rumsfeld*, 355 F.3d 697, 703 (D.C. Cir. 2004) (quotation omitted).

b. Beyond the various statements it catalogues, the district court also expressed its view that the timing and content of the national-security explanation offered by the Pentagon supported the conclusion that the explanation was a pretext for retaliatory animus. The court's views on this point are similarly unpersuasive.

At the outset, the district court expressed skepticism about the national-security explanation offered by the Department, believing that explanation was "conspicuously absent" from the March Policy. J.A. 28. But

the court's skepticism is misplaced. As explained, the March Policy itself articulates the basic national-security rationale underlying the escort requirement: the Department has determined that journalists' "unescorted access to the Pentagon cannot be responsibility maintained" given the Department's inability to effectively screen journalists "for security risks." J.A. 90. Thus, the Department concluded that the requirement (along with the rest of the March Policy) is needed to "preserv[e] the Department's legitimate security interests and its statutory obligation to ensure the safe, efficient, and secure operation of the Pentagon." J.A. 89.

In litigation, the Department has simply explained the detailed bases for its conclusion about the security risks of unescorted access reflected in the March Policy. Thus, the Department has provided specific information about its experience with the dramatic reduction in disclosures of classified and sensitive information since the October Policy, about its conclusion that the reduction was connected to journalists' no longer being physically present in the Pentagon, and about some of the specific ways in which it believes that journalists previously leveraged their unescorted access to obtain classified and sensitive information. *See* J.A. 421-22. Nor did the district court identify anything impermissible about the Department's

offering declarations in this litigation to flesh out those specific national-security concerns. Indeed, the March Policy itself is a short internal memorandum accompanied by a briefing for media members to explain the contours of the new policy to them. *See* J.A. 89-106. It would have been strange indeed for the Department to include within that relatively short informative document every empirical and logical basis for each conclusion reflected in the policy. And this Court has already credited the same general explanation similarly offered through litigation affidavits in determining to grant a stay of the previous injunction. *See New York Times*, 2026 WL 1179440, at *2.

Nor has the district court identified any material inconsistency between the explanation in the March Policy and the more complete explanation offered in litigation, as might cause a court to reasonably question the sincerity of the Department's explanation. To the contrary, the Department's explanation in litigation has simply elaborated on the specific security interests at stake that were referenced in more general terms in the underlying policy. That elaboration adds to, rather than retreats from, the Department's initial explanation.

And the district court's specific criticism about the connection between the October Policy and the March Policy is unavailing. In the court's view, the Department's explanation that the escort requirement helps to "fill the gap created" by the court's initial order is inherently suspect because the rest of the March Policy "do[es] the same thing" as the October Policy. J.A. 30 (quotation omitted). But that does not logically follow. For one, the March Policy is not identical to the October Policy, even with respect to the policies' overlapping requirements for maintaining PFACs. And more importantly, as the record reflects, the Department's experience with the October Policy independently led it to conclude that there was a connection between journalists' previous unescorted physical presence within the Pentagon and journalists' obtaining classified and other highly sensitive information. *See* J.A. 421-22. Thus, even standing on its own, the escort requirement furthers important interests in safeguarding classified and sensitive information, without regard to how effective the October and March Policies' inducement or solicitation restrictions may be. In other words, any "gap[s] created" by the district court's original order may have exacerbated the need for the escort requirement, J.A. 30 (quotation omitted), but it does not follow that

the existence of a gap was a necessary precondition for the Department's decision to adopt the requirement.

The district court's view (at J.A. 30-31) that the Department's conclusions were unreasonable provides no firmer basis for its determination of pretext. As an initial matter, even if the Department's explanation were unreasonable, that would not itself establish the requisite retaliatory animus.

