**[ORAL ARGUMENT NOT YET SCHEDULED]**

**No. 26-5253**

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

NEW YORK TIMES COMPANY, et al.,

Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF DEFENSE, also known as DEPARTMENT OF WAR, et al.,

Defendants-Appellants.

On Appeal from the United States District Court for the District of Columbia

# JOINT APPENDIX

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

BRAD HINSHELWOOD
JACK STARCHER
SEAN R. JANDA
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3388*

# TABLE OF CONTENTS

**Page**

District Court Order (June 30, 2026), Dkt. No. 16 ........ J.A. 1

District Court Opinion (June 30, 2026), Dkt. No. 17 ........ J.A. 3

Complaint with Exhibits (May 18, 2026),
- Complaint, Dkt. No. 1 ........ J.A. 38
- Exhibit 1: March Policy, Dkt. No. 1-1 ........ J.A. 88
- Exhibit 3: October Policy, Dkt. No. 1-3 ........ J.A. 107
- Exhibit 7: Press Release, Dkt. No. 1-8 ........ J.A. 129
- Exhibit 8: Press Briefing Transcript, Dkt. No. 1-9 ........ J.A. 134
- Exhibit 9: YouTube Video, Dkt. No. 1-10 ........ J.A. 149
- Exhibit 10: YouTube Video, Dkt. No. 1-11 ........ J.A. 151
- Exhibit 11: Associated Press Article, Dkt. No. 1-12 ........ J.A. 153
- Exhibit 13: Cam Higby Social Media Post, Dkt. No. 1-14 ........ J.A. 159
- Exhibit 14: Washington Post Article, Dkt. No. 1-15 ........ J.A. 161
- Exhibit 15: New York Times Article, Dkt. No. 1-16 ........ J.A. 166
- Exhibit 17: Scott Nover Social Media Post, Dkt. No. 1-18 ........ J.A. 175
- Exhibit 19: Sean Parnell Social Media Post, Dkt. No. 1-20 ........ J.A. 177
- Exhibit 20: Associated Press Article, Dkt. No. 1-21 ........ J.A. 179
- Exhibit 21: New York Times Article, Dkt. No. 1-22 ........ J.A. 182
- Exhibit 22: CBS News Article, Dkt. No. 1-23 ........ J.A. 187
- Exhibit 23: Washington Post Article, Dkt. No. 1-24 ........ J.A. 197
- Exhibit 24: Secretary Hegseth Social Media Post, Dkt. No. 1-25 ........ J.A. 210
- Exhibit 25: New York Times Article, Dkt. No. 1-26 ........ J.A. 212
- Exhibit 30: PBS NewsHour Video, Dkt. No. 1-31 ........ J.A. 222
- Exhibit 31: Politico Article, Dkt. No. 1-32 ........ J.A. 224
- Exhibit 33: Spectrum News Article, Dkt. No. 1-34 ........ J.A. 231
- Exhibit 34: PBS Article, Dkt. No. 1-35 ........ J.A. 235
- Exhibit 35: Secretary Hegseth Social Media Post, Dkt. No. 1-36 ........ J.A. 239
- Exhibit 36: Sean Parnell Social Media Post, Dkt. No. 1-37 ........ J.A. 241
- Exhibit 37: The Columbian Article, Dkt. No. 1-38 ........ J.A. 243

Exhibit 39: Memorandum for Resident and Visiting Press Assigned to the Pentagon (May 23, 2025), Dkt. No. 1-40 ........J.A. 246
Exhibit 41: Sean Parnell Social Media Post, Dkt. No. 1-42..........J.A. 249

Exhibits to Preliminary Injunction Motion (May 22, 2026),
Exhibit 1: New York Times Article, Dkt. No. 6-3 .........................J.A. 251
Exhibit 2: TIME Article, Dkt. No. 6-4...........................................J.A. 257
Exhibit 3: Alfred Goldberg, The Pentagon: The First Fifty Years (1992), Dkt. No. 6-5...............................................J.A. 261
Exhibit 4: The Atlantic Article, Dkt. No. 6-6 .................................J.A. 273
Exhibit 5: RealClear Politics Article, Dkt. No. 6-7........................J.A. 285
Exhibit 6: Requirements and Procedures for Issuing Supreme Court Press Credentials, Dkt. No. 6-8 ......................J.A. 289
Exhibit 7: Pentagon -- Air Force: Installation Details, Dkt. No. 6-9...............................................J.A. 293
Exhibit 8: U.S. Army: Your Guide to the Pentagon, Dkt. No. 6-10 ....................................................J.A. 296
Exhibit 9: Transcript of Press Briefing, Dkt. No. 6-11.................J.A. 303
Exhibit 10: Parlatore Law Group Website, Dkt. No. 6-12 ...........J.A. 320
Exhibit 11: New York Times Article, Dkt. No. 6-13 .....................J.A. 331
Exhibit 12: New York Times Article, Dkt. No. 6-14 .....................J.A. 339
Exhibit 13: New York Times Article, Dkt. No. 6-15 .....................J.A. 347
Declaration of Julian E. Barnes, Dkt. No. 6-17 .............................J.A. 354
Declaration of Robert Burns, Dkt. No. 6-18 ..................................J.A. 365
Declaration of Chris Meagher, Dkt. No. 6-19 ...............................J.A. 374
Declaration of Pete Williams with Exhibit, Dkt. Nos. 6-20 and 6-21 ..............................................................J.A. 381

Exhibits to Preliminary Injunction Opposition (June 4, 2026),
Exhibit 2: Declaration of Joel Manuel Valdez, Dkt. No. 11-2 ......J.A. 391
Exhibit 3: Declaration of Sean Parnell, Dkt. No. 11-3..................J.A. 419

Exhibits to Preliminary Injunction Reply (June 9, 2026),
Exhibit 1: Max Frankel 1971 Affidavit, Dkt. No. 12-2..................J.A. 425
Exhibit 2: New York Times Article, Dkt. No. 12-3........................J.A. 444
Exhibit 6: Washington Post Article, Dkt. No. 12-7 .......................J.A. 458
Supplemental Declaration of Julian E. Barnes, Dkt. No. 12-8 ....J.A. 463
Declaration of Richard W. Stevenson, Dkt. No. 12-9....................J.A. 469

Notice of Appeal (July 2, 2026), Dkt. No. 18 .......... J.A. 478

Docket Sheet .......... J.A. 479

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE NEW YORK TIMES COMPANY, et al., Plaintiffs, v. DEPARTMENT OF DEFENSE, et al., Defendants. | ) | Civil Action No. 26-1690 (PLF) |

ORDER

For the reasons set forth in the Opinion issued this same day, it is hereby

ORDERED that Plaintiffs' Motion for a Preliminary Injunction [Dkt. No. 6] is GRANTED; it is

FURTHER ORDERED that Defendants are preliminarily enjoined from implementing or enforcing the following provisions of the policy pertaining to Pentagon Facilities Alternate Credentials ("PFACs") that was issued by the Department of Defense on March 23, 2026 as a revised "Pentagon Reservation In-Brief for Media Members" ("In-Brief") attached to a Memorandum for Senior Pentagon Leadership entitled "Implementation of Revised Media In Brief" (collectively, the "Interim Policy") [Dkt. No. 1-1] against Mr. Barnes or any persons who hold, will hold, or will apply for a PFAC, who are employed by, working on behalf of, or otherwise associated with The New York Times:

- The escort requirement and related access limitations set forth on pages 2-3 of the In-Brief, under the heading "New Media Physical Security Restrictions on the Pentagon

Reservation," to the extent not currently enjoined by New York Times Co. v. Department of Defense ("NYT II"), Civil Action No. 25-04218 (PLF), 2026 WL 962252 (D.D.C. Apr. 9, 2026); and

- The section on pages 4-5 of the In-Brief under the heading "Escort Privileges and Procedures," to the extent not currently enjoined by NYT II. It is

FURTHER ORDERED that Plaintiffs shall post a bond in the amount of $1.00 by July 7, 2026.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 6/30/26

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE NEW YORK TIMES COMPANY, et al., Plaintiffs, v. DEPARTMENT OF DEFENSE, et al., Defendants. | Civil Action No. 26-1690 (PLF) |

OPINION

This matter represents the third installment in the ongoing dispute between The New York Times ("The Times") and its journalist Julian E. Barnes, and the Department of Defense (the "Department") under the leadership of Secretary of Defense Pete Hegseth, over the latter's attempt to curtail media access to the Pentagon.[1] This Court previously determined that a

[1] The documents reviewed by the Court in connection with the pending motion include: Complaint for Declaratory and Injunctive Relief ("Compl.") [Dkt. No. 1] and Exhibits [Dkt. Nos. 1-2 to 1-50]; Memorandum for Senior Pentagon Leadership: Implementation of Revised Media In-Brief ("Interim Policy") [Dkt. No. 1-1]; Plaintiffs' Motion for a Preliminary Injunction [Dkt. No. 6] and Exhibits [Dkt. Nos. 6-1 to 6-22]; Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction ("Mem.") [Dkt. No. 6-1]; Declaration of Theodore J. Boutrous, Jr. ("Boutrous Decl.") [Dkt. No. 6-4]; Declaration of Julian E. Barnes ("Barnes Decl.") [Dkt. No. 6-17]; Declaration of Robert Burns ("Burns Decl.") [Dkt. No. 6-18]; Declaration of Chris Meagher ("Meagher Decl.") [Dkt. No. 6-19]; Declaration of Pete Williams ("Williams Decl.") [Dkt. No. 6-20]; Defendants' Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction ("Opp.") [Dkt. No. 11] and Exhibits [Dkt. Nos. 11-1 to 11-3]; Declaration of Joel Manuel Valdez in Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction ("Valdez Decl.") [Dkt. No. 11-2]; Declaration of Sean Parnell in Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction ("Parnell Decl.") [Dkt. No. 11-3]; Reply Brief in Support of Plaintiffs' Motion for Preliminary Injunction ("Reply") [Dkt. No. 12] and Exhibits [Dkt. Nos. 12-1 to 12-9]; Supplemental Declaration of Theodore J. Boutrous Jr. ("Supp. Boutrous Decl.") [Dkt. No. 12-1]; Supplemental Declaration of Julian E. Barnes ("Supp. Barnes Decl.") [Dkt. No. 12-8]; Declaration of Richard W. Stevenson

press credentialing policy issued by the Department in October 2025 (the "October Policy") violated both the First and Fifth Amendments to the U.S. Constitution. See N.Y. Times Co. v. Dep't of Def. ("NYT I"), Civil Action No. 25-4218 (PLF), 2026 WL 788689, at *12, *18-19 (D.D.C. Mar. 20, 2026). The Court vacated and set aside the unconstitutional provisions of the October Policy, and it entered a permanent injunction barring the Department from implementing or enforcing those provisions "to deny, suspend, revoke, or not renew" the press credentials—known as Pentagon Facilities Alternate Credentials or "PFACs"—of any journalist from The Times. Id. at *20. It also ordered the immediate reinstatement of the PFACs that Times reporters had long held. See id.

The next business day, the Department issued another press credentialing policy (the "Interim Policy").[2] The Interim Policy, among other things, announced that the designated area of the Pentagon from which journalists had long worked—known as the "Correspondents' Corridor"—would be closed effective immediately, meaning that for the first time in decades, journalists would not be permitted to work from Pentagon grounds. See Interim Policy at 3; Boutrous Decl. at Ex. 2. In addition, and of particular relevance here, the Interim Policy announced that going forward, credentialed journalists would be prohibited from entering the Pentagon altogether unless specifically invited to attend a press conference or a prearranged interview—and even then, only if escorted by an authorized Department official at all times. See Interim Policy at 3.

("Stevenson Decl.") [Dkt. No. 12-9]; Defendants' Supplemental Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction ("Defs. Supp. Br.") [Dkt. No. 13]; and Supplemental Brief in Support of Plaintiffs' Motion for Preliminary Injunction [Dkt. No. 14].

[2] The pin cites to the Interim Policy in this opinion correspond to the ECF-generated page numbers of the PDF attached as Exhibit 1 to the Complaint.

The Times quickly moved to compel compliance, arguing that these and other provisions of the Interim Policy flouted the Court's prior opinion and order. After full briefing and a hearing on the plaintiffs' motion, the Court entered an order enjoining the enforcement of the escort requirement and the other challenged provisions of the Interim Policy. See N.Y. Times Co. v. Dep't of Def. ("NYT II"), Civil Action No. 25-4218 (PLF), 2026 WL 962252, at *10-11 (D.D.C. Apr. 9, 2026). The Department then sought and obtained a narrow stay allowing it to implement the Interim Policy's escort requirement while its appeals of this Court's decisions are pending. See N.Y. Times Co. v. U.S. Dep't of Def., No. 26-5113, 2026 WL 1179440, at *1-3 (D.C. Cir. Apr. 27, 2026). In issuing the stay, the D.C. Circuit did not address the lawfulness of the Interim Policy's escort requirement. See id. Instead, a majority of the divided motions panel concluded that the Department was likely to demonstrate that the escort requirement fell outside the scope of this Court's initial merits order, which did not address that requirement. See id. at *3.

In this new lawsuit, the plaintiffs ask the Court to preliminarily enjoin the escort requirement that remains in effect on the grounds that it is retaliatory, unreasonable, and viewpoint discriminatory in violation of the First Amendment and an arbitrary and capricious agency action under the Administrative Procedure Act (the "APA"). See Mem. The Department opposes the plaintiffs' motion. See Opp. The Court held a hearing on the motion on June 12, 2026. Having carefully considered the parties' written submissions, their oral arguments, and the relevant authorities, the Court will grant the plaintiffs' motion for a preliminary injunction.

## I. FACTUAL AND PROCEDURAL HISTORY

### *A. The Long History of the Media and the Pentagon*

For many decades, journalists from news organizations across the country, including reporters with The Times, have covered the United States military and other defense activities from inside the Pentagon. See NYT I, 2026 WL 788689, at *2; Compl. at Ex. 22; Barnes Decl. ¶ 8; Burns Decl. ¶ 3.[3] The enduring presence of media members in the Pentagon "has enhanced the ability of journalists and news organizations to keep Americans informed about the U.S. military while posing no security or safety risk to Department property or personnel," as the Department has acknowledged. NYT I, 2026 WL 788689, at *3.

Credentialed journalists have long enjoyed unescorted access to the Pentagon Press Briefing Room and the corridors linking the many press offices within the building, among other areas. See Barnes Decl. ¶¶ 8-10; Meagher Decl. ¶ 4; Compl. at Ex. 21. This access has come with myriad advantages, including that it has allowed reporters to cover official press briefings, even those called on short notice or without notice, and to ask questions of Department officials before, during, and after those briefings. See Barnes Decl. ¶ 8; Burns Decl. ¶¶ 7-8; Compl. at Ex. 21. The access also has permitted journalists to have organic semiformal and informal conversations with Department officials and personnel. See Barnes Decl. ¶ 9; Burns Decl. ¶¶ 9-11. Journalists from The Times and other media outlets could, for example, "stake out Jim Mattis, a defense secretary in President Trump's first term, when he picked up his clothes at an in-house dry cleaners and have an off-the-record chat as he walked back to his office, shirts slung over his shoulder" or "might bump into the chairman of the Joint Chiefs of

[3] The facts set forth in NYT I were undisputed. See NYT I, 2026 WL 788689, at *2 n.2.

Staff at a Pentagon Starbucks and have a conversation that could turn into a story." Compl. at Ex. 21, Maureen Dowd, Opinion, Fraidy-Cat at the Pentagon, N.Y. TIMES (Oct. 18, 2025). In addition, beginning in the 1970s, the Department provided reporters with dedicated office space in the Pentagon—known as the Correspondents' Corridor—where reporters could maintain desks and network booths. See Boutrous Decl. at Ex. 2; Williams Decl. ¶ 19; Burns Decl. ¶ 5.

To understand the historical ability of journalists to move through the Pentagon unescorted, it is helpful to have some context. The Pentagon is the world's second largest office building, with about six-and-a-half million square feet of floor space. Claudette Roulo, 10 Things You Probably Didn't Know About the Pentagon, U.S. DEP'T OF WAR (Apr. 16, 2024), https://perma.cc/N9GU-ZWDA. It "includes areas that resemble a mall and are often crowded with visitors and non-military employees." Barnes Decl. ¶ 10. "For example, there is a food court, a pharmacy, a sit-down restaurant, a bank, a dry cleaner, and a chocolate shop in the Pentagon." Id. The Pentagon has long been staffed by a thousand or more non-Department employees, including cleaning and maintenance professionals, contractors, consultants, representatives of other government agencies, and retail and cafeteria workers, who move around areas of the building unescorted every day. See Boutrous Decl. at Ex. 3; Meagher Decl. ¶ 5. In short, the Pentagon is not an "all-classified military command post." Burns Decl. ¶ 14.

*B. The Recent History of the Media and the Pentagon*

Pete Hegseth was confirmed as Secretary of Defense on January 24, 2025. See NYT I, 2026 WL 788689, at *2. "Before and during Secretary Hegseth's confirmation process, news outlets, including The Times, reported extensively on his background, including allegations of past sexual assault, excessive drinking, and marital infidelity, as well as questions about his lack of relevant experience." Id. Secretary Hegseth and other Department officials "have

complained openly about reporting that they perceive as unfavorable to them and the Department." Id. Following Secretary Hegseth's confirmation, the Department began taking unprecedented actions with respect to journalists covering the Department and its leadership. Just weeks after the confirmation, for example, the Department announced that it would be requiring several news outlets—specifically, The Times, NBC News, Politico, National Public Radio, CNN, The Hill, and The War Zone—to leave their dedicated workspaces in the Pentagon as part of a new "rotation" system. Compl. at Ex. 37; see also id. at Ex. 29 (describing Secretary Hegseth's "use of polygraph tests to search for people leaking information to the news media").

In March 2025, the editor-in-chief of The Atlantic reported that Secretary Hegseth and other top officials had inadvertently included him in a group chat on the messaging platform Signal in which officials disclosed details regarding imminent U.S. airstrikes in Yemen. See Boutrous Decl. at Ex. 4. That same month, a journalist with The Times reported that Secretary Hegseth also had shared details about U.S. plans to strike Yemen in a second private Signal group chat that included Defendant Timothy Parlatore, a Senior Advisor to Secretary Hegseth, as well as Secretary Hegseth's wife and brother. See Compl. at Exs. 31, 33. Following this reporting, Defendant Sean Parnell, the Assistant to the Secretary of Defense for Public Affairs, called The Times "garbage," and Secretary Hegseth accused The Times of "slashing and burning people to ruin their reputations." Id. at Ex. 33, 36. Both Mr. Parnell and Secretary Hegseth specifically criticized The Times' choice of sources for its reporting, including the use of anonymous sources. See id. Other officials made similar remarks in response to reporting on the Department, such as referring to journalists as "scum" and calling for their "severe punishment." Id. at Exs. 27, 28; see also NYT I, 2026 WL 788689, at *13.

*C. The October Policy and The New Pentagon Press Corps*

In May 2025, the Department issued a memorandum entitled "Updated Physical Control Measures for Press/Media Access Within the Pentagon," which outlined new restrictions on journalists' physical access to specific areas within the building. See Compl. at Ex. 39. The Department did not identify any breach of physical security or other incident necessitating these new restrictions, instead explaining that the "updated security measures" were "needed to reduce the opportunities for in-person inadvertent and unauthorized disclosures." Id.; see NYT I, 2026 WL 788689, *3-4. Four months later, in September 2025, the Department issued a memorandum entitled "Implementation of New Media In-brief," which purported to implement the "Updated Physical Control Measures" (the "September Policy"). See Compl. at Ex. 4. The September Policy stated that "[a]ll members of the press issued a [PFAC] w[ould] be required to read and sign a new in-brief form outlining information security requirements, the new physical control measures, and [Department] expectations of their compliance with safety and security requirements." Id. It further provided that a journalist's credentials could be "denied, revoked or not renewed" if the journalist was "reasonably determined to pose a security or safety risk to [Department] personnel or property" and that such a determination could be "based on the unauthorized access, attempted unauthorized access, or unauthorized disclosure of" Department information. Id. The Times and other news outlets objected to the September Policy as incompatible with the First Amendment and the responsibilities of the press, and they advised the Department that their journalists could not sign it. See NYT I, 2026 WL 788689, at *5.

Despite those objections, in October 2025, the Department issued a substantially similar final policy. See Compl. at Ex. 3. The October Policy reiterated the Department's view that "access [to the Pentagon] is a privilege subject to the discretion of government authorities."

Id. The October Policy provided that a PFAC "may be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to [Department] personnel or property," and that "[s]uch determination may be based on factors including, but not limited to, the unauthorized access, attempted unauthorized access, or unauthorized disclosure of" Department information "based on a reasonable assessment informed by the unique facts and circumstances of each case." Id. Specifically, the October Policy stated that if a journalist "solicit[s] the disclosure of such information or otherwise encourage[s] [Department] personnel to violate laws and policies concerning the disclosure of such information," the Department may deem the journalist a "security or safety risk." Compl. at Ex. 3. The October Policy provided that "solicitation" in violation of the policy "may include direct communications with specific [Department] personnel or general appeals, such as public advertisements or calls for tips," and it cited "an advertisement or social media post by an individual journalist or media outlet that directly targets [Department] personnel to disclose non-public information without proper authorization" as an "example" of what "would constitute a solicitation that could lead to revocation" of a PFAC. Id. Such "non-public information," according to the October Policy, "may include, but is not limited to, information protected by the Privacy Act, information that is law enforcement-sensitive, and certain operational security information." Id.

In addition, the October Policy included an "Acknowledgment" for journalists to sign, requiring them to affirm that they "received, read, and understand" the policy. Compl. at Ex. 3. Most journalists who held PFACs when the October Policy was issued, including those from The Times, The Wall Street Journal, The Washington Post, CNN, and Fox News, refused to sign the Acknowledgment. See NYT I, 2026 WL 788689, at *6, *14. As a result, the journalists were required to hand in their PFACs. See id. at *6.

Within days of the enactment of the October Policy, Mr. Parnell took to his official X account to "announce the next generation of the Pentagon press corps." Compl. at Ex. 19. New PFAC recipients included the National Pulse, which was described by its editor-in-chief as "an industry mag/site for MAGA world"; Laura Loomer, an "influential pro-Trump activist"; and former congressman Matt Gaetz, President Trump's one-time choice for Attorney General of the United States, who is now affiliated with One America News. Compl. at Exs. 11, 15. Many new recipients had expressed ideological agreement with and support for the Trump administration or indicated that they did not intend to report critically on the Pentagon. See id. at Ex. 15; NYT I, 2026 WL 788689, at *6. For example, Libby Emmons, the editor-in-chief of Human Events and The Post Millennial who requested four passes for her staff after "receiv[ing] an unsolicited invitation to apply for credentials," stated that "[t]here should be a place for reporting on what they are doing without always trying to expose the dark underbelly." Compl. at Ex. 15. Tim Pool, whose outlet, Timcast Media, also received a credential, explained that his is "not an investigative news organization" and that he did "not intend to maintain a significant presence in the Pentagon." Id. Mr. Parnell described these "[n]ew media outlets" willing to sign onto the October Policy as those who "circumvent the lies of the mainstream media and get real news to the American people." Id. at Ex. 19. He also wrote that those outlets' "reach and impact collectively are far more effective and balanced than the self-righteous media who chose to self-deport from the Pentagon." Id.

*D. The Challenge to the October Policy*

On December 4, 2025, The Times and Mr. Barnes filed suit to challenge certain provisions of the October Policy. See Complaint, NYT v. Dep't of Def., Civil Action No. 25-4218-PLF (Dec. 4, 2025), Dkt. No. 1. The parties filed and briefed cross-motions for

summary judgment, and the Court held a hearing on March 6, 2026. On March 20, 2026, the Court granted the plaintiffs' motion for summary judgment and denied the Department's cross-motion. See NYT I, 2026 WL 788689, at *2. The Court held that the challenged provisions of the October Policy violated the First and Fifth Amendments. On the plaintiffs' challenge under the Fifth Amendment, the Court concluded that the October Policy was so vague and standardless as to violate the Due Process Clause. See id. at *8-12. On the plaintiffs' challenge under the First Amendment, the Court concluded that the October Policy was both unreasonable and viewpoint discriminatory. See id. at *13-17. The latter conclusion rested on the "voluminous" and "undisputed" record evidence, which "reflect[ed] the [October] Policy's true purpose and practical effect: to weed out disfavored journalists—those who were not, in the Department's view, 'on board and willing to serve'—and replace them with news entities that are." Id. (citation omitted).

In considering the appropriate remedy, the Court determined, based on the Department's express concession, that "[t]he regular presence of PFAC holders at the Pentagon . . . pos[es] no security or safety risk to Department property or personnel." NYT I, 2026 WL 788689, at *5. The Court flatly rejected the Department's assertion that vacatur of the October Policy's unlawful provisions "would 'compromise the safety of the Pentagon,'" concluding that the assertion was "unfounded." Id. at *18. The Court therefore vacated the unconstitutional provisions of the October Policy as to all regulated parties, enjoined the Department from enforcing those provisions against the plaintiffs, and ordered the Department to immediately reinstate PFACs to Mr. Barnes and the six other Times journalists who held credentials prior to the October Policy's adoption. See id. at *19-20.

*E. The Interim Policy*

On Monday, March 23, 2026—the next business day after the Court issued its opinion and order vacating and enjoining the enforcement of the October Policy—the Department announced the Interim Policy. See Interim Policy; NYT II, 2026 WL 962252, at *1-2. In an email to counsel for The Times, Mr. Parlatore provided a copy of that "revised policy," which consists of a "Pentagon Reservation In-Brief for Media Members" (the "In-Brief"), an accompanying "Memorandum for Senior Pentagon Leadership" from Mr. Parnell (the "Memorandum"), and an Appendix. See Interim Policy; Compl. at Ex. 2. The Memorandum states that the Department "disagrees with the Court's decision and is pursuing an appeal," but "[i]n the interim," the Interim Policy will be in effect to "preserv[e] the Department's legitimate security interests and its statutory obligation to ensure the safe, efficient, and secure operation of the Pentagon Reservation." Interim Policy at 2. The Memorandum further states that the Interim Policy "addresses the provisions the Court vacated while retaining all physical access restrictions, conduct requirements, and security measures that were not at issue in the litigation." Id. In addition, the Memorandum asserts that "[t]he Court characterized the original Policy's provisions in ways the Department believes were inaccurate" and that the Interim Policy "includes targeted clarifications to correct these mischaracterizations." Id.

The Interim Policy, in pertinent part, provides that going forward, "PFACs may be denied, revoked, or not renewed if a person meets any of the criteria set forth in Appendix A." Interim Policy at 10. Appendix A outlines certain "[c]onduct-[b]ased [g]rounds" to deny or revoke a PFAC, including that the holder engaged in the "intentional inducement of unauthorized disclosure" of nonpublic information. Id. at 14. The Interim Policy made clear that "[t]o correct the Court's mischaracterization" of the October Policy in its merits opinion, "the Department has

replaced the term 'solicitation' with 'intentional inducement of unauthorized disclosure.'" Id. In an interview with The Times shortly after the Interim Policy's issuance, Mr. Parlatore confirmed that the Interim Policy "us[es] more words to say the same thing" as the October Policy had said. NYT II, 2026 WL 962252, at *5.

In addition, the Interim Policy provides that "[e]ffective immediately, the Correspondents' Corridor is closed" and that "[a] new press workspace . . . in an annex facility outside the Pentagon . . . will be available when ready." Interim Policy at 3. It does not, however, indicate when that space will be ready. See id. The Interim Policy further provides that moving forward, PFAC holders will be able to access the Pentagon only "for scheduled press briefings, press conferences, and interviews arranged through public affairs offices" and only if they are "escort[ed] by authorized [Department] personnel at all times." Id. Pursuant to the Interim Policy, "all journalist access to the Pentagon will require [an] escort," and "[w]hen in the Pentagon," PFAC holders "must remain with [their] escort at all times." Id. at 3, 7. No more than "three visiting media members from the same media outlet" may obtain "escort privileges." Id. at 8-9. The Interim Policy provides that the reason for the new escort requirement is that "following the Court's vacatur of the [October] Policy's security screening provisions, the Department determined that unescorted access to the Pentagon cannot be responsibly maintained without the ability to screen PFAC holders for security risks." Id.

*F. The Challenge to the Interim Policy*

On March 24, 2026, the plaintiffs moved the Court to compel the Department to comply with its merits order vacating and enjoining the enforcement of certain provisions of the October Policy. See Motion to Compel Compliance, N.Y. Times Co. v. Dep't of Def., Civil Action No. 25-4218-PLF (Mar. 24, 2026), Dkt. No. 37. The Court held a hearing on

March 30, 2026, and it granted the plaintiffs' motion on April 9, 2026. See NYT II, 2026 WL 962252, at *2. The Court determined that the Department's effort to "cut off all PFAC holders' meaningful access" to the Pentagon was a "transparent" attempt to circumvent the Court's order requiring "the Department to restore the plaintiffs' access to the Pentagon." Id. at *8-9 (emphasis omitted). The Court rejected the "justification offered by the Department for this sudden change—that the Court's order had removed all security screening authority—as "nonsense." Id. at *7. The Court enjoined the Department from enforcing the Interim Policy against The Times's journalists and ordered that Mr. Barnes and the other Times reporters be allowed "to access the Pentagon in a manner commensurate with the access provided to PFAC holders on March 20, 2026, following" the Court's merits order. Id. at *11.

The Department appealed the Court's March 20 and April 9, 2026 orders, and it sought a limited stay pending appeal to allow it to implement only the escort requirement of the Interim Policy. See Emergency Motion for Stay Pending Appeal, N.Y. Times Co. v. Dep't of Def., No. 26-5113 (D.C. Cir. Apr. 13, 2026). A divided motions panel of the D.C. Circuit granted that stay request, concluding that the Department was likely to succeed in demonstrating that the escort requirement was not within the scope of this Court's original merits order and thus could not be enjoined through a motion to enforce that order. See N.Y. Times Co. v. U.S. Dep't of Def., 2026 WL 1179440, at *3 (D.C. Cir. Apr. 27, 2026). The panel emphasized that it was not addressing the lawfulness of the Interim Policy on the merits, explaining that "because the challenge to the Interim PFAC Policy was presented in a motion to compel compliance," this Court did not have the opportunity to determine whether "the escort requirement independently violates the First or Fifth Amendment." Id.

*G. The Current Status of the Media and the Pentagon*

In the weeks since the plaintiffs moved to compel compliance with this Court's merits order, the vitriolic statements by Department officials toward the media have continued. For example, in April 2026, in a statement directed to the "American media" while addressing the ongoing war in Iran, Secretary Hegseth referred to the "endless stream of garbage" and "the relentlessly negative coverage that [journalists] just can't help peddling," stating that "sometimes it's hard to figure out what side some of [the journalists] are actually on." Compl. at Ex. 9. He continued to compare the "legacy Trump-hating press" to the biblical "Pharisees" who "held counsel against [Jesus]" and "scrutinized every good act in order to find a violation, only looking for the negative," and he asserted that the journalists' "hardened hearts . . . are calibrated only to impugn." Id. That same month, Secretary Hegseth referred to The Times's reporting as "incredibly problematic" and "incredibly irresponsible and unpatriotic." Id. at Ex. 8. In May 2026, President Trump responded to a question from a Times reporter about the war in Iran by stating: "We've had a total victory, except by people like you that don't write the truth. . . . I actually think it's sort of treasonous what you write. But you at The New York Times and CNN, I would say are the worst." Boutrous Decl. at Ex. 5.

In June 2026, when asked by a reporter about a proposed $1.8 billion "weaponization fund," President Trump responded by stating that "the fake news like CNN [and] like The New York Times" have "abused our people so badly," telling the reporter, "You should be ashamed of yourself." Supp. Boutrous Decl. at Ex. 5. In an interview that aired that same month, President Trump told a reporter from NBC's "Meet the Press" that she was either "crooked" or "stupid," continuing, "You ought to straighten out your press." NBC NEWS, Trump Says 'I'd Pay' Anti-Weaponization Fund Applicants 'the Kind of Money They Deserve',

(YouTube, June 7, 2026), https://perma.cc/79NS-BA3G. Later that month, Secretary Hegseth accused a journalist with CBS of "peddl[ing]" a "manufactured story" and "trying to put words in [his] mouth . . . to create a headline." Transcript: Defense Secretary Pete Hegseth on "Face the Nation with Margaret Brennan," June 14, 2026, CBS NEWS, https://perma.cc/4UUT-HNSB.

### *H. The Challenge to the Escort Policy*

On May 18, 2026, the plaintiffs filed a new lawsuit to challenge the Interim Policy's prohibition on unescorted access to the Pentagon, which is currently in effect and being implemented by the Department. See Compl. On May 22, 2026, the plaintiffs moved for preliminary injunctive relief, arguing that they are likely to show that the escort requirement violates the First Amendment and the APA and that the remaining preliminary injunction factors weigh in their favor. See Mot. The plaintiffs' motion has been fully briefed and argued, and it is ripe for decision.

## II. LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Nat'l Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). The balance of equities and public interest factors merge when the government is a party. See Nken v. Holder, 556 U.S. 418, 435 (2009).

III. DISCUSSION

*A. The Plaintiffs Have Shown a Likelihood of Success on the Merits*

The Court begins with the "most important" preliminary injunction factor: whether the plaintiffs "have established a likelihood of success on the merits." Aamer v. Obama, 742 F.3d 1023, 1038 (D.C. Cir. 2014); see Bailey v. Fed. Bureau of Prisons, Civil Action No. 24-1219 (PLF), 2024 WL 3219207, at *3 (D.D.C. June 28, 2024). "In First Amendment cases, the likelihood of success will often be the determinative factor." Media Matters for Am. v. Paxton, 138 F.4th 563, 584 (D.C. Cir. 2025) (quoting Green v. U.S. Dep't of Just., 54 F.4th 738, 745 (D.C. Cir. 2022)).

The plaintiffs contend that they are likely to establish that the Interim Policy's escort requirement violates the First Amendment twice over: because it was issued to retaliate against the plaintiffs for exercising their constitutional rights, and because it is an unreasonable and viewpoint discriminatory restriction on access to a nonpublic forum. See Mem. at 24-36. They also argue that they are likely to establish that the escort requirement is arbitrary and capricious in violation of the APA. Because the Court determines that the plaintiffs have shown that they are likely to succeed on their retaliation claim, the Court will not reach the plaintiffs' alternative arguments. See Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs. ("Am. Acad."), 816 F. Supp. 3d 27, 60 n.12 (D.D.C. 2026) (taking the same approach).

To prevail on the merits of their First Amendment retaliation claim, the plaintiffs must prove that "(1) [they] engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in [their] position from speaking again; and (3) a causal link between the exercise of a constitutional right

and the adverse action taken against" them. Media Matters for Am. v. Paxton, 138 F.4th at 584 (alterations in original) (quoting Aref v. Lynch, 833 F.3d 242, 258 (D.C. Cir. 2016)).

1. Protected Speech

On the first element, the Department wisely does not dispute that the plaintiffs have engaged in activity protected under the First Amendment. The plaintiffs' "reporting on public issues [is] [a] quintessential First Amendment activit[y]." Media Matters for Am. v. Paxton, 138 F.4th at 584; see N.Y. Times Co. v. Sullivan, 376 U.S. 254, 269 (1964) ("The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions."). And their lawsuit challenging the October Policy, too, "is a form of expression protected by the First Amendment." In re Halkin, 598 F.2d 176, 187 (D.C. Cir. 1979), overruled on other grounds by Seattle Times Co. v. Rhinehart, 467 U.S. 20, 29-33 (1984); see Jenner & Block LLP v. U.S. Dep't of Just., 784 F. Supp. 3d 76, 94 (D.D.C. 2025) (explaining that "courtroom advocacy on behalf of [one's] chosen causes . . . is [at] the very core of the First Amendment's protection of 'litigation as a vehicle for effective political expression and association'" (quoting In re Primus, 436 U.S. 412, 431 (1978))). The plaintiffs thus undoubtedly will succeed in establishing the first element of their retaliation claim.

2. Adverse Action Sufficient to Deter

Turning to the second element, the plaintiffs have demonstrated that the imposition of the escort requirement is an adverse action that would chill a speaker of "ordinary firmness." Media Matters for Am. v. Paxton, 138 F.4th at 584. This "bar is not a high one." Jenner & Block LLP v. U.S. Dep't of Just., 784 F. Supp. 3d at 95 n.7. "[E]ven minor forms of

retaliation can support a First Amendment claim, for they may have just as much of a chilling effect on speech as more drastic measures." Sanders v. District of Columbia, 85 F. Supp. 3d 523, 535 (D.D.C. 2015) (alteration in original) (quoting Smith v. Fruin, 28 F.3d 646, 649 n.3 (7th Cir. 1994)); see also Tao v. Freeh, 27 F.3d 635, 639 (D.C. Cir. 1994) (observing that the First Amendment protects against "even an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . when intended to punish her for exercising her free speech rights" (quoting Rutan v. Republican Party of Ill., 497 U.S. 62, 76 n.8 (1990))). Of course, the Department's actions here are far from trivial. This Court determined in the context of the plaintiffs' motion to compel that the abrupt closure of the Correspondents' Corridor and elimination of unescorted access to the Pentagon for credentialed journalists substantially encumber the ability of those journalists to do their jobs. See NYT II, 2026 WL 962252, at *8-9; see also N.Y. Times Co. v. U.S. Dep't of Def., 2026 WL 1179440, at *6 (Childs, J., dissenting) ("Reporters can hardly verify sources, gather information, or speak candidly with Department personnel with an escort looming over their shoulders.").

