

The Defense Department is falling in line with a policy of hostility toward news organizations that spans the Trump administration. Tierney L. Cross/The New York Times

Tim Parlatore, Mr. Hegseth's personal lawyer, said it was "false" that the secretary had ordered Ms. Kube's expulsion. He also accused Ms. Kube of "pushing knowingly false stories" and being "extremely unethical."

In Mr. Parlatore's account, Ms. Kube refused to listen to objections about her reporting and accused Mr. Parlatore of being sexist when he disputed her points. He complained to Ms. Kube's editor about the sexism accusation. "They ignored it," said Mr. Parlatore, who is also a Pentagon adviser.

An NBC spokeswoman said in a statement that the company was "proud of Courtney's distinguished and courageous reporting of national security issues spanning more than two decades across Democratic and Republican administrations." The statement added: "She is an intrepid journalist who has broken many impactful news stories in the public interest."



Courtney Kube, who covers the Pentagon for NBC News, appearing on "Meet the Press."
Shannon Finney/NBC, via Getty Images

Mr. Hegseth, 45, was a member of the news media for about a decade before becoming the defense secretary. He joined Fox News as a contributor in 2014, and later became a host. On air, he regularly voiced support for Mr. Trump and criticized Democrats and the news media, at one point calling both of them "agents of Russia."

As defense secretary, Mr. Hegseth has regularly criticized the press. Some of his most pointed comments have been directed at one of his former colleagues, Jennifer Griffin, a veteran Fox News Pentagon correspondent. Before becoming defense secretary, Mr. Hegseth had developed a professional disdain for Ms. Griffin, people with knowledge of the matter said.

Evidence of that animosity surfaced in early February when Mr. Hegseth tore into Ms. Griffin in a social media post. "Fake News of the Day," he wrote. At a June news conference, Ms. Griffin asked about U.S. airstrikes on Iranian nuclear facilities. "Jennifer, you've been about the worst — the one who misrepresents the most intentionally," Mr. Hegseth responded. Brit Hume, a Fox News political analyst, among many others, rushed to Ms. Griffin's defense, saying on Fox News, "Her professionalism, her knowledge and her experience at the Pentagon is unmatched."




Mr. Hegseth has attacked the work of Jennifer Griffin, a veteran Pentagon correspondent for Fox News.
Fox News, via Associated Press

Asked about the department's treatment of Ms. Griffin, the Pentagon sent a statement from Tami Radabaugh, a former colleague of Ms. Griffin's at Fox News and now an aide to Mr. Hegseth. Ms. Radabaugh said Ms. Griffin's reporting "is consistently sloppy, riddled with mistakes and inaccuracies," and added: "She is intentionally nasty and biased in her reporting of President Trump and his top allies like Secretary Hegseth."

Ms. Radabaugh provided no supporting evidence for her critique of Ms. Griffin, other than asserting that her viewpoint has been "confirmed" by the former Fox News hosts Tucker Carlson and Megyn Kelly. Fox News said in a statement: "Jennifer's depth of experience and distinguished reporting around the world throughout her more than 30-year journalism career speaks for itself."

Corridors and meeting spaces have sat at the center of numerous clashes between Mr. Trump and the media since just before his first term, in January 2017, when his advisers considered bouncing White House reporters from the West Wing.

Jim Acosta, a White House correspondent for CNN, was kicked out of the entire complex in 2018, then allowed back in after a successful court challenge. Brian Karem, a Playboy magazine correspondent whose press pass was revoked after an oral altercation in the Rose Garden with a former Trump adviser, similarly recovered his credentials through litigation. Both cases affirmed the principle that journalists subject to ejection must have the opportunity to challenge such official actions.



The press pass of Brian Karem, a Playboy correspondent, was revoked after an oral altercation with a former Trump adviser. Erin Schaff/The New York Times



Jim Acosta of CNN was kicked out of the White House in 2018, then allowed back in after a court challenge. Sarah Silbiger/The New York Times

Due process did not figure into Mr. Hegseth's request to expel Ms. Kube from the Pentagon, according to the people familiar with the situation. He wanted action, as did his wife, Jennifer, who was assisting Mr. Hegseth's team with communications strategy.

"It's hard to find previous reports of a defense secretary letting his wife sit in on official closed-door meetings or task his senior staff in their official duties," said John Ullyot, the chief Pentagon spokesman when Mr. Hegseth issued his instructions. "It shows poor judgment and may pose a risk to national security. As I've said before, President Trump deserves better."



Mr. Hegseth with his wife, Jennifer, who said she had no role in trying to bar Ms. Kube from the Pentagon. Haiyun Jiang for The New York Times

Mr. Ullyot, a deputy assistant to the president and chief spokesman for the National Security Council in Mr. Trump's first term, left his job at the Pentagon weeks after Mr. Hegseth started there. But while there, Mr. Ullyot defended Ms. Hegseth's role, saying that "she is welcome any time in the Pentagon." He now says Mr. Hegseth directed him to issue that statement despite his view that the arrangement was "strange and inappropriate."

Ms. Hegseth, in an email responding to questions about her role in pushing to oust Ms. Kube, said she was "definitely not part" of it. She added that she had "never read Ms. Kube's work and wouldn't know who she was if she showed up at my front door."

In the end, Mr. Hegseth's colleagues announced a rotation plan to remove outlets from their dedicated spaces and invite others to take their spots. The reshuffling proceeded in two waves, with NBC News among the first to lose its workspace.

Journalists working for the ousted news outlets retained their credentials and membership in the Pentagon Press Association, a group that pushes for access to military officials and events. Those credentials enable them to wander the Pentagon corridors in search of officials to buttonhole and stories to corral. The roaming privileges, two of the former Pentagon officials said, upset Mr. Hegseth, who was unsettled to see members of the press walking unescorted past his office.

In late May, the Pentagon issued a directive barring credentialed journalists from all but a sliver of the building without an official escort. They can no longer amble past the offices of the secretary, the joint staff and the public relations offices of the various branches of the military, which are frequent destinations for reporters seeking details about the military's expansive bureaucracy. Reaching one of the building's no-go zones now requires calling for help from an official.

"Basically, you have to have somebody willing to come to our part of the building, get you and bring you back," said Nancy Youssef, a staff writer at The Atlantic and a longtime Pentagon correspondent. "So it's a big ask, and you have to use it judiciously because of that."

In September, the department introduced a 17-page document detailing the circumstances that could lead to the revocation of a journalist's Pentagon credentials. After pushback from media lawyers, this week the department issued revised strictures that addressed some of their concerns. But the document still contains provisions that many journalists fear will expose them to punishment for doing their jobs.

"Limiting the media's ability to report on the U.S. military fails to honor the American families who have entrusted their sons and daughters to serve in it, or the taxpayers responsible for giving the department hundreds of billions of dollars a year," the Pentagon Press Association said in a statement on Wednesday.

"The new media policy is not about any one person or any one outlet," the Pentagon said in a statement. "It is about preventing leaks that damage operational security and national security. It's common sense."

---

A version of this article appears in print on , Section B, Page 1 of the New York edition with the headline: Media Faces Hostile Tone At Pentagon

# EXHIBIT 30

**This Exhibit serves as a Notice of Filing under Local Civil Rule 5.4(e)(1). It preserves a link to a publicly posted video on youtube.com. The original .mp4 file can be made available to the Court upon request.**


YouTube
Search
THE PENTAGON
WASHINGTON
PBS NEWS
WATCH LIVE: Hegseth holds briefing on Israel-Iran war
PBS NewsHour
5.27M subscribers
Subscribe
90
Share
Ask
Save
Download
PBS is an American public broadcast service. Wikipedia
15K views Streamed 10 months ago
Watch PBS News for daily, breaking and live news, plus special coverage. We are home to PBS News Hour, ranked the most credible and objective TV news show.
Subscribe for exclusive content in our newsletters: https://www.pbs.org/newshour/subscribe ...more

# EXHIBIT 31

# Hegseth attorney's dual roles trip conflict-of-interest alarms

Tim Parlatore's close relationship with Defense Secretary Pete Hegseth — while representing legal clients facing off against the department — is drawing scrutiny.




Attorney Tim Parlatore's dual role could allow him to capitalize on his ties to DOD chief Pete Hegseth (above) and his role in the secretary's office, legal experts say. | Francis Chung/POLITICO

By **DANIEL LIPPMAN** and **JOSH GERSTEIN**
05/03/2025 07:00 AM EDT

Tim Parlatore is a personal attorney and top adviser to Defense Secretary Pete Hegseth. At the same time, he's suing the Navy and defending private clients against the U.S. government.

Parlatore, who represented Donald Trump in a criminal case two years ago and rejoined the Navy Reserve in March to aid Hegseth, was recently tapped to coordinate the leak investigation that led to chaos at the Pentagon. The probe was publicly tied to the firings of top advisers and preceded further revelations that Hegseth was careless with classified information. Parlatore was also reportedly in the Signal group with Hegseth's wife and brother in which the Defense secretary shared details of a strike on Yemen.

But despite Parlatore's deep involvement at the Pentagon, he is pursuing litigation against the Navy. A review of federal court records shows Parlatore listed as an attorney on 11 cases — though a few appear to be dormant and not

all involve the U.S. government. Often his clients are retired military personnel.

The business of Washington is built on government officials leaving their jobs to trade access for private clients and using their connections to achieve client goals. While Parlatore insists his arrangement is above board, it's highly unusual for a sitting top adviser for a Cabinet secretary to be working in the government while at the same time representing clients suing the government, or working for clients as they fight off the feds.

That tension will be on display in federal court in Washington next week, as Parlatore — wearing his private lawyer hat — leads the defense of retired four-star Adm. Robert Burke against corruption charges. At the trial set to open Tuesday, the Justice Department will seek to prove that Burke, once the Navy's second-highest-ranking officer, arranged a lucrative contract for a workforce training firm in exchange for a job he took at the company after leaving the Navy.

That means Parlatore is likely to be cross-examining high-level Navy witnesses who know of his close ties with Hegseth and in-uniform responsibility for legal matters of keen interest to the secretary.

And while Parlatore signed up Burke before Trump won last fall's election, Parlatore's new, dual role could allow him to capitalize on his ties to Hegseth and his role in the secretary's office, legal experts say.

"It's a great advertising possibility that Parlatore has: Take me to be your attorney because I've got unusual access," said former Air Force lawyer and judge Joshua Kastenberg, now a law professor at the University of New Mexico.

"Tim's business is built around representing service members who are in the military justice system," said a person who has worked with Parlatore at the Pentagon. "So being close to the secretary and being in his front office provides him an advantage in that business." This person and two others — one who has worked with Parlatore, as well as a former defense official — were granted anonymity for fear of retribution.

Parlatore said he isn't marketing himself that way and noted that on his website, he doesn't mention his work for Hegseth or the fact he's currently in the Navy Reserve. He said he presents himself "as an attorney who wins cases, and I've been winning cases long before I had a client nominated to be the secretary of Defense."

"The government should be more concerned about my cross-examination skills, not my Navy Reserve duty," he added. "When a potential client has inquired about using my political connections to benefit their case, I've rejected the representations because I'm not selling political influence. I'm selling legal skill. I never have and I never will talk about any political connections or my role for Secretary Hegseth in connection with any potential client."

Spokespeople for the Defense Department didn't respond to requests for comment.

A 2002 graduate of the U.S. Naval Academy, Parlatore was recommissioned a few months ago as a Navy Reserve officer, with Hegseth swearing him in and Parlatore posting a photo of the ceremony. After that, he started coming into the office numerous days a week, much more frequently than typical reservists, according to the two people who have worked with Parlatore at the Pentagon. Early in Hegseth's tenure, Parlatore was on virtual calls with the Defense secretary and his core team, and Parlatore has been in numerous meetings with senior staff after his recommissioning, according to the same people and the former defense official.

Parlatore's frequent presence in the Defense secretary's office has raised concerns internally, especially since he does not have top-secret clearance, according to the people who have worked with Parlatore. Parlatore said he's in the process of getting top-secret clearance.

"When he got recommissioned and they wanted to bring him into the building, they couldn't give him an office in a SCIF," or area for viewing classified documents, because he didn't have a top-secret clearance, said one of the people who has worked with Parlatore.

Charlie Young, the acting general counsel of the Pentagon, was uncomfortable with the arrangement, according to the other person who worked with Parlatore. The former defense official said Young asked a number of questions about Parlatore's role advising Hegseth and what it would entail.

Young declined to comment.

Among his cases, Parlatore represents former Navy Vice Adm. Thomas Rowden in a Freedom of Information Act suit in which he's trying to coax the government to release more records about collisions of Navy ships that led to his client's demotion.

During a hearing last month in the Burke case, a prosecutor raised Parlatore's ongoing work for the Defense Department as a "potential conflict" and asked the judge to make sure Burke understood the two hats his attorney is wearing.

"We just need to make sure the defendant is aware … that his attorney has a job with the Navy and this trial will involve multiple witnesses from the Navy and involves allegations of criminal conduct while [Burke] was employed by the Navy," Assistant U.S. Attorney Rebecca Ross told U.S. District Judge Trevor McFadden, according to a court transcript. "We'd like to make sure that the defendant won't raise it, to preserve everything on appeal."

Parlatore said he saw no issue. "I don't know what the conflict would be. I'm in the Navy Reserves, as many attorneys are," the lawyer said. "I've tried many cases back when I was a Navy reservist before, including … in military courts, where I cross-examined people who were very much higher-ranking than me at the time."

Questioned by the judge, Burke said he was fine with the arrangement. "I have no concerns," the retired admiral said.

McFadden, a Trump appointee, later said he didn't view the situation as a conflict and that, in any event, Burke understood Parlatore's dual role.

However, during the discussion no one mentioned to McFadden that Parlatore is a top adviser to Hegseth who has represented him personally for almost eight years, including as he fought a sexual assault allegation during his confirmation process.

Jeff Hauser, founder and executive director of the watchdog group Revolving Door Project, criticized Parlatore's dual role and said America's adversarial judicial process is called into question when the attorney on the other side of the government has "incredible juice within the government."

While he noted that the arrangement "might be narrowly permissible under current law," he added: "What is the government attorney on the other side to think if they are up against somebody who helps set Defense Department policy and on whom the Secretary of Defense personally relies?"

Parlatore, the founder and managing partner of Parlatore Law Group, gained notice as one of Trump's lawyers in the Mar-a-Lago classified documents and Jan. 6 Capitol attack cases. Trump was accused of holding reams of classified documents at his Mar-a-Lago resort, and Parlatore was on the legal team representing Trump as he faced down special counsel Jack Smith. Parlatore eventually quit amid infighting on Trump's legal team.

Several legal experts consulted by POLITICO expressed concern about Parlatore's arrangement, although they also said it may not or would not

amount to a formal conflict of interest under legal ethics rules.

"It doesn't quite pass the smell test," Kastenberg said, noting the potential for witnesses to try to "curry some favor" by shading their recollections. But he also said: "It's not the role of the courts to bust an attorney-client relationship, unless there's an actual conflict that hasn't been waived or wouldn't be waivable."

"It doesn't look good," added Eugene Fidell, who teaches military law at Yale Law School.

Kathleen Clark, a professor of legal ethics at Washington University, said the prosecutors in the Burke case should be the most concerned, not Burke. She envisioned a potential scenario in which witnesses for the government were cowed by Parlatore's high-level Defense Department connections.

"The glaring conflict of interest in this case is the one for the government," she said.

Parlatore said in an interview that his work as an attorney and top Pentagon adviser is not problematic because there are clear conflict of interest rules that apply to reservists that are different from active duty or full-time government employees.

"The Navy Reserves provides a fantastic opportunity for me to return to serving my country while also maintaining a busy civilian private practice," Parlatore added.

In a post on X after joining Hegseth's office, Parlatore said he "intentionally declined to take a full-time position because I do not want this to create any conflicts" and that his Pentagon job is "a part-time Reserve position."

Parlatore has also represented servicemembers in court-martial proceedings, including getting former Navy SEAL Eddie Gallagher acquitted of a murder charge in a high-profile war crimes case.

In his Pentagon role, Parlatore has stayed busy as Hegseth has faced numerous controversies, including trying to find the source of leaks on matters including military operational plans for the Panama Canal and Elon Musk's controversial visit to the Pentagon.

Former Hegseth chief of staff Joe Kasper considered hiring an outside entity, such as another government agency or private company, to manage the leak investigation, according to the former defense official. But in the end, Kasper

told Parlatore to take over the supervision of the investigation because of Parlatore's experience with Trump's classified documents case. Kasper also told Parlatore that since he was not at the Pentagon at the time of the leaks, he wasn't a potential suspect so he was in a good position to supervise the investigation, according to the former official.

Besides the leak probe, Parlatore has been discussed inside the Pentagon to potentially do a comprehensive review of how investigative processes work for adjudicating criminal matters for personnel and readiness matters involving the services, according to one of the people who worked with Parlatore and the former official.

# EXHIBIT 33



*Defense Secretary Pete Hegseth speaks with reporters on the South Lawn of the White House before President Donald Trump and first lady Melania Trump participate in the White House Easter Egg Roll Monday, April 21, 2025, in Washington. (AP Photo/Alex Brandon)*

POLITICS

# Hegseth blames media, disgruntled former employees for second Signal chat leak

BY SUSAN CARPENTER WASHINGTON, D.C.
UPDATED 2:19 PM ET APR. 21, 2025

WASHINGTON — A day after The New York Times reported that Defense Secretary Pete Hegseth shared with his wife and brother U.S. plans to attack Yemen over the commercially available group chat app Signal, Hegseth blamed the media for what he said were “lies” and “hoaxes.”

