


President Trump speaking with reporters aboard Air Force One on Saturday. Tierney L. Cross/The New York Times

This article is based on interviews with U.S. officials and others familiar with intelligence assessments around Iran's nuclear stockpile. They spoke on the condition of anonymity because of the sensitive intelligence.

In recent weeks, beginning before the current military campaign began, U.S. officials have debated various options to secure the uranium or try to block Iran's access to it.

As his public comments demonstrated, Mr. Trump has made no decision on sending in the ground forces to secure the uranium, and is considering various options. A senior official said a commando raid was not part of the current plan for the Iran war.

It is also possible that the U.S. government is hoping that the overt threat of a ground operation may force Iran to give up its stockpile as part of a negotiation to end the war.

Iran has about 970 pounds of highly enriched uranium, the bulk of which is at Isfahan, according to American officials. The current stockpile has been enriched to 60 percent and would have to be further enriched to 90 percent to make a weapon. But that step is relatively easy if Iran's centrifuges are operational.

Elbridge Colby, the Pentagon's top policy official, was asked earlier this week how much government analysts were focused on the highly enriched uranium. He told a Council on Foreign Relations audience, "Without getting into any specifics, obviously we're always highly focused on that."

Ahead of the U.S. attacks last June, Iranian officials moved to protect the nuclear sites, pushing dirt into the entrances of underground facilities, including the tunnel network at Isfahan where the uranium was being kept.

When the United States launched the attacks, it used the largest weapon in its conventional arsenal, the Massive Ordnance Penetrator, to strike the underground facilities at Natanz and Fordo. But the U.S. military used Tomahawk cruise missiles to strike the base at Isfahan.

In addition to the uranium stockpile, Isfahan was home to Iran's test reactor and a facility where uranium gas would be transformed into a dense metal. That process, known as metallization, is a critical step in producing a nuclear weapon.

Soon after the strike, high-resolution spy satellites detected that Iran had moved excavation equipment to Isfahan, and had begun to access the underground tunnels, according to U.S. officials and others briefed on the intelligence.

The spy satellite images showed Iranians moving both the dirt they placed in the tunnel entrances and debris generated by the Tomahawk strikes, the people said.

An analysis of commercial satellite imagery by The New York Times's visual investigations team reached similar conclusions, finding evidence of digging in multiple areas of Isfahan.

At one location just north of the main facility, satellite photos show several pieces of excavating equipment moving earth. The images indicate that workers had excavated a pit, placed an unidentified object inside of it under a tarp, then buried it.

At another location northeast of the main facility, there was not much activity until last month, when satellite images showed what appeared to be a crane moving dirt into a truck.



Satellite imagery from Feb. 2 shows renewed earth-moving activity northeast of the Isfahan nuclear facility, an area that had been largely dormant. Heavy machinery, including an apparent excavator, can be seen loading dirt into a truck. Airbus

A large amount of earth moving was seen at several of the tunnel entrances in satellite imagery taken in February.

It is unclear whether the dirt was taken to a dumping site or moved to the tunnel entrances to protect them from future strikes.

Earlier this year, researchers at the Institute for Science and International Security also noticed increased activity on the road leading to the tunnel entrances. They suggested in a report that some tunnel entrances were being buried by soil as a

possible preparation for strikes, similar to Iran's activities ahead of the strikes last June.

Adam Sella contributed research.

***A correction was made on March 19, 2026****: An earlier version of this article included a graphic that showed earthmoving activity within the broader secured area that houses the Isfahan nuclear complex and labeled a nearby structure as a tunnel. It is unclear what the structure is, and whether it's related to the Isfahan nuclear program. That graphic, and a reference to it in the text, has been removed.*

---

When we learn of a mistake, we acknowledge it with a correction. If you spot an error, please let us know at corrections@nytimes.com. Learn more

**Julian E. Barnes** covers the U.S. intelligence agencies and international security matters for The Times. He has written about security issues for more than two decades.

**Tyler Pager** is a White House correspondent for The Times, covering President Trump and his administration.

**Christiaan Triebert** is a Times reporter working on the Visual Investigations team, a group that combines traditional reporting with digital sleuthing and analysis of visual evidence to verify and source facts from around the world.

**Eric Schmitt** is a national security correspondent for The Times. He has reported on U.S. military affairs and counterterrorism for more than three decades.

**Ronen Bergman** is a staff writer for The New York Times Magazine, based in Tel Aviv.

---

A version of this article appears in print on , Section A, Page 7 of the New York edition with the headline: Iran Could Retrieve Uranium at Site U.S. Struck Last Year, Officials Say

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE NEW YORK TIMES COMPANY, *et al.*<br>*Plaintiffs*,<br>v.<br>DEPARTMENT OF DEFENSE, *et al.*,<br>*Defendants*. | Civil Case No. 26-cv-01690-PLF |

**DECLARATION OF JULIAN E. BARNES**

I, Julian E. Barnes, hereby declare as follows:

1. I am over the age of 18 and make this declaration based upon my personal knowledge and experience. If called to do so, I could and would competently testify to these matters under oath.

2. I am a national security reporter with The New York Times ("The Times") and a plaintiff in the above-captioned case. I make this declaration in support of Plaintiffs' Motion for a Preliminary Injunction. This Declaration includes information that I previously attested to in multiple previous declarations filed in Case No. 25-cv-4218, at ECF Nos. 10-3, 44-1, 45, and 48-2.

***My career as a reporter.***

3. I have worked for The Times since June 2018. I reside in the District of Columbia and am assigned to The Times' Washington Bureau.

4. My work for The Times focuses on the Pentagon, United States intelligences agencies, and international security, among other subjects. I am one of seven Times reporters who held a Pentagon Facility Alternate Credential ("PFAC") issued by the Department of Defense (the

"Department") as recently as summer or fall 2025. I was issued a new PFAC by the Department on or around March 24, 2026.

5. Before I joined The Times, I covered the Pentagon for other news organizations including U.S. News and World Report, the Los Angeles Times, and The Wall Street Journal.

***My access to the Pentagon.***

6. I first obtained a PFAC in 2004, when I worked for U.S. News and World Report. I held a PFAC continuously from 2004 until August 2025 with the exception of a period of approximately 18 months in 2016 and 2017 when I did not regularly access the Pentagon because I was based in Brussels, Belgium. After I joined The Times in June 2018, I held a PFAC continuously until August 2025.

7. When I first obtained a PFAC, I was required to renew it every few months. After my initial renewals, I was required to renew it only annually. In my experience, this was typical of reporters who held PFACs: As long as you had been a continuous PFAC holder for an extended period of time, you would renew on an annual basis. At no point before August 2025 was my PFAC ever denied, suspended, revoked, or not renewed. I am also not aware of any incident involving me or any other PFAC holder that occurred during my time covering the Pentagon that placed, or was asserted to have placed, the safety or security of Department personnel or property at risk.

8. Between 2004 and 2025, I regularly accessed the Pentagon in the course of my work as a national security and intelligence reporter. As a reporter, there are myriad benefits to being at the Pentagon. Being onsite at the Pentagon enabled me to attend press briefings held at the Pentagon—which are often held on short notice and sometimes announced less than an hour before they occur. I also sometimes met with intelligence officials at the Pentagon for background

briefings or off-the-record discussions related to topics I was covering. I attended hundreds of press briefings at the Pentagon and had countless discussions at the Pentagon with Department employees and officials.

9. I also could and would regularly visit the Public Affairs offices of the United States military branches, which are housed at the Pentagon, to converse with Public Affairs staff and ask questions about United States military operations, the Department, or other topics pertinent to my reporting. There are numerous Public Affairs Offices within the Pentagon. Among others, the Department of Defense, Joint Staff, Army, Navy, Air Force, and Marine Corps each have their own Public Affairs Office within the Pentagon, each of which is staffed by separate Public Affairs officials whose job is to liaise with the media. In addition, military intelligence agencies and combatant commands sometimes have public affairs officers within their Pentagon liaison offices. Many of the most helpful conversations with Public Affairs staff cannot be planned or scheduled in advance: Those conversations may vary depending on which staff are present or available to speak, what the latest news is, or what information was shared in an immediately preceding conversation. In my experience, reporting from the Pentagon often necessitated speaking to upwards of a dozen officials and other personnel from different press offices in a given day, sometimes in response to rapidly developing events.

10. I think there is a common misperception that access to the Pentagon necessarily means access to secure areas or places where classified or other sensitive information is discussed. To the contrary, the Pentagon is a large building that includes areas that resemble a mall and are often crowded with visitors and non-military employees. For example, there is a food court, a pharmacy, a sit-down restaurant, a bank, a dry cleaner, and a chocolate shop in the Pentagon. Parts of the Pentagon feature displays of historical information of potential interest to tourists and

members of the general public, and tour groups are common. In my experience, Department officials are not discussing classified matters in corridors or similarly unsecure locations in the building. A reporter's mere presence in the building is therefore unlikely to give that reporter access to inadvertent disclosures of classified or sensitive information

11. Being at the Pentagon and, in particular, the ability to have face-to-face conversations with Pentagon officials and staff, has been integral to my reporting about the Department, national security, and United States intelligence agencies.

12. In my view, the longstanding tradition of press access to the Pentagon and to its personnel has helped provide the American public with a more in-depth, nuanced understanding of the United States military that has been beneficial to the press, the public, and to the Pentagon itself. I think that the American public has greater respect for the military because Pentagon leadership has in the past fostered a culture of permitting and even facilitating press access, which has led to a better understanding of military operations among the public.

***The Department's October 2025 policy leads to the loss of my PFAC.***

13. In May 2025, the Department announced new restrictions on reporters' physical access to certain parts of the Pentagon. As a result of those restrictions, even with my PFAC, I was no longer able to access spaces within the Pentagon that I had previously accessed routinely for years. Even with those new restrictions on physical access, however, I continued to report regularly from the Pentagon because it significantly benefitted my reporting to be in the building—both in order to cover formal proceedings, like press conferences, and to converse with Department personnel.

14. In or around August 2025, I learned that Department leadership was preparing to issue additional new restrictions relating to the press and, specifically, new rules relating to

reporters' PFACs. I found this deeply concerning. In particular, I was concerned that under those new rules, the Department and its leadership would have free rein to suspend or revoke PFACs on the basis of what journalists and news organizations reported, and that if they disliked something I had written for The Times, they would find a basis to suspend or revoke my PFAC.

15. As I explained in a prior declaration, *see* Case No. 25-cv-4218, at ECF No. 10-3, my PFAC lapsed on August 31, 2025. I decided not to renew it at that time because I was concerned about the new rules that I understood were going to be put in place by the Department. The Department announced a new PFAC policy in September 2025, and then an updated policy in October 2025, that confirmed my concerns: The new policy gave Department officials broad discretion to suspend or revoke reporters' PFACs (or to refuse to renew or issue PFACs) if it did not approve of information that a reporter had "solicited," obtained, attempted to obtain, or published. In October 2025, the Department revoked the PFACs of all reporters who did not agree to sign an "Acknowledgment" attesting that they "underst[ood]" the new policy. I gave my lapsed PFAC to my colleague at The Times, John Ismay, who handed in my PFAC, along with his, to the Department on October 15, 2025. All of the reporters at The Times who held PFACs turned them in on October 15, 2025.

***The Department reissues my PFAC but imposes an onerous new "escort" requirement.***

16. On March 20, 2026, I learned that the district court had granted Plaintiffs' Motion for Summary Judgment and ordered the Department to reinstate the PFACs previously held by me and my colleagues at The Times. I was enthusiastic about the prospect of regaining access to the Pentagon, which is extremely valuable to my work as a reporter. I immediately sent an email to the Pentagon Press Office inquiring about how to pick up my reinstated PFAC so that I could

access the Pentagon on the next business day, Monday, March 23. Lawyers for The Times also sent inquiries asking how reporters from The Times could obtain their reinstated PFACs.

17. I received an email from the Pentagon saying I could pick up my PFAC on Tuesday, March 24**,** between 6:00 am and 6:00 pm Eastern time from the Pentagon Press Office. When I arrived around 8:00 am on Tuesday, March 24, a Pentagon public affairs officer told me that despite the email I received they could not give me a pass. Instead, there was a set time between noon and 3:00 pm that the badge office would issue Times reporters new PFACs. The public affairs officer told me this information was supposed to have been included in another email but had inadvertently been omitted. I left and returned to the Pentagon visitor center at approximately 1:00 pm. I was escorted to the badge office where four other Times reporters were waiting to obtain their PFACs. That same afternoon, I was notified by a public affairs officer that the Department of Defense ("Department") had issued a revised "interim" policy (the "Interim Policy") governing PFACs and reporters' access to the Pentagon. When I arrived at the Pentagon visitor center I was handed a copy of the Interim Policy.

18. After my colleagues and I arrived at the badge office, we were given PFACs by Press Office staff. The new PFACs were different from the ones we had previously held. The Pentagon Press Office staff explained that, pursuant to the Interim Policy, the cards they were issuing to us would no longer give us access to the Pentagon: While our previous PFACs, once scanned, had enabled us to enter through the turnstiles at the Pentagon entrance, we were told that the new PFACs that were issued to us on March 24, 2026 did not.

19. The Pentagon Press Office staff also told me and my colleagues from The Times that we, along with all other reporters, would no longer be allowed into the Pentagon without an escort from the Department, and that an escort would be provided only for pre-arranged interviews,

press conferences, or other specified types of events. We were also told that we would need to submit a request to attend such events at least one day in advance in order to obtain an escort, and that the request would need to be approved by the Department's Office of Public Affairs.

20. The Pentagon Press Office staff also explained to me and my colleagues from The Times that our PFACs would enable us to access a new press area located in the Pentagon library, which is on the Pentagon grounds but in a separate building. My colleagues and I asked how we could access the library because, to our knowledge, the only way to access it on foot is through a corridor that we were told we could no longer walk through. The Pentagon Press Office staff indicated that they were unsure how we could access the library. They suggested we could use a Pentagon shuttle bus but, as we pointed out, PFAC holders did not have permission to ride on the shuttle bus. Ultimately, the Pentagon Press Office staff told us we needed to come back the next day for further instructions on how to access the library. We were later told that PFAC holders would be given permission to ride on the shuttle bus.

21. It was readily apparent to me that the Pentagon Press Office was unprepared for the changes effectuated by the Interim Policy. It was clear to me that these new rules had been implemented hastily and in response to the Court's March 20, 2026 ruling that required reinstatement of our PFACs.

22. The Interim Policy states that the Correspondents' Corridor—the area in the Pentagon where reporters used to work—is closed effective immediately. Within days of the Interim Policy's announcement, I saw what I understand to be a photograph of the entrance to the Correspondents' Corridor which shows that the old signage, which said "Correspondents' Corridor," has been torn down.

23. For more than 20 years, I have regularly accessed the Pentagon in the course of my work as a reporter. To my knowledge, this is the first time that the Department has ever barred reporters with PFACs from entering the Pentagon without an escort, a reservation, or an invitation to a specific press conference or event. No longer being able to access the Public Affairs Offices in the main Pentagon building is particularly frustrating for me. Before the Department implemented new PFAC rules and restrictions, the staff of these various Public Affairs Offices were frequent sources of information for my reporting. Those are individuals who are expressly authorized to talk to the press. In fact, it is in their job description.

24. To the best of my knowledge, the Department of Defense does not have a team of escorts who are readily available to facilitate reporters' access to the Pentagon. In my experience, a reporter with a credential must request an interview or meeting with a particular official or Public Affairs Office that he or she wishes to visit and, if that interview or meeting is granted, he or she will be provided an escort for that specific interview or meeting. As a practical matter, this means that each separate conversation requires a separate appointment: If I wanted to speak with the Public Affairs staff for the Air Force, for example, then I would need to make an appointment and pre-arrange an escort from that office; if I then wanted to speak to someone from the Joint Staff, I would need to leave the Pentagon (or return to the Library) and make a new appointment in order to obtain a separate escort from *that* office. This is time-consuming and burdensome, and it has substantially reduced my amount of interaction with staff from the Public Affairs Offices.

25. The escort requirement has made it exceedingly challenging to speak with press officials and other personnel in person, and to otherwise cover the Department and the U.S. military from Pentagon grounds.

26. For example, I submitted a request on March 27, 2026 to interview a Department official. Three days later, on March 30, I was notified that the Department had approved my interview request for the following day, March 31. The press officer later requested that interview be on background—meaning the official would not be on the record. The interview was set for 12:45 p.m., but the press officer recommended I arrive at 12:15 p.m. to navigate security. The press officer entered the information for the visit into the Pentagon system, and I received an automatic confirmation. When I arrived at the Pentagon at 12:10 p.m. on March 31 and showed my driver's license and PFAC to the attendant at the Visitor Center security area, he advised me that anyone with a PFAC could only enter through corridor 8—despite the fact that I had arranged for the escort to meet me in the visitor center. The interview was eventually postponed, and I was immediately escorted out of the building.

27. I have only visited the Pentagon one other time since March 23, 2026, when I pre-arranged a background interview with a Department official. I was escorted into the Pentagon by a staff member from the relevant office. When the interview concluded, I was escorted out of the building. I had no opportunity to visit any of the Public Affairs Offices located at the Pentagon or to converse with anyone other than my escort and the specific person I had arranged to interview.

28. Colleagues of mine from The Times, including Greg Jaffe and Helene Cooper, have attended press conferences at the Pentagon since they obtained their reinstated PFACs. I understand they have been required to arrive at least an hour early and to wear wristbands—in addition to the two other identification cards they were already required to wear within the Pentagon—and that their wristbands have been checked repeatedly throughout the scheduled events. This process is the same as the process that was in place for reporters that did not hold a PFAC before the district court issued its March 20, 2026 order. I also understand that, on at least

one occasion, reporters from The Times were told that they could not use the bathrooms without being accompanied by an escort because it would present a security risk.

29. These experiences have confirmed my view that the escort requirement is burdensome and impractical. Going through a sometimes-lengthy process of scheduling official appointments in order to ask even one or two questions to an official—even assuming that request is granted and that official does not have to reschedule—does not allow for meaningful engagement with Department personnel on a timeline consistent with news reporting. While I used to be able to walk from press office to press office throughout the day, I now would have to return to the library, call or email for an appointment, and wait for a response and approval, and for arrangement for and arrival of an escort. That means I will be spending hours of my day just waiting and walking back and forth—assuming I can get ahold of press offices and individuals and arrange interviews and be approved for an escort at all. That process will dramatically interfere with my ability to meaningfully engage with anyone from the Department on Pentagon grounds, or to obtain the information necessary to inform the public in a timely manner.

30. It also seems to me that the Interim Policy serves no discernible purpose. Neither I nor my colleagues pose any risk to the safety or security of the Pentagon. And to the extent that the purpose of the Interim Policy is to prevent the disclosure of classified or sensitive information, I do not understand how it will accomplish that goal. The areas of the Pentagon that journalists were previously able to access unescorted were not areas in which classified or sensitive information is discussed.

31. In my view, the escort requirement imposed by the Interim Policy makes the reinstated PFACs that were issued to me and my colleagues essentially worthless. All reporters, whether or not they hold a PFAC, can access the Pentagon if they obtain pre-approval to attend a

specific press conference, event, or for a pre-arranged interview. The point of a PFAC is to give journalists who regularly cover the Department, the United States military, and national security the ability to regularly work from the Pentagon. Under the Interim Policy, that is no longer the case. And, as a result of it, I rarely go to the Pentagon at all anymore.

32. Because of the Interim Policy's unnecessary and burdensome escort requirement, I and other reporters whose job it is to provide independent and probing coverage of the Pentagon and the United States military are being prevented from engaging in routine, lawful newsgathering and reporting onsite. That requirement is thus causing significant harm to reporters like me who cover national security and the Pentagon, to news organizations like The Times, and to the American public.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20 day of May 2026 in Washington, D.C.

Julian E. Barnes

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

THE NEW YORK TIMES COMPANY, *et al.*,

*Plaintiffs*,

v.

DEPARTMENT OF DEFENSE, *et al.*,

*Defendants*.

Civil Case No. 26-cv-01690

**DECLARATION OF ROBERT BURNS**

**DECLARATION OF ROBERT BURNS**

I, Robert Burns, hereby declare as follows:

1. I am over the age of 18 and make this declaration based upon my personal knowledge and experience. If called to do so, I could and would competently testify to these matters under oath.

***My career as a Pentagon reporter.***

2. I retired from The Associated Press ("AP") in May 2022 after 45 years as a reporter. I served as President of the Pentagon Press Association ("PPA") from 2012 until my retirement in 2022. Over the more than four decades I worked as a journalist, I spent more than thirty years covering national security and the Department of Defense (the "Department"). In 2013, I won the AP Gramling Journalism Award, the AP's highest honor, for my reporting on topics including the high rate of military suicides, attacks on U.S. troops by Afghan allies, and dysfunction in the Pentagon office charged with collecting the remains of wartime MIAs.

