**ORAL ARGUMENT NOT YET SCHEDULED**
**No. 26-5253**

# United States Court of Appeals
# For the District of Columbia Circuit

---

DEPARTMENT OF DEFENSE A/K/A DEPARTMENT OF WAR, ET AL.,

*Defendants-Appellants*,

v.

THE NEW YORK TIMES COMPANY, ET AL.,

*Plaintiffs-Appellees*.

---

On Appeal From The United States District Court
For The District Of Columbia, No. 1:26-cv-1690-PLF,
The Honorable Paul L. Friedman

---

**BRIEF FOR THE NEW YORK TIMES COMPANY AND JULIAN E. BARNES**


Susan M. Pelletier
Eric Brooks
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036-5306
(202) 955-8500
SPelletier@gibsondunn.com
EBrooks2@gibsondunn.com

Theodore J. Boutrous, Jr.
Katie Townsend
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
TBoutrous@gibsondunn.com
KTownsend@gibsondunn.com

*Counsel for Plaintiffs-Appellees*
*The New York Times Company and*
*Julian E. Barnes*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

1. **Parties and amici.** All parties, intervenors, and *amici* appearing in this court are listed in Appellants' Certificate as to Parties, Rulings, and Related Cases, Document #2181846 (July 6, 2026).

2. ***Rulings under review.*** References to the rulings at issue appear in Appellants' Certificate as to Parties, Rulings, and Related Cases, Document #2181846 (July 6, 2026).

3. **Related cases.** This case was not previously before this Court. There is one pending related case in this Court: *New York Times Co. v. U.S. Department of Defense*, No. 26-5113 (D.C. Cir.).

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Plaintiff-Appellee The New York Times Company ("The Times") discloses that it is a publicly traded company, it has no parent company, and no publicly held corporation owns ten percent or more of its stock. The Times is a global media organization focused on creating and distributing high-quality news and information.

# TABLE OF CONTENTS

Page


INTRODUCTION ............................................................................................1

STATEMENT ................................................................................................5

A. Journalists Have Worked Inside the Pentagon for Eighty Years. ..............5

B. Department Officials Target The Times and Other News Organizations for Their Coverage. ............................................................8

C. The Department Implements the October Policy. ......................................9

D. Plaintiffs Successfully Challenge the October Policy, Prompting the Department to Immediately Promulgate the "Interim Policy." ................11

E. Plaintiffs Challenge the Interim Policy. ..................................................14

SUMMARY OF ARGUMENT .......................................................................18

LEGAL STANDARD .....................................................................................21

ARGUMENT .................................................................................................22

I. The Escort Requirement Is Unconstitutional Retaliation. ............................22

A. The District Court Did Not Clearly Err in Finding an Adverse Action. ..23

1. The escort requirement is an adverse action. ....................................23

2. The Department's contrary arguments are wrong ..............................25

a. The escort requirement severely burdens reporting. .......................25

b. The escort requirement's applicability to all reporters does not make it less adverse. .........................................................................27

i. The argument is forfeited. ........................................................27

ii. A generally applicable rule can be adverse. .............................28

iii. The escort requirement is neither neutral nor generally applicable. ........................................................................................31

B. The District Court Did Not Clearly Err in Finding Causation. ................34

II. The Preliminary Injunction May Be Affirmed On Other Grounds. ..............42

A. The Escort Requirement Is Unreasonable and Viewpoint Discriminatory. .........................................................................................42

1. The escort requirement is an unreasonable restriction. .......................43

2. The escort requirement is an effort to suppress a disfavored editorial viewpoint....45
B. The Escort Requirement Violates the APA....48
III. The Remaining Injunction Factors Support Equitable Relief. ....52
A. Plaintiffs Have Shown Irreparable Harm. ....52
B. The Balance of Equities and Public Interest Favor Injunctive Relief. ....54
CONCLUSION ....55

## TABLE OF AUTHORITIES

Page(s)

### Cases

*ACLU of Maryland, Inc. v. Wicomico County*,
999 F.2d 780 (4th Cir. 1993) ....................................................................29

*ACLU of Ohio Found., Inc. v. DeWeese*,
633 F.3d 424 (6th Cir. 2011) ....................................................................35

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013)..................................................................................46

*Am. Acad. of Pediatrics v. HHS*,
816 F. Supp. 3d 27 (D.D.C. 2026)............................................................25

*Am. Freedom Def. Initiative v. WMATA*,
901 F.3d 356 (D.C. Cir. 2018)..................................................41, 45, 47

*Am. Radio Relay League, Inc. v. FCC*,
524 F.3d 227 (D.C. Cir. 2008)..................................................................48

*Anthropic PBC v. Department of War*,
2026 WL 1042493 (D.C. Cir. 2026)....................................................54, 55

*Aref v. Lynch*,
833 F.3d 242 (D.C. Cir. 2016)..................................................19, 23, 28

*Ateba v. Leavitt*,
133 F.4th 114 (D.C. Cir. 2025)..................................................25, 42, 43

*Baltimore Sun Co. v. Ehrlich*,
437 F.3d 410 (4th Cir. 2006) ....................................................................26

*Bd. of Governors of the Fed. Reserve Sys. v. United States*,
823 F. Supp. 3d 1 (D.D.C. 2026)..............................................................42

*Bennie v. Munn*,
822 F.3d 392 (8th Cir. 2016) ....................................................................21

*Blankenship v. Manchin*,
471 F.3d 523 (4th Cir. 2006) ....................................................................26

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993)..................................................................................33

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971)..................................................................................50

*Citizens United v. FEC*,
558 U.S. 310 (2010)..................................................................................54

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
473 U.S. 788 (1985) .......... 41, 46

*Counterman v. Colorado*,
600 U.S. 66 (2023) .......... 30

*Crawford-El v. Britton*,
523 U.S. 574 (1998) .......... 21, 34

*Ctr. for Nat. Sec. Stud. v. U.S. Dep't of Just.*,
331 F.3d 918 (D.C. Cir. 2003) .......... 55

*Davidson v. Chestnut*,
193 F.3d 144 (2d Cir. 1999) .......... 21, 23

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) .......... 38, 41, 50, 51

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) .......... 49

*Diegelmann v. Bessent*,
181 F.4th 142 (D.C. Cir. 2026) .......... 28

*Elrod v. Burns*,
427 U.S. 347 (1976) .......... 54

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) .......... 51

*First Choice Women's Res. Centers, Inc. v. Davenport*,
146 S. Ct. 1114 (2026) .......... 52

*Geleta v. Gray*,
645 F.3d 408 (D.C. Cir. 2011) .......... 39

*Google, Inc. v. Hood*,
822 F.3d 212 (5th Cir. 2016) .......... 54

*Gordon v. Holder*,
721 F.3d 638 (D.C. Cir. 2013) .......... 54

*Grossbaum v. Indianapolis-Marion County Building Authority*,
100 F.3d 1287 (7th Cir. 1996) .......... 27, 32

*Hanson v. Smith*,
120 F.4th 223 (D.C. Cir. 2024) .......... 21

*U.S. ex rel. Heath v. AT&T, Inc.*,
791 F.3d 112 (D.C. Cir. 2015) .......... 42

*Heffernan v. City of Paterson*,
578 U.S. 266 (2016) .......... 28, 30

*Int'l Ladies' Garment Workers' Union v. Donovan*,
722 F.2d 795 (D.C. Cir. 1983)....................................................................51

*Jenner & Block LLP v. U.S. Dep't of Just.*,
784 F. Supp. 3d 76 (D.D.C. 2025)...............................................................23

*Karem v. Trump*,
960 F.3d 656 (D.C. Cir. 2020)..............................................20, 26, 44, 52, 54

*Keepseagle v. Perdue*,
856 F.3d 1039 (D.C. Cir. 2017)..................................................................27

*Koala v. Khosla*, 931 F.3d 887 (9th Cir. 2019) ............................................30, 33

*Lozman v. City of Riviera Beach*,
585 U.S. 87 (2018)....................................................................................31

*Martin v. Dep't of Just.*,
488 F.3d 446 (D.C. Cir. 2007)....................................................................45

*McCreary Cnty., Ky. v. ACLU of Ky.*,
545 U.S. 844 (2005)..................................................................................35

*Media Matters v. FTC*,
2025 WL 2988966 (D.C. Cir. Oct. 23, 2025)................................21, 34, 36, 40

*Media Matters for Am. v. Paxton*,
138 F.4th 563 (D.C. Cir. 2025)............................................19, 22, 25, 52, 54

*Michigan v. EPA*,
576 U.S. 743 (2015)..................................................................................52

*Minn. Star & Tribune Co. v. Minn. Comm'r of Rev.*,
460 U.S. 575 (1983)..................................................................................33

*Minn. Voters All. v. Mansky*,
585 U.S. 1 (2018)...........................................................................4, 20, 43, 45

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983).........................................................................4, 48, 49, 50

*N.Y. Times Co. v. Dep't of Def.*,
824 F. Supp. 3d 27 (D.D.C. 2026)............................ 2, 6, 11, 35, 43, 46, 47, 52

*N.Y. Times Co. v. Dep't of Def.*,
830 F. Supp. 3d 1 (D.D.C. 2026)...................................................................2

*N.Y. Times Co. v. Dep't of Def.*,
No. 26-5113, 2026 WL 1179440 (D.C. Cir. Apr. 27, 2026).......................14, 53

*N.Y. Times Co. v. Dep't of Def.*,
No. 26-5253, 2026 WL 2168070 (D.C. Cir. July 16, 2026)........................17, 29

*N.Y. Times Co. v. Sullivan*,
376 U.S. 254 (1964)........................................................................................30

*N.Y. Times Co. v. United States*,
403 U.S. 713 (1971)........................................................................................47

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024)..........................................................................................3

*Nat'l Tr. for Historic Pres. in the United States v. Nat'l Park Serv.*,
2026 WL 2276494 (D.C. Cir. 2026)..................................................................55

*Nieves v. Bartlett*,
587 U.S. 391 (2019)........................................................................................41

*PhantomALERT Inc. v. Apple Inc.*,
184 F.4th 790 (D.C. Cir. 2026)........................................................................27

*Pursuing Am.'s Greatness v. FEC*,
831 F.3d 500 (D.C. Cir. 2016)..........................................................................42

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995)........................................................................................46

*Rutan v. Republican Party of Illinois*,
497 U.S. 62 (1990)..........................................................................................23