Regardless, the Department's high-level concerns about the connection between unescorted access and unauthorized disclosures are sensible on their face. For one, the Department's concerns were based not on bare speculation but instead on its actual experience. The record reflects that PFAC holders previously regularly obtained classified, controlled, and other highly sensitive information—"often monthly, and sometimes multiple times per month." J.A. 421. And the record reflects that the frequency of such unauthorized disclosures "dropped dramatically" when many journalists surrendered their PFACs after adoption of the October Policy. J.A. 422. It was plainly reasonable for the Department to rely on that actual experience in concluding that there was a link between journalists' ability to wander the Pentagon unescorted and their ability to obtain the highly sensitive information known or contained in the building.

And that conclusion makes sense. It is not hard to imagine how a journalist might leverage his unescorted access to observe activity in sensitive areas and thereby to develop leads and pursue access to classified or sensitive information that Department personnel are not permitted to disclose. Indeed, consistent with that reality, escort requirements and other access restrictions are common in federal (and other) buildings, as explained. The Supreme Court, for example, maintains extensive non-public areas around the Justices' chambers where journalists are, of course, not free to wander unescorted or loiter in hopes of picking up non-public information. The Department's adoption of a similar modest escort requirement is plainly aimed at similarly reducing the potential unauthorized disclosure of sensitive information.

Indeed, it is reasonable to presume that at least some Justices support the Court's policy in part *because* they do not want the press to find and report non-public information—at minimum, it would not take much for a reporter to plausibly allege that motive, and also to identify a few statements by Justices criticizing leaks of decisions and press coverage more generally. Under the district court's breathtaking rationale, that would suffice to obtain

a preliminary injunction allowing the press to roam free within the Supreme Court.

The district court's conclusion on this score is only further undercut by its reliance on plaintiffs' assertion that they specifically have not "obtained less nonpublic information since the October Policy was put in place." J.A. 31. Even if true, that assertion undermines plaintiffs' suggestion that the requirement would chill a reasonable journalist. But more to the point, it entirely fails to refute the Department's explanation. Plaintiffs' assertions about their own reporting do not speak to journalists as a whole, and the Department has explained that it experienced a "dramatic[]" drop in the frequency with which it learned of journalists' receiving "sensitive, controlled or classified information" after it imposed access restrictions. J.A. 422. Plaintiffs have offered no on-point contrary evidence.

Moreover, it should be obvious that not all "nonpublic information" is created equal. The escort requirement grew out of specific concerns about the frequency with which "[c]ontrolled unclassified information and classified information reached journalists." J.A. 421. The Department's concern about disclosures of this highly sensitive information occurring "monthly, and sometimes multiple times per month," *id.*, plainly is not an undifferentiated

concern with all "scoops" of "non-public information," J.A. 475-76 (quotation omitted)—notwithstanding the Department's short-hand use of "sensitive" to describe the relevant information, *contra* J.A. 31 n.7. Plaintiffs' general assertions about "non-public information" thus do not negate the Department's conclusions. And they certainly do not provide any basis for finding that the Department's explanation was nothing more than a pretext for retaliatory animus.

No more probative of animus is the fact that other civilian employees—such as cafeteria workers—are not subject to the same requirements, despite the district court's emphasis (at J.A. 32) of this point. As explained, the Department adopted the escort requirement against its background experience of journalists' regularly obtaining classified and other sensitive information through unauthorized disclosures. There is no record evidence to suggest any similar pattern of disclosures to cafeteria workers, baristas, or other authorized non-Department employees who are permitted to access the Pentagon without an escort. And, of course, that makes sense. The entire premise of plaintiffs' suit is that they seek to develop sources, pursue non-public information, and engage in reporting such information to the public. It is thus no surprise that the Department would be more concerned about the

possibility of journalists' using their unescorted access to seek out classified or sensitive information than cafeteria workers' doing the same.