The evidence presented in this litigation amply supports the same conclusion, thereby establishing that the escort requirement is an adverse action that "would deter persons of ordinary firmness from exercising their First Amendment rights." Media Matters for Am. v. Paxton, 138 F.4th at 581. Mr. Barnes testified, for example, that before the escort requirement, "reporting from the Pentagon often necessitated speaking to upwards of a dozen officials and other personnel from different press offices in a given day, sometimes in response to rapidly developing events." Barnes Decl. ¶ 9. The "most helpful conversations with Public Affairs staff," in Mr. Barnes' experience, "cannot be planned or scheduled in advance" and "vary depending on which staff are present or available to speak, what the latest news is, or what

information was shared in an immediately preceding conversation." Id. Prior to the escort requirement, Mr. Barnes was "able to walk from press office to press office throughout the day" to gather newsworthy information, and doing so was "integral to [his] reporting about the Department, national security, and United States intelligence agencies." Id. ¶¶ 11, 29. Mr. Barnes testified: "Those conversations strengthened my reporting by giving me more context and often a more nuanced understanding of the issues; those conversations also helped me to understand and incorporate the U.S. military's perspective in my reporting." Supp. Barnes Decl. ¶ 5. Robert Burns, a veteran reporter with The Associated Press, similarly testified that reporting from within the Pentagon gave him opportunities for "semi-formal" and "informal interactions" with Department officials. Burns Decl. ¶¶ 10-11. For example, Mr. Burns testified that "Secretary Donald Rumsfeld would invite reporters into his office on weekend mornings for wide-ranging, off-the-record discussions" separate from any scheduled press briefings or interviews. Id. ¶ 10. These sorts of less formal interactions "proved invaluable" to Mr. Burns' reporting. Id. ¶ 11.

Former Assistant Secretary of Defense for Public Affairs Chris Meagher testified that when he worked for the Department, "[r]eporters would visit the desks of different press operations officers, depending on what questions the reporters had or the topics they wanted to discuss," and they "frequently visited" the various "public affairs offices as part of their work." Meagher Decl. ¶¶ 7-8. "[D]oing so required that [the journalists] be able to move through hallways in the Pentagon unescorted" because the "offices and staff were located throughout the Pentagon building . . . in different wings and on different floors." Id. ¶ 8. Mr. Meagher testified that "regular, informal interactions between Defense Department staff and reporters [were] mutually beneficial" because they allowed staff to "correct misunderstandings early in the

reporting process and anticipate stories that might be controversial for the Department." Id. ¶ 12. These regular interactions also allowed staff to "build relationships with reporters that were built on trust and rapport." Id. In Mr. Meagher's experience, that relationship-building "was important because it helped give reporters confidence that the information [the Department was] providing was accurate and gave them opportunities to confirm and verify the accuracy of the information." Id. Former Assistant Secretary of Defense for Public Affairs Pete Williams similarly testified that the "regular presence of reporters in the Pentagon" was advantageous because it "helped develop respect and trust between those reporters and Department officials." Williams Decl. ¶ 8.

Now, by contrast, the default is that reporters are not present within the Pentagon. Mr. Barnes and other reporters must make "separate appointment[s]" and obtain escorts for "each separate conversation" with public affairs staff. Barnes Decl. ¶ 24. Once the scheduled appointment is completed, the reporter is escorted out of the building and is not permitted to speak with any other officials or visit any other offices. Id. ¶ 29. In other words, there are no longer opportunities for the semiformal or informal interactions that reporters and former Department officials alike testified were critical. Moreover, the escort requirement, in Mr. Barnes' estimation, leads to reporters spending "hours of [the] day just waiting and walking back and forth" between the Pentagon and the off-grounds library from which they are now expected to work. Id. ¶ 29. Mr. Barnes testified that "[t]his is time-consuming and burdensome, and it has substantially reduced [his] amount of interaction with staff from the Public Affairs Offices." Id. ¶ 24. He elaborated: "Going through a sometimes-lengthy process of scheduling official appointments in order to ask even one or two questions to an official—even assuming that request is granted and that official does not have to reschedule—does not allow for

meaningful engagement with Department personnel on a timeline consistent with news reporting." Id. ¶ 29. In Mr. Barnes' view, "[w]ith the escort requirement in place, going to the Pentagon is rarely worthwhile." Supp. Barnes Decl. ¶ 7. Mr. Barnes testified that "[i]f not for the escort requirement, [he] would go to the Pentagon more frequently, just as [he] did before October 2025." Id.

This testimony of the ways in which "[t]he escort requirement has made it exceedingly challenging to speak with press officials and other personnel in person, and to otherwise cover the Department and the U.S. military from Pentagon grounds," Barnes Decl. ¶ 25, surely clears the "relatively modest" bar to constitute adverse action that would deter persons of ordinary firmness from exercising their First Amendment rights. Endocrine Soc'y v. Fed. Trade Comm'n, Civil Action No. 26-512 (JEB), 2026 WL 1257289, at *10 (D.D.C. May 7, 2026); see Jenner & Block LLP v. U.S. Dep't of Just., 784 F. Supp. 3d at 95 n.7. This evidence largely goes unaddressed by the Department. In response to the plaintiffs' evidence, the Department points to testimony from Acting Press Secretary Joel Manuel Valdez that since the imposition of the escort requirement, sixty reporters have accessed the Pentagon to attend media events, and "no PFAC holder has been unable to enter the Pentagon because of an inability to arrange an escort." Valdez Decl. ¶ 6. But the plaintiffs' point is not that the work of journalists has been hindered because escorts have not been made available when requested. Rather, the plaintiffs maintain that their ability to interview varied sources from across the Department, engage in spontaneous conversations, and develop relationships with sources—which the record evidence demonstrates are essential aspects of covering the Pentagon—is inescapably burdened

by the requirement to obtain, in advance, an escort for each and every visit to the Pentagon.[4] These consequences of the escort requirement are not ones that ordinary people would "lightly disregard." Endocrine Soc'y v. Fed. Trade Comm'n, 2026 WL 1257289, at *10 (quoting First Choice Women's Res. Ctrs., Inc. v. Davenport, 146 S. Ct. 1114, 1127 (2026)); see also Am. Acad., 816 F. Supp. 3d at 53. The plaintiffs therefore are likely to prevail on the second prong of their retaliation claim.[5]

3. Causal Link

On the third element, the plaintiffs have marshaled compelling evidence connecting the imposition of the escort requirement to their protected speech. The D.C. Circuit has explained in the context of First Amendment retaliation that circumstantial evidence "is equally as probative as direct evidence in proving illegitimate intent." Media Matters for Am. v. Fed. Trade Comm'n ("FTC"), No. 25-5302, 2025 WL 2988966, at *8 (D.C. Cir. Oct. 23, 2025) (per curiam) (quoting Bailey v. Ramos, 125 F.4th 667, 685 (5th Cir. 2025)). "[S]uch circumstantial evidence, including proximity in time between the protected speech and

---

[4] Mr. Valdez testified that since the Interim Policy was implemented, journalists from "[o]utlets including The Associated Press, CNN, The Daily Mail, The Washington Post, The Wall Street Journal, and CBS News have requested PFACs and were approved but have yet to pick up their badges from the Pentagon." Valdez Decl. ¶ 3. As the plaintiffs point out, however, the logical implication of Mr. Valdez's testimony is that those outlets, whose journalists used to regularly report from the Pentagon, no longer believe the PFACs to have much value. See Reply at 23.

[5] The Department repeatedly cites the D.C. Circuit's decision in Flynt v. Rumsfeld, 355 F.3d 697, 703 (D.C. Cir. 2004) for the proposition that "[t]he First Amendment does not require that the government make a reporter's job easier or better." Opp. at 14; see also id. at 12; Defs. Supp. Br. at 7. That case, however, says nothing of the plaintiffs' likelihood of success on the second element of their retaliation claim. To satisfy that element, the plaintiffs must show only that the Department's action is onerous enough to chill a speaker of ordinary firmness—not that the Department's action itself violates the First Amendment. See Media Matters for Am. v. Paxton, 138 F.4th at 584. The plaintiffs have established that they are likely to succeed in making that showing.

government's adverse actions, the defendant's expression of hostility to the protected speech, and the absence of a proffered legitimate alternative explanation for the action can support a finding that protected speech caused the agency's response." Id.

The plaintiffs' evidence of retaliatory motive includes myriad statements by Department officials expressing disdain for reporting by The Times and other "legacy" media outlets. See FTC, 2025 WL 2988966, at *8; see also Nat'l Treasury Emps. Union v. Trump, 780 F. Supp. 3d 237, 255 (D.D.C. 2025) (considering "contemporaneous statements" as evincing the government's "retaliatory motive"); Am. Acad., 816 F. Supp. 3d at 57 (considering "negative . . . public statements against [the plaintiff] by [agency] officials" as probative of causation). The Department protests that many of the statements the plaintiffs identify were made before the October Policy was issued and thus are too "remote in time" to "contaminate" the Interim Policy. Opp. at 22. Perhaps that argument would have some force if the Department officials' hostile statements ceased after, or even were interrupted by, the issuance of the October Policy. What the plaintiffs' evidence shows, however, is a consistent stream of derisive comments beginning shortly after the confirmation of Secretary Hegseth and continuing through the present.

As early as March 2025, for example, Mr. Parnell referred to The Times as "a propaganda machine" and stated that "[t]he days of the Pentagon just allowing these fake narratives to spread is over." Compl. at Ex. 36. Following reporting on Secretary Hegseth's improper use of Signal in May 2025, Mr. Parnell called The Times "garbage," and Secretary Hegseth accused The Times of "slashing and burning people to ruin their reputations." Id. at Exs. 33, 36; see also supra Section I.B (describing similar statements). Immediately after the October Policy was enacted, Mr. Parnell referred to the "lies" of the "self-righteous media who chose to self-deport from the Pentagon." Id. at Ex. 19; see also NYT I, 2026 WL 788689, at 6-7.

More recently, as described above, Secretary Hegseth referred to the "endless stream of garbage" and "the relentlessly negative coverage that [journalists] just can't help peddling" and compared the "legacy Trump-hating press" to the biblical "Pharisees" who "held counsel against [Jesus]" and "scrutinized every good act in order to find a violation, only looking for the negative." Compl. at Ex. 9; see also id. at Ex. 8 (Secretary Hegseth calling The Times' reporting "incredibly irresponsible and unpatriotic"); Boutrous Decl. at Ex. 5 (President Trump responding to a question from a Times reporter about the war in Iran by stating: "We've had a total victory, except by people like you that don't write the truth. . . . I actually think it's sort of treasonous what you write. But you at The New York Times and CNN, I would say are the worst.").

The Department's attempt to dismiss these statements as innocuous expressions of the officials' "opinions about how [the plaintiffs'] reporting itself might harm national security and whether the reporting is accurate," Opp. at 23, falls flat. The Department officials' rhetoric demonstrates that they harbored animosity for the plaintiffs because of their protected speech—in Secretary Hegseth's words, their "relentlessly negative coverage" of the Department. Compl. at Ex. 9. This rhetoric therefore is powerful evidence of the Department's retaliatory motive. See Am. Acad., 816 F. Supp. 3d at 57; see also Endocrine Soc'y v. Fed. Trade Comm'n, 2026 WL 1257289, at *12 (finding "the [g]overnment's 'expression of hostility' regarding 'the protected speech'" to be "robust circumstantial evidence that retaliation motivated the [government's] actions" (quoting Am. Acad., 816 F. Supp. 3d at 54)).

To establish First Amendment retaliation, however, it is not enough for the plaintiffs to show that retaliation was a motive for the adverse action. The Department's "improper motive must be a but-for cause of [its] action, 'meaning that the adverse action against the plaintiff[s] would not have been taken absent the retaliatory motive.'" Comm. on Ways &

Means, U.S. House of Reps. v. U.S. Dep't of Treasury, 45 F.4th 324, 340 (D.C. Cir. 2022) (quoting Nieves v. Bartlett, 587 U.S. 391, 399 (2019)). "[E]ven if there was retaliatory motive," causation is not established if the government is "able to show that it would have [taken the same action] on nonretaliatory grounds anyway." FTC, 2025 WL 2988966, at *9; see Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).

The Department has proffered a supposed nonretaliatory explanation for imposing the escort requirement through a declaration submitted by Mr. Parnell. See Parnell Decl. Mr. Parnell testified that he was told by Pentagon Press Secretary Kingsley Wilson that before the issuance of the October Policy, her office "was contacted by journalists on a regular basis . . . regarding information they obtained that was sensitive or classified, including information relating to operational plans, intelligence assessments, diplomatic communications, and force posture decisions." Id. ¶ 4. "Following the implementation of the [October] Policy," however, "the frequency with which the Pentagon press office was contacted by journalists regarding sensitive, controlled or classified information dropped dramatically." Id. ¶ 8. Mr. Parnell determined that "this reduction [in contacts] occurred primarily because many journalists no longer maintained a persistent, unescorted presence near sensitive spaces in the Pentagon," which previously had enabled them to "observe activity patterns" and identify potential sources of sensitive information. Id. ¶¶ 6, 9. He thus concluded that "restoring unescorted access to the Pentagon for PFAC holders would result in a return to the same pattern of regular breaches of information security that . . . unescorted access had previously permitted." Id. ¶ 11. He explained: "I reached this conclusion after the Court rejected the October Policy's attempt to permit PFAC holders to access portions of the Pentagon without an escort, subject to a requirement that PFAC holders not intentionally induce unauthorized disclosures." Id. ¶ 12.

This "activity patterns" rationale immediately raises suspicions for the simple reason that it is conspicuously absent from the Interim Policy itself, and from the Department's briefing on the plaintiffs' motion to compel compliance with this Court's merits order, including the declarations submitted in opposition to that motion. See Interim Policy; Defendants' Opposition to Plaintiffs' Motion to Compel Compliance with the Court's Order, N.Y. Times v. Dep't of Def., Civil Action No. 25-4218 (D.D.C. Apr. 10, 2026), Dkt. No. 41. The Interim Policy provides the following as the justification for the escort requirement: "In assessing the Department's security posture following the Court's vacatur of the [October] Policy's security screening provisions, the Department determined that unescorted access to the Pentagon cannot be responsibly maintained without the ability to screen PFAC holders for security risks." Interim Policy at 3. In granting the plaintiffs' motion to compel compliance, the Court dismissed that explanation as baseless because, in fact, "the Court did not 'remove' or 'excise' the Department's authority to screen PFAC holders." NYT II, 2026 WL 962252, at *7. Only then, in seeking a partial stay of the Court's compliance order pending appeal, did the Department offer the "activity patterns" rationale through a declaration from Ms. Wilson. See Declaration of Kingsley Wilson in Support of Defendants' Emergency Motion for Stay Pending Appeal ("Wilson Decl."), N.Y. Times v. Dep't of Def., Civil Action No. 25-4218 (D.D.C. Apr. 10, 2026), Dkt. No. 58-1.[6]

[6] In deciding that the equities and public interest factors of the stay-pending-appeal test favored neither side, a majority of the motions panel determined, based on the Wilson Declaration, that "[t]he Department has . . . supported its claim that [the escort requirement] furthers important national security interests." N.Y. Times Co. v. U.S. Dep't of Def., 2026 WL 1179440, at *2. The Court does not understand that determination, which was made in the context of a non-merits element of the stay test and on a different factual record, to bear on this Court's assessment of whether the plaintiffs are likely to succeed on the merits of their retaliation claim. And even the Department does not appear to assert that the Court is bound by the panel majority's determination. Cf. Am. Foreign Serv. Ass'n v. Trump, 792 F. Supp. 3d 116, 136

Consideration of the proffered rationale itself only confirms those suspicions. The Department's position, as set forth in the Parnell Declaration, is that the October Policy demonstrated a relationship between unescorted access to the Pentagon's press spaces and the dissemination of sensitive or classified information such that the Department would have imposed the escort requirement absent its animus toward The Times. See Parnell Decl. ¶ 11 (averring that "restoring unescorted access to the Pentagon for PFAC holders would result in a return to the same pattern of regular breaches of information security that that unescorted access had previously permitted"). But the October Policy did not eliminate unescorted access to the press spaces of the Pentagon. The effect of the October Policy was that only certain journalists—those who were not "on board and willing to serve our commander in chief," NYT I, 2026 WL 788689, at *14—no longer had unescorted (or any) access to the Pentagon. The members of the "next generation of the Pentagon press corps," id. at *13, retained the ability to move freely within the Pentagon, and the Department vigorously advocated for that to continue. Only once this Court ordered the Department to restore The Times journalists' access to the Pentagon did the Department suggest that unescorted access was a problem.

The Department protests that the timing of the escort requirement cannot be seen as suspicious because the Department imposed the requirement immediately after, and in direct response to, this Court "vacat[ing] key provisions of the October Policy." Opp. at 21-22. Mr. Parnell testified that "after the Court rejected the October Policy's . . . requirement that PFAC holders not intentionally induce unauthorized disclosures," he determined that "[w]ithout the escort requirement or a prohibition on PFAC holders soliciting unlawful disclosures of

---

(D.D.C. 2025) ("To be sure, the government does not argue that the motions panel's reasoning is binding on the Court, and the Court will not treat it as such." (citations omitted)).

sensitive information, . . . the Department has no other effective means of managing th[e] demonstrated, repeated risk to the security of sensitive information within the Pentagon." Parnell Decl. ¶ 12. In other words, the Department's position is that it viewed the escort requirement as the next best thing to a prohibition on the "solicitation" of sensitive information. The problem with that position is that, along with imposing an escort requirement, the Interim Policy effectively reinstated the "solicitation" prohibition, just using different language. See NYT II, 2026 WL 962252, at *7. Indeed, the Interim Policy itself states that "[t]o correct the Court's mischaracterization [of the October Policy], the Department has replaced the term 'solicitation' with 'intentional inducement of unauthorized disclosure.'" Interim Policy at 14; see NYT II, 2026 WL 962252, at *5 (Mr. Parlatore explaining that the Interim Policy "us[es] more words to say the same thing and to foreclose creative misinterpretations"). Furthermore, in his declaration, Mr. Parnell conflates the "requirement that PFAC holders not intentionally induce unauthorized disclosures" with the "prohibition on PFAC holders soliciting unlawful disclosures of sensitive information," Parnell Decl. ¶ 12, thus making abundantly clear that the Department understood those provisions of the October Policy and the Interim Policy to do the same thing. The escort requirement, then, was imposed not instead of but in addition to the restriction on "solicitation" (or in the language of the Interim Policy, "inducement"). So it simply cannot be, as the Department now insists, that the escort requirement was necessary to "fill the gap created" by this Court's merits order. Opp. at 21.

On top of all of that, the Department's proffered rationale is facially dubious. Journalists, of course, do not "have access to sensitive or classified information simply by being in [the Pentagon] without an escort." Williams Decl. ¶ 21. The Department does not dispute that fact, asserting instead that unescorted access "logically . . . increases the risk" of journalists

obtaining such information. Opp. at 16 (emphasis omitted). That supposed logic, however, is far from self-evident. To reiterate, the escort requirement is founded upon Ms. Wilson's observation that her office was contacted less frequently by the press about "sensitive or classified" information after the implementation of the October Policy and Mr. Parnell's conclusion that the reduction in contacts was attributable to the journalists who refused to sign onto the October Policy no longer being able to "observe activity patterns and time their inquiries accordingly." Parnell Decl. ¶ 9; see Wilson Decl. ¶ 11. But as the plaintiffs point out, Ms. Wilson's observation of a decrease in contacts about "sensitive or classified information" does not necessarily correspond to a decrease in instances of journalists obtaining such information. See Reply at 5-6. Indeed, the plaintiffs have refuted the notion that The Times has obtained less nonpublic information since the October Policy was put in place, see Stevenson Decl. ¶¶ 16-17, and the Department does not offer any actual evidence to the contrary.[7] What is more, the Department's justification lacks any elucidation of the connection between journalists noticing Department officials' behavior and obtaining classified information. Why would it be that the

[7] The Department argues that the Stevenson Declaration's focus on nonpublic information is misplaced because "[m]uch information is non-public but is not classified or controlled unclassified information," for example, "various personnel decisions, such as hiring, firing, and promotion decisions." Defs. Supp. Br. at 4. The Department's goal with the escort requirement, it says, was to prevent journalists from obtaining only classified or controlled unclassified information—not the broader universe of nonpublic information. See id. There are at least two problems with the Department's argument. First, Mr. Parnell's declaration itself makes clear that the Department sought to prevent journalists from obtaining not only classified or controlled unclassified information but also "sensitive" information more broadly. See, e.g., Parnell Decl. ¶ 8 (describing "sensitive, controlled or classified information" (emphasis added)). Second, and in any event, it stretches credulity to its breaking point to conclude that The Times's recent reporting about, for example, "a growing concern within the Pentagon regarding espionage by Israel," Stevenson Decl. ¶ 17, resembles unclassified and uncontrolled nonpublic information on par with "personnel decisions." The plaintiffs' evidence therefore undercuts the Department's stated reason for imposing the escort requirement because it supports that the October Policy did not have the effect that the Department purportedly sought to replicate.

timing of a journalist's question increases the likelihood that a Department official would disclose classified information? Is the implication that a Department official is more likely to divulge such information while, say, in line at Starbucks? Based on what? The Department offers no answer to these questions.

In that vein, taken at face value, the Department's "activity patterns" rationale seemingly would apply to the much broader set of civilian workers in the Pentagon. As the plaintiffs point out, "the Pentagon is 'a city in itself with over 23,000 employees,'" including non-Department employees such as "contractors, consultants, representatives of other government agencies . . . , representatives of foreign governments, representatives of congressional committees, cafeteria workers, and employers of Concourse concessions." Mem. at 33 (alteration in original) (quoting Boutrous Decl. at Ex. 3). These thousands of civilian employees remain free to move about the Pentagon unescorted on a daily basis and, it would seem, are just as capable of observing officials' behavior or "overhear[ing]" sensitive conversations. Opp. at 16. The Department argues that the escort requirement applies only to journalists because it has not made a finding that "the range of other people who access the Pentagon" have "obtained sensitive information," and the Department insists that "[t]he unique nature of the journalistic profession and each journalist's access to both sources of and means for distributing information" justifies the policy. Id. at 14. The notion that reporters should be treated worse than baristas, short order cooks, dry cleaners, or any other civilians given access to the Pentagon, surely "is a perverse reading of the First Amendment." Reply at 4. And by singling out journalists, the escort policy "undercut[s] the basic assumption of our political system that the press will often serve as an important restraint on government." Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue, 460 U.S. 575, 585 (1983).

In ordinary circumstances, the Department would be entitled to a "presumption of regularity," meaning the Court would assume that the Department has acted properly and lawfully. This Court previously has questioned whether such a presumption continues to exist in light of the current administration's extensive pattern of illegal and unconstitutional behavior. See, e.g., Fed. Educ. Ass'n v. Trump, 795 F. Supp. 3d 74, 92 (D.D.C. 2025) ("In just six months, the President of the United States may have forfeited the right to such a presumption of regularity."). But regardless, the presumption that the Department has acted in good faith "is merely a presumption that may be overcome." Am. Acad., 816 F. Supp. 3d at 59. The plaintiffs have overcome that presumption in this case based on the "constellation of undisputed facts and circumstances compiled in this still-preliminary record." FTC, 2025 WL 2988966, at *6; see also Am. Acad., 816 F. Supp. 3d at 59. This "constellation" includes the statements of Department officials from both before and after the enactment of the October Policy, the timing of the imposition of the escort requirement immediately after the Court ordered The Times journalists' PFACs restored, and the fact that the Department has not offered a facially sound, nonretaliatory basis for imposing the requirement. The Court concludes on the record before it that the plaintiffs are likely to succeed on their First Amendment retaliation claim.

*B. The Plaintiffs Will Suffer Irreparable Harm Absent an Injunction*

Because the plaintiffs have shown a likelihood of success on the merits, "the Court need not belabor the other preliminary-injunction factors." Endocrine Soc'y v. Fed. Trade Comm'n, 2026 WL 1257289, at *14. That said, the Court concludes that the plaintiffs stand to suffer immediate irreparable harm absent injunctive relief. As the Supreme Court has held, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Mahmoud v. Taylor, 606 U.S. 522, 569 (2025) (alteration in

original) (quoting Roman Catholic Diocese of Brooklyn v. Cuomo, 592 U.S. 14, 19 (2020)); see Karem v. Trump, 960 F.3d 656, 667 (D.C. Cir. 2020) ("As our court has explained, a prospective violation of a constitutional right constitutes irreparable injury for purposes of seeking equitable relief." (citation modified)). "When a party makes it 'apparent' that its 'constitutional rights are violated,' it easily clears the irreparable-harm requirement to warrant preliminary relief." Endocrine Soc'y v. Fed. Trade Comm'n, 2026 WL 1257289, at *14 (quoting Mills v. District of Columbia, 571 F.3d 1304, 1312 (D.C. Cir. 2009)). For the reasons explained above, the plaintiffs are likely to succeed in showing that the Department "retaliat[ed] against them in response to their exercise of their First Amendment rights," and "that is . . . an irreparable injury." Media Matters for Am. v. Paxton, 138 F.4th at 585.

Moreover, the plaintiffs' harm is "not merely . . . abstract" or "theoretical" because the plaintiffs' "First Amendment interest depends on [their] ability to freely pursue 'journalistically productive conversations.'" Karem v. Trump, 404 F. Supp. 3d 203, 217 (D.D.C. 2019); see, e.g., Supp. Barnes Decl. ¶ 7 ("To be an effective reporter, I often need to have conversations, follow leads, and ask questions that cannot be planned days or even hours ahead of time."). The plaintiffs have demonstrated that the escort requirement burdens their ability to engage in newsgathering because it has "substantially reduced" their "amount of interaction with" sources and "made it exceedingly challenging to speak with press officials and other personnel in person." Barnes Decl. ¶¶ 24-25; see supra Section III.A.2. And because "the news is time-sensitive and occurs spontaneously," those harms "cannot be remedied retrospectively." Karem v. Trump, 404 F. Supp. 3d at 217.[8]

---

[8] Citing the D.C. Circuit's decision in Ateba v. Leavitt, 133 F.4th 114, the Department argues that the plaintiffs cannot show irreparable harm because they continue to have escorted access to the Pentagon. See Opp. at 28-29, 36. In Ateba, the D.C. Circuit

*C. The Balance of the Equities and the Public Interest Favor the Plaintiffs*

The balance of equities and public interest factors also weigh in the plaintiffs' favor. On the plaintiffs' side of the scale, there are constitutional interests of great significance. The plaintiffs' "interest in obtaining an injunction mirrors that of every person subject to government power: vindicating the right to be free of retaliation for its protected speech." Endocrine Soc'y v. Fed. Trade Comm'n, 2026 WL 1257289, at *14. "And 'there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional' government action." Media Matters for Am. v. Paxton, 138 F.4th at 585 (quoting Pursuing Am.'s Greatness v. Fed. Election Comm'n, 831 F.3d 500, 511 (D.C. Cir. 2016)). On the Department's side of the scale, while the Department certainly has an interest in protecting national security, it "may not 'act unlawfully even in pursuit of desirable ends.'" Id. (quoting Huisha-Huisha v. Mayorkas, 27 F.4th 718, 734 (D.C. Cir. 2022)); see also Karem v. Trump, 960 F.3d at 668 ("[E]nforcement of an unconstitutional law is always contrary to the public interest." (quoting Gordon v. Holder, 721 F.3d 638, 653 (D.C. Cir. 2013))).

The Department asserts that entering a preliminary injunction "would fly in the face of the D.C. Circuit's decision to stay the Court's previous injunction." Opp. at 38. That is

---

assumed without deciding that the plaintiff, who had been denied a "hard pass" to enter the White House unescorted, had stated a cognizable First Amendment injury. See Ateba v. Leavitt, 133 F.4th at 120-21. The court emphasized that the plaintiff had "maintained access to the Press Area by using day passes," and it noted that while day pass holders had to "wait for an escort to take them from the White House gate to the Press Area," both hard pass and day pass holders had "the same privileges once they [were] inside the Press Area." Id. at 117, 120. Setting aside the fact that the D.C. Circuit did not—as the Department asserts—conclude that "having to wait for an escort was not enough for a First Amendment injury," Defs. Supp. Br. at 6, the facts of Ateba are a far cry from the situation here, where journalists are permitted to enter the Pentagon only for prearranged interviews or press conferences and only if accompanied at all times by an official minder. The harms to the plaintiffs, as detailed above, are far more than mere "inconvenience[s]." Id. at 121.

not so. The panel order granting the Department a stay pending appeal rested on the conclusion that "[t]he escort requirement was not contemplated by the challenged [October] [P]olicy" such that this Court's "March 20 summary judgment opinion and order did not address that provision or a similar one." N.Y. Times Co. v. U.S. Dep't of Def., 2026 WL 1179440, at *3. The majority recognized that because of the posture of the plaintiffs' prior challenge to the Interim Policy, this Court "did not hold that the escort requirement independently violates" the Constitution. Id. With full briefing on the constitutionality of the escort requirement, the Court now, at least preliminarily, so holds.

*D. The Plaintiffs Must Post a Nominal Bond*

Rule 65(c) of the Federal Rules of Civil Procedure states that a "court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c). This rule provides "broad discretion in the district court to determine the appropriate amount of an injunction bond." DSE, Inc. v. United States, 169 F.3d 21, 33 (D.C. Cir. 1999). The plaintiffs ask the Court to order them to post a nominal bond of one dollar, given that the Department "will not 'be forced to absorb any costs as a result of an injunction.'" Mem. at 45 (quoting Am. Oversight v. Hegseth, 788 F. Supp. 3d 14, 32 (D.D.C. 2025)). The Department offers no argument in response. Because the Department has not shown that it "will suffer any 'material monetary injury' from the proposed injunction," the Court will order the plaintiffs to post a nominal bond of one dollar. Am. Oversight v. Hegseth, 788 F. Supp. 3d at 32 (quoting J.G.G. v. Trump, 786 F. Supp. 3d 37, 83 (D.D.C. 2025)).

## IV. CONCLUSION

This Court has spoken at several points about the critical importance of protecting the freedoms enshrined in the First Amendment, and that evergreen message bears repeating: "Those who drafted the First Amendment believed that the nation's security requires a free press and an informed people and that such security is endangered by governmental suppression of political speech. That principle has preserved the nation's security for almost 250 years." NYT I, 2026 WL 788689, at *1. As our country celebrates its 250th anniversary this very week, that principle must not be abandoned now.

The plaintiffs have shown that the factors governing preliminary injunctive relief weigh in their favor. Accordingly, the Court will GRANT the plaintiffs' Motion for a Preliminary Injunction [Dkt. No. 6]. An Order consistent with this Opinion will issue this same day.

SO ORDERED.

Paul L. Friedman

PAUL L. FRIEDMAN
United States District Judge

DATE: 6\30\26

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

THE NEW YORK TIMES COMPANY,
620 Eighth Avenue
New York, NY 10018;

JULIAN E. BARNES,
The New York Times Company
1627 I Street NW, Suite 700
Washington, DC 20006,

*Plaintiffs*,

v.

DEPARTMENT OF DEFENSE A/K/A
DEPARTMENT OF WAR,
1400 Defense Pentagon,
Washington, DC 20301;

PETE HEGSETH,
in his official capacity as Secretary of Defense, 1400 Defense Pentagon,
Washington, DC 20301;

SEAN PARNELL,
in his official capacity as Chief Pentagon Spokesman, 1400 Defense Pentagon,
Washington, DC 20301,

TIMOTHY PARLATORE,
in his official capacity as Special Advisor to the Secretary of Defense,
1400 Defense Pentagon,
Washington, DC 20301.

*Defendants*.

**Civil Case No. _________**

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. Plaintiffs The New York Times Company ("The New York Times" or "The Times") and its reporter Julian E. Barnes ("Barnes") bring this suit to vacate and enjoin a revised "interim" policy of the United States Department of Defense or Department of War ("Department") that violates the Administrative Procedure Act and Plaintiffs' First and Fifth Amendment rights (the "Interim Policy").

2. This is the second time Plaintiffs have been forced to file suit in this District to challenge Defendants' unlawful efforts to restrict Plaintiffs' constitutionally protected newsgathering and reporting, and to punish Plaintiffs for exercising their First Amendment rights. Defendants adopted the Interim Policy one business day after—and in direct response to—a court order that vacated and enjoined provisions of a prior Pentagon press credentialing policy as unconstitutional. The Department's Interim Policy not only revives unconstitutional provisions vacated by that prior court order but also employs additional means of carrying forward the same impermissible, viewpoint-discriminatory aim that has motivated Defendants from the beginning: closing the Pentagon to any journalist or news organization unwilling to report only what Department officials approve. Like its predecessor, the Department's Interim Policy is patently unconstitutional.

3. In the first lawsuit filed by Plaintiffs, Judge Paul L. Friedman concluded that the Pentagon's press credentialing policy violated the First and Fifth Amendments, vacated its unconstitutional provisions, and enjoined their enforcement against The Times and Barnes. When the Department responded by hastily issuing the Interim Policy, Judge Friedman granted The Times's Motion to Compel Compliance, recognizing the Interim Policy for what it was: an obvious attempt to evade the court's prior order. Defendants appealed both rulings and obtained a limited stay pending appeal from the D.C. Circuit allowing the Interim Policy's ban on unescorted access to

the Pentagon by credentialed journalists to go into effect. That stay ruling was based not on any finding that the Interim Policy was lawful, but rather on the ground that the escort requirement was likely not encompassed within the scope of the prior district court order. Because the escort requirement is inflicting—and the Interim Policy as a whole, if it is permitted to go into effect, will inflict—irreparable harm on Plaintiffs, and because it violates not only the First and Fifth Amendments but also the Administrative Procedure Act, Plaintiffs bring this second lawsuit to challenge the Interim Policy on its own terms. By this Complaint, Plaintiffs seek the Interim Policy's vacatur and, in the immediate term, preliminary relief from the currently in-force escort requirement.

4. Like the unlawful policy it replaced, the Department's Interim Policy aims to control the content of newsgathering and reporting about the Pentagon and its leadership, and to allow Department officials to punish reporters for coverage they disapprove. And, as a transparent effort to avoid complying with a prior district court ruling requiring that Times reporters' access to the Pentagon be restored, the Interim Policy also amounts to blatant retaliation against Plaintiffs, not only for their editorial viewpoint but also for vindicating their constitutional rights in litigation. If allowed to stand, the Interim Policy will upend the longstanding and "healthy adversarial tension between the government, which may seek to keep its secrets" and "the press, which may endeavor to" report them, Alexander Bickel, *The Morality of Consent* at 79 (1977). And it will deprive the public of vital information about the United States military and its leadership during a time of war.

5. For nearly a century, members of the press have worked from the Pentagon. Journalists with The Times, including Barnes, have held Pentagon press credentials for decades. That access has served the public interest—and benefitted the Department—by enabling reporters to quickly disseminate accurate information to the American people, especially during times of war and other military actions, and by facilitating journalists' efforts to hold the Department

accountable and help the public better understand the work of the United States military. In recent years, press access to the Pentagon has been facilitated by the issuance of "Pentagon Facility Alternate Credentials" or "PFACs." The D.C. Circuit has recognized that reporters' interest in maintaining press credentials and the access they have historically provided is constitutionally protected. *Karem v. Trump*, 960 F.3d 656, 660 (D.C. Cir. 2020).

6. Spurred by reporting from The Times and other members of the Pentagon press corps that Department leadership perceived as negative, the Department under Secretary Hegseth has taken a series of escalating steps designed to stop unfavorable coverage.

7. As part of that effort, on October 6, 2025, the Department promulgated a new policy pertaining to PFACs (the "October Policy"). Ex. 3. The policy vested Department officials with unbridled discretion to immediately suspend and ultimately revoke a reporter's PFAC for engaging in lawful newsgathering, both on and off Pentagon grounds, or for reporting any "unauthorized information"—information Department officials had not approved. When the vast majority of the Pentagon press corps refused to sign on to that policy and surrendered their PFACs, Department officials publicly derided them as "activists" and "propagandists" who spread "lies . . . to the American people," while simultaneously praising members of the media willing to sign on to the policy as free from "a biased agenda" and "willing to serve the Commander in Chief."[1]

8. Judge Friedman ruled that the Department's October Policy was unconstitutional on numerous grounds. Among other things, the district court found that the policy treated core newsgathering activities—like asking questions to Department personnel and publishing ways for

[1] Sean Parnell (@SeanParnellASW), X (Oct. 22, 2025, at 1:21 PM), https://x.com/SeanParnellASW/status/1981048206923329719 (attached as Ex. 19); DOW Rapid Response (@DOWResponse), X (Dec. 2, 2025, at 11:21 am), https://x.com/DOWResponse/status/1995890967002452302 (attached as Ex. 12).

potential sources to contact journalists to provide tips and other newsworthy information—as grounds for suspending and revoking journalists' press credentials. *New York Times Co. v. Dep't of Def.*, No. CV 25-04218 (PLF), 2026 WL 788689, at *12 (D.D.C. Mar. 20, 2026) (hereinafter "*NYT I*"). And the district court also found that, at its core, the October Policy was issued for an impermissible purpose: "to weed out disfavored journalists—those who were not, in the Department's view, 'on board and willing to serve' [by toeing the Department's line]—and replace them with news entities that are." *Id.* at *14. "A speech regulation that is neutral on its face may nonetheless be viewpoint discriminatory if it was adopted 'because of disagreement with the message [the speech] conveys.'" *Id.* at *13 (quoting *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 566 (2011)). As the district court concluded in vacating the October Policy's unconstitutional provisions and enjoining their enforcement, that policy was exactly the type of speech- and press-restrictive scheme that the Supreme Court and D.C. Circuit have recognized violates the First Amendment. *See id.* at *15–17; *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988); *Ateba v. Leavitt*, 133 F.4th 114, 124–25 (D.C. Cir. 2025); *see also Minn. Voters All. v. Mansky*, 585 U.S. 1, 11–12 (2018).