---

## What You Need To Know

- A day after The New York Times reported that Defense Secretary Pete Hegseth shared with his wife and brother U.S. plans to attack Yemen over the commercially available group chat app Signal, Hegseth blamed the media for what he said were “lies” and “hoaxes"
- “They take anonymous sources from disgruntled former employees, and then they try slashing and burning people to ruin their reputations,” Hegseth told reporters during Monday's Easter Egg Roll at the White House

- In March, Hegseth was part of a different group Signal chat that mistakenly shared exact warplane launch and bomb drop times on Houthi rebels with the editor-in-chief of The Atlantic magazine
- White House press secretary Karoline Leavitt said Monday that President Donald Trump "absolutely has confidence in Secretary Hegseth"

---

“This is what the media does,” Hegseth said of the Times story about a March 15 chat on Signal that shared the flight schedules for U.S. fighter jets targeting Houthi rebels in Yemen. “They take anonymous sources from disgruntled former employees, and then they try slashing and burning people to ruin their reputations.”

Speaking to reporters at Monday’s Easter Egg Roll at the White House, Hegseth said he has talked with President Donald Trump since the story broke.

“We are going to continue fighting on the same page all the way,” the defense secretary said.

Responding to the new Signal allegation, Trump told Spectrum News, "It’s all just the same old stuff from the media. That’s an old one. Try finding something new."

White House press secretary Karoline Leavitt confirmed the president’s support during an interview on NBC News on Monday morning.

“The president absolutely has confidence in Secretary Hegseth,” Leavitt said, echoing her comments from a month earlier, after Hegseth was implicated in another group Signal chat on the same day that mistakenly included The Atlantic magazine's editor-in-chief.

The back-and-forth texts on the app in March included exact warplane launch and bomb drop times before U.S. military personnel began their mission. Signal encrypts communications but is not approved for sending classified information.

Despite the March incident setting off a firestorm of criticism about security protocols within the Defense Department, Leavitt said last month that steps had been taken to “ensure that something like that can obviously never happen again.”

Following The New York Times story, multiple Congress members called for Hegseth to leave.

“I had concerns from the get-go because Pete Hegseth didn’t have a lot of experience,” Rep. Don Bacon, R-Neb., who serves on the House Armed Services Committee, told Politico. “I like him on Fox. But does he have the experience to lead one of the largest organizations in the world? That’s a concern."

“Hegseth has to go. Immediately,” Sen. Chris Murphy, D-Conn., wrote in a post on X late Sunday night that included a link to a Politico opinion piece written by former Pentagon spokesman John Ullyot.

Ullyot, who resigned from his position last week, said the past month at the Pentagon has been “total chaos” following “leaks of sensitive operational plans” and mass firings.

"It’s hard to see Defense Secretary Pete Hegseth remaining in his role for much longer," he wrote, saying the "latest flashpoint is a near collapse inside the Pentagon’s top ranks" after Hegseth fired three senior staffers on Friday.

“The Secretary of Defense clearly doesn’t understand the concept of operational security or he doesn’t care,” Sen. Mark Kelly, D-Ariz., a retired Navy captain, wrote on X late Sunday night in a post that linked to The New York Times' story. “Carelessness puts our service members at risk. If this is true, he has again proven himself unqualified for this job and should resign or be fired.”

# EXHIBIT 34

# Hegseth had a second Signal chat where he shared details of Yemen strike, New York Times reports

Politics Updated on Apr 21, 2025 11:44 AM EDT — Published on Apr 21, 2025 9:32 AM EDT

WASHINGTON (AP) — Defense Secretary Pete Hegseth created another Signal messaging chat that included his wife and brother where he shared similar details of a March military airstrike against Yemen's Houthi militants that were sent in another chain with top Trump administration leaders, The New York Times reported.

A person familiar with the contents and those who received the messages, who spoke on condition of anonymity to discuss sensitive matters, confirmed the second chat to The Associated Press.

The second chat on Signal — which is a commercially available app not authorized to be used to communicate sensitive or classified national defense information — included 13 people, the person said. The person also confirmed the chat was dubbed "Defense | Team Huddle."

**WATCH:** Meeting Panama's president, Hegseth vows to take back Panama Canal 'from China's influence'

The New York Times reported that the group included Hegseth's wife, Jennifer, who is a former Fox News producer, and his brother Phil Hegseth, who was hired at the Pentagon as a Department of Homeland Security liaison and senior adviser. Both have traveled with the defense secretary and attended high-level meetings.

The White House and Pentagon said late Sunday that disgruntled former employees were spreading false claims.

"No matter how many times the legacy media tries to resurrect the same non-story, they can't change the fact that no classified information was shared," said Anna Kelly, White House deputy press secretary. "Recently-fired 'leakers' are continuing to misrepresent the truth to soothe their shattered egos and undermine the President's agenda, but the administration will continue to hold them accountable."

Pentagon spokesman Sean Parnell added in a post on X late Sunday that the report "relied only on the words of people who were fired this week and appear to have a motive to sabotage the Secretary and the President's agenda. There was no classified information in any Signal chat, no matter how many ways they try to write the story."

The revelation of the additional chat group brought new calls for Hegseth to be ousted as President Donald Trump's administration has faced criticism for failing to take action so far against the top national security officials who discussed plans for the military strike in Signal.

"The details keep coming out. We keep learning how Pete Hegseth put lives at risk. But Trump is still too weak to fire him," Senate Democratic Leader Chuck Schumer posted on X. "Pete Hegseth must be fired."

The first chat, set up by national security adviser Mike Waltz, included a number of Cabinet members and came to light because Jeffrey Goldberg, editor-in-chief of The Atlantic, was added to the group.

The contents of that chat, which The Atlantic published, shows that Hegseth listed weapons systems and a timeline for the attack on Iran-backed Houthis in Yemen last month.

Hegseth has previously contended that no classified information or war plans were shared in the chat with the journalist.

**READ MORE:** The Atlantic releases the entire Signal chat showing Hegseth's detailed attack plans against Houthis

The Times reported Sunday that the second chat had the same warplane launch times that the first chat included. Multiple former and current officials have said sharing those operational details before a strike would have certainly been classified and their release could have put pilots in danger.

Hegseth's use of Signal and the sharing of such plans are under investigation by the Defense Department's acting inspector general. It came at the request of the leadership of the Senate Armed Services Committee — Republican Chairman Roger Wicker of Mississippi and ranking Democratic member Jack Reed of Rhode Island.

Reed urged the Pentagon watchdog late Sunday to probe the reported second Signal chat as well, saying that Hegseth "must immediately explain why he reportedly texted classified information that could endanger American servicemembers' lives."

"I have grave concerns about Secretary Hegseth's ability to maintain the trust and confidence of U.S. servicemembers and the Commander-in-Chief," he added.

The new revelations come during further turmoil at the Pentagon. Four officials in Hegseth's inner circle departed last week as the Pentagon conducts a widespread investigation for information leaks.

Dan Caldwell, a Hegseth aide; Colin Carroll, chief of staff to Deputy Defense Secretary Stephen Feinberg; and Darin Selnick, Hegseth's deputy chief of staff, were escorted out of the Pentagon.

While the three initially had been placed on leave pending the investigation, a joint statement shared by Caldwell on X on Saturday said the three "still have not been told what exactly we were investigated for, if there is still an active investigation, or if there was even a real investigation of 'leaks' to begin with."

Caldwell was the staff member designated as Hegseth's point person in the Signal chat with Trump Cabinet members.

Former Pentagon spokesman John Ullyot also announced he was resigning last week, unrelated to the leaks. The Pentagon said, however, that Ullyot was asked to resign.

*AP writer Michelle L. Price in Washington contributed to this report.*

# EXHIBIT 35

Post

Home

Explore

Notifications

Chat

Grok

Bookmarks

Creator Studio

Premium

Profile

More

**Pete Hegseth**
@PeteHegseth

So, let's me get this straight. The Atlantic released the so-called "war plans" and those "plans" include: No names. No targets. No locations. No units. No routes. No sources. No methods. And no classified information.

Those are some really shitty war plans.

This only proves one thing: Jeff Goldberg has never seen a war plan or an "attack plan" (as he now calls it). Not even close.

As I type this, my team and I are traveling the INDOPACOM region, meeting w/ Commanders (the guys who make REAL "war plans") and talking to troops.

We will continue to do our job, while the media does what it does best: peddle hoaxes.

11:29 AM · Mar 26, 2025 · **14.1M** Views

28K 49K 240K 7.5K

Relevant

View quotes

# EXHIBIT 36

**This Exhibit serves as a Notice of Filing under Local Civil Rule 5.4(e)(1). It preserves a link to a publicly posted video on X.com. The original .mp4 file can be made available to the Court upon request.**

X

Home
Explore
Notifications
Chat
Grok
Bookmarks
Creator Studio
Premium
Profile
More

Post

**Sean Parnell**
@SeanParnellASW

There should be accountability for liars! Especially within the media.

The NYT is a propaganda machine that should IMMEDIATELY retract their lies!

The days of the Pentagon just allowing these fake narratives to spread is over.




8:19 AM · Mar 21, 2025 · **643.7K** Views

# EXHIBIT 37

Click here to place an ad



# More news outlets lose Pentagon workspaces

By Associated Press
Published: February 9, 2025, 1:16pm

Share

Click here to place an ad




FILE - The Department of Defense logo is seen on the wall in the Press Briefing room at the Pentagon, Oct. 29, 2024, in Washington. (AP Photo/Kevin Wolf, File)

Morning Briefing Newsletter
Get a rundown of the latest local and regional news every Mon-Fri morning.
Sponsored advertisement
Enter your email address...
Sign Up

Click here to place an ad

Listen to this Article

The Columbian

Instaread

NEW YORK — The Trump administration on Friday doubled the number of news organizations it is evicting from their workspaces at the Pentagon in order to rotate in more friendly outlets.

CNN, The Washington Post, the Hill and War Zone will be asked to leave their spaces, with Newsmax, the Washington Examiner, the Daily Caller and the Free Press moving in, according to a memo from John Ullyot, acting assistant to Defense Secretary Pete Hegseth.

The decision, which the Pentagon Press Association called "unreasonable," continues a pattern of hostility toward journalists by the administration, which last week said it was looking to cancel media subscriptions paid for by agencies of the federal government.

"By turning over the office space loaned to you by the secretary, you will ensure that other outlets will enjoy the same opportunity to cover our nation's finest up close from office spaces inside the walls of the Pentagon this year and each year going forward," Ullyot wrote.

It's common for news outlets to occupy space in places like the White House and state Capitols for quicker access to officials they need to do their jobs, and get stories out quickly. The Pentagon isn't preventing the ousted outlets from covering them, just making it more difficult for them to do their jobs.

CNN, in a statement, said that its "mission to report on the Department of Defense, U.S. military and Trump administration will continue regardless of office arrangements. We will not be deflected from our duty to hold all three fairly and fully to account."

Similarly, The Washington Post said it would continue to cover the Pentagon independently and fairly, regardless of desk space.

The Pentagon announced its new rotation policy a week ago, saying that NBC News, the New York Times, NPR and Politico would be required to vacate. Their spaces are to be taken by One America News Network, the New York Post, Breitbart News and Huffpost.

The Times, Washington Post, CNN and Politico are organizations of which President Donald Trump has been critical. Each of the outlets rotated in last week has been more supportive in its coverage.

Morning Briefing Newsletter

Get a rundown of the latest local and regional news every Mon-Fri morning.

# EXHIBIT 39

SECRETARY OF DEFENSE
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

MAY 23 2025

MEMORANDUM FOR RESIDENT AND VISITING PRESS ASSIGNED TO THE PENTAGON

SUBJECT: Updated Physical Control Measures for Press/Media Access Within the Pentagon

References: (a) DoDM 5200.01, "Volume 3, DoD Information Security Program: Protection of Classified Information," February 24, 2012
(b) Office of Secretary of Defense, Chief of Staff Memorandum: "Efforts to Combat Unauthorized Disclosures," March 21, 2025

The Department of Defense's (DoD) highest priority is the defense of our Nation and our national security. Per reference (a), the protection of classified national intelligence information (CNSI) and sensitive, unclassified information, including information deemed critical to operations security (OPSEC), remains an unwavering imperative for the Department. Per reference (b), the Chief of Staff to the Secretary of Defense recently directed an investigation into unauthorized disclosures.

While the Department remains committed to transparency, the Department is equally obligated to protect CNSI and sensitive information — the unauthorized disclosure of which could put the lives of U.S. Service members in danger. To attain professional balance between press access and OPSEC, the following updated security measures for resident and visiting press are needed to reduce the opportunities for in-person inadvertent and unauthorized disclosures.

Effective immediately, the Secretary of Defense directs the following control measures for all resident and visiting press who have been issued a Pentagon Facilities Alternate Credential (PFAC) for the Pentagon:

1. Press/media are not authorized entry/access to the Secretary of Defense physical office spaces located on the 3rd floor, ring E, between corridors 9 and 8 without an official approval and escort from the Office of the Assistant to the Secretary of Defense for Public Affairs (OATSD(PA)).

2. Press/media are not authorized entry/access to the Joint Staff physical office spaces located on the 2nd floor between corridors 9 and 7, rings A through E, without official approval from the Office of the Secretary of Defense for Public Affairs (OSD(PA)) and escort by personnel from the Joint Staff Public Affairs Office.

3. Press/media are only authorized unescorted access in the Pentagon on rings A through E on the 2nd floor of the Pentagon between the "Metro Entrance" at corridors 1 and 10 and the "River Entrance" at corridors 8 and 9 via and to the Pentagon Courtyard and Food Court (located between corridor 1 and 10 on the 1st Floor). The exception is noted in paragraph 2 (above).

4. If press require access to other areas/offices within the Pentagon for "in-person"

OSD005511-25/CMD007128-25

interviews (or other engagements), they are required to be formally escorted to-and-from those respective offices by authorized DoD personnel from those specific offices/Agencies/Military Departments.

5. Press/media are no longer authorized access to the Pentagon Athletic Center.

In coming weeks, Pentagon Press Corps members will be required to complete an updated in-briefing form explaining their responsibilities to protect CNSI and sensitive information and reissued a new style of PFAC with a clearer "PRESS" identifier on their badge. We also anticipate a forthcoming announcement of additional security measures and enhanced scrutiny on the issuance of PFACs.

OSD(PA) will coordinate the Pentagon Force Protection Agency to ensure compliance with these additional security controls, including new PFACs. Failure by any member of the resident or visiting press to comply with these control measures will result in further restrictions and possibly revocation of press credentials.

# EXHIBIT 41

Home
Explore
Notifications
Chat
Grok
Bookmarks
Creator Studio
Premium
Profile
More
Post

Post

Sean Parnell
@SeanParnellASW

On March 20, 2026, a U.S. District Court judge vacated key security provisions of the Pentagon's October 2025 media access policy. The court removed every provision that allowed the Department to screen press credential holders for security risks and every provision that allowed the Department to deny, revoke, or suspend a press credential based on security considerations — while simultaneously ordering the Department to immediately reinstate press credentials for the New York Times.

The Department always complies with court orders but disagrees with the decision and is pursuing an appeal. In the interim, and in compliance with the court's order, I have signed the revised "Pentagon Reservation In-Brief for Media Members," effective immediately.

Here is what the revised policy does:

Closure of Correspondents' Corridor. In assessing the Department's security posture following the court's removal of all security screening authority, the Department determined that unescorted access to the Pentagon cannot be responsibly maintained without the ability to screen credential holders for security risks. Effective immediately, the Correspondents' Corridor is closed. A new and improved press workspace will be established in an annex facility outside the Pentagon, but still on Pentagon grounds, and will be available when ready.

Escorted Access Only. All journalist access to the Pentagon will require escort by authorized Department personnel. Credential holders will continue to have access to the Pentagon for scheduled press briefings, press conferences, and interviews arranged through public affairs offices.

The Department remains committed to transparency and to working with credentialed journalists who cover the Department and the U.S. military. The Department is equally committed to the security of the Pentagon and the protection of the men and women who work there. The revised policy reflects both commitments.

5:43 PM · Mar 23, 2026 · 595.3K Views

409 890 3.7K 147

# EXHIBIT 1

The New York Times | https://www.nytimes.com/2007/07/01/weekinreview/01word.html

WORD FOR WORD | SPYING ON REPORTERS

# *J.F.K. Turns to the C.I.A. to Plug a Leak*



**FURY** An article by Hanson Baldwin of The Times, right, angered Kennedy in 1962.
Associated Press, left; The New York Times

**By Tim Weiner**
July 1, 2007

THE unsealing by the C.I.A last week of the documents it called its "family jewels" was an only-in-America moment. A secret intelligence service freely admitted its crimes and blunders. Americans were reminded of a piece of living history: the time in the 1960s and 1970s when presidents turned the spying powers of American intelligence on the United States itself, searching for an enemy within.

As the "family jewels" make clear, this web of intrigue began in the Kennedy White House.