3. I first began reporting from the Pentagon in 1990 when the AP assigned me to cover the implications of the fall of the Berlin Wall. Thereafter, I reported broadly on national security matters, including assignments covering the White House and U.S. intelligence agencies. In 1999,

I became the AP's full-time Pentagon correspondent. I covered the Pentagon during multiple administrations spanning at least ten Secretaries of Defense.

4. I reported from the Pentagon frequently over the course of my career. I attended innumerable press briefings, background sessions, briefings specific to certain branches of services within the military, informal gatherings, and other engagements with civilian employees of the Department and military officials on Pentagon grounds.

***Reporters' access to and physical presence in the Pentagon.***

5. When I began covering the Pentagon in 1990, AP maintained a small workspace in the Pentagon press room that I understood journalists had used since the building's early years. After the September 11, 2001 terrorist attack and the Pentagon's renovation, the press area was relocated, but the basic arrangement remained the same: the Department provided the physical workspace and news organizations supplied their own materials and communications equipment.

6. In the immediate wake of the September 11, 2001 terrorist attack, the AP had three reporters at the Pentagon around the clock. Over time, that was reduced to two.

7. Reporting on-site at the Pentagon typically gave me and other reporters different types of opportunities to interact with government officials, including formal press briefings, whether regular or *ad hoc*. During these briefings, representatives from the Department or specific branches of the armed services would provide information and updates to the reporters who were present and would typically take questions. At times, these press briefings were led by the Secretary of Defense. At other times, they were led by senior press officials or leaders from different parts of the Department or branches of the military. These appearances routinely provided detail and nuance beyond what was included in statements issued to the public or press more broadly.

8. While beneficial, these briefings had some practical limitations: time for questions was limited, only a portion of substantive topics could be addressed, and questioning of senior officials often produced incomplete information that required follow-up. Accordingly, I and other reporters routinely engaged in additional and follow-up conversations immediately before or after briefings with senior officials or their aides. These conversations—sometimes on the record, sometimes on background, and sometimes off the record—in my experience were an essential part of obtaining the detail and clarity necessary to report accurately on defense policy and operations.

9. Reporting on-site at the Pentagon also gave me access to short-notice and no-notice briefings. Secretaries of Defense occasionally convened news conferences with little advance warning, sometimes to announce personnel decisions or respond to unfolding events. Certain Secretaries of Defense, including Secretary Robert Gates, at times provided very short notice—sometimes only an hour or two—before holding a significant press conference. Reporters who were not already in the building could miss these opportunities entirely. Physical presence in the building was essential to covering news in real time.

10. Reporting from the Pentagon also gave me an opportunity for semi-formal interactions with Department officials, including service-specific (*e.g.*, Army or Navy) background briefings, structured meetings outside the press room, and the like. For example, Secretary Donald Rumsfeld would invite reporters into his office on weekend mornings for wide-ranging, off-the-record discussions. For those kinds of discussions, being physically present in the building was the only way to attend and to know what transpired.

11. Finally, physical presence at the Pentagon also enabled informal interactions. Over time, reporters built professional relationships with mid-ranking and senior officials and could occasionally obtain helpful context or an understanding or sense of developing issues. On occasion,

for example, trusted officials would indicate that a reporter "might want to stay a little late today," signaling that significant news might emerge. Such cues did not convey sensitive information, but they reflected long-established professional trust. These sorts of informal interactions proved invaluable to me and other reporters, press outlets, and the Department, by ensuring news was timely reported with appropriate precision and nuance.

12. Physical presence also provided intangible situational awareness. Activity within the building—the tone of conversations, movements of personnel, or general atmosphere—often indicated that something significant was occurring before it was publicly announced. After the 2000 attack on a U.S. Navy ship, for example, I sensed the seriousness of the situation immediately upon entering the Pentagon. Remote reporting could not have provided me with that context or allowed me to prepare to report on unfolding events in the same manner.

13. In all, years of reporting from the Pentagon showed me that access for credentialed journalists to the building's unclassified areas is an essential part of keeping the American public informed. To require that journalists be accompanied by a government minder would severely damage their ability to do independent reporting. In my judgment, it would effectively be the same as banning reporters from the building because it would stifle, if not prohibit, the free interaction between reporters and officials that is essential to journalism in a democracy.

14. In addition, the idea that the Pentagon is an all-classified military command post is mistaken. It is the headquarters of a civilian-led government agency, the Department of Defense, with well-known security boundaries that in my experience have always been scrupulously respected by journalists. Across my decades in the Pentagon, reporters, including myself, respected physical and professional boundaries within the building. For example, the National Military Command Center and most of the Joint Chiefs area were off limits, and reporters did not

enter offices without invitation. These longstanding rules were in my long experience at the Pentagon and as President of the PPA consistently adhered to. I never observed or heard of a reporter attempting to enter a restricted area improperly.

15. Well-settled professional norms also governed reporter conduct within the Pentagon. For example, reporters wore Pentagon Facilities Alternate Credentials or, as they are more colloquially known, press badges. If at any time a reporter's press badge was not visible, the Pentagon's internal police force would remind the reporter to display it. These reminders were cordial, and reporters followed them without issue.

***The Pentagon credentialing process.***

16. Throughout my time at the Pentagon, the credentialing process for Pentagon reporters was straightforward and, as I recall, consistent. Because the process was never an issue of concern or contention, it is difficult to recall its exact metes and bounds over my more than thirty years covering the Pentagon. That said, my recollection is that the process generally required reporters to provide a letter confirming their employment and assignment and to undergo standard background checks. Later—in or around the 2000s—the Department asked reporters to sign a one-page form that set forth some basic, noncontroversial information and building security requirements relating to PFACs. That form stated, for example, that PFACs "must be visible and worn above the waist at all times while in the Pentagon" and that "[l]ost PFACs should be immediately reported to the Public Affairs Operations." After September 11, 2001, certain security offices were reorganized, but these changes did not materially affect credentialing for journalists.

17. As President of the PPA, I expect that I would have been aware of any credentialing issues affecting reporters or news organizations. I am not aware of any instance in which a qualified Pentagon reporter's credential was denied, suspended, revoked, or not renewed based on

any security or safety issue. I am also not aware of any instance in which a qualified Pentagon reporter's credential was denied, suspended, revoked, or not renewed based on the content of their reporting. That is true even of reporting that was critical of Department or other government officials or pertained to the disclosure of sensitive, secret, or confidential information. To the best of my knowledge and recollection, credentials were revoked only when a reporter was no longer actively reporting from the Pentagon.

18. During my tenure reporting from the Pentagon, I published a number of stories that were sensitive or could be seen as critical of the Department. For example, in the mid-2010s, I published a series of articles about systemic problems in the Air Force's nuclear missile enterprise, including inspection failures, morale issues, training deficiencies, and misconduct. Although that reporting covered extraordinarily sensitive issues and was, at least initially, unwelcome by some officials, I never experienced any threats—direct or indirect—to my credential or access to the Pentagon, and I never perceived any risk that my reporting would trigger retaliation. In fact, the Department later undertook reviews and instituted reforms to address issues identified in my reporting.

***The Department's new access policy will damage the public's interest.***

19. As with the original policy, I have grave concerns about the Department's latest policy and what it portends for national defense coverage, the Department, and the American public. Although I am confident that reporters covering the Department will continue working to uncover and report on important stories to the best of their abilities whether or not physically present at the Pentagon, I also know based on my own experience that the restriction or elimination of meaningful press access to the Pentagon—which the new policy appears designed to accomplish—harms the American public. It results in reporters with different areas of focus and

varied experience being unable to ask timely follow-up questions, attend short-notice briefings, and engage in the informal and semi-formal interactions that have long provided important context.

20. It is also likely that reporting on issues of importance that might otherwise be ignored will be curtailed or eliminated as a consequence of the new policy. For example, when I was covering the Pentagon, I spent an unusual amount of time reporting on how to recover remains of missing service members. It was a significant issue to service members' families, though not necessarily a subject of Department press announcements. But being in the building without extremely burdensome limitations allowed me to have in-depth conversations with individuals responsible for this work and to learn the details and nuances of this and other topics. In short, effectively excluding a wide range of Defense-beat reporters from the Pentagon or limiting their access will cause their reporting on the Department to lose the depth, scope, and accuracy that comes from observing events as they unfold and speaking directly with officials.

21. The public will also lose out. The Department of Defense is the largest federal agency, responsible for global operations, substantial public expenditures, and a wide range of military, personnel, and policy decisions. Understanding the scope of the Department's activity requires sustained interaction with the officials who carry out this work—sustained interactions that will be inhibited if not completely eliminated by the escort requirement. With all experienced Pentagon reporters subject to those restrictions, both the sort of institutional knowledge and the coincident relationships they have are at risk of being lost. If that occurs, reporting will be considerably impoverished to the detriment of the public. Simply reiterating official statements amounts to little more than stenography and leaves the public less safe and secure and with a narrower and less textured understanding of critical issues and events.

22. During my career, officials expressed to me on a number of occasions that interactions with reporters across a variety of news organizations helped them understand what issues were receiving attention and why. In other words, it served as a kind of intelligence-gathering tool for the Department. In addition, regular formal and informal interactions allowed the Department to clarify misunderstandings, provide additional context, better anticipate how policy decisions might be interpreted publicly, and help ensure its own voice was heard. These exchanges—after briefings, through periodic background discussions, and so forth—were an important part of how the Department kept its finger on the pulse of reporting and shaped its communications to all cross sections of the American public. The escort requirement is almost certain to eliminate these types of interactions.

23. Reporting made possible by physical access to the Pentagon also helped identify structural and personnel issues that the Department was prompted to address and improve. For example, my reporting on issues within the Air Force's nuclear missile enterprise, although perhaps unwelcome by Department leadership at the time, contributed to the Department's decision to undertake broad reviews and ultimately to reform. Along similar lines, during my travels with Secretaries of Defense to military bases, servicemembers would sometimes approach me or other reporters to express appreciation for our work. There are many other such examples, all of which underscore that sustained, informed, and sometimes critical press coverage can illuminate problems and support improvements in readiness, morale, and policy.

24. In sum, the longstanding press access structure at the Pentagon has benefitted reporters, the Department, and the public. The escort policy makes accurate reporting more difficult, makes America less informed and less safe—particularly in times of crisis—and ultimately harms both the Department and the American public whom the Department serves.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20th day of May 2026 in Reston, Virginia

[signature]

Robert Burns

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE NEW YORK TIMES COMPANY, *et al.*,<br>*Plaintiffs*,<br>v.<br>DEPARTMENT OF DEFENSE, *et al.*,<br>*Defendants*. | Civil Case No. 26-cv-01690<br><br>**DECLARATION OF CHRIS MEAGHER** |

**DECLARATION OF CHRIS MEAGHER**

I, Chris Meagher, hereby declare as follows:

1. I am over 18 years of age and I make this declaration based upon my own personal knowledge. If called to do so, I could and would competently testify to these matters under oath.

***My professional background.***

2. I am a communications professional with more than a decade of experience managing communications and press relations in both the public and private sectors. For several years prior to that, I also worked as a reporter.

3. I served as the Assistant to the Secretary of Defense for Public Affairs from September 2022 until January 2025. In that role, I oversaw communications for the Office of the Secretary of Defense, including public information, internal information, community relations, and press operations. Prior to becoming Assistant to the Secretary of Defense for Public Affairs, I served as a Deputy Press Secretary at the White House and as Deputy Director for Public Affairs at the Department of Transportation, among other roles.

4. In my experience as Deputy Press Secretary at the White House, reporters with hard passes had regular, unescorted access to press areas, corridors, and other designated areas within

the White House. To my knowledge, during my time at the White House, there was never any safety or security issue that arose from credentialed reporters having that unescorted access.

***My experience as Assistant to the Secretary of Defense for Public Affairs.***

5. During my time as Assistant to the Secretary of Defense for Public Affairs, I interacted with reporters who held Pentagon Facilities Alternative Credentials ("PFACs") on a daily basis, and often multiple times a day. To obtain a PFAC, a reporter would have to apply and undergo a standard background check for security purposes. During my time at the Department, other non-governmental employees who worked in the Pentagon—including, for example, people who worked at the CVS inside the building, or at one of the restaurants at the food hall located in the Pentagon—also had PFACs and, as a result, had unescorted access to the exact same spaces that journalists with PFACs had unescorted access to.

6. Reporters with PFACs would frequently stop by the office where I worked to talk with me and with the Defense Department's Press Secretary and Deputy Press Secretary, who both sat in the same suite of offices dedicated to the Public Affairs as I did, in what is known as the E-Ring of the Pentagon. The press briefing room, where we typically held press briefings every Tuesday and Thursday, was directly across the hallway from my office. The Defense Department's press operations team also had offices nearby, where we held an additional off-camera press briefing every Monday, and where reporters would frequently stop in to ask the press officers questions. In the same vicinity, there was a designated area where reporters had offices, sat, and worked. I frequently encountered and interacted with reporters in these areas, as well as in the hallways.

7. There are many people who work at the Pentagon whose primary job responsibilities include speaking with the press. During my time with the Defense Department,

they included the Press Secretary and Deputy Press Secretary, as well as a team of approximately twenty press operations personnel, each of whom was focused on a specific topical subjects such as Personnel and Readiness or Acquisition and Sustainment; or geographical regions, such as Europe and the Indo-Pacific, for example. Reporters would visit the desks of different press operations officers, depending on what questions the reporters had or the topics they wanted to discuss. For example, a reporter with questions about the war in Ukraine might visit the desks of press operations staff who made up the European Command team.

8. Each of the armed services, including the Army, Navy, Air Force, Marine Corps, along with the Joint Staff, also had their own communications and public affairs teams, with their own offices and staff. These offices and staff were located throughout the Pentagon building, including in different wings and on different floors from where my office was located, and from where reporters had office space. Reporters frequently visited these public affairs offices as part of their work—and doing so required that they be able to move through hallways in the Pentagon unescorted.

9. Throughout my time working for the Defense Department, reporters with PFACs always had unescorted access to the Pentagon. Of course, that meant they still had to enter and exit through the same security as everyone else to enter the building, and it does not mean they were able to access private offices or secure locations where sensitive or classified information was kept, viewed, or discussed. In my experience, that kind of information was kept, viewed, or discussed only in rooms called "Sensitive Compartmented Information Facilities," or "SCIFs," that had special information security protocols and required special access. For example, my office was a SCIF, which meant that reporters could not simply walk in at their leisure. They had to leave their phones outside the door and could come in only if I granted them entry, and I would do so

only after ensuring that no sensitive or classified information was visible or accessible. Similarly, on occasions when we would invite press into the office of the Secretary of Defense, we would take precautions before any reporters entered to ensure that no sensitive or classified information was visible or accessible.

10. Reporters were clear which areas of the Pentagon they could access and which they could not, and they respected those boundaries. Furthermore, they could not access sensitive or classified spaces without being allowed entry. I cannot recall ever being aware of an incident where a reporter entered an office or secure area that they were not permitted or invited to enter.

11. I found it very beneficial to have reporters working in the Pentagon. In my experience, it was helpful to be able to assemble reporters quickly for impromptu press briefings, particularly in response to breaking news. For example, in early 2023 there was an incident in which high-altitude balloons, widely reported to potentially be originating from China, were shot down over U.S. airspace. We quickly assembled the reporters who were already in the building and provided them with an update at a press briefing. That enabled us to disseminate accurate, relevant information quickly and efficiently to a broad swath of reporters—and to the American public.

12. I also found regular, informal interactions between Defense Department staff and reporters to be mutually beneficial. It was useful for my staff and I to hear what questions reporters had and what topics they were interested in, and to get a sense of what stories they were in the process of reporting. Those conversations enabled my staff and I to help correct any misunderstandings early in the reporting process and anticipate stories that might be controversial for the Department. In-person interactions also allowed us to build relationships with reporters that were built on trust and rapport. This was important because it helped give reporters confidence

that the information we were providing was accurate and gave them opportunities to confirm and verify the accuracy of that information. Building that kind of trust would be more difficult, if not impossible, without regular, face-to-face interaction.

13. In my experience, the Department of Defense was (and, presumably, still is) constantly competing with misinformation propagated by foreign adversaries, particularly with regard to overseas conflicts. When credentialed reporters like The New York Times, among others, have a regular presence in the Pentagon, it helps the Department effectively counter misinformation and prevent it from spreading. For example, there was one instance in which our team learned that a reporter was incorrectly attributing an overseas strike to the United States based on misinformation. My colleague was able to run down the hallway, find that reporter, and provide the reporter with accurate information so that they would not report incorrect information to the public. We would not have been able to do that so quickly and effectively if the reporter had not been working in the Pentagon.

14. I am not aware of any safety or security incident at the Pentagon caused by a credentialed journalist having unescorted access to the building. In my experience, when reporters did obtain sensitive information in the course of their reporting, it was not because they happened to be in the building. Also, when reporters obtained such information, in my experience, they treated it with the utmost seriousness, engaged with us, and were willing to listen to any concerns we may have had about national security or risks to American servicemembers, and sometimes held off on reporting stories or certain portions of stories as a result of those conversations.

15. Many of the reporters who report on the Defense Department, U.S. military, and national security are former servicemembers themselves, have family members who are servicemembers, or have previously reported from active war zones, which gives them a

heightened appreciation for what our servicemembers do, the dangers that they face, and the potential life and death impact that releasing classified information into the public domain could have. I consistently found that the reporters who worked at the Pentagon had the utmost respect for the U.S. military and its servicemembers and that they made every effort to do their jobs in a way that would not create any safety or security concerns.

16. In my opinion, the Department of Defense has a responsibility to the American people to ensure that a broad and diverse array of reporters have access to accurate, real-time information about the Department and U.S. military operations. An enormous percentage of the American public's tax dollars are dedicated to the Department of Defense, and every single day leaders at the Department make decisions about whether, when, and how to put servicemembers' lives at risk. The public has a right to know how its money is being spent and how those decisions are being made. For that reason, I believe that the Department of Defense has an obligation to be as transparent as possible with the American public. Regular, unescorted access to the Pentagon for credentialed members of the press is an important means of effectuating and protecting those principles, and it can be done without sacrificing safety or security.

***The Department's Interim Policy***

17. I am familiar with the Interim Policy regarding PFACs and reporters' access to the Pentagon that the Department of Defense put in place in March 2026. As I understand that policy, it prohibits reporters with PFACs from accessing the main Pentagon building unless they first make an appointment to speak with a specific official or attend a specific event, obtain approval, and obtain an escort who will accompany them at all times while they are in the building. This is a dramatic departure from the way things worked when I was Assistant to the Secretary of Defense for Public Affairs.

18. The escort requirement under the Interim Policy strikes me as a cumbersome, inefficient, wasteful use of taxpayer resources, and designed to deter reporters from being in the Pentagon at all. Additionally, I believe that the current leadership of the Department of Defense is acting against its own self-interest—and against the interests of the U.S. military and the American public—by implementing this policy. I fear that the Department will be less prepared, less effective, and less able to communicate with the American people as a result of these restrictions on credentialed reporters' Pentagon access.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: May 21, 2026

______________________, ____________________

______________________________

Chris Meagher

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE NEW YORK TIMES COMPANY, *et al.*,<br>*Plaintiffs*,<br>v.<br>DEPARTMENT OF DEFENSE, *et al.*,<br>*Defendants*. | Civil Case No. 26-cv-01690<br><br>**DECLARATION OF PETE WILLIAMS** |

## DECLARATION OF PETE WILLIAMS

I, Louis Alan (Pete) Williams, hereby declare as follows:

1. I am over 18 years of age and I make this declaration based upon my own personal knowledge. If called to do so, I could and would competently testify to these matters under oath.

***My professional background.***

2. I am a journalist and former public servant. I started my career in journalism in the 1970s as a local radio and television broadcaster in Casper, Wyoming, where I grew up, after graduating from Stanford University with a degree in journalism. I later served as press secretary for then-Congressman Dick Cheney from 1986 until 1989, when I went to work at the Department of Defense (the "Department") under then-Secretary of Defense Cheney. I served as Assistant Secretary of Defense for Public Affairs, a Senate-confirmed position, from May 1989 until January 1993.

3. After leaving the Defense Department, I became a justice correspondent for NBC News in late March 1993. I retired from NBC News in July 2022. During my nearly 30 years at the network, spanning five U.S. presidential administrations, I covered both the Department of Justice and the Supreme Court of the United States.

4. During my time as Assistant Secretary of Defense for Public Affairs, I interacted with reporters at the Pentagon every day, both formally in press briefings, and informally. My office was just down the hall from where the journalists' workspaces were located.

***My experience as Assistant Secretary of Defense for Public Affairs.***

5. During my time at the Pentagon, the Department had a process for providing journalists with press credentials—now called Pentagon Facility Alternative Credentials or PFACs—that enabled them to have a regular presence at the Pentagon. My recollection is that the process for obtaining a press credential was relatively straightforward and involved undergoing a background check. When I was at the Department, we did not decide who was eligible to obtain or maintain a press credential based on whether we thought a particular reporter or news organization would report favorably about the Department or its leadership.