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947)...................................................................................20, 49

*Sherrill v. Knight*,
569 F.2d 124 (D.C. Cir. 1977)............................................................................6

*Sons of Confederate Veterans v. City of Lexington*,
722 F.3d 224 (4th Cir. 2013) ...........................................................................41

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011)..............................................................................20, 33, 47

*Suarez Corp. Industries v. McGraw*,
202 F.3d 676 (4th Cir. 2000) ...........................................................................23

*Tao v. Freeh*,
27 F.3d 635 (D.C. Cir. 1994)...................................................................23, 29, 30

*Thompson v. N. Am. Stainless, LP*,
562 U.S. 170 (2011)........................................................................................29

*Toolasprashad v. Bureau of Prisons*,
286 F.3d 576 (D.C. Cir. 2002)..........................................................................30

*Trump v. Cook*,
146 S. Ct. 2234 (2026)......................................................................................37

*United States v. O'Brien*,
391 U.S. 367 (1968) ... 41

*United States v. U.S. Gypsum Co.*,
333 U.S. 364 (1948) ... 21

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) ... 51

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ... 21

*Yakima Valley Cablevision, Inc. v. FCC*,
794 F.2d 737 (D.C. Cir. 1986) ... 51

*Yamaha Corp. of Am. v. United States*,
961 F.2d 245 (D.C. Cir. 1992) ... 45

*Zerilli v. Smith*,
656 F.2d 705 (D.C. Cir. 1981) ... 5

**Statutes**

5 U.S.C. § 706(2)(A) ... 48

**Other Authorities**

Daryl J. Levinson, *Collective Sanctions*, 56 Stan. L. Rev. 345, 352–60 (2003) ... 29

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| Barnes | Julian E. Barnes, a reporter for The Times |
| Department | Department of Defense a/k/a Department of War |
| J.A. | Joint Appendix |
| PFAC | Pentagon Facilities Alternate Credential |
| The Times | The New York Times Company |

## INTRODUCTION

The Department of Defense a/k/a Department of War (the "Department") under Secretary Pete Hegseth has made its view of The New York Times ("The Times") and its reporters, including Julian E. Barnes ("Barnes"), unmistakably clear. Its leadership has labeled The Times's coverage of the Department "garbage" and "propaganda," and has called for The Times to be held "accountable." The Department's open hostility to The Times and to other news organizations committed to delivering fact-based reporting about the U.S. military, including the ongoing war in Iran, places in stark relief the escalating, retaliatory measures taken by the Department to punish and stifle journalism that Department officials dislike—measures that deprive the public of vital information about their government.

This appeal—the second of two related appeals pending before this Court—arises from an arbitrary and unprecedented "escort" requirement that strips credentialed reporters of their longstanding access to the Pentagon. It is the Department's *coup de grace* in an intensifying campaign to banish independent reporting from the Pentagon and curb coverage perceived as critical of the Department and its leadership. It is a blatant violation of the First Amendment and the Administrative Procedure Act ("APA") and it was properly preliminarily enjoined.

The escort requirement was not written on a clean slate. It was direct and immediate retribution for Plaintiffs' exercise of their First Amendment rights,

including Plaintiffs' successful challenge to Defendants' earlier assault on a free press. On March 20, the district court granted summary judgment to Plaintiffs and permanently enjoined provisions of the Department's October 2025 press credentialing policy (the "October Policy") that targeted news organizations, including The Times, "based on editorial viewpoint" in violation of the First Amendment. *N.Y. Times Co. v. Dep't of Def.*, 824 F. Supp. 3d 27, 49 (D.D.C. 2026) ("*NYT I*"). The October Policy was designed, as the district court found, to "weed out disfavored journalists"—those unwilling to publish "only stories that are favorable to or spoon-fed by Department leadership," who were not, in the Department's words, "on board and willing to serve our commander in chief"—and "replac[e] them with news entities that are." *Id.* The district court vacated the policy's unconstitutional provisions and ordered Defendants to immediately restore The Times's journalists' press credentials and their prior Pentagon access.

Instead of complying, the Department lashed out. The next business day it issued an "Interim Policy," thrown together over the weekend by Secretary Hegseth's personal attorney and advisor, that was transparently aimed at evading the court's order, *see N.Y. Times Co. v. Dep't of Def.*, 830 F. Supp. 3d 1, 4, 8–9 (D.D.C. 2026), and rendering Plaintiffs' press credentials "essentially worthless." J.A. 363. The Interim Policy closed, "effective immediately," Correspondents' Corridor—the decades-old dedicated workspace for the Pentagon press corps. J.A. 90. And, worse,

for the first time in the building's history, it forbade credentialed journalists from entering the Pentagon without an invitation or a pre-arranged interview or meeting—and even then, required that journalists be shadowed by an official escort. J.A. 359. Their "restored" Pentagon "credentials" did not even get The Times's reporters into the building. And faced with a policy even more restrictive than the one the district court had just struck down, Plaintiffs were forced to file a new complaint and seek a preliminary injunction prohibiting the Department from enforcing the escort requirement against them, which the district court granted. This Court should affirm.

Government officials can neither "use the power of the State to punish or suppress disfavored expression" nor "do indirectly what [they are] barred from doing directly." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188, 190 (2024). In issuing its preliminary injunction, the district court correctly found that Plaintiffs are likely to succeed on their claim that Defendants imposed the escort requirement in retaliation for Plaintiffs' independent journalism and their successful challenge to the October Policy. The court correctly found, based on well-settled law in this Circuit and a "constellation of undisputed facts," that the escort requirement is an adverse action—one that inflicts harms "far from trivial." J.A. 20, 33–34 & n.8. And the district court's findings of retaliatory motive rest on "compelling evidence connecting the imposition of the escort requirement to [Plaintiffs'] protected speech," including a torrent of statements by the Department attacking The Times

for its reporting. J.A. 24. The factual record forecloses any claim that Defendants were genuinely motivated by their post-hoc and "facially dubious" concerns about informational security. *See* J.A. 30, 151–52.

But that is not the only basis on which to affirm. The escort requirement also violates the First Amendment because it is an unreasonable and transparent "effort to suppress expression merely because public officials oppose [a] speaker's view." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 12–13 (2018) (internal citation omitted); *see* J.A. 5, 16. Defendants are issue precluded from contesting that the October Policy impermissibly aimed to restrict the newsgathering and reporting of those who insist on engaging in independent journalism. And the district court's finding that this unconstitutional aim motivated the escort requirement too is far from clear error.

The escort requirement is also textbook arbitrary and capricious agency action that violates the APA. The Department's post-hoc, ever-shifting justifications for its overnight policy change are not only evidence of pretext, but also the antithesis of "reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983).

The balance of the equities tips decidedly in Plaintiffs' favor. The preliminary injunction only restores the historical status quo that has prevailed since the Pentagon opened its doors in 1942. *See* J.A. 6. It does not give Plaintiffs any greater access to the Pentagon than they had for decades. Nor does it give them access to

sensitive spaces or to classified or sensitive information. J.A. 30–32. By contrast, as this Court observed long ago, "[w]ithout an unfettered press, citizens would be far less able to make informed political, social, and economic choices." *Zerilli v. Smith*, 656 F.2d 705, 711 (D.C. Cir. 1981). By punishing and impeding Plaintiffs' newsgathering and reporting, the escort requirement keeps the American people in the dark about the Department's activities during a time of war.

## STATEMENT

### A. Journalists Have Worked Inside the Pentagon for Eighty Years.

Since the Pentagon opened in 1942, journalists from The Times and other news organizations "have covered the United States military and other defense activities from inside the Pentagon." J.A. 6, 187–88. Their presence has made possible timely, accurate reporting during times of war and crisis, including during the September 11 terrorist attack on the Pentagon itself. J.A. 187–88. The Department has conceded that the longstanding presence of press within the Pentagon has "enhanced the ability of journalists and news organizations to keep Americans informed about the U.S. military" while "posing no security or safety risk to Department property or personnel." J.A. 6.

For decades, credentialed journalists have been able to enter and exit the Pentagon without an appointment and move freely within unrestricted areas, including Correspondents' Corridor, "the Pentagon Press Briefing Room and the corridors

linking the many press offices within the building." *Id*. This allowed reporters to engage with Department officials in the unscheduled, iterative manner needed for timely, comprehensive reporting. *Id*. It enabled credentialed reporters to cover official press briefings "called on short notice or without notice," ask questions of Department officials before and after those briefings, and have "semiformal and informal conversations" with Department officials and personnel. *Id*. To obtain a Pentagon Facilities Alternate Credential, or "PFAC," a journalist needed to confirm employment with a news organization, pass a standard background check, and agree to follow basic rules, such as visibly wearing the credential and not entering secure, restricted areas. *NYT I*, 824 F. Supp. 3d at 35; J.A. 85. Journalists, including with The Times, observed those boundaries. J.A. 6.

Since the 1970s, the Pentagon also provided reporters with "dedicated office space" in the building, known as Correspondents' Corridor, where reporters set up desks and TV network booths. J.A. 7. For members of the Pentagon press corps, it was their primary or frequent place of work. J.A. 386–87.

This is consistent with the approach taken by other government institutions, including Congress, the White House, the Supreme Court, and the Departments of Justice and State. J.A. 289–90, 381; *see Sherrill v. Knight*, 569 F.2d 124, 126–27 & n.3 (D.C. Cir. 1977). And the longstanding ability of credentialed journalists to move unescorted through parts of the Pentagon is also consistent with the layout and

other unique features of the building. Far from being "an all-classified military command post," the Pentagon is "the world's second largest office building"; parts of it "resemble a mall," with a "food court, a pharmacy, a sit-down restaurant, a bank, a dry cleaner, and a chocolate shop." J.A. 7. It has "long been staffed by a thousand or more non-Department employees"—including "cleaning and maintenance professionals, contractors, consultants, representatives of other government agencies, and retail and cafeteria workers"—many of whom hold PFACs and "move around areas of the building unescorted every day." *Id*.

As the district court's findings and the undisputed evidence reflect, credentialed journalists' regular, unescorted access to the Pentagon has never impeded information security. As former Assistants to the Secretary of Defense for Public Affairs in both Republican and Democratic administrations testified, "the notion that [someone] would have access to sensitive or classified information simply by being in the building without an escort is absurd" because that information is "tightly restricted and controlled" and discussed only in secure facilities reporters cannot enter; sensitive areas like the National Military Command Center and most of the Joint Chiefs area are off-limits altogether. J.A. 368–69, 384, 387. To the contrary, as those former Pentagon officials explained, "it was a tremendous advantage to the Department to have journalists from news organizations that reach a large and broad segment of the American public present in the Pentagon." J.A. 382. And "[t]he

public is best served by having reporters covering the Pentagon who are knowledgeable and informed about the Department." J.A. 387.