Finally, the district court's concerns regarding the timing of the March Policy are unfounded. Although the court (at J.A. 33) seemed to think that the release of the policy immediately after the court's previous injunction suggested that the policy was intended to retaliate against plaintiffs for bringing their first suit, that is incorrect. As explained, *see supra* pp. 39-40, "an agency may respond to an adverse ruling by adopting a revised policy." *New York Times*, 2026 WL 1179440, at *3; *cf. Department of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 21 (2020) (explaining that the government may "tak[e] *new* agency action" to "deal with the problem afresh" when a policy is invalidated (quotation omitted)). Such responsive agency action does not typically reflect retaliation against the original plaintiff for bringing her lawsuit, and it would impermissibly paralyze agency decisionmakers to allow plaintiffs to assert retaliation claims against neutral policies simply because they come in response to judicial orders.

## II. The Equitable Considerations Do Not Support the District Court's Preliminary Injunction

The preliminary injunction requires the Department to allow plaintiffs to roam the Pentagon unescorted—access that no other journalists have, that

the First Amendment plainly does not require as a substantive matter, and that the Department has determined may lead to serious breaches of the national security. At the same time, plaintiffs have asserted that despite the new policy—and despite having no unescorted access to the Pentagon for months—they have continued to carry out their journalistic activities essentially as before. The equitable factors thus independently dictate that the injunction should be vacated. *Cf. Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (per curiam) ("As a matter of equitable discretion, a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits.").

### A. Plaintiffs Have Not Demonstrated the Requisite Irreparable Harm

To obtain a preliminary injunction, a plaintiff must "clear a high standard" and identify an irreparable injury that "is both certain and great." *Alpine Secs. Corp. v. Financial Indus. Regul. Auth.*, 121 F.4th 1314, 1332 (D.C. Cir. 2024) (alteration and quotation omitted). That injury must be "sufficiently serious that there is a clear and present need for equitable relief on an expedited timeline and without the benefit of full factual development and hurried consideration of legal questions." *Id.* (quotation omitted). Here, plaintiffs' own averments regarding the limited effect of any physical access

restrictions—much less the minimally burdensome escort requirement—on their ability to engage in their reporting activities prevents them from making that showing.

1. At the outset, plaintiffs have failed to demonstrate any concrete irreparable harm to their newsgathering activities from the escort requirement. As explained, it is undisputed that neither plaintiffs nor any other PFAC holder has been denied requested access to the Pentagon because of the escort requirement. *See* J.A. 393-94. Barnes himself has declared that, even after implementation of the escort requirement, he has retained his "ability to report stories that rely on non-public information." J.A. 467. Indeed, according to plaintiffs, when they chose to stop physically accessing the Pentagon altogether after the October Policy, they "broke on average *more* stories about the Department based on non-public information" than they had before. J.A. 476. The escorted access that plaintiffs now enjoy can only further facilitate their newsgathering activities.

Given plaintiffs' own description of their previous reporting practices, it is clear that the escort requirement does not inflict any certain and great irreparable harm on plaintiffs' activities. And that conclusion coheres with this Court's previous explanation that a journalist was not substantially

harmed by delays in obtaining a pass that would afford him unescorted access to the White House because he could obtain escorted access in the interim. *Ateba*, 133 F.4th at 117, 127.

In nonetheless concluding that plaintiffs had demonstrated some sufficiently serious "burden[ on] their ability to engage in newsgathering," the district court improperly elevated plaintiffs' generalized complaints about the ability to "interact[] with sources" and "freely pursue journalistically productive conversations." J.A. 34 (quotation omitted). In the end, those complaints reduce to the proposition that the escort requirement is assertedly "logistically burdensome." J.A. 464. But plaintiffs' own experience demonstrates that those minor logistical burdens do not reflect serious and great harm to their actual journalistic activities.