9. The next business day following Judge Friedman's order vacating the October Policy's unconstitutional provisions and requiring Defendants to restore The Times reporters' access to the Pentagon, Department officials adopted the Interim Policy to evade compliance with that order and eliminate the access that Plaintiffs' credentials had previously provided. "Effective immediately," the Department closed the dedicated workspace in the Pentagon that journalists had used for decades, Correspondents' Corridor, and imposed an appointment and escort requirement on PFAC holders that, as the district court recognized, rendered the Times's reinstated credentials essentially worthless. *See New York Times Co. v. Dep't of Def.*, No. CV 25-04218 (PLF), 2026

WL 962252, at *8 (D.D.C. Apr. 9, 2026) (hereinafter "*NYT II*") ("[T]he access now available to PFAC holders . . . is not even close to as meaningful as the broad access that PFAC holders had previously been afforded" and the "restrictions make it exceedingly difficult to cover the Department and the U.S. military from the Pentagon grounds.")

10. The Interim Policy is patently retaliatory, utterly unreasonable, and manifestly arbitrary and capricious. Defendants adopted it as a means to thwart a district court order and to punish The Times both for its editorial viewpoint and its successful suit vindicating its constitutional rights. And the Interim Policy, like the unlawful policy it replaced, is impermissibly aimed at chilling independent newsgathering and reporting by threatening punishment—via suspension or revocation of access—for reporters who seek information from individuals not officially authorized to speak to the press on approved topics, or for offering to speak to a source on background, off-the-record, or not for attribution, despite such conversations being an everyday, necessary journalistic practice. The purpose of the Interim Policy is to restrict journalists' ability to do what they have always done: ask questions of government employees and gather information to report stories that take the public beyond official pronouncements. For each of the following reasons, the Interim Policy violates the First Amendment, the Due Process Clause, the Administrative Procedure Act, and binding D.C. Circuit precedent.

11. First, the Policy dramatically curtails longstanding press access to the Pentagon by barring credentialed journalists from the building unless they are invited to a press conference or secure a pre-arranged interview or meeting—and, even then, only if they are accompanied by a Department escort. Ex. 1. Defendants imposed those onerous limitations not to further any interest in security or safety, but to evade the injunction entered by the district court and carry out the same viewpoint-discriminatory, speech-suppressive purpose that court found unconstitutional. *NYT II*,

2026 WL 962252, at *4. The sequence of Department officials' actions and their own statements place the purpose and effect of the Interim Policy in stark relief: to restrict coverage of the Pentagon by independent journalists and news organizations who will not agree to only publish information "spoon-fed by Department leadership." *NYT I,* 2026 WL 788689, at *14.

12. Second, the Interim Policy revives vacated prohibitions on newsgathering and reporting that Judge Friedman already correctly found to be unconstitutional. The Interim Policy's architect, Commander Timothy Parlatore, openly admitted that it merely "us[ed] more words to say the same thing." *NYT II*, 2026 WL 962252, at *5 (quotation marks omitted). Through the Interim Policy, the Department, again, purports to apply to newsgathering and reporting that takes place off Pentagon grounds. And, while the Interim Policy purports to prohibit only questions that seek information the journalist knows an employee is legally prohibited from providing, the Interim Policy fails to delineate how that prohibition will be enforced. Worse, the Interim Policy expressly "presumes" that any agreement to speak to any Department-affiliated source that is not entirely on-the-record indicates such knowledge. Ex. 1. Because conversations with sources on background or off-the-record are a routine and necessary part of reporting, the Interim Policy gives Department officials unbounded discretion to suspend or revoke the Pentagon access of any reporter who publishes a story without naming all her sources. And punishing a reporter for merely engaging in routine newsgathering violates the First Amendment. *See Fla. Star v. B.J.F.*, 491 U.S. 524, 538 (1989) (the government may not impose civil liability for "routine newspaper reporting techniques" (internal alterations omitted)).

13. The Department's attempt to creatively achieve its unlawful ends through revised retaliatory means is impermissible. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188, 190 (2024) (a government official can neither "use the power of the State to punish or suppress

disfavored expression" nor "do indirectly what [he] is barred from doing directly"); *Media Matters for Am. v. Paxton*, 138 F.4th 563, 570 (D.C. Cir. 2025) ("retaliation against a media company" for engaging in protected conduct violates the First Amendment (emphasis omitted)). Even if the Department ordinarily has discretion to impose reasonable restrictions on press access to the Pentagon, it cannot do so for this constitutionally invalid purpose. *See Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76, 94 (D.D.C. 2025); *Nat'l Pub. Radio, Inc. v. Trump*, No. 25-1674 (RDM), 2026 WL 877434, at *1 (D.D.C. Mar. 31, 2026) ("[T]he First Amendment draws a line, which the government may not cross, at efforts to use government power . . . 'to punish or suppress disfavored expression' by others." (citation omitted)). Moreover, and in any event, the Interim Policy's provisions—in particular its escort requirement and related physical access limitations—are unconstitutionally unreasonable restrictions on expression in a nonpublic forum because they undermine the forum's purpose: to facilitate accurate, timely news reporting. *See Minn. Voters All. v. Mansky*, 585 U.S. 1, 13 (2018).

14. The Interim Policy marks a radical departure from a tradition deeply rooted in the Department and across the federal government, and it is inflicting irreparable harm on The Times and the American public. While Plaintiffs' enterprising reporting on the military will continue, as it has since the October Policy took effect, the Interim Policy ensures that certain newsworthy information—information, for instance, obtained through routine, unplanned interactions between journalists and Pentagon personnel on Pentagon grounds or through conversations with multiple press officials and press offices—will be simply unavailable to The Times and to the public that relies on The Times for fact-based, independent journalism.

15. By this Complaint, Plaintiffs seek vacatur of the provisions of the Interim Policy targeting the exercise of their First Amendment rights as well as injunctive relief barring

Defendants from enforcing those provisions—or any similar policy designed to retaliate against and impede their independent reporting—and restoring Plaintiffs' access to the Pentagon that is commensurate with the access they had for decades prior to October 2025.

**PARTIES**

16. The New York Times Company is a privately owned for-profit corporation located in New York. The Times is headquartered at 620 Eighth Avenue, New York, NY 10018. The Times' Washington Bureau is located at 1627 I Street NW, Suite 700, Washington, DC 20006. The Times and a number of its reporters, including Julian E. Barnes, hold PFACs.

17. Julian E. Barnes is a national security reporter with The Times who focuses on the Pentagon, United States intelligence agencies, and international security, among other subjects. Barnes has been with The Times since June 2018. Prior to that, Barnes covered the Pentagon for other news organizations including U.S. News and World Report, The Los Angeles Times, and The Wall Street Journal. He was first issued a PFAC in 2004. Except for an approximately 18-month period in 2016 and 2017, Barnes continuously held a PFAC from 2004 until the end of August 2025, when it lapsed. Though he was eligible to and invited to do so, Barnes did not seek to renew his PFAC due to the Department's adoption of the October Policy. As a result of that policy, Barnes was compelled to turn in his lapsed PFAC on October 15, 2025. Barnes was provided a new, physical PFAC card, following the district court's order, on March 24, 2026. Barnes resides in the District of Columbia and is assigned to The Times' Washington Bureau.

18. Defendant United States Department of Defense, also known as the Department of War, is an executive agency of the U.S. federal government tasked with overseeing the U.S. Armed Forces. The Department is headquartered at the Pentagon and maintains offices and facilities in Washington, DC, and conducts a substantial amount of official business in and relating to this District. The Department's address is 1400 Defense Pentagon, Washington, DC 20301.

19. Defendant Pete Hegseth is the U.S. Secretary of Defense. He is sued in his official capacity. Secretary Hegseth is responsible for overseeing the operations and administration of the Department of Defense and the U.S. Armed Forces, which include the Army, the Navy, the Marine Corps, the Air Force, and the National Guard, as well as developing national defense policy. He has ultimate authority over all Department policies and actions, including the Interim Policy and acts at issue here, and he conducts a substantial amount of official business in and relating to this District. As a member of the President's Cabinet, Secretary Hegseth regularly performs his official duties within the District of Columbia.

20. Defendant Sean Parnell is the Chief Spokesman for the Pentagon and Assistant to the Secretary of Defense for Public Affairs and conducts a substantial amount of official business in and relating to this District. He is sued in his official capacity. Parnell serves as the Department's principal spokesperson responsible for providing timely and accurate information about the Department to the media, the U.S. Congress, and the public. He also coordinates and conducts press briefings with members of the media. He issued the "Memorandum for Senior Pentagon Leadership" that together with the "Pentagon Reservation In-Brief for Media Members" ("In-Brief"), constitute the Interim Policy and, on information and belief, is responsible for implementation of the Interim Policy.

21. Defendant Commander Timothy Parlatore is an attorney and Special Advisor to Secretary Hegseth. He serves part time in this role, while simultaneously maintaining his private practice at Parlatore Law Group.[2] In his private capacity, he represents Secretary Hegseth in personal legal matters. On or about March 7, 2025, Cmdr. Parlatore was recommissioned as a Navy Reserve officer and appointed as a Special Advisor to aid the Secretary in his official capacity. In

---

[2] *See* https://parlatorelawgroup.com/.

that official capacity, Cmdr. Parlatore has communicated with the press, including counsel for Plaintiffs, on behalf of the Department regarding the Department's PFAC policies, and appeared as counsel for the Department in the Plaintiffs' action challenging the October 2025 PFAC Policy. He has played and continues to play a significant role in developing and implementing the Department's PFAC and other press-related policies, including the Interim Policy at issue.

## JURISDICTION AND VENUE

22. This Court has subject-matter jurisdiction because this action arises under the Constitution of the United States and federal statutes, 28 U.S.C. § 1331, and because the individual Defendants are U.S. officials sued in their official capacities, 28 U.S.C. § 1346(a)(2).

23. The Court is authorized to grant the requested relief under 28 U.S.C. §§ 2201 and 2202, 5 U.S.C. § 705, Rule 65 of the Federal Rules of Civil Procedure, and pursuant to its inherent equitable powers.

24. Venue is proper in this District under 28 U.S.C. § 1391(b) and 28 U.S.C. § 1391(e)(1) because Barnes resides in this District, because The Times and its journalists, including Barnes, regularly engage in newsgathering and reporting in this District, including at The Times' Washington Bureau, and because Defendants conduct a substantial amount of official business in this District, and a substantial part of the events giving rise to the claims occurred in the District of Columbia. In particular, among other things, Secretary Hegseth, as a member of the President's Cabinet, "'performs a significant amount of his official duties in the District of Columbia,'" *Bartman v. Cheney*, 827 F. Supp. 1, 2 n.2 (D.D.C. 1993) (citation omitted); *see also Chin-Young v. Esper*, No. 18-2072 (RDM), 2019 WL 4247260, at *5 (D.D.C. Sept. 6, 2019), and the Department's and Defendants' decision-making with respect to the development and implementation of the Policy occurred, in substantial part, within this District.

## FACTUAL ALLEGATIONS

### Historic Press Access at the Pentagon

25. There is a long tradition of journalists covering the military from the grounds of the Pentagon. That access has enabled, among other things, real-time, eyewitness reporting on the Department's response to the terrorist attacks of September 11, 2001, including the attack on the Pentagon itself—coverage the Department has lauded.[3] The ability of journalists to cover the military from the Pentagon grounds benefits the American public, in part, because it gives Department officials the ability to correct misinformation and get accurate information to journalists and, in turn, to the public quickly when there is a crisis.

26. Since the Pentagon opened in 1942, Department officials have afforded qualified members of the press, including reporters with The Times, access to the Pentagon complex to report on the military and other defense activities.[4] Hanson W. Baldwin, a Times reporter who won a Pulitzer Prize in 1943 for his coverage of World War II, for example, routinely visited the Pentagon to gather news and speak with Department sources.

27. Historically, members of the press have had unescorted access to areas including the Pentagon Press Briefing Room and corridors between the press offices for components of the Department of Defense. Their access also encompassed areas in the Pentagon that include shops, the cafeteria, and spaces in which public tours are conducted, among others. This access permitted reporters to engage with Department personnel in a timely, iterative manner conducive to real-

---

[3] *See, e.g.*, Jim Garamone, *Senior Pentagon Correspondent Recalls 9/11*, DOD News (Sept. 7, 2021), https://www.war.gov/News/Feature-Stories/Story/Article/2765676/senior-cnn-pentagon-correspondent-recalls-911/ (Department press office interview with then-ABC News producer Barbara Starr recounting her coverage of 9/11 from the Pentagon) (attached as Ex. 26).

[4] Eleanor Watson, *CBS News Ends Over 60-Year Presence at Pentagon After Declining to Sign New Press Requirements*, CBS News (Oct. 17, 2025), https://www.cbsnews.com/news/cbs-news-pentagon-60-year-presence-press-requirements/ (attached as Ex. 22).

time, comprehensive reporting. As The Times opinion columnist Maureen Dowd described in an October 18, 2025 column about the Policy, journalists from The Times and other media outlets previously "could stake out Jim Mattis, a defense secretary in President Trump's first term, when he picked up his clothes at an in-house dry cleaners and have an off-the-record chat as he walked back to his office, shirts slung over his shoulder" or "might bump into the chairman of the Joint Chiefs of Staff at a Pentagon Starbucks and have a conversation that could turn into a story."[5]

28. In addition, since the 1970s, the Pentagon provided reporters with dedicated office space in the building, known as Correspondents' Corridor, where reporters set up desks and TV network booths. Qualified members of the press, including The Times journalists, have had access to such areas within the Pentagon building for more than eight decades. That access, which was not conditioned on the perceived viewpoint of journalists and their news organizations, or the content of their reporting, served the interests of the American public and posed no security or safety risk to Pentagon property or personnel.

29. As is true of most journalists, particularly those covering governmental institutions, Pentagon reporters frequently talk to sources, including Department officials, on background or off-the-record. Reporters permit sources to discuss matters off-the-record or without attribution regularly for all sorts of reasons. Many sources authorized to speak to members of the press, including high-ranking officials and Department Public Affairs Office staff, often ask to speak only on background even to discuss information they are authorized to convey to the press.

[5] Maureen Dowd, *Fraidy-Cat at the Pentagon*, N.Y. Times (Oct. 18, 2025), https://www.nytimes.com/2025/10/18/opinion/pentagon-journalists-news-hegseth.html (attached as Ex. 21).

**Department Officials Including Secretary Hegseth Repeatedly Criticize The Times and Other Media Outlets for Their Coverage**

30. On November 12, 2024, then President-elect Donald Trump named Defendant Pete Hegseth as his nominee for Secretary of Defense. Hegseth was confirmed as Secretary of Defense on January 24, 2025.

31. Since he was nominated, Secretary Hegseth and other Department officials have continually criticized and threatened the press for publishing stories they consider unflattering.

32. "The story begins prior to the adoption of the Policy." *NYT I*, 2026 WL 788689, at *13. During the debate over Secretary Hegseth's nomination, The Times and other news organizations reported extensively on his background, including allegations of past sexual assault, excessive drinking, and infidelity, as well as questions about his lack of experience. As the Department conceded in *NYT I*, "Secretary Hegseth and Department officials openly complained about reporting they perceive[d] as unfavorable to them and the Department." *Id.* (quotation marks omitted).

33. At the same time, the Department has sought to impose increasingly stringent and unprecedented restrictions on journalists covering the Department and its leadership.

34. In or around January and February 2025, the Department announced that it was requiring several news outlets—specifically, The Times, NBC News, Politico, National Public Radio, CNN, the Hill, and the War Zone—to give up their dedicated working spaces in the Pentagon as part of a new so-called "rotation" system.[6] Citing the "'journalist value of working from physical office space in the Pentagon,'" the Department announced that it would be requiring The

[6] Associated Press, *More News Outlets Lose Pentagon Workspaces*, The Columbian (Feb. 9, 2025), https://www.columbian.com/news/2025/feb/09/more-news-outlets-lose-pentagon-workspaces/#:~:text=By%20Associated%20Press,going%20forward%2C%E2%80%9D%20Ullyot%20wrote (attached as Ex. 37).

Times to vacate its workspace for *The New York Post*, a media outlet without a Pentagon correspondent.[7] The Department's decision to require specified news outlets to give up their dedicated workspaces in the Pentagon press room was criticized, including by former Defense Department officials.

35. Department officials continued to make negative statements about the Pentagon press corps related to the content of their reporting.

36. These attacks intensified in March of 2025, when Jeffrey Goldberg of The Atlantic revealed in a story that Secretary Hegseth and other top officials had inadvertently included him in a group chat on the messaging platform Signal that disclosed details regarding imminent U.S. airstrikes in Yemen.[8]

37. That same month, after The Times reported that the Department planned to give Elon Musk a classified briefing on plans for a potential war with China, Chief Spokesman and Senior Advisor Sean Parnell said that "this type of garbage from the New York Times . . . undermines our mission"—and that "[t]he days of the Pentagon just allowing these fake narratives to spread is over."[9]

[7] Amanda Terkel, *Pentagon Removes Major Media Outlets, Including NBC News, from Dedicated Workstations in New 'Rotation Program,'* NBC News (Feb. 1, 2025), https://www.nbcnews.com/politics/donald-trump/pentagon-removes-major-media-outlets-nbc-news-dedicated-workstations-p-rcna190276 (attached as Ex. 38).

[8] *See* Jeffrey Goldberg, *The Trump Administration Accidentally Texted Me Its War Plans*, The Atlantic (Mar. 24, 2025), https://www.theatlantic.com/politics/archive/2025/03/trump-administration-accidentally-texted-me-its-war-plans/682151/; Pete Hegseth (@PeteHegseth), X (Mar. 26, 2025, at 11:29 AM), https://x.com/petehegseth/status/1904918673250468002?s=46&t=_B86ruyGVxABuY-Q9DIrhw (attached as Ex. 35).

[9] Sean Parnell (@SeanParnellASW), X (Mar. 21, 2025, at 8:19 AM), https://x.com/SeanParnellASW/status/1903058997835440144 (attached as Ex. 36).

38. Later that month, after The Times broke the story that Secretary Hegseth's wife, brother, and personal lawyer and Senior Advisor, Cmdr. Parlatore,[10] were included in a second private Signal group chat in which the Secretary had shared details about imminent U.S. plans to strike Yemen, Secretary Hegseth complained: "This is what the media does. . . . [T]hey try slashing and burning people to ruin their reputations."[11]

39. Department officials have especially fixated on The Times's choice of sources—its use of unnamed sources and refusal to give controlling weight to the Department's official narrative. Parnell complained about The Times's use of "five anonymous sources."[12]

40. Parnell elsewhere criticized The Times for "rel[ying] only on the words of people who were fired this week and appear to have a motive to sabotage the Secretary and the President's agenda."[13]

[10] While Cmdr. Parlatore serves as a Senior Advisor to the Secretary, it is not clear whether he has a top-secret clearance and has continued to represent private clients in litigation against the government; as a result, his "frequent presence in the Defense secretary's office" and participation in meetings with the Defense secretary and his senior staff has raised concerns within the Department as well as Congress. *See* Daniel Lippman and Josh Gerstein, *Hegseth Attorney's Dual Roles Trip Conflict-of-Interest Alarms*, Politico (May 3, 2025), https://www.politico.com/news/2025/05/03/parlatore-hegseth-navy-conflict-00323266 (attached as Ex. 31); *see also*, Congressman Jason Crow, Press Release: *Crow Presses Secretary Pete Hegseth Over Defense Department Corruption, Conflicts of Interest* (April 30, 2026) (transcript of Congressman Crow questioning Secretary Hegseth about Cmdr. Parlatore's lack of a security clearance and work in private practice, including on behalf of foreign governments) (attached as Ex. 7).

[11] Susan Carpenter, *Hegseth Blames Media, Disgruntled Former Employees for Second Signal Chat Leak*, Spectrum News (Apr. 21, 2025), https://spectrumlocalnews.com/us/snplus/politics/2025/04/21/hegseth-second-signal-chat (attached as Ex. 33).

[12] Sean Parnell (@SeanParnellASW), X (Mar. 21, 2025, at 8:19 AM), https://x.com/SeanParnellASW/status/1903058997835440144 (attached as Ex. 36).

[13] Tara Copp, *Hegseth Had a Second Signal Chat Where He Shared Details of Yemen Strike, New York Times Reports*, PBS News (Apr. 21, 2025), https://www.pbs.org/newshour/politics/hegseth-had-a-second-signal-chat-where-he-shared-details-of-yemen-strike-new-york-times-reports (attached as Ex. 34).

41. Secretary Hegseth too objected that The Times had quoted "anonymous sources" in an article about him.[14]

42. Secretary Hegseth also complained that The Times's coverage of the June 2025 attack on Iran relied too heavily on sources suggesting the attack had failed and too little on sources supporting his claim that the United States had "obliterate[ed]" Iran's nuclear capacity. "Have any of these quotes made their way into New York Times?"[15]

43. In late summer 2025, Department leadership even publicly asserted that recent coverage should be "punished."[16]

**The Pentagon Announces a New PFAC Policy**

44. On May 23, 2025, Secretary Hegseth issued what he called "Updated Physical Control Measures for Press/Media Access Within the Pentagon," imposing restrictions on journalists' access to specific areas of the building, including in the vicinity of his office, and requiring journalists to be accompanied by official "escorts" when visiting certain areas. Ex. 39. These changes were not precipitated by any security or safety incident involving a PFAC holder. *See, e.g.*, Defs.' *NYT I* SUMF, Dkt. 22-2 at 2 (¶ 11) (agreeing this fact is "[u]ndisputed"). According to the "Memorandum for Resident and Visiting Press Assigned to the Pentagon," these "updated security measures" were purportedly "needed to reduce the opportunities for in-person inadvertent and

[14] Carpenter, *Hegseth Blames Media, Disgruntled Former Employees For Second Signal Chat Leak*, supra n. 11 (attached as Ex. 33).

[15] PBS NewsHour, Hegseth holds briefing Israel-Iran war (June 26, 2025), https://www.youtube.com/watch?v=ttWMTNGJIqE (attached as Ex. 30).

[16] Deputy Press Secretary Joel Valdez (@JoelValdezDOW), X (Aug. 20, 2025, at 8:56 AM), https://x.com/JoelValdezDOW/status/1958151139331088527 (attached as Ex. 28); *see also* Brian Flood, *Pentagon officials blast Washington Post for putting 'lives at risk' with report on Pete Hegseth's security,* Fox News (Aug. 20, 2025), https://www.foxnews.com/media/pentagon-officials-blast-washington-post-putting-lives-risk-report-pete-hegseths-security(attached as Ex. 27).

unauthorized disclosures." Ex. 39 at 1; *see also* Erik Wemple, *Inside Hegseth's Effort to Limit Press Access at the Pentagon*, N.Y. Times (Oct. 10, 2025) ("Under [Secretary Hegseth's] leadership, the [D]epartment has removed national news outlets from a shared media workspace . . . ; [and] has scaled back reporters' ability to roam Pentagon corridors.").[17] These restrictions coincide with other efforts by the Department to restrict the flow of newsworthy information to the public, both via the press,[18] and via Congress.[19]

45. On September 18, 2025, Parnell issued a "Memorandum for Senior Pentagon Leadership" ("September 18 Memorandum") purporting to implement the Department's Updated Physical Control Measures. Ex. 4. The Memorandum included an attached "Pentagon Reservation In-Brief for Media Members" ("September 18 In-Brief"; together, the "September 18 Policy"). In the September 18 Memorandum, which purported to implement the Department's "Updated Physical Control Measures for Press/Media Access Within the Pentagon," Parnell announced new policies governing the issuance, renewal, suspension, and revocation of PFACs that went even further than the newly instituted "physical control measures." *Id.* at 2–10.

46. The September 18 Memorandum explained that "[a]ll members of the press issued a [PFAC] will be required to read and sign a new in-brief form outlining information security requirements, the new physical control measures, and [Department] expectations of their compliance with safety and security requirements." *Id.* at 1.

---

[17] https://www.nytimes.com/2025/10/10/business/media/hegseth-pentagon-press-access.html (attached as Ex. 25).

[18] *See, e.g.*, Dan Lamothe & Ellen Nakashima, *Hegseth team told to stop polygraph tests after complaint to White House*, Wash. Post (July 26, 2025), https://www.washingtonpost.com/national-security/2025/07/26/pete-hegseth-leak-investigation-trump/ (attached as Ex. 29).

[19] *See, e.g.*, Ben Finley & Konstantin Toropin, *Hegseth changes policy on how Pentagon officials communicate with Congress*, AP News (Oct. 21, 2025), https://apnews.com/article/defense-department-pentagon-hegseth-congress-c15a2050aa95998f28e31a6b5c1d287a (attached as Ex. 20).

47. In addition to setting out specific requirements for physical presence within the facility, including restrictions on journalists' access to certain floors of the Pentagon, *id.* at 4, the September 18 In-Brief also included provisions addressed to the "unauthorized" disclosure of information. Specifically, it stated that "[Department] information must be approved for public release by an appropriate authorizing official before it is released, even if it is unclassified" because "[u]nauthorized disclosure of CNSI [classified national security information] or CUI [controlled unclassified information] poses a security risk that could damage the national security of the United States and place [Department] personnel in jeopardy." *Id.* at 6.

48. The September 18 iteration of the In-Brief was followed by an "Acknowledgment" that required PFAC holders to agree that they could be "determined to pose a security or safety risk . . . based on the unauthorized access, attempted unauthorized access, or unauthorized disclosure of [classified national security information] or [controlled unclassified information]," and to initial next to other statements, including that "PFACs are . . . a courtesy." *Id.* at 12.

49. The September 18 In-Brief also set forth a process for PFAC issuance, renewal, and termination. It provided that "PFACs may be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to [Department] personnel or property[.]" *Id.* at 7, 12. It further provided that "[a]n initial determination of security or safety risk may result in an immediate suspension of Pentagon access during the process for making a final determination," which "may be based on the unauthorized access, attempted unauthorized access, or unauthorized disclosure" of Department information. *Id.* at 7; *see id.* at 12.

50. An Appendix to the September 18 Policy provided that the grounds for determining whether a journalist poses a security or safety risk "include, but are not limited to," convictions for certain offenses or "actions other than conviction . . . such as attempts to improperly obtain"

Department information, or "being found in physical possession of" such information "without reporting it." *Id.* at 14. This Appendix also stated that a PFAC holder would be notified of a decision to deny, revoke, or not renew a PFAC in writing, including the basis for the decision, after which the journalist would have 30 days to appeal that decision. *Id.* at 14–15.

**Members of the Press Object to the Policy**

51. The Department's announcement of its new press credentialing policy sparked widespread confusion and concern among news organizations and journalists who cover the Pentagon. On September 22, the Reporters Committee for Freedom of the Press (the "Reporters Committee" or "RCFP") sent a letter to Parnell asking for clarification as to how the Policy's restriction on disclosure would be applied and whether the Acknowledgment was intended to require journalists to agree not to publish information without first obtaining Department approval. Ex. 6.

52. In a response letter dated September 24, Parnell wrote to "clarif[y]" that the restriction against disclosure in the Policy is one that Pentagon personnel must follow, and "does not impose restrictions on journalistic activities, such as investigating, reporting, or publishing stories." Ex. 5 at 1, 3. According to Parnell, "it informs PFAC holders of [the Department]'s internal policies and the processes for managing building access, which is a privilege extended to facilitate responsible coverage." *Id.* The letter disclaimed any attempt to require that "reporters . . . seek [Department] approval for their stories or endorse any viewpoint on pre-authorization," and stated that "[j]ournalists remain free to gather information through legitimate means, such as Freedom of Information Act requests, official briefings, or unsolicited tips, and to publish as they deem newsworthy." *Id.* at 2.

53. This letter, however, provided cold comfort. According to Parnell, the "focus" of the Policy was "on preventing active solicitation that encourages [Department] personnel to violate

these disclosure rules, as such conduct is not always protected by the First Amendment." *Id*. Parnell also confirmed that the First Amendment-protected receipt and publication of unsolicited, classified or protected information "could factor" into the Department's wholly "discretion[ary]" decision to revoke a reporter's PFAC. *Id*.

54. On September 28, 2025, Cmdr. Parlatore—Secretary Hegseth's private attorney and advisor[20]—circulated a redlined, revised version of the Acknowledgement to members of the media integrating language from the Parnell letter. Ex. 5-1. The revisions included a number of statements that appeared designed to characterize the Policy, including the Acknowledgment requirement, as "not impos[ing] any obligations on [PFAC holders] to refrain from constitutionally protected journalistic activities." *Id.* at 2. But these statements contradicted other specific statements in the Policy that do in fact directly intrude on "constitutionally protected journalistic activities." *Id.* For example, the Policy as revised continued to expressly claim that Department officials had uncabined "discretion[]" to immediately suspend a PFAC based on a determination that activities protected by the First Amendment, including lawful newsgathering and publication, posed a "security or safety risk." Ex. 3 at 13. And, according to the redlined Acknowledgement, any "direct communications with specific [Department] personnel or general appeals, such as public advertisements or calls for tips"—typical, lawful newsgathering techniques that journalists routinely utilize—would constitute "solicitation" in violation of the Policy. Ex. 5-1 at 2.

55. News organizations and PFAC-holding journalists from numerous outlets, including The Times, informed Pentagon leadership that the September 28, 2025 revisions to the Policy

[20] *See* Dan Lamothe, *Hegseth's legal fixer at the center of Pentagon's new media restrictions*, Wash. Post (Oct. 15, 2025), https://www.washingtonpost.com/national-security/2025/10/15/hegseth-media-restrictions-tim-parlatore/ (attached as Ex. 23).

were incompatible with their First Amendment rights and responsibilities as members of the press to engage in independent journalism and that they could not sign the Acknowledgement.

**The Pentagon Announces its Final Policy and Mandates That PFAC Holders Sign the Acknowledgement**

56. On October 6, 2025, the Department issued its final Policy ("the October Policy"), a true and correct copy of which is attached hereto as Exhibit 3.

57. The final version of the October Policy included an Acknowledgment that stated:

> I have received, read, and understand the "Pentagon Reservation In-brief for Media Members," with [relevant appendices] which address[] the standard and procedures for denying, revoking, and not renewing a PFAC. The in-brief describes [Department] policies and procedures. My signature represents my acknowledgement and understanding of such [Department] policies and procedures, even if I do not necessarily agree with such policies and procedures. Signing this acknowledgment does not waive any rights I may have under law.

Ex. 3 at 15.

58. Even though the Policy invoked the Secretary's statutory authority under 10 U.S.C. § 2674 to safeguard the physical property of the Pentagon itself, the October Policy was neither motivated by nor narrowly tailored to any such interest. To the contrary, the Policy reaffirmed the Department's position that it possesses unbridled discretion to rescind a PFAC based on First Amendment-protected newsgathering and reporting wherever it occurs. Specifically, the In-Brief stated that while allowing that "the receipt of unsolicited" classified or unclassified information "and its subsequent publication is generally protected by the First Amendment and would not, on its own, normally trigger denial, revocation, or non-renewal of a PFAC," if a journalist "solicit[s] the disclosure of such information or otherwise encourage[s] [Department] personnel to violate laws and policies concerning the disclosure of such information," the Department may deem the journalist a "security or safety risk." *Id*. at 13.

59. With respect to what constitutes improper "solicitation" in the Department's view, the In-Brief stated that "solicitation" in violation of the Policy "may include direct communications with specific [Department] personnel or general appeals, such as public advertisements or calls for tips . . ." and it cited "an advertisement or social media post by an individual journalist or media outlet that directly targets [Department] personnel to disclose non-public information without proper authorization" as an "example" of what "would constitute a solicitation that could lead to revocation" of a PFAC. *Id.* at 13-14.

60. The October Policy also took an expansive approach to what "non-public information" the Department may view as being off limits, and if "solicited," obtained or published could result in the denial, suspension or revocation of a reporter's PFAC. According to the Policy, such unclassified information "may include, but is not limited to, information protected by the Privacy Act, information that is law enforcement-sensitive, and certain operational security information." *Id.* at 7. And purportedly "[t]o ensure the safety of U.S. personnel," the Policy instructed journalists "who find themselves in possession of information that appears to be [classified national security information] or [controlled unclassified information]" to "discuss those materials with the [Pentagon Press Operations] prior to publication." *Id.*

61. In addition to reiterating the Department's view that "[m]embers of the news media do not possess a legal right to access the Pentagon" and that "such access is a privilege, subject to the discretion of government authorities," *id.* at 4, the Policy explained that a PFAC "may be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to [Department] personnel or property," and that "[s]uch determination may be based on factors including, but not limited to, the unauthorized access, attempted unauthorized access, or

unauthorized disclosure of" classified or unclassified information "based on a reasonable assessment informed by the unique facts and circumstances of each case." *Id*. at 13.

62. The October Policy further stated that Pentagon officials have the discretion to "deny, revoke, or refuse to renew the PFAC of any person reasonably determined to pose a security or safety risk to [Department] personnel or property." *Id.* at 16. It explains that "[p]ersons presumed to present such a risk include, *but are not limited to*, those who have been convicted of any offense involving," among other things "[u]nprofessional conduct that might serve to disrupt Pentagon operations." *Id*. (emphasis added). The Policy did not explain what type of "conviction" it refers to with respect to "[u]nprofessional conduct," and expressly notes that "actions other than conviction may be deemed to pose a security or safety risk." *Id*.

63. The October Policy stated that an "initial determination" that a journalist "pose[s] a security or safety risk . . . may result in an immediate suspension" of a PFAC "while the procedures preceding a final determination are pending." *Id*. at 13.

64. Following its issuance of the Policy on October 6, the Department gave PFAC holders until October 14 to review and sign the Acknowledgment.

65. The decision to issue the October Policy, as well as related decisions regarding the content of the Policy, were made either in full or in substantial part by Secretary Hegseth, Mr. Parnell, Cmdr. Parlatore, and other Department officials and advisors located in the District of Columbia.

**The Department's October Policy Forces Plaintiffs and Other Journalists Out of the Pentagon**

66. Prior to the Department's deadline, journalists with PFACs at The Times and virtually every other major news organization covering the Pentagon uniformly declined to sign the Acknowledgment. Instead, they informed Pentagon officials that they believed the Policy, and the

Department's insistence that they sign the Acknowledgment, violated their First Amendment rights. As a result, on October 15, 2025, they were compelled to turn in their PFACs. The vast majority of journalists and news outlets represented in the Pentagon Press Association (PPA) refused to sign the Acknowledgement.

67. Department officials made clear that this outcome was intentional. Hegseth responded to news organizations making clear they could not sign the Policy by posting to his official X account an emoji of a hand waving goodbye.[21] Mr. Parnell similarly celebrated the Department's success in driving longtime, independent reporters from the Pentagon, posting to X that "Americans have largely abandoned digesting their news through the lens of activists who masquerade as journalists in the mainstream media," and "[w]e look forward to beginning a fresh relationship with members of the new Pentagon press corps."[22]

**The Department Selects a New "Pentagon Press Corps" Based on Editorial Viewpoint**

68. Within days, Parnell took to his official X account to "announc[e] the next generation of the Pentagon press corps."[23] In describing the "[n]ew media outlets" willing to accede to the Department's "media access policy," Parnell wrote that they "circumvent the lies of the mainstream media and get real news to the American people," and "[t]heir reach and impact collectively are far more effective and balanced than the self-righteous media who chose to self-deport from

[21] Pete Hegseth (@PeteHegseth), X (Oct. 13, 2025, at 2:49 P.M.), https://x.com/PeteHegseth/status/1977808951338307907 (attached as Ex. 24).

[22] Sean Parnell (@SeanParnellASW), X (Oct. 22, 2025, at 1:21 PM), https://x.com/SeanParnellASW/status/1981048206923329719 (attached as Ex. 19).

[23] *Id.*

the Pentagon"—journalists "in the mainstream media" whom Parnell described as "activists who masquerade as journalists."[24]

69. New PFAC recipients included the National Pulse, which was described by its editor-in-chief as "'an industry mag/site for MAGA world'"; Laura Loomer, an "influential pro-Trump activist"; and former congressman Matt Gaetz, President Trump's one-time pick for Attorney General of the United States, who is now affiliated with One America News.[25] Many had expressed ideological support for the Trump administration or indicated that they do not intend to report critically on the Pentagon.[26] For example, Libby Emmons, the editor-in-chief of Human Events and the Post Millennial who requested four passes for her staff after "receiv[ing] an unsolicited invitation to apply for credentials," stated that "[t]here should be a place for reporting on what they are doing without always trying to expose the dark underbelly," and Tim Pool, who disclosed that his outlet would be getting a credential, explained that his is "not an investigative news organization" and he did "not intend to maintain a significant presence in the Pentagon."[27]

70. The following week, the Department held its first in-person press events on Pentagon grounds since the Policy went into effect, which included a press briefing and a "meet-and-greet" event with Secretary Hegseth.[28] In welcoming what she called the "official new members

---

[24] *Id.*

[25] Ken Bensinger & Erik Wemple, *New Pentagon Press Crew Is All In on Trump*, *supra* n.5 (attached as Ex. 15); David Bauder, *Some Friendly, Some On-the-News Questions at First Briefing for New Pentagon Press Corps*, AP News (Dec. 2, 2025), https://apnews.com/article/pentagon-press-corps-access-journalists-96163e7ac0c8a73a44178fb5bb852863 (attached as Ex. 11).