Another treasure trove, however, was already in public view — tapes that President John F. Kennedy himself recorded in the Oval Office. Here are edited transcripts — and a link to the tapes themselves — of two August 1962 conversations in which Kennedy took steps to spy on the national security reporter for The New York Times, Hanson Baldwin. The president was furious. He wanted to stop secrets from leaking.

These Oval Office transcripts were published in October 2001 by the Miller Center of Public Affairs. But that was the month after 9/11, and they went largely unnoticed — until last week, when the more closely guarded "family jewels" were released.

Those documents include a description of Project Mockingbird, which involved the C.I.A.'s wiretapping of two unnamed Washington reporters. This surveillance began on March 12, 1963, under the authority of John A. McCone, the director of central intelligence, and Attorney General Robert F. Kennedy, both of whom were present in the Oval Office in August 1962.

It was 45 years ago. But it seems like yesterday. And it is.

In December 2005, The Times revealed that the executive branch was once again using its foreign intelligence powers to spy within the borders of the United States, also by warrantless wiretapping. We may learn the full story a generation from now, if and when the first of the 21st century's "family jewels" are revealed. TIM WEINER

•

The chief protagonists in the transcripts:

President John F. Kennedy

John A. McCone, director of central intelligence.

James Killian, chairman of the president's foreign intelligence advisory board.

Clark Clifford, adviser to Democrats since the Truman administration, and a member of the intelligence advisory board.

Hanson Baldwin, military analyst for The New York Times since 1937, winner of the Pulitzer Prize for his dispatches from Guadalcanal and the western Pacific in 1943, a dependably pro-military reporter. He had infuriated the president with an article on the Soviets' efforts to protect their intercontinental ballistic missile launch sites

with concrete bunkers. His reporting accurately stated the conclusions of the C.I.A.'s most recent national intelligence estimate. He is not present; he is the object of the participants' anger and concern.

*Aug. 1, 1962, 5:35 p.m.-6:25 p.m., President Kennedy meets with his foreign intelligence advisory board. Present: the president, Attorney General Robert F. Kennedy, Clark Clifford, Dr. James Killian, Dr. Edwin H. Land, a physicist, and Gen. Maxwell D. Taylor, the president's military representative and soon to be his chairman of the Joint Chiefs of Staff.*

**Killian:** We would say to you unequivocally that this has been a tragically serious breach of security.

**J.F.K.:** What I find is incomprehensible ... that someone of Baldwin's experience and stature and the status of The Times would do it. ...

**Killian:** The F.B.I. may not be the best agency to conduct investigations of leaks to this kind. ... We would suggest, therefore, that the director of central intelligence be encouraged to develop an expert group that would be available at all times to follow up on security leaks.

**Clifford:** I think this is the most effective recommendation that the group makes: that there be a full-time small group, devoting themselves to this all the time. I believe that that group could become knowledgeable about the pieces that these various men write, like Baldwin. ...

**Killian:** There are many things that such a sensitized group could do ... They could follow the press and see evidence of ——

**Taylor:** We'd know the trends, where their contacts ——

**J.F.K.:** That's a very good idea. We'll do that.

...

**Clifford:** They can find out who are Hanson Baldwin's contacts. When he goes over to the Pentagon, who does he see? Nobody knows now. The F.B.I. doesn't know. But I think it would be mighty interesting ... To my knowledge it's never been done before and it is long overdue.

*Aug. 22, 1962, 6:10-6:37 p.m.,meeting on intelligence matters. Present: The president, McCone, General Taylor.*

**J.F.K.:** How are we doing with that set-up on the Baldwin business?

**McCone:** Well, I've got a ... finally got a plan in which C.I.A. is completely in agreement with. It does a number of things that were recommended, including the setting up this task force, which would be a continuing investigative group reporting to me. ...

**J.F.K.:** Would you have supervision over the leakage from the Department of Defense?

**McCone:** As far as intelligence information is concerned. ...

**J.F.K.:** Then anyone who had intelligence would have to log their meetings?

**McCone:** That's right ... I get a log every week of all the contacts they make and memoranda of the discussions.

**Taylor:** Do you?

**McCone:** I write a memoranda ——

**Taylor:** Has that ever been revealed to the press? [Have] you ever been ——

**McCone:** Oh, no ——

*Mr. McCone then awkwardly returned to the subject of the task force or investigative group the president wanted him to create. It was arguably illegal, and almost inarguably prohibited by the C.I.A.'s charter. That charter was signed on July 26, 1947, and Mr. Clifford was among those who helped to write it. The charter*

*commanded the C.I.A. to protect intelligence sources and methods, but barred it from operating within the United States, spying on Americans, or behaving like secret police. Mr. McCone mumbles, and the tape is unclear.*

**McCone:** It's clearly a, it's kind of a, of a directive that ... [to] avoid getting involved, you or your office getting involved ... [unclear] I can do under the law — there's nothing wrong [with it] — By the National Security Act, I'm charged with [unclear].

**J.F.K.:** Well, I think they're scared. ... Hanson Baldwin and these fellows who've got these very good contacts over there [at the Pentagon]. They're all well regarded and they talk to them so frankly. So I think if they begin to think they're going to have to write a report on it, it's going to have a very inhibiting effect, I think. And especially when I saw from Hoover that they figured that there were 761 people that had this secret information.

•

*After an interrogation from J. Edgar Hoover's F.B.I. about his New York Times article on Soviet nuclear forces, a shaken Hanson Baldwin told a colleague, in a conversation wiretapped and taped by the bureau: "I think the real answer to this is Bobby Kennedy and the president himself." A transcript of that conversation was on the attorney general's desk the next day.*

*As the newly released "family jewels" and other now public United States government records confirm, the C.I.A. kept watch on reporters and some of their sources for three years after Kennedy and Mr. McCone met. The surveillance continued after the president's assassination, until 1965.*

*So now the record is clear: long before President Nixon created his "plumbers" unit of C.I.A. veterans to stop news leaks, President Kennedy tried to use the agency for the same goal. Nevertheless, throughout the decades, reporters have continued to plague the C.I.A. and presidents alike by reporting on secrets of state.*

# EXHIBIT 2

SUBSCRIBE

**Introducing TIME Games: Play Now**

VIEW MORE

U.S.

# Pentagon's Correspondents Corridor Renamed

ADD TIME ON GOOGLE



The 40-year old Correspondents Corridor is now the OSD Public Affairs corridor. *Battleland photo*

by TIME Staff

SEP 27, 2012 10:46 PM ET

For 40 years, a stretch of the Pentagon's E-ring, where reporters maintained their desks and Pentagon press officers helped them do their jobs, was known as the *Correspondents Corridor*. There were humble, but tasteful signs, declaring it so.

No longer. It's been rechristened the *OSD Public Affairs* corridor (OSD as in Office of the Secretary of Defense). We've asked OSD public affairs to explain the change.

It's apparently part of a redesign of the corridor. Old newspaper front pages and magazine covers displayed on its walls have been replaced with newer versions. The press, which used to have prime real estate along the E-ring – *with outside windows!* – was pushed toward the interior awhile back.

So perhaps it's only fitting that the corridor be renamed in honor of the spinners instead of the spun.

But not everyone might agree. Then-defense secretary Don Rumsfeld spoke fondly of the hallway in a 2004 talk before newspaper editors:

“”

Back in 1996, Ken Bacon, at the time the top civilian spokesman for the Department of Defense – and before that a longtime Pentagon correspondent for the *Wall Street Journal* – opened a press briefing on a historic note:

“”

Sadly, Ken Bacon died three years ago. But that defense secretary he mentioned is still around. He shared his opinion of the change late Thursday in a telephone chat from his

Florida home.

“”

So Mr. Secretary, *Battleland* asked, are you upset?

“I’m not upset about anything,” he countered. “At 90 years, you don’t get too upset.”

## Must-Reads from TIME

The Truth About Donald Trump’s Sanity

'It Will Become a Landmark': Trump Defends Giant Golden Statue of Himself Amid Much Debate

Former YouTube CEO Susan Wojcicki Died From Lung Cancer in 2024. Her Family Is Trying to Find Out Why

READ MORE

15-Year HELOAN: check with no credit hit

Check your 15-year HELOAN options today. Quick quiz with no impact to your credit score.

Learn More

**Rocket Mortgage** | Sponsored

# EXHIBIT 3



# The Pentagon

*The First Fifty Years*

# The Pentagon
## *The First Fifty Years*

Alfred Goldberg

Historical Office
Office of the Secretary of Defense
Washington, D.C.
1992

# Contents

**Introduction** .......... 1

**I. Conception and Construction** .......... 3

**II. Pentagon Profiles** .......... 93

- Architecture .......... 97
- Cost .......... 111
- Possible Alternative Uses .......... 115
- Ownership and Operation .......... 117
- Structural Changes .......... 119
- Dedicated Corridors .......... 125
- Amenities .......... 131
- Inside Vehicles .......... 137
- Transportation .......... 139
- The National Military Command System .......... 143
- Security .......... 149
- Demonstrations .......... 153
- Inhabitants .......... 157
- Pentagon Lore .......... 175
- Environmental Impact .......... 177

**Conclusion** .......... 181

**Appendixes** .......... 182

**Note on Sources and Bibliography** .......... 193

## Charts

1. Organization of the War Department—June 1941 .................... 6
2. The Army on the Eve of Pearl Harbor .................................. 42
3. Organization of the Army (The Marshall Reorganization) 9 March 1942 ......................... 63
4. Office of the Secretary of Defense—15 September 1948 ........ 118
5. Department of Defense—June 1991 .................................. 161
6. Office of the Secretary of Defense—August 1991 ................. 166

## Illustrations

War Department building in Philadelphia ........................................................ 4
War Department building in Washington ........................................................ 4
State, War, and Navy Building ........................................................ 5
Munitions Building ........................................................ 8
New War Department Building ........................................................ 8
Under Secretary of War Patterson and General Somervell ................................ 11
Secretary of War Stimson and General Marshall ................................ 13
Early sketch of pentagonal design ........................................................ 15
Flooding on Hoover Airport site ........................................................ 17
Original sketch of Pentagon Building ........................................................ 18
General Somervell ........................................................ 21
President Franklin D. Roosevelt ........................................................ 23
Senator Alva Adams ........................................................ 25
Pentagon and environs ........................................................ 26
John McShain, Clarence Renshaw, and Henry Thompson ................................ 29
Pentagon planning principals ........................................................ 30-31
Home of the architects ........................................................ 32-33
J. Paul Hauck ........................................................ 35
David Witmer ........................................................ 37
Engineer Office staff, Pentagon ........................................................ 38-39
Architects and draftsmen ........................................................ 41
Model of the building ........................................................ 45
Harold L. Ickes ........................................................ 46
Building location plan, 1942 ........................................................ 47
Preparing the site ........................................................ 48-49
Early site preparation ........................................................ 48-49
Washington orientation of the Pentagon ........................................................ 50-51
A long haul ........................................................ 52-53
Building site, 15 September 1941 ........................................................ 55
Construction progress on Section A, November 1941 ...................................... 57

Floor plan guide ....... 59
Schematic drawing, 1942 ....... 61
Leslie R. Groves ....... 62
Plan of road system ....... 64-65
New road and overpasses ....... 67
Interior of heating and cooling plant ....... 68
Exterior of heating and cooling plant ....... 69
Shift change, 1941 ....... 71
Construction progress, December 1941 ....... 72
Architects and draftsmen in hangar ....... 73
Front of Section A, December 1941 ....... 74
Design staff members ....... 74
Early 1942 view ....... 75
Section A, January 1942 ....... 76
Section B, February 1942 ....... 77
View from Navy Annex, March 1942 ....... 78-79
Telephone switchboard ....... 80
Center Court construction, May 1942 ....... 81
Four Sections, June 1942 ....... 82-83
Section A, November 1942 ....... 84-85
Clarence Renshaw ....... 86
Preparing the tunnels, November 1942 ....... 87
River Entrance view, November 1942 ....... 88
High aerial view ....... 90
Mall Entrance and Center Court ....... 91
River Entrance, spring 1990 ....... 94-95
Mall Entrance, 1990 ....... 96
River Entrance and Lagoon ....... 97
River Entrance Ceremony ....... 101
Center Court, c. 1950 ....... 102
Program in Center Court, 1946 ....... 103
Original Cafeteria, 1942 ....... 104-105
Cafeteria, 1991 ....... 106
Center Court, 1992 ....... 107
Five Capitol Buildings ....... 109
River Entrance, 1990 ....... 110
John McShain ....... 113
File room ....... 114
James Forrestal ....... 116
David O. Cooke ....... 117
Open bay "Busy Bees" ....... 119
Pentagon helicopter pad ....... 120
View of Concourse ....... 121
Bus tunnel ....... 123

POW/MIA Corridor ........ 124
Eisenhower Corridor ........ 125
Hall of Heroes ........ 126
NATO Corridor ........ 127
MacArthur Corridor ........ 128
World War II Paintings Corridor ........ 129
Pentagon Library ........ 130
Concourse, c. 1960 ........ 131
Library scene ........ 132
Crystal City backdrop ........ 133
Child Development Center ........ 135
Concourse construction, 1942 ........ 136-137
North Parking ........ 140-141
National Military Command Center ........ 142
Robert S. McNamara ........ 143
Current Action Center ........ 145
Emergency Conference Room ........ 146-147
Joint Staff entrance ........ 148
Entrance from Metro underground ........ 151
Anti-Vietnam War demonstration, 1967 ........ 152
1967 demonstration ........ 155
General George Marshall ........ 156
Fire drill, River Entrance ........ 159
Directors of Women's Services ........ 162
Unification cartoon ........ 163
Secretary of Defense office ........ 164
Frank Knox ........ 165
Richard B. Cheney ........ 167
General Colin L. Powell ........ 167
Ceremony for King Saud ........ 168
President-elect Eisenhower at Pentagon ........ 169
Robert A. Lovett and Winston Churchill ........ 170
George Marshall and Anna Rosenberg ........ 171
President Truman with Louis A. Johnson and General Omar Bradley ........ 172
James Forrestal and military department secretaries ........ 173
River Entrance ........ 174
South Entrance, 1990 ........ 176
Rosslyn skyline ........ 178
Crystal City skyline ........ 178-179
Pentagon City ........ 179

# Amenities

Because of its remoteness from the facilities ordinarily available in the urban environment of Washington, the Pentagon had to provide many of these amenities for its large population. The huge Concourse—680 ft. long and 135 ft. wide—at the second floor level above the bus tunnels housed a variety of shops and services which grew in number over the years. These included the indispensable and ubiquitous American institution—the drugstore—a bank, a small department store for women's clothes and accessories, a large barbershop with as many as 20 chairs, a newsstand, bookstore, post office, federal credit union, and a miscellany of other services catering to human needs from head to foot—from eyeglasses to shoe repair. Since it was also the major public transportation entry and exit, the Concourse was normally as thronged as Grand Central Station in New York during the rush hours, and also during the lunch hour when many people did their shopping or window gazing.

Feeding a population the size of a small city required the provision initially of six large cafeterias, nine beverage or snack bars, and dining rooms with table service for executives and high-ranking officers. The food services employed about 1,100 people during the World War II years, and some of the facilities remained open around the clock to cater to workers on second and third shifts. These facilities had a seating capacity of more than 4,000 and served 17,500 meals per day. Over the years, as the population of the building diminished, four of the cafeterias were converted to office space.

*Concourse, c. 1960*



More efficient systems for speeding food service and checkout made possible faster turnover of clientele, and two cafeterias sufficed. Five special dining rooms serve select clients from the Office of the Secretary of Defense, the offices of the three military service secretaries, and the office of the chairman of the Joint Chiefs of Staff. And in the late spring and summer months, a snack bar in the center court has made it possible for many hundreds of employees to enjoy lunch alfresco at tables with colorful umbrellas to protect them from the sun. Moreover, they can count on entertainment once or twice a week from bands, orchestras, and other musical groups. The center court has also often been the scene of ceremonies, including presidential visits and awards presentations.

The large population of the building posed a requirement for first aid and other emergency medical care far beyond that of the average federal office building. Two large clinics—one military and one civilian—provide for these needs. The large Army General Dispensary, at one end of the Concourse, provides a rapid response capability for emergencies. Medical corpsmen run to the scene of an emergency to render first aid, followed quickly by a doctor and rolling equipment for moving a patient. Ambulances evacuate severely ill patients to military or civilian hospitals. For many years, emergency rooms on most floors ministered to the medical needs of civilian employees, but these were eventually eliminated and a single large clinic, located on the first floor near the South entrance, performs the necessary functions. Many lives have probably been saved because of the capacity to move patients quickly to hospitals for specialized emergency treatment or operations.





Crystal City in background



Pentagon Library

The Pentagon Library, originally the Army Library and still administered by the Army, has been an important and useful research facility since its inception in 1944, when a number of separate Army library facilities in the building were consolidated into one. Because of space constraints, the library has had to limit its holdings to about 150,000 volumes. Its collection of 5,800 periodicals is remarkable in its range, covering military, technical, historical, political, and legal subjects. The law section of the library, which maintains a large collection of congressional and other government documents, receives heavy use. A staff of able and responsive reference librarians makes for expeditious and effective use of the library's resources by those seeking information. The library has provided valuable, indeed often indispensable, support to most of the various staffs in the building and elsewhere in the area.