6. In my experience, it was a tremendous advantage to the Department to have journalists from news organizations that reach a large and broad segment of the American public present in the Pentagon. During my time as Assistant Secretary of Defense for Public Affairs, I frequently would talk to reporters who were present in the building as their stories were being developed and, in that way, get a sense of what was important to them and what issues would be at the forefront for the American public. I could also help provide guidance to journalists if I thought they were not headed in the right direction on a story; I could help correct mistakes or misunderstandings or provide additional context where needed.

7. For instance, during the Gulf War, many of the more experienced Pentagon and national security reporters were reporting from the Gulf, so news organizations had less experienced reporters working at the Pentagon. It was helpful both for those reporters and for the Department to have them in the building, where they were able to ask questions, confirm facts,

and learn information that would help them avoid making mistakes in their reporting. Always, but especially during times of war or national crises, it benefits everyone to ensure that timely, accurate information is being conveyed to the American public.

8. The regular presence of reporters in the Pentagon also helped develop respect and trust between those reporters and Department officials. While it did not prevent those journalists from writing critical stories about the Department and its leadership, the trust that was built up over time between journalists and Department officials was mutually beneficial. I recall instances where I asked journalists to hold back specific pieces of information they had learned because we believed, if it was made public right away, it would damage operational security. The reporters that I encountered regularly at the Pentagon would often consider and honor those requests. In those situations, it was vital that journalists and Department officials trusted one another.

9. During my service as Assistant Secretary of Defense for Public Affairs, some Department officials may have found it inconvenient or challenging to have journalists in the building covering the Department and the United States military. For example, there were times when journalists published critical stories or reported information that Department officials believed had come out too soon or wished had not been made public. But Department leadership understood and respected the role of an independent press in our democracy, and cutting off access to the Pentagon for journalists could never stop reporting that was critical of the Department. We would never have considered suspending, revoking, or not renewing a journalist's press credential in response to a critical story. Nor would we have ever considered prohibiting credentialed journalists from being inside the Pentagon without an escort or eliminating their designated workspaces in the building. As detailed above, in my experience, it was a benefit to everyone, including the Department, to have journalists in the Pentagon.

10. During my time as Assistant Secretary of Defense for Public Affairs, I did not encounter any security or safety incident arising out of the presence of a credentialed journalist at the Pentagon. To the contrary, in my experience, journalists were very sensitive to security considerations and cared deeply about the safety of men and women in the United States military. I do not recall the Pentagon suspending, revoking, or not renewing any journalist's press credential because of a safety or security concern.

***My experience as a journalist covering the Department of Justice and Supreme Court.***

11. As a correspondent covering the Department of Justice for NBC News, I had a long-term "hard" building pass issued by the Justice Department's Office of Public Affairs and frequently reported from Justice Department headquarters.

12. As was the case when I was at the Pentagon, when I was covering the Justice Department, credentialed journalists had desks in the building and places where cameras were set up to allow journalists to report live. As a credentialed journalist covering the Justice Department, I could enter through the building through the same entrance used by Justice Department employees, and walk unescorted to areas in the building, including where the offices of the Attorney General and Deputy Attorney General were located, that were not restricted or secure. That was also true when I was covering the Supreme Court. Credentialed journalists were not required to be accompanied by an escort in the Supreme Court. Similarly, when I was Assistant Secretary of Defense for Public Affairs, journalists could go anywhere in the Pentagon where they did not require clearance—only secure areas, like the National Military Command Center, were off limits.

13. I found it beneficial as a reporter to be in the building both when I was covering the Justice Department and the Supreme Court. I learned things by being there on a regular basis that

improved my reporting. Reporters get to know the rhythms of the building and can sense when something newsworthy is happening.

14. When I was covering the Justice Department, being in the building gave me ready access to experts—people who could answer questions about, for example, the wording in a federal criminal statute, and help me better understand how a particular procedure or process worked. By being present in the building, I was also able to quickly verify information, which is critical for good journalism. In my view, trying to cover the Justice Department or the Pentagon without regularly being present in the building is like trying to write a restaurant review without going to the restaurant and trying the food.

***The Department's new "interim" policy harms the American public.***

15. I am familiar with changes that have been made by the Department to press access under Secretary Hegseth, and I have read the policy concerning press credentials that was issued by the Department in October 2025 and challenged by The New York Times in prior litigation. I have also read the March 2026 "interim" policy concerning press access to the Pentagon that is at issue in this litigation. Based on my experience both as a journalist and as Assistant Secretary of Defense for Public Affairs, I believe these measures are counterproductive for the Department and will ultimately harm the American public.

16. In early February 2025, after learning that the Department had announced that it would be shifting news organizations out of the Pentagon press room—the area sometimes referred to as Correspondents' Corridor—I wrote to then-chief Pentagon spokesman John Ullyot to share my view that such a move would not be in the Department's best interests. Among other things, I pointed out that when I was in his position, I had found it essential to have journalists close at hand when I needed to reach them to urge corrections, suggest approaches in reporting, or provide

guidance to avoid mistakes. I also noted that journalists from three of the news organizations singled out to vacate their spaces in the Pentagon—The New York Times, NBC, and NPR—had died covering United States military operations abroad. A true and correct copy of my email is attached hereto as Exhibit A.

17. The press credential policy put into the place by the Department in October 2025 was, in my view, even worse and even more counterproductive for the Department. The policy stated that the Department can take away a press credential if a journalist reports even unclassified information that the Department hasn't approved for release. That is offensive and counter to the role of an independent press. Journalists should not risk the loss of their credentials simply because they are doing their job as reporters. And by promulgating that policy, the Department forced knowledgeable and experienced national security and defense reporters out of the building entirely—journalists from news organizations that reach a large and broad segment of the American public.

18. After portions of its October 2025 press credential policy were struck down by the district court, the Department went, in my view, even further in the wrong direction by announcing an interim policy that immediately closed Correspondents' Corridor and prohibited credentialed journalists from entering the Pentagon except for press conferences and pre-scheduled interviews, and then only if they are minded at all times by an official escort. These measures make it impossible for journalists to work at the Pentagon.

19. From Correspondents' Corridor, journalists could file stories and, for cable and broadcast news, do live shots throughout the day using available remote camera equipment without the need for a camera crew. Journalists had easy access to press conferences and briefings, including those called on short notice. And, for urgent stories, journalists had the ability to confirm

information and get answers to questions quickly. For the Department, it is valuable to have press in the building when newsworthy things happen to ensure that accurate information is being disseminated to the public. Other federal buildings including, in my own experience, the Supreme Court and the Justice Department, have workspace for journalists. That is because it is in the interest of the press, the public, and the government to have journalists there.

20. The public is best served by having reporters covering the Pentagon who are knowledgeable and informed about the Department and who understand military culture. Reporters gain that knowledge and understanding by working in the building regularly, asking questions, and talking to people face to face. Prohibiting credentialed journalists from entering the Pentagon unless it is for a scheduled press conference or interview, and only then if they have an official escort, prevents that from happening. It undermines the reporting process but, even more importantly, it harms the public who benefits from informed reporting.

21. These measures serve no legitimate national security purpose. In my experience as Assistant Secretary of Defense for Public Affairs, credentialed journalists moved throughout the building, unescorted, without posing any risk to national security. The notion that credentialed reporters would have access to sensitive or classified information simply by being in the building without an escort is absurd. Access to such information is tightly restricted and controlled; it is strictly forbidden to discuss classified matters in Pentagon hallways or other unsecure spaces. In any event, keeping journalists out of the Pentagon will not stop them from reporting on the Department and its leadership, and will not prevent journalists from obtaining sensitive information from sources.

22. As fewer Americans have any involvement with or direct connection to the United States military, it is more important than ever for the Department to be transparent and to build

and maintain trust with the American people. Interacting with the press is an important way to build and maintain that trust. Unfortunately, the Pentagon's new press credential policy will only undermine it.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated: May 15, 2026, Washington, D.C.

Louis Alan (Pete) Williams

# EXHIBIT A

**From:** Pete Williams [redacted]
**Date:** Monday, February 3, 2025 at 3:20 PM
**To:** john.ullyot[redacted]
**Subject:** Pentagon rotation policy

Dear John,

I write as a former Assistant Secretary of Defense for Public Affairs to urge you to rethink a plan to shift news organizations in and out of the Pentagon press room. Such a policy would not be in the Defense Department's best interests and would instead be perceived as punitive.

The organizations notified in the January 31 memo to leave their spaces have vastly larger audiences than the four selected to take their places. That will prove to be an impediment when the Secretary or other civilian and military officials have urgent messages to share. In an age when a dwindling number of Americans have any connection to the military services, reaching the broadest possible audience becomes ever more important.

While journalists from the vacating organizations would still have access to the building, as a practical matter the policy would force them to go elsewhere to compile and file their reports. When I was the Pentagon spokesman, I found it essential to have journalists close at hand when I needed to reach them -- to urge corrections, suggest approaches in reporting, or provide guidance to avoid mistakes.

Three of the organizations singled out to vacate their spaces have indisputably earned their stripes in covering the Department of Defense. Seven journalists from New York Times died covering combat in World War II, Vietnam, and Afghanistan. Four NBC journalists died covering US military operations in Vietnam, and David Bloom died while reporting on the Iraq war. National Public Radio lost two journalists in Afghanistan. To now suggest that they leave the press room would be perceived as an affront to that legacy.

Contrast that sacrifice with the memo's stated goal of giving other news organizations an opportunity to report as resident members of the Pentagon press corps, an experience that by the policy's own terms would last a year.

In short, John, the rotation policy won't do the Defense Department any good. It would instead make it more difficult for the President, the Secretary, and you to communicate your message.

Respectfully,

Pete Williams
ASD/PA 1989-1973

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE NEW YORK TIMES COMPANY, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>DEPARTMENT OF DEFENSE, a/k/a DEPARTMENT OF WAR, *et al.*,<br><br>*Defendants*. | Civil Action No. 26-1690 (PLF) |

**DECLARATION OF JOEL MANUEL VALDEZ IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Joel Manuel Valdez, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

**BACKGROUND**

1. I am Acting Pentagon Press Secretary within the Office of the Assistant to the Secretary of War for Public Affairs. I make this declaration based upon my personal knowledge and upon my review of information available to me in my official capacity.
2. I have served as Deputy Press Secretary since June 2025 and Acting Press Secretary since May 2026. My official duties include advising the Chief Pentagon Spokesman Sean Parnell and Press Secretary Kingsley Wilson on strategic communication and preparing them for press engagements, including press briefings, television interviews, speeches, and multimedia content for social media. I also serve as the principal liaison between Pentagon Press Operations desk officers and the Press Secretary, drafting responses to political and sensitive press requests, statements, and releases.

**THE INTERIM POLICY**

3. On Monday, March 23, 2026, the Department of War adopted and published the Interim Policy. While that policy has been in effect, journalists from numerous outlets who had previously held PFACs, but turned them in following the issuance of the October 2025 policy, have requested and obtained PFACs. Those outlets include The New York Times and USA Today. Outlets including The Associated Press, CNN, The Daily Mail, The Washington Post, The Wall Street Journal, and CBS News have requested PFACs and were approved but have yet to pick up their badges from the Pentagon.

4. Julian Barnes, a journalist associated with The New York Times, picked up his reinstated PFAC on Tuesday, March 24, 2026. Since then, to the best of my knowledge, he has attempted to enter the Pentagon just twice.

5. Seven other journalists affiliated with The New York Times hold PFACs. PFAC holders and reporters associated with The New York Times have accessed the Pentagon approximately seven times since March 23, 2026. With the exception of one interview discussed in paragraph 17 below, PFAC holders associated with The New York Times have been able to access the Pentagon for journalistic activities on every occasion they have sought to do so.

6. The Interim Policy provides that any PFAC holder may enter the Pentagon only with an escort. The escort requirement has functioned smoothly over the six-plus weeks it has been in effect. Since March 23, 2026, 60 reporters, who hold active PFACs or are employees of outlets who have received approval to pick up their PFACs, have repeatedly accessed the Pentagon to attend media events, including press conferences, on or off record interviews, media roundtables, bilateral meetings with press, and more. Across the

Pentagon's Office of the Secretary of War, other departments, and all service branches, 24 media events have been held in person at the Pentagon since March 23, 2026. Escorts are readily available for these meetings. As of June 4, 2026, the Pentagon has held five press briefings since March 23, 2026, which is attended by approximately 60 reporters for every briefing and requires multiple escorts to be dispatched. To date, and to the best of my knowledge, no PFAC holder has been unable to enter the Pentagon because of an inability to arrange an escort.

7. Typically, for non-press affiliated visitors to the Pentagon, an escort can only accompany up to three people at a time. Since media events are usually not small in attendance, the host organization (such as the Office of the Assistant to the Secretary of War for Public Affairs or a specific service branch) contacts the Pentagon Force Protection Agency (PFPA) to allow escorts to accompany up to ten people at a time in order to ensure there is never a shortage of escorts. Pentagon staff either volunteer to escort media or are assigned as escorts by those who are hosting the media engagement. Escorts can accompany journalists on impromptu visits to other engagements if those engagements have been approved by their organization.

8. Under the Interim Policy, as before, there are substantial advantages to holding a PFAC rather than applying for a day pass each time a journalist wishes to enter the Pentagon.

9. PFACs grant access to the Pentagon Library and Conference Center (PLC2) and the Corridor 8 Pedestrian Bridge Access Point. PFAC holders can enter the Pentagon grounds and access PLC2 with their PFACs via a pedestrian bridge.

10. Unlike day pass holders, PFAC holders are pre-cleared in the system and do not need to undergo a background check each time they wish to access the Pentagon. A PFAC holder

requires only an escort, which can be arranged on short notice, including immediately, if needed. By contrast, a day pass must be requested at least 24 hours in advance.

11. If a PFAC holder in the PLC2 workspace decides to interview a Department official or speak with Public Affairs staff, all the PFAC holder needs to do is contact that official's office or the Pentagon Press Office to arrange the interview, or reach out to the Public Affairs staff member. If the official or staff member is available, a staff member can escort the PFAC holder into the Pentagon immediately, with no waiting period.

**BARNES DECLARATION CLAIMS**

12. I have reviewed the declaration submitted by Julian Barnes in this litigation. This declaration substantially repeats Mr. Barnes's previous declarations, to which I previously responded.

13. Mr. Barnes makes various assertions about the process for picking up his PFAC on March 24 and conversations with Pentagon Press Office staff members he declines to identify. ECF 6-17 at ¶¶ 16-21.

14. In particular, Mr. Barnes reports that he received unclear instructions about how to pick up his PFAC on March 24. ECF 6-17 at ¶ 17. This report omits that, as I previously explained, the Department had informed Mr. Barnes's counsel that Major Andrea Kelly in the Pentagon Press Office would be his point of contact for scheduling pickup, that his colleagues contacted Major Kelly and received proper instructions for PFAC pickup, and that Mr. Barnes arrived at the Pentagon without having communicated or coordinated with Major Kelly or other Pentagon staff. *See* Ex. A at ¶ 7.

15. Mr. Barnes also reports that unnamed Pentagon staff were "unsure," on March 24, how he could access the Pentagon library. ECF 6-17 at ¶ 20. This report omits that, as I

previously explained, PPO staff provided Barnes with photos and Google Maps screenshots showing how to access the library on March 25. *See* Ex. A at ¶ 19. I also maintain, as I previously stated, that Mr. Barnes's statement is not accurate. *See id.* at ¶¶ 15-19.

16. Mr. Barnes additionally reports that PFAC holders did not have permission to ride the Pentagon shuttle bus on March 24. ECF 6-17 at ¶ 20. As I previously explained, that is incorrect: Before Mr. Barnes and his colleagues received their PFACs, my office had already arranged for the Pentagon shuttle bus to transport PFAC holders to the Pentagon Library and Conference Center. Ex. A at ¶ 21. And Mr. Barnes and his colleagues were informed that PFAC holders could use the shuttle bus, and that signage would be updated to reflect as much. *Id.* Shuttle bus signage was in fact updated on April 1, 2026.

17. Mr. Barnes also reports that, on March 31, he attempted to enter the Pentagon with his PFAC, but Pentagon staff were confused about access protocols and the interview he had arranged was cancelled. ECF 6-17 at ¶ 26. This report omits that, as I have explained, the interview was postponed because of a routine scheduling conflict wholly unrelated to the Interim Policy, and that the access confusion was a one-off event, not a result dictated or called for by the Interim Policy. Ex. B at ¶¶ 9-10.

18. Last, Mr. Barnes reports that he has not attended a press conference, but that his colleagues have been required to wear wristbands during press conferences and that their wristbands were checked. ECF 6-17 at ¶ 28. This report omits that, as I have explained, those are standard security protocols for events involving the Secretary of War, are not new, and are not restrictions imposed by the Interim Policy. Ex. B at ¶ 12. As for the limitations on restroom breaks that Mr. Barnes reports on behalf of his colleagues, ECF

6-17 at ¶ 28, that report omits that, as I have explained, the closest restrooms to the Pentagon Briefing Room are located in a restricted area near the Joint Chiefs of Staff corridor, and escorts are required. PPO staff thus informed reporters of this fact and recommended that they use the restrooms half an hour before the briefing started, when escorts are readily available, to avoid delays once the briefing commenced. Ex. B at ¶ 14.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 4, 2026 at Washington, D.C.

Joel Valdez

JOEL MANUEL VALDEZ
Acting Pentagon Press Secretary
Office of the Assistant to the Secretary of War for Public Affairs
1400 Defense Pentagon
Washington, D.C. 20301-1400

# Declaration Exhibit A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE NEW YORK TIMES COMPANY, et al.,<br>Plaintiffs,<br>v.<br>DEPARTMENT OF DEFENSE a/k/a DEPARTMENT OF WAR, et al.,<br>Defendants. | Civil Action No. 1:25-cv-04218-PLF |

SUPPLEMENTAL DECLARATION OF JOEL MANUEL VALDEZ

I, Joel Manuel Valdez, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

## INTRODUCTION

1. I am Deputy Press Secretary within the Office of the Assistant to the Secretary of War for Public Affairs (OATSW(PA)). I previously submitted a declaration in this matter on March 27, 2026 (ECF No. 41-3). I submit this Supplemental Declaration in response to the Supplemental Declaration of Julian E. Barnes (ECF No. 44-1, "Barnes Supp. Decl.") filed on March 29, 2026, and the Second Supplemental Declaration of Julian E. Barnes (ECF No. 45, "Second Supp. Barnes Decl.") filed on March 31, 2026.

2. I have personal knowledge of the matters stated herein, and if called as a witness, I could and would testify competently thereto. My official duties include advising the Chief Pentagon Spokesman and Press Secretary on strategic communication, serving as the principal liaison between Pentagon Press Operations (PPO) desk officers and the Press Secretary, and overseeing the implementation of the Department's press access policies.

3. Throughout his supplemental declaration, Mr. Barnes attributes various claims to unnamed "Pentagon Press Office staff" and "a Pentagon public affairs officer" without identifying these individuals by name. Barnes Supp. Decl. ¶¶ 6, 7, 8, 9. These sources are unnamed not because they requested anonymity, but because Mr. Barnes did not identify them.

### A. <u>TIMELINE</u>

4. Mr. Barnes's Supplemental Declaration indicated he picked up his PFAC and received a copy of the Interim Policy at around 1pm on "Monday, March 23." Barnes Supp. Decl. ¶ 6. That was incorrect, for two reasons.

5. First, Mr. Barnes could not have received a copy of the Interim Policy at 1:00 PM on Monday, because the policy had not been finalized or adopted at that time. The Interim Policy was not signed until approximately 4:15 PM Eastern on Monday, March 23. The Interim Policy was transmitted to Plaintiffs' counsel promptly upon signing. *See* ECF No. 37-6 (email to Plaintiff's counsel attaching revised policy, received by Plaintiff's counsel at 1:15 PM Pacific time—4:15 PM Eastern time—on Monday, March 23).

6. Second, Mr. Barnes—together with four other New York Times journalists—picked up his PFAC on Tuesday, March 24, not on Monday, March 23. Mr. Barnes corrected the date in his Second Supplemental Declaration.

7. On Monday, March 23, Commander Parlatore sent representatives from The New York Times a point of contact at the Pentagon Press Office — Major Andrea L. Kelly, PPO Operations Officer — to schedule PFAC pickup for Tuesday, March 24. Mr. Barnes's colleagues, New York Times journalists Helene Cooper and John Ismay, contacted Major

Kelly to schedule a pickup time and received instructions to pick up their PFACs between 12:00 PM and 3:00 PM.

8. Mr. Barnes did not schedule a pickup time through Major Kelly. Instead, he arrived at the Pentagon at 8:00 AM without having communicated with Major Kelly or other Pentagon staff.