### B. Department Officials Target The Times and Other News Organizations for Their Coverage.

Since Pete Hegseth was nominated to serve as Secretary of Defense, he and other Department officials have consistently attacked news organizations, and The Times in particular, for reporting they consider unflattering or unfavorable. J.A. 7–8. In addition to a stream of criticism and threats directed at reporters, the Department has taken escalating steps to interfere with their newsgathering and reporting.

Around February 2025, the Department revoked the dedicated workspaces of The Times and several other news outlets that had reported on criticism of Secretary Hegseth during his confirmation process as part of a new so-called "rotation" system. J.A. 8, 51–52. In March 2025, after The Times reported that Secretary Hegseth had shared top-secret plans to strike Yemen "in a second private Signal group chat" with his personal attorney and Senior Advisor, Defendant Timothy Parlatore, and his wife and brother, J.A. 8, Secretary Hegseth accused The Times of "slashing and burning people to ruin their reputations"—adding that was "not going to work with me." J.A. 8, 53 n.11, 232–34. Over the ensuing months, the Pentagon's Chief Spokesman Sean Parnell called The Times a "propaganda machine," declared that "the days of the Pentagon just allowing these fake narratives to spread is over," and

demanded The Times be held "accountabl[e]." J.A. 25, 242. Department leadership also said reporters should suffer "severe punishment" for their recent coverage of Secretary Hegseth. J.A. 8.

### C. The Department Implements the October Policy.

In October 2025, the Department announced a new Pentagon press credentialing policy. The October Policy vested Department officials with unbounded discretion to "den[y], revoke[], or not renew[]" the credential of any journalist it "reasonably determined to pose a security or safety risk." J.A. 10. And it made clear that routine newsgathering and reporting could lead to such a determination. Suspension, denial, or revocation of a PFAC could "be based on factors including," but not limited to, a reporter's "unauthorized access, attempted unauthorized access, or unauthorized disclosure of" nonpublic information, regardless of classification. *Id*. The October Policy expressly stated that a journalist who "solicit[s] the disclosure" of nonpublic information may be deemed a "security or safety risk," and defined "solicitation" to include any "direct communications with specific [Department] personnel or general appeals, such as public advertisements or calls for tips." J.A. 10, 59–60. The Department required credentialed journalists to sign an acknowledgement affirming their "understand[ing]" of the October Policy. J.A. 10. The Department identified no breach of security or other incident necessitating the new requirements. J.A. 9, 54–55.

Before the final October Policy was promulgated, numerous news outlets, including The Times, informed Pentagon leadership that it was incompatible with their First Amendment rights and that they could not sign the acknowledgement. J.A. 9. The Department nonetheless finalized the policy without meaningful change. J.A. 9–10. When The Times announced publicly its reporters would not sign on to the October Policy, Secretary Hegseth responded on his official X account with an emoji of a hand waving goodbye. J.A. 62. After the October Policy went into effect, nearly all of the Pentagon press corps declined to sign the acknowledgement submitting themselves to it and lost their credentials as a result. J.A. 10.

Within days, Parnell took to his official X account to "announce the next generation of the Pentagon press corps"—a hand-selected group of "new" media the Department believed would deliver its preferred messaging. J.A. 11. It included the National Pulse, described by its editor-in-chief as "an industry mag/site for MAGA world"; Laura Loomer, an "influential pro-Trump activist"; and former congressman Matt Gaetz, President Trump's one-time choice for Attorney General. *Id*. Many had expressed ideological agreement with and support for the Trump administration or indicated that they did not intend to report critically on the Department. *Id*. According to Parnell, the "[n]ew media outlets" willing to accept the October Policy "circumvent the lies of the mainstream media and get real news to the American

people" and "are far more effective and balanced than the self-righteous media" that had previously held PFACs. *Id*.

As the district court found, the Department made clear its intent to interpret and enforce the October Policy in discriminatory ways. *NYT I*, 824 F. Supp. 3d at 49. And Pentagon Press Secretary Kingsley Wilson called the journalists who had previously held credentials "propagandists" who "stopped telling the truth" and "continue[] to lie," while describing the Department's chosen replacements as "the absolute best people"—those "on board and willing to serve our commander in chief." *Id.* at 40.

### D. Plaintiffs Successfully Challenge the October Policy, Prompting the Department to Immediately Promulgate the "Interim Policy."

Plaintiffs filed suit. On Friday, March 20, 2026, the district court granted summary judgment in Plaintiffs' favor, concluding that the October Policy violated the First and Fifth Amendments. It found, based on "voluminous and undisputed record evidence," that the October Policy was "unreasonable and viewpoint discriminatory" because its "true purpose and practical effect [was] to weed out disfavored journalists," J.A. 10, unwilling to publish "only stories that are favorable to or spoon-fed by Department leadership," *NYT I,* 824 F. Supp. 3d at 49. It vacated the policy's challenged provisions, enjoined their enforcement against The Times, and ordered

the Department to "immediately reinstate" the Pentagon access of Barnes and six other Times reporters. J.A. 12.

Plaintiffs immediately contacted the Department about obtaining restored credentials, but they received no substantive response until 4:15 p.m. the next business day—Monday, March 23—when Defendant Parnell informed them that the Department "disagree[d] with the Court's decision" and was imposing a stopgap policy that would apply "[i]n the interim" while it "pursue[d] an appeal." J.A. 89. Under that Interim Policy, Correspondents' Corridor was closed "[e]ffective immediately," J.A. 14, and credentialed journalists were permitted to enter the Pentagon only "for scheduled press briefings, press conferences, and interviews arranged through public affairs offices" and were required to be "escort[ed] by authorized [Department] personnel at all times." *Id.* The Interim Policy limits each media outlet's "escort privileges" to "three visiting media members." *Id.* The Department's stated justification for these requirements was that the district court had purportedly vacated "the [October] Policy's security screening provisions"; the Interim Policy stated that these requirements would remain in effect only "until [new screening] standards have been fully implemented." J.A. 14, 28, 90.

At the time, Parlatore—a part-time Special Advisor to Secretary Hegseth and the author of the Interim Policy—publicly criticized Plaintiffs' lawsuit and the district court's ruling in their favor, and he described the Interim Policy as an effort to

"us[e] more words to say the same thing" as the October Policy. J.A. 14, 44. Parlatore assembled the Interim Policy over a single weekend. J.A. 84. And he threw it together so quickly that the Department was unprepared to implement it. Restored credentials were not available at the provided time, J.A. 359; the library annex reporters were told they could access could be reached only through areas from which they were barred, J.A. 360; and when Barnes secured a pre-approved interview—which was ultimately postponed—security refused him entry at the Visitor Center where the Department had directed him to meet his escort. J.A. 362.

The district court granted Plaintiffs' motion to compel compliance with its summary judgment order, finding that the Department's hurried effort to "cut off all PFAC holders' meaningful access" to the Pentagon was a "transparent" attempt to circumvent the court's injunction requiring "the Department to restore [Plaintiffs'] access to the Pentagon." J.A. 15. The court rejected the Department's proffered justification—"that [its] order had removed all security screening authority"—as "nonsense" because it had left longstanding security screening protocols untouched. *Id*. The court enjoined the Department from enforcing the challenged parts of the Interim Policy, including the escort requirement, against The Times's credentialed reporters. *Id*.

The Department appealed the district court's summary-judgment and compliance orders and sought a narrow stay allowing it to immediately implement the

Interim Policy's escort requirement. *Id.* In support of its stay motion, the Department for the first time asserted that the escort requirement was adopted because Wilson had noticed a decrease in calls from journalists relating to "sensitive," controlled, or classified information after the October Policy was implemented and most journalists were no longer working in the building—a phenomenon she attributed to reporters' decreased ability to "observe activity patterns" of Pentagon personnel and "time inquiries" strategically. J.A. 27–28 & n.6. Expressly noting that the constitutionality of the Interim Policy was not before it, a divided panel of this Court stayed the district court's ruling on the ground that the escort requirement was likely outside the scope of the district court's earlier injunction. *N.Y. Times Co. v. Dep't of Def.*, No. 26-5113, 2026 WL 1179440, at *3 (D.C. Cir. Apr. 27, 2026). In their appeal, Defendants declined to defend the October Policy or to challenge the district court's judgment that it unconstitutionally discriminated based on editorial viewpoint—a conclusion that is issue preclusive here.

### E. Plaintiffs Challenge the Interim Policy.

Plaintiffs filed a new action to challenge the Interim Policy on its merits and sought a preliminary injunction to bar enforcement of the escort requirement—the only challenged portion of the Interim Policy currently in effect as to The Times—while their lawsuit was pending. J.A. 38–87. Plaintiffs alleged that the Interim Policy was unconstitutional retaliation for their protected speech, newsgathering, and

for pursuing a successful lawsuit to vindicate their rights. *Id.* They further alleged that the escort requirement is an unreasonable and viewpoint-discriminatory restriction on access to and use of a nonpublic forum in violation of the First Amendment, and that it is arbitrary and capricious in violation of the APA. *Id.* In response, the Department reprised the "activity patterns" rationale first raised in seeking a stay of the court's order compelling compliance, this time through a declaration from Parnell. J.A. 421–22.

On June 30, the district court granted Plaintiffs' motion, concluding that Plaintiffs were likely to succeed on their retaliation claim without reaching their other grounds. J.A. 1–37. Recognizing Plaintiffs had indisputably engaged in protected activity, the court focused on the other elements of the retaliation claim: whether the Department took an adverse action against Plaintiffs, and whether that action was motivated by Plaintiffs' exercise of their First Amendment rights. J.A. 18–19. The district court found the escort requirement "surely clears the relatively modest bar to constitute adverse action" set by this Court's cases. J.A. 23. It found that because of the escort requirement "the default is that reporters are not present within the Pentagon" and "must make separate appointments and obtain escorts for each separate conversation with public affairs staff." J.A. 22. This prevents journalists from speaking with multiple press officials in one visit and deprives them of "opportunities for the semiformal or informal interactions that reporters and former Department

officials alike testified were critical." *Id.* In short, it renders use of Plaintiffs' Pentagon credentials "rarely worthwhile." J.A. 23.