2. The district court's conclusion that plaintiffs had demonstrated the requisite irreparable injury based on the abstract "loss of First Amendment freedoms," J.A. 33 (quotation omitted), fares no better. The mere "invocation" of a constitutional right "cannot substitute for the presence of an imminent, non-speculative irreparable injury." *Google, Inc. v. Hood*, 822 F.3d 212, 228 (5th Cir. 2016). Instead, a plaintiff must demonstrate that the asserted impairment of his constitutional right inflects an immediate and

significant real-world injury. *Cf. John Doe Co. v. CFPB*, 849 F.3d 1129, 1135 (D.C. Cir. 2017) (per curiam) (explaining that an asserted constitutional separation-of-powers violation "by itself is not invariably an irreparable injury" without "immediate or ongoing harm stemming from the" alleged constitutional defects (quotation omitted)). And although the Supreme Court has said that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," that was in the context of evaluating just such a concrete real-world inhibition of the plaintiffs' First Amendment rights: the plaintiffs in that case had demonstrated that they been coerced into actually "provid[ing] support for the Democratic Party in order to avoid discharge" from government employment. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Here, unlike in *Elrod* and its progeny, plaintiffs have failed to make the requisite showing. Plaintiffs have not demonstrated any "ongoing adverse effects" to their rights; they have not, for example, claimed any "current self-censorship in their reporting." *Media Matters for Am. v. Paxton*, 138 F.4th 563, 585 (D.C. Cir. 2025). To the contrary, as explained, plaintiffs have stated that they have continued to engage in the same—indeed, in more—reporting of non-public information notwithstanding the limitations on their access.

That experience does not reflect any concrete, imminent, or great burden on plaintiffs' First Amendment rights; it instead reflects a simple complaint about minor logistical burdens. *Cf. Anthropic PBC v. U.S. Dep't of War*, 2026 WL 1042493, at *3 (D.C. Cir. Apr. 8, 2026) (per curiam) (explaining that party's claim of "ongoing harms from retaliation for its constitutionally protected speech" reduced to "primarily financial" interests insufficient to support a stay pending review, in large part because the party did "not show that its speech has been chilled during the pendency of th[e] litigation").

The insufficiency of that claim is only underscored by the district court's failure to conclude that those minor administrative burdens themselves violate the First Amendment's substantive standards. Indeed, to the contrary, there is no dispute that plaintiffs (like all other members of the public) have no freestanding First Amendment right to access—much less to access unescorted—secure federal buildings like the Pentagon. They thus do not suffer any serious constitutional harm from being provided restricted access on the same terms as all other journalists.

### B. The Balance of Harms and the Public Interest Weigh Against a Preliminary Injunction

Even if plaintiffs had been able to demonstrate some irreparable harm, none of those asserted harms could outweigh the significant harm to the

government and the public occasioned by the preliminary injunction. *See Nken*, 556 U.S. at 435 (noting that the balance of the equities and the public interest merge in cases involving the government).

1. The injunction threatens substantial injuries to the government and the public. The injunction compels the Department to allow plaintiffs to roam the Pentagon unescorted, notwithstanding the Department's judgment that continuing to allow that kind of unfettered physical access poses national-security risks by threatening the unauthorized disclosure of classified and other highly sensitive information. As this Court has recognized, courts should "not lightly override the Department's judgments on matters involving national security." *Anthropic PBC*, 2026 WL 1042493, at *3; *see also Center for Nat'l Sec. Stud. v. U.S. Dep't of Just.*, 331 F.3d 918, 927 (D.C. Cir. 2003) ("[W]e have consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review.").

Here, the record reflects that the Department's changes in its access policy were made in response to concrete concerns about the frequency with which sensitive information, including highly classified national defense information, was reaching journalists. J.A. 421-22. The Department

concluded that regular, unauthorized dissemination of such information "posed serious risks to national security." J.A. 423. And "restoring unescorted access to the Pentagon for PFAC holders" will, in the Department's judgment, "result in a return to the same pattern of regular breaches of information security that that unescorted access had previously permitted." *Id.* Indeed, this Court has already twice concluded that the Department's interests in safeguarding sensitive and classified information from unauthorized disclosure suffice to support the entry of interim relief. *See* Order 1 (July 16, 2026); *New York Times*, 2026 WL 1179440, at *2.