[26] Bensinger & Wemple, *New Pentagon Press Crew Is All In on Trump*, *supra* n. 25.

[27] *Id.*

[28] Scott Nover, *Pentagon's right-wing, pared press corps gets a meet-and-greet*, Wash. Post (Nov. 29, 2025), https://www.washingtonpost.com/business/2025/11/29/pentagon-press-policy-hegseth/ (attached as Ex. 14).

of the Pentagon Press Corps," Pentagon Press Secretary Kingsley Wilson ("Wilson") specifically focused on the Department's preference for their First Amendment activities. She criticized journalists and news organizations, like Plaintiffs, who had previously held PFACs, calling them "propagandists" who "stopped telling the truth," and she praised those the Department had selected to cover the Pentagon, asserting that they "actually reach Americans, ask real questions, and don't pursue a biased agenda."[29]

71. Similarly, in determining when solicitation of unapproved information is permissible, the Department drew distinctions based on favored and disfavored content and speakers. In her X post announcing that LOOMERED "is now a credentialed outlet at the Pentagon," Loomer stated: "I have developed a Rolodex of sources and if you have any tips, feel free to contact the Loomered Tip Line: the most influential Tip Line in all of DC."[30] When asked whether Loomer's "request for tips violates its new press policy,"[31] the Department responded that it did not. Through a statement attributable to Wilson, the Department stated:

> Unlike [the Washington Post's] solicitation, which explicitly and exclusively targets military personnel and DoW employees, Laura Loomer's X post regarding tips to her news outlet is a general tip line, which is constitutionally permissible. Therefore it does not violate the Pentagon's media access policy. This distinction was explained in detail to the Pentagon Press Association before they chose to engage in a dishonest and performative walk out. If Fake News reporters actually had a brain and could read our policy correctly, then maybe one day they will be as effective of a journalist as Ms. Loomer is.[32]

---

[29] DOW Rapid Response (@DOWResponse), X (Dec. 2, 2025, at 11:21 am), https://x.com/DOW-Response/status/1995890967002452302 (attached as Ex. 12).

[30] Laura Loomer (@LauraLoomer), X (Nov. 3, 2025, at 11:13 PM), https://x.com/LauraLoomer/status/1985560924720124414 (attached as Ex. 18).

[31] Scott Nover (@ScottNover), X (Nov. 4, 2025, at 1:53 PM), https://x.com/ScottNover/status/1985782401755128207 (attached as Ex. 16).

[32] Scott Nover (@ScottNover), X (Nov. 4, 2025, at 2:02 PM), https://x.com/ScottNover/status/1985784630100804036 (attached as Ex. 17).

This explanation came on the heels of another statement from Wilson in which she asserted that "we have seen a lot of the mainstream media continue to lie."[33]

72. In another instance, at the first official press conference held by Wilson on December 2, 2025, James O'Keefe, founder of the conservative group Project Veritas, noted that he had surreptitiously recorded a high-level Pentagon official making unguarded statements that were plainly unapproved by Department leadership—newsgathering then ostensibly prohibited by the October Policy. Wilson, however, praised O'Keefe's work, which appeared to expose a critic of President Trump, noting: "That's why the work you all do is so important."[34]

73. On December 3, 2025, new PFAC holder Cam Higby posted to his X account a video of an interview with Wilson, under the header "MSM Journalists wreaked havoc on the Pentagon during their time in the building. Pentagon Press Sec Kingsley Wilson explains the hostile work environment created for DoW staff by adversarial media."[35] Wilson said members of the "former Pentagon press corps" engaged in "unprofessional behavior," including by coming to her office to speak with her.[36]

**The District Court Vacates and Enjoins the October Policy**

74. The Times and Barnes filed suit on December 4, 2025, challenging provisions of the October Policy related to the Acknowledgement requirement, safety and security

[33] Bensinger & Wemple, *New Pentagon Press Crew Is All In on Trump*, *supra* n. 25 (attached as Ex. 15).

[34] *James O'Keefe Asks Pentagon Press Secretary Question About Identifying Anti-Trump Members of DOD*, Forbes Breaking News, YouTube (Dec. 2, 2025), https://www.youtube.com/watch?v=BQfpJfAgIdU (attached as Ex. 10); *see also* James O'Keefe (@JamesOKeefeIII), X (Apr. 23, 2025 at 3:46 PM), https://x.com/JamesOKeefeIII/status/1915175452404035624 (attached as Ex. 32).

[35] Cam Higby (@camhigby), X (Dec. 3, 2025 at 2:21 PM), https://x.com/camhigby/status/1996298682136768743 (attached as Ex. 40).

[36] *Id.*

determinations, newsgathering, and reporting. The parties cross-moved for summary judgment. Plaintiffs submitted extensive evidence demonstrating that the Policy was motivated by a viewpoint discriminatory effort to censor independent reporting and that their exclusion was causing them irreparable First Amendment injuries every day. The Department, by contrast, submitted nothing indicating that it had any legitimate national security or safety concern related to members of the press being present in the Pentagon.

75. On March 20, 2026, following full briefing and a hearing, the district court granted Plaintiffs' motion for summary judgment and denied Defendants' cross-motion for summary judgment. *NYT I*, 2026 WL 788689, at *2. The court held that provisions of the Department's October PFAC Policy violated the First and Fifth Amendments. The Department conceded that the Pentagon's press spaces were a nonpublic forum and, accordingly, that any restrictions it imposed on access to and use of that forum could be neither unreasonable nor viewpoint discriminatory. *See id.* at *25–26; *Ateba v. Leavitt*, 133 F.4th 114, 123 (D.C. Cir. 2025). The district court found that the challenged provisions were both. In particular, it concluded that even if the Policy was "facially viewpoint neutral," its "purpose and its effect" was "to chill speech that the Department perceives as unfavorable or biased." *NYT I*, 2026 WL 788689, at * 13–14 (alterations omitted).

76. The district court reached its conclusion that the October Policy was viewpoint discriminatory based on "voluminous" undisputed evidence, including that "Department officials openly complained about reporting" related to "Secretary Hegseth's background and qualifications" that they "perceived as unfavorable"; that "in the weeks and months leading up to the issuance of the Policy," senior Department officials called media outlets "scum" and "garbage" and "called for their 'severe punishment'"; and that after implementing the Policy, Department officials accused excluded journalists and news organizations, like The Times, of being

"'propagandists' who 'stopped telling the truth' and who 'continue to lie,'" while simultaneously praising those willing to submit to the Policy as "the absolute best people" who were "on board and willing to serve our commander-in-chief." *Id.* The district court further found that the Department was interpreting the October Policy to prohibit certain conduct by disfavored news organizations while permitting substantially identical conduct by media outlets the Department preferred. *Id.* "In sum, the undisputed evidence reflect[ed] the Policy's true purpose and practical effect: to weed out disfavored journalists—those who were not, in the Department's view, 'on board and willing to serve'—and replace them with news entities that are. That is viewpoint discrimination, full stop." *Id.* at *14 (citation omitted).

77. In assessing the constitutionality of the October Policy and weighing the injunction factors, the district court found that "[t]he regular presence of PFAC holders at the Pentagon . . . pos[es] no security or safety risk to Department property or personnel," *id.* at *3—a fact expressly conceded by the Department. *Compare* Plaintiffs' SUMF, Dkt. 10-36 at 3 (¶ 11) *with* Defendants' SUMF, Dkt. 22-2 at 2 (¶ 11) (agreeing this fact is "[u]ndisputed"). It squarely rejected the Department's "assertion that vacatur would 'compromise the safety of the Pentagon'" as "unfounded." *NYT I*, 2026 WL 788689, at *18.

78. The court vacated the challenged provisions as to all regulated parties, enjoined Defendants from enforcing those provisions against Plaintiffs, and ordered Defendants to immediately reinstate PFACs to Barnes and the six other Times journalists who held valid credentials prior to the Policy's adoption.

**The Department Retaliates Through the "Interim" Policy**

79. Rather than comply with the district court's order, pursue an orderly appeal, or take the time to construct a reasoned, lawful PFAC policy consistent with the district court's decision,

the Department scrambled to flout it. Faced with the prospect of letting The Times journalists back into the Pentagon, Defendants instead issued the "Interim Policy" just one working day after the district court issued its order.

80. On March 23, 2026, in an email to counsel for The Times, Department officials provided an "attached revised policy" that consisted of a "Memorandum for Senior Pentagon Leadership" from Defendant Sean Parnell (the "Memorandum"), a "Pentagon Reservation In-Brief for Media Members" (the "In-Brief"), and an Appendix. Ex. 2.

81. The Interim Policy provides that "PFACs may be denied, revoked, or not renewed if a person meets any of the criteria set forth in Appendix A." Ex. 1 at 10.

82. Appendix A sets forth certain conviction-based grounds for PFAC denial, revocation, or non-renewal, as well as so-called "[c]onduct-[b]ased [g]rounds," including the "inducement of unauthorized disclosure as defined in" the In-Brief. *Id.* at 16. According to the In-Brief, purportedly "[t]o correct the Court's mischaracterization" of the Policy, "the Department has replaced the term 'solicitation' with 'intentional inducement of unauthorized disclosure.'" *Id.* at 14. The Interim Policy defines "intentional inducement of unauthorized disclosure" to mean "intentionally encouraging, inducing, or requesting that a specific Department employee disclose classified national security information or [controlled unclassified information] that the journalist knows that the specific Department employee is not authorized to disclosing [sic] under Article 92 of the Uniform Code of Military Justice (10 U.S.C. § 892), 18 U.S.C. § 1905, or 5 U.S.C. § 552a." *Id.*

83. The In-Brief then lists six activities that "do not constitute 'intentional inducement of unauthorized disclosure' under" the Interim Policy, including (a) "[a]sking questions of Department personnel who are authorized to speak with the press," (b) "[r]eceiving unsolicited information," (c) "[p]ublishing calls for tips or other general appeals to the public at large that are not

specifically directed at Department personnel," (d) "[d]eveloping source relationships outside the Pentagon through independent reporting," (e) "[c]ommunicating with Department personnel through official channels for public disclosure of information," such as press briefings and interviews arranged by public affairs offices, and (f) "[a]sking questions of any Department employee where the journalist does not know that the employee is not authorized to disclose the information sought." *Id.* at 15. The In-Brief further states, however, that "[a] journalist's offer of anonymity or privacy protection to a Department employee in exchange for information shall create a rebuttable presumption that the journalist knew the employee was not authorized to disclose the information sought." *Id.* at 14.

84. The Interim Policy also states that, "[e]ffective immediately, the Correspondents' Corridor is closed" and that PFAC holders will be able to access "[a] new press workspace . . . in an annex facility outside the Pentagon" once it is "operational." *Id.* at 3. It further states that "[i]n the interim, PFAC holders" will be able to access the Pentagon only "for scheduled press briefings, press conferences, and interviews arranged through the public affairs offices," and only if they are "escort[ed] by authorized [Department] personnel at all times." *Id.* Under the Interim Policy, "all journalist access to the Pentagon will require [an] escort[,]" and, "[w]hen in the Pentagon," PFAC holders "must remain with [their] escort at all times." *Id.* at 3, 7. According to the Interim Policy, no more than "three visiting media members from the same media outlet" may obtain "escort privileges." *Id.* at 8–9.

85. Any journalist, whether a PFAC-holder or not—or any member of the public—may visit the Pentagon on these terms. And in practice, they prohibit reporters from meaningfully reporting from the Pentagon.

86. On the same day that the Department sent The Times the Interim Policy, Defendant Parnell also announced it in a post on X.[37] The post described the Department's decision to limit PFAC holders' access to the Pentagon to escorted visits for "scheduled press briefings, press conferences, and interviews arranged through public affairs offices." *Id.* He asserted that the Department had determined these changes were necessary to ensure Pentagon security in light of the district court's order—stating that "[i]n assessing the Department's security posture following the court's removal of all security screening authority, the Department determined that unescorted access to the Pentagon cannot be responsibly maintained without the ability to screen credential holders for security risks." *Id.* Parnell's post thus expressly attributed the Interim Policy to the court's order that The Times' PFACs be reinstated—making clear that it is retaliatory and aimed at denying Plaintiffs meaningful Pentagon access.

87. The decision to issue the Interim Policy, as well as related decisions regarding the content and implementation of the Interim Policy, were made either in full or in substantial part by Secretary Hegseth, Mr. Parnell, Cmdr. Parlatore, and other Department officials and advisors located in the District of Columbia.

**The District Court Orders Defendants to Comply with the March 20 Order**

88. On March 24, 2026, Plaintiffs moved to compel compliance with the district court's order.

89. The district court granted that motion on April 9, 2026. The court saw Defendants' conduct for what it was: the same "unlawful policy under the guise of taking 'new' action." *NYT II*, 2026 WL 962252, at *4. It determined that the Interim Policy had the same unconstitutional

[37] Sean Parnell (@SeanParnellUSA), X (Mar. 23, 2026 at 5:43 PM), https://x.com/SeanParnellASW/status/2036197221121794508 (attached as Ex. 41).

motive of "dictat[ing] the information received by the American people" that rendered the original Policy invalid, and that Defendants' effort to "cut off *all* PFAC holders' meaningful access" violated the court's March 20 Order "requir[ing] the Department to *restore* the plaintiffs' access to the Pentagon." *Id.* at 9, 19.

90. The court enjoined the Department from enforcing the relevant provisions of the Interim Policy against The Times journalists and ordered that Mr. Barnes and other Times reporters be allowed "to access the Pentagon in a manner commensurate with the access provided to PFAC holders on March 20, 2026, following [the court's prior order]." *NYT II* Order, ECF No. 54, at 3.

91. Defendants appealed both of the district court's orders and sought a limited stay pending appeal of the aspect of the district court's order requiring them to permit Plaintiffs to access the Pentagon without an escort. A divided panel of the D.C. Circuit granted that motion, concluding that Defendants were likely to succeed in demonstrating that the district court's original order did not address or bar their later adoption of the escort requirement. The court expressly did not address the Interim Policy's lawfulness. *See New York Times Co. v. Dep't of Def.*, No. 26-5113, 2026 WL 1179440, at *3 (D.C. Cir. Apr. 27, 2026). Defendants are presently enjoined from enforcing any other aspect of the October or Interim policies against Plaintiffs.

92. Department officials continue to make clear their disdain for The Times and other members of the Pentagon press corps, as well as their belief that legitimate reporting constitutes exclusively printing what press officials seek to share with the public. Cmdr. Parlatore, for instance, compared reporters asking a Department official unapproved questions to a murderer trying to hire a "hit man."[38]

[38] Erik Wemple (@ErikWemple), X (Mar. 30, 2026 at 4:36 PM), https://x.com/ErikWemple/status/2038716982548115545 (attached as Ex. 42).

93. Addressing the ongoing war in Iran, Hegseth recently told the "American media" that when they engaged in "relentlessly negative coverage" of the Pentagon, they did not "choos[e] wisely": "Sometimes it's hard to figure out what side some of you are actually on." He compared the "legacy Trump-hating press" to the biblical "Pharisees" who "held counsel against [Jesus on] how to destroy him" and said the media, like the Pharisees, were wrong to have "scrutinized every good act in order to find a violation."[39]

94. At a recent press conference, Hegseth called The Times "unpatriotic."[40]

**The Escort Requirement Does Not Serve Any Security Rationale**

95. There is no legitimate safety or security need for credentialed Pentagon reporters to be accompanied by an escort.

96. The Pentagon has long been staffed by thousands of nongovernment employees—such as contractors, food-service workers, and representatives of other branches of the government or other nations—many of whom move around the Pentagon unescorted each day. In addition, members of the public are welcomed into the Pentagon for tours and other events.

97. The Pentagon already protects information security by, among other things, keeping certain sensitive areas, like the National Military Command Center and most of the Joint Chiefs area, off limits, and through statutes governing Department employee's disclosure of certain information.

[39] C-Span, *Secretary Hegseth Compares Media to the Pharisees in the Bible* (Apr. 16, 2026), https://www.c-span.org/clip/news-conference/defense-secretary-hegseth-compares-media-to-biblical-pharisees/5199158 (attached as Ex. 9).

[40] Dep't of War, Transcript: Secretary of War Pete Hegseth and Chairman of the Joint Chiefs of Staff Gen. Dan Caine Hold a Press Briefing (Apr. 24, 2026), https://www.war.gov/News/Transcripts/Transcript/Article/4470197/secretary-of-war-pete-hegseth-and-chairman-of-the-joint-chiefs-of-staff-gen-dan/ (attached as Ex. 8).

98. Defendants admitted in prior litigation that the regular presence of PFAC holders at the Pentagon poses no security or safety risk to Department property or personnel. *Compare* Plaintiffs' SUMF, Dkt. 10-36 at 3 (¶ 11) *with* Defendants' SUMF, Dkt. 22-2 at 2 (¶ 11) (agreeing this fact is "[u]ndisputed").

**Plaintiffs Suffer Ongoing Irreparable Harm From the Interim Policy**

99. While the Department has no legitimate security or safety interest in terminating meaningful press access to the Pentagon, their decision to do so is causing irreparable harm to Plaintiffs and the public.

100. Although reporters from The Times and other news organizations without PFACs have continued and will continue to gather news and publish important stories about the Department and the United States military, the Policy ensures that certain stories will no longer be available to those journalists and news organizations—and to the public that relies on their reporting. As one new PFAC recipient put it when asked why he was reporting from the Pentagon: "Press have always worked at the Pentagon. . . . Correspondents place themselves at the buildings so when a major story breaks they're there to cover it."[41]

101. To report effectively on the Department, a reporter often must speak with over a dozen officials sitting in Public Affairs offices spread throughout the building. For decades, the Pentagon's press-access policies reflected this physical reality by allowing reporters unescorted access in unsecured corridors so that they can move from press office to press office and ask questions on short notice as events unfolded. The Interim Policy breaks sharply from that history and tradition.

[41] Cam Higby (@camhigby), X (Dec. 1, 2025, at 7:45 PM), https://x.com/camhigby/status/1995655541474165162 (attached as Ex. 13).

102. Now, to ask even one question, Barnes and other reporters must call or email for an appointment, wait for a response, get an escort, ask their question, and return to the library outside the Pentagon—only to repeat the process for the next source. Reporters must either forgo conversations or else spend hours chasing schedulers by phone and shuttling in and out of the building.

103. As the district court found in *NYT II*, "the access now available to PFAC holders [under the Interim Policy] . . . is not even close to as meaningful as the broad access that PFAC holders had previously been afforded," "mak[ing] it exceedingly difficult to cover the Department." *NYT II*, 2026 WL 962252, at *8.

104. Stories based on routine unplanned interactions between journalists and Pentagon personnel on Pentagon grounds, stories built on dozens of conversations with Pentagon press officers from various parts of the Department and across the building, stories that capture the mood and atmosphere within the Pentagon during times of consequential military operations—all are examples of what Plaintiffs can no longer report. In-person, and often spontaneous exchanges, in which reporters can judge the demeanor of government officials as they respond to questions in real time and press for more information on the spot, are different in kind and can elicit different information than inquiries by phone or by email. And they are different from interviews scheduled with officials days or weeks in advance—to the extent requests for such interviews are granted (or even seen) in the time before a reporter has a deadline. Without meaningful access to the Pentagon, Plaintiffs and other journalists and news organizations are deprived of unique, newsworthy information that can only be obtained in person and through such exchanges. *Cf. ABC, Inc. v. Stewart*, 360 F.3d 90, 99 (2d Cir. 2004) ("[O]ne cannot transcribe an anguished look or a nervous tic.").

105. This loss is made more urgent by recent events that have exacerbated the importance of independent reporting, including the capture of the President of Venezuela, the Iran war, and Secretary Hegseth's firings of multiple high ranking military officials.

106. Given the urgent and irreparable nature of the harm the Interim Policy is inflicting, Plaintiffs bring this suit to challenge the Interim Policy on its face and seek immediate relief from its unconstitutional, retaliatory escort requirement that, in design and effect, is depriving Plaintiffs of meaningful access to the Pentagon.

## CLAIMS FOR RELIEF

### COUNT ONE
### Violation of the First Amendment

107. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

108. News organizations and journalists, including Plaintiffs, have historically had regular, unescorted access to areas of the Pentagon, including to the Pentagon Press Briefing Room, Correspondents' Corridor, and to hallways throughout the building. Such access for credentialed journalists has not posed risk to the safety or security of Pentagon property or personnel.

109. "Although the government is not required to open such spaces for any speech at all, the government creates a 'nonpublic forum' when it provides 'selective access for individual speakers.'" *Ateba*, 133 F.4th at 122 (citations omitted). Areas of the Pentagon, including the Pentagon Briefing Room and Correspondents' Corridor, are nonpublic fora for First Amendment purposes. *See id.* at 121–22 (holding that White House press area was a nonpublic forum for First Amendment purposes); *see also United States v. Nassif*, 97 F.4th 968, 976–77 (D.C. Cir. 2024) (United States Capitol buildings are nonpublic fora for First Amendment purposes).

110. As the Supreme Court has recognized, the government may reserve a nonpublic forum "for its intended purposes, communicative or otherwise, as long as the regulation on speech

is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Minn. Voters All.*, 585 U.S. at 11–12 (quotation marks omitted). The Interim Policy satisfies neither of these requirements.

111. Because the Interim Policy is "an effort to suppress" speech and newsgathering on Pentagon grounds by members of the press, including Plaintiffs, whose reporting and perceived viewpoint the Department disfavors, the Interim Policy violates the First Amendment. *Id.*

112. Defendants' statements criticizing The Times and other reporters, the sequences of events, and the Interim Policy's substance all make clear that it, like the October PFAC Policy before it, was designed and implemented to carry out Department officials' viewpoint discriminatory motive. The Interim Policy's purpose is to exclude from the Pentagon those reporters that will engage in independent newsgathering and reporting—not merely unquestioningly repeat official Department statements—and to allow Department officials to exclude reporters whose coverage they dislike. That viewpoint-discriminatory motive animated the October Policy and was only aggravated by Plaintiffs' successful legal challenge to that policy. It alone renders the Interim Policy unlawful. *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (even when the government may act "for any number of reasons," it "may not rely . . . on a basis that infringes [a person's] constitutionally protected interests—especially, his interest in freedom of speech"); *Nat'l Pub. Radio, Inc.*, 2026 WL 877434, at *1 ("As the Supreme Court and D.C. Circuit have observed on more than a dozen occasions, the government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit.'" (quoting *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013))); *see also Am. Freedom Def. Initiative v. WMATA*, 901 F.3d 356, 365 (D.C. Cir. 2018)

(the government violates the First Amendment if it "change[s] the nature of a forum in order to deny access to a particular speaker or point of view").

113. The Interim Policy is also not viewpoint neutral on its face because it permits journalists to ask certain questions and to report information based on on-the-record conversations with press officials but prohibits certain questions as well as reporting based on unnamed sources or other Department personnel. In doing so, the Interim Policy expressly targets and discriminates against the editorial viewpoint of reporters and news organizations, like Plaintiffs, who engage in independent journalism rather than toe the Department's line.

114. The Interim Policy also violates the First Amendment because its provisions are not reasonable "in light of the purpose served by the forum." *NYT I*, 2026 WL 788689, at *15 (citation omitted). Its provisions significantly interfere with reporters' ability to report on the Department and the U.S. military quickly, accurately, and comprehensively, even though facilitating such reporting is the purpose of the forum.

115. Barring credentialed reporters from the Pentagon unless they are accompanied by an escort is unreasonable because it imposes significant burdens on reporters' newsgathering at the Pentagon given the physical layout of the building. The escort requirement is also wholly unnecessary in view of the long history and tradition of unescorted press access, the absence of any security or safety risk posed by such access, and the absence of any safety or security concerns associated with the thousands of civilian employees in various roles who move around the Pentagon without an escort every day.

116. It is also unreasonable to prohibit and threaten to penalize journalists for agreeing to speak to Department-affiliated sources on background, off-the-record, or confidentially. Relying on unnamed sources is a common and constitutionally protected journalistic practice that

reporters frequently engage in, including at the request of official sources, for reasons having nothing to do with an intent to induce the disclosure of "unauthorized" information.

117. The Interim Policy is also unreasonable and violates the First Amendment because it vests Department officials with standardless and "boundless discretion" to determine whether a PFAC shall be denied, revoked, or not renewed for an "intentional inducement of unauthorized disclosure." *City of Lakewood*, 486 U.S. at 764. Because every bona fide reporter sometimes speaks to sources on background, not for attribution, or on some other condition of anonymity, all reporters may presumptively lose their PFACs under the Interim Policy. The Department gets to decide when the "presumption" created by a journalist's "offer of anonymity or privacy protection" is satisfactorily rebutted. And the Interim Policy lacks objective, workable standards to guide Department officials in making that decision. As the district court concluded in *NYT II*, the provision's "'safe harbors' explicitly leave open the possibility that '[a]sking questions' on certain topics and to certain officials could trigger the revocation or denial of a PFAC." *NYT II*, 2026 WL 962252, at *6.

118. Similarly, the Interim Policy also vests Department officials with unbridled discretion to deny a PFAC holder an escort for any reason or no reason at all, thereby giving Department officials the ability to deny a PFAC holder access to the Pentagon on an ad hoc basis.

119. Because the Interim Policy's escort and "intentional inducement of unauthorized disclosure" provisions, in practice, vest the Department with discretion to exclude any journalist it wants from the Pentagon on an ad hoc basis, the Interim Policy is unreasonable and violates the First Amendment. *See City of Lakewood*, 486 U.S. at 764; *Minn. Voters All.*, 585 U.S. at 21–22 (holding that a state's "indeterminate prohibition" on certain apparel in polling places—nonpublic forums—was unreasonable and therefore violated the First Amendment including because it failed

to include "objective, workable standards" for enforcement); *see also Ateba*, 133 F.4th at 125 (explaining that "the exercise of unbridled discretion to deny access to a nonpublic forum is unreasonable" (citing *WMATA*, 901 F.3d at 364, 372)).

120. The Interim Policy was not prompted by any specific security or safety concern or security incident involving a PFAC holder and does not serve any actual, legitimate interest in ensuring the security or safety of Department personnel, property, or information.

121. The Policy violates the First Amendment facially and as applied to Plaintiffs.

122. Defendants' adoption of the Interim Policy constitutes final agency action reviewable under the APA, 5 U.S.C. § 706.

123. The Policy has caused Plaintiffs irreparable harm and is causing ongoing irreparable harm to Plaintiffs as well as the public.

124. The Court should declare specified provisions of the Interim Policy contrary to law and vacate and enjoin Defendants from implementing those provisions of the Policy or any similar policy.

**COUNT TWO**
**Violation of the First Amendment (Retaliation)**

125. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

126. The First Amendment prohibits the government from retaliating against someone because of that person's exercise of First Amendment rights.

127. Unlawful retaliation occurs when someone "engage[s] in conduct protected under the First Amendment," the government takes a "retaliatory action" "sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again," and there is "a causal link between the exercise of a constitutional right and the adverse action." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (quotation marks omitted).

128. The Times and Barnes engaged in protected First Amendment activity when newsgathering and reporting about issues of public importance, as well as when they sued the Department to challenge the lawfulness of the October Policy. *See Media Matters for Am. v. Paxton*, 138 F.4th 563, 584 (D.C. Cir. 2025); *Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76, 94 (D.D.C. 2025); *In re Primus*, 436 U.S. 412, 431 (1978).

129. The Interim Policy—and, especially, its provisions that deprive Plaintiffs of the access that previously accompanied their press credentials—is "retaliatory conduct [that] would likely deter a person of ordinary firmness" from engaging in the activities the Interim Policy was enacted to punish. *Media Matters for Am.,* 138 F.4th at 580–81. As the district court found in *NYT II*, the escort requirement and closing of Correspondents' Corridor harm Barnes's and other Times reporters' newsgathering by making it substantially harder for them to interview Department officials and decreasing the number of individuals they are able to speak with to report on a story—a unique and important form of newsgathering that has served the public for decades. *NYT II*, 2026 WL 962252, at *8. "Reporters can hardly verify sources, gather information, or speak candidly with Department personnel with an escort looming over their shoulders." *New York Times Co. v. Dep't of Def.*, No. 26-5113, 2026 WL 1179440, at *6 (D.C. Cir. Apr. 27, 2026) (Childs, J., dissenting). Stripping away this access is a harsh punishment that is intended to chill and deter the "uninhibited, robust, and wide-open debate that the First Amendment is intended to protect." *Counterman v. Colorado*, 600 U.S. 66, 78 (2023) (citations omitted).

130. That Plaintiffs have continued to vigorously gather and report newsworthy information about the Department despite the Interim Policy does not lessen its chilling effect. Government retaliation for engaging in protected First Amendment conduct constitutes a "concrete harm in and of itself" when the "retaliatory conduct would likely deter a person of ordinary

firmness from the exercise of First Amendment rights." *Media Matters for Am.*, 138 F.4th at 580–81 (quotation marks omitted). The Interim Policy sends a message to Plaintiffs and other journalists that they must adapt their journalistic and editorial choices to suit the Department's preferences, and not seek to vindicate their constitutional rights, if they are ever to regain the access to the Pentagon they historically had. "That is enough to show that a person of ordinary firmness would be chilled from freely exercising his or her First Amendment rights[,]" even if The Times has refused to heed that message. *Nat'l Pub. Radio, Inc.*, 2026 WL 877434, at *15.

131. The causal link between Plaintiffs' protected activity and the Department's actions is apparent from the face of the Interim Policy, the sequence of events leading up to its adoption, and the Department's own statements, as detailed above. The timing and substance of the Interim Policy and Defendants' statements discussing it confirm that it was meant to punish Plaintiffs for obtaining relief in *NYT I*. The Department's retaliatory motive is further exposed by its changing and implausible *post hoc* justifications for the Policy. Defendants found it necessary to close press workspaces and eliminate all unescorted access to the Pentagon only once Plaintiffs prevailed in their suit and the district court ordered that The Times' reporters' access be restored. Nothing else changed in the three days following the district court's order. The obvious and inescapable conclusion is that Defendants acted to target and inflict harm on Plaintiffs, making things worse for them than if they had never challenged the Department's unlawful policy at all.

132. More broadly, the Interim Policy is also the latest in a series of access restrictions meant to punish media outlets, including The Times specifically, for coverage Department officials disliked. Defendants' numerous statements condemning and threatening The Times based on its stories and use of certain sources, and their celebratory statements when Times reporters lost their PFACs in October, confirm this intent. The district court in *NYT I* found "voluminous,"

"undisputed" evidence that the October policy targeted "'mainstream media' whose reporting it views as unfavorable" and that the Interim Policy carried that motive forward and violated the same "constitutional principles." *See NYT I*, 2026 WL 788689, at *13-14; *NYT II*, 2026 WL 962252, at *9. And Defendants' statements in the time since issuing the Interim Policy make clear their continued desire to impair The Times's ability to report on the Department.

133. Defendants' adoption of the Interim Policy constitutes final agency action reviewable under the APA, 5 U.S.C. § 706.

134. The Interim Policy has caused Plaintiffs irreparable harm and is causing ongoing irreparable harm to Plaintiffs as well as the public.

135. The Court should declare specified provisions of the Interim Policy contrary to law, and vacate and enjoin Defendants from implementing those provisions of the Policy or any similar policy.

**COUNT THREE**
**Violation of the Due Process Clause**

136. Plaintiffs incorporate by reference the allegations of the preceding paragraphs of the Complaint.

137. The Due Process Clause of the Fifth Amendment provides that "No person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The Times and its reporters, including Barnes, have both a liberty and a property interest in their PFACs.

138. The Interim Policy's escort and "intentional inducement of unauthorized disclosure" provisions violate the Due Process Clause's prohibition on vague laws because they "authorize and even encourage arbitrary and discriminatory enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). The Interim Policy does not provide Department officials with clear

standards to guide them when determining that a journalist's PFAC shall be suspended, revoked, or not renewed for "intentionally induc[ing]" an "unauthorized disclosure," or when a journalist's request for access may be denied, thereby empowering Department officials to do what they want, depending on their own predilections. For instance, the Interim Policy does not establish any criteria for when reporters will not be provided an escort to access to the Pentagon. And because the Interim Policy treats any grant of "anonymity or privacy" as a presumptive basis to revoke, deny, or not renew a PFAC, it functionally authorizes Department officials to target almost any independent reporting by a PFAC holder. *Id.* at 62.

139. Likewise, the Interim Policy fails to provide adequate notice to Plaintiffs and other journalists and news organizations of the activity that will result in the denial of an escort or the revocation, denial or non-renewal of a PFAC pursuant to the "intentional inducement of unauthorized disclosure" provision of the Interim Policy. As the district court concluded in *NYT II*: That provision's "safe harbors" provide, for example, "that asking questions about any subject to a Department official who is "authorized to speak with the press" is permissible. . . . But how is a journalist to know who is authorized to speak? That uncertainty and lack of clarity is precisely what this Court held to be unacceptable." *NYT II*, 2026 WL 962252, at *6.

140. Defendants' adoption of the Policy constitutes final agency action reviewable under the APA, 5 U.S.C. § 706.

141. The Policy has caused Plaintiffs irreparable harm and is causing ongoing irreparable harm to Plaintiffs as well as the public.

142. The Court should declare specified provisions of the Interim Policy contrary to law, and vacate and enjoin Defendants from implementing those provisions of the Policy or any similar policy.

**COUNT FOUR**
**Violation of the Administrative Procedure Act (Arbitrary & Capricious Action)**

143. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

144. The Administrative Procedure Act "requires agencies to engage in 'reasoned decisionmaking.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)). Agencies fall short of that when, among other things, they fail to "examine the relevant data and articulate a satisfactory explanation for [their] action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation marks omitted). The Department's adoption of the Interim Policy squarely violates this requirement.

145. The Interim Policy is both arbitrary and capricious. 5 U.S.C. § 706(2)(A).

146. Judge Friedman issued his ruling granting summary judgment in favor of Plaintiffs and vacating and enjoining the unconstitutional provisions of the Department's October Policy on a Friday. To avoid complying with that ruling, the Department, led on information and belief by Cmdr. Parlatore, scrambled over the weekend to hastily cobble together the Interim Policy, issuing it on the Monday following Judge Friedman's ruling. And as the rushed "immediate" closure and quick destruction of Correspondents' Corridor, among other things, evidence, the Interim Policy's goal was not to address any legitimate security considerations or implement in good faith the district court's ruling following a reasoned analysis. Instead, the Interim Policy was designed to retaliate against Plaintiffs and evade Judge Friedman's ruling.

147. Neither Cmdr. Parlatore nor any other Defendant collected any facts, conducted any investigation, or undertook any assessment over the weekend before the Interim Policy was

issued. And as the Department's total lack of preparedness to implement the Interim Policy underscores, it was drafted hastily and without even adequate communication within the Department.

148. The total lack of any reasoned deliberation is apparent from the face of the Interim Policy. For example, contrary to the Interim Policy's primary claim, the Court did not vacate "security screening provisions." It left security requirements in place no less stringent than the ones the Department has used for decades without issue—including a background check requirement. And the security concerns the Interim Policy purports to rely upon are the very ones that the district court in *NYT I* found unsupported based on Defendants' inability to produce any evidence of potential security or safety risk. By premising the Interim Policy on pretext, falsehood, and unsupported concerns, the Department failed to engage in reasoned decisionmaking.

149. Further, in adopting the Policy, the Department failed to consider less burdensome "alternative way[s] of achieving [its] objectives." *State Farm*, 463 U.S. at 48; *see also, e.g.*, *Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986) ("The failure of an agency to consider obvious alternatives has led uniformly to reversal.").

150. The Department also took into account impermissible factors in crafting the Interim Policy. As the Court found, the purpose of the Interim Policy, including its escort requirement, was to nullify the Court's order and to carry forward its discrimination against disfavored viewpoints and content. *See Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (Courts "cannot ignore the disconnect between the decision made and the explanation given" as they are "not required to exhibit a naiveté from which ordinary citizens are free." (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.))). Agency action is arbitrary and capricious if the agency, as here, "relied on factors" it is not empowered "to consider." *State Farm*, 463 U.S. at 43. As detailed above, Defendants acted with the aim of retaliating against Plaintiffs

and excluding them and other reporters whose coverage Department officials dislike from the Pentagon; viewpoint discriminatory and retaliatory objectives are not permissible considerations for the agency to take into account in formulating its action.

151. Any belated effort by the Department to provide a factual basis and rationale for the Interim Policy cannot save it. *Post hoc* rationalizations are "impermissible." *Dep't of Homeland Sec.*, 591 U.S. at 22.

152. In all these respects, the Interim Policy violates the Administrative Procedure Act.

153. Defendants' adoption of the Policy constitutes final agency action reviewable under the APA, 5 U.S.C. § 706.

154. The Policy has caused Plaintiffs irreparable harm and is causing ongoing irreparable harm to Plaintiffs as well as the public.