The latest addition to the Pentagon's facilities is the Pentagon Child Development Center, a separate building constructed in the North Parking area and opened in November 1989. The center provides day care for more than 200 children of civilian and military employees of the Department of Defense.



When the building reached full occupancy in 1943, the Army Service Forces had more than half of the space for its 12,500 civilians and 3,500 military people. The rest of the building housed the offices of the secretary of war, the under secretary and assistant secretaries, each with substantial staffs, the chief of staff and the general staff, and the Army Air Forces. The Joint Chiefs of Staff had their offices in the Public Health Building on Constitution Avenue in Washington all during the war.

At full occupancy in 1943, the Pentagon probably had a working population of up to 33,000. Sources report numbers ranging from a low of 27,000 "daytime strength" to an improbable high of 40,000. Determining the population of the building at any given time is a complex matter, one of the most difficult of all statistics about the Pentagon to come by. It is an elusive figure because of inadequate reporting and also because it varies depending on the elements included in the totals. The main element after 1948 consisted of military and civilian employees of the Department of Defense comprising the staffs of the Office of the Secretary of Defense, the Joint Chiefs of Staff, the Departments of Army, Navy, and Air Force, and other agencies. Other elements—adding up to 2,000 or more people—included protective services, cleaning force, maintenance force (electricians, plumbers, carpenters, etc.), contractors, consultants, representatives of other government agencies (Bureau of the Budget, General Accounting Office), representatives of foreign governments, representatives of congressional committees, cafeteria workers, and employees of Concourse concessions. And press correspondents also had offices.

Although many of these groups may be numbered among the building's occupants, only some of them are employees of the Department of Defense or of the government. Many fall in the category of support personnel; apparently, they are sometimes included as part of the building's strength and sometimes not. Thus, different numbers reported for the same period—month or year—may vary by thousands depending on which categories are included. Numbers reported in different sources, official and unofficial, are variously for "daytime strength," "inhabitants," "military and civilian employees," "office workers," "employees," "population," "people," "men and women," and "occupants."

# EXHIBIT 4

POLITICS

# The Trump Administration Accidentally Texted Me Its War Plans

U.S. national-security leaders included me in a group chat about upcoming military strikes in Yemen. I didn't think it could be real. Then the bombs started falling.

By Jeffrey Goldberg



Andrew Harnik / Getty

MARCH 24, 2025 SHARE AS GIFT SAVE

***Editor's Note:*** *This article is the first in a series about the Trump administration's use of Signal group chatting. Read the next story in the series here.*

The world found out shortly before 2 p.m. eastern time on March 15 that the United States was bombing Houthi targets across Yemen.

I, however, knew two hours before the first bombs exploded that the attack might be coming. The reason I knew this is that Pete Hegseth, the secretary of defense, had texted me the war plan at 11:44 a.m. The plan included precise information about weapons packages, targets, and timing.

This is going to require some explaining.

ADVERTISEMENT

*This article was featured in the One Story to Read Today newsletter. Sign up for it here.*

The story technically begins shortly after the Hamas invasion of southern Israel, in October 2023. The Houthis—an Iran-backed terrorist organization whose motto is "God is great, death to America, death to Israel, curse on the Jews, victory to Islam"—soon launched attacks on Israel and on international shipping, creating havoc for global trade. Throughout 2024, the Biden administration was ineffective in countering these Houthi attacks; the incoming Trump administration promised a tougher response.

This is where Pete Hegseth and I come in.

On Tuesday, March 11, I received a connection request on Signal from a user identified as Michael Waltz. Signal is an open-source encrypted messaging service popular with journalists and others who seek more privacy than other text-messaging services are capable of delivering. I assumed that the Michael Waltz in question was President Donald Trump's national security adviser. I did not assume, however, that the request was from the actual Michael Waltz. I have met him in the past, and though I didn't find it particularly strange that he might be reaching out to me, I did think it somewhat unusual, given the Trump administration's contentious relationship with journalists—and Trump's periodic fixation on me specifically. It immediately crossed my mind that someone could be masquerading as Waltz in order to somehow

entrap me. It is not at all uncommon these days for nefarious actors to try to induce journalists to share information that could be used against them.

I accepted the connection request, hoping that this was the actual national security adviser, and that he wanted to chat about Ukraine, or Iran, or some other important matter.

Two days later—Thursday—at 4:28 p.m., I received a notice that I was to be included in a Signal chat group. It was called the "Houthi PC small group."

A message to the group, from "Michael Waltz," read as follows: "Team – establishing a principles [*sic*] group for coordination on Houthis, particularly for over the next 72 hours. My deputy Alex Wong is pulling together a tiger team at deputies/agency Chief of Staff level following up from the meeting in the Sit Room this morning for action items and will be sending that out later this evening."

The message continued, "Pls provide the best staff POC from your team for us to coordinate with over the next couple days and over the weekend. Thx."

Read: Here are the attack plans that Trump's advisers shared on Signal

The term *principals committee* generally refers to a group of the senior-most national-security officials, including the secretaries of defense, state, and the treasury, as well as the director of the CIA. It should go without saying—but I'll say it anyway—that I have never been invited to a White House principals-committee meeting, and that, in my many years of reporting on national-security matters, I had never heard of one being convened over a commercial messaging app.

One minute later, a person identified only as "MAR"—the secretary of state is Marco Antonio Rubio—wrote, "Mike Needham for State," apparently designating the current counselor of the State Department as his representative. At that same moment, a Signal user identified as "JD Vance" wrote, "Andy baker for VP." One minute after that, "TG" (presumably Tulsi Gabbard, the director of national intelligence, or someone masquerading as her) wrote, "Joe Kent for DNI." Nine minutes later, "Scott B"—apparently Treasury Secretary Scott Bessent, or someone spoofing his identity, wrote, "Dan Katz for Treasury." At 4:53 p.m., a user called "Pete Hegseth" wrote, "Dan Caldwell for DoD." And at 6:34 p.m., "Brian" wrote "Brian McCormack for NSC." One more person responded: "John Ratcliffe" wrote at 5:24 p.m. with the name of a CIA official to be included in the group. I am not publishing that name, because that person is an active intelligence officer.

The principals had apparently assembled. In all, 18 individuals were listed as members of this group, including various National Security Council officials; Steve Witkoff, President Trump's Middle East and Ukraine negotiator; Susie Wiles, the White House

chief of staff; and someone identified only as "S M," which I took to stand for Stephen Miller. I appeared on my own screen only as "JG."

That was the end of the Thursday text chain.

After receiving the Waltz text related to the "Houthi PC small group," I consulted a number of colleagues. We discussed the possibility that these texts were part of a disinformation campaign, initiated by either a foreign intelligence service or, more likely, a media-gadfly organization, the sort of group that attempts to place journalists in embarrassing positions, and sometimes succeeds. I had very strong doubts that this text group was real, because I could not believe that the national-security leadership of the United States would communicate on Signal about imminent war plans. I also could not believe that the national security adviser to the president would be so reckless as to include the editor in chief of *The Atlantic* in such discussions with senior U.S. officials, up to and including the vice president.

---

The next day, things got even stranger.

At 8:05 a.m. on Friday, March 14, "Michael Waltz" texted the group: "Team, you should have a statement of conclusions with taskings per the Presidents guidance this morning in your high side inboxes." (*High side*, in government parlance, refers to classified computer and communications systems.) "State and DOD, we developed suggested notification lists for regional Allies and partners. Joint Staff is sending this am a more specific sequence of events in the coming days and we will work w DOD to ensure COS, OVP and POTUS are briefed."

At this point, a fascinating policy discussion commenced. The account labeled "JD Vance" responded at 8:16: "Team, I am out for the day doing an economic event in Michigan. But I think we are making a mistake." (Vance was indeed in Michigan that day.) The Vance account goes on to state, "3 percent of US trade runs through the suez. 40 percent of European trade does. There is a real risk that the public doesn't understand this or why it's necessary. The strongest reason to do this is, as POTUS said, to send a message."

The Vance account then goes on to make a noteworthy statement, considering that the vice president has not deviated publicly from Trump's position on virtually any issue. "I am not sure the president is aware how inconsistent this is with his message on Europe right now. There's a further risk that we see a moderate to severe spike in oil prices. I am willing to support the consensus of the team and keep these concerns to myself. But there is a strong argument for delaying this a month, doing the messaging work on why this matters, seeing where the economy is, etc."

A person identified in Signal as "Joe Kent" (Trump's nominee to run the National Counterterrorism Center is named Joe Kent) wrote at 8:22, "There is nothing time sensitive driving the time line. We'll have the exact same options in a month."

Then, at 8:26 a.m., a message landed in my Signal app from the user "John Ratcliffe." The message contained information that might be interpreted as related to actual and current intelligence operations.

At 8:27, a message arrived from the "Pete Hegseth" account. "VP: I understand your concerns – and fully support you raising w/ POTUS. Important considerations, most of which are tough to know how they play out (economy, Ukraine peace, Gaza, etc). I think messaging is going to be tough no matter what – nobody knows who the Houthis are – which is why we would need to stay focused on: 1) Biden failed & 2) Iran funded."

The Hegseth message goes on to state, "Waiting a few weeks or a month does not fundamentally change the calculus. 2 immediate risks on waiting: 1) this leaks, and we look indecisive; 2) Israel takes an action first – or Gaza cease fire falls apart – and we don't get to start this on our own terms. We can manage both. We are prepared to execute, and if I had final go or no go vote, I believe we should. This [is] not about the Houthis. I see it as two things: 1) Restoring Freedom of Navigation, a core national interest; and 2) Reestablish deterrence, which Biden cratered. But, we can easily pause. And if we do, I will do all we can to enforce 100% OPSEC"—operations security. "I welcome other thoughts."

A few minutes later, the "Michael Waltz" account posted a lengthy note about trade figures, and the limited capabilities of European navies. "Whether it's now or several weeks from now, it will have to be the United States that reopens these shipping lanes. Per the president's request we are working with DOD and State to determine how to compile the cost associated and levy them on the Europeans."

The account identified as "JD Vance" addressed a message at 8:45 to @Pete Hegseth: "if you think we should do it let's go. I just hate bailing Europe out again." (The administration has argued that America's European allies benefit economically from the U.S. Navy's protection of international shipping lanes.)

The user identified as Hegseth responded three minutes later: "VP: I fully share your loathing of European free-loading. It's PATHETIC. But Mike is correct, we are the only ones on the planet (on our side of the ledger) who can do this. Nobody else even close. Question is timing. I feel like now is as good a time as any, given POTUS directive to reopen shipping lanes. I think we should go; but POTUS still retains 24 hours of decision space."

At this point, the previously silent "S M" joined the conversation. "As I heard it, the president was clear: green light, but we soon make clear to Egypt and Europe what we

expect in return. We also need to figure out how to enforce such a requirement. EG, if Europe doesn't remunerate, then what? If the US successfully restores freedom of navigation at great cost there needs to be some further economic gain extracted in return."




That message from "S M"—presumably President Trump's confidant Stephen Miller, the deputy White House chief of staff, or someone playing Stephen Miller—effectively shut down the conversation. The last text of the day came from "Pete Hegseth," who wrote at 9:46 a.m., "Agree."

After reading this chain, I recognized that this conversation possessed a high degree of verisimilitude. The texts, in their word choice and arguments, sounded as if they were written by the people who purportedly sent them, or by a particularly adept AI text generator. I was still concerned that this could be a disinformation operation, or a simulation of some sort. And I remained mystified that no one in the group seemed to have noticed my presence. But if it was a hoax, the quality of mimicry and the level of foreign-policy insight were impressive.

---

It was the next morning, Saturday, March 15, when this story became truly bizarre.

At 11:44 a.m., the account labeled "Pete Hegseth" posted in Signal a "TEAM UPDATE." I will not quote from this update, or from certain other subsequent texts. The information contained in them, if they had been read by an adversary of the United States, could conceivably have been used to harm American military and intelligence personnel, particularly in the broader Middle East, Central Command's




A screenshot from the Signal group shows debate over the president's views ahead of the attack.

area of responsibility. What I will say, in order to illustrate the shocking recklessness of this Signal conversation, is that the Hegseth post contained operational details of forthcoming strikes on Yemen, including information about targets, weapons the U.S. would be deploying, and attack sequencing.

The only person to reply to the update from Hegseth was the person identified as the vice president. "I will say a prayer for victory," Vance wrote. (Two other users

subsequently added prayer emoji.)

According to the lengthy Hegseth text, the first detonations in Yemen would be felt two hours hence, at 1:45 p.m. eastern time. So I waited in my car in a supermarket parking lot. If this Signal chat was real, I reasoned, Houthi targets would soon be bombed. At about 1:55, I checked X and searched *Yemen*. Explosions were then being heard across Sanaa, the capital city.

I went back to the Signal channel. At 1:48, "Michael Waltz" had provided the group an update. Again, I won't quote from this text, except to note that he described the operation as an "amazing job." A few minutes later, "John Ratcliffe" wrote, "A good start." Not long after, Waltz responded with three emoji: a fist, an American flag, and fire. Others soon joined in, including "MAR," who wrote, "Good Job Pete and your team!!," and "Susie Wiles," who texted, "Kudos to all – most particularly those in theater and CENTCOM! Really great. God bless." "Steve Witkoff" responded with five emoji: two hands-praying, a flexed bicep, and two American flags. "TG" responded, "Great work and effects!" The after-action discussion included assessments of damage done, including the likely death of a specific individual. The Houthi-run Yemeni health ministry reported that at least 53 people were killed in the strikes, a number that has not been independently verified.

On Sunday, Waltz appeared on ABC's *This Week* and contrasted the strikes with the Biden administration's more hesitant approach. "These were not kind of pinprick, back-and-forth—what ultimately proved to be feckless attacks," he said. "This was an overwhelming response that actually targeted multiple Houthi leaders and took them out."

The Signal chat group, I concluded, was almost certainly real. Having come to this realization, one that seemed nearly impossible only hours before, I removed myself from the Signal group, understanding that this would trigger an automatic notification to the group's creator, "Michael Waltz," that I had left. No one in the chat had seemed to notice that I was there. And I received no subsequent questions about why I left—or, more to the point, who I was.

Earlier today, I emailed Waltz and sent him a message on his Signal account. I also wrote to Pete Hegseth, John Ratcliffe, Tulsi Gabbard, and other officials. In an email, I outlined some of my questions: Is the "Houthi PC small group" a genuine Signal thread? Did they know that I was included in this group? Was I (on the off chance) included on purpose? If not, who did they think I was? Did anyone realize who I was when I was added, or when I removed myself from the group? Do senior Trump-administration officials use Signal regularly for sensitive discussions? Do the officials believe that the use of such a channel could endanger American personnel?




A screenshot from the Signal group shows reactions to the strikes.

Brian Hughes, the spokesman for the National Security Council, responded two hours later, confirming the veracity of the Signal group. “This appears to be an authentic message chain, and we are reviewing how an inadvertent number was added to the chain,” Hughes wrote. “The thread is a demonstration of the deep and thoughtful policy coordination between senior officials. The ongoing success of the Houthi operation demonstrates that there were no threats to troops or national security.”

William Martin, a spokesperson for Vance, said that despite the impression created by the texts, the vice president is fully aligned with the president. “The Vice President’s first priority is always making sure that the President’s advisers are adequately briefing him on the substance of their internal deliberations,” he said. “Vice President Vance unequivocally supports this administration’s foreign policy. The President and the Vice President have had subsequent conversations about this matter and are in complete agreement.”

I have never seen a breach quite like this. It is not uncommon for national-security officials to communicate on Signal. But the app is used primarily for meeting planning and other logistical matters—not for detailed and highly confidential discussions of a pending military action. And, of course, I've never heard of an instance in which a journalist has been invited to such a discussion.

Read: A conversation with Jeffrey Goldberg about his extraordinary scoop

Conceivably, Waltz, by coordinating a national-security-related action over Signal, may have violated several provisions of the Espionage Act, which governs the handling of "national defense" information, according to several national-security lawyers interviewed by my colleague Shane Harris for this story. Harris asked them to consider a hypothetical scenario in which a senior U.S. official creates a Signal thread for the express purpose of sharing information with Cabinet officials about an active military operation. He did not show them the actual Signal messages or tell them specifically what had occurred.

All of these lawyers said that a U.S. official should not establish a Signal thread in the first place. Information about an active operation would presumably fit the law's definition of "national defense" information. The Signal app is not approved by the government for sharing classified information. The government has its own systems for that purpose. If officials want to discuss military activity, they should go into a specially designed space known as a sensitive compartmented information facility, or SCIF—most Cabinet-level national-security officials have one installed in their home—or communicate only on approved government equipment, the lawyers said. Normally, cellphones are not permitted inside a SCIF, which suggests that as these officials were sharing information about an active military operation, they could have been moving around in public. Had they lost their phones, or had they been stolen, the potential risk to national security would have been severe.

Hegseth, Ratcliffe, and other Cabinet-level officials presumably would have the authority to declassify information, and several of the national-security lawyers noted that the hypothetical officials on the Signal chain might claim that they had declassified the information they shared. But this argument rings hollow, they cautioned, because Signal is not an authorized venue for sharing information of such a sensitive nature, regardless of whether it has been stamped "top secret" or not.

There was another potential problem: Waltz set some of the messages in the Signal group to disappear after one week, and some after four. That raises questions about whether the officials may have violated federal records law: Text messages about official acts are considered records that should be preserved.