9. Mr. Barnes declares that he "received an email from the Pentagon saying I could pick up my PFAC between 6:00 am and 6:00 pm Eastern time." Barnes Supp. Decl. ¶ 6. The email Mr. Barnes is referring to is an automated notification from the Pentagon Visitor Management System (VMS). PPO submitted Mr. Barnes into the VMS for arrival between 6:00 AM to 6:00 PM in order to ensure scheduling flexibility in the event Mr. Barnes had limited availability and could not pick up his PFAC between 12:00 PM to 3:00 PM.

**B. <u>GRAPHIC DESIGN AND ACCESS</u>**

10. Mr. Barnes declares that the PFACs issued to him and his colleagues were "different from the ones we had previously held." Barnes Supp. Decl. ¶ 7. The PFACs issued on Tuesday, March 24 are the current PFAC version. The appearance of PFACs was updated in October 2025 to include a red banner with "PRESS" reflected in white text. The previous version that Mr. Barnes held did not have this red banner.

11. This graphic design change was announced in the October 6, 2025 Policy, which stated: "The new PFACs will have 'PRESS' clearly imprinted on them in red letters both vertically and horizontally to assist in identifying members of the press within the Pentagon." AR at 2.

12. The access granted by the PFACs issued on March 24 aligns with the Interim Policy. Specifically, the PFACs grant access to the Pentagon Library and Conference Center (PLC2) and the Corridor 8 Pedestrian Bridge Access Point. Access to the main Pentagon building requires escort by authorized Department personnel, consistent with the Interim Policy. The PFACs are configured to reflect the access arrangements described in the Interim Policy.

13. PFAC holders can enter the Pentagon and access PLC2 with their PFACs via a pedestrian bridge. *See* ¶¶ 15-21 below.

14. By Monday, March 23, I personally witnessed confirmation from the Pentagon's library leadership that a temporary workspace for PFAC holders, in PLC2, was ready for use. I was shown the spaces during a walkthrough.

## C. <u>PFAC HOLDERS HAVE UNESCORTED ACCESS TO PLC2</u>

15. Mr. Barnes declares that he and his colleagues "asked how we could access the library because, to our knowledge, the only way to access it on foot is through a corridor that we were told we could no longer walk through" and that "the Pentagon Press Office staff indicated that they were unsure how we could access the library." Barnes Supp. Decl. ¶ 9. Both of these statements are inaccurate, and the information necessary to correct them was available to Mr. Barnes in the policy document he received and from the personnel he had access to.

16. First, the PLC2 is not accessible only through the Pentagon. The PLC2 is accessible via the Corridor 8 Pedestrian Bridge, which connects the Pentagon's North Parking Lot to the PLC2. A PFAC holder does not need to enter the Pentagon to reach the PLC2. The PFAC holder can walk, drive, carpool, rideshare, or take the Pentagon shuttle bus to the North

Parking Lot and then cross the Corridor 8 Pedestrian Bridge to the PLC2. Journalists may park in the designated press parking area at the Connector Lot and proceed from there to the North Parking Lot by foot or by shuttle bus. In approaching the PLC2, a PFAC badge holder will be required to present the PFAC badge to access the PLC2 as is required of any and all badge holders with access to the PLC2.

17. Second, PPO staff did not indicate that they were "unsure how [Mr. Barnes and his colleagues] could access the library." PPO staff explained the access options to Mr. Barnes and his colleagues and stated that the decision on how to arrive at the Pedestrian Bridge — whether by walking, driving, or shuttle bus — was up to the journalists.

18. Third, the Interim Policy that Mr. Barnes received itself described PLC2 as the designated workspace and breaking news gathering point. The Interim Policy states that "[i]n breaking news situations, PFAC holders will gather at the Pentagon Library and Conference Center and be escorted into the Pentagon by authorized DoW personnel." ECF No. 37-2 at 7. The Interim Policy further states that "[a] new press workspace will be established in an annex facility outside the Pentagon." ECF No. 37-2 at 7. And the Interim Policy references Appendix D, which "shall be updated to reflect the relocation of the press workspace to the Pentagon Library and Conference Center." ECF No. 37-2 at 15.

19. Fourth, on the morning of Wednesday, March 25—two days before Mr. Barnes signed his Supplemental Declaration—PPO staff provided Mr. Barnes with photos and Google Maps screenshots to show him where to access PLC2.

20. Fifth, regardless, Mr. Barnes had multiple avenues to obtain accurate information about PLC2 access. His designated point of contact, Major Kelly, could have answered any questions. Indeed, his colleagues Cooper and Ismay used the designated POC and received proper instructions. Or he could have asked his counsel to confer with counsel for the defendants in this matter to raise concerns or seek clarification. Verifying information should be routine for a veteran Pentagon reporter.

21. Mr. Barnes also declares that "PFAC holders did not have permission to ride on the shuttle bus." Barnes Supp. Decl. ¶ 9. This is incorrect. Before the New York Times reporters received their PFACs, OATSW(PA) had already arranged for the Pentagon shuttle bus to transport PFAC holders to the PLC2. The shuttle bus route includes a stop near the Pentagon Library and Conference Center, as shown on the Pentagon Circulator flyer attached hereto as Exhibit A. Mr. Barnes was told that PFAC holders could use the shuttle bus and that the signage — which currently states "Common Access Card (CAC) required to ride DoD Shuttles" — would be updated to include PFAC holders. Despite being told he could ride the shuttle bus, Mr. Barnes presented the outdated signage to the Court as if it prohibited him from riding. The accommodation was already in place, and Mr. Barnes was informed of it well before he signed his supplemental declaration on March 27.

### D. PFACs PROVIDE SIGNIFICANT ADVANTAGES OVER DAY PASSES

22. Mr. Barnes declares that the reinstated PFACs are "essentially worthless" because "[a]ll reporters, whether or not they hold a PFAC, can access the Pentagon if they obtain pre-approval to attend a specific press conference, event, or a pre-arranged interview."

Barnes Supp. Decl. ¶ 13. This is incorrect. There are significant differences between holding a PFAC and obtaining a day pass.

23. A day pass requires at least 24 hours advance notice and a background check conducted by the Pentagon Force Protection Agency (PFPA). A journalist without a PFAC who wishes to attend a press event must submit a request at least 24 hours in advance, undergo a background check, and wait for PFPA approval before being granted access.

24. A PFAC holder, by contrast, is already pre-cleared in the system. A PFAC holder does not need to undergo a background check each time he or she wishes to access the Pentagon. A PFAC holder requires only an escort, which can be arranged on short notice — including immediately, if needed. If a PFAC holder in the PLC2 workspace decides to interview a Department official or speak with Public Affairs staff (which Mr. Barnes "would frequently spend [his] days" doing as a PFAC holder, Barnes Supp. Decl. at ¶ 14), all the PFAC holder needs to do is contact that official's office or the Pentagon Press Office to arrange the interview, or reach out to the Public Affairs staff member. If the official or staff member is available, a staff member can escort the PFAC holder into the Pentagon immediately, with no waiting period.

25. Mr. Barnes declares that reporters "would need to submit a request to attend such events at least one day in advance in order to obtain an escort." Barnes Supp. Decl. ¶ 8. The Interim Policy contains no such requirement for PFAC holders. The 24-hour advance notice requirement applies to day passes — not to PFACs. *See* ECF No. 37-2 at 8-9 (Interim Policy specifying that a PFAC "affords escort privileges for up to three visiting media members from the [PFAC holder's] same media outlet," although such "[v]isiting media members must be entered into the PFPA Visitor Management System (VMS) …

no later than one business day in advance for U.S. citizens."). Mr. Barnes apparently did not seek clarification from his designated point of contact or by having his attorneys confer with counsel for the defendants in this matter.

26. To be clear, the Interim Policy does not require PFAC holders to submit requests to attend events or obtain escorts "at least one day in advance."

27. Just this morning, for example, the Department held a press briefing that was announced at approximately 3 PM Eastern yesterday. New York Times journalist and PFAC holder Greg Jaffe attended the press conference. Attending journalists, including Mr. Jaffe, were escorted to and from the press briefing seamlessly.

## E. THE INTERIM POLICY'S PROVISIONS ARE CLEAR

28. Mr. Barnes declares that the Interim Policy's prohibition on "intentional inducement of unauthorized disclosure" is unclear, and asks whether he would be in violation "simply by asking a Public Affairs representative follow-up questions or seeking clarification in a way that pushes beyond that person's pre-approved talking points." Barnes Supp. Decl. ¶ 16. The answer is no. Safe harbor (a) of the Interim Policy expressly protects "[a]sking questions of Department personnel who are authorized to speak with the press, including Public Affairs Officers, designated spokespersons, and other personnel speaking on the record in their official capacity, regardless of the subject matter of the question." ECF No. 37-2 at 15 (emphasis added). Follow-up questions, probing questions, and questions that push beyond talking points are all "questions" within the meaning of safe harbor (a). The safe harbor contains no limitation on the type, tone, or persistence of questions directed at authorized personnel. The copy of the Interim Policy that Mr. Barnes received makes this clear.

29. Mr. Barnes also declares that "many authorized sources, including high-ranking officials and Public Affairs Office staff, often ask for anonymity or agree to speak only on background, with their name withheld — even if they are authorized to speak with me about the information in question." Barnes Supp. Decl. ¶ 17. That situation raises no concerns under the policy, for two reasons. First, even if the presumption applied, safe harbor (a) protects "[a]sking questions of Department personnel who are authorized to speak with the press," "regardless of the subject matter of the question." ECF No. 37-2 at 15. That safe harbor applies whether or not the Public Affairs Office staff member is speaking on background, anonymously, off the record, or on the record with full attribution. Second, the presumption addresses a fundamentally different situation: where the journalist proactively offers anonymity as an inducement to get someone to talk who otherwise would not. When an employee voluntarily chooses to provide information and asks that his or her name not be used, the employee is the initiator of the disclosure — not the journalist. This is consistent with safe harbor (b), which protects "[r]eceiving unsolicited information, including classified national security information or controlled unclassified information." ECF No. 37-2 at 15. Just as the receipt of unsolicited information is protected, so too is the receipt of information from a source who voluntarily discloses and independently requests anonymity.

30. To be clear about how the "intentional inducement" provision operates in practice: the Department does not actively monitor published stories to identify anonymous sources, and the publication of a story with an anonymous source does not necessarily suggest a violation of the policy. For example, the anonymous source may have been a Press Office staffer (as Mr. Barnes says is "often" the case, *see* Barnes Supp. Decl. ¶ 17), the

anonymous source may have offered the information to the journalist (*see* ¶ 29 above), or the anonymous source may have been a "source relationship[]" developed "outside the Pentagon through independent reporting (Interim Policy safe harbor (d), ECF No. 37-2 at 15).

31. Department employees receive training on reporting attempted security breaches, including information security breaches. If a Department employee believes that anyone has attempted to induce the employee to disclose information the employee is not authorized to disclose, the proper means to report that attempt is through the Department's security reporting channels.

32. If an employee reports such an attempt, and the report identifies a specific journalist who offered anonymity or privacy protection to induce the employee to disclose information not authorized for release, the presumption may apply. The presumption is rebuttable—the journalist may provide evidence that he or she did not know the employee was not authorized to disclose the information, notwithstanding the offer of anonymity.

33. Critically, because the Interim Policy defines "intentional inducement of unauthorized disclosure" as inducing "a specific Department employee," the Department cannot act on this provision without identifying that specific employee. The publication of a story relying on anonymous sources does not, standing alone, provide the Department with sufficient information to satisfy the "specific Department employee" element. The only way the Department can identify the specific employee is through the employee's own report — not by reading a published story. Without a specific employee report identifying a specific journalist's specific conduct, the Department has no basis for action under this

provision. There is no "inquisition panel" that reviews published stories. The enforcement mechanism is employee-initiated, not Department-initiated.

34. Mr. Barnes declares that he does not "know all the various kinds of information that qualify as 'controlled unclassified information'" and that he "would not know how to avoid soliciting that information — other than by avoiding all information-gathering activities altogether." Barnes Supp. Decl. ¶ 18. Safe harbor (f) of the Interim Policy directly addresses this concern. It provides that "asking questions of any Department employee where the journalist does not know that the employee is not authorized to disclose the information sought" does not constitute "intentional inducement of unauthorized disclosure." ECF No. 37-2 at 15. If Mr. Barnes does not know whether information qualifies as CUI, and does not know whether the employee he is speaking with is authorized to disclose it, safe harbor (f) protects him. The intentional inducement provision applies only where the journalist *knows* the employee is prohibited from disclosing the information by "Article 92 of the [UCMJ] (10 U.S.C. §892), 18 U.S.C. § 1905, or 5 U.S.C. § 552a." ECF No. 37-2 at 14. Mr. Barnes's professed lack of knowledge about CUI categories is precisely the situation the safe harbor was designed to address.

## F. <u>THE DEPARTMENT'S WEEKEND COORDINATION</u>

35. Mr. Barnes declares that "[i]t was readily apparent to me that the Pentagon Press Office was unprepared for the changes effectuated by the Interim Policy" and that "these new rules had been implemented hastily and in response to the Court's March 20, 2026 ruling." Barnes Supp. Decl. ¶ 10. The Department issued PFACs, prepared a workspace, and adopted the Interim Policy within two business days of the Court's order. That the

Department moved quickly to comply with a judicial order does not mean it was unprepared — it means the Department took the Court's order seriously and devoted significant resources to compliance on an expedited timeline.

**EXHIBIT**

36. Attached hereto as **Exhibit A** is a true and correct copy of the Pentagon Circulator Service flyer, showing the shuttle bus route including the stop near the Pentagon Library and Conference Center.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 31, 2026 at Washington, D.C.

Joel Valdez

JOEL MANUEL VALDEZ
Deputy Press Secretary
Office of the Assistant to the Secretary of War for Public Affairs
1400 Defense Pentagon
Washington, D.C. 20301-1400

# Declaration Exhibit B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE NEW YORK TIMES COMPANY, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DEPARTMENT OF DEFENSE a/k/a DEPARTMENT OF WAR, et al.,<br><br>Defendants. | Civil Action No. 1:25-cv-04218-PLF |

SECOND SUPPLEMENTAL DECLARATION OF JOEL MANUEL VALDEZ

I, Joel Manuel Valdez, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

**INTRODUCTION**

1. I am Deputy Press Secretary within the Office of the Assistant to the Secretary of War for Public Affairs (OATSW(PA)). I previously submitted declarations in this matter on March 27, 2026 (ECF No. 41-3) and March 31, 2026 (ECF No. 46). I submit this Second Supplemental Declaration in response to the Third Supplemental Declaration of Julian E. Barnes (ECF No. 48-2) filed on April 2, 2026, and the Post-Hearing Brief (ECF No. 48-1) filed the same day.

2. I have personal knowledge of the matters stated herein, and if called as a witness, I could and would testify competently thereto.

**MR. BARNES'S ACCOUNT OF THE PLC2 CONVERSATION**

3. Mr. Barnes declares that "Mr. Valdez was not present when that conversation took place, and I stand by the accuracy of my statements." Third Barnes Decl. ¶ 3. I was not present during Mr. Barnes's conversation with PPO staff on March 24, 2026. However, before

submitting my first Supplemental Declaration, I spoke with both PPO staffers who interacted with Mr. Barnes on that day. Both confirmed the account I provided to the Court. My declaration was based on the facts—not on speculation.

**<u>THE MARCH 31 INTERVIEW WITH A SENIOR DEPARTMENT OFFICIAL</u>**

4. Mr. Barnes declares that on Monday, March 30, 2026, he scheduled an interview with "a Department official" for Tuesday, March 31, 2026. Third Barnes Decl. ¶ 5. This is correct. In response to an interview request made by Mr. Barnes, a senior Department official granted an interview. OATSW(PA) facilitated the logistics of the interview as a liaison but was not involved in setting the terms of the interview.

5. Mr. Barnes declares that "the press office later requested that interview be on background — meaning he would be an anonymous source." Third Barnes Decl. ¶ 5. To clarify: the senior official's office requested that the interview be conducted on background. This was the official's preference, not a request from OATSW(PA) or the Pentagon Press Office. The decision to conduct an interview on background is a routine matter between the official and the journalist. It is not uncommon for senior Department officials to speak with reporters on background, and the decision to do so is made by the official — not by the press office.

6. This fact is relevant to the anonymity presumption in the Interim Policy. The presumption is triggered when a journalist *offers* anonymity or privacy protection to a Department employee "in exchange for information." ECF No. 37-2 at 14. Here, the official's office requested background treatment — the journalist did not offer it as an inducement. This is precisely the distinction the Interim Policy draws: when the source initiates the request for anonymity, the journalist is not "offering" anything. The presumption does not apply.

7. If that were not enough, the interview is also covered, in its entirety, by safe harbor (e), which applies to "interviews arranged through public affairs offices." ECF 37-2 at 15.

**MR. BARNES'S ESCORT ON MARCH 31**

8. Mr. Barnes declares that on March 31, 2026, he arrived at the Pentagon Visitor Center for his scheduled interview, was told that PFAC holders must enter through Corridor 8, and was unable to meet his escort in the Visitor's Center as planned. Third Barnes Decl. ¶ 6.

9. This was a one-off event, not a result dictated by the Interim Policy. Mr. Barnes's escort had not been fully briefed on the access procedures for PFAC holders under the Interim Policy. Going forward, OATSW(PA) and PFPA will permit reporters visiting the Pentagon to be escorted through either the Visitor's Center or Corridor 8, reducing the risk for any confusion in the future.

10. Mr. Barnes also declares that "the interview was postponed, and I was immediately escorted out of the building." Third Barnes Decl. ¶ 6. The interview was postponed because the senior official was in a meeting that overlapped with Mr. Barnes's scheduled interview time and could not leave in time to conduct the interview. This was a routine scheduling conflict, not a consequence of the Interim Policy or any restriction on Mr. Barnes's access. The interview has been rescheduled.

**THE MARCH 31 PRESS CONFERENCE**

11. Mr. Barnes declares that his colleague's experience of the March 31 press conference was not "seamless" and describes various security requirements, including early arrival, wristbands, and restrictions on restroom access. Third Barnes Decl. ¶ 11.

12. The aspects of the press conference about which Mr. Barnes's colleague complains—the arrival time and wristbands—are standard security protocols for events involving the Secretary. They are not new, and they are not imposed by the Interim Policy.

13. As is the case with all bilateral meetings when the Secretary of War is present, reporters who have received confirmation to attend must arrive no later than 7:00 AM Eastern in order to be properly screened. The wristbands indicate to security personnel that the wearer has been screened and does not require additional security checks. These requirements apply to all media — credentialed and non-credentialed alike — and are standard security protocols for events involving the Secretary. In every media advisory announcing a morning press briefing, the email clearly indicates that press must arrive no later than 7:00 AM, briefings begin at 8:00 AM, and reporters must be in their seats no later than 7:30 AM.

14. Mr. Barnes also states that his colleague was "told they need to have an escort to use the restrooms and could not use the restrooms after 7:30 a.m. because it would present a security risk." Third Barnes Decl. ¶ 11. The restrooms nearest to the Pentagon Briefing Room are located down the hall in proximity to the Joint Chiefs of Staff corridor — a restricted area. Journalists require an escort to access that area. PPO staff informed reporters of this logistical reality and recommended that they use the restrooms before 7:30 AM — when escorts were readily available — to avoid delays once the briefing commenced. This was a practical accommodation, not a punitive restriction. The fact that every reporter whose RSVP was confirmed was screened, escorted into the building, and prepared for the press briefing by 8:00 AM confirms that the process functioned as intended.

THE ANONYMITY DISTINCTION IN PRACTICE

15. Mr. Barnes declares that the distinction between a journalist offering anonymity and a source requesting it is "blurry" in practice, and that "conversations sometimes go on and off the record, with it unclear exactly who initiated what." Third Barnes Decl. ¶ 10. The Interim Policy's anonymity presumption addresses a specific, identifiable situation: where a journalist proactively offers anonymity or privacy protection to a Department employee as an inducement to disclose information the employee is not authorized to disclose. It does not address the fluid, conversational dynamics Mr. Barnes describes — where parties negotiate terms of engagement as a conversation unfolds, or where a source independently requests that his or her name not be used.

16. When an employee voluntarily chooses to provide information and asks that his or her name not be used, the employee is the initiator of the disclosure — not the journalist. This is consistent with safe harbor (b), which protects the receipt of unsolicited information. Just as the receipt of unsolicited information is protected, so too is the receipt of information from a source who voluntarily discloses and independently requests anonymity. The presumption addresses a fundamentally different situation: where the journalist proactively offers anonymity as an inducement to get someone to talk who otherwise would not.

17. As I explained in my prior Supplemental Declaration, the Department does not actively monitor published stories to identify anonymous sources. The enforcement mechanism is employee-initiated: if a Department employee believes a journalist has attempted to induce the employee to disclose unauthorized information, the employee reports the attempt through the Department's existing security reporting channels. Because the

Interim Policy requires identification of "a specific Department employee," the Department cannot act without a specific employee report identifying a specific journalist's specific conduct. The publication of a story with anonymous sources does not, standing alone, provide the Department with sufficient information to act.