The district court found equally "compelling evidence connecting the imposition of the escort requirement to [The Times's] protected speech." J.A. 24. In finding that Defendants' "retaliatory motive" was a "but-for cause" of their adverse action, the court pointed to "myriad statements by Department officials expressing disdain for reporting by The Times" and the policy's "suspicious" timing, as well as the viewpoint discriminatory purpose of the October Policy that the Interim Policy was meant to replicate. J.A. 25, 29–30. The court rejected the Department's explanation that it had adopted the escort requirement to prevent reporters from obtaining "sensitive" information because it was post-hoc and rested on speculation that was refuted by evidence in the record. J.A. 27–32.

The district court found the remaining preliminary-injunction factors satisfied: the escort requirement inflicts irreparable harm by making reporters' jobs "exceedingly challenging," and by depriving them of valuable and irreplaceable interactions with sources. J.A. 34. Because "the news is time-sensitive and occurs spontaneously, those harms cannot be remedied retrospectively." *Id.* It concluded that the balance of equities and the public interest also favored the Plaintiffs because there is a strong public interest in "vindicating the right to be free of retaliation for

[one's] protected speech" and in an informed public's access to independent reporting on the military, and none in perpetuating unlawful government action. J.A. 35.

The Department sought and obtained a stay of the district court's order. For the first time in its stay motion, the Department argued that a "generally applicable" policy categorically cannot be an adverse action for purposes of a First Amendment retaliation claim. In a split decision, a majority of the stay panel ruled that the Department was likely to show that a "generally applicable escort requirement" could not "constitute retaliation under the First Amendment," and noted that Plaintiffs' alternative grounds were not before them. *N.Y. Times Co. v. Dep't of Def.*, No. 26-5253, 2026 WL 2168070, at *1 (D.C. Cir. July 16, 2026) ("*Stay Order*").

Judge Garcia dissented. He explained that "no binding precedent" supports the proposition that a "generally applicable" policy "cannot constitute an adverse action." *Id.* at *3. Instead, "[t]he adverse-action inquiry poses a relatively low bar," and "[i]f threatening to impose a requirement like the escort requirement on one journalist would (as the district court found) sufficiently chill his speech, it makes little sense to suggest that effect evaporates if the government threatens to impose the same requirement on *all* reporters." *Id.* Judge Garcia would have denied the stay because "[a] retaliatory government policy should not be immunized simply because it is broadly and evenly applied." *Id.*

While this case has been pending, the administration's campaign of retaliation against The Times has intensified. Secretary Hegseth called The Times's reporting on the Iran War "unpatriotic" and likened the "'legacy Trump-hating press' to the biblical 'Pharisees' who 'held counsel against [Jesus].'" J.A. 16, 26. He said that journalists engaged in "relentlessly negative coverage" of the Iran War did not "choos[e] wisely." J.A. 72 n.39, 149–50. Within days after Plaintiffs filed their motion explaining that unescorted press access has always been compatible with national security in part because access to the areas of the Pentagon where classified information is discussed—Sensitive Compartmented Information Facilities, or "SCIFs"—is restricted, J.A. 356–57, the Department announced that the Pentagon's Press Office, an office that exists to liaise with the press, would be designated a SCIF so that reporters could no longer enter it, J.A. 459–60, 466. And hours after Plaintiffs filed their opposition to the Department's stay motion, federal agents served grand jury subpoenas on Barnes and other Times reporters at their homes in connection with an article reporting on security concerns emanating from the President's use of a Qatari-donated Boeing 747-8 as the new Air Force One—an aircraft operated by the Department. Dkt. 2183273.

## SUMMARY OF ARGUMENT

Plaintiffs are entitled to a preliminary injunction barring enforcement of the escort requirement. The district court correctly held that Plaintiffs are likely to

prevail on their First Amendment retaliation claim. And, although the district court found it unnecessary to reach Plaintiffs' other claims, they provide ample alternative grounds for this Court to affirm.

1. The escort requirement is retaliation in violation of the First Amendment. The Department does not dispute that Plaintiffs' journalism and their lawsuit challenging the October Policy are constitutionally protected activities, and its arguments that the escort requirement cannot constitute adverse action and was not adopted in response to Plaintiffs' expression are without merit.

a. The district court's findings are reviewed for clear error, and the court more than reasonably found on the record before it that the Department's onerous requirement—which effectively renders journalists' credentials worthless—would chill journalists and news organizations of ordinary firmness from reporting aggressively or filing suit to vindicate their rights. *See Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016); *Media Matters for Am. v. Paxton*, 138 F.4th 563, 584 (D.C. Cir. 2025).

The Department's response—that a "generally applicable" policy is categorically immune from a claim of retaliation—was not raised below, is wrong as a matter of law, and has no application to a policy singling out the press. This Court should reject the government's invitation to ignore clear forfeiture and create a loophole that would give the government license to retaliate against the press with impunity.

b. Nor did the district court clearly err in finding that the Department imposed the escort requirement to punish The Times for its coverage and successful challenge to the October Policy. The Department's post-hoc explanation for the policy contradicts its contemporaneous explanation and is obviously pretextual.

2. Even setting aside the Department's retaliation, the escort requirement separately violates the First Amendment by imposing an unreasonable restriction on access to and use of a nonpublic forum to achieve viewpoint-discriminatory ends. Like its predecessor, the Interim Policy is not "reasonable in light of the purpose served by the forum," *Mansky*, 585 U.S. at 12, and "burdens disfavored speech by disfavored speakers," *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564 (2011).

Finally, the Department's decision to abandon, over a weekend, nearly a century of tradition without any valid, much less reasoned basis fails under the APA. The Department's viewpoint and retaliatory aims were impermissible factors the agency was barred from considering, and its post-hoc, pretextual justification cannot be considered. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

3. The equitable factors support preliminary injunctive relief. Plaintiffs—and the public that relies on them for accurate, independent coverage of the U.S. military—suffer irreparable harm each day the escort requirement remains in effect, while the Department has no legitimate interest in enforcing its unconstitutional policy. *See Karem v. Trump*, 960 F.3d 656, 667–68 (D.C. Cir. 2020).

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Court reviews the grant of a preliminary injunction for abuse of discretion, reviewing the district court's legal conclusions de novo and its factual findings for clear error. *Hanson v. Smith*, 120 F.4th 223, 231 (D.C. Cir. 2024).

Both elements of the district court's ruling that Defendants contest are reviewed for clear error: the adverse-action inquiry is "factual in nature," *Davidson v. Chestnut*, 193 F.3d 144, 150–51 (2d Cir. 1999), *see also Bennie v. Munn*, 822 F.3d 392, 398 (8th Cir. 2016), and retaliatory intent is "a pure issue of fact," *Crawford-El v. Britton*, 523 U.S. 574, 589 (1998); *see also Media Matters v. FTC*, 2025 WL 2988966, at *6–9 (D.C. Cir. Oct. 23, 2025). A finding is clearly erroneous only if, on the entire record, the reviewing court is "left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

## ARGUMENT

### I. The Escort Requirement Is Unconstitutional Retaliation.

To succeed on a First Amendment retaliation claim, a plaintiff must demonstrate that it engaged in protected activity, that the government took "retaliatory action sufficient to deter a person of ordinary firmness in [plaintiff's] position from speaking," and a "causal link" between the protected activity and the adverse action. *Media Matters*, 138 F.4th at 584. The Department stripped Plaintiffs' Pentagon credentials of their value to punish them for their journalism and their successful challenge to the October Policy. The Department's unconstitutional retaliation could hardly be more obvious.

The Department does not dispute that Plaintiffs' "reporting on public issues is a quintessential First Amendment activity" or that their challenge to the October Policy "is a form of expression protected by the First Amendment." J.A. 17 (citations and alterations omitted). It challenges only the adverse action and causation elements of Plaintiffs' retaliation claim. Restricting reporters' access to their workplace, their sources, and the officials they cover—to the point of making it "exceedingly challenging" to "cover the Department and the U.S. military from Pentagon grounds," J.A. 23—is obviously "sufficient to deter a person of ordinary firmness in [the plaintiff's] position from speaking." *Media Matters*, 138 F.4th at 584. And causation is clear: Defendants took this adverse action to punish The Times for its

coverage and successful lawsuit. The escort requirement was imposed one business day after the Department was ordered to restore The Times's access, after a year of threatening The Times for its coverage. At minimum these conclusions, amply supported by the record, were not clearly erroneous.

### A. The District Court Did Not Clearly Err in Finding an Adverse Action.

#### 1. The escort requirement is an adverse action.

As this Court has explained, the adverse-action element asks a modest question: would the challenged action chill a speaker of "ordinary firmness in [the] plaintiff's position." *Aref*, 833 F.3d at 258. This inquiry is "factual in nature." *Davidson*, 193 F.3d at 150–51; *accord Suarez Corp. Industries v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000). And the "bar is not a high one." J.A. 19 (quoting *Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76, 95 n.7 (D.D.C. 2025)). Forcing someone to spend "twenty-seven hours of additional work" on an application, or "even an act of retaliation as trivial as failing to hold a birthday party," can qualify. *Tao v. Freeh*, 27 F.3d 635, 639 (D.C. Cir. 1994) (quoting *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 76 n.8 (1990)).

As the district court found, based on an unrebutted record, before the escort requirement credentialed journalists regularly worked from the building, interviewing "upwards of a dozen officials and other personnel from different press offices in a given day, sometimes in response to rapidly developing events." J.A. 20. For

eight decades, such reporting led to important stories about the Department and was essential to journalists' ability to cover the military. The escort requirement makes this type of newsgathering and reporting impossible. Reporters are now "prohibited from entering the Pentagon altogether unless specifically invited to attend a press conference or a prearranged interview." J.A. 4; *see also* J.A. 22. Deprived of "opportunities for … semiformal or informal interactions," reporters must "spend[] 'hours of [the] day just waiting and walking back and forth' between the Pentagon and the off-grounds library from which they are now expected to work" just to visit press offices in the building. J.A. 22. This "does not allow for meaningful engagement" and has "made it exceedingly challenging" to "cover the Department and the U.S. military from Pentagon grounds." *Id.* at 22–23. It is difficult to overstate the difference between having the opportunity to speak to officials in an unscheduled, impromptu manner and having to coordinate every interview and conversation in advance while shadowed by an escort at all times. The latter is not just burdened reporting; in practice it ceases to resemble reporting at all.