The harms associated with the injunction are exacerbated because the Department unquestionably has statutory authority to impose restrictions to ensure the Pentagon's security. *See* 10 U.S.C. § 2674. The Department's "evaluation of the facts" and determination that the escort requirement is necessary to help safeguard the security of sensitive information within the Pentagon "is entitled to deference." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-35 (2010) (deferring to the political branches' national-security judgment even in the context of a First Amendment claim warranting strict scrutiny). And the harm from the district court's failure to give proper deference to the Department's national-security judgments is especially

consequential because the interest in ensuring the nation's security "is an urgent objective of the highest order." *Id.* at 28. Even beyond that, the preliminary injunction, which prohibits the Executive Branch from carrying out lawful authority, imposes an inherent irreparable harm by working "an improper intrusion by a federal court into the workings of a coordinate branch of the Government." *Immigration & Naturalization Serv. v. Legalization Assistance Project of the L.A. Cnty. Fed'n of Lab.*, 510 U.S. 1301, 1305-06 (1993) (O'Connor, J., in chambers).

2. In assessing these important harms, the district court did not conclude that the Department's concerns regarding reporters' ability to access classified, controlled, or other highly sensitive information were unfounded. Nor did the court question the Department's explanation of the grave harms that may occur when such information is publicly disclosed without proper authorization. Nor did the court conclude that plaintiffs' asserted interests outweigh those harms if those harms are taken on their own terms.

Instead, the district court concluded that the public interest and balance of the equities favored a preliminary injunction only by disregarding the government's articulated interests on the ground that the government

60

"may not act unlawfully even in pursuit of desirable ends." J.A. 35 (quotation omitted). In other words, because the court concluded at this preliminary stage that the escort requirement is likely unlawful, the court also concluded that the Department could not have legitimate interests in implementing the requirement for purposes of the equitable balancing.

That mode of analysis was inconsistent not only with the inherently tentative nature of a merits determination at the preliminary relief stage but also with Supreme Court precedent. As *Winter* explained, the preliminary injunction framework requires distinct merits and equities showings—and, in all cases, courts are required to "balance the competing claims of injury" and "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." 555 U.S. at 24 (quotation omitted). And indeed, in *Winter* itself, the Supreme Court declined to "address the lower courts' holding that plaintiffs" had "established a likelihood of success on the merits." *Id.* at 23-24. Nonetheless, the Court ultimately reversed the lower courts' entry of a preliminary injunction, concluding "that the balance of equities and consideration of the overall public interest" weighed in favor of the government—notwithstanding the Court's acceptance of the lower

61

courts' conclusion that the agency action in question was likely unlawful. *Id.* at 26.

At most, a determination that the escort requirement is likely unlawful may undermine the sovereign harm the government would otherwise experience from its inability to implement the requirement. *Cf. Maryland v. King*, 567 U.S. 1301, 1302-03 (2012) (Roberts, C.J., in chambers). But Supreme Court precedent does not permit the district court to erase the tangible national-security harms experienced by the government and the public when classified and controlled information is improperly disclosed. Nor can the district court erase the substantial harm to the public interest generated by its preliminary injunction's turning the First Amendment on its head and requiring the government to provide preferential treatment to plaintiffs by exempting them from the access restrictions that apply to all other PFAC-holding journalists. Those interests must be weighed against plaintiffs' alleged harms. And when that balance is properly conducted, it is clear that plaintiffs have failed to demonstrate entitlement to preliminary relief.

## CONCLUSION

For the foregoing reasons, the district court's preliminary injunction should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney*
  *General*


BRAD HINSHELWOOD
JACK STARCHER

 */s/ Sean R. Janda*
SEAN R. JANDA
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3388*
  *sean.r.janda@usdoj.gov*

August 2026

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,105 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in CenturyExpd BT 14-point font, a proportionally spaced typeface.

/s/ Sean R. Janda
Sean R. Janda