155. The Court should declare specified provisions of the Interim Policy contrary to law, and vacate and enjoin Defendants from implementing those provisions of the Policy or any similar policy.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs respectfully request an order:

a. Declaring that the provisions of the Interim Policy targeting Plaintiffs' protected newsgathering and speech and all actions implementing those provisions are unlawful and unconstitutional;

b. Vacating and preliminarily and permanently enjoining the Defendants from implementing or seeking to enforce those provisions of the Interim Policy or any similar policy;

c. Ordering Defendants to reinstate access to Barnes and The Times' other reporters commensurate with that provided to PFAC holders on October 25, 2025;

d. Entering judgment in favor of Plaintiffs;

e. Awarding Plaintiffs their reasonable costs and attorney's fees in accordance with law; and

f. Issuing any other relief that the Court deems just and proper.

Dated: May 18, 2026

Respectfully submitted,

/s Theodore J. Boutrous, Jr.
Theodore J. Boutrous, Jr. (D.D.C. Bar No. 420440)
Katie Townsend (D.D.C. Bar No. 1026115)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
TBoutrous@gibsondunn.com
KTownsend@gibsondunn.com

Susan Pelletier*
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036
(202) 955-8500
SPelletier@gibsondunn.com

*Counsel for Plaintiffs The New York Times Company and Julian E. Barnes*

**pro hac vice application forthcoming*

# EXHIBIT 1

ASSISTANT TO THE SECRETARY OF WAR
1400 DEFENSE PENTAGON
WASHINGTON, D.C. 20301-1400

PUBLIC AFFAIRS

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP

SUBJECT: Implementation of Revised Media In-Brief

On March 20, 2026, the United States District Court for the District of Columbia vacated certain provisions of the October 6, 2025 PFAC Policy. *See New York Times Co. v. Department of Defense*, No. 25-04218 (D.D.C. Mar. 20, 2026). The Department disagrees with the Court's decision and is pursuing an appeal. In the interim, and without conceding the validity of the Court's analysis, the Department has revised the Policy to comply with the Court's order while preserving the Department's legitimate security interests and its statutory obligation to ensure the safe, efficient, and secure operation of the Pentagon Reservation. 10 U.S.C. § 2674.

The attached documents implement the revised "Pentagon Reservation In-Brief for Media Members," effective March 23, 2026. This memorandum and attachments supersede the "Implementation of New Media In-Brief," dated October 6, 2025.

**Revised Policy.** All members of the press issued a PFAC will receive a copy of the revised in-brief at the time their PFAC is issued or renewed. Receipt of the PFAC and the accompanying in-brief constitutes notice of the Policy's terms. The revised in-brief addresses the provisions the Court vacated while retaining all physical access restrictions, conduct requirements, and security measures that were not at issue in the litigation.

**Clarifications in Response to the Court's Decision.** The Court characterized the original Policy's provisions in ways the Department believes were inaccurate. The revised Policy includes targeted clarifications to correct these mischaracterizations. In particular:

- The Court stated that the Policy's use of the term "solicitation" was ambiguous because "to 'solicit' in the everyday sense means 'to approach (someone) with a request or plea'" and that "a charity requesting donations, a community organizer calling on volunteers, or a journalist asking questions is not a crime." *Id.*, slip op. at 21. The Department agrees that asking questions is not a crime. The original Policy never prohibited asking questions. To correct the Court's mischaracterization, the revised Policy replaces the term "solicitation" with "intentional inducement of unauthorized disclosure" and provides a specific definition tied to identified federal criminal statutes, with a knowledge requirement and six explicit safe harbors for routine newsgathering activities that were never covered by this provision.

- The Court stated that the Policy's "security or safety risk" standard was too vague. While the Department maintains that the original standard, read in context with its enumerated factors, provided adequate notice, the revised Policy replaces this standard with an exhaustive list of specific, enumerated grounds for denial, revocation, or non-renewal of a PFAC, with evidentiary standards consistent with those applied in security clearance

adjudications under Executive Order 12,968. No PFAC may be denied, revoked, or not renewed on grounds not enumerated in the revised Appendix A.

- The Court expressed concern about the absence of processing timelines. The revised Policy includes specific deadlines: 30 days for a final decision where no further inquiry is needed, and 60 days where further inquiry is required.

**Closure of Correspondents' Corridor and Relocation of Press Workspace.** As previously announced in the October 6, 2025 Policy, the Department committed to "upgrade the space used by PFAC holders to a different area that provides WiFi access and cell phone service, as well as increased space for the expanded press corps." The Department is now fulfilling that commitment. Effective immediately, the Correspondents' Corridor is closed. A new press workspace will be established in an annex facility outside the Pentagon and will be available when ready. The Department will notify PFAC holders when the new workspace is operational.

In the interim, PFAC holders will continue to have access to the Pentagon for scheduled press briefings, press conferences, and interviews arranged through public affairs offices. Access to the Pentagon for these events will require escort by authorized DoW personnel at all times. In breaking news situations, PFAC holders will be escorted into the Pentagon by authorized DoW personnel. The Pentagon Briefing Room remains in the Pentagon and will continue to be used for press events.

In assessing the Department's security posture following the Court's vacatur of the PFAC Policy's security screening provisions, the Department determined that unescorted access to the Pentagon cannot be responsibly maintained without the ability to screen PFAC holders for security risks. The revised Policy establishes new security screening standards in the revised Appendix A. Until those standards have been fully implemented and the new workspace is operational, all journalist access to the Pentagon will require escort.

**Notice of Policy.** The original Policy required PFAC holders to sign an Acknowledgement attesting to their receipt, reading, and understanding of the Policy. The Court vacated this requirement. The Department maintains that requiring journalists to acknowledge a constitutional policy is a reasonable administrative measure, and the Court's vacatur was based on its finding that the underlying provisions were constitutionally deficient — a finding the Department disputes and is appealing. Regardless, the revised Policy eliminates the signature requirement. Instead, each PFAC holder will receive a copy of the revised in-brief at the time their PFAC is issued or renewed, and will sign a receipt confirming that they have received their PFAC and a copy of the Policy. Receipt of the PFAC and the accompanying in-brief constitutes sufficient notice of the Policy's terms. No PFAC holder is required to agree with, endorse, or acknowledge understanding of the Policy as a condition of receiving or maintaining a PFAC.

I request your assistance in ensuring that all personnel in your Component are aware of the revised physical access measures, including the requirement to provide escorts for media entering the Pentagon for approved events. If personnel see any news media inside the Pentagon without an escort, they should direct them to the Pentagon Press Operations office and alert PPO at 703-697-5131.

My POC for this action is Sue Gough, Pentagon Press Operations, susan.l.gough.civ@mail.mil or 703-697-1254.

Sean Parnell

Attachments:
As stated

# PENTAGON RESERVATION IN-BRIEF FOR MEDIA MEMBERS

NAME:__________________________ DATE:______________

The purpose of this briefing is to inform you, as a member of the news media who has been granted access to the Pentagon Reservation and issued a Pentagon Facilities Alternative Credential (PFAC), also known as a Department of War Building Pass or a Pentagon badge, of the rules regarding conduct on the Pentagon Reservation. Failure to comply with the physical access restrictions and conduct requirements set forth in this in-brief may result in loss of access to the Pentagon. Additionally, this briefing informs you of the procedures associated with denying, revoking, or not renewing the issuance of a PFAC, including contesting such a decision (see Appendix A).

## General Security

Members of the news media do not possess a legal right to access the Pentagon; rather, such access is a privilege extended by the government. Pursuant to 10 U.S.C. § 2674, the Secretary of War has jurisdiction, custody, and control over, and responsibility for, the operation, maintenance, and management of the Pentagon Reservation. Under this statute, the Secretary is authorized to prescribe appropriate regulations to ensure the safe, efficient, and secure operation of the Pentagon Reservation. 32 C.F.R. Part 234 addresses conduct on the Pentagon Reservation, and section 234.4 of this part makes clear that entering or remaining on Pentagon property without express invitation or consent from those with lawful control is prohibited. The regulation applies "to all persons entering in or on the property" (see 32 C.F.R. § 234.2), including members of the news media, and provides that individuals who violate a Department rule or regulation may be ordered to leave or barred from reentry. Having chosen to extend this privilege, the Department will not deny, revoke, or suspend a PFAC arbitrarily or on the basis of the content or viewpoint of a journalist's reporting.

Be alert for suspicious activity and immediately report any unusual activity and/or circumstances to the Pentagon Force Protection Agency (PFPA) at (703) 697-1001.

Ensure office doors are locked, and property is secure when exiting your office or cubicle.

Every individual entering the building is subject to random metal detector and X-ray inspection of personal belongings. Many events, including those involving the Secretary of War, Deputy Secretary of War, or visiting high-level U.S. government officials or foreign dignitaries, require additional security screenings to which PFAC holders would be subject.

Every individual exiting the building, regardless of status (e.g., military Service member, civilian employee, member of the news media), is subject to random checks of personal belongings.

A property pass is required to remove property from the building that is not readily identifiable as personal. When you or other members of your organization (e.g., technicians, photographers) remove equipment owned by your organization, obtain a property pass in advance to avoid problems when exiting the building. Property passes may be obtained in the Pentagon Press Operations (PPO) office, room 2D961, during normal working hours.

PFAC Security

Maintaining the security of your PFAC is an individual responsibility.

PFACS must be visible and always worn above the waist while in the Pentagon, except as noted below during press or other recorded events. Remove or hide your PFAC from view when not in the Pentagon.

Exceptions for press and other events: Do not have your PFAC visible in the following circumstances: when present during an on-camera press briefing; when doing a live-shot in the Pentagon Briefing Room or stand-ups at the Mall Entrance, River Parade Field, or on the Connector Parking Lot hill; when covering honor cordon arrival ceremonies; if on-camera during an open press event on the Pentagon Reservation; or at any other events that will be recorded via photograph or video. For those with a recording studio in the Pentagon, do not have your PFAC visible when recording in your studio.

Lost PFACS should be immediately reported to PPO at (703) 697-5131, or, after normal working hours, to (703) 678-6162 or to OSD.PA.Duty Officer@mail.mil. Normal working hours for PPO on non-holiday weekdays are 7:30 a.m. to 6 p.m. Eastern Time.

Additional Press Identifier Badge

The Additional Press Identifier Badge (APIB) (see Appendix B) must also be visible and always worn above the waist while in the Pentagon. Note that APIBS serve only as an additional visual identifier. APIBS are not credentials and do not confer credentialing or attendance approval for any event.

News Media Physical Security Restrictions on the Pentagon Reservation

Effective May 23, 2025, in accordance with Secretary of War Memorandum, "Updated Physical Control Measures for Press/Media Access within the Pentagon," May 23, 2025 (Appendix C), physical security restrictions have been enacted for news media, including those with valid, current PFACS.

Effective March 23, 2026, the Correspondents' Corridor is closed. A new press workspace will be established in an annex facility outside the Pentagon and will be available when ready. The Department will notify PFAC holders when the new workspace is operational. This closure fulfills the Department's previously announced commitment to upgrade the space used by PFAC holders to a different area that provides WiFi access, cell phone service, and increased space for the expanded press corps.

Until the new workspace is operational, PFAC holders will continue to have access to the Pentagon for the following purposes, with escort by authorized DoW personnel at all times:

- Scheduled press briefings and press conferences in the Pentagon Briefing Room;
- Interviews and meetings arranged through OATSW(PA) or the sponsoring public affairs office;
- Press events announced by OATSW(PA), the public affairs office for the Office of the Chairman of the Joint Chiefs of Staff, or the public affairs offices of the Military Departments or Headquarters, U.S. Marine Corps;
- Honor cordons and events at the Pentagon River Terrace Parade Field, the Pentagon Auditorium, and the Pentagon Center Courtyard;
- Other events specifically approved by OATSW(PA).

In breaking news situations, PFAC holders will gather at the Pentagon Library and Conference Center and be escorted into the Pentagon by authorized DoW personnel.

News media are not authorized to be anywhere in the Pentagon at any time without an escort from an authorized DoW official. If personnel see any news media inside the Pentagon without an escort, they should direct them to the Pentagon Press Operations office and alert PPO at 703-697-5131.

As a non-government employee, while a PFAC is your authorized means of entering the Pentagon, a PFAC does not allow you unfettered access to all of the Pentagon. When in the Pentagon, you must remain with your escort at all times.

<u>Public Release of DoW Information and the Protection of Classified National Security Information and Controlled Unclassified Information</u>

DoW remains committed to transparency to promote accountability and public trust. However, DoW information must be approved for public release by an appropriate authorizing official before it is released by any military member, DoW civilian employee or contract employee, even if it is unclassified. The Department of War must safeguard classified national security information (CNSI), in accordance with Executive Order 13526 and the Atomic Energy Act, and information designated as controlled unclassified information (CUI), in accordance with Executive Order 13556. CUI may include, but is not limited to, information protected by the Privacy Act, information that is law enforcement-sensitive, and certain operational security information. Beyond CNSI and CUI, additional authorities may restrict the disclosure of certain information. Given the complexities of the various laws and policies concerning disclosure of information, DoW employees are required to have all information cleared for release by an appropriate authorizing official.

Military members, in particular, face potentially severe consequences for disclosing non-public information without proper authorization. Article 92 of the Uniform Code of Military Justice imposes criminal liability on military members who violate a lawful order or regulation.

Both military members and DoW civilian employees also face potential criminal liability under 18 U.S.C. § 1905 for disclosure of confidential information or under the Privacy Act, 5 U.S.C. § 552a, for knowing and willful unauthorized disclosures.

Only authorized persons who have received favorable determinations of eligibility for access, signed approved non-disclosure agreements, and have a need-to-know may be granted access to CNSI. DoW may only provide CUI to individuals when there is a lawful governmental purpose for doing so.

To be clear, the foregoing laws and regulations apply to military members, DoW civilian employees, and contractors. Members of the news media are not required to submit their writings to DoW for approval. Members of the news media remain free to gather information through legitimate means, such as Freedom of Information Act requests, official briefings, questions posed to authorized Department spokespersons and officials, or unsolicited tips, and to publish as they deem newsworthy. The receipt of unsolicited information, including CNSI or CUI, and its subsequent publication, is protected by the First Amendment. Nothing in this in-brief prohibits a PFAC holder from engaging in constitutionally protected journalistic activities, such as investigating, reporting, or publishing stories.

Escort Privileges and Procedures

A PFAC authorizes media members who are U.S. citizens to access the Pentagon with escort by authorized DoW personnel for the purposes described in the "News Media Physical

Security Restrictions" section above, and affords escort privileges for up to three visiting media members from the same media outlet who possess appropriate media credentials.

Visiting media members must be entered into the PFPA Visitor Management System (VMS) by the sponsoring U.S. public affairs office no later than one business day in advance for U.S. citizens and no later than three business days in advance for non-U.S. citizens.

PFAC Issuance and Renewals

PFACs may be issued to those media members who require regular access to the Pentagon, who are accessing the building at a minimum monthly visit frequency. See PPO for the current minimum monthly visit frequency. You must continue to meet the minimum access frequency requirement to be reissued a PFAC. There are two probationary periods for an initial PFAC issuance.

An initial PFAC expires in three months, on the last day of the third month. You may submit a request for renewal at the beginning of the month of expiration. Media members who have met the minimum monthly visit frequency requirements during the initial three-month probationary period will generally be approved for a six-month badge.

The second probationary period is for six months. Requests for renewals of a six-month PFAC may be submitted at the beginning of the month of expiration. Media members who have met the minimum monthly visit frequency requirements during the six-month probationary period during both the initial three-month and subsequent six-month probationary periods, will generally be approved for a one-year PFAC.

If the two probationary periods have been completed successfully and all requirements have been met, PFACs will be renewed annually. During annual renewal reviews, if frequency requirements have not been met, PFAC renewals may be denied or revert to 3- or 6-month PFACS.

For all renewals, PFACs expire on the last day of the month of expiration. Renewal requests should be submitted at the beginning of the month of expiration, but not before the start of the month of expiration. Requests received prior to the start of the month will not be processed until the first business day of the month. Due to processing times, renewal requests should be submitted to PPO no later than the middle of the month of expiration to ensure a new badge is available before the old one expires.

Frequency requirements may be waived by OATSW(PA) for a news organization's equipment technicians and some camera crews, if specifically identified and requested by the

bureau chief. For first-time applications, equipment technicians and camera crews must still go through the two probationary periods.

PFACs may be denied, revoked, or not renewed if a person meets any of the criteria set forth in Appendix A, or is not meeting the frequency requirements. See Appendix A for the applicable standards and the process for denying, revoking, or not renewing a PFAC.

<u>Press Parking</u>

Parking on the Pentagon Reservation is restricted to vehicles with permanent parking permits, or which have been cleared for temporary parking for specific days. Vehicles may only be parked in the areas for which they have been cleared.

There is a designated parking area for the news media at the Pentagon. The parking spaces in two lanes of the Connector Lot, located at intersection of Connector Road and Boundary Channel Drive, have been reserved for the press (see Appendix E). These parking spaces are clearly marked with "PRESS" stenciled on the ground.

To access the building, for those with a PFAC, walk north towards Boundary Drive and go up either the stairs or the ramp to the pedestrian bridge. At the security checkpoint, swipe your badge and then show it to the PFPA officer on duty. See the route depicted at Appendix E. The checkpoint opens at 6:00 a.m. and closes at 8:00 p.m. on weekdays. The checkpoint is closed on weekends and federal holidays. All visiting press must go through the Visitor Center at the Pentagon Metro Entrance.

There are a limited number of permanent "P" parking permits for news media members. Those who have such permits may park in designated PRESS spaces with their approved "P" parking permit at any time. News media members with "P" permit are not authorized to park elsewhere on the Pentagon Reservation, except when provided specific guidance to do so for special circumstances (e.g., when the Connector Lot is being re-surfaced, or closed for a special event). For such instances, PPO will provide information on where you may park.

News media members desiring to be issued a "P" parking pass should contact PPO; there is usually a waiting list for available permit.

News media without a "P" parking permit may also park in the PRESS area provided they obtain an approved temporary parking clearance prior to their arrival at the Pentagon. News media should contact the PPO Admin Support Team at 703-697-5131 at least 30 minutes prior to their arrival to request temporary parking clearance, and must provide the PPO with the following information: date requesting to park if not the day of the call, driver's name, email,

phone number, media outlet, vehicle make, vehicle model, vehicle color, license plate number, state of registration, vehicle classification (car/truck/motorcycle/etc.), fuel type (gas/diesel/hybrid/electric), and whether it is a personal vehicle or a business vehicle. For repeat visits using the same vehicle, press need only provide date, name, and vehicle license plate. For parking on weekends, call the PPO Duty Officer at 703-678-6162.

News media may request temporary parking clearance for up to 5 days per month. Press can request an exception from the PPO for more days only on a case-by-case basis.

Overnight parking at the Pentagon is not permitted for members of the news media. Overnight parking is considered parking for more than 24 hours at a time.

If you are issued a "P" parking permit, you will be required to return it to the PPO upon completion of your media/press duties, or upon the expiration of the "P" parking permit.

Access on Weekends

If news media need to access the Pentagon on weekends, holidays, or when the pedestrian bridge between the Connector Lot and River Entrance is closed, news media may park in the press parking area and walk along Connector Road to River Road, go through a pedestrian turnstile, and continue walking up the River Road to Mug Handle to get to the River Entrance, which is open 24/7. See Appendix E for a depiction of the route. Note that those without a "P" parking permit must still provide their vehicle information to the PPO Duty Officer at 703-678-6162.

Mall Entrance Temporary Parking

News media crews that are doing a stand-up at the Mall Entrance location may request Mall parking. Mall Entrance parking is by reservation only. News media should contact the PPO Support Team at 703-697-5131 at least two hours prior to their arrival to request Mall Entrance parking clearance and must provide the same information as for regular press parking (see above) with the addition of time and arrival. Note that due to demand, there may be times when parking in the Mall Entrance lot is restricted to four hours per day. Visiting press who need to be at the Pentagon all day should park either in regular press parking or at the Mall Entrance. Parking at the Mall Entrance is by numbered spaces; PPO will provide the numbered parking space for each vehicle when Mall Entrance Parking is requested.

Filming/Photography

Filming, photography, and audio recording on the Pentagon Reservation is prohibited, unless approved in advance. In accordance with 32 CFR § 234.15 - Use of visual recording devices:

(a) The use of cameras or other visual recording devices on the Pentagon Reservation is prohibited, unless the use of such items are approved by the Pentagon Force Protection Agency, the Installation Commander, or the Office of the Assistant to the Secretary of War for Public Affairs.
(b) It shall be unlawful to make any photograph, sketch, picture, drawing, map or graphical representation of the Pentagon Reservation without first obtaining permission of the Pentagon Force Protection Agency or the Office of the Assistant to the Secretary of War for Public Affairs.

Note that this prohibition applies to the use of apps on mobile devices that utilize the front-facing camera lens, such as "FaceTime" or the taking of "selfies."

News media visiting the National Pentagon 9/11 Memorial in their personal capacity, not as a member of the press, may take photos using their personal devices. Filming or photography in the Memorial for a news media interview or to obtain b-roll requires an exception, as described below under Filming/Photography Exception Requests.

Filming/Photography Pre-Approved Exceptions

News media do not need to obtain permission in advance for filming, photography, or audio recording in the following circumstances:

- Press events in the Pentagon Briefing Room.
- Press events announced by OATSW(PA), the public affairs office for the Office of the Chairman of the Joint Chiefs of Staff, or the public affairs offices of the Military Departments or Headquarters, U.S. Marine Corps, that are not located in the Pentagon Briefing Room. Examples would include honor cordons and events at the Pentagon River Terrace Parade Field, the Pentagon Auditorium, and the Pentagon Center Courtyard.
- Unilateral news media stand-ups in the Pentagon Briefing Room, if approved, at the designated stand-up location outside the Mall Entrance, or live or recorded shots inside the network studio rooms in the Correspondent's Corridor.
- Recording audio of off-camera interviews approved and monitored by authorized DoW public affairs personnel.

Filming/Photography Exception Requests

The filming/photography exception requests discussed below require public affairs escort from either OATSW(PA) or the sponsoring public affairs office, regardless of whether the news media involved have a current PFAC or are visiting press.

- News media desiring to obtain b-roll or stock footage or photos of the Pentagon interior or exterior must submit a request to PPO a minimum of one week in advance to obtain permission. If this request is in conjunction with a press event sponsored by a public affairs office other than OATSW(PA), submit the request through the sponsoring public affairs office. Requests should include date and times and either the exact location or sufficient information for the public affairs office to determine the best available locations for the footage or photos.
- News media desiring to film DoW officials standing or walking in a corridor in conjunction with an interview must submit a request through the sponsoring public affairs office to PPO a minimum of one week in advance to obtain permission. Request must include date, time, and exact location.
- News media desiring to photograph DoW officials in their offices or conference rooms in conjunction with an interview must submit their request through the sponsoring public affairs office to the security manager for that space.
- News media desiring to obtain b-roll or interview or film anyone inside the National Pentagon 9/11 Memorial must submit a DD Form 2798, "Application/Permit for Use of Space on the Pentagon Reservation," at least one week in advance to the Pentagon Facility Operations Division Special Events Office at whs.pentagon.fsd.mbx.pbmo-special-events@mail.mil.

Filming/Photography from the Press Parking Area

News media desiring to do a stand-up or film from the grassy hill next to the press parking area (see Appendix E) should submit a request to PPO no later than three hours in advance. Requests should include the date, time, and the number of personnel in the crew. Once approved, filming from the grassy hill does not require public affairs escort.

Pandemics, National Health Emergencies, and Other Contingencies

During a declared pandemic or national health emergency, the DoW will protect the workforce while continuing to perform its national security mission. Protecting the workforce may entail the adoption of personal protective measures, restrictions on access to the Pentagon for essential functions only, symptom screenings, or other measures.

In the event of a declared pandemic or national health emergency, news media entering the Pentagon are expected to follow the same personal protective measures as DoW personnel

and as required by Health Protection Condition (HPCON) announcements. Failure or refusal to comply may result in a loss of access, ranging from temporary suspension to revocation of PFACS.

Additionally, news media are not considered essential personnel. During a declared pandemic or national health emergency, news media may temporarily be denied physical access to the Pentagon.

During other general emergency contingencies (e.g., fires, active shooters, natural disasters, utility outages), news media physical access to the Pentagon may be temporarily curtailed or denied.

Standards for PFAC Determinations

**Grounds for Denial, Revocation, or Non-Renewal.** A PFAC shall be denied, revoked, or not renewed only on the grounds set forth in Appendix A. No PFAC determination shall be based on the content, viewpoint, or perceived editorial perspective of an applicant's or holder's journalism.

**Intentional Inducement of Unauthorized Disclosure.** The Court in *New York Times Co. v. Department of Defense*, No. 25-04218 (D.D.C. Mar. 20, 2026), characterized the original Policy's use of the term "solicitation" as ambiguous, stating that "to 'solicit' in the everyday sense means 'to approach (someone) with a request or plea'" and that "a charity requesting donations, a community organizer calling on volunteers, or a journalist asking questions is not a crime." *Id.*, slip op. at 21. The Department agrees that asking questions is not a crime. The original Policy never prohibited asking questions. To correct the Court's mischaracterization, the Department has replaced the term "solicitation" with "intentional inducement of unauthorized disclosure."

For purposes of this Policy, "intentional inducement of unauthorized disclosure" means intentionally encouraging, inducing, or requesting that a specific Department employee disclose classified national security information or CUI that the journalist knows that the specific Department employee is not authorized to disclosing under Article 92 of the Uniform Code of Military Justice (10 U.S.C. § 892), 18 U.S.C. § 1905, or 5 U.S.C. § 552a. This is an administrative standard for PFAC determinations; it does not constitute a criminal charge or referral.

A journalist's offer of anonymity or privacy protection to a Department employee in exchange for information shall create a rebuttable presumption that the journalist knew the employee was not authorized to disclose the information sought. This presumption may be

rebutted through the procedures set forth in Appendix A by evidence that the journalist did not know that the employee was unauthorized to disclose the information notwithstanding the offer of anonymity.

The following do not constitute "intentional inducement of unauthorized disclosure" under this Policy, notwithstanding the general definition of that term above:

(a) Asking questions of Department personnel who are authorized to speak with the press, including Public Affairs Officers, designated spokespersons, and other personnel speaking on the record in their official capacity, regardless of the subject matter of the question;
(b) Receiving unsolicited information, including classified national security information or controlled unclassified information;
(c) Publishing calls for tips or other general appeals to the public at large that are not specifically directed at Department personnel;
(d) Developing source relationships outside the Pentagon through independent reporting;
(e) Communicating with Department personnel through official channels for public disclosure of information, including press briefings, press conferences, interviews arranged through public affairs offices, and Freedom of Information Act requests.
(f) Asking questions of any Department employee where the journalist does not know that the employee is not authorized to disclose the information sought.

**Due Process Protections.** Without conceding the validity of the Court's analysis, the revised Policy provides the following protections regarding suspension of a PFAC: Before any PFAC is denied, revoked, or not renewed on the grounds set forth in Appendix A, the applicant or holder shall receive the process set forth in Appendix A, Part B. A PFAC may be immediately suspended if the Director, PFPA, or designee, determines that the holder has engaged in conduct described in Appendix A, Part A and that the nature of the conduct requires immediate action to protect the security of Pentagon personnel, property, or information pending the completion of the procedures set forth in Appendix A, Part B. In such cases, the holder shall receive written notice within 24 hours stating the specific subsection of Part A that applies, and the full procedures described in Appendix A, Part B shall commence immediately.

**No Waiver of Rights.** Nothing in this document requires you to waive any constitutional rights. This in-brief constitutes a description of DoW policies.

**APPENDIX A:** DENIAL, REVOCATION, OR NON-RENEWAL OF PENTAGON FACILITY ALTERNATIVE CREDENTIALS

A. Grounds for Denial, Revocation, or Non-Renewal. The Director, PFPA, or designee, shall deny, revoke, or refuse to renew the PFAC of any person who meets one or more of the following criteria. These are the sole grounds for denial, revocation, or non-renewal of a PFAC based on security considerations. No PFAC shall be denied, revoked, or not renewed on grounds not enumerated in this section.

Conviction-Based Grounds. Conviction of an offense involving:

(1) National defense (such as treason, sabotage, terrorism, or espionage).
(2) The use, attempted use, or threatened use of physical force against another person (such as murder, manslaughter, assault, rape, robbery, or kidnapping) or conduct that presents a serious potential risk of physical injury to another (such as arson, burglary, or the unlawful possession of explosives or firearms).
(3) Unlawful manufacturing or distribution of drugs.
(4) Threatening or harassing communications directed at Department personnel or facilities.
(5) Theft, embezzlement, trespassing, or property destruction on the Pentagon Reservation or other Department facility.
(6) Fraud or deceit in connection with obtaining or maintaining access to a government facility or government information systems.
(7) Engaging in operations and activities that are unsafe, failing to abate an identified hazard, endanger others, or creating a condition immediately dangerous to life or health

A conviction described in subsections (1) through (7) creates a rebuttable presumption that the applicant or holder poses a security risk. The applicant or holder may rebut this presumption by demonstrating, through the procedures set forth in Part C below, that granting or maintaining the PFAC is clearly consistent with the security of the Pentagon Reservation. Factors relevant to rebuttal include the nature and seriousness of the offense, the time elapsed since the conviction, evidence of rehabilitation, and the applicant's or holder's conduct since the conviction. Any doubt as to whether the applicant or holder poses a security risk shall be resolved in favor of the security of the Pentagon Reservation.

Conduct-Based Grounds. Engaging in conduct that would constitute an offense described in subsections (1) through (7) above, or inducement of unauthorized disclosure as defined in the "Standards for PFAC Determinations" section of this in-brief. For a final determination based on conduct, the Director, PFPA, or designee, must find that substantial evidence supports the determination that the conduct described in the applicable subsection occurred. Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support the conclusion. A conduct-based determination does not require a criminal charge, indictment, or conviction. The written determination shall identify:

(g) The specific subsection of this Part A that the conduct would constitute;
(h) The specific facts supporting the determination, including the date, time, location, and nature of the conduct;

(i) The identity of any witnesses or the source of any documentary evidence supporting the determination, to the extent that disclosure would not compromise an ongoing investigation or the safety of any individual; and
(j) The basis for the Director's determination that substantial evidence supports the conclusion that the conduct occurred.

The PFAC holder shall receive the full procedures set forth in Part C below, including the opportunity to contest the factual basis for the determination. A conduct-based determination is subject to the same rebuttable presumption framework as a conviction-based determination: the holder must demonstrate that granting or maintaining the PFAC is clearly consistent with the security of the Pentagon Reservation. Any doubt as to whether the holder poses a security risk shall be resolved in favor of the security of the Pentagon Reservation.

Standard of Review. For conduct-based determinations under this section, the Director, PFPA, or designee, must find that substantial evidence supports the determination that the conduct described in the applicable subsection occurred. For immediate suspension under Part B, the Director, PFPA, or designee, must find probable cause to believe the conduct occurred. For rebuttal of a conviction-based or conduct-based presumption, the applicant or holder must demonstrate that granting or maintaining the PFAC is clearly consistent with the security of the Pentagon Reservation; any doubt as to whether the applicant or holder poses a security risk shall be resolved in favor of the security of the Pentagon Reservation. The final decision of the Director, PFPA, or designee, shall constitute a final agency decision subject to judicial review under 5 U.S.C. § 706(2)(A). These standards are consistent with those applied in security clearance adjudications under Executive Order 12,968.

B. Immediate Suspension. A PFAC may be immediately suspended if the Director, PFPA, or designee, determines that there is probable cause to believe that the holder has engaged in conduct described in Part A and that the nature of the conduct requires immediate action to protect the security of Pentagon personnel, property, or information pending the completion of the procedures set forth in Part C. Probable cause exists when the facts and circumstances known to the Director, PFPA, or designee, are sufficient to warrant a person of reasonable caution to believe that the conduct described in Part A has occurred.

In such cases:

(8) The holder shall receive written notice within 24 hours stating the specific subsection of Part A that applies, the specific facts establishing probable cause, and the basis for the determination that immediate action is required.
(9) The full procedures described in Part C shall commence immediately upon issuance of the written notice.
(10) The immediate suspension shall remain in effect until a final decision is issued under Part C, unless the Director, PFPA, or designee, determines that the basis for the immediate suspension no longer exists.
(11) At the final determination stage under Part C, the Director, PFPA, or designee, must find that substantial evidence supports the determination that the conduct occurred.

If the substantial evidence standard is not met, the immediate suspension shall be lifted and the PFAC reinstated.

C. Procedures for Denial, Revocation, or Non-Renewal. If the Director, PFPA, or designee, anticipates that a PFAC might be denied, revoked, or not renewed, the applicant or holder or his or her authorizing official shall be notified in writing by the Director, PFPA, or designee, of the basis for the proposed denial, in as much detail as security considerations permit, citing the specific subsection of Part A that applies. When an individual's PFAC has been denied, revoked, or not renewed pursuant to a final decision under this Part, both unescorted and escorted access to any DoW facility is terminated. This section does not apply to journalists who decide not to renew for reasons unrelated to the criteria in Part A, such as a change in employment or assignment.

(1) The notification of proposed denial, revocation, or non-renewal shall inform the applicant or holder of the right to respond to and rebut any factual basis supporting the proposed denial, revocation, or non-renewal.
(2) The applicant or holder will be allowed 30 days from the mailing date of the proposed denial, revocation, or non-renewal notification to make an appeal appointment with the Director, Pentagon Access Control Branch (PACB).
(3) If the applicant or holder or representative is unable to schedule an appointment within 30 days, an extension for one additional 30-day period will be granted on receipt of a telephone request to PACB for such an extension.
(4) If mitigating information is presented at the appointment to substantiate a reversal of denial, revocation, or non-renewal, the applicant or holder may receive a DoW Building Pass at that time.
(5) If no mitigating information is presented or if information is presented but is insufficient to substantiate the issuance of a DoW Building Pass, the applicant or holder will be allowed 30 days from the appeal appointment to respond in writing to the Director, PFPA, or designee. The response will consist of any explanation or rebuttal considered appropriate by the applicant or holder and must be signed by the applicant or holder or representative under oath or affirmation.
(6) At the time of the filing of the written response to the notification of the proposed denial, revocation, or non-renewal, the applicant or holder or representative may request, and shall be granted, the opportunity to make a personal appearance before the Director, PFPA, or designee, to personally support his or her eligibility for a pass and to rebut or explain the factual basis for the proposed denial.
(7) On the basis of the written or oral response to the proposed denial, revocation, or non-renewal, the Director, PFPA, or designee, shall determine whether further inquiry or investigation on the issues raised is necessary.
   (k) If a decision is made that no such inquiry is necessary, a final decision shall be issued within 30 days.
   (l) If a decision is made that further inquiry is necessary, the Director, PFPA, or designee, shall conduct such inquiry and issue a final decision within 60 days of the personal appearance.
(8) Upon receipt of the applicant's or holder's written or oral response explaining or rebutting the factual basis for the proposed denial, revocation, or non-renewal, and upon

completion of any additional inquiry, a final decision shall be made by the Director, PFPA, or designee. If a final adverse decision is reached, the applicant or holder shall be notified of the final decision in writing. The notification shall state, as precisely as security considerations permit, the factual basis for the denial, citing the specific subsection of Part A that applies.

(9) The decision of the Director, PFPA, or designee, under this section shall constitute a final agency decision subject to judicial review under 5 U.S.C. § 706(2)(A).

[Appendices B through E remain unchanged, except that Appendices D and E shall be updated to reflect the relocation of the press workspace to the Pentagon Library and Conference Center.]

# EXHIBIT 3

ASSISTANT TO THE SECRETARY OF WAR
1400 DEFENSE PENTAGON
WASHINGTON, D.C. 20301-1400

PUBLIC AFFAIRS

OCT 0 6 2025

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP

SUBJECT: Implementation of New Media In-brief

The attached documents implement the Secretary of War memorandum, "Updated Physical Control Measures for Press/Media Access Within the Pentagon," dated May 23, 2025. All members of the press requesting to be issued a Pentagon Facility Alternate Credential (PFAC), will be required to read and sign the updated in-brief form outlining information security requirements, the new physical control measures, and Department of War expectations of their compliance with safety and security requirements. This memorandum and attachments supersede the "Implementation of New Media In-Brief," dated September 18, 2025.

The package that will be provided to the member of the press as part of the in-brief includes the following:

- Pentagon Reservation In-brief for Media Members
- Appendix A, "Denial, Revocation, or Non-Renewal of Pentagon Facility Alternative Credentials"
- Appendix B, "Additional Press Identifier Badge"
- Appendix C, SW memo, "Updated Physical Control Measures for Press/Media Access Within the Pentagon"
- Appendix D, graphic showing the areas on the first and second floor of the Pentagon where press do not require a new escort
- Appendix E, graphic showing the route that press can take to access the River Entrance on weekends and holidays

In addition to the Additional Press Identifier Badge depicted in Appendix B, the Pentagon Force Protection Agency (PFPA) will begin issuing new PFACs to the press in coming weeks. Priority of issuance of the new PFACs will be to members of the news media, including equipment crew members, with existing PFACs expiring by October 31, 2025, and will run through October 31, 2025. Beginning November 1, 2025, PFPA will then commence issuing new PFACS for members of the news media with existing PFACS expiring after October 31, 2025, starting with resident members (i.e., those with current authorized workspace in the Pentagon), followed by non-resident members. The new PFACs will have "PRESS" clearly imprinted on them in red letters both vertically and horizontally to assist in identifying members of the press within the Pentagon.