"Under the records laws applicable to the White House and federal agencies, all government employees are prohibited from using electronic-messaging applications such as Signal for official business, unless those messages are promptly forwarded or copied to an official government account," Jason R. Baron, a professor at the University of Maryland and the former director of litigation at the National Archives and Records Administration, told Harris.

"Intentional violations of these requirements are a basis for disciplinary action. Additionally, agencies such as the Department of Defense restrict electronic messaging containing classified information to classified government networks and/or networks with government-approved encrypted features," Baron said.

Several former U.S. officials told Harris and me that they had used Signal to share unclassified information and to discuss routine matters, particularly when traveling overseas without access to U.S. government systems. But they knew never to share classified or sensitive information on the app, because their phones could have been hacked by a foreign intelligence service, which would have been able to read the messages on the devices. It is worth noting that Donald Trump, as a candidate for president (and as president), repeatedly and vociferously demanded that Hillary Clinton be imprisoned for using a private email server for official business when she was secretary of state. (It is also worth noting that Trump was indicted in 2023 for mishandling classified documents, but the charges were dropped after his election.)

Waltz and the other Cabinet-level officials were already potentially violating government policy and the law simply by texting one another about the operation. But when Waltz added a journalist—presumably by mistake—to his principals committee, he created new security and legal issues. Now the group was transmitting information to someone not authorized to receive it. That is the classic definition of a leak, even if it was unintentional, and even if the recipient of the leak did not actually believe it was a leak until Yemen came under American attack.

All along, members of the Signal group were aware of the need for secrecy and operations security. In his text detailing aspects of the forthcoming attack on Houthi targets, Hegseth wrote to the group—which, at the time, included me—"We are currently clean on OPSEC."

*Shane Harris contributed reporting.*

## ABOUT THE AUTHOR



**Jeffrey Goldberg**

Follow

# EXHIBIT 5

RealClear Politics

# Trump Blasts NYT's David Sanger: We've Had A Total Victory in Iran, Except With "Treasonous" Reporters Like You

Posted By Ian Schwartz
On Date May 15, 2026




At a press availability on Air Force One on Friday, President Donald Trump ripped chief Washington correspondent for "The New York Times" David Sanger for his "treasonous" reporting on the Iran war.

DAVID SANGER, NEW YORK TIMES: On Iran, Mr. President, just to be clear, I mean, what's next? Are you -- Is the threat of the bombing starting again? How realistic is that?

PRESIDENT DONALD TRUMP: Well, I don't want to say that. I mean, I'd like to tell you. I'd like to say on a certain hour, a certain day, the bombing is going to start. I don't want to say that. I can only say that Iran... I can say this with very, very strong conviction. Iran will never have a nuclear weapon. a nuclear weapon. Not going to happen.

REPORTER: Mr. President, what would the use be --

TRUMP: There's no chance.

REPORTER: What would the use be of repeating the bombing? You did it for 38 days.

TRUMP: Well, no. We did.

REPORTER: And you did not get the political changes in Iran.

TRUMP: No, I got... I had a total military victory. But the fake news, guys like you, write incorrectly. You're a fake guy. And guys like you write about it incorrectly. We had a total military victory. We knocked out their entire Navy. We knocked out... We knocked out their entire Air Force. We knocked out all of their anti-aircraft weaponry. We knocked out all of their radar.

We knocked out all of their leaders, number one. And then we knocked out all of their leaders in the 2nd Division. And we knocked out numerous of their leaders in the 3rd Division. And they're very confused. We've had a total victory, except by people like you that don't write the truth. You know?

You should write... I actually think it's sort of treasonous what you write. But you at The New York Times and CNN, I would say are the worst. And you should know better, David. Your editors tell you what to write and you write it. You should be ashamed of it.

When you write, like, they're doing well militarily, and they have no Navy, no Air Force, no anti-anything... By the way, we knocked out 85% of their manufacturing for the missiles. We knocked out everything.

We haven't knocked out other than one bridge, and we did because they misbehaved. But we have bridges we could knock out. We could knock out their bridges and their electrical capacity within two days.

We could knock out the whole thing. And then I read the New York Times, and they act like they're doing well. And everybody knows it. That's why your subscribers are way down. You know, the Times subscribers are way down because it's fake news. Subscribers are way down.

mgid



LeafFilter
Here’s What Gutter Guards Will Cost For A 2,000 Sq Ft Home

# EXHIBIT 6

# Requirements and Procedures for Issuing Supreme Court Press Credentials

## Introduction

The Supreme Court's Public Information Office (PIO) provides the general public and professional journalists with information about the Court and its work. Among its many responsibilities, the PIO administers the Court's press credentialing process, which includes issuing hard passes (full-time credentials) and day passes. Although a hard pass is not essential for reporting on the Court, it may confer privileges that journalists find helpful, including access to seats in the Courtroom during Court sessions; use of the pressroom facilities and office resources; assigned personal work space; and access to the Court building after normal business hours. In addition, the PIO provides credentialed reporters with information and guidance, beyond what is provided to the public, that facilitates their work. The PIO also issues more than 1,000 day passes every Court Term, providing single-day access to the Courtroom and pressroom to individuals seeking to observe a particular Court session.

The PIO's seven-member staff must carefully allocate the limited space and resources available for press usage. The Courtroom has a limited number of seats set aside exclusively for the media, and the pressroom has 18 carrels assigned for the media's use. To ensure efficient allocation of space and resources, the PIO has traditionally reserved hard passes for full-time professional journalists employed by media organizations that have records of substantial and original news coverage of the Court and a demonstrated need for regular access to the Court's press facilities. The PIO makes no assessment of the content or quality of a journalist's coverage in the credentialing process. But because the Court's fundamental function is adjudication of important issues, the PIO must ensure that press credentialing does not create any appearance of partiality or unfair advantage among litigants or attorneys engaged in the Court's judicial processes. And because a press credential provides access to non-public spaces, the PIO must also be attentive to security concerns.

To better meet those demands and the needs of journalists, to provide greater transparency about the credentialing process, and to address changes in the journalism profession, the PIO adopted new requirements and procedures for issuing Supreme Court hard passes and day passes in February 2015. Commentary is included to explain the rationale for the requirements and procedures and to guide their interpretation. All current holders of hard passes are required to submit applications to renew their credentials for the next term in August.

Requirements for Issuing Supreme Court Press Credentials.

Hard Passes. To qualify for a hard pass, an applicant must demonstrate:

The applicant is a full-time journalist;

The applicant operates or is employed by a media organization, and the applicant's primary professional work is for the media organization through which the applicant seeks a hard pass;

The applicant or the applicant's media organization has a record of substantial and original news coverage of the work of the Court;

The applicant will be present at the Court regularly for reporting purposes;

The applicant does not practice law before the Court and is independent of individuals and entities that practice law before the Court; and

The applicant has not been employed by the Court during the two years preceding the application for a hard pass.

Day Passes. To qualify for a day pass, an applicant must demonstrate:

The applicant is a journalist affiliated with a media organization or, as space allows, a writer who is not affiliated with a media organization; and

The applicant has a need to report from the Court on, or to observe, a particular Court session.

Exceptions. Applicants may be relieved of the need to meet the requirements listed above when necessary to address new or unanticipated situations, to prevent undue hardship, or to ensure fairness in the application of these requirements.

Procedures for Issuing Supreme Court Press Credentials.

Hard Passes. Individuals interested in applying for a full-time press credential from the Court should first contact the PIO at (202) 479-3211.

An applicant for a hard pass must submit a written application provided by the PIO that will require the following information:

The applicant's full name, affiliation, and contact information;

A statement from the media organization's bureau chief, editor, or publisher that the applicant meets the requirements for issuance of the hard pass; and

Documentation that the applicant meets the requirements for issuance of the hard pass.

In August of every year, a holder of a hard pass must apply to renew his or her credential. The applicant should submit the application to pio@supremecourt.gov.

Holders of hard passes must immediately inform the PIO when any requirement for a press credential is no longer satisfied.

If the PIO denies an application for a hard pass, it will provide a written statement of the basis for its decision. Before suspending or revoking a hard pass, the PIO will notify the holder, allow an opportunity to respond, and provide a written statement of the basis for its decision.

Day Passes. Individuals interested in obtaining a day pass to cover a Court session should contact the PIO at (202) 479-3211. Seating in the Courtroom is limited and is provided on an as-available basis.

# EXHIBIT 7

**Get Support Now:** Unable to connect locally? Contact Military OneSource via secure li...

MILITARY INSTALLATIONS

MENU

Home › Pentagon - Air Force

# Pentagon - Air Force

Installation Home | Details | Contacts | Essentials | Services

## PHOTOS







VIEW ALL PHOTOS (4)

## INSTALLATION DETAILS

### Mission

The Pentagon is the headquarters of the United States Department of Defense (DoD). As a symbol of the U.S. military, the "Pentagon" is often used metonymically to refer to DoD rather than the building itself. It is the largest office building by floor area.

### History

The Pentagon was conceived at the request of Brigadier General Brehon B. Sommervell, Chief of the Construction Division of the Office of the Quartermaster General, on a weekend in mid-July 1941. The purpose was to provide a temporary solution to the War Department's critical shortage of space. Congress, cautious about the size of the expenditure and the enormity of the project, but anxious about events in Europe and the Far East that could require U.S. military intervention, appropriated the funds necessary to construct the War Department's new home (approximately $83

million) on August 14, 1941. The groundbreaking ceremony took place on September 11, 1941.

COST OF LIVING

## Population

The Pentagon houses approximately 24,000 military and civilian employees and approximately 3,000 non-defense support personnel.

## Location

Home to Department of Defense Headquarters, the Pentagon is one of the world's largest office buildings. It is located in Arlington, VA, right across the Potomac River from Washington, DC. The Pentagon is virtually a city in itself with over 23,000 employees, both military and civilian, assigned. It has 200 acres of lawn, 16 parking lots, 131 stairways and 19 escalators, a number of food and shopping vendors, dry cleaners and banking facilities. The building has approximately 17.5 miles of corridors.

The National Capital Region (NCR) is a high cost of living area. Many people choose to live further away in Virginia or Maryland and commute to work at the Pentagon. Pentagon Operator: 703-697-1201, DSN: 312-227-1201.

For more specific information on working at the Pentagon, visit https://www.whs.mil.

MILITARY ONESOURCE

# EXHIBIT 8

An official website of the United States government Here's how you know



# Your Guide to the Pentagon

By Spc Brandon Dyer March 15, 2016



[https://api.army.mil/e2/c/images/2016/03/15/427052/original.jpg]

SHOW CAPTION + 1 / 5

The Pentagon, home to the United States Department of Defense, is one of the most recognized buildings in the world. It is one of the most secure facilities in the world.

Its also a great place to visit.

Every year, approximately 100,000 people are taken on a tour through the labyrinth of hallways and corridors. A Joint Armed Forces team of Tour Guides from the Army, Air Force, Navy, Marines, and Coast Guard lead the public on a mile-and-a-half, hour-long tour through highlights of military history.

Types of people that take the tours range from school groups and fraternal organizations to ministers and secretaries of Defense from all over the world.

Spc (P) Daryl D. Willard a former Pentagon Tour Guide that performed over 700 tours, also performed the duties of a Tomb Sentinel.

"Training-wise, Pentagon tour probably required as much, if not more intensity as the Tomb," said Willard.

The Tour Guide position was a natural fit for Willard, who worked as a live TV and Infomercial pitchman before joining the military.

"Volume is a big performance measure as a Tour Guide," said Willard. "You have to be able to project continuously."

Willard took a wide range of people on tours; from stars of the TV show Duck Dynasty to the Prime Minister of Australia.

Tour Guides must be members of their service's ceremonial guard. Ceremonial guards have certain customs and courtesies that Tour Guides must adhere to, so other units cannot be represented.

That means the seven representatives for the Army come from the 3d U.S. Infantry Regiment (The Old Guard).

"We would be liaisons between the DOD (Department of Defense), the Army," said Sgt. Kyle M. Poole, the Non-commissioned officer in charge of the Army Tour Guides. "We are a face to the force."

Tour Guides are first chosen from volunteers that respond to an open call on Joint Base Myer-Henderson Hall. The initial audition includes memorizing a short script and an interview, said Poole.

Successful soldiers have an extensive knowledge of the Army, a solid physical training test score and professional appearance, said Poole. Those selected then move onto a three-week training cycle that requires the memorization of 33 pages of information that must be recalled verbatim, said Poole.

Tour Guides must also master reciting the script while navigating the escalators and multiple floors in one of the world's largest office buildings. Tour Guides must walk backwards, using lighting fixtures and fire extinguishers as guideposts, said Poole.

Willard said he did fall once, over a misplaced bench.

The Pentagon has three times as much floor space as the Empire State Building.

Willard said the Pentagon is like a small city, with everything from doctor's offices, dentists, a post office, a bank, gift shops, pharmacy, flower shops, 35 different food vendors, a 125 thousand square foot gym and a department of motor vehicles.

When being evaluated, new Tour Guides are asked to give a tour to three senior tour guides. The senior tour guide will do their best to disrupt the trainee by acting like "the most belligerent tourist you can possibly have" said Willard.

"Initially, you are expected to do everything on route, on script," said Willard. "And once you qualify with your pre-evaluation and final evaluation, then you are allowed to do the public tours."

Tours also have no set route. Due to security considerations, construction, or time restraints tours will be detoured through any number of varied formulations, said Poole.

"We can basically go anywhere," said Poole. "There are so many different sections, there's no set thing."

Poole said the 33 pages of information is also a mere starting point. Tour Guides are expected to come up with a minimum two of their own facts about each of the sections (Korean War, Eisenhower, MacArthur, etc.) and personalize their tours, said Poole.

"You have to submit the two facts and then we thoroughly review them," said Poole. "You never want to give false information."

After performing hundreds of tours, Tour Guides challenge themselves to keep growing and personalizing their knowledge.

"Tour number 1,000 has to be just as engaging as tour number one was," said Willard. "To all of them, it is tour number one."

Willard said he would research the scale model planes in the Air Force section and be able to come up with interesting facts.

"I always had one trivia question in there too that I would throw at people: which one is Air Force One?" said Willard. "None of them are Air Force One, since none of them has the President on them currently at the time."

One place tours always make a stop is the Pentagon 9/11 Memorial, said Poole.

"Nobody honestly cares about how many tiles there are on the ceiling," said Willard. "What they care about is fact The Pentagon remained still open even when it was hit by an airplane."

"Its peoples actions that make the United States what it is," said Willard. "Not just a building."

After training, Tour Guides are on probation for two to four months. After completing this period Tour Guides can wear the Office of the Secretary of Defense Badge.

The average Tour Guide serves no more than two years, said Poole.

After four months, Tour Guides have an opportunity to advance to VIP Tours.

Spc. Christopher Molitoris has been a Tour Guide for a year and a half, and conducted an estimated 1,500 combined Public and VIP Tours.

Guests of the Chairman or Joint Chiefs of Staff are typically who get VIP Tours, said Molitoris.

There are many areas of the Pentagon not included in the public tour route that are accessible on a VIP Tour, said Molitoris.

VIP Tours are a separate entity that Tour Guides must pass another test to be certified to conduct.

Tour Guides are given a room somewhere within the Pentagon, an amount of time to conduct a VIP tour, and an end point.

A VIP tour must start and end within three minutes of the allotted time.

Content of a VIP is left to the discretion of the Tour Guide, and has some new challenges.

Willard said Tour Guides can't repeat any corridors and must think of things to talk about in blank corridors. Unlike the Public Tour route, VIP Tours may not have things to point out to show them along the way.

"You have to know your way around really well," said Willard. "There are 17 and a half miles of corridors."

The biggest difference between a Public and Pentagon Tour guide is a Public Tour Guide has to talk about what they have memorized, a VIP tour guide has to talk about what they know, said Willard.

The duty becomes a very personal mission for the men and women that perform it.

"I loved it," said Willard. "I loved giving these people an impression of the United States Military that perhaps they didn't have before."

Pentagon Tour Guides ultimately become the personification of the Department of Defense.

"You are really representing yourself," said Molitoris. "You might be the only representation of your branch to another country, or maybe a child they see you as the Army, you are the symbolism of the Army."



[illegible]

# EXHIBIT 9

**TRANSCRIPT**

# Secretary of War Pete Hegseth and Chairman of the Joint Chiefs Air Force Gen. Dan Caine Hold a Press Briefing

**March 13, 2026**

SECRETARY OF WAR PETE HEGSETH: Good morning.

UNKNOWN: Good morning.

SECRETARY OF WAR PETE HEGSETH:

I'll start as we often do here at the Department of War, with the bottom line up front, for the world to hear and the press to actually admit, that the United States is decimating the radical Iranian regime's military in a way the world has never seen before. Never before has a modern capable military, which Iran used to have, been so quickly destroyed and made combat ineffective, devastated.

We said it would not be a fair fight and it has not been. As I stated during our first press conference on day two – that was 10 short days ago – the combination of the world's two most powerful air forces is unprecedented and unbeatable. Between our Air Force and that of the Israelis, over 15,000 enemy targets have been struck. That's well over 1,000 a day.