**MR. BARNES'S CHARACTERIZATION OF THE SCHEDULING PROCESS**

18. Mr. Barnes declares that "going through a sometimes-lengthy process of scheduling official appointments in order to ask even one or two questions to an official… does not allow for meaningful engagement with Department personnel on a timeline consistent with news reporting." Third Barnes Decl. ¶ 8. As I explained in my prior Supplemental Declaration, PFAC holders are pre-cleared in the system and do not need to undergo a background check each time they wish to access the Pentagon. A PFAC holder requires only an escort, which can be arranged on short notice — including immediately, if needed.

19. To the extent Mr. Barnes experiences delays in scheduling interviews with Department officials, those delays are attributable to the officials' own schedules — not to the Interim Policy. Before the Interim Policy, if Mr. Barnes wished to interview a specific Department official, he still had to schedule through that official's office and wait for the official to be available. The Interim Policy does not change the officials' scheduling process. The only additional step is the escort from PLC2 to the official's office, which can be arranged immediately once the official is available. Mr. Barnes's own experience last week demonstrates this: he scheduled an interview with a senior Department official on Monday and the interview was arranged for Tuesday — with less than 24 hours' notice.

20. Mr. Barnes also declares that "Pentagon officials and personnel are not permitted to and do not discuss classified or national-security sensitive information in Pentagon hallways." Third Barnes Decl. ¶ 9. Pentagon officials and personnel are not permitted to discuss classified or national-security sensitive information with reporters in any setting. However, the security concern addressed by the escort requirement is not limited to the verbal disclosure of classified information in hallways. Unescorted access to hallways near sensitive spaces can provide information about activity patterns within the Pentagon — such as which officials are meeting, when, and in what configuration — that may be used to identify and target sources for unauthorized disclosures of non-public information. The escort requirement addresses this broader information-security concern.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 6, 2026 at Washington, D.C.

Joel Valdez

JOEL MANUEL VALDEZ
Deputy Press Secretary
Office of the Assistant to the Secretary of War for Public Affairs
1400 Defense Pentagon
Washington, D.C. 20301-1400

# Exhibit 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

THE NEW YORK TIMES COMPANY, *et al.*,

*Plaintiffs*,

v.

DEPARTMENT OF DEFENSE, a/k/a
DEPARTMENT OF WAR, *et al.*,

*Defendants*.

Civil Action No. 26-1690 (PLF)

**DECLARATION OF SEAN PARNELL IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Sean Parnell, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

**BACKGROUND**

1. I am the Assistant to the Secretary of War for Public Affairs. In this role, I am responsible for advising the Secretary of War and the Deputy Secretary of War on communications strategy and public engagement and serving as the Department of War's Chief Spokesperson. I am the decisionmaker who promulgated the PFAC policy issued on October 6, 2025, and the interim PFAC policy issued on March 23, 2026.

2. I have personal knowledge of the matters stated herein, and if called as a witness, I could and would testify competently thereto. In particular, I have personal knowledge of the basis for adopting the interim PFAC policy I signed and issued on March 23, 2026.

3. Kingsley Wilson, the Pentagon Press Secretary, reports directly to me. I am aware that Ms. Wilson provided a declaration in previous litigation regarding the interim PFAC policy issued on March 23, 2026, explaining that prior to the issuance of the October 2025 PFAC policy, journalists—including PFAC holders—frequently contacted the

Department regarding sensitive or classified information they had obtained; that that pattern ceased when many journalists surrendered their PFACs after the institution of the October 2025 policy; and that if the Department were required to afford PFAC holders unescorted access to the Pentagon, a resumption of unescorted access would almost certainly result in a return to the previous pattern of journalists frequently receiving controlled or classified information, including highly classified national defense information. *See New York Times v. Dep't of Defense*, No. 1:25-cv-4218 (D.D.C.), ECF 58-1.

**THE PRE-OCTOBER POLICY PATTERN**

4. Because Ms. Wilson reports to me, I was aware of the information that she provided to this Court in connection with previous litigation involving press access to the Pentagon. Before the October 2025 PFAC policy was implemented, Ms. Wilson's office was contacted by journalists on a regular basis—often monthly, and sometimes multiple times per month—regarding information they had obtained that was sensitive or classified, including information relating to operational plans, intelligence assessments, diplomatic communications, and force posture decisions. These contacts came from journalists at multiple news outlets, including The New York Times. Many of these journalists, including New York Times journalists, were PFAC holders. *Id.* at ¶ 4.

5. Controlled unclassified information and classified information reached journalists with a frequency that made me seriously concerned about the security of information within the Pentagon. *Id.* at ¶ 5.

6. Prior to adoption of the interim policy in March 2026, Ms. Wilson advised me, and I concluded, that unescorted access to the Pentagon was a significant contributing factor to

the frequency with which controlled and classified information was reaching journalists. Unescorted access allowed journalists to maintain a persistent physical presence near sensitive spaces within the Pentagon. This presence enabled journalists to observe activity patterns—such as which officials were meeting, when, and in what configuration—that could be used to identify individuals with access to specific sensitive information and to time inquiries accordingly. *See id.* ¶ 7.

7. The Correspondents' Corridor was located in close proximity to the office space for the Joint Chiefs of Staff—the military advisors to the President, National Security Council, Homeland Security Council, and Secretary of Defense. *See* 10 U.S.C. § 151. Journalists, including journalists who regularly contacted the Pentagon press office regarding controlled or classified information they had obtained, frequently used their access to closely monitor activity in and out of the Joint Staff spaces. *Id.* ¶ 8.

8. Following the implementation of the PFAC Policy in October 2025, the frequency with which the Pentagon press office was contacted by journalists regarding sensitive, controlled or classified information dropped dramatically. It changed from a regular pattern of contacts involving such information to a small number of isolated incidents. *See id.* ¶ 10.

9. Prior to adoption of the interim policy in March 2026, Ms. Wilson advised me, and I concluded, that this reduction occurred primarily because many journalists no longer maintained a persistent, unescorted presence near sensitive spaces in the Pentagon after they surrendered their PFACs following the implementation of the PFAC Policy. Without the ability to observe activity patterns and time their inquiries accordingly, the systematic pattern was disrupted. *See id.* ¶ 11.

## THE INTERIM POLICY

10. It is an unacceptable risk to national security for sensitive, controlled or classified information to regularly reach journalists. The regular pattern of unlawful disclosures prior to October 2025 posed serious risks to national security. Unauthorized disclosure of operational plans, intelligence assessments, force posture decisions, and other obviously sensitive information puts American lives in danger, allows our enemies to adjust their tactics ahead of our operations, and risks compromising our ongoing operations. These disclosures are irreversible: Once compromised, information cannot be recalled.

11. When I adopted the interim policy, I assessed that the combination of unescorted access and the absence of security screening criteria contributed to the frequency with which classified information was reaching journalists. I also agreed with Ms. Wilson that restoring unescorted access to the Pentagon for PFAC holders would result in a return to the same pattern of regular breaches of information security that that unescorted access had previously permitted, especially if we were unable to prohibit journalists from intentionally soliciting unlawful disclosures of information. The escort requirement adopted as part of the Interim Policy was specifically designed to address this assessment of risks to the security of information in the Pentagon, and thus to the nation's security, that would exist if the Department were required to return to the pre-October Policy status quo, under which journalists frequently obtained sensitive information. *See id.* ¶ 9.

12. I reached this conclusion after the Court rejected the October Policy's attempt to permit PFAC holders to access portions of the Pentagon without an escort, subject to a requirement that PFAC holders not intentionally induce unauthorized disclosures. Without the escort requirement or a prohibition on PFAC holders soliciting unlawful

disclosures of sensitive information, I concluded that the Department has no other effective means of managing this demonstrated, repeated risk to the security of sensitive information within the Pentagon while still permitting journalists to access the Pentagon.

13. I adopted the escort requirement in response to the Court's rejection of the challenged portions of the October 2025 policy, in order to address the risk to the security of sensitive controlled and classified information within the Pentagon, and the risks that the unauthorized disclosure of that information would carry for the Nation's security, which would exist if the Department had to return to the pre-October Policy status quo.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 4, 2026 at Washington, D.C.

SEAN PARNELL
Assistant to the Secretary of War for
Public Affairs
1400 Defense Pentagon
Washington, D.C. 20301-1400

# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------x

UNITED STATES OF AMERICA, :

Plaintiff, :

-v- : 71 Civ. 2662

NEW YORK TIMES COMPANY, et al., :

Defendants. :

----------------------------------------x

STATE OF NEW YORK )
: ss.:
COUNTY OF NEW YORK )

MAX FRANKEL, being duly sworn, deposes and says:

1. I am the Washington Bureau Chief and the Washington correspondent of The New York Times. I have been a reporter on The Times for 20 years, including 5 years as a foreign correspondent, mostly in Moscow, and 10 years in Washington. In our capital, I have been successively The Times' diplomatic correspondent, White House correspondent and, currently, chief correspondent, supervising the work of 35 editors and reporters, including most of those who prepared the disputed series of articles.

2. I submit this affidavit in opposition to the pending motion by the United States for an injunction barring The Times, among other things, from printing further documents relating to its current series of articles on the Vietnam war.

"Secrecy" in Washington

3. The Government's unprecedented challenge to The Times in the case of the Pentagon papers, I am convinced, cannot be understood, or decided, without an appreciation of the manner in which a small and specialized corps of reporters and a few hundred American officials regularly make use of so-called classified, secret, and top secret information and documentation. It is a cooperative, competitive, antagonistic and arcane relationship. I have learned, over the years, that it mystifies even experienced professionals in many fields, including those with Government experience, and including the most astute politicians and attorneys.

4. Without the use of "secrets" that I shall attempt to explain in this affidavit, there could be no adequate diplomatic, military and political reporting of the kind our people take for granted, either abroad or in Washington and there could be no mature system of communication between the Government and the people. That is one reason why the sudden complaint by one party to these regular dealings strikes us as monstrous and hypocritical--unless it is essentially perfunctory, for the purpose of retaining some discipline over the Federal bureaucracy.

5. I know how strange all this must sound. We have been taught, particularly in the past generation of spy scares and Cold War, to think of secrets as secrets--varying in their

"sensitivity" but uniformly essential to the private conduct of diplomatic and military affairs and somehow detrimental to the national interest if prematurely disclosed. By the standards of official Washington--Government and press alike--this is an antiquated, quaint and romantic view. For practically everything that our Government does, plans, thinks, hears and contemplates in the realms of foreign policy is stamped and treated as secret--and then unraveled by that same Government, by the Congress and by the press in one continuing round of professional and social contacts and cooperative and competitive exchanges of information.

6. The governmental, political and personal interests of the participants are inseparable in this process. Presidents make "secret" decisions only to reveal them for the purposes of frightening an adversary nation, wooing a friendly electorate, protecting their reputations. The military services conduct "secret" research in weaponry only to reveal it for the purpose of enhancing their budgets, appearing superior or inferior to a foreign army, gaining the vote of a congressman or the favor of a contractor. The Navy uses secret information to run down the weaponry of the Air Force. The Army passes on secret information to prove its superiority to the Marine Corps. High officials of the Government reveal secrets in the search for support of their policies, or to help sabotage the plans and policies of rival departments. Middle-rank officials of government reveal secrets so as to attract the attention of their superiors or to lobby against the orders of those superiors. Though not the only vehicle for this traffic in secrets--the

Congress is always eager to provide a forum--the press is probably the most important.

7. In the field of foreign affairs, only rarely does our Government give full public information to the press for the direct purpose of simply informing the people. For the most part, the press obtains significant information bearing on foreign policy only because it has managed to make itself a party to confidential materials, and of value in transmitting these materials from government to other branches and offices of government as well as to the public at large. This is why the press has been wisely and correctly called The Fourth Branch of Government.

8. I remember during my first month in Washington, in 1961, how President Kennedy tried to demonstrate his "toughness" toward the Communists after they built the Berlin wall by having relayed to me some direct quotations of his best arguments to Foreign Minister Gromyko. We were permitted to quote from this conversation and did so. Nevertheless, the record of the conversation was then, and remains today, a "secret."

9. I remember a year later, at the height of the Cuban missile crises, a State Department official concluding that it would surely be in the country's interest to demonstra[illegible] the perfidy of the same Mr. Gromyko as he denied any know[illegible]e of those missiles in another talk with the President; the [illegible]fficial returned within the hour and let me take verbatim notes of the Kennedy-Gromyko transcript--providing only that I would not use direct quotations. We printed the conversation between the President and the Foreign Minister in the third person, even though the record probably remains a "secret."

10. I remember President Johnson standing beside me, waist-deep in his Texas swimming pool, recounting for more than an hour his conversation the day before, in 1967, with Prime Minister Kosygin of the Soviet Union at Glassboro, N. J., for my "background" information, and subsequent though not immediate use in print, with a few special off-the record sidelights that remain confidential.

11. I remember Secretary of State Dean Rusk telling me at my first private meeting with him in 1961 that Laos is not worth the life of a single Kansas farm boy and that the SEATO treaty, which he would later invoke so elaborately in defense of the intervention in Vietnam, was a useless instrument that should be retained only because it would cause too much diplomatic difficulty to abolish it.

12. Similar dealings with high officials continue to this day.

13. We have printed stories of high officials of this Administration berating their colleagues and challenging even the President's judgment about Soviet activities in Cuba last year.

14. We have printed official explanations of why American intelligence gathering was delayed while the Russians moved missiles toward the Suez Canal last year.

15. These random recollections are offered here not as a systematic collection of secrets made known to me for many, usually self-evident (and often self-serving) reasons. Respect for sources and for many of the secrets prevents a truly detailed

accounting, even for this urgent purpose. But I hope I have begun to convey the very loose and special way in which "classified" information and documentation is regularly employed by our government. Its purpose is not to amuse or flatter a reporter whom many may have come to trust, but variously to impress him with their stewardship of the country, to solicit specific publicity, to push out diplomatically useful information without official responsibility, and, occasionally, even to explain and illustrate a policy that can be publicly described in only the vaguest terms.

16. This is the coin of our business and of the officials with whom we regularly deal. In almost every case, it is secret information and much of the time, it is top secret. But the good reporter in Washington, in Saigon, or at the United Nations, gains access to such information and such sources because they wish to use him for loyal purposes of government while he wishes to use them to learn what he can in the service of his readers. Learning always to trust each other to some extent, and never to trust each other fully--for their purposes are often contradictory or downright antagonistic--the reporter and the official trespass regularly, customarily, easily and unself-consciously (even unconsciously) through what they both know to be official "secrets." The reporter knows always to protect his sources and is expected to protect military secrets about troop movements and the like. He also learns to cross-check his information and to nurse it until an insight or story has turned ripe. The official knows, if he wishes to preserve this valuable

channel and outlet, to protect his credibility and the deeper purpose that he is trying to serve.

## The Role of "Classified" Information

17. I turn now in an attempt to explain, from a reporter's point of view, the several ways in which "classified" information figures in our relations with government. The Government's complaint against The Times in the present case comes with ill-grace because Government itself has regularly and consistently, over the decades, violated the conditions it suddenly seeks to impose upon us--in three distinct ways:

First, it is our regular partner in the informal but customary traffic in secret information, without even the pretense of legal or formal "declassification." Presumably, many of the "secrets" I cited above, and all the "secret" documents and pieces of information that form the basis of the many newspaper stories that are attached hereto, remain "secret" in their official designation.

Second, the Government and its officials regularly and customarily engage in a kind of ad hoc, de facto "declassification" that normally has no bearing whatever on considerations of the national interest. To promote a political, personal, bureaucratic or even commerical interest, incumbent officials and officials who return to civilian life are constantly revealing

the secrets entrusted to them. They use them to barter with the Congress or the press, to curry favor with foreign governments and officials from whom they seek information in return. They use them freely, and with a startling record of impunity, in their memoirs and other writings.

Third, the Government and its officials regularly and routinely misuse and abuse the "classification" of information, either by imposing secrecy where none is justified or by retaining it long after the justification has become invalid, for simple reasons of political or bureaucratic convenience. To hide mistakes of judgment, to protect reputations of individuals, to cover up the loss and waste of funds, almost everything in government is kept secret for a time and, in the foreign policy field, classified as "secret" and "sensitive" beyond any rule of law or reason. Every minor official can testify to this fact.

18. Obviously, there is need for some secrecy in foreign and military affairs. Considerations of secruity and tactical flexibility require it, though usually for only brief periods of time. The Government seeks with secrets not only to protect against enemies but also to serve the friendship of allies. Virtually every mature reporter respects that necessity and protects secrets and confidences that plainly serve it.

19. But for the vast majority of "secrets," there has developed between the Government and the press (and Congress) a

rather simple rule of thumb: The Government hides what it can, pleading necessity as long as it can, and the press pries out what it can, pleading a need and right to know. Each side in this "game" regularly "wins" and "loses" a round or two. Each fights with the weapons at its command. When the Government loses a secret or two, it simply adjusts to a new reality. When the press loses a quest or two, it simply reports (or misreport as best it can. Or so it has been, until this moment.

## Some Examples

20. Some of the most powerful examples of the widespread traffic in secret information that I describe were found by a few colleagues in the Washington bureau in a most perfunctory search of our files. Even as I write this affidavit I can glance at the Times of June 16, 1971 and find, beside the headline of the Court's temporary restraining order in this case, a sample from our military correspondent, William Beecher:

> WASHINGTON--June 15--The Nixon Administration is engaged in a broad policy review aimed at determining courses of action that might improve South Vietnam's ability to withstand military assaults next year, after most American forces have been withdrawn...
>
> Other key developments include an estimate by the National Security Council that North Vietnam is building toward a new offensive in the South next year....
>
> Well-placed Administration sources disclose that, against the expected North Vietnamese threat, officials are focusing on the following major questions....
>
> Many planners expect President Nixon to scale down to a residual force of 30,000 to 70,000 men by July 1, 1972, but to leave enough flexibility in the pace of reductions so that many of them can be timed for May and June...

> Should this residual force include many helicopter and artillery units to "stiffen" South Vietnamese defenses....

Not a single source of that information is identified by name, either because sources are peddling information for which they have asked not to be held responsible or because they are revealing information without authorization. Either way, they are relaying secret data which we, judging by other confidential contacts, deem reasonably reliable.

21. Some of the best examples of the regular traffic I describe may be found in the Pentagon papers that the Government asks us not to publish. The uses of top secret information by our Government in deliberate leaks to the press for the purposes of influencing public opinion are recorded, cited and commented upon in several places of the study. Also cited and analyzed are numerous examples of how the Government tried to control the release of such secret information so as to have it appear at a desired time, or in a desired publication, or in a deliberately loud or soft manner for maximum or minimum impact, as desired.

22. The temporary restraining order currently in effect precludes me from citing and quoting these passages in the Pentagon study. Examples of my point are so numerous that despite the great bulk of the papers, we were able to locate more than a dozen different kinds of such passages in less than an hour.

23. Extensive samples of stories plainly based on supposedly secret information are annexed to this affidavit. They include not only regular, daily articles but also major

contemporary analyses of Government decision-making at several key stages of the Vietnam war, right after the Cuban missile crisis, and shortly after the invasion of Cambodia. They include major journalistic investigations of secret institutions, like the Central Intelligence Agency. They combine known facts, pried-out secrets and deliberate disclosures of secrets. They are recognized within the profession and among readers as the most valuable kind of journalism and have never been shown to cause "irreparable" harm to the national security. They have occasionally prompted investigations inside the Government to determine the sources of information, the possible presence of disloyal or dissenting officials or the existence of information not previously given any weight or credibility by higher authority. None of these articles could be fairly described as less "sensitive" or more innocuous than the materials now challenged. None of them ever produced a legal challenge or a request for new legislation.

24. Samples of the second kind of traffic in secrets that I mentioned--the ad hoc, de facto (but by no means authorized, official or "legal") declassification of documents--are simply too numerous and too voluminous to collect in this format and on such short notice.

25. George Christian of Austin, Tex., former press secretary to President Johnson, who had free admission to all foreign and domestic discussions involving the President, at any level and in any forum, has already published his memoir. It includes 70 pages of narrative on the decisions to end the bombing of North Vietnam in late 1968, with many direct quotations of

the President and other officials, many unflattering references to our allies in South Vietnam and a great deal of detailed information, all still highly classified, about the secret negotiations with North Vietnam in Paris. This book, entitled, "The President Steps Down," (MacMillan, 1970), actually covers a period more recent than that discussed in the Pentagon papers, and at a much higher level of government and secrecy.

26. Recently, a book of top secret documents from members of the Joint Chiefs of Staff about the very same period covered by The Times' materials was published. The book, entitled "Roots of Involvement," by Marvin Kalb and Elie Abel (pp. 208-212) includes telegram exchanges between General Westmoreland and General Wheeler in early 1968. We are advised that these texts were taken from privately circulated analyses and histories of phases of the war by leading military commanders, still on active duty!