Based on these facts, which the Department left "unaddressed" below and continues to ignore, J.A. 23, the district court reasonably concluded that the escort requirement burdens reporting so substantially that a journalist of ordinary firmness would be deterred from challenging the Department—in its questioning or coverage,

or in court—in the future. J.A. 23–24. That "clears the 'relatively modest' bar to constitute adverse action." *Id.*

**2. The Department's contrary arguments are wrong.**

The Department offers two reasons why the escort requirement is not adverse: (1) it is not sufficiently detrimental, purportedly evidenced by the fact that The Times did not capitulate, and (2) it is generally applicable to reporters and news organizations. Neither point speaks to the adverse-action inquiry, which asks only if the government's punishment would chill a person of ordinary firmness.

**a. The escort requirement severely burdens reporting.**

The adverse-action test is "objective": it considers whether a person of "ordinary firmness" would be chilled. *Media Matters*, 138 F.4th at 581. That is precisely the question the district court asked and, for the reasons explained above, answered correctly. J.A. 24 n.5. The Department's attempt to "convert[ that] legally objective test into a subjective one" would "strip constitutional rights away from the most principled speakers." *Am. Acad. of Pediatrics v. HHS*, 816 F. Supp. 3d 27, 53 (D.D.C. 2026).

Defendants try to cast the escort requirement's dramatic curtailment of reporters' ability to do their jobs as mere inconvenience. But stripping journalists of their ability to engage in journalistic practices they've relied on for eight decades is different in kind from the cases the Department cites. *See* Br. 31–33. First, *Ateba v.*

*Leavitt*, 133 F.4th 114, 117 (D.C. Cir. 2025), was not a retaliation case and does not speak to the adverse-action standard. Moreover, the reporter in *Ateba* objected to being escorted only "from the White House gate to the Press Area" where he could then move "*without an escort*." *Id.* (emphasis added). As the district court correctly recognized, that "is a far cry from the situation here." J.A. 34–35 n.8.

The Department next invokes *Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410 (4th Cir. 2006), to suggest the escort requirement resembles an official denying a reporter's interview request. Br. 32–33. But *Ehrlich* involved a governor's direction that his subordinates not grant interviews to two journalists—the ordinary, day-to-day choice whether to speak with a reporter, which implicates the officials' *own* First Amendment rights and the daily "rough and tumble" of reporters "compet[ing] for access." *Id.* at 413, 419. There is nothing ordinary about the escort requirement; it deprives journalists of the value of press credentials in which they have a constitutionally protected liberty interest. *See Karem*, 960 F.3d at 660; *Blankenship v. Manchin*, 471 F.3d 523, 531–32 (4th Cir. 2006) (distinguishing *Ehrlich* from case where the government imposes an "adverse regulatory action"). It does not implicate any official's decision of whether to speak with The Times, but The Times's ability to pursue such conversations at all.

**b. The escort requirement's applicability to all reporters does not make it less adverse.**

Relying on the Seventh Circuit's 30-year-old decision in *Grossbaum v. Indianapolis-Marion County Building Auth.*, 100 F.3d 1287 (7th Cir. 1996), and the stay panel's divided order, the Department posits that "a prospective and generally applicable rule" can never constitute adverse action against the target of retaliation—no matter how obviously motivated by a desire to punish its target for protected expression, nor how severely it interferes with that target's speech. Br. 26. That theory is forfeited. But even if it were preserved, it would be gravely wrong and inapplicable to the escort requirement on its own terms.

**i. The argument is forfeited.**

The Department contended below only that the burdens imposed by the escort requirement were too minimal to be adverse. *See* Dkt. 11 at 27–29. It did not argue that the escort requirement's supposed "generality" exempted it from scrutiny and it did not even cite *Grossbaum*. *Id.* at iii, 27–29. The district court, accordingly, never addressed the argument. J.A. 19–24.

This is black-and-white forfeiture. "It is well settled that issues and legal theories not asserted at the District Court level ordinarily will not be heard on appeal." *Keepseagle v. Perdue*, 856 F.3d 1039, 1053 (D.C. Cir. 2017). That principle applies even when a new theory is purely legal and concerns an element litigated below on a different ground. *See*, *e.g.*, *PhantomALERT Inc. v. Apple Inc.*, 184 F.4th 790, 803

(D.C. Cir. 2026); *Diegelmann v. Bessent*, 181 F.4th 142, 146 (D.C. Cir. 2026). The Department's old and new theories are unalike. The former was a matter of degree: the escort requirement is not burdensome enough on reporting. The latter is a matter of kind: no generally applicable policy can ever be an adverse action. The latter is not preserved and there is no reason to excuse the forfeiture.

**ii. A generally applicable rule can be adverse.**

If this Court nevertheless reaches the Department's argument that a rule of general applicability cannot be an adverse action, it should reject it. Retaliation against or affecting a group violates the First Amendment for the same reason retaliation against an individual does: It puts a price on protected expression and tells the speaker—and everyone watching—that speaking again will cost them. *See Heffernan v. City of Paterson*, 578 U.S. 266, 273 (2016). That the cost of speech is imposed on many people does not make it less adverse to each. Were it otherwise, the government could buy immunity by increasing the number of speakers harmed—by doing to everyone what it aimed to do to one.

The Department's contrary theory misunderstands the adverse-action element, Br. 24–26, which differentiates trivial slights from real penalties by asking whether an action is "sufficient to deter a person of ordinary firmness" from speaking. *Aref*, 833 F.3d at 258. A penalty that meets that standard for one does not cease to be adverse when imposed on others. Group punishment does not dilute a penalty's

effect. In many cases, it compounds it: "the chilling effect on a speaker with any regard for his peers may be amplified" by group punishment. *Stay Order*, 2026 WL 2168070, at *3 (Garcia, J., dissenting); *see also* Daryl J. Levinson, *Collective Sanctions*, 56 Stan. L. Rev. 345, 352–60 (2003) (documenting how for centuries, societies have found "group punishment" to be an "irresistibly expedient" way to deter unwanted conduct). Indeed, courts have gone further, recognizing that individuals can be chilled by threats to act adversely solely against others. *See*, *e.g.*, *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 174 (2011) (finding "it obvious that a reasonable worker might be dissuaded from engaging in protected activity if she knew that her fiancé would be fired").[1]

The rash imposition of the escort requirement delivered an unmistakable message: if a reporter gathers and publishes news the Department dislikes or successfully challenges the Department in court, the Department will make things worse—for her and everyone else. A journalist of ordinary firmness would be chilled from reporting, or seeking to vindicate her rights, in the face of that threat. And a reporter who knows that it could cost the entire Pentagon press corps may hesitate more, not less.

[1] The Department's cited cases are not to the contrary. Br. 26, 35. *ACLU of Maryland, Inc. v. Wicomico County*, 999 F.2d 780, 785–86 (4th Cir. 1993), refused to treat a government's refusal to give the plaintiff special treatment as adverse; it did not address a general policy punishing her and her colleagues. And *Tao*'s reference to "singl[ing] out" describes the plaintiff's allegation, not the governing standard. 27 F.3d at 639.

The Department's assertion that a requirement "applied neutrally to all speakers cannot logically deter any given speaker, because no speaker may escape the regulation by self-censoring" misunderstands how retaliation impedes speakers' First Amendment rights. Br. 27. Penalizing speech after it occurs burdens that speech and chills future speech because it threatens *future* punishment: it tells "others that they engage in protected activity at their peril." *Heffernan*, 578 U.S. at 273; *Counterman v. Colorado*, 600 U.S. 66, 76, 78 (2023) (threat of punishment "will deter … even truthful statements" and "discourage the uninhibited, robust, and wide-open debate that the First Amendment is intended to protect"); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 277 (1964). The escort requirement chills future protected activity by threatening that it will only make the reporters' and their colleagues' situation worse.

A retaliation claim has never required proof that the plaintiff could escape punishment by sacrificing her protected activity; in many paradigm retaliation cases the harm is already complete. *See, e.g.*, *Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 584–86 (D.C. Cir. 2002) (completed retaliatory transfer); *Tao*, 27 F.3d at 639 (completed requirement to expend additional hours of work); *Koala v. Khosla*, 931 F.3d 887, 891–93 (9th Cir. 2019) (completed defunding). The Department's own examples—arrest, prosecution, dismissal, Br. 31—underline the point.

The Department's policy arguments are equally without merit. Defendants argue that permitting retaliation claims against generally applicable policies would "paralyz[e]" the Executive Branch and expose it to "overwhelming litigation risks" from claims that are "easy to allege and hard to disprove." Br. 27–28. But retaliation suits against "generally applicable" policies no more "paralyze" government than the far more numerous suits challenging discretionary actions; the Department never explains why motive-based claims are "eas[ier] to allege and hard[er] to disprove" when the adverse action is a policy. *Id.* Nor is the Department correct that an official policy is less coercive than individualized action. "An official retaliatory policy is a particularly troubling and potent form of retaliation, for a policy can be long term and pervasive, unlike an ad hoc, on-the-spot decision by an individual officer." *Lozman v. City of Riviera Beach*, 585 U.S. 87, 100 (2018). Finally, enjoining Defendants' retaliation against The Times creates no special "exemption," Br. 41—party-specific relief is the ordinary remedy for a constitutional violation, and Defendants are free to cure any asserted inequity by ceasing to enforce their unconstitutional rule against anyone.

**iii. The escort requirement is neither neutral nor generally applicable.**

In any event, the Department's categorical rule would not apply here even if it were correct. To begin, the escort requirement is not genuinely neutral even among journalists. It imposes little to no burden on outlets that wish to attend a press

conference, repeat the Department's official line, and leave. It burdens most heavily reporters who wish to ask follow-up questions, cultivate informal relationships, visit multiple public-affairs offices, and pursue stories from different angles—in short, journalists like those with The Times who want to "scrutinize[]" the Department rather than "serve" it. J.A. 20–23, 26, 29, 367. The escort requirement may matter little to a member of the Department's "next generation … Pentagon Press Corps" who admits his outlet is "not an investigative news organization" and who does "not intend to maintain a significant presence in the Pentagon." J.A. 29, 63. But for a veteran reporter like Barnes, it renders a trip to the Pentagon "rarely worthwhile." J.A. 23; *see supra* 21–22. *Grossbaum* itself recognized that an ostensibly neutral rule may lack general applicability when it has "hugely disproportionate effect on [disfavored] speech." 100 F.3d at 1298 n.10. That is the case here.