I request your assistance in ensuring that all personnel in your Component are aware of the physical control measures, including the requirement to provide escorts for media coming into your spaces for approved interviews. Additionally, if personnel see any news media outside of the areas depicted in Appendix D that do not have an escort, they should direct them back to the designated no-escort required areas and alert the Pentagon Press Operations office at 703-697-5131.

My POC for this action is Mr. Christopher Garver, Pentagon Press Operations, christopher.c.garver.civ@mail.mil or 703-695-3886.

Sean Parnell

Attachments:
As stated

# PENTAGON RESERVATION IN-BRIEF FOR MEDIA MEMBERS

NAME: ______________________________ DATE: ________________

The purpose of this briefing is to inform you, as a member of the news media who has been granted access to the Pentagon Reservation and issued a Pentagon Facilities Alternative Credential (PFAC), also known as a Department of War Building Pass or a Pentagon badge, of the rules regarding conduct on the Pentagon Reservation. Failure to abide by these rules may result in suspension or revocation of your PFAC and loss of access. Additionally, this briefing informs you of the procedures associated with denying, revoking, or not renewing the issuance of a PFAC, including contesting such a decision (see Appendix A).

## General Security

Members of the news media do not possess a legal right to access the Pentagon; rather, such access is a privilege, subject to the discretion of government authorities and is regulated by federal law and Department of War policy. Legally, the press has no greater right of access than the public. While members of the news media may be granted access under certain conditions, this is a privilege extended by the government and not a constitutionally protected right.

Pursuant to 10 U.S.C. § 2674, the Secretary of War has jurisdiction, custody, and control over, and responsibility for, the operation, maintenance, and management of the Pentagon Reservation. Under this statute, the Secretary is authorized to prescribe appropriate regulations to ensure the safe, efficient, and secure operation of the Pentagon Reservation. 32 C.F.R. Part 234 addresses conduct on the Pentagon Reservation, and section 234.4 of this part makes clear that entering or remaining on Pentagon property without express invitation or consent from those with lawful control is prohibited. The regulation applies "to all persons entering in or on the property" (see 32 C.F.R. § 234.2), including members of the news media, and provides that individuals who violate a Department rule or regulation may be ordered to leave or barred from reentry. This framework establishes that access is not open to the public or the press as a matter of right but is instead a controlled privilege.

Be alert for suspicious activity and immediately report any unusual activity and/or circumstances to the Pentagon Force Protection Agency (PFPA) at (703) 697-1001.

Ensure office doors are locked, and property is secure when exiting your office or cubicle.

Every individual entering the building is subject to random metal detector and X-ray inspection of personal belongings. Many events, including those involving the Secretary of War, Deputy Secretary of War, or visiting high-level U.S. government officials or

foreign dignitaries, require additional security screenings to which PFAC holders would be subject.

Every individual exiting the building, regardless of status (e.g., military Service member, civilian employee, member of the news media), is subject to random checks of personal belongings.

A property pass is required to remove property from the building that is not readily identifiable as personal. When you or other members of your organization (e.g., technicians, photographers) remove equipment owned by your organization, obtain a property pass in advance to avoid problems when exiting the building. Property passes may be obtained in the Pentagon Press Operations (PPO) office, room 2D961, during normal working hours.

PFAC Security

Maintaining the security of your PFAC is an individual responsibility.

PFACs must be visible and always worn above the waist while in the Pentagon, except as noted below during press or other recorded events. Remove or hide your PFAC from view when not in the Pentagon.

Exceptions for press and other events: Do not have your PFAC visible in the following circumstances: when present during an on-camera press briefing; when doing a live-shot in the Pentagon Briefing Room or stand-ups at the Mall Entrance, River Parade Field, or on the Connector Parking Lot hill; when covering honor cordon arrival ceremonies; if on-camera during an open press event on the Pentagon Reservation; or at any other events that will be recorded via photograph or video. For those with a recording studio in the Pentagon, do not have your PFAC visible when recording in your studio.

Lost PFACs should be immediately reported to PPO at (703) 697-5131, or, after normal working hours, to (703) 678-6162 or to OSD.PA.DutyOfficer@mail.mil. Normal working hours for PPO on non-holiday weekdays are 7:30 a.m. to 6 p.m. Eastern Time.

Additional Press Identifier Badge

The Additional Press Identifier Badge (APIB) (see Appendix B) must also be visible and always worn above the waist while in the Pentagon. Note that APIBs serve only as an additional visual identifier. APIBs are not credentials and do not confer credentialing or attendance approval for any event.

News Media Physical Security Restrictions on the Pentagon Reservation

Effective May 23, 2025, in accordance with Secretary of War Memorandum, "Updated Physical Control Measures for Press/Media Access within the Pentagon," May 23, 2025

(Appendix C), new physical security restrictions have been enacted for news media, including those with valid, current PFACs:

- News media are not authorized to be anywhere on the 5th Floor, 4th Floor, 3rd Floor, Basement, or Mezzanine levels, including all corridors and rings, at any time without an escort from an authorized DoW official.
- On the 2nd Floor, news media are authorized unescorted access in the Pentagon for the below areas. For all other areas of the 2nd Floor not included below, except as otherwise addressed in this in-brief, news media must have an escort from authorized DoW personnel:
  - Rings A through E between Corridors 1, 10 and 9 (from the Metro Entrance on the E Ring through the Concourse to the A Ring);
  - E Ring from the Metro Entrance to Corridor 9;
  - E Ring from the River Entrance directly to Corridor 9;
  - Corridor 9 from the E Ring to the A Ring; 951-999
  - At the Apex of Corridors 9/10, the exit to the Courtyard;
  - A Ring from the Apex of Corridors 9/10 to the Mall Corridor between Corridor 6 and 7 and the Mall Corridor to the Mall Entrance for the purpose getting to and from the Mall Entrance for stand-ups
- On the 1st Floor, news media are authorized unescorted access to the Center Courtyard and the Food Court between Corridors 1 and 10.
- See Appendix D for a graphic of the areas where the news media are authorized unescorted access.
- News media are not authorized access to the Pentagon Athletic Center.

If news media require access to other areas or offices within the Pentagon for in-person interviews or other engagements, they must be escorted to and from those spaces by authorized DoW personnel.

As a non-government employee, while a PFAC is your authorized means of entering the Pentagon, a PFAC does not allow you unfettered access to all of the Pentagon. You have been briefed on the physical control measures for news media access and understand which areas require escort even though you have a PFAC. When in an area requiring an escort, you must remain with your escort at all times.

The list of authorized areas is expected to be modified within the next three months, as DoW intends to upgrade the space used by PFAC holders to a different area that provides WiFi access and cell phone service, as well as increased space for the expanded press corps.

<u>Public Release of DoW Information and the Protection of Classified National Security Information and Controlled Unclassified Information</u>

DoW remains committed to transparency to promote accountability and public trust. However, DoW information must be approved for public release by an appropriate authorizing official before it is released by any military member, DoW civilian employee or contract employee, even if it is unclassified. The Department of War must safeguard

classified national security information (CNSI), in accordance with Executive Order 13526 and the Atomic Energy Act, and information designated as controlled unclassified information (CUI), in accordance with Executive Order 13556. CUI may include, but is not limited to, information protected by the Privacy Act, information that is law enforcement-sensitive, and certain operational security information. Beyond CNSI and CUI, additional authorities may restrict the disclosure of certain information. Given the complexities of the various laws and policies concerning disclosure of information, DoW employees are required to have all information cleared for release by an appropriate authorizing official.

Military members, in particular, face potentially severe consequences for disclosing non-public information without proper authorization. Article 92 of the Uniform Code of Military Justice imposes criminal liability on military members who violate a lawful order or regulation.

Both military members and DoW civilian employees also face potential criminal liability under 18 U.S.C. §1905 for disclosure of confidential information or under the Privacy Act, 5 U.S.C. §552a, for knowing and willful unauthorized disclosures.

Only authorized persons who have received favorable determinations of eligibility for access, signed approved non-disclosure agreements, and have a need-to-know may be granted access to CNSI. DoW may only provide CUI to individuals when there is a lawful governmental purpose for doing so.

To be clear, these are the laws and regulations that apply to military members and DoW civilian employees and contractors. Members of the news media are not required to submit their writings to DoW for approval. However, they should understand that DoW personnel may face adverse consequences for unauthorized disclosures (see, e.g., Uniform Code of Military Justice Article 92 (10 U.S.C. 892); 18 U.S.C. 1905; 5 U.S.C. 552a(i)). Any solicitation of DoW personnel to commit criminal acts would not be considered protected activity under the 1st Amendment.

Unauthorized disclosure of CNSI or CUI poses a security risk that could damage the national security of the United States and place DoW personnel in jeopardy. To ensure the safety of U.S. personnel, news media who find themselves in possession of information that appears to be CNSI or CUI should discuss those materials with the PPO prior to publication.

Escort Privileges and Procedures

A PFAC authorizes media members who are U.S. citizens to access the Pentagon 24 hours a day and affords escort privileges for up to three visiting media members from the same media outlet who possess appropriate media credentials.

Visiting media members must be entered into the PFPA Visitor Management System (VMS) by the sponsoring U.S. public affairs office no later than one business day in

advance for U.S. citizens and no later than three business days in advance for non-U.S. citizens.

A PFAC also affords escort privileges for media members who are U.S. citizens for up to three visiting family members for special events, such as the Bring Your Child to Work Day, subject to the approval of the Office of the Assistant to the Secretary of War for Public Affairs (OATSW(PA)). Family members 18 years and older must be entered into the PFPA Visitor Management System (VMS) by the sponsoring public affairs office no later than 24 hours in advance for U.S. citizens and no later than 48 hours in advance for non-U.S. citizens.

PFAC holders escorting other media members or family members must stay with their visitor(s) at all times. Failure to do so may result in loss of the PFAC issued to you.

PFAC holders who are not U.S. citizens do not have escort privileges.

PFAC Issuance and Renewals

PFACs may be issued to those media members who require regular access to the Pentagon, who are accessing the building at a minimum monthly visit frequency. See PPO for the current minimum monthly visit frequency. You must continue to meet the minimum access frequency requirement to be reissued a PFAC. There are two probationary periods for an initial PFAC issuance.

An initial PFAC expires in three months, on the last day of the third month. You may submit a request for renewal at the beginning of the month of expiration. Media members who have met the minimum monthly visit frequency requirements during the initial three-month probationary period and who have not posed a security or safety risk to DoW personnel or property will generally be approved for a six-month badge.

The second probationary period is for six months. Requests for renewals of a six-month PFAC may be submitted at the beginning of the month of expiration. Media members who have met the minimum monthly visit frequency requirements during the six-month probationary period and who have not posed a security or safety risk to DoW personnel or property during both the initial three-month and subsequent six-month probationary periods, will generally be approved for a one-year PFAC.

If the two probationary periods have been completed successfully and all requirements have been met, PFACs will be renewed annually. During annual renewal reviews, if frequency requirements have not been met, PFAC renewals may be denied or revert to 3- or 6-month PFACs.

For all renewals, PFACs expire on the last day of the month of expiration. Renewal requests should be submitted at the beginning of the month of expiration, but not before the start of the month of expiration. Requests received prior to the start of the month will not be processed until the first business day of the month. Due to processing times,

renewal requests should be submitted to PPO no later than the middle of the month of expiration to ensure a new badge is available before the old one expires.

Frequency requirements may be waived by OATSW(PA) for a news organization's equipment technicians and some camera crews, if specifically identified and requested by the bureau chief. For first-time applications, equipment technicians and camera crews must still go through the two probationary periods.

PFACs may be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to DoW personnel or property, or is not meeting the frequency requirements. An initial determination of a security or safety risk may result in an immediate suspension of Pentagon access during the process for making a final determination. A determination that an individual poses a security risk may be based on the unauthorized access, attempted unauthorized access, or unauthorized disclosure of CNSI or CUI. See Appendix A for information on the applicable standard and the process for denying, revoking, or non-renewing a PFAC.

Press Parking

Parking on the Pentagon Reservation is restricted to vehicles with permanent parking permits, or which have been cleared for temporary parking for specific days. Vehicles may only be parked in the areas for which they have been cleared.

There is a designated parking area for the news media at the Pentagon. The parking spaces in two lanes of the Connector Lot, located at intersection of Connector Road and Boundary Channel Drive, have been reserved for the press (see Appendix E). These parking spaces are clearly marked with "PRESS" stenciled on the ground.

To access the building, for those with a PFAC, walk north towards Boundary Drive and go up either the stairs or the ramp to the pedestrian bridge. At the security checkpoint, swipe your badge and then show it to the PFPA officer on duty. See the route depicted at Appendix E. The checkpoint opens at 6:00 a.m. and closes at 8:00 p.m. on weekdays. The checkpoint is closed on weekends and federal holidays. All visiting press must go through the Visitor Center at the Pentagon Metro Entrance.

There are a limited number of permanent "P" parking permits for news media members. Those who have such permits may park in designated PRESS spaces with their approved "P" parking permit at any time. News media members with "P" permit are not authorized to park elsewhere on the Pentagon Reservation, except when provided specific guidance to do so for special circumstances (e.g., when the Connector Lot is being re-surfaced, or closed for a special event). For such instances, PPO will provide information on where you may park.

News media members desiring to be issued a "P" parking pass should contact PPO; there is usually a waiting list for available permit.

News media without a "P" parking permit may also park in the PRESS area provided they obtain an approved temporary parking clearance prior to their arrival at the Pentagon. News media should contact the PPO Admin Support Team at 703-697-5131 at least 30 minutes prior to their arrival to request temporary parking clearance, and must provide the PPO with the following information: date requesting to park if not the day of the call, driver's name, email, phone number, media outlet, vehicle make, vehicle model, vehicle color, license plate number, state of registration, vehicle classification (car/truck/motorcycle/etc.), fuel type (gas/diesel/hybrid/electric), and whether it is a personal vehicle or a business vehicle. For repeat visits using the same vehicle, press need only provide date, name, and vehicle license plate. For parking on weekends, call the PPO Duty Officer at 703-678-6162.

News media may request temporary parking clearance for up to 5 days per month. Press can request an exception from the PPO for more days only on a case-by-case basis.

Overnight parking at the Pentagon is not permitted for members of the news media. Overnight parking is considered parking for more than 24 hours at a time.

If you are issued a "P" parking permit, you will be required to return it to the PPO upon completion of your media/press duties, or upon the expiration of the "P" parking permit.

Access on Weekends

If news media need to access the Pentagon on weekends, holidays, or when the pedestrian bridge between the Connector Lot and River Entrance is closed, news media may park in the press parking area and walk along Connector Road to River Road, go through a pedestrian turnstile, and continue walking up the River Road to Mug Handle to get to the River Entrance, which is open 24/7. See Appendix E for a depiction of the route. Note that those without a "P" parking permit must still provide their vehicle information to the PPO Duty Officer at 703-678-6162.

Mall Entrance Temporary Parking

News media crews that are doing a stand-up at the Mall Entrance location may request Mall parking. Mall Entrance parking is by reservation only. News media should contact the PPO Support Team at 703-697-5131 at least two hours prior to their arrival to request Mall Entrance parking clearance and must provide the same information as for regular press parking (see above) with the addition of time and arrival. Note that due to demand, there may be times when parking in the Mall Entrance lot is restricted to four hours per day. Visiting press who need to be at the Pentagon all day should park either in regular press parking or at the Mall Entrance. Parking at the Mall Entrance is by numbered spaces; PPO will provide the numbered parking space for each vehicle when Mall Entrance Parking is requested.

Filming/Photography

Filming, photography, and audio recording on the Pentagon Reservation is prohibited, unless approved in advance. In accordance with 32 CFR § 234.15 — Use of visual recording devices:

(a) The use of cameras or other visual recording devices on the Pentagon Reservation is prohibited, unless the use of such items are approved by the Pentagon Force Protection Agency, the Installation Commander, or the Office of the Assistant to the Secretary of War for Public Affairs.

(b) It shall be unlawful to make any photograph, sketch, picture, drawing, map or graphical representation of the Pentagon Reservation without first obtaining permission of the Pentagon Force Protection Agency or the Office of the Assistant to the Secretary of War for Public Affairs.

Note that this prohibition applies to the use of apps on mobile devices that utilize the front-facing camera lens, such as "FaceTime" or the taking of "selfies."

News media visiting the National Pentagon 9/11 Memorial in their personal capacity, not as a member of the press, may take photos using their personal devices. Filming or photography in the Memorial for a news media interview or to obtain b-roll requires an exception, as described below under Filming/Photography Exception Requests.

<u>Filming/Photography Pre-Approved Exceptions</u>
News media do not need to obtain permission in advance for filming, photography, or audio recording in the following circumstances:

- Press events in the Pentagon Briefing Room.
- Press events announced by OATSW(PA), the public affairs office for the Office of the Chairman of the Joint Chiefs of Staff, or the public affairs offices of the Military Departments or Headquarters, U.S. Marine Corps, that are not located in the Pentagon Briefing Room. Examples would include honor cordons and events at the Pentagon River Terrace Parade Field, the Pentagon Auditorium, and the Pentagon Center Courtyard.
- Unilateral news media stand-ups in the Pentagon Briefing Room, if approved, at the designated stand-up location outside the Mall Entrance, or live or recorded shots inside the network studio rooms in the Correspondent's Corridor.
- Recording audio of off-camera interviews approved and monitored by authorized DoW public affairs personnel.

<u>Filming/Photography Exception Requests</u>

The filming/photography exception requests discussed below require public affairs escort from either OATSW(PA) or the sponsoring public affairs office, regardless of whether the news media involved have a current PFAC or are visiting press.

- News media desiring to obtain b-roll or stock footage or photos of the Pentagon interior or exterior must submit a request to PPO a minimum of one week in advance

to obtain permission. If this request is in conjunction with a press event sponsored by a public affairs office other than OATSW(PA), submit the request through the sponsoring public affairs office. Requests should include date and times and either the exact location or sufficient information for the public affairs office to determine the best available locations for the footage or photos.

- News media desiring to film DoW officials standing or walking in a corridor in conjunction with an interview must submit a request through the sponsoring public affairs office to PPO a minimum of one week in advance to obtain permission. Request must include date, time, and exact location.

- News media desiring to photograph DoW officials in their offices or conference rooms in conjunction with an interview must submit their request through the sponsoring public affairs office to the security manager for that space.

- News media desiring to obtain b-roll or interview or film anyone inside the National Pentagon 9/11 Memorial must submit a DD Form 2798, "Application/Permit for Use of Space on the Pentagon Reservation," at least one week in advance to the Pentagon Facility Operations Division Special Events Office at whs.pentagon.fsd.mbx.pbmo-special-events@mail.mil. You can download a DD Form 2798 here: https://www.esd.whs.mil/Directives/forms/dd2500_2999/DD2798/

Filming/Photography from the Press Parking Area

News media desiring to do a stand-up or film from the grassy hill next to the press parking area (see Appendix E) should submit a request to PPO no later than three hours in advance. Requests should include the date, time, and the number of personnel in the crew. Once approved, filming from the grassy hill does not require public affairs escort.

Pandemics, National Health Emergencies, and Other Contingencies

During a declared pandemic or national health emergency, the DoW will protect the workforce while continuing to perform its national security mission. Protecting the workforce may entail the adoption of personal protective measures, restrictions on access to the Pentagon for essential functions only, symptom screenings, or other measures.

In the event of a declared pandemic or national health emergency, news media entering the Pentagon are expected to follow the same personal protective measures as DoW personnel and as required by Health Protection Condition (HPCON) announcements. Failure or refusal to comply may result in a loss of access, ranging from temporary suspension to revocation of PFACs.

Additionally, news media are not considered essential personnel. During a declared pandemic or national health emergency, news media may temporarily be denied physical access to the Pentagon.

During other general emergency contingencies (e.g., fires, active shooters, natural disasters, utility outages), news media physical access to the Pentagon may be temporarily curtailed or denied.

Security Risks

A PFAC may be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to DoW personnel or property, in accordance with the standards and procedures outlined in Appendix A. Such an initial determination may result in an immediate suspension of your Pentagon access while the procedures preceding a final determination are pending.

This in-brief and its Appendices address DoW policy and the potential bases for such a determination and do not prohibit you as a PFAC holder from engaging in constitutionally protected journalistic activities, such as investigating, reporting, or publishing stories.

Such determination may be based on factors including, but not limited to, the unauthorized access, attempted unauthorized access, or unauthorized disclosure of CNSI or CUI, convictions for national defense offenses, threats, or unsafe activities (as listed in Appendix A). Such a determination is based on a reasonable assessment informed by the unique facts and circumstances of each case--such as whether the conduct is willful or repeated, versus isolated and unintentional—and incorporates due process (e.g., written notice of the basis, a 30-day appeal period, an opportunity for personal appearance, and a final, reviewable determination).

For clarity, the receipt of unsolicited CNSI or CUI and its subsequent publication is generally protected by the First Amendment and would not, on its own, normally trigger denial, revocation, or non-renewal of a PFAC. However, if you solicit the disclosure of such information or otherwise encourage DoW personnel to violate laws and policies concerning the disclosure of such information, such conduct may weigh in the consideration of whether you pose a security or safety risk.

There is a critical distinction between lawfully requesting information from the government and actively soliciting or encouraging government employees to break the law. The First Amendment does not permit journalists to solicit government employees to violate the law by providing confidential government information. The press's rights are not absolute and do not override the government's compelling interest in maintaining the confidentiality of sensitive information. Soliciting or encouraging government employees to break the law falls outside the scope of protected newsgathering activities.

Solicitation may include direct communications with specific DoW personnel or general appeals, such as public advertisements or calls for tips encouraging DoW employees to share non-public DoW information. For example, an advertisement or social media post by an individual journalist or media outlet that directly targets DoW personnel to disclose

non-public information without proper authorization would constitute a solicitation that could lead to revocation.

Additionally, publication that recklessly endangers American lives could factor into an assessment of whether continued unescorted access to the Pentagon poses a security risk.

All determinations under this policy are undertaken on a case-by-case basis reviewing the totality of the circumstances to ensure the policy is narrowly tailored to safeguard sensitive information without unduly restricting speech and are informed by factors such as convictions for national defense offenses, threats, or unsafe activities (as listed in Appendix A). Moreover, determinations will take into account whether such conduct is willful or repeated, as opposed to isolated and unintentional.

No Waiver of Rights

Nothing in this document requires you to waive any constitutional rights. This in-brief constitutes a description of DoW policies.

---

**PRIVACY ACT STATEMENT**

**AUTHORITY:** 10 U.S.C. 113, Secretary of Defense; 42 U.S.C. Chapter 23, Development and Control of Atomic Energy; Executive Order 13526, Classified National Security Information; Executive Order 13556, Controlled Unclassified Information; 32 C.F.R. Part 234, Conduct on the Pentagon Reservation; DoD Directive 5122.05, Assistant to the Secretary of Defense for Public Affairs (ATSD(PA)).
**PRINCIPAL PURPOSE:** To inform members of the news media being granted access to the Pentagon Reservation and issued a Pentagon Alternative Facilities Alternative Credential (PFAC) of the rules regarding conduct on the Pentagon Reservation and the rules and procedures concerning termination of such access.
**ROUTINE USE(S):** In certain circumstances, it may be necessary to disclose this record outside of the Department of Defense. For example, this record may be disclosed to a component of the Department of Justice for the purpose of representing the Department of Defense, or its components, officers, employees, or members in pending or potential litigation to which the record is pertinent; or to an appropriate law enforcement authority when the record, either alone or in conjunction with other information, indicates a violation or potential violation of law, whether criminal, civil, or regulatory in nature. For a complete list of routine uses, refer to the applicable system of records notice: DPAD 12.0, DoD Media Pool and Pentagon Correspondent Files, at https://www.federalregister.gov/documents/2021/05/03/2021-09211/privacy-act-of-1974-system-of-records
**DISCLOSURE:** Voluntary; however, failure to complete this acknowledgement may result in limiting DoD's ability to grant access to the Pentagon Reservation.

---

NAME: ______________________________ DATE: ____________________

Acknowledgement

I have received, read, and understand the "Pentagon Reservation In-brief for Media Members," with Appendices A-E, including Appendix A, which addresses the standard and procedures for denying, revoking, or not renewing a PFAC. The in-brief describes DoW policies and procedures. My signature represents my acknowledgement and understanding of such DoW policies and procedures, even if I do not necessarily agree with such policies and procedures. Signing this acknowledgment does not waive any rights I may have under law.

______________________________ ______________________________
Signature -- Administering Official Signature -- Media Member

New Badge Expiration Date________________

Email address______________________________

Work phone___________________ Cell phone_____________________

**APPENDIX A:** DENIAL, REVOCATION, OR NON-RENEWAL OF PENTAGON FACILITY ALTERNATIVE CREDENTIALS.

A. Reason for Denial, Revocation, or Non-Renewal. The Director, PFPA, or designee, shall deny, revoke, or refuse to renew the PFAC of any person reasonably determined to pose a security or safety risk to DoW personnel or property. Persons presumed to present such a risk include, but are not limited to, those who have been convicted of any offense involving:

(1) National defense (such as treason, sabotage, terrorism, or espionage).

(2) The use, attempted use, or threatened use of physical force against another person (such as murder, manslaughter, assault, rape, robbery, or kidnapping) or conduct that presents a serious potential risk of physical injury to another (such as arson, burglary, or the unlawful possession of explosives or firearms).

(3) Unlawful manufacturing or distribution of drugs.

(4) Threatening or harassing communications.

(5) Theft, embezzlement, trespassing, or property destruction.

(6) Fraud or deceit.

(7) Prostitution or other prohibited sexual conduct.

(8) Engaging in operations and activities that are unsafe, fail to abate an identified hazard, endanger others, or create a condition immediately dangerous to life health.

(9) Unprofessional conduct that might serve to disrupt Pentagon operations.

Additionally, actions other than conviction may be deemed to pose a security or safety risk, such as discussed in the Pentagon Reservation In-Brief for Media Members

B. Procedures for Denial, Revocation, or Non-Renewal. If the Director, PFPA, or designee, anticipates that a PFAC might be denied, revoked, or not renewed, the applicant or his or her authorizing official shall be notified in writing by the Director, PFPA, or designee, of the basis for the proposed denial, in as much detail as security considerations permit. When an individual's PFAC has been denied, revoked, not renewed, or suspended for the reasons outlined above, both unescorted and escorted access to any DoW facility is terminated. This section does not apply to journalists who decide not to renew for reasons unrelated to any security or safety risk, such as a change in employment or assignment.

(1) The notification of proposed denial, revocation, or non-renewal shall inform the applicant of the right to respond to and rebut any factual basis supporting the proposed denial, revocation, or non-renewal.

(2) The applicant will be allowed 30 days from the mailing date of the proposed denial, revocation, or non-renewal notification to make an appeal appointment with the Director, Pentagon Access Control Branch (PACB).

(3) If the applicant or representative is unable to schedule an appointment within 30 days, an extension for one additional 30-day period will be granted on receipt of a telephone request to PACB for such an extension.

(4) If mitigating information is presented at the appointment to substantiate a reversal of denial, revocation, or non-renewal, the applicant may receive a DoW Building Pass at that time.

(5) If no mitigating information is presented or if information is presented but is insufficient to substantiate the issuance of a DoW Building Pass, the applicant will be allowed 30 days from the appeal appointment to respond in writing to the Director, PFPA, or designee. The response will consist of any explanation or rebuttal considered appropriate by the applicant and must be signed by the applicant or representative under oath or affirmation.

(6) At the time of the filing of the written response to the notification of the proposed denial, revocation, or non-renewal, the applicant or representative may request, and shall normally be granted, the opportunity to make a personal appearance before the Director, PFPA, or designee, to personally support his or her eligibility for a pass and to rebut or explain the factual basis for the proposed denial. The Director, PFPA, or designee, shall exercise final review authority in the matter.

(7) On the basis of the written or oral response to the proposed denial, revocation, or non-renewal, the Director, PFPA, or designee, shall determine whether further inquiry or investigation on the issues raised is necessary.

(a) If a decision is made that no such inquiry is necessary, a final decision shall be issued.

(b) If a decision is made that further inquiry is necessary, the Director, PFPA, or designee, shall conduct such inquiry as deemed appropriate.

(8) Upon receipt of the applicant's written or oral response explaining or rebutting the factual basis for the proposed denial, revocation, or non-renewal, and upon completion of any additional inquiry, a final decision shall be expeditiously made by the Director, PFPA, or designee. If a final adverse decision is reached, the applicant shall be notified of the final decision in writing. The notification shall state, as precisely as security considerations permit, the factual basis for the denial.

(9) The decision of the Director, PFPA, or designee, under this section shall constitute a final agency decision. This section does not confer any rights on any individual or entity and is intended only as internal guidance for the administration of the Department of War.

(Page 128 of Total)

USCA Case #26-5253 Document #2187550 Filed: 08/10/2026 Page 128 of 218
Case 1:26-cv-01690 Document 1-3 Filed 05/18/26 Page 18 of 22

# Appendix B

## Additional Press Identifier Badge

FRONT




BACK



SECRETARY OF DEFENSE
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

MAY 2 3 2025

MEMORANDUM FOR RESIDENT AND VISITING PRESS ASSIGNED TO THE PENTAGON

SUBJECT: Updated Physical Control Measures for Press/Media Access Within the Pentagon

References: (a) DoDM 5200.01, "Volume 3, DoD Information Security Program: Protection of Classified Information," February 24, 2012
(b) Office of Secretary of Defense, Chief of Staff Memorandum: "Efforts to Combat Unauthorized Disclosures," March 21, 2025

The Department of Defense's (DoD) highest priority is the defense of our Nation and our national security. Per reference (a), the protection of classified national intelligence information (CNSI) and sensitive, unclassified information, including information deemed critical to operations security (OPSEC), remains an unwavering imperative for the Department. Per reference (b), the Chief of Staff to the Secretary of Defense recently directed an investigation into unauthorized disclosures.

While the Department remains committed to transparency, the Department is equally obligated to protect CNSI and sensitive information — the unauthorized disclosure of which could put the lives of U.S. Service members in danger. To attain professional balance between press access and OPSEC, the following updated security measures for resident and visiting press are needed to reduce the opportunities for in-person inadvertent and unauthorized disclosures.

Effective immediately, the Secretary of Defense directs the following control measures for all resident and visiting press who have been issued a Pentagon Facilities Alternate Credential (PFAC) for the Pentagon:

1. Press/media are not authorized entry/access to the Secretary of Defense physical office spaces located on the 3rd floor, ring E, between corridors 9 and 8 without an official approval and escort from the Office of the Assistant to the Secretary of Defense for Public Affairs (OATSD(PA)).

2. Press/media are not authorized entry/access to the Joint Staff physical office spaces located on the 2nd floor between corridors 9 and 7, rings A through E, without official approval from the Office of the Secretary of Defense for Public Affairs (OSD(PA)) and escort by personnel from the Joint Staff Public Affairs Office.

3. Press/media are only authorized unescorted access in the Pentagon on rings A through E on the 2nd floor of the Pentagon between the "Metro Entrance" at corridors 1 and 10 and the "River Entrance" at corridors 8 and 9 via and to the Pentagon Courtyard and Food Court (located between corridor 1 and 10 on the 1st Floor). The exception is noted in paragraph 2 (above).

4. If press require access to other areas/offices within the Pentagon for "in-person"

OSD005511-25/CMD007129-25

## Appendix D

Yellow areas indicate areas where press are allowed without escort.

## Pentagon 2nd Floor



(Page 131 of Total)

# Appendix D

Yellow areas indicate areas where press are allowed without escort.

## Pentagon 1st Floor






USCA Case #26-5253 Document #2187550 Filed: 08/10/2026 Page 131 of 218
Case 1:26-cv-01690 Document 1-3 Filed 05/18/26 Page 21 of 22


River Entrance
CVS Pharmacy
Starbucks
Richmond Hwy
Boundary Dr
Potomac Heritage National Scenic Trl
Connector Rd
River Rd
HRP
Grassy Hill
Layers
Google
Personnel access control point on pedestrian bridge
Weekday route to River Entrance
Personnel turnstile at vehicle access control point
Press parking
Weekend route to River Entrance

Appendix E

# EXHIBIT 7

# Crow Presses Secretary Pete Hegseth Over Defense Department Corruption, Conflicts of Interest

April 30, 2026 **Press Release**

**WASHINGTON** — Congressman Jason Crow (D-CO), a former paratrooper and Army Ranger, pressed Secretary of Defense Pete Hegseth about conflicts of interest swirling around a top advisor Hegseth described as a "long term friend" and "great patriot" during his appearance before the House Armed Services Committee.

While serving at the Pentagon, Special Advisor to the Secretary of Defense Tim Parlatore maintains a private law practice that represents clients who may have business before the U.S. Government and benefit from having an attorney with close personal ties to the Secretary. When asked about Parlatore's conflicts of interest, Hegseth refused to answer whether Parlatore represents and profits off clients from foreign governments or whether he represents and profits off U.S. military officers who are under consideration for promotions by Hegseth.

Secretary Hegseth commissioned Parlatore into the Navy Reserve in March 2025, bypassing vetting and oversight by the White House Presidential Personnel Office and the U.S. Senate. Hegseth's decision to keep Parlatore at the Pentagon despite conflicts of interest is indicative of his failed leadership for servicemembers and the American people.

**CONGRESSMAN CROW:** *He* [Parlatore] *maintains a private law practice, does he represent foreign governments or foreign persons in that private law practice?*

**SECRETARY HEGSETH:** *Uhh, I don't know.*

**CONGRESSMAN CROW:** *You don't know? Somebody who is sitting in your meetings, a special advisor, you don't know?*




Parlatore previously worked as Hegseth's personal attorney when he faced **sexual assault allegations**, has represented soldiers accused of **war crimes** and former members of the mob, and hired and commended lawyers who worked for **Jeffrey Epstein**. Despite his unknown ties to foreign entities, Parlatore was also on an **unsecured Signal thread** where Secretary Hegseth shared classified information about strikes in Yemen with his wife, brother, and other close associates last year.

Parlatore, who was also once a member of President Trump's legal team, has been accused by the President's team of **lying** and was reportedly described by the President as "**unstable**." The White House **removed** him and Secretary Hegseth from overseeing investigations into former DoD aides because of their inability to remain objective.

**A transcript of the exchange is provided below and can be viewed here.**

**CONGRESSMAN JASON CROW:** Mr. Secretary, I want to go in a little bit of a different direction. Timothy Parlatore served as your private attorney, correct?

**SECRETARY PETE HEGSETH:** Correct.

**CROW:** And Mr. Parlatore also served as private attorney for President Trump's campaign, correct?

**HEGSETH:** I'm not privy to every professional position that he's held.

**CROW:** I'll help you out, he did. And you appointed Mr. Parlatore as your senior advisor, correct?

**HEGSETH:** He does reserve duty on behalf of the Navy, does great work.

**CROW:** His title is senior advisor, you gave him that title, correct?

**HEGSETH:** And I would count him as very much an advisor of mine.

**CROW:** Yep, he travels with you, correct?

[Crosstalk]

**HEGSETH:** Tim Parlatore's been a long term friend. He's a great patriot…

**CROW:** He travels with you.

**HEGSETH**:…and has traveled with me. He serves the country…

**CROW:** That's not what I asked. He travels with you, doesn't he?

**HEGSETH**:…he's an excellent military lawyer.

**CROW:** He travels with you, doesn't he, correct? There's public Instagram that shows this, just say yes.

**HEGSETH:** Yes, of course.

**CROW:** Okay. He sits in meetings with you and advises you, doesn't he?

**HEGSETH:** Uhh, he sits in some meetings on occasion.

**CROW:** Well, he maintains a desk and an office in the Pentagon, does he not?

**HEGSETH:** I'd have to check.

**CROW:** You don't know?

**HEGSETH:** It's a big Pentagon.

**CROW:** You directly commissioned Mr. Parlatore in the Naval Reserve as a Navy Commander in March 2025, did you not?

**HEGSETH:** I was very proud to do so.

**CROW:** And when you did, because he's a Navy Reserve Officer, he didn't have to go through the PPO process, the White House Presidential Personnel Office, right? He wasn't vetted by White House PPO.

**HEGSETH:** Uniformed service members don't get vetted by....

**CROW:** The answer is yes, he didn't have to be vetted by White House PPO. He didn't go through the Senate confirmation process either did he?

The answer is no.

[Crosstalk]

**HEGSETH:** I don't know what you're getting to, but Tim is a fantastic...

**CROW:** I'll tell you what I'm getting to…

**HEGSETH:** …he does great work.

**CROW:** …the answer is no, right?

**HEGSETH:** He does great work.

**CROW:** Okay. He didn't maintain a security clearance when you appointed him as special advisor, is that right?

**HEGSETH:** I'd have to check.

**CROW:** You don't know?

**HEGSETH:** I mean, anybody that has access to sensitive material is going to have the appropriate clearance.

**CROW:** Okay, so when you appointed him as special advisor, he had a security clearance?

[Crosstalk]

**HEGSETH:** I don't, you're trying to piece together a timeframe…

**CROW:** No, I'm asking a simple question...

**HEGSETH:**…that I can't give you exact dates for.

**CROW:** …one of your special, most sensitive advisors, did he have a security clearance?

**HEGSETH:** No, you're playing a gotcha game like you do on TV…

**CROW:** I'm asking questions.

**HEGSETH**…everywhere else you're trying to thread together details…

**CROW:** Clearly you're concerned...

**HEGSETH:**…that aren't connected about something else.

**CROW:**…clearly you're concerned about my line of questioning, aren't you, Mr. Secretary, because you know where it's going, don't you? I think you do.