No other combination of countries in the world can do that. So today, as we speak, we fly over the top of Iran and Tehran, fighters and bombers all day, picking targets as they choose, as our intelligence gets better and better and more refined. Looking up, the IRGC and Iranian regime sees only two things on the side of aircraft: the stars and stripes and the Star of David, the evil regime's worst nightmare.

Iran has no air defenses. Iran has no air force. Iran has no Navy. Their missiles, their missile launchers and drones being destroyed or shot out of the sky. Their missile volume is down 90%. Their one-way attack drones yesterday, down 95%. And as the world is seeing, they are exercising sheer desperation in the Straits of Hormuz, something we're dealing with, we have been dealing with it and don't need to worry about it.

We're on plan to defeat, destroy, disable all of their meaningful military capabilities at a pace the world has never seen before. But it's not just that Iran doesn't have a functioning Air Force or that their entire Navy is at the bottom of the Persian Gulf or their missile force is shrinking daily. Even more importantly, they also don't have the ability to build more.

That's the most important component I'd like to emphasize today. Soon, and very soon, all of Iran's defense companies will be destroyed. For example, as of two days ago, Iran's entire ballistic missile production capacity, every company that builds every component of those missiles, has been functionally defeated, destroyed. Buildings, complexes and factory lines all across Iran, destroyed.

So we're shooting down and destroying what missiles they still have in stock, but more importantly, ensuring that they have no ability to make more. Their production lines, their military plants, their defense innovation centers, defeated. Iran's leadership is in no better shape, desperate and hiding, they've gone underground, cowering. That's what rats do.

We know the new so-called not-so-supreme leader is wounded and likely disfigured. He put out a statement yesterday, a weak one, actually, but there was no voice and there was no video. It was a written statement. He called for unity. Apparently killing tens of thousands of protesters is his kind of unity.

Iran has plenty of cameras and plenty of voice recorders, why a written statement? I think you know why. His father, dead. He's scared. He's injured. He's on the run and he lacks legitimacy. It's a mess for them. Who's in charge? Iran may not even know. With every passing hour, we know and we know they know, that the military capabilities of their evil regime are crumbling. They can barely communicate, let alone coordinate; they're confused and we know it.

Our response? We will keep pressing. We will keep pushing, keep advancing, no quarter, no mercy for our enemies. Yet some in this crew, in the press, just can't stop. Allow me to make a few suggestions. People look up at the TV and they see banners, they see headlines. I used to be in that business. And I know that everything is written intentionally.

For example, a banner or a headline: "Mideast war intensifies," splashing on the screen the last couple of days, alongside visuals of civilian or energy targets that Iran has hit, because that's what they do. What should the banner read instead?

How about, 'Iran increasingly desperate,' because they are. They know it and so do you, if it can be admitted. Or more fake news from CNN, "reports that the Trump administration underestimated the Iran war's impact on the Strait of Hormuz" – patently ridiculous, of course. For decades, Iran has threatened shipping in the Strait of Hormuz.

This is always what they do, hold the strait hostage. CNN doesn't think we thought of that. It's a fundamentally unserious report. The sooner David Ellison takes over that network, the better.

Another example of a fake headline that I saw yesterday, "war widening." Here's a real headline for you, for an actual patriotic press: how about, 'Iran shrinking, going underground'? You see, Iran's leaders are hiding in bunkers and moving into civilian areas. The only thing that is widening is our advantage, not to mention our Gulf partners stepping up even more, now going on the offense, and have always been with us on the defense with collective and integrated air defenses.

Our will, it is unshakable. Our options, maximized. And our capabilities still building. We're going up, they're going down. As I said from the start, President Trump holds the cards. He'll determine the pace, the tempo and the timing of this conflict, his hand firmly on the wheel as well as on the throttle setting. America first, peace through strength, in action.

From day one, as our nation expects and the president demands, our warriors have fought with lethality, precision and rapid innovation. In fact, today will be yet again the highest volume of strikes that America has put over the skies of Iran and Tehran. The number of sorties and number of bomber pulses, the highest yet, ramping up and only up. And quantity has a quality of its own as we continue to ramp up.

Every tool of AI, of cyber, of space, EW, counter UAS, you name it, we're employing it, blinding, confusing and deceiving our enemy. Because we know who the good guys are here and the American people do, too. And that makes my job simple. I serve God, the troops, the country, the Constitution and the president of the United States and answer only to those, all in service of victory on the battlefield and the military objectives that we've laid out from day one: defeat the missiles, missile launchers and defense industrial base, which I laid out today; defeat the navy; and deny Iran the ability to have a nuclear weapon – clear , decisive, achievable.

And Adm. Cooper knows, the CENTCOM commander who we spent a couple of hours with last night, that in pursuit of those objectives, we have his back in every way. His commanders know that and so do the troops in harm's way. Adm. Cooper gets what he needs, the assets, the authorities, the munitions, you name it. We will stop at nothing to win. War is hell. War is chaos. And as we saw yesterday with the tragic crash of our KC135 tanker, bad things can happen.

American heroes, all of them. And as I have with all of them, as we have, we will greet those heroes at Dover and their sacrifice will only recommit us to the resolve of this mission. But war in this context and in pursuit of peace is necessary, which is why each day on bended knee, we continue to appeal to heaven, to Almighty God's providence, to watch over and give special skill and confidence to our leaders and to our warriors. To those warriors who this nation prays for every single day, I hear from all of you out there, who pray for them every day, stay on bended knee and pray for them. I continue to say to them, Godspeed, may the Lord bless you and keep you and keep going. Mr. Chairman, over to you.

GENERAL DAN CAINE: Thank you, Mr. Secretary, and good morning, ladies and gentlemen, and thank you for joining us today. Before I start with an update, I also want to address the tragic loss of our KC135 refueling aircraft yesterday. The incident occurred over friendly territory in western Iraq while the crew was on a combat mission. And again, was not the result, as CENTCOM has said, was not the result of hostile or friendly fire.

We're still treating this as an active rescue and recovery operation. As CENTCOM announced this morning, four airmen have been recovered and the Air Force and U.S. Central Command will provide updates as information becomes available.

Please keep these brave airmen, their families, friends and units in your thoughts in the coming hours and days. Our service members make an incredible sacrifice to go forward and do the things that the nation asks of them. It's a reminder of the true cost of the dedication and commitment of the joint force.

We're also aware of a fire on board the USS Gerald R. Ford. We're thinking about the crew there who were injured in the fire. We believe and hope that everyone will be OK and we're grateful for that, and for any further questions on that, we'd refer you to NAVCENT or to the Navy.

This morning, we enter the 13th day of Operation Epic Fury and we continue to make progress towards our military objectives. As the secretary said, today will be our heaviest day of kinetic fires across the operating area. CENTCOM continues to attack ballistic missile

and drone capabilities so that they are no longer a threat to U.S. forces, our bases or our partners.

They're continuing to destroy the Iranian Navy to ensure freedom of navigation. And this means going after Iran's mine laying capability and destroying their ability to attack commercial vessels. And we're targeting their defense industrial base, so they cannot rebuild the capabilities that can harm America's interests or our partners in the future. As Adm. Cooper said in his update on Wednesday, Iranian combat power continues to decline as a result of the continued strikes, as the secretary talked about.

We've attacked over 6,000 targets and our strike packages continue to launch every hour and we've maintained an unprecedented number of sorties up over our head of Iran. CENTCOM is now persistently over the enemy and a result, we've seen a reduction in missile in one way attack fires, as the secretary said.

In less than two weeks, we've rendered the Iranian Navy combat ineffective and continue to attack naval vessels, including all of their Soleimani-class warships, which were armed with anti-ship missiles and anti-aircraft weapons. We've made progress, but Iran still has the capability to harm friendly forces in commercial shipping and our work on this effort continues.

But I want to make something clear: the only thing preventing commercial traffic and flow through the Straits right now, which there is some through the Straits, is — is Iran. They are the belligerents here holding — holding the straits closed, although there is some traffic moving through there.

We've made it a priority to target Iran's mine laying enterprise. There are mine layers, the naval bases and depots in addition to the missiles that could influence the Straits, and CENTCOM continues to attack those efforts. And we continue to make progress on the industrial base to include factories, weapons, warehouses that are stored in, and we will continue to do so in the coming days, especially today.

Now as I often do, I want to share a little bit about our incredible joint force. Today, I'm going to talk about our incredible artillery force, comprised of American soldiers and Marines who've been sinking ships destroying depots and launching Army tactical missile systems, or ATACMS, precision strike missiles or PrSMs, and high mobility rocket systems, or HIMARS.

From outside Iran, our army and Marine artillery are hitting sites that Iran relies on to project power beyond their borders and protect our deployed. In just the first 13 days of this operation, our artillery forces have made history. They fired the first precision strike missiles

ever used in combat, reaching deep into enemy territory. They've used Army ATACMS to sink multiple ships, including a submarine, and they've done all of this with the precision and determination that comes from relentless training and trust in each other and in their weapon systems.

Yesterday, I had the incredible honor and privilege of speaking with some of our young soldiers from the 3rd Battalion 27th Field Artillery Regiment out of Fort Bragg, North Carolina, the unit and the crew that fired the first precision strike missiles.

The soldiers I met came from all over this great country, New York, Texas, Delaware, California. One had been in the Army only six months and been in the unit for two months and was already deployed. He was the youngest, at 20, but you would not know it from the way that they talked about their mission.

The others were 22 and 28 years old. They spoke with the sense of calm, pride, purpose and clarity that tells you clearly, they understand the weight of what they're doing and the people who depend on them. I asked him to walk me through a fire mission. I asked not just what they do, but what they feel, especially those first crew members on this particular mission.

These soldiers basically live in these vehicles behind us. The cab very tight, two folks sit next to each other with the crew commander behind them. It's jammed inside there with their personal weapons and kit and they sit and wait for a fire mission. And when that fire mission comes, they close the armored doors and begin to program the systems.

They then throw three simple toggle switches and 10 to 15 feet behind them, a rocket motor ignites and the round is headed downrange to do the nation's work. I asked these youngsters, these young, awesome Americans, what does that feel like? And one of them just looked at me and said, it's awesome. No drama, no hesitation, in the middle of the day, in the middle of the night, in the sun, the rain and the snow, flawless execution.

The Marine counterparts are out there doing the same thing every night. Same work, same pressure, same expectations, same results. And we hand tremendous and enormous responsibility to these young Americans and they carry it with a level of maturity, grit, professionalism and tenacity that makes me incredibly proud to be a part of their joint force. Their parents and families would and should be incredibly proud and their leaders and I trust them to do the deeds that they must do in difficult circumstances every single time.

I also want to touch today, a moment – I want to touch for a moment today on their leadership. These young Americans are led by extraordinary young leaders out at the tactical edge.

Yesterday, the battery commander and her NCO were there with this crew. On the same video screen, the two of them hardly said a word, they didn't have to. In their eyes, and in particular, the commander's eyes, you could see the quiet trust and confidence she had in these soldiers and the rest of their battery.

It came through loud and clear and we appreciate their leadership. When I asked these soldiers yesterday, 'what is it that you need from the secretary and I?', they looked at each other, paused for a moment and look back at me and said, "more rounds, sir." It was awesome. So thank you to those soldiers and Marines out on the firing line supporting our mission and thank you to their families.

Our joint force will continue today to deliver dynamic fires against the enemy from the land, sea and air. We remain deeply grateful for their service. And for the third time today, I'll mention that today will be our busiest day. This mission remains complex, dangerous and difficult and every service member has a family waiting for them to return home. And I want to thank all of the families today who are supporting their deployed forces and those doing the work here in the States.

On a personal note today, I also want to thank the joint staff and the team that I have the pleasure of working with, some of them right here in this room. They are working 24 hours a day to deliver the options that we must to the secretary and to the president.

Today, as I close, I ask that we remember our fallen and those participating in the recovery operations to bring home our lost KC135 crew, that we keep those service members and their families in their thoughts and prayers. Those are very, very, very tough days, when that knock comes on the door, for people on both sides of the door.

Again, thank you to our deployed, thank you to our fallen and to their families, and to the joint force. And with that, I'll turn it back to you, sir.

SECRETARY HEGSETH: Thank you, Mr. Chairman.

Q: Alexandra Ingersoll, One America News. Can you tell us a little bit more about the Strait of Hormuz and when it might be fully operational again? And how do we ensure our objective of denying Iran a nuclear weapon if they continue to align with our adversaries?

SECRETARY HEGSETH: So I'll take it, and chime in, Mr. Chairman if you'd like at all. I want to emphasize what the chairman said about that. The only thing prohibiting transit in the Straits right now is Iran shooting at shipping. It is open for transit, should Iran not do that. Now, there's a reason why we chose as one of our primary objectives, destroy the navy.

We understood the ability to interdict shipping is something Iran has done for 40 years. It's key terrain. They've used it as leverage. The world is seeing what they'll do to fight back in that context. And so we've heard them talk about taking various measures. And we're planning for all of them.

So we have a plan for every option here. We're working with our interagency partners and that's – that's not a strait we're going to allow to remain contested or with a lack of flow of — of commercial goods. So we're aware of that. We're laser-focused on our military objectives, but also want to make sure our partners across this government understand we're working with you to make sure that energy flows. And that's an important part.

And the second question was on the nuclear capability. As we said from the beginning, their strategy shifted just from defense of their nuclear facilities to a conventional umbrella of so many missiles that no one would challenge their ability to their — the opportunity to defeat their missile — their nuclear capabilities.

And it was growing by the day. So with Iran at its weakest moment, taking — going at that ballistic missile capability, creates an opportunity to ensure at any point in time that Iran give up their nuclear capabilities, or if need be, you prevent them from doing it, as the president has done once already with Operation Midnight Hammer, obliterating those capabilities. So the conventional side is a huge part at getting at denying nuclear capabilities. If you have anything you want to add.

GEN. CAINE: I appreciate the question. I'm not going to comment on what we may or may not be thinking about, any options that the joint force could be tasked to do in the future, whether it's on the nuke matter or anything else. Thank you. But we have options.

Q: Are you [inaudible] the mines that are in the Strait of Hormuz and our ability to, you know, obliterate them?

GEN. CAINE: We retain a range of options to solve a whole variety of problems and that is one set of options that we have, you know, that we hold on to. So thank you.

SECRETARY HEGSETH: Absolutely.

Q: Thank you, Secretary Hegseth. Mary Margaret with Daily Wire. Thank you both for the update. ABC news has updated its story from yesterday, clarifying that the FBI report on Iran possibly striking California was unverified. I just want to ask you, what impact did that original reporting have on the public? And does Iran even have the ability to conduct such a strike?

And then just really quickly on another note, what role did Vice President Vance play in counseling the president on this conflict? Can you speak to some of the media reporting suggesting that there is a division there?

SECRETARY HEGSETH: That reporting on California obviously had no impact on us. Also we're used to bad reporting. We're used to ill-informed reporting. And so it doesn't change how we operate, but we engage with it to prove that it's not true, as CENTCOM has done so well. Ultimately, I look at the reports on a daily basis of — our interagency is all over it. My partners across government are all over, looking for indications and warnings, keeping the American people safe.

There's a lot of things Iran has said it can do for — for a long time. Thankfully — including engaging their proxies and getting them involved in the fight, which they haven't been able to do. So we're watching that very closely. And as far as — as far as the vice president, he's an incredible member – leader – of this team as well, alongside the president and the secretary of state.

I can't say enough great stuff about this team, how it works together, how it provides options to the president, and the vice president every single day is a key voice in that, an indispensable voice in that, actually.

In the middle there, red tie. Yes.

Q: Yes. Michael Gordon, Wall Street Journal. Iran is thought to have 440 kilograms of highly enriched uranium in at least two locations and several thousand kilograms of lower purity material. Can you conclude this mission successfully without physically taking control of that material or are you counting on diplomatic negotiations to provide some measure of control leading to its removal? You've mentioned missiles, you've mentioned drones, military industry. You haven't stipulated that taking care of that material is a mission priority.

SECRETARY HEGSETH: We've said from the beginning, deny Iran nuclear weapons as a core mission. We have — we retain options across the spectrum to ensure that they never do. And President Trump has said that. And that's why this mission actually couldn't have been

possible without Midnight Hammer, without what those B-2s did going across and obliterating those facilities. That set the condition for the opportunity to do what we're doing now.

So he's kept — the president's kept his eye focused on nuclear capabilities. And I will say, we have a range of options, up to and including Iran deciding that they will give those up, which of course we would welcome. They weren't willing to do in negotiations. I would not — never tell this group or the world what we're willing to do or how far we're willing to go, but we have options, for sure.

Right next to him.

Q: Me?

SECRETARY HEGSETH: No, right there.

Q: Right here, sir?

Q: Right here? I'll take it, for sure.

SECRETARY OF WAR PETE HEGSETH: [Inaudible] right there. Yep. No, you. Yep.

Q: OK. Thank you, sir. Can you please provide some guidance of — it's been 13 days in. Can you please provide some guidance, both of you, about the strike on the girl's school? There has been reporting that indicates that preliminary inquiry, even though it's ongoing, has determined that the airstrike was carried out by the United States.

Given that there is another competing narrative that this was done intentionally, can you provide us with some guidance about whether this was the case? Secondly, we are also getting — we had heard yesterday from Energy Secretary Wright that said that the U.S. Navy would not be ready until the end of the month to provide escorts through the Strait of Hormuz. Is that an accurate assessment? And if so, can you tell us why? Thank you.