27. Theodore C. Sorensen's "Kennedy," written within a year of the death of his President, reveals dozens upon dozens of actions, meetings, reports and documents, all still treated as "classified" by the Government and unavailable for more objective journalistic analysis. Sorensen treated the Kennedy-Khrushchev correspondence as private, to protect future channels of communication with Soviet leaders, but the most "secret" of these letters, during the Cuban missile crisis, were fully revealed in two subsequent books, one by Elie Abel and one by Robert F. Kennedy. Sorensen also observes that while Kennedy was still alive he invited Professor Richard Neustadt into

Government archives for a contemporary analysis of decision-making of the "Skybolt" affair, the secrets of which were later revealed by the professor in a public account of this minor-missile crisis with Britain.

28. Arthur Schlesinger, Jr., kept notes in the White House for his history of the Kennedy years entitled "A Thousand Days." Roger Hilsman, an intelligence officer and then Assistant Secretary of State for the Far East poured his files and secrets into a quick memoir entitled "To Move a Nation" (Doubleday 1967). John Martin, special ambassador during the Dominican Republic invasion of 1965, wrote "Overtaken by Events," (Doubleday, 1966) recounting numerous confidential messages and communications. Chester Cooper, a C.I.A. official involved in Vietnam policy for two decades left the White House to produce what was probably the most complete and best-documented history until the Pentagon papers became available to The Times. "The Secret Search for Peace in Vietnam," by David Kraslow and Stuart Loory of The Los Angeles Times, remains to this day the most thorough newspaper (and book) account of the diplomacy surrounding the war--through channels that are still deemed "live".

The Pentagon Study

29. As The Times indicated in the first of its articles about the Pentagon study that is in question here, it is a massive history of how the United States went to war in Indochina. Its 3,000-page analysis, to which 4,000 pages of official documents are appended, was commissioned by Secretary of Defense Robert S. McNamara in 1967 and completed in 1968, by which time

he had been replaced by Clark M. Clifford. The analysis covers a historical record, as The Times said, from World War II to May, 1968--the start of the peace talks in Paris, by which time President Johnson had set a limit on further military commitments and revealed his intention to retire. We said that "though far from a complete history, even at 2.5 million words, the study forms a great archive of government decision-making on Indochina over three decades." That was the most concise journalistic definition we could give to the materials. Examination of our report thus far on the study and presentation of its documentation confirms the accuracy of that definition.

30. Moreover, the material was treated by The Times as an historical record that was of importance not only to our daily readers but also to the community of scholars that we have long served with a record of events. Our presentation was subjected to the most careful editing so that our report would remain faithful to the Pentagon record itself.

31. It is difficult, while publication is suspended, to describe the content and scope of the material. But our first article has already established the framework for our readers. We said the authors of the study reached many broad conclusions and specific findings, including the following:

(a) "--That the Truman Administration's decision to give military aid to France in her colonial war against the Communist led Vietminh 'directly involved' the United States in Vietnam and 'set' the course of American policy.

(b) "--That the Eisenhower Administration's decision to rescue a fledgling South Vietnam from a Communist take-over and attempt to undermine the new Communist regime of North Vietnam gave the Administration a 'direct role in the ultimate breakdown of the Geneva settlement' for Indochina in 1954.

(c) "--That the Kennedy Administration, though ultimately spared from major escalation decisions by the death of its leader, transformed a policy of 'limited-risk gamble,' which it inherited, into a 'broad commitment' that left President Johnson with a choice between more war and withdrawal.

(d) "--That the Johnson Administration, though the President was reluctant and hesitant to take the final decision, intensified the covert warfare against North Vietnam and began planning in the spring of 1964 to wage overt war, a full year before it publicly revealed the depth of its involvement and its fear of defeat.

(e) "--That this campaign of growing clandestine military pressure through 1964 and the expanding program of bombing North Vietnam in 1965 were begun despite the judgment of the Government's intelligence community that the measures would not cause Hanoi to cease its support of the Vietcong insurgency in the South, and that the bombing was deemed militarily ineffective within a few months.

(f) "--That these four succeeding Administrations

built up the American political, military and psychological stakes in Indochina, often more deeply than they realized at the time, with large-scale military equipment to the French in 1950; with acts of sabotage and terror warfare against North Vietnam beginning in 1954; with moves that encouraged and abetted the overthrow of President Ngo Dinh Diem of South Vietnam in 1963; with plans, pledges and threats of further action that sprang to life in the Tonkin Gulf clashes in August, 1964; with the careful preparation of public opinion for the years of open warfare that were to follow; and with the calculation in 1965, as the planes and troops were openly committed to sustained combat, that neither accommodation inside South Vietnam nor early negotiations with North Vietnam would achieve the desired result."

(g) Further characterizing the materials, our introduction also indicated revelations "about the ways in which several administrations conducted their business on a fateful course, with much new information about the roles of dozens of senior officials of both major political parties and a whole generation of military commanders."

32. The Times found the history to be concerned primarily with the decision-making process in Washington and the thoughts, motives, plans, debates and calculations of the decisionmakers. I have seen no materials bearing on future plans of a diplomatic or military nature.

The Times' interest throughout, like that of the study itself, in the words of our opening line, was in "how the United States went to war in Indochina."

33. In considering the remainder of the material, in preparation for publication, it is difficult to be precise, without compromising our deep conviction that no agency of Government ought to be placed in the position of approving, or being asked to approve, prior to publication, any article or other materials that we plan to publish in the exercise of our profession.

34. But it may be helpful to affirm to the Court what is already plain from what we have published so far. The remaining articles will be of the same historical character as the first three, similarly dealing with the decision-making process and the thoughts, debates and calculations of the decision-maker

35. Of the numbered paragraphs in our original introduction to the first article, the materials and accounts bearing on paragraphs (4) and (5) and a part of (6) -- covering the period from early 1964 to the middle of 1965 -- have already appeared in print. The remainder of that introduction was deemed by us to be a fair journalistic summary of the remainder of our story.

36. Within the limits we have set on discussion of our unpublished articles, we can state that the stories will cover, as we have indicated, the origins of the United States

involvement in Southeast Asia from World War II forward, in the broad context of our evolving policy for the Pacific, through the period of the Eisenhower Administration and the Geneva conference on Indochina. They will cover the history of policy-making inherited by President Kennedy and the Kennedy years, including the broad perspective of those years, which involved the specific problem of political stability culminating in the overthrow of President Ngo Dinh Diem. Among other things, our stories will also cover the history of other policy decisions through early 1968, including the personal disillusionment with policy felt by Secretary McNamara and the roles of other policy-makers.

37. The Pentagon papers published and to be published by the Times and a bureaucratic history and analysis of the interaction of events and policy decisions are an invaluable historical record of a momentous era in our history. We cannot believe they should or will be suppressed.

Max Frankel

Max Frankel

Sworn to before me this
17th day of June, 1971

[signature]

MARY ANN C. SIMPSON
Notary Public, State of New York
No. 41-3622775
Qualified in Queens County
Commission Expires March 30, 1973

[The following pages contain copies of exhibits submitted with Mr. Frankel's affidavit, articles copied from various publications.]

# EXHIBIT 2

Times in the case of the Pentagon papers, I am convinced, cannot be understood, or decided, without an appreciation of the manner in which a small and specialized corps of reporters and a few hundred American officials regularly make use of so-called classified, secret, and top secret information and documentation. It is a cooperative, competitive, antagonistic and arcane relationship. I have learned, over the years, that it mystifies even experienced professionals in many fields, including those with Government experience, and including the most astute politicians and attorneys.

4. Without the use of "secrets" that I shall attempt to explain in this affidavit, there could be no adequate diplomatic, military and political reporting of the kind our people take for granted, either abroad or in Washington and there could be no mature system of communication between the Government and the people. That is one reason why the sudden complaint by one party to these regular dealings strikes us as monstrous and hypocritical--unless it is essentially perfunctory, for the purpose of retaining some discipline over the Federal bureaucracy.

5. I know how strange all this must sound. We have been taught, particularly in the past generation of spy scares and Cold War, to think of secrets as secrets--varying in their


"sensitivity" but uniformly essential to the private conduct of
diplomatic and military affairs and somehow detrimental to the
national interest if prematurely disclosed. By the standards of

THE PENTAGON PAPERS

# Washington's Daily Secret Machine

A White House correspondent examines a predecessor's candid memo about how classified information is traded in the Beltway.



**By Peter Baker**

June 9, 2021

*This article is part of a special report on the 50th anniversary of the Pentagon Papers.*

One night during the legal battle over the Pentagon Papers, Max Frankel was stewing with anger. Mr. Frankel, then the Washington bureau chief of The New York Times, remembered that he was the only one at the table during the newspaper's deliberations with its legal team who had actually read the papers. Yet he was stunned when the outside lawyers hired by the newspaper to defend it asserted that the journalists had somehow erred by publishing national secrets.



Bettmann Archive, via Getty Images

“So I dashed off a long memo to make them understand how Washington works,” Mr. Frankel, who went on to become the paper’s executive editor from 1986 to 1994, recalled last month. The memo offered a ground-truth guide to the realities of government, journalism and secrecy in the nation’s capital. The lawyers were impressed and decided that the judges hearing the dispute could use a similar lesson, so they turned Mr. Frankel’s memo into an affidavit and submitted it along with the briefs in the case. What resulted was a legal document unlike any other. A close reading shows how much such trading in secrets still drives Washington today.

> It is a cooperative, competitive, antagonistic and arcane relationship. I have learned, over the years, that it mystifies even experienced professionals in many fields, including those with Government experience, and including the most astute politicians and attorneys.

In his affidavit, Mr. Frankel peeled back the fiction of a government dependent on secrets, valiantly guarding them against unscrupulous journalists, instead explaining the more intricate relationship in which all sides are involved in the information trade. And in the process, he exposed the false outrage of government officials who protest the disclosure of sensitive details when they themselves regularly traffic in them for their own purposes. In that, not much has changed. Hypocrisy is one commodity of which there remains no shortage in the capital.

> 4. Without the use of "secrets" that I shall attempt to explain in this affidavit, there could be no adequate diplomatic, military and political reporting of the kind our people take for granted, either abroad or in Washington and there could be no mature system of communication between the Government and the people. That is one reason why the sudden complaint by one

Fifty years later, this is still an apt description of how Washington works. "Secrets," as the government describes them, are the coin of the realm. Public officials and journalists deal in them constantly, and aggressive reporting by news outlets is as critical as ever in keeping the public informed about how the government is wielding power in its name.

of the participants are inseparable in this process. Presidents make "secret" decisions only to reveal them for the purposes of frightening an adversary nation, wooing a friendly electorate, protecting their reputations. The military services conduct "secret" research in weaponry only to reveal it for the purpose of enhancing their budgets, appearing superior or inferior to a foreign army, gaining the vote of a congressman or the favor of a contractor. The Navy uses secret information to run down the weaponry of the Air Force. The Army passes on secret information to prove its superiority to the Marine Corps. High officials of the Government reveal secrets in the search for support of their policies, or to help sabotage the plans and policies of rival departments. Middle-rank officials of government reveal secrets so as to attract the attention of their superiors or to lobby against the orders of those superiors.

In a few pithy sentences, Mr. Frankel made the point that in Washington everyone leaked secrets and for a variety of reasons, many of them less than altruistic. The same bureaucratic rivalries and political imperatives that applied in 1971 apply today. Presidents are still wooing electorates; the armed forces are still in competition for budgetary dollars; and officials still seek to gain support, sabotage opponents or lobby against their superiors — all through strategic leaks.

8. I remember during my first month in Washington, in 1961, how President Kennedy tried to demonstrate his "toughness" toward the Communists after they built the Berlin wall by having relayed to me some direct quotations of his best arguments to Foreign Minister Gromyko. We were permitted to quote from this conversation and did so. Nevertheless, the record of the conversation was then, and remains today, a "secret."

10. I remember President Johnson standing beside me, waist-deep in his Texas swimming pool, recounting for more than an hour his conversation the day before, in 1967, with Prime Minister Kosygin of the Soviet Union at Glassboro, N. J., for my "background" information, and subsequent though not immediate use in print, with a few special off-the record sidelights that remain confidential.

Mr. Frankel's Washington was a cozier one than today's, one where presidents routinely hobnobbed with select journalists and spoke with them without their words' being attributed to them. While presidents these days sometimes directly spin reporters without their names attached, they usually leave the more serious leaking to others. I've covered the last five presidents, and none of them ever stood next to me in a swimming pool, as President Lyndon B. Johnson had done with Mr. Frankel, to give a rundown of the latest conversation with a Russian leader.

President Donald J. Trump was an occasional exception. Chris Christie, the former governor of New Jersey, discovered that in 2018, when Jonathan Swan of Axios reported that Mr. Trump was considering Mr. Christie for White House chief of staff. When Mr. Christie expressed concern about the leak, the president told him, "Oh, I did it," according to "A Very Stable Genius" by Philip Rucker and Carol Leonnig. According to the book, Mr. Christie was shocked and thought: "You're leaking yourself? And to think I came this close to being your chief of staff."

those missiles in another talk with the President; the official returned within the hour and let me take verbatim notes of the Kennedy-Gromyko transcript--providing only that I would not use direct quotations. We printed the conversation between the President and the Foreign Minister in the third person, even though the record probably remains a "secret."

Obtaining direct notes of a president's meeting with another foreign leader is pretty rare today, but transcripts of two of Mr. Trump's early conversations with the president of Mexico and the prime minister of Australia were leaked in 2017 to The Washington Post, which posted them online. Unlike Mr. Frankel's example, the revelation here was presumably not authorized by Mr. Trump but disclosed by people who were alarmed by the conversations.

The episode led an angry president to become so guarded about future leaks that after one of his talks with President Vladimir V. Putin of Russia, Mr. Trump demanded that the interpreter hand over notes of the discussion. Mr. Trump did authorize the disclosure of one of his conversations with a foreign leader, the July 2019 telephone call in which he pressured Ukraine's president to "do us a favor" and investigate former Vice President Joseph R. Biden Jr. and other Democrats. But Mr. Trump released it openly, not through a leak, in hopes of proving he did nothing wrong. House Democrats were not convinced and impeached him anyway.

> 11. I remember Secretary of State Dean Rusk telling me at my first private meeting with him in 1961 that Laos is not worth the life of a single Kansas farm boy and that the SEATO treaty, which he would later invoke so elaborately in defense of the intervention in Vietnam, was a useless instrument that should be retained only because it would cause too much diplomatic difficulty to abolish it.

Dean Rusk was neither the first nor the last senior Washington official to deliver a message to a reporter under the cloak of anonymity that was diametrically the opposite of what he said when the cameras were on. In one memorable example, a spokesman for President George W. Bush's Coalition Provisional Authority in Iraq summed up the disastrous progress of the war in 2004 to Rajiv Chandrasekaran of The Washington Post: "Off the record: Paris is burning. On the record: Security and stability are returning to Iraq." During the beginning of the coronavirus

pandemic last year, Mr. Trump similarly told Bob Woodward that it was "deadly stuff" and in fact "more deadly" than the ordinary flu, while at the same time telling the public that it was "a little like the regular flu" and would disappear.

> accounting, even for this urgent purpose. But I hope I have begun to convey the very loose and special way in which "classified" information and documentation is regularly employed by our government. Its purpose is not to amuse or flatter a

The government makes no spousal exception to its rules on secrets, but that does not stop some officials from filling in their partners. When the Obama administration was about to launch its raid to capture or kill Osama bin Laden, Hillary Clinton, then secretary of state, did not even tell her husband, Bill, the former president, who has pretty high clearance. But Bill Daley, then the White House chief of staff, was not so discreet. He revealed to Garrett Graff, in an oral history published by Politico Magazine in April, that when his wife asked why he was so preoccupied, "I took her down to the first-floor bathroom, turned on the faucet, took her in the shower, shut the shower door and whispered in her ear: 'We're going to go after Osama bin Laden.'"

> be official "secrets." The reporter knows always to protect his sources and is expected to protect military secrets about troop movements and the like. He also learns to cross-check his

Even in an era of gushing leaks, one area that remains taboo for journalists is reporting information that would clearly put American troops at immediate risk. When a few other reporters and I were embedded with the Marine general commanding the drive toward Baghdad in 2003, we were privy to information about future military plans, but never published it until after any operations had taken place. But sometimes the government insists on protecting troop movements

even long after the fact; our former New York Times colleague Tim Weiner disclosed one such absurdity while at The Baltimore Sun in 1991 when he found that among the files still classified was one on World War I troop movements in 1917.

> To hide mistakes of judgment, to protect reputations of individuals, to cover up the loss and waste of funds, almost everything in government is kept secret for a time and, in the foreign policy field, classified as "secret" and "sensitive" beyond any rule of law or reason. Every minor official can testify to this fact.

Government officials these days are even more addicted to classifying information than they were in Mr. Frankel's day, no matter how routine or unremarkable the details may be. There is no perceived cost to overclassifying, whereas officials who fail to mark documents "confidential," "secret" or "top secret" take a risk of being accused of being too cavalier with sensitive information. In 2016, the last year a full accounting was made, the government reported 39,240 classification decisions.

"Everyone who has looked at the issue agrees that the government classifies too much information for too long," said Steven Aftergood, director of the Project on Government Secrecy at the Federation of American Scientists. "It is the path of least resistance." Even some of those who oversee agencies that rely on secrets think it has gone too far. Last year, Gen. John Hyten, vice chairman of the Joint Chiefs of Staff, told an audience, "In many cases in the department, we're just so over-classified it's ridiculous, just unbelievably ridiculous."

> periods of time. The Government seeks with secrets not only to protect against enemies but also to serve the friendship of allies. Virtually every mature reporter respects that necessity and protects secrets and confidences that plainly serve it.

Journalists are less deferential today to arguments that revealing sensitive information will affect alliances, but editors before publication regularly hear out government officials maintaining that disclosures would harm national security in some way. In some cases, they make a persuasive case, and The New York Times and other publications have withheld particular pieces of information. When WikiLeaks obtained reams of State Department cables and provided them to The Times, the paper did not publish the names of Afghan informers who might be subject to retaliation if their cooperation with American authorities were known. But most of the time, when officials seek to persuade editors not to go forward, what they are trying to avoid is not damage to national security but personal embarrassment or political trouble, neither of which is a news organization's job to guard against.

> 25. George Christian of Austin, Tex., former press secretary to President Johnson, who had free admission to all foreign and domestic discussions involving the President, at any level and in any forum, has already published his memoir. It includes 70 pages of narrative on the decisions to end the bombing of North Vietnam in late 1968, with many direct quotations of the President and other officials, many unflattering references to our allies in South Vietnam and a great deal of detailed information, all still highly classified, about the secret negotiations with North Vietnam in Paris. This book, entitled,

If anything, memoirs are even more common today than they were in Mr. Frankel's time. Dozens of presidential aides and appointees end up writing books about their time in government, often recounting episodes and conversations behind closed doors in great detail. Many of them have to go through a review process whereby the government scours the manuscript for classified information, but the interpretation is often quite subjective and even political.

When John R. Bolton, the former national security adviser, submitted a memoir in which he was highly critical of Mr. Trump, a career official said he could not directly quote the president. He left in the words attributed to the president, but simply deleted the quotation marks. The book was then cleared for publication. Only later did a Trump appointee with no experience in classification overrule the career official and declare that the book actually did contain secrets. Mr. Bolton considered it nothing more than a blatant effort to stifle a critical account of the president and published anyway. He is now in court defending against a Justice Department lawsuit.



34. But it may be helpful to affirm to the Court what is already plain from what we have published so far. The remaining articles will be of the same historical character as the first three, similarly dealing with the decision-making process and the thoughts, debates and calculations of the decision-maker:

Now as then, many of the fights journalists get into with the government over secrets concern not current-day events but episodes that took place in the past. In other words, what is at stake is less the continuing security of the country than the reputations of the people who once ran it. The New York Times and its reporters have filed 81 federal lawsuits under the Freedom of Information Act since 2003, some of them seeking documents about actions and decisions made under presidents who have already left office, trying to discern, as Mr. Frankel wrote, "the thoughts, debates and calculations of the decision-maker."

**Peter Baker** is the chief White House correspondent and has covered the last five presidents for The Times and The Washington Post. He also is the author of six books, most recently "The Man Who Ran Washington: The Life and Times of James A. Baker III."

---

A version of this article appears in print on , Section F, Page 10 of the New York edition with the headline: Classified, Until It's Not

# EXHIBIT 6

*Democracy Dies in Darkness*

**wp EXCLUSIVE**

# Pentagon bans journalists from press office, designating it a classified space

The change creates a new barrier compared with previous administrations, under which the office was an open room where reporters could stop by the desks of military public affairs officials without escorts.

June 1, 2026



By Scott Nover

The Defense Department has designated its press office a classified space and banned journalists from accessing it to meet with the public affairs officers who have traditionally answered their questions.