Nor is the escort requirement "generally applicable"; it applies only to journalists. In *Grossbaum*, the government, after a dispute over one religious display, "prohibit[ed] *all* private displays, religious or otherwise" from a city building. *Id.* at 1290. The Seventh Circuit deemed that a "generally applicable rule because it ban[ned] *all* private displays henceforth." *Id.* at 1296 (emphasis added). The escort requirement, by contrast, applies *only* to reporters—a narrow subset of the thousands of non-Department employees with PFACs. Barbers, bank tellers, baristas, and other non-Department employees may move through the building's unsecured

spaces without official escorts—reporters alone must have escorts to supervise their every move. J.A. 7. A rule is not generally applicable when it targets protected conduct—being present in the building to report—while leaving similar unprotected conduct—*e.g.*, being present in the building to sell goods—untouched. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 528, 542–44 (1993) (ordinance banning the "sacrifice [of] any animal" was not generally applicable because it targeted religious sacrifice while permitting other forms of animal slaughter). Rather, the First Amendment is skeptical of laws aimed at "a narrow class of disfavored speakers." *Sorrell*, 564 U.S. at 573. "When the State singles out the press," it "undercut[s] the basic assumption of our political system that the press will often serve as an important restraint on government." *Minn. Star & Tribune Co. v. Minn. Comm'r of Rev.*, 460 U.S. 575, 585 (1983).

The Ninth Circuit applied that principle to nearly identical facts. After a satirical campus newspaper published a controversial article, U.C. San Diego "eliminated [student organization] funding for all print media." *Koala*, 931 F.3d at 891. The school invoked *Grossbaum* to argue "that the government's motive is irrelevant when it enacts a content-neutral rule of general applicability." *Id.* at 904. The Ninth Circuit disagreed because the university's ban "d[id] not apply to all [organizations]; it ban[ned] all *media organizations* from obtaining student activity fee funding." *Id.* Here too, the Department responded to Plaintiffs' expression by burdening the press

as a class. Giving the Department a constitutional pass because it punishes the entire press corps would be "perverse." J.A. 32.

### B. The District Court Did Not Clearly Err in Finding Causation.

The district court correctly found "but-for cause": that Defendants imposed the escort requirement to punish Plaintiffs, not to address any genuine security concern. Retaliatory intent is "a pure issue of fact." *Crawford-El*, 523 U.S. at 589. And the district court found "compelling evidence connecting the imposition of the escort requirement to [Plaintiffs'] protected speech." J.A. 24. There is no basis to reverse that finding.

The district court's finding of retaliatory intent rested on the Department's own words and conduct—more than a year of threats against the press, including The Times specifically, the Interim Policy's obviously "suspicious" timing, and its continuity with the October Policy. J.A. 29. The evidence included myriad statements by Department officials expressing disdain for The Times, demanding The Times be held "accountable," warning that reporters did not "choose wisely," and calling for their "severe punishment." J.A. 8, 16, 25–26, 53 n.11, 72, 232–34. These are not mere "express[ions of] disagreement" with reporting. Br. 42. They are "expression[s] of hostility to [plaintiff's] protected speech"—classic evidence of retaliatory motive. *Media Matters*, 2025 WL 2988966, at *8; *see also* J.A. 25–26 (collecting examples). After the Department adopted a rule whose burdens fell

overwhelmingly on The Times and other disfavored news organizations, *supra* 28–30, the district court's conclusion that these statements revealed the Department's true motive was inescapable; it certainly was not clearly erroneous.

The district court's decision also draws decisive support from its now-binding finding in *NYT I* that the October Policy was grounded in an unlawful motive. The district court determined based on "voluminous" and "undisputed" evidence that the October Policy's "true purpose and practical effect" was "to weed out disfavored journalists." *NYT I*, 824 F. Supp. 3d at 48–49; J.A. 12. That determination—uncontested on appeal—is preclusive. *Infra* 40. Nothing suggests this improper purpose vanished in the two days between when the October Policy was enjoined and when the Department issued the Interim Policy. To the contrary, courts routinely recognize that a "[d]efendant's history of [an unconstitutional motive] casts aspersions on his purportedly [proper] purpose in" taking a related action. *ACLU of Ohio Found., Inc. v. DeWeese*, 633 F.3d 424, 433 (6th Cir. 2011); *McCreary Cnty., Ky. v. ACLU of Ky.*, 545 U.S. 844, 874 (2005) ("[A]n implausible claim that governmental purpose has changed should not carry the day in a court of law any more than in a head with common sense.").

The Department's attempts to undermine the district court's finding fail. It first objects that no official expressly announced that the Department adopted the escort requirement to retaliate. Br. 42. But a retaliation claim does not require an

explicit admission of guilt, which is "usually difficult, if not impossible, to obtain." *Media Matters*, 2025 WL 2988966, at *8. "Courts have recognized that … circumstantial evidence … can support a finding" of retaliation. *Id.* (citing examples). And the fact that the threats and hostile statements came from "different officials" over "a full year," Br. 42, only shows the breadth and depth of the animus. *See Media Matters*, 2025 WL 2988966, at *1–2, 6–7 (citing years of statements by officials across the government as evidence of the FTC's retaliatory motive). The statements here came from the official who promulgated the policy, the press secretary whose observations the Department now claims justify it, the Secretary above them, and the President above him. Hostility running down the chain of command is more probative, not less.

The Department's claim that a "desire to retaliate against the 'legacy' media generally" defeats causation as to The Times specifically is wrong on multiple fronts. *See* Br. 40–41. The Times was the target of the Interim Policy: The Department repeatedly attacked and threatened The Times. J.A. 26. It then sought to punish The Times because of its reporting and because it had successfully challenged the October Policy. Indeed, the Department put the escort requirement in place immediately after *The Times's* reporters' access—and only their access—was ordered restored. That the Department was willing to catch other members of the "legacy" media in the crossfire does nothing to disprove its retaliatory intent as to The Times.

In any event, even if the "legacy" media writ large was the target, The Times would still be *a* target. The Department's contrary rule would immunize the most sweeping retaliation. By this perverse logic, so long as the government punishes many for their speech in one stroke, there is no constitutional violation.

The Department's post-hoc proffered justification for the escort requirement is plainly pretextual. Its story changes with each filing, but its current account is that it adopted the escort requirement to prevent unauthorized disclosures of sensitive information—that is, to prevent reporters from observing "activity patterns" and strategically "tim[ing]" inquiries to Department personnel. Br. 9–10, 37–41, 44–46. But, as explained, that story rests on an anecdote relayed via hearsay, and it appeared only *after* the district court found that the Interim Policy was issued to flout its ruling striking down the October Policy. Parnell's declaration recounted Wilson's supposed observation that calls about sensitive or classified information "dropped dramatically" after the October Policy was implemented, and conjecture that reporters had been observing "activity patterns" and "tim[ing]" inquiries accordingly, though neither claims to have seen anyone do so. *Supra* 12; J.A. 27, 421–22. The Supreme Court recently counseled that courts assessing the government's explanations for action must not "exhibit a naivete from which ordinary citizens are free," else "any perceived [story] could provide a ready pretext." *Trump v. Cook*, 146 S. Ct. 2234,

2249 (2026) (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019)). The Department's after-the-fact, implausible story cannot pass that test.

It is clear the Department invented its "activity patterns" story for litigation. It was "conspicuously absent from the Interim Policy itself," which claimed the escort requirement was needed because *NYT I* had left the Department unable to "screen PFAC holders for security risks." J.A. 28, 90. The district court found that explanation to be obvious "nonsense": it never removed the Department's screening authority; it left in place the background-check regime that had worked for decades. J.A. 15, 28. Only then did the Department pivot to its "activity patterns" theory, first articulated in a motion to stay the order compelling compliance. J.A. 28. But if the "activity patterns" theory truly motivated the rule, *see* Br. 45–46, the Department would have mentioned it earlier—if not in the Interim Policy itself then at least in arguments to the district court.

The Department's newly minted rationale is not a more "detailed" or "specific" explanation of the "security screening" story included in the Interim Policy. Br. 44–45. What reporters observe has nothing to do with how they are screened. Every credentialed journalist subject to the escort requirement has already been screened. And the Interim Policy said the escort requirement would remain only "[*u]ntil* [new screening] standards have been fully implemented." J.A. 90 (emphasis

added). That endpoint fits a "screening" problem; it makes no sense if the real concern was the observation of "activity patterns."

Other contradictions make clear this post-hoc explanation is pretext. Below, the Department justified the escort requirement as prompted by the need for agency action to "fill the gap" left when *NYT I* vacated the October Policy's "solicitation" prohibition. J.A. 30. But the Interim Policy already had an "inducement" provision designed to "fill [that] gap." *See* J.A. 30, 101, 423–24. And the Department's latest claim on appeal that a gap was not "a necessary precondition," Br. 47–48, flatly contradicts Parnell's claim that he "reached [his] conclusion" that the escort requirement was needed after the Court rejected the solicitation restriction and the Interim Policy's characterization of the requirement as a temporary measure. J.A. 423.

The Department has consistently failed to answer a basic question: if its concerns about unauthorized disclosure were so great, why did the Department permit its handpicked "next generation of the Pentagon press corps" (including one who secretly recorded a Department employee) to roam unescorted from October through March? J.A. 151–52, 178. The Department has no answer for why this supposed risk became intolerable only over the weekend after the Department was ordered to restore access to Times reporters. J.A. 29. Again, the Department's "shifting and inconsistent justifications are 'probative of pretext.'" *Geleta v. Gray*, 645 F.3d 408, 413 (D.C. Cir. 2011) (citation omitted). "[T]he district court did not err in

considering … [this] relevant evidence of pretext" here. *Media Matters*, 2025 WL 2988966, at *7.