So does Mr. Parlatore represent foreign governments? He has a private law practice, does he not?

**HEGSETH:** From what I understand of his law practice, he does a lot of great work for servicemembers in the military and others.

**CROW:** He maintains a private law practice. Does he represent foreign governments or foreign persons in that private law practice?

**HEGSETH:** Uhh, I don't know.

**CROW:** You don't know? Somebody who is sitting in your meetings, a special advisor, you don't know?

Does he represent any senior officers who are currently under consideration for promotion by you or your office?

**HEGSETH:** The only person that makes determinations about senior officers is me.

**CROW:** Answer the question. Does he represent senior officers who are under consideration for promotion by you?

[Crosstalk]

**HEGSETH:** No, I'm the one that makes decisions about choosing…

**CROW:** Does he represent them, Mr. Secretary?

**HEGSETH:**…and finding senior officers.

**CROW:** Does he represent them?

**HEGSETH:** He doesn't represent anyone. He's a legal advisor and always has been.

**CROW:** But he has clients, does he not?

**HEGSETH:** He's a legal advisor to me on reserve duty, and he always has been and he does a fantastic job.

[Crosstalk]

**CROW:** Is it true that Mr. Parlatore was removed…

**HEGSETH:** You're playing a losing hand whatever your…

**CROW:**…I reclaim my time. Is it true that Mr. Parlatore was removed from an investigation by the White House last year?

**HEGSETH:** I don't know what you're referring to, but not that I'm aware of.

**CROW:** You're not aware of it. Well is it true that you were also removed from that same investigation?

The answer is yes.

**HEGSETH:** Uhh, no, not that I'm aware of.

**CROW:** You're not aware of it, that's interesting. Well, is it true that Mr. Parlatore disparaged President Trump?

**HEGSETH:** Uhh, I don't know what you're referring to but no.

**CROW:** Is it true that Mr. Parlatore was accused by President Trump and his lawyers of lying?

**HEGSETH:** What you're accused of is a cute line of questioning that's going nowhere.

**CROW:** Well it's going somewhere, which is why you're not answering the question. Was it true that he was accused of lying by the President's legal team?

[Crosstalk]

**HEGSETH:** I'm not familiar, you'd have to give me the context of the article...

**CROW:** Well it's right here, you want to look at the statement from President Trump's legal team..

**HEGSETH:**…anyone can blow up a quote and claim it says something, and that's what you're doing in a little stunt

**CROW:** Secretary Hegseth, what I'm really concerned about is you purport to have unfaltering loyalty to President Trump, and yet you are continuously...

**HEGSETH:** Oh, you care a lot about President Trump, don't you?

**CROW:** …I reclaim my time. You're going behind his back and appointing people…

**HEGSETH:** This is a cute waste of your five minutes...

**CROW:** …I reclaim my time.

**HEGSETH:**…a huge cute waste of your five minutes that led nowhere.

**CROW:** I reclaim my time. You are repeatedly going behind President Trump's back, appointing people who he has accused of lying, who the White House has accused of lying, and you are not being honest with President Trump.

# EXHIBIT 8

**TRANSCRIPT**

# Secretary of War Pete Hegseth and Chairman of the Joint Chiefs of Staff Gen. Dan Caine Hold a Press Briefing

**April 24, 2026**

SECRETARY OF WAR PETE HEGSETH: Well, good morning. Unlike the endless wars of the past that dragged on for years and for decades with little to show for it, Operation Epic Fury has delivered a decisive military result in just weeks. Korea, Vietnam, Iraq, Afghanistan, as the President has pointed out, all took years, decades, vague missions, shifting sands, little to show for it. Operation Epic Fury has been laser-focused from the very start, as I've said to all of you.

Clear mission objectives and, ultimately, Iran will not have a nuclear weapon. It's a bold and dangerous mission, a gift to the world, historic, courtesy of a bold and historic President. That mission continues today in this new phase, as Iran has an important choice, a chance to make a deal, a good deal, a wise deal.

As part of that effort, the United States has imposed an ironclad blockade that grows more powerful by the day. From the Gulf of Oman to the open oceans, our Navy is enforcing this blockade without hesitation or apology. Now, as usual, there's a lot of false information out there. I'll say this, every ship, every ship that the US believes meets our criteria, either Iranian ships or to and from Iranian ports, has been turned around. As of this morning, 34 total.

Non-Iranian vessels are allowed to transit, and many have, including overnight. Not only is the blockade growing, in fact, a second aircraft carrier will join the blockade in just a few days, but this growing blockade has also gone global. Just this week, we seized two Iranian dark fleet ships in the Indo-Pacific region that had left Iranian ports before the blockade went into effect. They thought they'd made it out just in time. They did not.

We seized their sanctioned ships and we will seize more. Our blockade is growing and going global. America's military is unmatched, projecting power, denying passage to adversaries, and protecting our interests at the time and place of our choosing.

No one sails from the Strait of Hormuz to anywhere in the world without the permission of the United States Navy. To the regime in Tehran, the blockade is tightening by the hour. We are in control, nothing in, nothing out. Iran's battered military, the IRGC specifically, has been reduced to a gang of pirates with a flag.

They cloak their aggression in slogans, but the world now sees them for what they are, criminals on the high seas. They don't control anything. They're acting like pirates, acting like terrorists. They're the ones who lay indiscriminate mines, who shoot at random ships, who killed 45,000 of their own people, innocent protesters in the course of weeks, their own people. They are the bad actors.

The vessels that the Iranians seized in recent days, a couple of them, they're not American ships, they're not Israeli ships, they're just random ships that drove where they drove their little speedboats up to and shot at those ships with AK-47s. Anyone with a speedboat, a gun, and the wrong intentions can do that.

They know that we, the United States of America, control the flow of global shipping, and we know that they know. Their real navy is at the bottom of the Arabian Gulf. It's worth saying again, for 47 years, Iran has been at war with America, killing our citizens, our soldiers, and our allies, while previous administrations looked the other way.

The real endless war is the war that Iran has waged on us for 47 years. President Trump is the only president with the guts and moral clarity to finally do something about it. I see it every day behind closed doors; President Trump's fortitude is unshakable and his mission is

crystal clear. President Trump said it again yesterday, we have all the time in the world, and we're not anxious for a deal. And I hear him say it every day in private as well.

Iran knows that they still have an open window to choose wisely, as we said previously, choose wisely at the negotiating table. All they have to do is abandon a nuclear weapon and in meaningful and verifiable ways. Or instead, they can watch their regime's fragile economic state collapse under the unrelenting pressure of American power.

A blockade as long as it takes, whatever President Trump decides, because the bottom line remains the bottom line, Iran will never get a nuclear bomb. The choice is theirs, but with this blockade, the clock is not on their side.

Moreover, President Trump has authorized the United States Navy to destroy any Iranian fast boats that attempt to put mines in the water or disrupt passage through the Strait of Hormuz, to shoot and kill. Our commanders have clear rules of engagement. If Iran is putting mines in the water, or otherwise threatening American commercial shipping or American forces, we will shoot to destroy, no hesitation, just like the drug boats in the Caribbean.

It's also worth saying, this should not be America's fight alone. We barely use the Strait of Hormuz as a country. Our energy doesn't flow through there, and we have plenty of energy. Just look at the new global Congo line headed to Texas, a beautiful picture.
Europe and Asia have benefited from our protection for decades, but the time for free-riding is over. America and the free world deserve allies who are capable, who are loyal, and who understand that being an ally is not a one-way street, it's a two-way street. We are not counting on Europe, but they need the Strait of Hormuz much more than we do, and might want to start doing less talking and having less fancy conferences in Europe, and getting a boat.

This is much more their fight than ours. On this core mission, America's will is unshakable, our capabilities unmatched. Our blockade is only growing and going global. And as the President said, we have all the time in the world. Iran has a historic chance to make a serious deal, and the ball is in their court. Either way, the War Department stands ready for what comes next, locked and loaded. May God continue to bless our warriors each and every day and on each and every mission. Mr. Chairman, over to you.

GENERAL DAN CAINE: Thank you, Mr. Secretary, and good morning, everyone. Thanks for being here. Today marks 55 days since the President of the United States ordered major combat operations against Iran. Today, and this morning, the Joint Force remains postured and prepared to recommence major combat operations on the order of the president.

On April 8th, the president announced a cease fire. And last week, at the president's direction and on order of the secretary, US CENTCOM began enforcing a blockade against all commercial vessels going into and out of Iran and their ports. Simultaneously, the US military, in support of the US Department of Justice, was ordered to conduct maritime interdiction operations against sanctioned and dark fleet vessels globally. This operation also began on April 8th. And what I'd like to do this morning is update all of you on those actions and activities.

First, as I mentioned, US Central Command continues to maintain a strict blockade on all the ports. We're enforcing the blockade across the board against any ship of any nationality that is transiting to or from an Iranian port or territory.

We're closely tracking vessels of interest headed towards Iran and those moving away from Iran that were outside the blockade area when this blockade was ordered. And as everyone saw this past weekend, we're prepared and postured to intercept them. As of this morning, 34 ships have met the US blockade and made the wise choice to turn around.

One ship did not, and that ship was the motor vessel Touska. Over several hours this past Sunday, April 19th the US conducted maritime interdiction operations against the Touska, whose crew attempted to breach the blockade line. The Touska is a large container ship, about 965 feet long, or about the same size as a United States Navy aircraft carrier, and over 100 feet wide.

The operation began about 4:00 am Eastern Standard Time, when the United States Navy destroyer approached her and the crew and the vessel ignored warnings. And I've described how the destroyer force is operating in the area prior. Um, upon intercept and coming within visual range, American forces began to issue several clear and unambiguous warnings, and informed the vessel and their crew that they were in a violation of the US blockade and directed the ship to turn around.

Over a six hour period, the vessel and her crew repeatedly ignored US warnings. And then the US Navy destroyer executed a series of pre-planned, carefully calibrated escalation options, including firing five warning shots. The vessel and her crew continued to ignore warnings. And after exhausting all other measures, CENTCOM authorized disabling fire against the Touska.

US sailors warned the crew of the Tuska to abandon the engine room and at approximately 9:00 am eastern time, the destroyer disabled the Touska's engine by firing nine inert rounds from the destroyer's mark 45 five-inch guns, precisely into the engine room and engine space on board the Touska. Not surprisingly, the vessel then reported issues with their engine, went dead in the water and began to comply with US directions and orders.

At 4:00 pm Eastern Standard Time, CENTCOM ordered United States Marines to seize the ship. Via helicopters, US Marines maneuvered quickly to the disabled ship, boarded her from fast ropes via helicopter infiltration methods, and took custody of the ship. The ship and her crew remain safe in US custody today.

Let me now turn to global operations in the Pacific, and I want to highlight that this is a major interagency effort between the United States military, the White House, the Department of Homeland Security, and the Department of Justice. On Monday, April 20th, US INDOPACOM forces, in support of a Department of Justice request, interdicted the motor tanker Tifani, which was transporting sanctioned Iranian oil.

The Tifani is a very large crude tanker, VLCC for short, and is also about the size of a US aircraft carrier, and capable of transporting approximately two million barrels of oil. At approximately 11:30 pm Eastern Time, US military forces and law enforcement forces also went to the ship via rotary wing platforms, fast roped onto her deck and secured her.

After the ship was secured, a US Navy control team embarked aboard the Tifani, Tifani or Tifani, and assumed control of the ship at 4:00 am Eastern Time on April 21st. A Navy control team is comprised of sailors led by a boarding officer that assumes control of a sea ship in order to secure the crew, the cargo and the vessel, and disposition of that first vessel is still pending. The next interdiction occurred on Wednesday, this past Wednesday, 22 April, when INDOPACOM conducted yet another interdiction, again at the request of the US Department of Justice. This time, the stateless motor tanker, Majestic X, also known as

The Panics, also in the Indian Ocean. This is, again, a VLCC, or very large crude tanker. At approximately 11:00 pm Eastern Standard Time, US forces began the interdiction, again, using rotary wing assets to get to the ship, got on board and secured the bridge. Both ships, the Tifani, the Majestic X, and their crews, remain in US custody. And we will continue to conduct similar maritime interdiction actions and activities in the Pacific and Indian Oceans against Iranian ships and vessels of the dark fleet.

The actions by our service members and our law enforcement partners demonstrate the incredible discipline and dedication and professionalism of our Joint Force, and highlight the global reach of American combat power. The Joint Force remains on ensuring the Iranian regime cannot harm our interests or those of our allies and partners.

And I'll highlight that Iran has repeatedly sought to offensively and proactively expand the conflict by aggression against its neighbors and its attacks on global shipping through the strait. To date, Iran has attacked five merchant vessels, seized two of them that were attempting to transit the strait, and these include ships that Iran itself had cleared to proceed.

Now, as I always do, I want to honor members of the Joint Force. Today, I want to highlight and proudly describe the essential role of our intelligence enterprise and the role that they play in conducting our military operations. The totality of their work is the culmination of days, months, and in many cases, years of work by our uniformed and civilian intelligence professionals.

We have been able to do the work that we are ordered to do because America's intelligence force, including our core collectors and analysts, have spent decades searching for every loose thread. From the determination of a particular intelligence requirement, to that piece of intelligence being collected in the field by a military or interagency case officer, to the rigorous analysis that goes into reporting on that finding, those team members spend their careers answering the incredibly important questions that we must attempt to answer before, during, and after operations. They live in the enemy's mind. Normally located behind the green door or behind the vault door, in dark, windowless rooms across the world 24 hours a day, seven days a week, 365 days a year, are world-class intel members from DIA, our service intelligence components, NSA, NGA, CIA, NRO, and in the case of the operations

that I've just described, the Office of Naval Intelligence, all work tirelessly to sift through the mountains of collected information using tools, tactics, techniques and procedures that I'm not going to discuss today.

The sun never sets on these world-class professionals, and their goal is every minute of every day to be on the account. And they know the enemy. They know their combat capability, their weapons, their industrial and economic systems and they know their leaders, their leaders' pattern of life, where they go, what they think, and what they do. Thanks to their work, we know Iran and it is an incredible work that they do.

Again, none of our operations that we've conducted during my time in this job could have done — could have been done without the service of these intelligence professionals. And the distance from those core collectors and those analysts to those Patriot crews for defending US forces forward, or the fighter pilots, is incredibly small.
Every single day, as their motto say, they are committed to excellence in the defense of the nation and to securing the future and they're doing the work of the nation. Before I close, as I do every time, I want to highlight and remember our fallen. Today, I want to highlight the 63 victims of the terrorist bombing of the US Embassy in Beirut, which occurred 43 years ago, just a few days ago, on April 18th, 1983. At that time, this was the deadliest attack on a US diplomatic mission, and this was the first attack conducted by Iranian-backed forces on Americans.

The suicide bomber detonated a vehicle borne improvised explosive device out in front of the embassy, killing 63 innocent people, including 32 Lebanese, 14 visitors and 17 Americans. And among those lost, members of the Joint Force to include three Army soldiers and one United States Marine. We remember their names, Sergeant First Class Richard Twine, Staff Sergeant Ben Maxwell, Staff Sergeant Mark Salazar, and United States Marine Corporal Vincent McMahon.

Today, we remember them. We carry on their memory and the memory of all our fallen and remain grateful for their sacrifice and that of their families who continue to show us what courage looks like. As we continue to press forward and maintain these operations, the Secretary, the Joint Chiefs of Staff and I are deeply humbled by the spirit, tenacity and

commitment and grit of the 2.8 million members of our Joint Force. The Secretary and I thank every member of the Joint Force engaged in this operation, every warrior who remains deployed or who is supporting from here at home.

Thank you to you and thank you to your families. Sir, I'll turn it back over to you.

SECRETARY HEGSETH: Thank you, Mr. Chairman. We'll take a few questions.

Q: Thank you. In your estimation, have there been increased or decreased instances of Iranian vessels either approaching or trying to breach the blockade the longer it is in effect? And another question about the mine threat. Has the mine threat been neutralized enough to facilitate freer flow in the Straits?

SECRETARY HEGSETH: Well, to the second question, first of all, we are seeing vessels transiting. There are paths that are open, and part of what the President is threatening is ensuring if there's attempts to lay recklessly and irresponsibly lay more mines, we're going to deal with that. It's a violation of the cease fire.

So transit is occurring, much more limited than anybody would like to see, and with more risk than people would like to see, but that's because Iran is doing irresponsible things with small fast boats, crafts, like I said, with weapons on them. These are commercial ships, in some cases, cruise ships, cruise ships that came through, being threatened by these.

So as far as breaching the blockade, it's been a pretty consistent. There were a number of ships at the beginning. Then you had the interdiction that the Chairman described, where we took out the engine room and disabled that ship. I think that sent a very clear sign that this is not a fake blockade, this is a real, full blockade. We'll use up to and including lethal force if necessary.

And that stopped and other ships have taken note of that. So any ships that have attempted, there's been levels of escalation, but none that far and they've turned around, absolutely. Yes.

Q: Good morning, Mr. Secretary, Mr. Chairman. David Zere, Real America's Voice. To follow up on Alexandra's question, um, how big are these mine laying boats? Can they be achieved from fast boats? And I wanted to follow up on my last week question about as jet fuel stocks in Europe reportedly are only about six weeks left, they get most of their jet fuel from the Gulf, have any European countries reached out to assist in cordoning off the strait and participating in escorts?

SECRETARY HEGSETH: I know there's a lot of talks. You saw the, I would call it a silly conference, uh, in Europe last week, where they got together and talked about talking about maybe doing something, eventually, when things are done. Uh, those are not serious efforts yet. We would welcome that. We would welcome a serious European effort to do something about this strait and this passage, considering it's their energy capabilities that are most at stake.

I think it's a wake-up call. It's a wake-up call for countries around the world. Either you have capabilities or you don't. Otherwise, you're at the behest of a country like Iran. And the only country that can do something about it is the United States military. Do you want to talk about the mines and the small crafts?

GENERAL CAINE: They have a variety of smaller Boston Whaler-sized boats. We have forces up there deterring and preventing them from continuing to do that, and we'll continue to do so pursuant to the orders of the Secretary and the President.

SECRETARY HEGSETH: But it would — reckless mining like that is a violation of the cease fire.

GENERAL CAINE: Unwise to do that.

SECRETARY HEGSETH: And very unwise to do, absolutely. Jerry.

Q: Thank you. So, uh, Pope Leo has made some comments about the war in Iran, and the US Conference of Catholic Bishops recently put out a statement suggesting that the war does not fit the requirements of just war theory. And I wondered if the Pentagon had, uh, thought about, uh, this war against the terrorist regime in Iran in terms of the framework of a just war? And if either one of you could talk about that.

And then just my second question would be, um, the Pentagon recently, this week, gave well-deserved, um, award upgrades to the members of Golf Company 2/1 Marines who served at HKIA and Abbey Gate during the withdrawal and evacuation. I wonder if you, Mr. Secretary, could speak a little bit about that and maybe give us a little bit more in terms of what to expect from this Afghanistan review in terms of further proper recognition and proper accountability?

SECRETARY HEGSETH: Um, on the first question, Pope's going to do his thing. That's fine. Uh, we know what our mission is. We know what authority we have. We're very clear about that. We follow that, uh, the orders of the President. We've got, uh, lawyers all over the place, looking at what we're doing and why we're doing it, and giving us every authority necessary under the Constitution and under our laws to execute it. So we feel very confident across the spectrum about what we're doing and why we're doing it, and the legal justification that we're following in order to do it.

You mentioned the Marines at Abbey Gate, uh, and, you know, what we've undertaken at this department is a historic, uh, Afghanistan review. So we have, over the course of months, reviewed what happened leading up to and including the events at Abbey Gate and the disastrous withdrawal in Afghanistan. There's never actually been a full accounting in this department of the decisions that were made.

There's been sort of papered-over Congressional attempts, but never a real deep dive, where we brought everybody in to talk about what happened and why it happened. That has happened. That review will come, uh, later this summer, and I think you'll find it to be probably the most comprehensive review this department has ever done about a single series of events.

And it's because the cascading effect of what Joe Biden did in abandoning, uh, that mission the way that he did, and that disastrous withdrawal had ripple effects for our military, for our country, and for the world. That's why reestablishing deterrence is one of the core pillars of what we've been doing at the War Department, is because the world looked at that disaster and made choices, Vladimir Putin made choices, Hamas made choices, and saw that America wouldn't do anything about it.

Houthis shot at ships. They made choices because Joe Biden and his administration were seen as feckless and weak. And that withdrawal was a part of what the world saw, people hanging to planes as we fled. That deserves a full accounting, which is exactly what we're doing. Sean Parnell, our Chief Spokesman, one of my senior advisors, has been leading that effort, getting to the bottom of it. And one of the revelations was that those Marines at Abbey Gate who showed courage, who were out there exposed, knew there was a threat, nebulous mission, the only gate that's open, did not receive the kind of proper recognition they should have for their heroism.

So one of the early results of this Afghan review is to ensure they get the due recognition and award they deserve for the heroism and courage they showed at that gate. Despite the bad decisions of this building and that administration, those Marines acted heroically, and we're going to recognize them for that. Jerry, thank you. Yeah, right here.

Q: Thank you. Michael Casey with O'Keefe Media Group. Earlier this week, James O'Keefe published a story on Department of Army nuclear chief Andrew Hug, who revealed top secret national security information to a stranger he met on a dating app. Will you defer

Mr. Hug for termination and prosecution?

SECRETARY HEGSETH: Yeah, he won't work here anymore.

Q: And given the revelations, will —

SECRETARY HEGSETH: It's an easy one.

Q: — any changes be made to the current anti-espionage training for all Department of War employees now, given this?

SECRETARY HEGSETH: Well, we're always on the lookout for CI threats, any internal threats, anyone talking out of school about things they should not. We take leaking very seriously here, informally or formally, which is why some of the reporting done by some of the people in here is incredibly problematic. They're willing to publish things based on classified information that would potentially harm those in harm's way.

And we think them doing so is incredibly irresponsible and unpatriotic. And I would encourage members of the press to think twice about the lives they're affecting when they publish things in their publications, like The New York Times.

Q: Mr. Chairman?

SECRETARY HEGSETH: Yes. Right here.

Q: Was the Touska carrying dual use equipment to China?

SECRETARY HEGSETH: Sir. I'm sorry, the question is right here.

Q: Thank you. Ryan Morgan with The Epoch Times. Earlier this week, on that topic, there was a report, I believe, with The Washington Post, that the Pentagon had briefed Congress that it could take up to six months to fully sweep the Strait of Hormuz for mines. I was wondering if you could comment a little bit more on the specifics of the timeline, the range of time that it could take, and then just a general idea of how many mines have been placed?

SECRETARY HEGSETH: We would not speculate on a timeline. I saw that report. It was based on, again, another leak from a closed door session which was supposed to be classified and apparently, allegedly, that was something that was said about we feel confident in our ability, in the correct period of time, to clear any mines that we identify. I would encourage other countries to be a part of such an effort as well, but we're tracking that very closely. Mr. Chairman, do you want to add anything to that?

GENERAL CAINE: No, sir. I think you covered it.

SECRETARY HEGSETH: OK. Right here, new members of our press corps here.

Q: Jacob Wasserman with TMZ DC. We have two questions. I'm going to ask the first, my colleague will ask the second.

SECRETARY HEGSETH: Well, we'll see.

Q: You know, I've heard you talk a lot about — sorry.

SECRETARY HEGSETH: We'll see.

Q: OK. I've heard you talk a lot about bombing people in places. And when you give these orders to carry out this extreme level of violence, what's going through your mind and your body? Do you have, like, an adrenaline rush? Are you scared? Do you feel like you're on a power trip? Just walk us through and paint us a picture —

SECRETARY HEGSETH: No.

Q: — of what it feels like mentally and physically.

SECRETARY HEGSETH: It's a very TMZ question. Um, my only thought process is to ensure that our war fighters have everything they need to be successful, defeat and destroy the enemy, and they come home. Uh, that they — I want them to feel empowered, to have every authority they need within our rules and within our law to bring maximum violence to the enemy, because war is violent, uh, war requires doing difficult things, but I want our people to feel empowered, so it's our guys that come home and their guys that do not.

Q: And second question.

SECRETARY HEGSETH: Sure, I'll give you one chance.

Q: Charlie Cotton from TMZ DC. Uh, you changed the Department of Defense to the Department of War. Would you consider changing the name again to the Department of Peace, since that's what we're all after?

SECRETARY HEGSETH: Well, that's the pursuit. It's a great question, actually. Uh, you go from defense to war because you want to be proactive about peace through strength. And really, I gave a speech in front of generals about what the ethos of the War Department is all about, because I want it to go through every echelon of this department.

It means something, it's not just words. And when you fight a war the right way, the idea is on the other side you bring about peace. That is what we would like to see the most. In fact, I once did a video about the one institution that should win the Nobel Peace Prize every single year is the United States military, because we are the guarantor of the safety and security, not just of our country, but of a lot of people in this world.

Last question, yes, sir.

Q: Thank you very much, Mr. Secretary. I do appreciate your time. Since February 28th, 725 drones and missiles have hit the Kurdistan region as your loyal ally, killing 22 people and injuring 100 others. Even after the cease fire, Mr. Secretary, 20 more attacks were carried out. My question is, does that ceasefire include Iraq and the Kurdistan region?

And really, what is your clear policy toward proxies? Why I am asking this question by President Masoud Barzani statement, five times targeting his office, even targeting President of Kurdistan Region residents in Duhok City.

SECRETARY HEGSETH: We watch it very closely, and that area and those folks, the Kurds, deal with a lot of what the IAMGs, or the proxies, are capable of doing. And a reminder of the reverberating effect of this Iranian regime, it's not just what it does to its own people, killing 45,000 of its own citizens just recently, but it's also the terror they've brought to the region.

And so getting a good deal and making sure they can't wield a nuclear weapon over top of those proxies is why this mission is such an important one. Thank you very much, appreciate it.

GENERAL CAINE: Thank you.

Hosted by Department of War Information Activity - WEB.mil

# EXHIBIT 9

**This Exhibit serves as a Notice of Filing under Local Civil Rule 5.4(e)(1). It preserves a link to a publicly posted video on youtube.com. The original .mp4 file can be made available to the Court upon request.**


YouTube
Search
DEFENSE SECY. HEGSETH & GEN. CAINE HOLD
BRIEFING ON TWO-WEEK CEASEFIRE WITH IRAN
C-SPAN
Secretary Hegseth Compares Media to the Pharisees in the Bible
C-SPAN
1.84M subscribers
Subscribe
210
Share
Ask
Save
Download
7.1K views 3 weeks ago #cspan
Secretary Pete Hegseth compares media to the Pharisees in the Bible: "Even though they witnessed a literal miracle, it didn't matter...Our press are just like these Pharisees...Your politically motivated animus for President Trump nearly completely blinds you from the brilliance of our American warriors."
...more

# EXHIBIT 10

**This Exhibit serves as a Notice of Filing under Local Civil Rule 5.4(e)(1). It preserves a link to a publicly posted video on youtube.com. The original .mp4 file can be made available to the Court upon request.**

YouTube

Search




**James O'Keefe Asks Pentagon Press Secretary Question About Identifying Anti-Trump Members Of DoD**

Forbes Breaking News
5.4M subscribers

Subscribe

27 Share Save

1K views 4 weeks ago
At a press briefing on Tuesday, James O'Keefe asked Pentagon Press Secretary Kingsley Wilson about identifying and addressing anti-Trump members of the Department of Defense.
...more

**7 Comments** Sort by

Add a comment...

# EXHIBIT 11

POLITICS

# Some friendly, some on-the-news questions at first briefing for new Pentagon press corps




1 of 2 | Former Rep. Matt Gaetz, R- Fla. speaks at AmericaFest, Dec. 22, 2024, in Phoenix. (AP Photo/Rick Scuteri, File)

Dave
uder
tands fo
portrait
at the
New York
headquart
ers of The
Associate
d Press on
Tuesday,
ug. 23,
022 (AP

BY DAVID BAUDER
Updated 5:15 PM EDT, December 2, 2025



The new journalism guard is officially in at the Pentagon. And the questions being asked of those running the world's most powerful military range from softballs to pointed queries to performances.

On Tuesday, Defense Department press secretary Kingsley Wilson — focused on her talking points and jabbing at old-guard reporters along the way — held her first briefing since most nonpartisan news outlets were replaced by friendly media representatives willing to accept new rules imposed by department chief Pete Hegseth.

Even before the new rules were in place, Hegseth's Pentagon struggled to hold televised briefings. Wilson's boss, Pentagon top spokesman Sean Parnell, held only two, one in March and another in July. By contrast, Pentagon officials under the Biden administration typically held two public briefings per week by the end of their time in office.

ADVERTISEMENT

Among the topics that interested the latest crop of reporters: the National Guard in American cities, military action in Iran and Somalia, an investigation into former President Joe Biden, potential legal action against The Washington Post and efforts to root out disloyal employees.

**RELATED STORIES**



**Federal judge finds Pentagon is violating court order to restore access to reporters**



**Pentagon blocks photographers from Hegseth's briefings on the Iran war**



**Trump team applying pressure to media: Tell the war's story the way we see it**

With Hegseth's role in U.S. military strikes on boats carrying suspected drug couriers off South America under scrutiny, Wilson was asked what say Adm. Frank Bradley had in a second strike on one boat, which a report in the Post on Friday said killed two survivors from the initial attack.

"At the end of the day, the president and the (defense) secretary are the ones directing these strikes, and any follow-up strikes that were directed by Admiral Bradley, the secretary 100% agrees with," she said.

She was asked whether the department was contemplating legal action against the newspaper, which reported that Hegseth issued a verbal order to "kill everybody" on the boat in the early September strike. That opened the door for her to attack the newspaper.

"The Washington Post readership," she said, "should think twice about reading that outlet again."

ADVERTISEMENT




SPONSORED CONTENT

## Former congressman, now part of press, asks a direct question

Former U.S. Rep. Matt Gaetz, a Republican credentialed to cover the Pentagon for One America News, asked about Pentagon plans for running Venezuela if President Donald Trump ousts the country's leader, Nicolás Maduro, and whether the U.S. would consider anyone who worked for the Venezuelan government or military a narco-terrorist.

Wilson replied that "if anything happens, we have a response ready," and said the future of Venezuelan government employees would be "a determination for the president to make."

Gaetz "experienced being on the other side" in not getting his questions answered, said Barbara Starr, retired Pentagon correspondent for CNN, who viewed the briefing online.

"I actually thought several of the questions the audience asked were very good, pointed, on-the-news questions," Starr said. "I don't think they got good answers."

All administrations look to emphasize their points of view in such briefings, the veteran correspondent said, but Trump's team is especially intent on not making actual news. Starr said it was not a journalistically sound event because of the reporters that were excluded.

ADVERTISEMENT

Wilson was asked why Americans were still fighting in Somalia (protecting Americans from terrorists, she said), whether the U.S. should reevaluate its relationship with Israel if the country had helped fund Hamas in the past (call the State Department, she suggested) and about reports that Iran was rebuilding its nuclear capabilities (she didn't answer, except to praise Trump's initial attack order ). She also didn't address a question about any evidence of criminal activity found on boats that were attacked.

ADVERTISEMENT




## The Pentagon spokeswoman got assists from some reporters

Some briefing attendees looked to help her advance the administration's point of view. Conservative provocateur James O'Keefe, who has made a name for himself taping political opponents in unguarded moments, asked what steps were being taken to root out disloyal Pentagon employees.

"Thank you for the question," Wilson said. "That's why the work you all do is so important."

When asked, she promised an administration report next summer on the Biden-ordered withdrawal from Afghanistan in 2021. She was about asked potential military honors or a burial in Arlington National Cemetery for a National Guard member killed in Washington last week.

Storm Paglia, a representative from the RedState and TownHall conservative blogs, expressed his happiness at being at the briefing. "Dawning of a new day with patriots reporting the truth," Paglia wrote on X. "Not media liars."

Before taking any questions, Wilson criticized media outlets that chose to "self-deport" from the Pentagon rather than accept Hegseth's new rules for working there. Hegseth characterizes them as common sense rules designed to protect national security; most mainstream news outlets worried they limited their ability to report anything Hegseth didn't want to see.

ADVERTISEMENT

They're continuing coverage off-site, and non-credentialed reporters weren't allowed in for Tuesday's briefing. The Pentagon made clear that attendance, and thus the chance to ask questions, was for "invited press only."

"We're not going to beg these gatekeepers to come back and we're not going to rebuild a broken model just to appease them," Wilson said. "The public has moved on from the old model, and so has the Pentagon."

The new reporters are expected to meet with Hegseth in person on Wednesday.

---

David Bauder writes about the intersection of media and entertainment for the AP. Follow him at http://x.com/dbauder and https://bsky.app/profile/dbauder.bsky.social



**DAVID BAUDER**

Bauder is the AP's national media writer, covering the intersection of news, politics and entertainment. He is based in New York.

# Conversation

All comments are subject to our Community Guidelines.

Please note that comments are not moderated immediately — every post is reviewed before appearing publicly to ensure it meets our community guidelines. This means there may be a delay before your comment is visible.

Join the conversation

ALL COMMENTS 2 NEWEST

CL **clive** DECEMBER 4, 2025

true journalism is done

REPLY 0 0

MN **MNrick** DECEMBER 3, 2025

"The Washington Post readership," she said, "should think twice about reading that outlet again." Apparently she thinks the Pentagon has the power to control what people read now too. I just renewed my subscription and she might want to reconsider her statement since Jeffy is a big trump pleaser.

REPLY 1 0

Powered by viafoura

ACTIVE CONVERSATIONS



Iran war ceasefire grows increasingly shaky after Trump rejects Tehran's latest...
122





Voter confusion and headaches for election officials follow hasty GOP push to redraw...
107

# EXHIBIT 13

Post

Home

Explore

Notifications

Chat

Grok

Bookmarks

Cam Higby
@camhigby

Subscribe

Press have always worked at the Pentagon.

Spoiler: They work at the White House too.

Correspondents place themselves at the buildings so when a major story breaks they're there to cover it.

7:45 PM · Dec 1, 2025 · **79.4K** Views

64 4 231 3

Relevant

# EXHIBIT 14

Media

# Pentagon's right-wing, pared press corps gets a meet-and-greet

Defense Secretary Pete Hegseth's briefing at the Pentagon next week will welcome a new crop of media that no longer includes the mainstream press.

November 29, 2025



By Scott Nover

The Defense Department is set to play host to right-wing media at the Pentagon early next week for its first in-person press event and briefing since the mainstream press corps walked out in October rather than sign the department's new press policy, according to two people familiar with the plans.

Shortly after the exodus of established Pentagon journalists, the Defense Department said a group of right-wing media outlets and influencers — who had not regularly covered the Pentagon under the Trump administration — would sign the new press policy, which prohibits soliciting any information that the government doesn't authorize. Those outlets include the Gateway Pundit, the Post Millennial, Human Events and the National Pulse, along with far-right activist Laura Loomer.

Many of the new signatories are based outside the Washington area and have not picked up their badges. The events, to run Monday through Wednesday, give them a chance to receive their credentials and interact with department officials. Press secretary Kingsley Wilson is scheduled to conduct a briefing for the new media crew, which is then set to have a meet-and-greet and press gaggle with Defense Secretary Pete Hegseth.

Loomer confirmed that she will attend. Turning Point USA, the Daily Signal and Tim Pool's Timcast are also among those invited to attend, according to the people familiar with the matter, who spoke on the condition of anonymity to discuss plans that have not been made public. The Defense Department and representatives of those outlets did not respond to requests for comment.

Pool previously had a lucrative contract with a group called Tenet Media that the Justice Department said in an indictment was operated by the Russian government-funded media outlet RT. Pool was not charged and has said he didn't know about the outlet's ownership.

Loomer, a close ally of President Donald Trump, has frustrated some in the administration with her public criticisms of high-ranking defense and national security officials who she argues are disloyal to Trump — sometimes succeeding in getting them ousted. Loomer has called herself "anti-Islam" and has urged a "national crackdown on Islam" in recent days, after an Afghan national was charged in an armed attack on two National Guard members that left one dead and another in critical condition.

Hegseth, a former Fox News host, has largely shied from the mainstream press during his time as secretary. While he said in a statement in February that he would help usher in "the most transparent administration ever," formal press briefings have been scarce. Dive deeper

---

---

Wilson, the Pentagon press secretary, has conducted only two off-camera gaggles with reporters since she joined the Defense Department at the start of the administration, most recently on Aug. 14, and has never briefed the press on camera. The last on-camera briefing was held by chief spokesman Sean Parnell on July 2. Hegseth, for his part, has engaged with reporters on camera during trips but most recently held an on-camera briefing with the press on June 26.

Before the new press policy and the resultant walkout, Hegseth and his staff spent months tightening restrictions on Pentagon reporters while limiting military personnel from directly communicating with the press. In February, Hegseth removed several major news organizations from their dedicated offices at the Pentagon to afford space for the right-wing outlets OAN, Newsmax and Breitbart, as well as the left-leaning HuffPost. The briefing room, typically available for reporters to use for TV appearances, was also made inaccessible. Dive deeper

---

---

One America News is the only media outlet that previously regularly reported on the Pentagon in person and signed the document. OAN reporter Alexandra Ingersoll was granted a rare interview with Hegseth, which broadcast on Nov. 20.