SECRETARY HEGSETH: Well, with an issue on your first topic, an issue of such seriousness, we don't — we're not going to let reporting lead us or force our hand into indicating, what happened in a particular situation, because the truth matters. So I can report that CENTCOM has designated an investigating officer to complete a command investigation.

The command investigation will take as long as necessary to address all the matters surrounding this incident and the investigating officer is from outside CENTCOM and is a — is a general officer. But I will note to this group and to the world, there's only one entity in this conflict between us and Iran that never targets civilians, literally never target civilians.

I look at the process that's used on dynamic strikes or on boat strikes and others. We have a very high fidelity process in that case. So we don't target, Iran does. We will investigate and we'll get to the truth and we'll share it when we have it, absolutely.

And what was the second question?

Q: About the Strait of Hormuz, about the Navy, Secretary Wright —

GEN. CAINE: It's a tactically complex environment. And before I think we want to take anything through there at scale, we want to make sure that we do the work pursuant to our current military objectives to do – to do that safely and smartly. So we're continuing to develop options.

SECRETARY HEGSETH: And we do a lot of work.

GEN. CAINE: Yes.

SECRETARY HEGSETH: And like I said, this is a — it is dynamic, but this is, I think almost by 20%, the largest day of strikes. And as I said, our intelligence just gets better and better. That feedback loop feeds itself. And as we refine those targets, it exponentially increases what we can hit and why, to include strategic things the world's talking about and looking at. And it's our job to have a plan for it, which we do, to address it and ensure that the president has options.

We've done that from the beginning in this department. He'll have options on that — on that topic as well.

Right here.

Q: Thank you.

Q: [Inaudible] that strike, sir?

SECRETARY HEGSETH: An investigation is an investigation. That's what it is. It doesn't mean anything other than that.

Yes.

Q: Ryan Morgan with the Epoch Times. Regarding today's busy day of strikes, last week you guys discussed the progress of the air campaign to gain air superiority and to transition from these standoff weapons launched at range to more overhead strikes. Can you now say that these strikes today are going to rely entirely on stand-in over the top weapons or are standoff range weapons still in play?

SECRETARY HEGSETH: It's a great question. I can say based on the report I read this morning at 0600, only 1% of the munitions we're using today are standoff munitions. The rest are over the top, the types of which we have a plethora. Which was — which was our goal from the beginning. You use standoff which are more exquisite. You transition to a much larger magazine depth, ensuring that you're preserving all the capabilities you have and your options across the force, absolutely.

Q: Mr. Chairman, has Iran placed any mines since the war started?

SECRETARY HEGSETH: Right here.

Q: Is Iran placing new mines?

SECRETARY HEGSETH: We've heard them talk about it, just like you've reported recklessly and wildly about it —

Q: I haven't reported [inaudible]

SECRETARY OF WAR PETE HEGSETH: — but there's — we have no clear evidence. We have no clear evidence of that.

Right here.

Q: Thank you, sir. Mr. Secretary, given everything the U.S. have accomplished in the last 24 hours, as of today, how do you define success in this military option? And has that definition changed from day one? And also regarding Iran government telling countries hosting U.S. American bases that they could face attacks, what is the Pentagon doing about that?

SECRETARY HEGSETH: First question is what is the objective?

Q: How do you define success as of today?

SECRETARY HEGSETH: Yeah, I mean, we — like, we define success, again, 13, 12 days in, 13 days in, by reaching the military objectives that we've laid out — launchers, missile launchers, defense industrial base, their navy, the ability to project power on the naval sense, leading toward denying them to get a nuclear weapon. And we've got internal metrics that look at that that we represent to the president, who then can decide, how long he'd like to continue in pursuit of those military objectives.

So that hasn't changed. There's a lot of things a lot of people talk about, what they want us to do or what we should do or what we should stay focused on. And again, I've addressed this before and I think it's worth saying again, mission creep or expansive missions or prolonged

timelines or democracy-building or nation-building, you name it, has not been part of what President Trump wants us to be involved in. We're solving for something here, this particular mission set.

But also recognizing this country's conditioned to previous leaders, whether it's George W. Bush or Barack Obama or Joe Biden, who had these expansive nebulous mission sets that kept changing all the time and so the timeline kept moving and we kept pouring more troops in and on the ground. And then pretty soon everyone wonders, like I did in Afghanistan in 2012, what's our mission here? I'm not — I'm not clear what it is. We're taking the opposite approach here and saying, we've defined these objectives, we're pursuing those objectives. The president has his hand on the throttle and will decide ultimately when they've been reached, that serve the purposes of the United States of America, American interests first.

Q: And regarding —

[Crosstalk]

SECRETARY HEGSETH: Yes, right here.

Q: Thank you, Secretary Hegseth. Polls show over 80% of Republicans support the president's military action in Iran, but there's some consternation in parts of the party, particularly from your fellow Fox News alum, Tucker Carlson. He called the war disgusting and evil and then said of unconditional surrender, which the president has called for, means foreign troops get to rape your wives and daughters. Have you heard these comments and what's your reaction to them?

SECRETARY HEGSETH: We're busy executing on behalf of great patriotic Americans with a clear mission, that's 47 years overdue. And we're going to execute on that regardless of what people say about it.

Yes, right here.

Q: Mr. Secretary, you have said that the U.S. military has essentially aerial superiority, naval superiority over Iran, yet we're not escorting ships through the Strait of Hormuz. Why? How did you not plan for this?

SECRETARY HEGSETH: We planned for it. We recognize it. Because ultimately, we want to do it sequentially in a way that makes the most sense for what we want to achieve and ensure that we're sending the right signals to the world when we do so. So when Chris

Wright speaks or we speak, it's based on a full assessment of — of what we're — what we're up against, what we want to say to the world, how we want them to see and understand the conflict.

It's like this whole idea of the war widening. That's what the press wants to make it look like, like it's widening and chaos is ensuing. No, we're actually closing in on, grabbing hold of and controlling what objectives we want to achieve and how we want to achieve them, shape — it's called shaping operations and setting the conditions.

But when you shape the environment, you don't always tell — I mean, foolish political leaders and foolish military leaders of the past will hang an exact deadline on it or here's exactly when we'll do what we're going to do or here's how long it's going to take us. And then if you meet that, maybe you meet it, but if you don't, you fail.

And if you're far beyond — we know exactly what we're shaping and why. We're sending those signals working across the interagency. The Strait of Hormuz is something we've paid attention to from the beginning and the American people can rest assured we will ensure that our interests are advanced, no doubt.

Yes, right there, green jacket.

[Crosstalk]

Q: Mike Brass with the Washington Examiner. How many American casualties have there been and where were the American service members when they were injured?

SECRETARY HEGSETH: Um —

GEN. CAINE: I mean, it's — a bunch have returned to duty.

SECRETARY HEGSTETH: Yes

GEN. CAINE: So we've had a whole — the large, large majority have gone in for some medical treatment and returned to duty. We've had in Kuwait, Jordan, down across the southern flank a little bit, a variety of places. Most from one-way attack strikes.

SECRETARY HEGSETH: But I want to clarify that. I think what we've tried to do here —

GEN. CAINE: And I'm sorry I didn't hear you [inaudible] yeah [inaudible]

SECRETARY HEGSETH: — is clarify those numbers. Rather than saying, KIA or WIA – wounded – be more clear about that, because the overwhelming majority, almost 90%, thank God —

GENERAL DAN CAINE: Yes.

SECRETARY HEGSETH: — are returned to duty, minor injuries, returned to duty. And so that number can look a certain way and our job is to add some fidelity to it.

GEN. CAINE: Yes.

[Crosstalk]

SECRETARY HEGSETH: [Inaudible] Right here. Yes.

Q: Thank you, Mr. Secretary. David [inaudible], Real America's Voice. Can you share what types of munitions have been used on the attacks on commercial shipping? Have any hit mines? And are USV's, unmanned surface vehicles, being used? And just a quick follow-up: were there any arrests in Fort Campbell with the drone thefts?

GEN. CAINE: I'm not familiar with the Fort Campbell thing. The — the strikes that Iran has taken on shipping up north in the vicinity of Kuwait have been, I believe, from surface-to-surface missiles up there. We've not seen any USV activity out of Iran, that we've seen in the Gulf at this point.

SECRETARY HEGSETH: Nor have any ships hit mines or anything like that. It's still flowing through the strait. Absolutely.

GENERAL DAN CAINE: Yes, there's been no – yes, yes, thank you. There's been no strikes that —

SECRETARY HEGSETH: One more time, right here.

Q: Thank you so much. Heather Mullins, Lindell TV. My first question is, President Trump is set to meet with XI Jinping in a couple of weeks; how much support, if any, has China been given the Iranian regime? And then the second question, just, you know, I know President Trump calling for an unconditional surrender from Iran. Given that the U.S. is working in partnership with Israel on this whole operation, is Iran expected to meet demands of both countries or just the U.S.? And what are those demands?

SECRETARY HEGSETH: Well, we're – we're proud to partner with the incredible capabilities the Iranians — or excuse me, the Israelis have, but our objectives are our objectives. So when those are met, as we meet those, we'll set the — we'll set the tempo of when those are met.

What was the first question?

Q: He's meeting with Xi Jinping in a couple weeks. What's China's role in all of this?

SECRETARY HEGSETH: Oh, yes. The president has a -- has a historic relationship with President Xi. They look forward to having a dynamic conversation, two powers. President Trump, ultimately, has established terms of that relationship, which advance the United States of America and that meeting will continue to ensure we advance that.

That's all I've got. Thank you very much. Appreciate it.

Hosted by WEB.mil

# EXHIBIT 10

Resources FAQs Client Login

PARLATORE
LAW GROUP

# PARLATORE LAW GROUP

## FIGHTING & WINNING THE BATTLE FOR JUSTICE

We fight for justice and do not shy away from tough cases. Whatever you're up against, we've got your back.

GET STARTED

## WE FIGHT AND WIN

WHERE LEGAL ACUMEN MEETS UNWAVERING ADVOCACY

TOUGH CASES ARE OUR COMFORT ZONE

INNOVATIVE LEGAL STRATEGIES

EASE OF ACCESS

EXPERT REPRESENTATION, SMARTER PRICING

# ABOUT PARLATORE LAW GROUP

Parlatore Law Group was founded on the principle of eliminating all the unnecessary overhead expenses associated with traditional law firms while providing the highest quality legal services.

LEARN MORE

# WHY US?

By trimming all the excess expenses and passing those savings on to their clients, Parlatore Law Group's attorneys can instead devote their full efforts to solving their clients' problems and working together as a cohesive team. Our cloud computing capabilities create great opportunities to effectively communicate across geographies for both attorneys and clients.

LEARN MORE

# MISSION

Provide our clients with the highest quality legal services at an affordable rate. We do this by removing all the barriers, bureaucracy, and bloated overhead costs associated with traditional law firms, and instead focus on unleashing the energy and individual genius of the best legal minds in the industry.

GET STARTED

## EXPERIENCE THE PARLATORE LAW GROUP DIFFERENCE

### OUR TEAM OF EXPERIENCED LEGAL PROFESSIONALS

At Parlatore Law Group, we strive to provide our clients with the best possible legal counsel and to ensure that they get the best results. Our attorneys are carefully selected and experienced legal professionals who have demonstrated successful track records and years of experience in the legal industry.

### FOUNDED BY A MILITARY VETERAN

The culture and ethos of the firm at Parlatore Law Group draw heavily from the experience of our founder, a military veteran. We believe in a mission-oriented and client-focused approach, with all employees and attorneys sharing in our mindset. This approach has allowed us to draw from a like-minded talent pool that is skilled and diverse

### ENERGETIC AND MISSION-ORIENTED

Our team is energetic, mission-oriented, and eager to work together to achieve the best results for our clients. We believe that by working together, we can provide our clients with the best possible legal representation. We are passionate about providing our clients with quality representation, and we strive to provide the best possible service.

## OUR CORE PRACTICE AREAS

CORPORATE

From startups to established industry players, every successful corporation needs a trusted legal advisor. We can assist with all legal aspects of running your business.

## CRIMINAL

Our attorneys have proven track records of success in all manner of criminal proceedings, whether at the investigative stage, trial, or appeals. We work with you to develop and implement an effective and aggressive legal defense strategy.

## GOVERNMENT, REGULATORY & COMPLIANCE

Clients face a labyrinth of laws, regulations, and guidelines created by various legislative and regulatory bodies. Whether in the filing process, compliance, or various administrative proceedings, our attorneys help guide clients through this intricate tangle.

## LITIGATION

Disputes between parties often end up needing to be litigated to be resolved. Whether through negotiation, mediation, arbitration, lawsuits, or appeals, our attorneys are adept at handling these disputes.

## MEDIATION

A mediator acts as a neutral third party to assist parties in reaching their own resolutions to an action. Finding the right mediator is crucial to the parties' success. At Parlatore Law Group, our professionals pride themselves on their ability to put the parties at ease, as well as utilizing our remote cloud-based platform to ensure we can schedule your matter promptly. This saves the parties both time and money.

## TRUSTS & ESTATES

Planning for the future can feel overwhelming. But with the right guidance, you can ensure your loved ones are cared for, your assets are safeguarded, and your educational dreams are realized.

## STRATEGIC LEGAL & CRISIS COMMUNICATIONS

In our hyperconnected world, a single misstep can send your brand into a tailspin. Whether it's a court case, scandal, or just negative press, navigating the legal and reputational minefield of a crisis requires a steady hand and a keen mind.

## COUNSEL & COMPASS

Counsel & Compass is a new program that provides General Counsel services that are scaled to what your business needs and can afford. Most small and mid-sized business owners know that legal issues aren't just issues faced by large companies. Counsel & Compass levels the playing field.

## MILITARY & VETERANS

Parlatore Law Group is dedicated to helping our military and veterans with a wide array of legal issues. Our attorneys are renowned for their victories in military courtrooms and administrative proceedings for active duty and reserve military members. Our team also helps veterans navigate the VA disability process, ensures that you are getting all the benefits you earned through your service, corrects military records, and builds veteran-owned businesses.

LEARN MORE

# LATEST POSTS

VIEW ALL POSTS

## NOT ALL MARITIME WORKERS ARE CREATED EQUAL: SEAMEN, PASSENGERS, LONGSHOREMEN, AND WHY IT MATTERS

Understanding Maritime Worker Classifications: How the Legal Category of an Injured Worker Determines Remedies, Defenses, and Litigation Strategy for Employers, Vessel Owners, and Insurers

## SURPRISING WAYS ADMIRALTY JURISDICTION APPLIES-4 UNEXPECTED MARITIME LAW SCENARIOS FOR BUSINESSES AND INSURERS

Admiralty jurisdiction has a remarkably long arm, and if you don't recognize it early, you may find yourself litigating under the wrong legal framework entirely.

READ MORE »

Mark Collins • April 24, 2026

## MIRANDA RIGHTS: WHAT YOU ACTUALLY NEED TO KNOW THE REAL-WORLD GUIDE THAT COULD SAVE YOUR FREEDOM

"The police will do whatever it takes to get you to talk. The courts will generally say whatever they need to say to excuse the

READ MORE »

Mark Collins • April 16, 2026

## FEATURED BY

‹ ›

## JOIN OUR COMMUNITY

Whether you are a potential client looking for new representation or an attorney looking to upgrade your practice, we would like to hear from you. Contact us today to see how our new and innovative approach can help you.

### CONTACT

contact@parlatorelawgroup.com

(212) 603-9918

Parlatore Law Group, LLP
1440 N Edgewood St.
Arlington VA 22201

### RESOURCES

Contact Us

Media Inquiries

FAQs

Careers

Privacy Policy

Attorney Advertising. Prior results do not guarantee future outcomes.

© Copyright 2026 | Parlatore Law Group | All Rights Reserved

# EXHIBIT 11

# *U.S. at Fault in Strike on School in Iran, Preliminary Inquiry Says*

Outdated targeting data may have resulted in a mistaken missile strike, according to the ongoing military investigation, which undercuts President Trump's assertion that Iran could be to blame.

Listen · 9:14 min



**By Julian E. Barnes, Eric Schmitt, Tyler Pager, Malachy Browne and Helene Cooper**

The reporters have been covering the U.S.-Israeli war against Iran.

March 11, 2026

See more of our coverage in your search results.

**Add The New York Times on Google ↗**

An ongoing military investigation has determined that the United States is responsible for a deadly Tomahawk missile strike on an Iranian elementary school, according to U.S. officials and others familiar with the preliminary findings.

The Feb. 28 strike on the Shajarah Tayyebeh elementary school building was the result of a targeting mistake by the U.S. military, which was conducting strikes on an adjacent Iranian base of which the school building was formerly a part, the preliminary investigation found. Officers at U.S. Central Command created the target coordinates for the strike using outdated data provided by the Defense Intelligence Agency, people briefed on the investigation said.

Officials emphasized that the findings are preliminary and that there are important unanswered questions about why the outdated information had not been double checked.

Striking a school full of children is sure to be recorded as one of the most devastating single military errors in recent decades. Iranian officials have said the death toll was at least 175 people, most of them children.

While the overall finding was largely expected — the United States is the only country involved in the conflict that uses Tomahawk missiles — it has already cast a shadow on the U.S. military operation in Iran.