The change in security status, which took effect in recent weeks, was confirmed by four people familiar with the matter, who spoke on the condition of anonymity to discuss the nonpublic matter.

While Pentagon reporters are still largely barred from the building, as litigation over the agency's press rules continues, the change would have an outsize impact on them upon a possible return — restricting access to a space they have for years been able to walk freely.

People familiar with the change said it was driven in part by a shift that moved Pentagon speechwriters into the public affairs office. The office will be equipped with SIPRNet, the Secret Internet Protocol Router Network, so personnel can use the tool without decamping for a separate secured room.

"The Pentagon Press Office has been redesignated as a Sensitive Compartmented Information Facility due to speechwriters from the Office of the Secretary of War sharing the facility," acting Pentagon press secretary Joel Valdez said in a statement to The Washington Post. "These speechwriters routinely handle classified material and require SIPRNet access," he said.

"As a result, journalists will no longer be permitted to enter the office space," he added. "Access to the office of the Assistant to the Secretary of War for Public Affairs and to the Press Secretary remains available by appointment only."

The move comes amid a months-long legal battle over whether journalists should have unescorted access to unclassified spaces in the Pentagon. Members of the media traditionally have been allowed to access public spaces in the Defense Department, talking to sources and attending regular briefings.

But under Defense Secretary Pete Hegseth, the Pentagon has sharply curtailed access for the media, imposing a restrictive set of press guidelines and barring access to most spaces in the facility.

The latest designation creates a scenario in which even if journalists are able to access the Pentagon, their ability to interact with the department's spokespeople will be reduced.

The public affairs office used to be an open room where reporters could stop by the desks of military public affairs officials without escorts.

It was a meeting area, and in previous administrations the Pentagon press secretary or other officials would regularly hold off-camera gaggles and take questions from the news media, whose members would gather on couches in the room.

But neither Hegseth nor his staff have continued that dynamic.

Instead they have removed members of the media — including a new group from largely right-wing outlets — from the building. The estranged relationship stands in contrast to Secretary of State Marco Rubio and President Donald Trump's press operations; both leaders continue to regularly talk with the reporters who cover them and allow them continued access to the State Department and White House.

Long-simmering tensions between the defense secretary and the Pentagon press corps boiled over in October, when hundreds of journalists turned in their media credentials rather than sign an updated press policy mandating that they agree not to solicit information the government has not authorized for their release.

In March, a federal judge struck down the controversial policy after the New York Times sued. The government is currently appealing that ruling. The Times also sued a second time in May, explicitly challenging a requirement that journalists have an escort to move about the Pentagon. That litigation is ongoing.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

THE NEW YORK TIMES COMPANY, *et al.*

*Plaintiffs*,

v.

DEPARTMENT OF DEFENSE, *et al.*,

*Defendants*.

Civil Case No. 26-cv-01690 (PLF)

**SUPPLEMENTAL DECLARATION OF JULIAN E. BARNES**

I, Julian E. Barnes, hereby declare as follows:

1. I am over the age of 18 and make this declaration based upon my personal knowledge and experience. If called to do so, I could and would competently testify to these matters under oath.

2. I am a national security reporter with The New York Times ("The Times") and a plaintiff in the above-captioned case. I make this supplemental declaration in support of Plaintiffs' Motion for a Preliminary Injunction.

3. I have worked for The Times since June 2018 and am assigned to The Times's Washington Bureau. My work for The Times focuses on the Pentagon, United States intelligence agencies, and international security, among other subjects. As detailed in my prior declaration filed in this matter, *see* ECF No. 6-17, I am one of seven Times reporters who held a Pentagon Facility Alternate Credentials ("PFAC") issued by the Department of Defense (the "Department") as of fall 2025. I surrendered my PFAC on or about October 15, 2025 due to the Department's new policy regarding PFACs (the "October Policy"), and I obtained a new PFAC in March 2026, on or around the same day the Department implemented a revised PFAC policy (the "Interim Policy").

4. I have reviewed the Declarations of Joel Manuel Valdez and Sean Parnell filed in the above-captioned case. In his declaration, Mr. Valdez states that since I picked up my reinstated PFAC on March 24, 2026, I have "attempted to enter the Pentagon just twice." Valdez Decl., ¶ 4. That is correct. The reason I have not attempted to visit the Pentagon more frequently since March 24 is because of the Interim Policy. As I explained in my prior declaration, the Interim Policy's escort requirement makes it much more difficult for me to work from the Pentagon: I have to plan my visit in advance, submit a request for an escort that is linked to a specific event or appointment, wait for my request to be approved, and then wait for the assigned escort to meet me.

5. But the escort requirement is not merely logistically burdensome. It has effectively eliminated what made having a PFAC and visiting the Pentagon valuable for purposes of newsgathering and reporting. As stated in prior declarations, I have been covering national security for more than 20 years. At times, including, specifically, when I worked as a Pentagon correspondent for the Los Angeles Times and then The Wall Street Journal from 2006 to 2015, I would visit the Pentagon, on average, three or more times in a typical workweek, spending at least half of the workday in the building. At least once a week I would typically stay for a full workday. On most of those days, I did not have any appointment or scheduled interview. Instead, I would make a circuit of the Public Affairs offices around the building—moving, for example, from the Navy Public Affairs Office, to the Army Public Affairs Office, sometimes to the Marine Corps Public Affairs Office, then to the Joint Staff Public Affairs Office, the Air Force Public Affairs Office, and finally to the Public Affairs Office for the Office of the Secretary of Defense. At each stop, I would visit with senior and junior public affairs officers to talk, face-to-face, about stories I was pursuing—articles that were close to being published as well as those that were in earlier or more nascent stages. And I would ask questions based on who was there. For instance, if the Navy

Public Affairs officer responsible for shipbuilding was in the office, I might ask about the status of the latest warship. I am always working on multiple stories at any given time, and I would typically discuss several different topics with personnel at the Pentagon on any given day. Those conversations strengthened my reporting by giving me more context and often a more nuanced understanding of the issues; those conversations also helped me to understand and incorporate the U.S. military's perspective in my reporting.

6. At The Times, because I cover intelligence, I do not go to the Pentagon quite as frequently as some of my other Times colleagues, or as frequently as I did when I was a Pentagon correspondent. But, until October 2025, I would still go to the Pentagon frequently in the course of my work. Prior to October 2025, on most of the days that I went to the Pentagon, I did not have a specific, pre-arranged interview, event, or press conference to attend. Instead, I went because being at the Pentagon significantly improved my ability to do my job effectively by enabling me to speak, face-to-face, with multiple officials, including especially when I was reporting on breaking or rapidly developing events.

7. To be an effective reporter, I often need to have conversations, follow leads, and ask questions that cannot be planned days or even hours ahead of time. Before October 2025, being present at the Pentagon was one of the best ways for me to gain the kind of knowledge and context that is critical to in-depth, informed reporting. The escort requirement prevents me from doing any of that at the Pentagon. With the escort requirement in place, going to the Pentagon is rarely worthwhile. I visit the Pentagon only if I have a scheduled interview, and those are infrequently approved by the Department. If not for the escort requirement, I would go to the Pentagon more frequently, just as I did before October 2025.

8. I understand that the Department emphasizes, in its briefing, that the October Policy also imposed an escort requirement for certain parts of the Pentagon. *See* Opp. at 4. An escort requirement applicable to the entire building, like the one imposed for the first time in the Interim Policy, is categorically different from any restrictions the Department previously had in place. In my experience covering the Pentagon since 2004, there have always been certain areas of the Pentagon that for legitimate reasons credentialed reporters could not go without an invitation or without being accompanied by someone from the Department. But as a general matter, reporters were still able to freely move through the Pentagon's corridors, visit the various press offices around the building, and do their jobs. The Interim Policy bars reporters from accessing any part of the Pentagon without an escort. That restriction is unprecedented.

9. Last week the Department announced it had re-designated the Pentagon Press Office as a Secure Compartmented Information Facility, or "SCIF." In my experience, the Pentagon Press Office, consistent with its name and purpose, has traditionally been open to members of the press. In fact, in the past, including during President Trump's first term in office, the Department would hold morning press gaggles in the Pentagon Press Office. Some press offices, including the Press Office for the Office of the Secretary of Defense (OSD), had a separate internal room that was designated as a SCIF, but the rest of the Press Office was open and accessible to credentialed reporters without an escort.

10. Mr. Parnell's declaration states that, according to Pentagon Press Secretary Kingsley Wilson, her office received less frequent contacts from reporters after the October Policy was put in place, and that Ms. Wilson attributed that to reporters having less access to non-public information. While I can only speak to my own experience, those statements are not true with respect to me or any other reporter with The Times. At The Times, we practice "no surprises"

journalism; we contact the Department to get their perspective and comment any time that we plan to publish a story involving the Department. I adhered to that practice both before and after the October Policy was put in place and have continued to adhere to it since the Interim Policy was put in place. Simply put, I am not contacting the Department any less frequently than I did before the October Policy. Moreover, lacking unescorted access to the Pentagon has unquestionably impeded my ability to pursue the kinds of informal conversations that are important to doing my job well, but it has not eliminated my ability to report stories that rely on non-public information.

11. Mr. Valdez's declaration repeatedly takes issue with statements in my prior declaration, but it does not actually refute or contradict any of those statements. For example, it is true that I received unclear instructions about how to pick up my new PFAC and that, when I did pick up my new PFAC on March 24, Pentagon Press Office staff expressed uncertainty about how I could access the Pentagon library. *See* ECF No. 6-17 at ¶¶ 17, 20. The fact that I was told to contact a specific Department staff person, *see* Valdez Decl., ¶ 14, or that I received instructions for accessing the Library on a *subsequent day*, *id*., ¶ 15, does not establish that the instructions given to me on March 23 and March 24 were clear. They were not.

12. Similarly, Mr. Valdez asserts that Pentagon staff's "confusion" about whether and how I could access the building when I came for a pre-arranged interview on March 31, 2026 was a "one-off event." *Id*., ¶ 17. Even if that is true, that confusion—like the uncertainty about how reporters could access the Library and the unclear instructions regarding picking up PFACs—reinforces my view that the Department implemented the Interim Policy in a hasty and haphazard manner after the October Policy was invalidated, for the specific purpose of preventing me and other reporters from The Times from having their unescorted access to the Pentagon restored.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 9 day of June 2026 in Washington, DC.

Julian E. Barnes

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE NEW YORK TIMES COMPANY, *et al.*,<br>*Plaintiffs*,<br>v.<br>DEPARTMENT OF DEFENSE A/K/A DEPARTMENT OF WAR, *et al.*,<br>*Defendants*. | Civil Case No. 26-cv-01690 (PLF)<br><br>**DECLARATION OF RICHARD W. STEVENSON** |

**DECLARATION OF RICHARD W. STEVENSON**

I, Richard W. Stevenson, hereby declare as follows:

1. I am over the age of 18 and make this declaration based upon my personal knowledge and experience. I make this declaration in support of Plaintiffs' Motion for Preliminary Injunction in the above-captioned case. If called to do so, I could and would competently testify to these matters under oath.

2. I am an editor and Washington bureau chief with The New York Times ("The Times"). I have worked for The Times since 1985, and I have been based in The Times Washington bureau since 1996.

3. As part of my responsibilities as the Times's Washington bureau chief, I oversee coverage of the federal government, including the Pentagon and the Department of Defense (the "Department" or "Pentagon"). I edit the work of reporters at The Times, including reporters who cover the Pentagon and who have held Pentagon Facility Alternate Credentials ("PFACs").

4. Since I joined The Times in 1985 until October 2025, The Times has consistently had multiple reporters with PFACs who have regularly accessed the Pentagon in the course of their work. In my view, as an editor at The Times, the ability of Times reporters to access the Pentagon

unescorted on a regular basis has enhanced the depth, detail, and quality of The Times's coverage of the Pentagon, the Department, the United States military, and national security issues. It has enabled Times reporters to speak face-to-face with Department officials, attend press conferences and briefings, ask questions of public affairs staff and Department leadership, develop relationships with Department personnel, and provide immediate, in-person coverage of events that occur at the Pentagon. To my knowledge, no Times reporter has ever had their PFAC suspended, revoked, or not renewed because the Department concluded they posed a threat to the safety or security of Department personnel or property, or for any issue related to national security or the receipt or publication of classified information.

5. In my experience, Times reporters who cover the Pentagon and national security have consistently strived to be accurate, independent, probing, and fair in their coverage. One aspect of those reporters' job is to report on the official pronouncements of the Department and the information that Department leadership wants to convey to the public. But it is also important that those reporters seek to contextualize, investigate, and fact-check the Department's official pronouncements, which includes gathering and reporting information that may contradict or cast doubt on Department leaders' statements, and to sometimes report information that Department leadership does not intend to make public at all. All of this reporting is integral to ensuring that the American public understands what its government and military are doing, and to ensuring that Department leaders are accountable for their actions and statements.

6. For as long I have been a journalist, covering national security or the Pentagon (indeed, covering any aspect of the federal government) has meant learning information that is not public and that may (or may not) be considered "sensitive, controlled or classified." Sometimes government officials, including officials at the highest levels of government, want non-public

information to be made public. Sometimes non-public information is provided to reporters not for publication but to provide important context for their reporting. None of this is new. It has been true for at least the last 40 years that I have been with The Times. Nor does it mean that journalists are a threat to national security, as the current leadership of the Department now claims. To the contrary, the careful work that journalists at The Times and other news outlets undertake to deliver fact-based, independent reporting to the American public—including reporting that relies on information that the Department would characterize as secret—strengthens our democracy and helps safeguard our national security.

7. Since the fall of 2025, the Department has taken unprecedented step after unprecedented step to restrict access to the Pentagon for credentialed journalists with The Times and other news outlets unwilling to report only what the Department's leadership wants them to report. I submit this declaration to respond to assertions made by the Department regarding its latest unprecedented restriction: an "interim" policy prohibiting credentialed journalists from being anywhere in the Pentagon without an official escort. In particular, the Department's claim that barring all unescorted access to the Pentagon prevents journalists from obtaining non-public information is factually incorrect. And, as detailed below, the principal effect of the Department's new escort requirement has been to impose additional roadblocks to lawful, routine newsgathering and reporting by The Times, in particular, as well as other independent news organizations—journalism that serves the interests of the American public.

8. In September and October 2025, the Department announced new rules governing reporters' PFACs. I read the first version of this new PFAC policy shortly after it was announced in September, and read the final policy, as revised, when it was issued in early October. Among other things, the policy stated that a reporter or news organization who sought out, acquired, or

published information that Department officials had not approved—even if that information was not classified—could be deemed a "security or safety risk" and could lose their PFAC immediately, without warning. That meant that the Department could suspend or revoke a reporter's PFAC if that reporter or his or her news outlet gathered or published information that the Department viewed as unflattering or critical of it or its leadership. As explained in the prior declaration I submitted to the Court in a separate lawsuit filed by The Times challenging its constitutionality, Case No. 25-cv-4218, at ECF No. 10-5, the Department's October 2025 policy was, in my view, intolerable and inconsistent with The Times's journalistic standards and practices.

9. Ultimately, all seven Times reporters who held PFACs as of August 2025—Eric Schmitt, Helene Cooper, Greg Jaffe, John Ismay, Carol Rosenberg, Julian Barnes, and Bill Hennigan—decided not to sign the "Acknowledgment" required under the Department's October 2025 policy and were compelled to surrender their PFACs as a result. Accordingly, beginning in or around October 15, 2025, The Times no longer had reporters at the Pentagon regularly. Other individuals who were willing to sign the "Acknowledgement"—including Laura Loomer, Mike Lindell, and James O'Keefe, among others—were issued PFACs by the Department shortly thereafter, which gave them unescorted access to Correspondents' Corridor, the Pentagon Press Office, and other areas within the building.

10. On or about March 20, 2026, I learned that the district court had ordered the Department to reinstate the PFACs previously held by journalists with The Times. I understood the district court's order to require that Times reporters have their access to the Pentagon restored, and I was thrilled that Times reporters would once again be able to report from the building on a regular basis. While The Times continued to provide in-depth coverage of the Pentagon after October 15, 2025, that reporting was made more difficult and burdensome because no Times

reporter had a PFAC. In my view, keeping Times journalists out of the Pentagon is a detriment primarily to The Times's readership, who are deprived of perspectives and information that might otherwise be reported, but also to the Department itself.

11. On or about March 23, 2026, I learned that the Department had issued a revised "interim" policy (the "Interim Policy") governing PFACs and reporters' access to the Pentagon. I reviewed that Interim Policy shortly after it was issued. Among other things, the Interim Policy states that the Correspondents' Corridor—the area in the Pentagon where reporters work—is closed effective immediately, and that no journalist with a PFAC is permitted to enter the Pentagon unless it is for a pre-arranged interview, press conference or other event, and even then, only if the journalist is accompanied by an official escort at all times.

12. I have read the Declaration of Joel Manuel Valdez filed in the above-captioned case. Mr. Valdez's declaration states that the escort requirement has "functioned smoothly," suggests that The Times's reporters who hold PFACs have been able to access the Pentagon without issue since the Interim Policy took effect on or about March 23, 2026 "on every occasion they have sought to do so," and asserts that escorts have been "readily available." Valdez Decl., ¶¶ 5-6. This is inaccurate and misleading because it overlooks the ways in which the escort requirement has made it more cumbersome, more inefficient, and less worthwhile for The Times's reporters to access the Pentagon in the first place. Before October 15, 2025, Times reporters with PFACs often accessed the Pentagon on a regular basis. For example, Eric Schmitt would frequently spend most or all of his workday at the Pentagon. While at the Pentagon, Times reporters would gather information and context for their reporting both through pre-arranged events and interviews and through informal or unplanned interactions. The escort requirement now makes it difficult (if not impossible) for reporters to engage in informal or unplanned conversations at the Pentagon and

requires far more effort and advanced planning for any pre-arranged interviews or even to attend press conferences and other scheduled events. As Mr. Valdez acknowledges, Times national security reporters have only accessed the Pentagon a handful of times since March 23, 2026. *See* Valdez Decl., ¶ 5. That is because the escort requirement interferes with the reporters' ability to effectively do their jobs. If not for the escort requirement, in addition to the other constraints imposed by the Department's Interim Policy, including the closure of the Correspondents' Corridor, Times reporters would be at the Pentagon on a regular basis, typically at least several times a week, as they were before October 2025.

13. Mr. Valdez's declaration also states that it is a "standard security protocol[]" for PFAC holders to be issued wristbands, and for Department staff to repeatedly check their wristbands, when they attend press conferences and other scheduled events at the Pentagon. Valdez Decl., ¶ 18. To my knowledge, there was no requirement that PFAC holders wear wristbands at the Pentagon prior to October 2025. There was also no requirement, prior to October 2025, that reporters with PFACs obtain an escort to use the restroom. Nor was there any restriction on *when* reporters were permitted to use the restrooms in the Pentagon. Now, as Mr. Valdez acknowledges, *id*., reporters are being told when to use the restroom and are prohibited from visiting the restroom without an escort. Mr. Valdez's assertion that this is because the "closest restrooms to the Pentagon Briefing Room are located in a restricted area near the Joint Chiefs of Staff corridor" is misleading: Before October 2025, The Times's reporters were able to access those same restrooms, and others throughout the Pentagon, without restrictions.

14. I have also read the Declaration of Sean Parnell filed in the above-captioned case. Mr. Parnell asserts in his declaration that "[f]ollowing the implementation of the PFAC Policy in October 2025, the frequency with which the Pentagon press office was contacted by journalists

regarding sensitive, controlled or classified information dropped dramatically" and "changed from a regular pattern of contacts . . . to a small number of isolated incidents." Parnell Decl., ¶ 8. Mr. Parnell also states in his declaration that prior to the Department's implementation of the October Policy, "journalists frequently obtained sensitive information," *id.*, ¶ 11, and suggests that the "escort requirement" in the Interim Policy reduces the frequency with which journalists obtain "sensitive information." I do not know exactly what Mr. Parnell means by "sensitive, controlled, or classified information" or "sensitive information," particularly because "sensitive information" is not a term defined in the Interim Policy (or the October Policy) or Mr. Parnell's declaration. Further, as explained above, journalists frequently learn information that is not classified but is also not public, and may (or may not) be considered "sensitive," in the course of their reporting. To the extent Mr. Parnell is suggesting that The Times's reporting of non-public information about the Department decreased after October 15, 2025, that claim is demonstrably false.

15. After Pentagon Press Secretary Kingsley Wilson first made a similar claim in a declaration filed with the D.C. Circuit Court of Appeals on April 10, 2026, The Times set about fact checking it. To do so, the national security team looked at articles published by The Times beginning in October 2025 to determine whether it was apparent from the face of an article that it included original reporting about the Department that relied on non-public information. The information we took into account was available to Ms. Wilson when she filed her declaration in April 10, 2026, and was available to Mr. Parnell when he filed his declaration on June 4, 2026.