The district court also reasonably found "facially dubious" the assertion that disclosures of sensitive or classified information have decreased since October. J.A. 30. Neither Parnell nor Wilson claimed to have seen less "sensitive" information in print since that time. Their claim is only that Wilson received an unquantified smaller number of *calls* about such information. As the district court explained, this "observation" "does not necessarily correspond to a decrease in instances of journalists obtaining [sensitive] information." J.A. 31. Journalists "do not 'have access to sensitive or classified information simply by being [in the Pentagon] without an escort.'" J.A. 30, 363. And it is implausible that the Department would rely on Wilson's anecdote to craft such a significant policy when it had access to all the published reporting before and after October. The district court also reasonably credited evidence from The Times showing that it published more stories based on nonpublic information after the October Policy than before. J.A. 31. Moreover, the asserted mechanism by which reporters obtain sensitive information—that they observe "activity patterns"—is equally speculative. Neither Parnell nor Wilson points to any story they believe was even slightly advanced by a reporter's observation of who walked into the Joint Chiefs space.

In the end, the Department asserts that the Court should not have probed its motive at all, invoking again the escort requirement's applicability beyond The Times. Br. 26–30. But that premise runs into this Court's binding holding that facially neutral rationales cannot immunize suppressive intent, *Am. Freedom Def. Initiative v. WMATA*, 901 F.3d 356, 365 (D.C. Cir. 2018), and the Supreme Court's admonition that a neutral policy still may not be enacted "to suppress a particular point of view." *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 812 (1985). The Department reads *Nieves v. Bartlett*, 587 U.S. 391 (2019), to establish that a speaker's "protected speech" can be a "wholly legitimate consideration" underlying official action. *Id.* at 401. But *Nieves* said that of police officers, who must weigh a suspect's words in "split-second" arrest decisions to gauge an immediate threat. Its rationale does not extend to considering the content of reporting. *Id.* And the Fourth Circuit's refusal to probe *legislative* motive for a city's complete closure of a forum in *Sons of Confederate Veterans v. City of Lexington*, 722 F.3d 224 (4th Cir. 2013), is likewise inapplicable. As is the Department's reference to *United States v. O'Brien*, 391 U.S. 367 (1968), where the Court's reluctance to question the motive of "an otherwise constitutional statute" rested on the concern that "a handful of Congressmen" may not speak for Congress as a whole. *Id.* at 383–84. Those institutional concerns do not translate to executive action, the motivations for which courts routinely probe. *See, e.g., Dep't of Com.*, 588 U.S. at 773–85 (questioning

motive for generally applicable policy); *Bd. of Governors of the Fed. Reserve Sys. v. United States*, 823 F. Supp. 3d 1 (D.D.C. 2026).

## II. The Preliminary Injunction May Be Affirmed On Other Grounds.

The district court correctly determined that Plaintiffs' likelihood of success on their retaliation claim obviated the need to reach Plaintiffs' other claims, J.A. 18. But this Court may affirm "on any basis adequately preserved in the record below," *U.S. ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 123 (D.C. Cir. 2015), including because the escort requirement is a viewpoint discriminatory and unreasonable restriction on access to and use of a nonpublic forum that violates the First Amendment. Alternatively, it is a patently unreasonable exercise of agency decisionmaking under the APA. These alternative arguments are straightforward grounds to affirm, and nothing would be gained by forcing Plaintiffs to suffer ongoing injury while litigating these issues for a third time below. *See Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 506 (D.C. Cir. 2016).

### A. The Escort Requirement Is Unreasonable and Viewpoint Discriminatory.

The Pentagon's press areas—including the press briefing room, corridors, and Correspondents' Corridor—are concededly a nonpublic forum. Br. 1, 15, 22, 44; *see Ateba*, 133 F.4th at 121–22. Restrictions on access to a nonpublic forum must be "reasonable in light of the purpose served by the forum" and must not be "an

effort to suppress expression merely because public officials oppose the speaker's view." *Mansky*, 585 U.S. at 12–13; *Ateba*, 133 F.4th at 123. The escort requirement fails both tests.

**1. The escort requirement is an unreasonable restriction.**

The purpose of having press inside the Pentagon is to facilitate newsgathering and reporting on the U.S. military for the benefit of the public. For decades, credentialed reporters moved unescorted through the Pentagon's unrestricted areas—attending breaking-news briefings, speaking informally with sources, and visiting public affairs offices. *See supra* 4–6; J.A. 355–57, 363, 376–77, 384–85. As the Department conceded in *NYT I*, this access "enhanced the ability of journalists and news organizations to keep Americans informed about the U.S. military while posing no security or safety risk to Department property or personnel." J.A. 6 (quoting *NYT I*, 824 F. Supp. 3d at 35). The Interim Policy itself asserts a "commit[ment] to transparency to promote accountability and public trust." J.A. 95.

By conditioning press access on advance permission and the presence of an official minder, the escort requirement is fundamentally incompatible with the design, history, and purpose of a forum intended to facilitate fact-based, independent reporting. The escort requirement is not a mere inconvenience. Br. 2, 17, 20, 30–33, 54–57. It thwarts basic newsgathering and reporting. *See supra* 20–23. By design, the requirement makes reporters' credentials practically worthless.

Comparisons to other government institutions only underscore how unreasonable the escort requirement is. Br. 30–31. Credentialed reporters have unescorted access at the Supreme Court, Congress, the White House, the State Department, the Justice Department, and this Court. *Supra* 6; *see Karem*, 960 F.3d at 659.

A generalized interest in protecting classified or other "sensitive" information does not make the escort requirement reasonable.[2] For eight decades the Department maintained information security at the Pentagon without it. The Department's assertion that this same access suddenly—right after Defendants lost in court defending the October Policy—poses an information-security threat is not credible. *See supra* 32–36. As explained, the Pentagon is no sealed fortress: thousands of non-Department employees and visitors move through it unescorted every day. *Supra* 6. Defendants offer no persuasive explanation why only journalists purportedly pose an informational security threat. Their conjecture about reporters observing "activity patterns" could not justify this burden even if it were credible. *Supra* 34–36.

[2] Defendants never define "sensitive" information. Br. 5. They use the label expansively—Parnell's declaration invokes "sensitive, controlled or classified information," J.A. 423—yet they concede that much nonpublic information is neither classified nor controlled unclassified, including "personnel decisions, such as hiring, firing, and promotion," J.A. 31. Simply put, any nonpublic information regardless of classification could be deemed "sensitive."

### 2. The escort requirement is an effort to suppress a disfavored editorial viewpoint.

The escort requirement independently fails because it is an effort to "suppress expression merely because public officials oppose [a] speaker's view." *Mansky*, 585 U.S. at 12–13. The government may not "change the nature of a forum in order to deny access to a particular speaker or point of view." *WMATA*, 901 F.3d at 365. But that is precisely the aim of the escort requirement. Indeed, the district court's express finding that Defendants' viewpoint discriminatory purpose in adopting the Interim Policy carried over unabated from their October Policy should foreclose any other conclusion. J.A. 33; *supra* 31.

The Department is precluded from contesting the viewpoint discriminatory purpose of the October Policy. Issue preclusion applies when an issue was "contested by the parties and submitted for judicial determination" in an earlier case and was "actually and necessarily determined," absent some unfairness. *Yamaha Corp. of Am. v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992). The Department vigorously litigated the viewpoint discriminatory purpose of the October Policy and the district court ruled on it at summary judgment. *See NYT I*, 25-cv-4218 (D.D.C.), Dkt. 23 at 29–37. Defendants now have abandoned any challenge to that ruling on appeal. *See* Br. for Appellants at 17–21, No. 26-5113 (D.C. Cir.). That ruling—and all of its component findings of fact and conclusions of law—is therefore final and preclusive. *Martin v. Dep't of Just.*, 488 F.3d 446, 454–55 (D.C. Cir. 2007).

Defendants cannot contest that their aim in imposing the October Policy was to exclude The Times and others based on their editorial viewpoint, or that in doing so they violated the First Amendment. *NYT I*, 824 F. Supp. 3d at 48–49.

Defendants have made clear they want to be covered by what they call the "patriotic" press "on board and willing to serve" the administration. J.A. 306; *NYT I*, 824 F. Supp. 3d at 48. That motive animated the October Policy—as Defendants no longer dispute—and motivated the Interim Policy too. *Supra* 30–32. That discriminatory motive alone renders the escort requirement unlawful. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) (The government "may not deny a benefit to a person on a basis that infringes his constitutionally protected … freedom of speech."). Indeed, "[w]hen the government targets … particular views, the violation of the First Amendment is all the more blatant," and "egregious." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

The Department cannot save the escort requirement by calling it "facially neutral" or insisting it applies "evenhandedly." Br. 1, 3, 15, 23–27, 33–36, 40. A neutrally written policy is still unconstitutional if "based on the desire to suppress a particular point of view." *Cornelius*, 473 U.S. at 812. "A government bent on frustrating an impending demonstration might pass a law demanding two years' notice before the issuance of parade permits"; though "neutral as to content and speaker,"

its "purpose to suppress speech" would render it unconstitutional. *Sorrell*, 564 U.S. at 566. The escort requirement may apply to all credentialed journalists but, like the October Policy, its purpose and effect are to hinder the newsgathering of those, including The Times, whose view is that journalism in the public interest requires more than repeating spoon-fed official pronouncements. *Supra* 28–29. That is why it was instantly imposed only after the district court ordered that The Times's reporters' access be restored.

Defendants' invocation of a desire to protect "sensitive" information is no answer. Br. 5. Even setting aside that the "[m]ere recitation of viewpoint-neutral rationales" does not immunize government action from scrutiny, *WMATA*, 901 F.3d at 365, the asserted justification is not neutral. Attempting to prevent journalists from publishing unapproved information, Br. 5, 8–9, 38–40, 45–48, is itself viewpoint discrimination. *NYT I*, 824 F. Supp. 3d at 48–49. As the district court explained, the government may not discriminate against independent reporting solely because it involves disclosure of information the government did not approve. *See id.* There is no constitutional loophole that allows the government to suppress information the government wants to keep secret. *See N.Y. Times Co. v. United States*, 403 U.S. 713, 713–14 (1971) (per curiam).[3]

---

[3] As explained above, the Department's cited cases do not support its argument that it may regulate press access to suppress speech. *See supra* 36. Regardless,

## B. The Escort Requirement Violates the APA.

The escort requirement rashly abandons nearly a century of reasonable, secure press access to the Pentagon that created enormous reliance interests and public benefit. The Department provided no considered, reasoned basis for this drastic change. To the contrary, the escort requirement was concocted over a weekend by a part-time employee to evade a court order and silence independent reporting. That impetuous departure from established policy and shambolic process flouts the APA's requirements for agency decisionmaking.