“The Defense Department has avoided questions from the press, all while U.S. troops are operating around the globe, the Pentagon has conducted legally questionable military strikes that have killed people in international waters and the administration has deployed troops to American cities,” the Military Reporters and Editors, an association supporting military journalists, wrote in an October statement denouncing the press policy.

# EXHIBIT 15

The Defense Department's new press policy led to an exodus of traditional journalists. Supporters of the president have stepped in.

---

**By Ken Bensinger and Erik Wemple**

Nov. 4, 2025

When Mike Lindell, the chief executive of MyPillow and the founder of the upstart digital news site LindellTV, recently heard about the chance to secure a Pentagon press credential, he immediately applied for four.

The outlet, which strongly supports the Trump administration and is known for promoting election conspiracy theories, already had accredited journalists stationed at the White House and in Congress. The Pentagon would be a perfect capstone, he thought.

"We're going to make them proud," he said about the administration in an interview.

It has been nearly three weeks since dozens of legacy outlets — including The New York Times, The Washington Post and the three major broadcast news networks — Fox News and Newsmax surrendered press passes that gave their journalists access to the Pentagon. They did so after declining to sign on to new rules that, according to many media lawyers, curbed their First Amendment rights to report on the military. Many of those outlets have continued aggressive coverage of the military from outside the Pentagon since then.

In their place, a fresh crop of news media has stepped forward to occupy the Pentagon's tightly circumscribed press areas, ones with a strikingly different philosophy when it comes to traditional journalistic notions about the fourth estate and holding truth to power.




Raheem Kassam, editor in chief of the National Pulse, which will be among new media organizations at the Pentagon. "We're there for the big-ticket narrative stuff," he said. Alex Wroblewski/Agence France-Presse — Getty Images

The Pentagon said it would not release a list of the outlets in the changing press corps, but The Times was able to identify a dozen of them. They range from widely popular right-wing podcasts to niche publications largely focused on issues like abortion, but are similar in their unwavering support for the Trump administration and the firm belief that ruffling government feathers is decidedly not part of the job description.

"We're there for the big-ticket narrative stuff," Raheem Kassam, editor in chief of the National Pulse, a part of the new Pentagon press detachment, wrote in a text message. He called his publication "basically an industry mag/site for MAGA world."

Initially, the National Pulse's eyes and ears in the Pentagon will be Will Upton, who worked in the Treasury Department during the first Trump administration and has been a frequent and vocal critic of traditional journalists, whom he has characterized as partisan actors.

Laura Loomer, the influential pro-Trump activist, said in a post on X late on Monday that she would be joining the Pentagon press corps, writing that she looks forward to "breaking more stories that impact our country and our national security." News of her accreditation was reported earlier by The Washington Post.

Other new arrivals include LifeSite News, a Catholic advocacy publication, whose Pentagon reporter is a former aide to Representative Paul Gosar, an Arizona Republican, and has been accused of making antisemitic and misogynistic remarks; RedState, owned by the Christian radio giant Salem Media, whose reporter was the communications director for James O'Keefe, the right-wing hidden camera journalist who founded Project Veritas; and Gateway Pundit, a site that often has spread conspiracy theories, which will have two military correspondents, including one who is perhaps best known for her work pushing for pardons for participants in the Capitol riot on Jan. 6, 2021.



Jim Hoft, publisher of Gateway Pundit, at the White House in 2019. Gateway Pundit is among the right-leaning outlets that were given credentials to access the Pentagon. Evan Vucci/Associated Press

David Schulz, director of Yale Law School's Media Freedom and Information Access Clinic, who serves as legal counsel for the Pentagon Press Association, said that the new rules amounted to an effort to limit what journalists could report and that the new outlets had pro-Trump leanings in common.

"These new regulations are really not about national security," Mr. Schulz said. "They're about controlling viewpoint and content."

In a statement, Sean Parnell, the chief Defense Department spokesman, said the traditional news outlets had misrepresented the policy. "The so-called 'journalists' staged a self-deportation and filmed their theatrics," he said. "We are proud to see the new wave of highly motivated journalists, who value truth, occupy the Correspondents Corridor."

Mr. Parnell had previously said in a social media post that the newcomers amounted to more than 60 journalists, roughly equivalent to the number of traditional reporters who handed in their badges on Oct. 15. A handful of outlets that had been in the Pentagon press corps previously, including The Epoch Times and One America News Network, agreed to sign the policy and have remained there.

Mr. Parnell's post prompted announcements from outlets that said they would be getting credentials, among them Human Events and the Post Millennial, sister sites that share a single owner and frequent contributions from Jack Posobiec, the well-known podcaster and Navy veteran who has a close relationship with numerous Trump administration officials, including Defense Secretary Pete Hegseth.

"We repealed and replaced the press pool," Mr. Posobiec said in a recent interview on Real America's Voice, which itself said on X that it would be getting a Pentagon credential.



Jack Posobiec, center, contributes to the conservative outlets Human Events and the Post Millennial and has a close relationship with Defense Secretary Pete Hegseth. Haiyun Jiang for The New York Times

Libby Emmons, editor in chief of Human Events and the Post Millennial, said she had requested four passes for her staff and signed the new Pentagon press policy.

“There should be a place for reporting on what they are doing without always trying to expose the dark underbelly,” Ms. Emmons said. “And that’s part of why I said sure, I’ll sign your thing and come check it out.”

Major Washington outposts — Congress, the White House, the State Department and the Pentagon — have long had their own press corps: packs of print reporters, television correspondents and their camera crews, who hover in the hallways and tag along with officials as they travel.

President Trump and his appointees have often criticized the journalists who follow them on a daily basis, but until now, the administration has never gone so far as to effectively remake an entire press corps.



The outlets now granted Pentagon press passes have pro-Trump leanings in common, said David Schulz, legal counsel for the Pentagon Press Association. Haiyun Jiang for The New York Times

"I've never seen anything like that, and it doesn't seem to resemble anything from a team that respects an actual independent press corps," said Eric Schultz, who served as a press aide under President Barack Obama.

Ms. Emmons said she had received an unsolicited invitation to apply for credentials after the legacy journalists refused to sign the new rules.

"We value what the press does every single day, but unfortunately we have seen a lot of the mainstream media continue to lie," Kingsley Wilson, Defense Department spokeswoman, said in an interview that same day with Frontlines, a media arm of Turning Point USA. That outlet subsequently announced that it, too, would be joining the new Pentagon media crew.

Several of those joining the new press corps live nowhere near the nation's capital, even though the department's published policies say credentialed correspondents should be at the Pentagon, just outside Washington, "at least three times a month."

Tim Pool, the beanie-wearing right-wing podcaster, said on X that he did "not intend to maintain a significant presence in the Pentagon" after disclosing that his outlet, Timcast Media, was also getting a credential. Last year, a federal investigation revealed that Mr. Pool was paid to produce videos for a company that was secretly funded by the Russian government. Mr. Pool, who was not charged, has claimed he was unaware of where the payments, which amounted to $100,000 per video, came from.



Tim Pool in the "new media" seat during a White House media briefing with Karoline Leavitt at the White House in April. Doug Mills/The New York Times

Under the new policy, journalists could get in trouble — and even lose access permanently — for soliciting government employees to "violate the law by providing confidential government information." Securing confidential information is the bread and butter of accountability reporting and has produced some of the most important journalism of the past century.

There are few signs, however, that the reconstituted Pentagon press corps has aspirations to test the limits of those rules. Mr. Pool, on his podcast, said, “We are not an investigative news organization.” He added: “We do not have journalists meeting with sources in parking garages while they kick over a manila folder with secret documents. We don’t do any of that.”

Mr. Lindell, for his part, said he would “follow the rules to the T,” echoing the contention by Pentagon officials that leaks — even of nonclassified information — are a threat to national security.

“We would never do anything like the mainstream media does to jeopardize our country,” he added.

**Ken Bensinger** covers media and politics for The Times.

---

A version of this article appears in print on , Section B, Page 1 of the New York edition with the headline: New Pentagon Press Crew Defined by Loyal Support of Trump

# EXHIBIT 17

X

← **Post**

**Scott Nover**
@ScottNover

New: @PressSecDOW now says Loomer's request for tips doesn't violate the press policy b/c it's a "general" tip line.

"If Fake News reporters actually had a brain and could read our policy correctly, then maybe one day they will be as effective of a journalist as Ms. Loomer is."

VaPo's solicitation, which explicitly and exclusively targets military personnel and DoW employees, Laura Loomer's X
g tips to her news outlet is a general tip line, which is constitutionally permissible. Therefore it does not violate the Pe
ccess policy. This distinction was explained in detail to the Pentagon Press Association before they chose to engage ir
st and performative walk out. If Fake News reporters actually had a brain and could read our policy correctly, then ma
will be as effective of a journalist as Ms. Loomer is."
**itable to Pentagon Press Secretary Kingsley Wilson.**

**Scott Nover** @ScottNover · Nov 4
I've asked the Defense Department whether this request for tips violates its new press policy. It never responded to my requests for comment about Loomer's credentialing yesterday and has not responded to this question today.
...

2:02 PM · Nov 4, 2025 · **285.8K** Views

29 59 224 22

**Read 29 replies**

# EXHIBIT 19

X

← **Post**

**Sean Parnell**
@SeanParnellASW

Today, the Department of War is announcing the next generation of the Pentagon press corps.

We are excited to announce over 60 journalists, representing a broad spectrum of new media outlets and independent journalists, have signed the Pentagon's media access policy and will be joining the new Pentagon press corps. Twenty-six journalists across 18 outlets were among the former Pentagon press corps who chose to sign the DOW media access policy.

New media outlets and independent journalists have created the formula to circumvent the lies of the mainstream media and get real news directly to the American people. Their reach and impact collectively are far more effective and balanced than the self-righteous media who chose to self-deport from the Pentagon. Americans have largely abandoned digesting their news through the lens of activists who masquerade as journalists in the mainstream media. We look forward to beginning a fresh relationship with members of the new Pentagon press corps.

1:21 PM · Oct 22, 2025 · **4.8M** Views

4.4K 5.7K 21K 732

**Read 4.4K replies**

# EXHIBIT 20

# Hegseth changes policy on how Pentagon officials communicate with Congress

Leaders at the Pentagon have significantly altered how military officials will speak with Congress after a pair of new memos issued last week.

AP
BEN FINLEY and KONSTANTIN TOROPIN
October 22, 2025 7:12 pm 1 min read

WASHINGTON (AP) — Leaders at the Pentagon have significantly altered how military officials will speak with Congress after a pair of new memos issued last week.

In an Oct. 15 memo, Defense Secretary Pete Hegseth and his deputy, Steve Feinberg, ordered Pentagon officials — including the chairman of the Joint Chiefs of Staff — to obtain permission from the department's main legislative affairs office before they have any communication with Capitol Hill.

The memo was issued the same day the vast majority of Pentagon reporters exited the buildingrather than agree to the Defense Department's new restrictions on their work, and it appears to be part of a broader effort by Hegseth to exert tighter control over what the department communicates to the outside world.

According to the memo, a copy of which was authenticated by a Pentagon official, "unauthorized engagements with Congress by (Pentagon) personnel acting in their official capacity, no matter how well-intentioned, may undermine Department-wide priorities critical to achieving our legislative objectives."

**Join us June 10 and 11 for Federal News Network's Cloud Exchange where agency and industry leaders will discuss a whole-of-government approach to cloud modernization. Register today!**

Sean Parnell, the top Pentagon spokesman, called the move a "pragmatic step" that's part of an effort "to improve accuracy and responsiveness in communicating with the Congress to facilitate increased transparency."

Previously, individual agencies and military branches within the Pentagon were able to manage their own communications with Congress.

A second memo, issued Oct. 17, directed a "working group to further define the guidance on legislative engagements."

The memos were first reported by the website Breaking Defense.

*Copyright © 2026 The Associated Press. All rights reserved. This website is not intended for users located within the European Economic Area.*

# EXHIBIT 21

MAUREEN DOWD

# Fraidy-Cat at the Pentagon

Oct. 18, 2025

Listen · 5:00 min



**By Maureen Dowd**
Opinion Columnist, reporting from Washington

See more of our coverage in your search results.
**Add The New York Times on Google** ↗

It is a truth generally acknowledged that Pete Hegseth is a muttonhead.

But I come not to bury the self-proclaimed “secretary of war,” rather to praise him.

He is going to spur some superlative Pentagon coverage. Because nothing gets a bunch of reporters going like being forced out of the building where they work and being told they aren’t allowed to do their jobs.

The Pentagon has said it will deny credentials to reporters who seek information that has not been approved for release. Hegseth already cut off access to large swaths of the Pentagon to reporters without escorts.

Journalists have walked the Pentagon’s halls since its opening in World War II. They could stake out Jim Mattis, a defense secretary in President Trump’s first term, when he picked up his clothes at an in-house dry cleaners and have an off-

the-record chat as he walked back to his office, shirts slung over his shoulder. They might bump into the chairman of the Joint Chiefs of Staff at a Pentagon Starbucks and have a conversation that could turn into a story.

Pentagon officials liked it because they could clock what the reporters were working on, and the reporters liked it because they could get tips.

Mainstream news outlets have generally been careful, responsible, sometimes even overly deferential, about covering our military and handling sensitive information.

This crackdown on reporting supposedly would protect such information, even though the secretary himself personifies the motto “loose lips sink ships.”

He was embarrassed by the revelations that the Atlantic editor, Jeffrey Goldberg, had been mistakenly added to a chat about classified war plans on Signal, and that Hegseth had shared details of strikes against the Houthis in Yemen in a Signal chat that included his wife and brother, and that Elon Musk had been invited to a briefing on top-secret plans in the event of war with China.

And Hegseth, the former weekend Fox News anchor, does not like how the media covered him as he ascended — utterly unqualified and looking like the third lead of a cheesy spring-break movie.

As The New Yorker’s Jane Mayer wrote at the time, a trail of documents indicated that Hegseth was dumped from prior leadership positions for financial mismanagement, sexist behavior and drinking on the job.

His tenure at the Pentagon has been marked by chaos as he pushed out several top Black and female leaders and derided “fat troops” and “fat generals.”

Knowing he’s in over his head, Hegseth has grown more paranoid and resentful — qualities we need in the supervisor of a nearly trillion-dollar budget, supervising troops and weapons all over the world.

When I covered stories in Saudi Arabia, officials attached minders to us. But imposing such undemocratic, restrictive protocols at the Pentagon makes it seem as though we're run by tinpot dictators.

Trump can seem more open with reporters. Attention is his oxygen, after all. But he continually maligns the media.

And there's a creepy "Invasion of the Body Snatchers" feel to the press corps at the White House now, as the perches of legacy media get filled with MAGA ringers — like the two White House "reporters" from Mike "MyPillow" Lindell's "news" network.

One of the pillow reporters, Cara Castronuova, was among the handful of media representatives allowed in with Trump and President Volodymyr Zelensky of Ukraine on Friday. Castronuova's penetrating "questions" consisted of gushing over Trump, who "stuck out his neck" for a Middle East peace deal, and chiding Zelensky for wanting the weapons that Trump had suggested he might give Ukraine. "As he said," Castronuova tartly told the Ukrainian president, "we need our Tomahawks, too."

Trump dodged Vietnam with his bone spurs excuse, and he has called the Iraq war "the single worst decision ever made." So, somewhere, under all that bombast and desire to be praised rather than challenged, he knows we need a vibrant Pentagon media corps to ferret out the truth when our leaders are lying to us to prolong or start wars.

America's greatest fiascoes happened because there wasn't enough sunlight cast on them. As a chastened J.F.K. told The Times's managing editor, Turner Catledge, after the Bay of Pigs: "Maybe if you had printed more about the operation, you would have saved us from a colossal mistake."

After reporters — including those from Fox News and Newsmax — refused to agree to Hegseth's 21 pages of conditions, the Defense Department's official X account trolled them with a puerile meme.

Hegseth, immature and unconfident, cannot accept that a free press is integral to democracy. As Thomas Jefferson put it: "Were it left to me to decide whether we should have a government without newspapers or newspapers without a government, I should not hesitate a moment to prefer the latter."

Hopefully, the defense secretary who will take over when Hegseth is undone by the press for his ineptitude and un-American diktats will understand that.

*The Times is committed to publishing a diversity of letters to the editor. We'd like to hear what you think about this or any of our articles. Here are some tips. And here's our email: letters@nytimes.com.*

*Follow the New York Times Opinion section on Facebook, Instagram, TikTok, Bluesky, WhatsApp and Threads.*

Maureen Dowd is an Opinion columnist for The Times. She won the 1999 Pulitzer Prize for distinguished commentary. She is the author, most recently, of "Notorious." @MaureenDowd • Facebook

---

A version of this article appears in print on , Section SR, Page 2 of the New York edition with the headline: Fraidy-Cat at The Pentagon

# EXHIBIT 22

**Media outlets won't sign on to new Pentagon press restrictions**
(03:32)

Politics

# CBS News ends over 60-year presence at Pentagon after declining to sign new press requirements

By Eleanor Watson

Updated on: October 17, 2025 / 4:41 PM EDT / CBS News

Add CBS News on Google

For the first time in more than 60 years, CBS News will close out the week without a workspace in the Pentagon after declining — along with nearly every major news organization — to sign onto new press requirements that reporters' associations say could infringe on their First Amendment rights.

During D-Day, CBS News radio correspondent Joseph F. McCaffrey reported live from the Pentagon about the strategy and General Dwight D. Eisenhower's background.

"Most of the plotting, the working, the split-haired timing was done in this building," McCaffrey reported on June 6, 1944. "Although only a chosen few knew when the day would arrive, the atmosphere here in the Pentagon building has been tense for several weeks." Listen to the audio here.

CBS News had radio correspondents in the building since the 1940s and a TV network booth, or mini-office, in an area designated for media since the 1970s. Over the past two decades, as the networks have been able to go live from the building, "on-air" lights flash on when major news breaks, and journalists relay information to the public live from the Pentagon.




CBS News' David Martin and Mary Walsh

For most of that time, CBS News chief national security correspondent David Martin was the one breaking the news and reporting out every story. The Pentagon gave him his first press badge in 1983, his longtime producer Mary Walsh 10 years later. Since then, the duo has not only covered every military conflict, but also told stories about the military's service members and their lives.

"I'm proud of the work David Martin and I have done, telling stories of valor on the battlefield and courage and resilience at Walter Reed," Walsh wrote in an email before turning in her Pentagon press credential this week. "I have been inspired and humbled by the fortitude of these men and women, their willingness to sacrifice everything for our country."

Many of those stories emerged from relationships built because of CBS News' constant presence inside the Pentagon.

Watch CBS News




David Martin and Mary Walsh with an Emmy awarded for a piece on the Battle of Wanat in Afghanistan.

"Walking the halls of the Pentagon was my M.O. for 40 years. I don't know how else to cover a story except by being there," Martin wrote in an email. "I would guess that 90 per cent of the stories I broke were a result of being in the hallways and visiting officials in their offices."

"Not every official was glad to see me but dealing with them face to face, day in and day out, developed a level of trust on both sides. Sometimes relationships got tense but never acrimonious," Martin wrote. "Even when [Chairman of the Joint Chiefs] Colin Powell was yelling at me to get the hell out of his way, I knew I could go back and talk to him the next day."

Martin's first day on the job as CBS News Pentagon correspondent was April 18, 1983, the day a previously unknown terrorist group called Hezbollah blew up the American embassy in Beirut.

"Nobody knew it at the time, but that was the start of the age of terror," Martin said.

"The next 40 years included the invasion of Grenada, Panama, the First Gulf War, the air war against Serbia, 9/11, the invasion of first Afghanistan and then Iraq, the Bin Laden raid and the withdrawal from Afghanistan — not to mention all the cultural issues, like women in combat. I cannot imagine covering any of those stories without a building pass," Martin wrote.




CBS News' Bob Schieffer speaks with Nixon-era Defense Secretary Melvin Laird.

Bob Schieffer, the moderator of "Face the Nation" from 1991-2015, spent some of his first years at CBS News wearing a Pentagon pass.

Watch CBS News

"I came to work for CBS in 1969, and it was shortly after that, they just sent me out to the Pentagon because I was the rookie," Schieffer said in a phone interview.

Schieffer was there for about six years and "loved it."

"I'll tell you what I loved about it — it was like covering a small town in the middle of a big city," Schieffer said. "You could get information, and you know, most of the time, it was information that not only helped you, it helped the public understand."

"They spend a lot of money at the Pentagon and rightly so, but I think people have a right to know about it, and not just get one public relations person who's going to put out a press release."




Charlie D'Agata reports from the Pentagon.

Currently, Charlie D'Agata is CBS News' senior national security correspondent covering the Pentagon and brings over two decades of experience covering the conflicts in Ukraine and Gaza, as well as the U.S. military involvement in war zones from Iraq and Afghanistan to Syria.

But it's not just the correspondents on camera who are giving up their passes.




Cami McCormick interviews members of the Army.

CBS News radio correspondent Cami McCormick has covered national security at CBS for over two decades. And teams of producers, camera operators, audio technicians and engineers crucial to bringing stories of the military to Americans across the country will also be turning in their passes.

Watch CBS News

The Pentagon says the intent of its new policy is to stop press leaks and exercise control over stories about the military reported by CBS News and other media organizations. It sent journalists a memo in September mandating they sign an agreement acknowledging they would need formal authorization to publish either classified or controlled unclassified information.




CBS News' David Martin, Eleanor Watson

The department said in the memo that "information must be approved before public release ... even if it is unclassified." News organizations were given a deadline of 5 p.m. this past Tuesday to return the signed agreement. The vast majority declined to do so, though at least one outlet, the far-right One America News Network, agreed to the new restrictions.

CBS News Pentagon journalists may have turned in their credentials this week, but losing access to the building isn't going to stop them from reporting what's going on

Watch CBS News

in what Defense Secretary Pete Hegseth once promised would be "the most transparent administration ever."

---

## CBS News stories from the Pentagon over the years:

- *"CBS Evening News": Battle of Wanat in Afghanistan*
- *"60 Minutes": The New Cold War*
- *"60 Minutes": Incoming*
- *"CBS Sunday Morning": Aftermath*
- *"CBS Evening News": Caisson horses at Arlington Cemetery*
- *"CBS Evening News": U.S. troops at southern border*
- *CBS News Radio: Broadcast from Pentagon on D-Day*

**More from CBS News**

CBS ATLANTA
Georgia high schools working to implement state's new cellphone ban



CBS POLITICS
3 killed in U.S. strike on suspected drug boat in eastern Pacific, Pentagon says




CBS POLITICS
To avoid risk of mines, Navy directs ships on path farther from Iran



CBS MINNESOTA
Minnesota House approves bill that legalizes psychedelic mushrooms for therapeutic use



**Go deeper with The Free Press**

# EXHIBIT 23

*Democracy Dies in Darkness*

# Hegseth's legal fixer at the center of Pentagon's new media restrictions

Tim Parlatore represented the defense secretary when he faced sexual assault allegations, and also counts alleged mobsters and President Donald Trump as former clients.

October 15, 2025



By Dan Lamothe

Defense Secretary Pete Hegseth's bid to impose sweeping restrictions on journalists' ability to report at the Pentagon was orchestrated with advice from his longtime personal lawyer, whose role on Hegseth's staff has troubled some defense officials.

Tim Parlatore's dual status as a mid-ranking military officer and legal fixer for Hegseth has attracted scrutiny internally among other officials, some of whom are leery of the influence he wields, people familiar with the matter said. He was integral in shaping the new media restrictions set to take effect this week, according to people familiar with the matter and a draft of the policy obtained by The Washington Post.

The 21-page policy requires credentialed reporters who sign the document to acknowledge they understand Hegseth's view that by requesting any information — including unclassified material — that has not been preapproved for release by the Pentagon, they are "soliciting or encouraging government employees to break the law." Such action, the policy claims, "falls outside the scope" of "newsgathering activities" protected by federal law. Journalists who do not sign must leave the building by Wednesday evening.

The Washington Post is among a number of news organizations, spanning the ideological spectrum, that have declined to sign the new rules. Many have cited the proposed changes' infringement on the media's First Amendment protections.

Pentagon officials anticipate one or more media outlets may challenge Hegseth's policy in court, said people familiar with the matter, who like some others spoke on the condition of anonymity to disclose internal conversations.

Parlatore, 46, joined Hegseth's staff in March, upon commissioning into the Navy Reserve. He arrived shortly before Hegseth fired three senior political appointees in April, shrinking a small group of senior advisers he trusted even more, people familiar with the matter said. The part-time arrangement allows Parlatore to remain involved in his private practice — work that included representing Hegseth when the former Fox News personality was accused of sexual assault — while working behind the scenes in uniform, in an ostensibly nonpartisan military role, to shape policy and carry out the defense secretary's directives.

People familiar with Parlatore's actions describe him as calculating and brash, at times angering others on Hegseth's team. He uses a desk in the defense secretary's front-office suite, and has outlasted several other senior aides who have been either fired or marginalized during a months-long period of infighting and instability among the secretary's brain trust. Parlatore's sway with leadership far exceeds his rank, Navy commander, a dynamic that has made some officials uncomfortable, people familiar with the situation said.

"This guy is an officer, who also wears a civilian hat, who is also representing the secretary, who also is in the secretary's front office, who also still has a private law firm," one person said. "It's like, who is he representing here?"

Sean Parnell, a Pentagon spokesman, said in a statement that Parlatore is a special adviser to Hegseth and "has extensive legal experience regarding First Amendment cases and press freedom." Kingsley Wilson, a spokeswoman for the department, declined to answer additional questions about Parlatore's activities on Hegseth's behalf.

Parlatore's involvement in a number of legal issues has unsettled some in the Defense Department's Office of General Counsel in particular, whose lawyers advise the defense secretary and other senior officials. In private, some have voiced concerns to other defense officials about his influence and potential conflicts of interest, though it is unclear if anyone has raised a formal complaint. That anxiety, detailed by Politico in May, has endured throughout Hegseth's tumultuous nine months in office, people familiar with the matter said.

In a phone interview, Parlatore justified the new media restrictions as an essential step to shore up information security. He also defended his other work on behalf of Hegseth and his standing more broadly within the department, saying there are well-established conflict-of-interest guidelines that he follows. No one in the general counsel's office, he said, has ever raised any concerns to him about how he navigates his civilian and military careers.

"One of the tremendous benefits of being a reservist is the ability to bring in outside experience, and I have a lot of experience in a lot of areas that no active-duty [lawyer] or career attorney in the general counsel's office could possibly provide," Parlatore said. "So I do get called upon on various nonroutine matters."

Parlatore said he is not actively representing the defense secretary in a civilian capacity, but does usually "maintain long-term relationships with clients like that."

Parlatore played a leading role in Hegseth's use of polygraph tests to scrutinize officials suspected of disclosing to the news media embarrassing details about the dysfunction among the secretary's senior aides, several people familiar with the matter said. The practice fostered resentment among staff and eventually faced scrutiny at the White House after a complaint from a senior political appointee, Patrick Weaver.

While Parlatore has downplayed the significance of the issue, saying polygraph tests are routinely used in government, a White House representative instructed Hegseth's team to stop and Parlatore's reputation took a hit internally, people familiar with the matter said. Weaver did not respond to questions about the issue. The White House referred questions to the Pentagon.

Parlatore also has interfaced with the Defense Department Office of Inspector General as its investigators conducted a review of how Hegseth and his senior aides handled sensitive information in what has become known as the Signalgate affair, people familiar with the matter said. The inspector general's findings are expected to address how and why the defense secretary — or someone acting on his behalf — divulged information over the unclassified chat app Signal that derived from a classified email detailing a U.S. bombing operation in Yemen.

Parlatore called his desire to serve on the defense secretary's team "multifaceted" and said he thinks he can offer a lot to the military based on his background as a criminal defense attorney. Beyond Hegseth, he has taken on a number of high-profile clients, including accused mobsters, and, for a time, President Donald Trump, as he faced prosecution by the Justice Department in a case scrutinizing his handling of classified documents.

"I'm a lawyer, and I represent people across the political spectrum," Parlatore said. "Everyone is entitled to a defense — whether you agree with it or not."

## The client list

Parlatore grew up as Timothy Payne in the New Jersey suburbs of New York City and graduated from the Naval Academy in 2002. His time in the service included an active-duty stint as a surface warfare officer on the USS Normandy and time in the Navy Reserve overseeing a small military police unit in Italy.

He legally changed his last name to his mother's maiden name in 2005, around the time he left active duty, according to a legal petition he filed in 2014. He told The Post he did so because he disliked his last name and his departure from the active-duty Navy marked a "clean breaking point."

He was inspired to pursue a legal career in part by observing the "legends" who served in criminal defense during the "heyday of organized crime," Parlatore told a podcast in 2020.

Among those Parlatore has represented are Anthony "Skinny" Santoro, described by prosecutors as a member of the Bonanno crime family, and Bruce Cutler, an attorney who won acquittals on behalf of John Gotti, the former head of the Gambino mafia. Parlatore, who also was legal partners with Cutler, represented him in a misdemeanor assault case in which Cutler was accused of punching another lawyer. The charges were dismissed. Cutler died this month.

Also among Parlatore's clients was Bernard Kerik, the New York Police Department commissioner during 9/11 who later pleaded guilty to tax evasion. Kerik, who received a pardon from Trump in 2020, died earlier this year.

A few years later, he was retained by Hegseth after a woman accused him of sexually assaulting her in 2017. Hegseth paid the woman $50,000 — a revelation that surfaced late last year after Trump selected Hegseth for defense secretary. Hegseth has maintained his innocence, while Parlatore accused the woman of being the "aggressor" that night in a statement to The Post last year.

The scandal nearly derailed Hegseth's nomination and left him embittered toward the journalists who chronicled his bruising path to confirmation, people familiar with the matter said.

The case that elevated Parlatore to national prominence was that of Chief Petty Officer Edward Gallagher, a Navy SEAL who in 2018 was charged with murder and other crimes in connection with a combat deployment.

Gallagher, in a phone interview, said Parlatore took over his case after Kerik called Gallagher's wife and offered to help. The retired SEAL said he found comfort in the idea that his lawyer had served in the Navy but not "in the system" as a military attorney.

Parlatore disputed the charges against Gallagher, and spoke out in the news media to portray the prosecution as sloppy and overzealous. Gallagher was acquitted of most of the serious charges but convicted of posing for photos with the remains of a slain militant. The trial received significant attention from Hegseth, who from his pulpit as a Fox News personality compelled Trump to intervene and reverse the Navy's decision to demote Gallagher.

"He fought like a bulldog the whole time — and he was not afraid to call out lies and corruption," Gallagher said of Parlatore.

Gallagher acknowledged that his case "got political." He said he is glad Hegseth, 45, is defense secretary but thinks he is "young" and benefits from having someone on hand like Parlatore "who has beat the system."

Parlatore became an attorney for Trump in 2022, but had a falling out with another of Trump's lawyers, Boris Epshteyn, and departed the case, people familiar with the matter said. In interviews, Parlatore later blamed Epshteyn for hindering his access to Trump, and putting him and other Trump attorneys at a disadvantage while dealing with prosecutors.

Parlatore told The Post he did not want to talk about his disagreement with Epshteyn, but disputed that he had problems with other lawyers who've represented Trump.

Epshteyn did not respond to requests for comment.

Also among those close to the administration who have clashed with Parlatore is political consultant Arthur Schwartz, who has objected to some of Parlatore's actions on behalf of Hegseth — including the polygraph tests, people familiar with the matter said. Schwartz, who assisted with Hegseth's confirmation, acknowledged having issues with Parlatore but declined to say why when contacted by a Post reporter.

"As much as I dislike Tim," he said, "I dislike you more."

Parlatore, informed of Schwartz's remark, laughed and declined to comment.

## The media restrictions

Constitutional scholars — including some generally supportive of the Trump administration — have labeled Hegseth's media restrictions an assault on the First Amendment. Opponents have characterized his pursuit as an attempt to evade accountability.

The Pentagon Press Association (PPA), which represents journalists credentialed to work there, called the policy "an unprecedented message of intimidation." It has urged Pentagon leaders to reconsider, saying the policy requires reporters to hand in their badges or accept a policy that "gags Pentagon employees and threatens retaliation against reporters who seek out information that has not been pre-approved for release."

Hegseth has scoffed at such concerns, and his team has claimed the department is still committed to transparency.

The PPA has noted that the new policy devotes significant attention to restricting reporting on "controlled unclassified information," a vast category that "does not meet the criteria for classification but must still be protected," according to the Defense Department's website. The policy claims that the First Amendment "does not permit journalists to solicit government employees to violate the law by providing confidential government information."

The new restrictions also warn vaguely that service members may be prosecuted for releasing "non-public information" to journalists and state that credentialed reporters posting "public advertisements" online seeking tips — a common practice — is grounds for revocation of a Pentagon badge.

On Fox News recently, Jonathan Turley, a First Amendment scholar who has frequently spoken out in defense of Trump, called the new rules essentially "limitless" and warned that the Pentagon appeared poised to "create a stranglehold on the free press."

Parlatore disputed any suggestion that the new media policy is an attempt to choke off scrutiny of Hegseth's missteps in the job. "It has nothing to do with embarrassing the secretary," he said. "That's a talking point that people have raised, but this is purely focused on preventing criminal activity."

Hegseth, appearing with Trump at the White House on Tuesday, falsely stated that journalists once could go "pretty much anywhere in the Pentagon" and that the building is "the most classified area in the world." Reporters have long been restricted to unclassified parts of the building, which is regularly visited by tourists and foreign military officers as well.

Trump appeared to back Hegseth's decision, saying the defense secretary finds the news media disruptive, and suggested America's generals are "not necessarily good" at dealing with the press and could make mistakes.

*Tara Copp, Alex Horton, Scott Nover and Aaron Schaffer contributed to this report.*

# EXHIBIT 24

Post

Home
Explore
Notifications
Chat
Grok
Bookmarks
Creator Studio
Premium
Profile
More

**Pete Hegseth**
@PeteHegseth

👏

**NYTimes Communications** @NYTimesPR · Oct 10, 2025

A statement from The New York Times on the Pentagon's press pass policy:

"Journalists from The New York Times will not sign the Pentagon's revised press pass policy, which threatens to punish them for ordinary news gathering protected by the First Amendment. Since the policy was first announced, we have expressed concerns that it constrains how journalists can report on the U.S. military, which is funded by nearly $1 trillion in taxpayer dollars annually. The public has a right to know how the government and military are operating. The Times is dedicated to pursuing the public interest through deep, fair reporting and an unwavering pursuit of the facts."

– Richard Stevenson, Washington Bureau Chief

The New York Times

2:49 PM · Oct 13, 2025 · **1M** Views

1.7K 2.5K 25K 278

Relevant

View quotes

# EXHIBIT 25

The New York Times | https://www.nytimes.com/2025/10/10/business/media/hegseth-pentagon-press-access.html

# *Inside Hegseth's Effort to Limit Press Access at the Pentagon*

Defense Secretary Pete Hegseth is at odds with the news media to a degree unseen in modern times, former Pentagon officials say.

**By Erik Wemple**
Reporting from Washington

Oct. 10, 2025

See more of our coverage in your search results.

**Add The New York Times on Google ↗**

As the Senate weighed whether to confirm Pete Hegseth as defense secretary, NBC News dug up information about his past, including an affidavit from his former sister-in-law accusing him of abusive behavior toward his second wife. Courtney Kube, a Pentagon correspondent for the network, assisted with the coverage.

The reporting did not upend the confirmation of Mr. Hegseth, a Fox News host before his nomination. But it did leave an impression on him.

Shortly after taking office, Mr. Hegseth told his team to bar Ms. Kube from the Pentagon, according to three people with knowledge of his order. The team did not follow through, because Pentagon lawyers said the Defense Department could not single out one news outlet for removal, two of the people said.

Mr. Hegseth's request did, however, foreshadow his adversarial approach to the press while in the job — both toward specific reporters and toward the industry more broadly.

Under his leadership, the department has removed national news outlets from a shared media workspace and made it available to conservative outlets instead; has scaled back reporters' ability to roam Pentagon corridors; and, in the most recent salvo, is imposing a set of restrictions outlining causes for the revocation of correspondents' press passes.

The Defense Department is falling in line with a policy of hostility toward news organizations that spans the Trump administration. President Trump himself has sued ABC and CBS over their coverage, with both lawsuits ending in settlements, and has accused The Wall Street Journal and The New York Times of defamation. (The case against The Times was dismissed, though Mr. Trump has the right to file a new complaint.) The White House ejected The Associated Press from the White House press pool and seized control of coverage assignments formerly administered by the White House Correspondents' Association.

Mr. Hegseth's initiatives, former Pentagon officials say, point toward a defense secretary at odds with the news media to a degree unseen in modern times.

"I don't remember any secretary of defense — and I've worked for a number of them — saying, 'OK, put a shackle on them,'" said Raymond DuBois, a former Pentagon official whose roles included overseeing the operations of the sprawling complex.

Sean Parnell, the chief Pentagon spokesman, said in a statement that Mr. Hegseth "takes his message directly to the troops and the American people." Mr. Parnell added: "He doesn't rely on the corrupt filter of the mainstream media."