President Trump's attempts to sidestep the blame for the strike have also already complicated the inquiry, leaving officials who have reviewed the findings showing U.S. culpability expressing unease. The people interviewed for this story spoke on the condition of anonymity, citing the sensitive nature of the ongoing investigation and Mr. Trump's assertion at one point that Iran, not the United States, was responsible.

"As The New York Times acknowledges in its own reporting, the investigation is still ongoing," Karoline Leavitt, the White House press secretary, said in a statement.

Asked about this article as he left the White House on Wednesday for a trip to promote his economic agenda in Ohio and Kentucky, Mr. Trump replied, "I don't know about that."

People briefed on the investigation said many questions were yet to be answered around why outdated information was used and who failed to verify the data.

Still, the error has not surprised current and former officials.



Excavators and workmen dug nearly 100 graves at a cemetery in Minab before the funeral for children and teachers killed in an airstrike on a school on Feb. 28. Iran's Foreign Media Department, via Associated Press

The school, in the town of Minab, is on the same block as buildings used by Iran's Islamic Revolutionary Guards Navy, a top target of the U.S. military strikes. The site of the school was originally part of the base. Officials briefed on the inquiry said the building was not always used as a school, though it is not clear precisely when the school opened on the site.

A visual investigation by The Times showed the building housing the school had been fenced off from the military base between 2013 and 2016.

Satellite imagery reviewed by The Times showed that watchtowers that once stood near the building had been removed, three public entrances were opened to the school, ground was cleared and play areas including a sports field were painted on asphalt, and walls were painted blue and pink.

The "target coding" provided by the Defense Intelligence Agency, the military intelligence agency that helps develop targets, labeled the school building as a military target when it was passed to Central Command, the military headquarters

overseeing the war, according to people briefed on the preliminary findings of the investigation.

Investigators do not yet fully understand how the outdated data was sent to Central Command or whether the Defense Intelligence Agency had updated information.

Military targeting is very complex and involves multiple agencies. Many officers would have been responsible for verifying that the data is correct, and officers at Central Command are responsible for checking the information they receive from the Defense Intelligence Agency or another intelligence agency. But in a fast-moving situation, like the opening days of a war, information is sometimes not verified.

In addition to the Defense Intelligence Agency and Central Command, investigators are examining the work of the National Geospatial-Intelligence Agency, known as the N.G.A., which provides and examines satellite imagery of potential targets.

U.S. officials and others emphasized that the investigation was ongoing and there was more to learn, according to people briefed on the inquiry. Officials from Central Command declined to comment. Officials from the Defense Intelligence Agency referred questions to the Pentagon, which declined to comment, saying the incident was under investigation. The National Geospatial-Intelligence Agency did not immediately respond to a request for comment.

The Defense Intelligence Agency and the National Geospatial-Intelligence Agency have dozens, even hundreds, of analysts at combatant commands who work with military operational planners and intelligence offices to develop targets.

When the Defense Intelligence Agency's targeting data is older, intelligence officers are expected to use imagery or data from the National Geospatial-Intelligence Agency to update and verify the target.

While Mr. Trump has made targeting Iran's navy a top priority of the war to prevent it from interfering with global commerce in the region, historically it has not been a top priority of the Defense Intelligence Agency, which has focused more on Iran's missiles and other priorities like China and North Korea.

Officials conducting the investigation have examined whether any artificial intelligence models, data crunching programs or other technical intelligence gathering means were to blame for the mistaken targeting of the school, according to U.S. officials.

While Claude, the large language model created by Anthropic, does not directly create targets, it works with the National Geospatial-Intelligence Agency's Maven Smart System and other software to identify points of interest for military intelligence officers.

But officials said the error was unlikely to have been the result of new technology. Instead, they said, it likely reflected a common — but sometimes devastating — human error in wartime.

The top line finding of the internal military investigation mirrors a growing body of public evidence that clearly suggests U.S. responsibility.

Satellite imagery, social media posts and verified videos assembled by The Times visual investigation team indicate that the school was severely damaged by a precision strike that occurred around the same time as attacks on the naval base. A Times analysis showed that base was hit again within around two hours of the first strikes.

A video uploaded Sunday by Iran's semiofficial Mehr News Agency and verified by The Times also shows a Tomahawk cruise missile striking the naval base beside the school in Minab on Feb. 28.

Defense Secretary Pete Hegseth and other administration officials have declined to comment on the strike, other than to say it is under investigation. Despite that, the president has tried at times to put the blame on Iran.

"In my opinion, based on what I've seen, that was done by Iran," Mr. Trump told reporters on Air Force One on Saturday, as Mr. Hegseth stood beside him, adding: "They're very inaccurate, as you know, with their munitions. They have no accuracy whatsoever. It was done by Iran."

On Monday, a Times reporter asked Mr. Trump why he was the only official in his administration blaming Iran. "Because I just don't know enough about it," Mr. Trump answered, asserting incorrectly that Iran might also have Tomahawk missiles but adding that he would accept the results of the inquiry into what happened.

Although most presidents might refrain from commenting or couch their statements while an investigation is underway, Mr. Trump has not hesitated to weigh in, and has not fully backed down even as evidence has mounted of U.S. culpability.

On Tuesday, Ms. Leavitt, the White House press secretary, reiterated that Mr. Trump would accept the findings of the investigation.

While the investigation into the school is not complete, the use of old data evoked the biggest misstep of the Kosovo war.

In 1999, old, outdated maps and poor tradecraft led the C.I.A. to provide erroneous targeting data to the military, resulting in an airstrike on the Chinese Embassy in Belgrade that killed three Chinese citizens. The C.I.A. wrongly assessed that the building was the headquarters of a Yugoslav arms agency.

"Database maintenance is one of the basic elements of our intelligence effort, but it is also one that has suffered in recent years as our work force has been spread thin," George J. Tenet, the C.I.A. director at the time, told a congressional committee in 1999.

Military planners assumed the intelligence agency had verified the site and ordered the strike.

**Julian E. Barnes** covers the U.S. intelligence agencies and international security matters for The Times. He has written about security issues for more than two decades.

**Eric Schmitt** is a national security correspondent for The Times. He has reported on U.S. military affairs and counterterrorism for more than three decades.

**Tyler Pager** is a White House correspondent for The Times, covering President Trump and his administration.

**Malachy Browne** is enterprise director of the Visual Investigations team at The Times. He was a member of teams awarded the Pulitzer Prize for International Reporting in 2020 and 2023.

**Helene Cooper** is a Pentagon correspondent for The Times. She was previously an editor, diplomatic correspondent and White House correspondent.

---

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: U.S. Is Responsible In School Strike, Early Review Says

# EXHIBIT 12

# *A Harrowing Race Against Time to Find a Downed U.S. Airman in Iran*

For the Iranians, the Air Force colonel whose fighter jet had been shot down was possible leverage. For the U.S. military, finding him was a moral imperative.

Listen · 9:17 min

   

**By Greg Jaffe, Helene Cooper, Eric Schmitt and Julian E. Barnes**

Reporting from Washington

April 5, 2026

See more of our coverage in your search results.

**Add The New York Times on Google ↗**

The two crew members ejected from their fighter jet just seconds after it was hit by Iranian fire. The F-15E Strike Eagle, the first fighter jet lost to enemy fire in the war, crashed violently to the ground.

The Air Force officers were deep in hostile territory on Friday morning, alone and armed only with pistols. The plane's pilot was in "constant communication" with his unit and rescued about six hours later by a force that included attack planes and helicopters that came under heavy fire, military officials said.

But the aircraft's weapons systems officer was missing. In the chaos of the ejection — a violent, lifesaving maneuver — he had become separated from the pilot, setting off a vast search that became the primary focus for the U.S. military troops and C.I.A. officers across the entire theater for two days.

This account of the weapons officer's fight for survival and rescue is based on interviews with about a dozen current and former military and administration officials, who spoke on the condition of anonymity to discuss the sensitive operation.

Surveillance planes and drones combed the area near where the plane had crashed but could not find the weapons officer or any signs that he was alive, a military official briefed on the rescue said.

The military described him as "status unknown," the official said.

On the ground in Iran, the downed officer's mission boiled down to two words: evasion and survival. Surrounded by potential enemies, he hiked up a 7,000-foot ridgeline and wedged himself into a crevice where he hoped he would be safe until American forces found him, U.S. military officials said.

U.S. Central Command was preparing a statement that the plane had gone down and the pilot had been rescued.

But just as they were about to release the statement — about 14 hours after the fighter jet was hit — U.S. officials got a lock on the weapons officer's location via a beacon he was carrying. Air Force fighter pilots and weapons officers are equipped with beacons and secure communications devices for coordinating with their rescuers. But they are trained not to signal their location constantly and to restrict use of the beacon, which can be spotted by the enemy, military officials said.

Central Command officials immediately scrapped the statement they were preparing to release. Defense Secretary Pete Hegseth called President Trump and told him that as long as there was a chance that they could find the weapons officer, they needed to keep information about the pilot's rescue secret.

Iran had launched several search parties, one of which had assembled at the base of the mountain where the weapons officer was hiding. For the Iranians, the downed Air Force colonel was a powerful asset they could use as leverage in high-stakes negotiations with the United States.

For the U.S. military, which lives by the mantra of “no man left behind,” finding the downed officer was a moral imperative.

Battered by the force from his ejection, the weapons officer waited. He knew that both U.S. and Iranian forces were racing to find him.

A military official described the weapons officer’s signaling as intermittent. The first task for the military was making sure that the person signaling was the weapons officer and not someone in Iran who had found his equipment.

At its campus in Langley, Va., the C.I.A. was developing a deception plan to buy the U.S. military and the airman some time. They spread word in Iran that the airman had been found and was being moved out of the country in a ground convoy. The hope was that the Iranians would shift their search from the place where the airman was thought to be and focus instead on the roads out of the region.

The C.I.A. operation appeared to cause confusion among the Iranian forces hunting for the airman, according to a senior administration official.

The Iranians, however, intensified their search, calling on the public via the state’s primary broadcaster to capture the “enemy’s pilot or pilots” and turn them over alive to security forces for a reward.

On Saturday morning, Mr. Trump was escalating his threats against Iran, vowing to blow up the country’s electrical infrastructure unless its leaders opened the Strait of Hormuz to all traffic. “Time is running out — 48 hours before all Hell will reign down on them,” Mr. Trump wrote on social media.

At that moment, U.S. military officials were in the final stages of preparing a vast and complex rescue mission that involved about 100 Special Operations forces, led by elements of SEAL Team 6, with Delta Force commandos and Army Rangers on standby if needed. A far larger conventional force made up of helicopters, surveillance planes, fighters and aerial tankers was readied to provide support.

A U.S. military official said it took hours to get the weapons officer's location and determine that it was him. Military officials were assisted by the C.I.A., which used a special piece of technology unique to the agency to locate the airman hiding in the mountain crevice and confirm his identity. U.S. and Israeli officials gathered intelligence to determine if the airman was alone, surrounded by Iranians or had been captured.

Once they determined the airman was alone, senior military officials waited until dark to launch a rescue mission. Special Operations helicopters, loaded with commandos, raced to the remote mountain site where he was waiting.

A senior U.S. official described the rescue mission as one of the most challenging and complex in the history of U.S. Special Operations. The commandos had to contend with the mountainous terrain, the Iranian forces that they assumed would rush to attack them and the injured airman's health, which remained uncertain.

As the commandos landed on the objective, U.S. and Israeli warplanes dropped bombs whose bright orange blasts lit up the silhouettes of the surrounding mountains. From his hiding place, the weapons officer alerted his rescuers to the areas they should target for strikes, where he could see Iranians advancing, one senior military official said. The commandos fired their weapons ferociously to keep any Iranians in the area from advancing toward them.

But they did not engage in a firefight with enemy forces. U.S. officials described the territory where the airman was hiding as strongly opposed to the Iranian regime and said it was unclear how close Iranian forces ever got to the site.

He was rushed to a helicopter that whisked him off to a sandy, austere airstrip inside Iran that Special Operations forces had previously developed for possible rescues or other contingencies.

The plan was to immediately load the airman and the rescue force onto two C-130 aircraft that were supposed to carry them out of danger to an airfield in Kuwait. But, in a final twist, the nose gear of at least one, and possibly both, of those planes got stuck in the sandy dirt at the airstrip, military officials said.

Hours passed. Efforts to free the stuck wheels failed, so the commandos called in three replacement aircraft.

Officials in the Pentagon and at Central Command waited anxiously. The success of a dangerous mission, which had seemed nearly complete, was suddenly once again uncertain.

Eventually the commandos and the injured weapons system operator were reloaded onto three newly arrived replacement aircraft. After the rescue team left, American warplanes bombed the two disabled planes and four MH-6 Special Operations helicopters rather than let them fall into Iranian hands.



An image shared by Iranian state television purporting to show U.S. aircraft destroyed during the mission to find a stranded airman in Iran. Social Media/UGC, via Reuters

As the sun was rising, the three planes launched in succession from the remote airstrip. The plane carrying the rescued airman went first followed by the others.

When word reached the White House that the aircraft had cleared Iranian airspace, Mr. Trump announced the mission's success.

"WE GOT HIM!," Mr. Trump exclaimed in a social media post a few minutes after midnight in Washington. "This brave Warrior was behind enemy lines in the treacherous mountains of Iran, being hunted down by our enemies, who were getting closer and closer by the hour."

The rescued officer had "sustained injuries," Mr. Trump wrote, but would be "just fine."

All of the commandos were safe and accounted for. There were no U.S. casualties.

The moment of celebration seemed to pass quickly for Mr. Trump, who on Easter Sunday morning returned to the reality of an unpopular war for which he seemed to have no clear exit strategy. The airman was safe, but the Strait of Hormuz was still in Iranian control, imperiling as much as 20 percent of the world's oil supply and the global economy.

Mr. Trump had tried bullying America's allies in Europe and Asia to come to his aid, but his entreaties were ignored.

So he threatened Iran's leaders in an angry and profane social media message.

"Tuesday will be Power Plant Day, and Bridge Day, all wrapped up in one, in Iran. There will be nothing like it!!!," Mr. Trump wrote. "Open the Fuckin' Strait, you crazy bastards, or you'll be living in Hell — JUST WATCH! Praise be to Allah. President DONALD J. TRUMP."

Ronen Bergman and Adam Rasgon contributed reporting.

**Greg Jaffe** covers the Pentagon and the U.S. military for The Times.

**Helene Cooper** is a Pentagon correspondent for The Times. She was previously an editor, diplomatic correspondent and White House correspondent.

**Eric Schmitt** is a national security correspondent for The Times. He has reported on U.S. military affairs and counterterrorism for more than three decades.

**Julian E. Barnes** covers the U.S. intelligence agencies and international security matters for The Times. He has written about security issues for more than two decades.

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: How U.S. Military, Racing The Clock, Saved An Airman

# EXHIBIT 13

# *Iran Could Retrieve Uranium at Site U.S. Bombed Last Year, Officials Say*

The fate of the highly enriched uranium and the options for securing it have become critical issues for the Trump administration.

Listen · 6:50 min







**By Julian E. Barnes, Tyler Pager, Christiaan Triebert, Eric Schmitt and Ronen Bergman**

The reporters have been covering the U.S.-Israel military campaign against Iran for months.

Published March 7, 2026 Updated March 19, 2026

See more of our coverage in your search results.

**Add The New York Times on Google ↗**

American intelligence agencies have determined that Iran or potentially another group could retrieve Iran's primary store of highly enriched uranium even though it was entombed under the country's nuclear site at Isfahan by U.S. strikes last year, according to multiple officials familiar with the classified reports.

Officials familiar with the intelligence said that Iran can now get to the uranium through a very narrow access point. It is unclear how quickly Iran could move the uranium, which is in gas form and stored in canisters.

U.S. officials have said that American spy agencies have constant surveillance of the Isfahan site and have a high degree of confidence they could detect — and react — to any attempt by the Iranian government or other groups to move it.

That stockpile of uranium would be a key building block if Iran decided to move toward making a nuclear weapon.

With Iran in chaos from the ongoing strikes by the United States and Israel, the fate of the uranium and the options for securing it have become critical issues for the Trump administration.

On Saturday, President Trump was asked by reporters on Air Force One if he would consider sending in ground forces to secure the highly enriched uranium.

"Right now we're just decimating them, but we haven't gone after it," he said. "But something we could do later on. We wouldn't do it now."

Prime Minister Benjamin Netanyahu of Israel said on Saturday that the decision to go to war with Iran was motivated, in part, by the Iranian government's decision to move its nuclear and missile projects so far underground that they would be "immune to any assault."

The United States chose not to try to retrieve the uranium last year after the 12-day war in which Iran's nuclear sites came under intense bombardment. Mr. Trump determined that doing so at that time would be too dangerous.

Any insertion of ground forces — presumably Special Operations commandos — would be highly risky. U.S. officials said that the air campaign against Iran would need to continue for days to further weaken Iranian defenses before any final decision on the viability of that type of raid.

The option to conduct a raid on nuclear sites was earlier reported by Semafor. The New York Times reported in January that Mr. Trump was considering inserting commando teams into Iran.

On Saturday, Mr. Trump alluded to the risks, suggesting that there was a need to wait to conduct such an operation. "I would say if we ever did that, they would be so decimated that they wouldn't be able to fight at the ground level," he said.