16. Between October 15, 2025 and March 31, 2026, The Times published 308 stories about the Department or U.S. military from its Pentagon team; 109 (or 36.5%) of those stories were "scoops"—*i.e.*, original reporting, which includes original reporting that builds or expands on exclusive information other news outlets published. More than half of those stories—158 (or

51.6%)—relied on non-public information. In comparison, during the first 123 days of the Trump Administration, *before* Secretary Hegseth had imposed any new restrictions on credentialed journalists' access to the Pentagon, The Times's published 170 stories about the Department or U.S. military from its Pentagon team; 60 (or 35.7%) of those stories were "scoops" and 76 (or 44.7%) of them relied on non-public information. In other words, the Times broke on average *more* stories about the Department based on non-public information after journalists' Pentagon access was revoked in October 2025. The frequency with which Times journalists "obtained" non-public information not approved for release by the Department did not "drop[] dramatically," and Mr. Parnell, like Ms. Wilson in her earlier statement, offers no data to support a claim to the contrary.

17. To give one recent example, on June 6, 2026, The Times published an article by Julian E. Barnes and Eric Schmitt about a growing concern within the Pentagon regarding espionage by Israel. That article included non-public information that the Department may well have considered "sensitive" or "secret." To my knowledge, the Times's reporters did not visit the Pentagon in the course of reporting that story. The notion that the escort requirement will prevent reporters from learning and reporting non-public information is preposterous. It has not had that effect so far, at least as far as The Times is concerned, and I do not expect that it will have that effect in the future.

18. Mr. Parnell's declaration also seems to imply that a purported reduction in the frequency with which journalists contact the Pentagon Press Office "regarding sensitive, controlled or classified information" demonstrates a corresponding reduction in journalists' amount of access to such information. Based on my experience, that assumption is incorrect, at least with respect to The Times. It is The Times's practice to always engage with Public Affairs

officials at the Department before publishing any story that has potentially sensitive or disputed elements. We have not changed that approach in response to constraints on our reporting imposed by the Department. The Times's journalists continue to contact the Pentagon Press Office to seek information and comment on a regular basis, just as they did before the Interim Policy and before the October Policy. Simply put, there has been no reduction in the frequency of contacts to the Pentagon Press Office by Times journalists as a result of changes in the Department's press access policies.

19. To the extent that the Department's rationale for the escort requirement is that it prevents reporters from accessing non-public information, that rationale simply does not hold water. It seems clear to me that the principal purpose and intended effect of barring journalists from the Pentagon without an escort is not to stop them from obtaining non-public information, but instead to thwart the basic and essential newsgathering that, prior to Secretary Hegseth's tenure, regularly took place at the Pentagon without posing any threat to national security.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 9th day of June 2026 in Washington, D.C.

[signature]

Richard W. Stevenson

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE NEW YORK TIMES COMPANY, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>DEPARTMENT OF DEFENSE, a/k/a DEPARTMENT OF WAR, *et al.*,<br><br>*Defendants*. | Civil Action No. 26-1690 (PLF) |

**NOTICE OF APPEAL**

PLEASE TAKE NOTICE that all Defendants hereby appeal to the United States Court of Appeals for the District of Columbia Circuit from this Court's June 30, 2026 opinion and order granting a preliminary injunction (ECF Nos. 16 and 17).

DATED: July 2, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

*/s/ Sarah Welch*
SARAH WELCH
Senior Counsel to the Assistant Attorney General
U.S. Department of Justice
Civil Division
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
(202) 514-3180
sarah.e.welch@usdoj.gov

*Counsel for Defendants*

APPEAL,TYPE−D

# U.S. District Court
# District of Columbia (Washington, DC)
# CIVIL DOCKET FOR CASE #: 1:26−cv−01690−PLF

NEW YORK TIMES COMPANY et al v. DEPARTMENT OF DEFENSE et al
Assigned to: Judge Paul L. Friedman
Case in other court: USCA, 26−05253
Cause: 05:702 Administrative Procedure Act

Date Filed: 05/18/2026
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**NEW YORK TIMES COMPANY** represented by **KatieLynn Boyd Townsend**
GIBSON DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
213−229−7839
Email: ktownsend@gibsondunn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Theodore J. Boutrous , Jr.**
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229−7804
Fax: (213) 229−6804
Email: tboutrous@gibsondunn.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JULIAN E. BARNES** represented by **KatieLynn Boyd Townsend**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Theodore J. Boutrous , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**DEPARTMENT OF DEFENSE**
*also known as*
DEPARTMENT OF WAR

represented by **James R. Powers**
U.S. DEPARTMENT OF JUSTICE
Federal Programs Branch, Civil Division
1100 L Street NW
Room 11218
Washington, DC 20005
(202) 353−0543
Fax: (202) 616−8470
Email: james.r.powers@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael Benjamin Bruns**
DOJ−Civ
1100 L St NW
Washington, DC 20005
202−514−4011
Email: michael.bruns@usdoj.gov

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sarah Welch**
DOJ−Civ
Civil Division
950 Pennsylvania Ave.
Ste 3612
Washington, DC 22202
202−514−3180
Email: sarah.e.welch@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**PETE HEGSETH**
*in his official capacity as Secretary of Defense*

represented by **James R. Powers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael Benjamin Bruns**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sarah Welch**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**SEAN PARNELL**
*in his official capacity as Chief Pentagon Spokesman*

represented by **James R. Powers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael Benjamin Bruns**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sarah Welch**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**TIMOTHY PARLATORE**
*in his official capacity as Special Advisor to the Secretary of Defense*

represented by **James R. Powers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael Benjamin Bruns**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sarah Welch**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/18/2026 | 1 | COMPLAINT *for Declaratory and Injunctive Relief* against DEPARTMENT OF DEFENSE A/K/A DEPARTMENT OF WAR, PETE HEGSETH, TIMOTHY PARLATORE, SEAN PARNELL ( Filing fee $ 405 receipt number ADCDC−12427306) filed by THE NEW YORK TIMES COMPANY, JULIAN E. BARNES. (Attachments: # 1 Exhibit 1 − Interim Policy [37−3], # 2 Exhibit 2 − Revised Policy Email [37−6], # 3 Exhibit 3 − October Policy [1−1], # 4 Exhibit 4 − September 18 Policy [1−5], # 5 Exhibit 5 − Parnell Letter to RCFP [1−3], # 6 Exhibit 5−1 − Redlined Acknowledgment [1−4], # 7 Exhibit 6 − RCFP Letter to Parnell [1−2], # 8 Exhibit 7 − Jason Crow Press Release, # 9 Exhibit 8 − Transcript of DOW Press Briefing, # 10 Exhibit 9 − Pete Hegseth Press Briefing − CSPAN, # 11 Exhibit 10 − Forbed Article re: James O'Keefe Asks About Identifying Anti−Trump DOD Members, # 12 Exhibit 11 − AP News Article re: Questions from new Pentagon press corps, # 13 Exhibit 12 − DOW Rapid Response X Post, # 14 Exhibit 13 − Cam Higby X post re: Press presence in Pentagon, # 15 Exhibit 14 − Wah Post Article re: Pentagon's new 'right−wing' press corps, # 16 Exhibit 15 − NYTimes Article re: Pentagon press corps support of Trump, # 17 Exhibit 16 − Scott Nover X Post re: Laura Loomer's tip request, # 18 Exhibit 17 − Scott Nover X Post re: Laura Loomer's tip request (cont.), # 19 Exhibit 18 − Laura Loomer X post re: Tip requests, # 20 Exhibit 19 − Sean Parnell X Post re: Announcmenets of new press corps., # 21 Exhibit 20 − Wash. Post Article re: Hegseth policy change on communications, # 22 Exhibit 21 − NYTimes Article: Fraidy−Cat at the Pentagon, # 23 Exhibit 22 − CBS News Article re: Declining new press requirements after 60 years, # 24 Exhibit 23 − Wash. Posrt Article re: Hegseth's legal fixer, Tim Parlatore, # 25 Exhibit 24 − Hegseth X Post re: Waving goodbye at reporters' refusal to sign, # 26 Exhibit 25 − NYTimes Article: Inside Hegseth's Effort to Limit Press Access at the Pentagon, # 27 Exhibit 26 − DOD News Article: Pentagon correspondent recalls 9/11, # 28 Exhibit 27 − Fox News Article re: Pentagon angry for report on Hegseth's security, # 29 Exhibit 28 − Joel Valdez X Post re: Safety risk from report on Hegseth's security, # 30 Exhibit 29 − Wash. Post Article re: Hegseth team ordered to stop polygraph tests, # 31 Exhibit 30 − Hegseth Press briefing on Iraon war − PBS, # 32 Exhibit 31 − Politico Article re: Parlatore's conflict−of−interest, # 33 Exhibit 32 − James O'Keefe X Post re: DOD officials criticism of Trump/Hegseth, # 34 Exhibit 33 − Spectrum News Article re: Hegseth blames media for second signal chat, # 35 Exhibit 34 − PBS Article re: Second Signal chat, # 36 Exhibit 35 − Pete Hegseth X Post re: Signal chat war plans, # 37 Exhibit 36 − Sean Parnell X Post re: Urging accountability for the NYTimes' lies, # 38 Exhibit 37 − AP Article: More news outlets lose Pentagon workspaces, # 39 Exhibit 38 − NBC Article re: Pentagon media rotation program, # 40 Exhibit 39 − Updated Physical Control Measures May 2025, # 41 Exhibit 40 − Cam Higby X Post re: Reporters creating a hostile work environment, # 42 Exhibit 41 − Sean Parnell X Post re: New Interim Policy, # 43 Exhibit 42 − Erik Wemple X Post re: Parlatore's press briefing, # 44 Summons, # 45 Summons, # 46 Summons, # 47 Summons, # 48 Summons, # 49 Summons, # 50 Civil Cover Sheet)(Boutrous, Theodore) (Entered: 05/18/2026) |
| 05/18/2026 | 2 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by THE NEW YORK TIMES COMPANY (Boutrous, Theodore) (Entered: 05/18/2026) |
| 05/18/2026 | 3 | NOTICE OF RELATED CASE by JULIAN E. BARNES, THE NEW YORK TIMES COMPANY. Case related to Case No. 25−04218. (Boutrous, Theodore) (Entered: 05/18/2026) |
| 05/18/2026 | 4 | NOTICE of Appearance by KatieLynn Boyd Townsend on behalf of JULIAN E. BARNES, THE NEW YORK TIMES COMPANY (Townsend, KatieLynn) (Entered: 05/18/2026) |
| 05/19/2026 | | Case Assigned to Judge Paul L. Friedman. (zjm) (Entered: 05/19/2026) |
| 05/19/2026 | 5 | SUMMONS (6) Issued Electronically as to DEPARTMENT OF DEFENSE, PETE HEGSETH, TIMOTHY PARLATORE, SEAN PARNELL, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(zjm) (Entered: 05/19/2026) |
| 05/22/2026 | 6 | MOTION for Preliminary Injunction by JULIAN E. BARNES, NEW YORK TIMES COMPANY. (Attachments: # 1 Memorandum in Support, # 2 Declaration of Theodore |

| | | |
|---|---|---|
| | | J. Boutrous, Jr., # 3 Exhibit 1 − News Article, # 4 Exhibit 2 − News Article, # 5 Exhibit 3 − Book Excerpts, # 6 Exhibit 4 − News Article, # 7 Exhibit 5 − News Article, # 8 Exhibit 6 − Court Procedures, # 9 Exhibit 7 − Article, # 10 Exhibit 8 − Article, # 11 Exhibit 9 − Webpage, # 12 Exhibit 10 − Webpage, # 13 Exhibit 11 − News Article, # 14 Exhibit 12 − News Article, # 15 Exhibit 13 − News Article, # 16 Exhibit 14 − News Article, # 17 Declaration of Julian E. Barnes, # 18 Declaration of Robert Burns, # 19 Declaration of Chris Meagher, # 20 Declaration of Pete Williams, # 21 Exhibit − Williams Declaration A − Email, # 22 Text of Proposed Order)(Boutrous, Theodore) (Entered: 05/22/2026) |
| 05/22/2026 | 7 | NOTICE of Appearance by Michael Benjamin Bruns on behalf of All Defendants (Bruns, Michael) (Entered: 05/22/2026) |
| 05/22/2026 | 8 | CERTIFICATE OF SERVICE by JULIAN E. BARNES, NEW YORK TIMES COMPANY . (Boutrous, Theodore) (Entered: 05/22/2026) |
| 05/22/2026 | 9 | Consent MOTION for Briefing Schedule by DEPARTMENT OF DEFENSE, PETE HEGSETH, TIMOTHY PARLATORE, SEAN PARNELL. (Attachments: # 1 Text of Proposed Order)(Bruns, Michael) (Entered: 05/22/2026) |
| 05/26/2026 | | MINUTE ORDER granting 9 Consented to Motion for Scheduling Order. Defendants shall file their opposition to plaintiffs' motion for a preliminary injunction on or before June 4, 2026. Plaintiffs shall file their reply on or before June 9, 2026. The parties shall appear for a hearing on plaintiffs' motion for a preliminary injunction at 10:00 a.m. on Friday, June 12, 2026, in Courtroom 29 in the William B. Bryant Annex to the E. Barrett Prettyman Courthouse at 333 Constitution Avenue N.W., Washington, D.C. 20001. Signed by Judge Paul L. Friedman on May 26, 2026.(lccm) (Entered: 05/26/2026) |
| 05/26/2026 | | Set/Reset Deadlines: Opposition due by 6/4/2026 and Replies due by 6/9/2026. Motion Hearing set for 6/12/2026 at 10:00 AM in Courtroom 29A− In Person before Judge Paul L. Friedman. (tj) (Entered: 05/26/2026) |
| 06/04/2026 | 10 | NOTICE of Appearance by Sarah Welch on behalf of All Defendants (Welch, Sarah) (Entered: 06/04/2026) |
| 06/04/2026 | 11 | Memorandum in opposition to re 6 MOTION for Preliminary Injunction filed by DEPARTMENT OF DEFENSE, PETE HEGSETH, TIMOTHY PARLATORE, SEAN PARNELL. (Attachments: # 1 Exhibit 1 (Field Manual), # 2 Exhibit 2 (Valdez Declaration), # 3 Exhibit 3 (Parnell Declaration))(Welch, Sarah) (Entered: 06/04/2026) |
| 06/08/2026 | | MINUTE ORDER: The Court will connect the public−access telephone line for the hearing scheduled for Friday, June 12, 2026 at 10 a.m. Any member of the public or media may access the public−access line by dialing (833) 990−9400 and using meeting ID 492497252. As a reminder, any use of the public−access telephone line requires adherence to the general prohibition against recording, livestreaming, and rebroadcasting of court proceedings (including those held by videoconference). Violation of these prohibitions may result in sanctions, including removal of court−issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court. Signed by Judge Paul L. Friedman on June 8, 2026.(lccm) (Entered: 06/08/2026) |
| 06/09/2026 | 12 | REPLY to opposition to motion re 6 Motion for Preliminary Injunction,,, */ Reply Brief in Support of Plaintiffs' Motion for Preliminary Injunction* filed by JULIAN E. BARNES, NEW YORK TIMES COMPANY. (Attachments: # 1 Declaration (Supplemental) of Theodore J. Boutrous Jr., # 2 Exhibit 1 − Max Frankel Affidavit, # 3 Exhibit 2 − NYTimes Article 1, # 4 Exhibit 3 − WSJ Article, # 5 Exhibit 4 − NYTimes Article 2, # 6 Exhibit 5 − CNN Video, # 7 Exhibit 6 − Washington Post Article, # 8 Declaration (Supplemental) of Julian E. Barnes, # 9 Declaration of Richard W. Stevenson)(Boutrous, Theodore) (Entered: 06/09/2026) |
| 06/12/2026 | | Minute Entry for Motion Hearing held on 6/12/2026 before Judge Paul L. Friedman: The matter was before the Court on Plaintiffs' Motion 6 for Preliminary Injunction. Theodore J. Boutrous, Jr., Katielynn B. Townsend, Susan Pelletier, and Eric Brooks present on behalf of plaintiffs. Sarah Welch present on behalf of defendants. The motion was briefed, argued, and taken under advisement. Defendants' request to respond to new evidence submitted in plaintiffs' reply brief 12 is GRANTED. |

| | | |
|---|---|---|
| | | Defendants shall file their response on or before Wednesday, June 17, 2026. Plaintiffs shall file a response not to exceed five pages. (Court Reporter: Tammy Nestor)(mhp) (Entered: 06/12/2026) |
| 06/12/2026 | | MINUTE ORDER: Defendants shall file their response to plaintiffs' 12 reply on or before June 17, 2026. Plaintiffs shall file their response of up to five pages on or before June 18, 2026. Signed by Judge Paul L. Friedman on 6/12/2026. (mhp) (Entered: 06/12/2026) |
| 06/17/2026 | 13 | SUPPLEMENTAL MEMORANDUM to re 6 MOTION for Preliminary Injunction filed by DEPARTMENT OF DEFENSE, PETE HEGSETH, TIMOTHY PARLATORE, SEAN PARNELL. (Welch, Sarah) (Entered: 06/17/2026) |
| 06/18/2026 | 14 | SUPPLEMENTAL MEMORANDUM to re 6 MOTION for Preliminary Injunction filed by JULIAN E. BARNES, NEW YORK TIMES COMPANY. (Boutrous, Theodore) (Entered: 06/18/2026) |
| 06/24/2026 | 15 | NOTICE of Appearance by James R. Powers on behalf of All Defendants (Powers, James) (Entered: 06/24/2026) |
| 06/30/2026 | 16 | ORDER granting 6 Plaintiffs' Motion for a Preliminary Injunction. Plaintiffs shall post a bond in the amount of $1.00 on or before July 7, 2026. See Order for details. Signed by Judge Paul L. Friedman on June 30, 2026. (lccm) (Entered: 06/30/2026) |
| 06/30/2026 | 17 | OPINION granting 6 Plaintiffs' Motion for a Preliminary Injunction. See Opinion for details. Signed by Judge Paul L. Friedman on June 30, 2026. (lccm) (Entered: 06/30/2026) |
| 07/01/2026 | | DEPOSIT of Bond in the amount of $ 1.00, Receipt Number 212152. (zjm) (Entered: 07/01/2026) |
| 07/02/2026 | 18 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 16 Order, Memorandum & Opinion, 17 Order, Memorandum & Opinion by TIMOTHY PARLATORE, PETE HEGSETH, DEPARTMENT OF DEFENSE, SEAN PARNELL. Fee Status: No Fee Paid. (Welch, Sarah) (Entered: 07/02/2026) |
| 07/02/2026 | 19 | MOTION to Stay re 16 Order, Memorandum & Opinion, 17 Order, Memorandum & Opinion *Pending Appeal* by DEPARTMENT OF DEFENSE, PETE HEGSETH, TIMOTHY PARLATORE, SEAN PARNELL. (Welch, Sarah) (Entered: 07/02/2026) |
| 07/02/2026 | 20 | ORDER granting in part and denying in part 19 Defendants' Motion for Stay Pending Appeal. See Order for details. Signed by Judge Paul L. Friedman on July 2, 2026. (lccm) (Entered: 07/02/2026) |
| 07/02/2026 | 21 | Transmission of the Notice of Appeal, Order Appealed (Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 18 Notice of Appeal to DC Circuit Court. (zjm) (Entered: 07/02/2026) |
| 07/06/2026 | | USCA Case Number 26−5253 for 18 Notice of Appeal to DC Circuit Court filed by DEPARTMENT OF DEFENSE, TIMOTHY PARLATORE, PETE HEGSETH, SEAN PARNELL. (mg) (Entered: 07/06/2026) |
| 07/14/2026 | 22 | NOTICE *of Submission of Additional Evidence* by JULIAN E. BARNES, NEW YORK TIMES COMPANY (Attachments: # 1 Declaration of David McCraw)(Boutrous, Theodore) (Entered: 07/14/2026) |
| 07/15/2026 | 23 | Unopposed MOTION for Extension of Time to File Answer re 1 Complaint,,,,,,,,,,,,, by DEPARTMENT OF DEFENSE, PETE HEGSETH, TIMOTHY PARLATORE, SEAN PARNELL. (Attachments: # 1 Text of Proposed Order)(Powers, James) (Entered: 07/15/2026) |
| 07/16/2026 | | MINUTE ORDER granting 23 Defendants' Unopposed Motion for Extension of Time to Answer or Otherwise Respond to the Complaint. Defendants shall answer or otherwise respond to Plaintiffs' 1 Complaint for Declaratory and Injunctive Relief on or before August 11, 2026. Signed by Judge Paul L. Friedman on July 16, 2026. (lccm) (Entered: 07/16/2026) |

| | | |
|---|---|---|
| 07/16/2026 | | Set/Reset Deadlines: Answer due by 8/11/2026. (tj) (Entered: 07/16/2026) |