Courts must "hold unlawful and set aside" agency action that is "arbitrary" or "capricious," 5 U.S.C. § 706(2)(A), including when an agency fails to engage in reasoned decisionmaking. An agency must "examine the relevant data and articulate a satisfactory explanation for its action," while forgoing reliance on factors it is not empowered to consider. *State Farm*, 463 U.S. at 43 (quotation omitted). And it must "consider responsible alternatives to its chosen policy" and explain rejecting them. *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 242 (D.C. Cir. 2008). The Department failed each of these requirements.

To start, by targeting Plaintiffs' exercise of First Amendment rights and seeking to suppress a disfavored editorial viewpoint, Defendants relied on factors they

---

Defendants are precluded by *NYT I* from arguing that their speech-repressive purpose is permissible. *Supra* 40.

were not permitted to consider. *See State Farm*, 463 U.S. at 43; *supra* 30–31, 39–41. The October Policy's indisputably viewpoint-discriminatory aim at minimum informed the Department's decision to adopt the Interim Policy. On that basis alone, the escort requirement is arbitrary and capricious.

The Department has also abandoned any effort to "defend its actions based on the reasons it gave when it acted." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 24 (2020). Yet those are the only ones that can be considered in this Court's review. *Regents*, 591 U.S. at 21; *accord Chenery Corp.*, 332 U.S. at 196. The Department's "activity patterns" rationale proffered only after the district court rejected the Department's original rationale contradicts the explanation the Department gave at the time. *See supra* 32–34. The Department even now abandons its contention that the requirement is "interim," and thereby its justification for why such purportedly temporary measures were necessary. This about-face is alone fatal because government action "[can]not [be] upheld on the basis of [an] impermissible 'post-hoc rationalization,'" much less one that contradicts the agency's previous explanation. *Regents*, 591 U.S. at 21.

Moreover, neither the reason the Department gave at the time nor the one it offers now is reasoned. The contemporaneous justification—that the district court's vacatur left the Department without "the ability to screen PFAC holders for security risks," J.A. 90—was "nonsense," J.A. 15, 28. The court "did not 'remove' or

'excise' the Department's authority to screen PFAC holders"; it left in place the background-check regime that had worked successfully for decades. J.A. 28. And the "activity patterns" rationale for the now apparently final "March Policy," *e.g.*, Br. 9, besides being post-hoc, also fails on its own terms. The escort requirement is both wildly under- and overinclusive: unescorted presence in press areas does not give journalists access to "sensitive" nonpublic information, excluding them has not stopped reporting of such information, *see, e.g.*, J.A. 331, 339, 347, and other non-employees retain unescorted access to the very corridors now closed to the press, J.A. 356 (¶ 10); *see* J.A. 32. That "significant mismatch," *Dep't of Com.*, 588 U.S. at 784, defeats any "rational connection between the facts found and the choice made," *State Farm*, 463 U.S. at 43, and "provides further evidence of pretext," *Dep't of Com.*, 588 U.S. at 781–85.

The Department's "process" for adopting the requirement confirms the point: the policy was thrown together over a weekend without any investigation, factfinding, or analysis. Such haphazard action reflects unreasoned decisionmaking. An agency cannot examine "relevant data" it did not have time to obtain or consider. *See State Farm*, 463 U.S. at 43; *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (review asks "whether the decision was based on a consideration of the relevant factors"). And the agency has not provided any indication

that it discerned any data relevant to its decision whatsoever.[4] Procedural irregularity is another indicator that the stated rationale was contrived. *See Dep't of Com.*, 588 U.S. at 781–85; *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) ("Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role.").

Finally, Defendants neither considered obvious alternatives nor accounted for the costs of the course they chose. An agency departing from longstanding policy must explain why the departure is warranted. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009). The pre-October access regime had worked effectively for decades. Other alternatives to achieve the Department's stated aims were equally apparent, such as tightening internal controls over classified information. Yet the Interim Policy never explains its rejection of alternative approaches. *See Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 816 n.41 (D.C. Cir. 1983); *Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 (D.C. Cir. 1986). Nor did Defendants weigh the costs of the escort requirement. In fact, they improperly undersold them, given their now-abandoned assertion that it was merely

[4] The Department points (and only after the fact) to nothing but Wilson's unquantified impression that calls about sensitive information had declined, J.A. 421–22—not an examination of "relevant data." There is no basis to treat this post-hoc explanation as reflective of the administrative record, and the Policy's imposition on the business day after the district court's summary judgment order belies the premise that it was based on any reasoned assessment.

"interim." The district court and Plaintiffs had made Defendants aware of the severe burdens their efforts were imposing on newsgathering and on the public's access to information about the U.S. military. *Supra* 8–9; *NYT I*, 824 F. Supp. 3d at 53–55. The Department's wholesale disregard of those burdens is in no sense reasoned decisionmaking. *See Michigan v. EPA*, 576 U.S. 743, 750–53 (2015).

## III. The Remaining Injunction Factors Support Equitable Relief.

### A. Plaintiffs Have Shown Irreparable Harm.

The district court correctly found that Plaintiffs "stand to suffer immediate irreparable harm absent injunctive relief." J.A. 33. By violating the First Amendment, the escort requirement inflicts an inherent irreparable constitutional injury. Contrary to the Department's argument, Br. 55–57, "a prospective violation of a constitutional right constitutes irreparable injury for purposes of seeking equitable relief." *Karem*, 960 F.3d at 667 (citation omitted); *see First Choice Women's Res. Centers, Inc. v. Davenport*, 146 S. Ct. 1114, 1127 (2026). The district court's finding can be affirmed on that ground alone. Regardless, the harm here is "not merely abstract or theoretical." J.A. 34. "A campaign of retaliation" necessarily inflicts irreparable injury. *Media Matters*, 138 F.4th at 585. And, as the district court found, "the escort requirement burdens [reporters'] ability to engage in newsgathering because it has 'substantially reduced' their 'amount of interaction with' sources and 'made it exceedingly challenging to speak with press officials and other personnel

in person.'" J.A. 34. Times reporters lose conversations that supply "context," "nuance[]," and "the U.S. military's perspective." J.A. 21. "Reporters can hardly verify sources, gather information, or speak candidly with Department personnel with an escort looming over their shoulders." *N.Y. Times Co.*, 2026 WL 1179440, at *6 (Childs, J., dissenting). Because "the news is time-sensitive and occurs spontaneously, those harms cannot be remedied retrospectively." J.A. 21 (citation omitted). A missed opportunity to cover a breaking story cannot be recreated, and is unlikely to be relevant, months later.

The Department's responses repeat its merits arguments and miss the point. *See* Br. 54. It is not a defense that no reporter "has been denied requested access" when the problem is that their access is so restricted as to now be meaningless. *See id.*; *supra* 21–22. Nor does The Times's continued ability "to report stories that rely on non-public information" show an absence of harm; indeed, that argument only undermines the Department's purported rationale for the escort requirement. Br. 54–55; *supra* 35. And calling the requirement a "minor logistical burden[]," Br. 55, does not make it so. The district court found based on unrebutted testimony that "essential aspects of covering the Pentagon" were "inescapably burdened"—so much so that reporters have largely stopped going. J.A. 23; *supra* 21–22.

The Department is wrong to the extent it suggests that a plaintiff must show ongoing self-censorship. "The loss of First Amendment freedoms, for even minimal

periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.). Defendants' cases do not suggest otherwise. In *Anthropic PBC v. Dep't of War*, 2026 WL 1042493, at *3 (D.C. Cir. 2026), the Court accepted that irreparable "financial harms" caused by alleged retaliation "qualif[ied] as irreparable" and denied relief for other reasons. And *Google, Inc. v. Hood*, 822 F.3d 212, 227–28 (5th Cir. 2016), is about imminence: the plaintiff challenged a future retaliatory prosecution that might not happen. The escort requirement is impairing Plaintiffs' reporting every day.

**B. The Balance of Equities and Public Interest Favor Injunctive Relief.**

The public has a compelling interest in independent coverage of the world's most powerful military, particularly in a time of war. After all, "the right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. FEC*, 558 U.S. 310, 339 (2010). Yet every day the escort requirement is in effect, the public's access to timely, accurate information suffers.

The Department has no countervailing interest in enforcing an unconstitutional policy. "Enforcement of an unconstitutional law is always contrary to the public interest." *Karem*, 960 F.3d at 668. The Department faults the district court for relying on this principle, but this Court routinely applies it to affirm preliminary injunctions. *See id.; Media Matters*, 138 F.4th at 585; *Gordon v. Holder*, 721 F.3d

638, 653 (D.C. Cir. 2013). The district court also rejected the factual premise of the Department's asserted security interest as facially dubious and unsupported. *See supra* 35–36. The Department's "shifting and contradictory positions are a frail reed on which to rest equitable arguments." *Nat'l Tr. for Historic Pres. in the United States v. Nat'l Park Serv.*, 2026 WL 2276494, at *39 (D.C. Cir. 2026).

The Department's invocation of national security concerns is misdirected. *See* Br. 58–60. The Department has not made a military judgment about whether a particular technology would impair its operations, *Anthropic*, 2026 WL 1042493, at *3, or how terrorists might exploit information, *see Ctr. for Nat. Sec. Stud. v. U.S. Dep't of Just.*, 331 F.3d 918, 928 (D.C. Cir. 2003). The "judgments" to which it seeks deference are conjecture by press officials, undermined by specific data, about how reporters supposedly obtain information—information that the Department has not shown presents any risk to national security. *Supra* 35–36, 39. Once Plaintiffs established a likelihood of success on that finding, the Department's unsupported resort to claims of national security supplied no independent reason to deny relief.

## CONCLUSION

The Court should affirm the preliminary injunction.

Dated: September 4, 2026

Respectfully submitted,


<u>*/s/ Theodore J. Boutrous, Jr.*</u>

Theodore J. Boutrous, Jr.
Katie Townsend
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
TBoutrous@gibsondunn.com
KTownsend@gibsondunn.com

Susan M. Pelletier
Eric Brooks
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036-5306
(202) 955-8500
SPelletier@gibsondunn.com
EBrooks2@gibsondunn.com

*Counsel for Plaintiffs-Appellees The New York Times Company and Julian E. Barnes.*

## CERTIFICATE OF COMPLIANCE (RULE 32(G)(1))

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7) because it contains 12,993 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Microsoft Word in 14-point Times New Roman, a proportionally spaced typeface.

*/s/ Theodore J. Boutrous, Jr.*
Theodore J. Boutrous, Jr.