ORAL ARGUMENT NOT YET SCHEDULED

No. 26-5113, 26-5253

IN THE

# United States Court of Appeals for the District of Columbia Circuit

THE NEW YORK TIMES COMPANY, *et ano*,

*Plaintiffs-Appellees*,

v.

DEPARTMENT OF DEFENSE A/K/A DEPARTMENT OF WAR, *et al.*,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the District of Columbia, Nos. 25-cv-4218 & 26-cv-1690
Hon. Paul L. Friedman, J.

## BRIEF OF *AMICUS CURIAE* PENTAGON PRESS ASSOCIATION IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

DAVID A. SCHULZ
CHRISTINA LEE
MEDIA FREEDOM &
INFORMATION ACCESS CLINIC
YALE LAW SCHOOL
127 Wall Street
New Haven, CT 06511
(212) 850-6103
david.schulz@yale.edu

*Counsel for Pentagon Press Association as Amicus Curiae*

# TABLE OF CONTENTS


STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY TO FILE.......... ix

CERTIFICATES AND CORPORATE DISCLOSURE STATEMENT ..... x

PRELIMINARY STATEMENT.......... 1

ARGUMENT .......... 4

I. THE PENTAGON HAS ALWAYS BEEN A FORUM FOR WATCHDOG JOURNALISM .......... 4

A. Journalists Have Sought Out the News at the Pentagon Since Its Doors First Opened .......... 4

B. Newsgathering at the Pentagon is Protected by the First Amendment .......... 9

II. THE DEPARTMENT'S NEW RESTRICTIONS ON NEWSGATHERING ARE PATENTLY UNREASONABLE.......... 11

A. Restrictions Against Asking Questions or "Inducing Information" Unreasonably Obstruct Newsgathering .......... 11

B. Requiring Reporters to be Escorted at All Times Unreasonably Obstructs Newsgathering.......... 15

C. The Department Provided No Plausible Justification for Its New Obstruction of Newsgathering .......... 27

III. THE DEPARTMENT IMPOSED THE NEW RESTRICTIONS TO SUPPRESS UNFAVORABLE INFORMATION AND STIFLE CRITICISM.......... 29

IV. THE DEPARTMENT'S NEWSGATHERING RESTRICTIONS DEPRIVE THE PUBLIC OF VITAL INFORMATION.......... 32

CONCLUSION .......... 34

# TABLE OF AUTHORITIES

## Cases

*Ateba v. Leavitt*, 133 F.4th 114 (D.C. Cir. 2025)....................................11

*Branzburg v. Hayes*, 408 U.S. 665 (1972) .............................................10

*Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991) ..................................25

*Cornelius v. NAACP*, 473 U.S. 788 (1985) .............................................30

*Grosjean v. American Press, Co.*, 297 U.S. 233, 250 (1936).............30, 31

*Houchins v. KQED, Inc.*, 438 U.S. 1 (1978) ...........................................11

*Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*,
505 U.S. 672 (1992) ..................................................................11

*Minn. Voters Alliance v. Mansky*, 585 U.S. 1 (2018) ........................11, 30

*Minneapolis Star & Trib. Co. v. Minn. Com'r of Revenue*,
460 U.S. 57 (1983) .............................................................25, 26

*New York Times Co. v. DOD*, No. 26-5113, 2026 WL 1179440
(D.C. Cir. Apr. 27, 2026)..........................................................17

*New York Times v. United States*, 403 U.S. 713 (1971)................2, 10, 35

*Nicholson v. McClatchy Newspapers*, 177 Cal. App. 3d 509 (1986) .......13

*Pell v. Procunier*, 417 U.S. 817 (1974) ..................................................10

*Perry Ed. Assn.* 460 U.S. 37 (1983) .......................................................30

*Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977)..................................27

*Sorrell v. IMS Health, Inc.*, 564 U.S. 522 (2011) ....................................30

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ...............................30

*Zerilli v. Smith*, 656 F.2d 705 (D.C. Cir. 1981).......................................11

## Other Authorities

Alex Horton & Tara Copp, *Military Leaders Warn Hegseth Against Extending Iran War Operations*, Wash. Post (Aug. 30, 2026).............22

ALFRED GOLDBERG, THE PENTAGON: THE FIRST FIFTY YEARS (1992) ........ 5

Amanda Shanor, *The Constitutional Exceptionalism of Religion & the Press*, *in*THE FUTURE OF PRESS FREEDOM: DEMOCRACY, LAW, AND THE NEWS IN CHANGING TIMES170-181 (RonNell Anderson Jones & Sonja R. West eds., Cambridge Univ. Press 2025)................26

Anna Fifield, *I Went to North Korea and Was Told I Ask Too Many Questions*, WASH. POST (May 11, 2016), https://perma.cc/9FWG-DH2N ........................................................ 16

Barbara Starr, *The Reshuffling of the Pentagon Press Corps Is a Warning*, COLUM. JOURNALISM REV. (Feb. 5, 2025), https://perma.cc/DG6P-CZY9 ........................................................ 6

Bill Kovach & Tom Rosenstiel, *Introduction*, *in* THE ELEMENTS OF JOURNALISM: WHAT NEWSPEOPLE SHOULD KNOW AND THE PUBLIC SHOULD EXPECT (4th ed. 2021) ............................................ 13, 15, 18

Brian Stelter, *Pentagon to Swap Traditional Media with Pro-Trump Outlets Under New Rotational Program for Defense Department Workspace*, CNN (Feb. 1, 2025), https://perma.cc/Y7BT-SV4V ........................................................ 6

Col. Ryan Dowdy, *The Military and the Media:A Match Made In…Necessity?*, WARROOM: ONLINE J. (Oct. 1, 2019), https://perma.cc/6YZT-KJ8L ........................................................ 34

*Collection: Iran, Israel and the United States at War (2025-2026 Operations)*, JUST SEC.(Aug. 5, 2026), https://perma.cc/7T7C-WLUW ........................................................ 33

Compl., *Slavin et al. v. Parnell et al.*, No. 26-cv-03009 (D.D.C. Aug. 27, 2026)........................................................ 3

Dan Lamothe & Tara Copp, *Pentagon Secretly Installs Military Influencers in Civilian Roles*, Wash. Post (Aug. 30, 2026), https://perma.cc/P67T-NZ7U ........................................................ 22

David Anderson, *The Origins of the Press Clause*, 30 UCLA L. REV. 455 (1983) ........................................................ 10

Dexter Filkins, *The Twilight of the Iranian Revolution*, NEW YORKER (May 18, 2020), https://perma.cc/6A6T-3QHP ............... 16

Donald Rumsfeld, Address to the American Society of Newspaper Editors (Apr. 22, 2004), *quoted in* ALASDAIR ROBERTS, BLACKED OUT: GOVERNMENT SECRECY IN THE INFORMATION AGE (2006) ........................................................... 7

Eric Schmitt, *Pentagon Withheld Dozens of U.S. Military Injuries in Iran War*, N.Y. TIMES (Jul. 20, 2026), https://perma.cc/VRQ7-7QJY ........................................................ 33

Ernest B. Furguson, *On Being Adversaries*, BALT. SUN, Nov. 23, 1972 ........................................................ 7

Helene Cooper, *On the War Against Iran, the Pentagon Has Said Little*, N.Y. TIMES (Jul. 16, 2026), https://perma.cc/BS8G-FFXX ........................................................ 33

Hillary Profita, *A Day in the Life of a Pentagon Correspondent*, CBS NEWS (July 3, 2006), https://perma.cc/J8XM-6CXL .............................. 5

Isaac May, et ano, *Finding Religion? Most-Favored-Nation Doctrine and the Press*, 40 WTR COMM. LAW. 15 (2025) .................. 26

JAMES C. GOODALE, FIGHTING FOR THE PRESS: THE INSIDE STORY OF THE PENTAGON PAPERS AND OTHER BATTLES (2013) .......................... 6

Jane Elizabeth, *Effective Accountability Journalists Find Their Own Way and Direct Their Own Work*, AM. PRESS INST. (Dec. 20, 2016), https://perma.cc/35MS-K43Q .................................... 15

Jane Elizabeth, *Effective Accountability Journalists Spend Considerable Time Building Relationships With Sources and Readers*, AM. PRESS INST. (Dec. 20, 2016), https://perma.cc/W4VM-HZPW ........................................................ 20

Jeremy Chin, Margaret Lin & Aidan Arasasingham, *Timeline of Boat Strikes and Related Actions*, JUST SEC. (Aug. 26, 2026), https://perma.cc/8N5F-EFFX ........................................................ 33

John M. Diamond, *The Media: Witness to the National Security Enterprise*, *in* THE NATIONAL SECURITY ENTERPRISE: NAVIGATING THE LABYRINTH353 (Roger Z. George & Harvey Rishikof eds., 2d ed. 2017) ........ 5

Julia Manchester, *Trump on Talk of Hegseth 2028 Run: 'It's Very Early to Talk About That'*, THE HILL (Aug. 31, 2026), https://perma.cc/6FZJ-8HMU ........ 31, 32

Liam Scott, *Stars and Stripes Job Applicants are Asked if They Back Trump Policies*, WASH. POST (Jan. 14, 2026), https://perma.cc/U6NW-3J5D ........ 3

Mark Thompson, *Pentagon's Correspondent's Corridor Renamed*, TIME (Sep. 27, 2012), https://perma.cc/BC2F-5SRU ........ 6, 8

Matt Schiavenza, *Why It's So Difficult for Journalists To Report From Xinjiang*, ASIA SOC'Y (May 23, 2019), https://perma.cc/UJR3-WSNK ........ 16

*Navy Goes to Pentagon*, N.Y. TIMES, (Aug. 12, 1948), https://perma.cc/623X-ATRX........ 5

Neiman Watchdog Project, *About Us* (May 24, 2004), https://perma.cc/FQB3-MZ9H ........ 13, 19

*Pentagon – Air Force: Installation Details*,MIL. INSTALLATIONS(last visited Apr. 16, 2026), https://perma.cc/V4A8-BARU ........ 25

Phil Stewart & Idrees Ali, *Exclusive: US Investigation Points to Likely US Responsibility in Iran School Strike, Sources Say*, REUTERS (Mar. 6, 2026),https://perma.cc/FPE6-GFX7 ........ 21

ROBERT B. SIMS, THE PENTAGON REPORTERS (1983)........ 9

Robert Post, *The Press and American Democracy*, *in* THE FUTURE OF PRESS FREEDOM: DEMOCRACY, LAW, AND THE NEWS IN CHANGING TIMES17 (RonNell Andersen Jones & Sonja West eds., Cambridge Univ. Press (2025)........ 9,10

RonNell Andersen Jones, *Press Speakers and the First Amendment Rights of Listeners*, 90 U. COLO. L. REV. 499, 543 (2019) .................... 32

Sonja West, *Awakening the Press Clause*, 58 UCLA L. REV.1025 (2011) ............................................................ 10

Sonja West, *The Stealth Press Clause*, 48 GA. L. REV. 729 (2014) ......... 32

Sec. Donald Rumsfeld, Address to the American Society of Newspaper Editors (Apr. 22, 2004), *quoted in* ALASDAIR ROBERTS, BLACKED OUT: GOVERNMENT SECRECY IN THE INFORMATION AGE (2006) ........................................................... 7

*SPJ Code of Ethics,* SOC'Y OF PRO. JOURNALISTS (Sept. 6, 2014), https://perma.cc/SFF4-4XFM ............................................................ 12

Stephen J. Berry, *Opinion: CBS Lets the Pentagon Taint Its News Process*, NIEMAN REPORTS (Sep. 15, 2004), https://perma.cc/E6X6-QMQH ............................................................................ 7, 8

STEVE VOGEL, THE PENTAGON: A HISTORY 278–-79 (2007) ................. 4, 22

Sue-Lin Wong, *Woken Up Before 5 a.m. to See North Korea's Leader, Five Hours Later*, REUTERS (Apr. 13, 2017), https://perma.cc/UKD7-QVTY .......................................................... 16

Tom Bowman, *Opinion: Why I'm Handing In My Pentagon Press Pass*, NPR (Oct. 14, 2025), https://perma.cc/3ZPE-XAP7 ............ 5

*Too Many Secrets: Overclassification as a Barrier to Critical Information Sharing,Hearing Before the Subcomm. on National Security, Emerging Threats, and International Relations of the Comm. on Government Reform,* 108th Cong. 263 at 82-83 (2004) ...... 29

Vincent Blasi, *The Checking Value in First Amendment Theory*, 2 AM. BAR FOUND. RSCH. J. 521 (1997)........................................... 10, 32

*Wartime Pentagon Goes Two-Plus Months Without Media Briefing*, U.S. PRESS FREEDOM TRACKER (Jul. 20, 2026), https://perma.cc/B67E-9A5A............................................................. 33

Zachary D. Streit, *Investigative Journalism and National Security*, 5 CARDOZO PUB. L. POL'Y & ETHICS J. 75, 84-86 (2006) ........................ 34

## Glossary & Citation Conventions

| | |
|---|---|
| Department | Department of Defense |
| Appellants' S.J. Brief | Brief for Appellants in No 26-5113, appeal from summary judgment and compliance orders in Case No. 25-cv-4218 |
| Appellants' P.I. Brief | Brief for Appellants in No. 26-5253, appeal from preliminary injunction in Case No. 26-cv-1690 |
| S.J.-J.A.. | Joint Appendix filed in No 26-5113, appeal from summary judgment and enforcement order |
| P.I.-J.A. | Joint Appendix filed in No 26-5253, appeal from preliminary injunction |
| PFAC | Pentagon Facilities Access Credential or press pass |
| PPA | Pentagon Press Association |
| PPO | Pentagon Press Operations Office |

## STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY TO FILE[1]

The Pentagon Press Association ("PPA") is a nonprofit association that promotes the interests and protects the rights of journalists who regularly report on the Department of Defense ("Department"). PPA members are journalists who cover the U.S. military and need routine access to the Pentagon and military officials to gather news. Their newsgathering requires PPA members to ask questions, cross-check and confirm facts, and interview Department subject-matter experts, among other routine reporting activities that are facilitated by their presence at the Pentagon. Until now, PPA members have worked at the Pentagon secure in the knowledge that they would not be subjected to adverse government action simply for doing their job.

The PPA has a direct stake in the outcome of these appeals. More than 100 PPA members had their Pentagon press credentials revoked on October 15, 2025, for refusing to accept unreasonable restrictions on

[1] This *Amicus* brief is submitted in two related appeals arising out of challenges by The New York Times Company to new Pentagon press policies issued by the Defense Department: No. 26-5113 (appeal from summary judgment and compliance orders in No. 25-cv-4218), and No. 26-5253 (appeal from preliminary injunction in No. 26-cv-1690).

routine newsgathering imposed by the Department. Even after the district court declared those new restrictions illegal, most PPA members have not restored their credentials because an "interim" policy hastily issued by the Department retained the unreasonable restrictions on newsgathering and imposed new ones. The First Amendment rights of PPA's members and the public's fundamental interest in knowing what its government is up to are both directly at stake in this appeal.

The PPA participated as an amicus in support of plaintiffs' motion for summary judgment in the district court in No. 1:25-cv-04218 and previously submitted an amicus brief to this Court supporting plaintiff-appellees' opposition to entry of a stay in No. 26-5113.

All parties have consented to the filing of this brief, and amicus files it pursuant to Fed. R. App. P. 29(a)(2) and D.C. Circuit Rule 29(b).

## CERTIFICATES AND CORPORATE DISCLOSURE STATEMENT

### A. Parties and Amici

To the best of counsel's knowledge, all parties, intervenors, and amici appearing before the district court and in this Court are listed in the Briefs for Appellants in these two cases.

**B. Corporate Disclosure Statement**

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 28(a)(1)(A), *amicus curiae* certifies as follows: the Pentagon Press Association is an unincorporated nonprofit association. It has no parent corporation and no subsidiaries, and it issues no stock.

**C. Circuit Rule 29(d) Certification**

Pursuant to Circuit Rule 29(d), *Amicus* Pentagon Press Association certifies that this brief is necessary to clarify for the Court the ways in which the Department's new press restrictions obstruct PPA members' ability to gather and report the news to such an extent that having a Pentagon press pass has become essentially worthless, and to underscore the damaging impact these restrictions have on the flow of vital information to the public.

**D. Rule 29(a)(4)(E) Certification**

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), amicus certifies that no party or counsel for a party authored the brief in part or in whole. Aside from amicus and its counsel, no person or entity made a financial contribution to fund the preparation or submission of the brief.

## PRELIMINARY STATEMENT

The Pentagon has always been, and remains, a non-public forum where reporters who have passed a background check may gather news in close proximity to military leaders and other news sources. But today, seeking to avoid unfavorable and embarrassing reports, the Department of Defense ("Department") imposes such severe restrictions on Pentagon reporters that the watchdog journalism historically done there is all but impossible. The Department maintains a public pretense that the Pentagon is open to reporters but denies the use of routine reporting practices—prohibiting newsgathering activity secured from government interference by the First Amendment's guarantee of the "freedom… of the press."

When the new restrictions were imposed last October, virtually the entire Pentagon press corps concluded they could not agree to them and still do their job. More than 100 PPA members had their credentials revoked for refusing to accept the new press policy, and were promptly replaced by inexperienced, highly partisan bloggers and activists recruited by the Department based on their past support of Secretary Hegseth and the Trump administration.

The Department defends its draconian restrictions on appeal as "animated" by "important security interests," Appellants' S.J. Brief at 1,[2] but has never identified any new security risk or newsgathering practice that would require such radical limitations on the newsgathering carried out at the Pentagon since the day its doors opened in 1942. As Justice Black cautioned more than fifty years ago, in another *New York Times* lawsuit defending the rights of the press against the government's assertion of national security needs:

> The word "security" is a broad, vague generality whose contours should not be invoked to abrogate the fundamental law embodied in the First Amendment. The guarding of military and diplomatic secrets at the expense of informed representative government provides no real security for our Republic.

*New York Times v. United States*, 403 U.S. 713, 719 (1971) (Black, J., concurring).

Invoking national security to abrogate First Amendment rights at the expense of informed representative government is precisely what the Department is seeking to do. The restrictions on routine reporting at the

---

[2] The Brief for Appellants in No. 26-5113, the summary judgment appeal, is cited herein as "Appellants' S.J. Brief. at __;" the Brief for Appellants in No. 26-5253, the preliminary injunction appeal, is cited as "Appellants' P.I. Brief. at __."

Pentagon, the district court concluded, are nothing less than an "attempt by the Secretary of Defense to dictate the information received by the American people, to control the message so that the public hears and sees only what the Secretary and the Trump Administration want them to hear and see." S.J.-J.A. at 361.[3] This is not the only step the Department has taken to control reporting on its activities,[4] and the American public today is provided less information about the Department's plans, actions, or accomplishments than at any point in modern history, even as the military is actively engaged in multiple combat operations.

The Pentagon press corps' past ability to work freely within the building has reassured the public of the independence and reliability of reporting on our military. The PPA submits this amicus brief to make

[3] References to the Joint Appendix in appeal No. 5113 are cited "S.J.-J.A. at __;" references to the Joint Appendix in appeal No. 5253 are cited herein as "P.I.-J.A. at__."

[4] The Department just recently terminated the publisher, editor, and a reporter of *Stars & Stripes,* the U.S. military's independent news source since the Civil War, for speaking out after the Department criticized the paper as "woke" and began asking job applicants what they would do to support President Trump's policies. *See* Compl. at ¶ 2, *Slavin et al. v. Parnell et al.*, No. 26-cv-03009 (D.D.C. Aug. 27, 2026); Liam Scott, *Stars and Stripes Job Applicants are Asked if They Back Trump Policies*, WASH. POST (Jan. 14, 2026), https://perma.cc/U6NW-3J5D.

clear how dramatically the new policies depart from past practice, how severely they obstruct reporters' ability to gather news, and how much they restrict the flow of vital information to the public.

## ARGUMENT

## I. THE PENTAGON HAS ALWAYS BEEN A FORUM FOR WATCHDOG JOURNALISM

The propriety of the Department's press restrictions can be properly assessed only with an understanding of how dramatically they depart from the unbroken history of reporting at the Pentagon.

### A. Journalists Have Sought Out the News at the Pentagon Since Its Doors First Opened

When the military first began moving into the Pentagon in 1942, Secretary of War Henry Stimson provided journalists access to the new building so they could keep close to key "sources of information."[5] By the end of World War II, the Pentagon hosted an established press corps, and on August 11, 1948, a "combined National Defense press room" was

---

[5] STEVE VOGEL, THE PENTAGON: A HISTORY 278-79 (2007).

opened in the building, meaning the press has had a longer tenancy than the U.S. Navy.[6]

From the outset, reporters were allowed free access to "all but the most secure corridors of the vast building."[7] This access enabled reporters to meet senior uniformed officials informally and build relationships that help develop stories and check facts.[8] Dedicated office space in the Pentagon also provided "journalistic value,"[9] allowing reporters to "be in

---

[6] *Navy Goes to Pentagon*, N.Y. TIMES (Aug. 12, 1948), https://perma.cc/623X-ATRX; *see also* ALFRED GOLDBERG, THE PENTAGON: THE FIRST FIFTY YEARS 157-58 (1992).

[7] John M. Diamond, *The Media: Witness to the National Security Enterprise*, *in* THE NATIONAL SECURITY ENTERPRISE: NAVIGATING THE LABYRINTH 353, 355 (Roger Z. George & Harvey Rishikof eds., 2d ed. 2017); Hillary Profita, *A Day in the Life of a Pentagon Correspondent*, CBS NEWS (July 3, 2006), https://perma.cc/J8XM-6CXL.

[8] Tom Bowman, *Opinion: Why I'm Handing In My Pentagon Press Pass*, NPR (Oct. 14, 2025), https://perma.cc/3ZPE-XAP7 (noting the value in "talking to and getting to know officers from all over the globe").

[9] Brian Stelter, *Pentagon to Swap Traditional Media with Pro-Trump Outlets Under New Rotational Program for Defense Department Workspace*, CNN (Feb. 1, 2025), https://perma.cc/Y7BT-SV4V (quoting a Pentagon spokesperson).

touch with trusted sources throughout the day and be ready to quickly file news stories."[10]

The Pentagon maintained this open access even amid intense public criticism. During the Vietnam War and the heated controversy over publication of the Pentagon Papers, for example, the government fought the disclosure of unauthorized information by the *New York Times* and *Washington Post* in court, but the Department never threatened to revoke their reporters' credentials.[11] To the contrary, just the next year, Defense Secretary Melvin Laird dedicated a "Correspondent's Corridor" in the Pentagon to honor "a free and strong American press"[12] and to "praise and preserve" the adversarial relationship between the press and the government.[13] In doing so, he welcomed "go[ing] about our

---

[10] Barbara Starr, *The Reshuffling of the Pentagon Press Corps Is a Warning*, COLUM. JOURNALISM REV. (Feb. 5, 2025), https://perma.cc/DG6P-CZY9.

[11] *See generally* JAMES C. GOODALE, FIGHTING FOR THE PRESS: THE INSIDE STORY OF THE PENTAGON PAPERS AND OTHER BATTLES (2013) (recounting the legal fight from the perspective of *The New York Times*'s legal team).

[12] Mark Thompson, *Pentagon's Correspondent's Corridor Renamed*, TIME (Sep. 27, 2012), https://perma.cc/BC2F-5SRU.

[13] Ernest B. Furguson, *On Being Adversaries*, BALT. SUN, Nov. 23, 1972, at A30 (cleaned up).

constitutional business of being adversaries" without "becoming antagonists." *Id.*

In 2004, amid ongoing military operations in Afghanistan and Iraq, Defense Secretary Donald Rumsfeld similarly extolled reporters' investigative role at the Pentagon. The United States, he explained, was founded "on the notion that an unchecked government is a major obstacle to human freedom," so that American leaders must be "challenged… externally by a free and energetic press."[14] When 60 Minutes revealed abuses at Abu Ghraib just months later, the Department protested a compromise of military operations,[15] but never yanked the press passes of the CBS reporters.

Obtaining and publishing newsworthy information not "approved" for public release is both an important part of reporting from the Pentagon and in the public interest. Longtime AP Pentagon

[14] Sec. Donald Rumsfeld, Address to the American Society of Newspaper Editors (Apr. 22, 2004), *quoted in* ALASDAIR ROBERTS, BLACKED OUT: GOVERNMENT SECRECY IN THE INFORMATION AGE 51 (2006).

[15] Stephen J. Berry, *Opinion: CBS Lets the Pentagon Taint Its News Process*, NIEMAN REPORTS (Sep. 15, 2004), https://perma.cc/E6X6-QMQH (describing the Pentagon's request to delay the broadcast due to "the tense situation in Iraq and the danger to hostages").

correspondent Robert Burns testified, for example, about a series of articles he wrote revealing "systemic problems in the Air Force's nuclear missile enterprise, including inspection failures, morale issues, training deficiencies, and misconduct." P.I.-J.A. at 370, ¶ 18 (Burns Decl.). While his stories exposed highly sensitive issues, Burns "never experienced any threats—direct or indirect—to my credential or access to the Pentagon." *Id.* In fact, Burns' reporting led the Department to conduct internal reviews and institute reforms. *Id.*

The long history of such accountability journalism being done at the Pentagon reflects a consensus across Administrations that a free press and a free country are inseparable.[16] Until now, the Pentagon remained broadly accessible to journalists, regardless of how they did their work, the content of their reports, or the viewpoints they expressed. Reporters working for the Soviet Union wire service TASS were even provided access to the Pentagon at the height of the Cold War, despite the Soviet Union's role as the United States's principal military and intelligence threat.[17]

---

[16] Thompson, *supra* note 12.

[17] ROBERT B. SIMS, THE PENTAGON REPORTERS 12 (1983).

As the district court found, "[t]he enduring presence of media members in the Pentagon has enhanced the ability of journalists and news organizations to keep Americans informed about the U.S. military while posing no security or safety risk to Department property or personnel." P.I.-J.A. at 6 (cleaned up).

### B. Newsgathering at the Pentagon is Protected by the First Amendment

The Department's ability to regulate the newsgathering of journalists working at the Pentagon is constitutionally constrained because newsgathering is a First Amendment-protected activity. The Founders recognized that civic debate and democratic self-governance require a press that is free to unearth, organize, and disseminate information of public concern.[18] They considered a free press the "'bulwark of Liberty'" that would restrain government's "natural

---

[18] *See* Robert Post, *The Press and American Democracy*, *in* THE FUTURE OF PRESS FREEDOM: DEMOCRACY, LAW, AND THE NEWS IN CHANGING TIMES 17, 18-19 (RonNell Andersen Jones & Sonja West eds., Cambridge Univ. Press 2025) (describing the role of press in early public discourse); Sonja West, *Awakening the Press Clause*, 58 UCLA L. REV. 1025, 1042-43 (2011) (describing the democracy-enabling role of the press).

tendency toward tyranny and despotism."[19] The press is given constitutional protection specifically to safeguard reporters' ability to "acquir[e] enough information to pass judgment on the actions of government."[20] Or, as Justice Black put it, to "bare the secrets of government and inform the people." *New York Times Co. v. United States*, 403 U.S. at 717 (Black, J., concurring).

While the Press Clause does not "require government to accord the press special access to information not shared by members of the public generally," it protects a journalist in seeking out sources of information that are not publicly available. *Pell v. Procunier*, 417 U.S. 817, 834 (1974); *see Branzburg v. Hayes*, 408 U.S. 665, 681 (1972) (cautioning that "without some protection for seeking out the news, freedom of the press could be eviscerated"). It conveys "an undoubted right to gather news from any source by means within the law." *Houchins v. KQED, Inc.*, 438 U.S. 1, 11 (1978) (internal quotation omitted); *see Zerilli v. Smith*, 656 F.2d 705, 711 (D.C. Cir. 1981) (First

---

[19] David Anderson, *The Origins of the Press Clause*, 30 UCLA L. REV. 455, 533 (1983).

[20] Vincent Blasi, *The Checking Value in First Amendment Theory*, 2 AM. BAR FOUND. RSCH. J. 521, 541 (1997).

Amendment protects newsgathering because it "is essential to a free press").

## II. THE DEPARTMENT'S NEW RESTRICTIONS ON NEWSGATHERING ARE PATENTLY UNREASONABLE

Having opened the Pentagon as a forum where journalists may investigate and report, any regulation imposed on their First Amendment activity must be reasonable in light of that purpose. *Minn. Voters Alliance v. Mansky*, 585 U.S. 1, 13 (2018); *see also Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678-79 (1992); *Ateba v. Leavitt*, 133 F.4th 114, 121-23 (D.C. Cir. 2025). The Department's Press Policies are manifestly *un*reasonable because they disallow basic reporting techniques and substantially thwart the journalists' newsgathering mission.

### A. Restrictions Against Asking Questions or "Inducing Information" Unreasonably Obstruct Newsgathering

The Department's initial revisions to the press policy issued on October 8, 2025 (the "October Policy") barred reporters who receive PFACs from, inter alia, "soliciting the disclosure" or publication of information not pre-authorized for release and defined "solicitation" to include both "direct communications" with Department personnel and

"general appeals, such as public advertisements or calls for tips" from Department personnel. *See* S.J.-J.A. at 213, 223. When the district court declared these restrictions illegal, the Department hurriedly issued a substitute policy (the "Interim Policy") that replaced the ban on "soliciting" an unauthorized disclosure with a ban on "the intentional inducement" of it. P.I.-J.A. at 13-14 (P.I. Op.). As the district court found, both verbal formulations have the same intended purpose and effect—thwarting journalists from doing their job. P.I.-J.A. at 27-28, 32.

Essential elements of newsgathering include asking questions, verifying information, and working with autonomy (freedom from official oversight).[21] A good journalist, particularly one doing the kind of watchdog reporting pursued at the Pentagon, takes nothing at face value, asks questions, confirms facts, and follows up with multiple sources.[22] The most fundamental tool of journalism is "asking probing, penetrating

---

[21] *See, e.g.*, *SPJ Code of Ethics,* SOC'Y OF PRO. JOURNALISTS (Sept. 6, 2014), https://perma.cc/SFF4-4XFM (instructing journalists, among other things, to "[v]erify information," diligently "seek subjects of news coverage," and use "original sources whenever possible").

[22] *See, e.g.*, Bill Kovach & Tom Rosenstiel, *Introduction*, *in* THE ELEMENTS OF JOURNALISM: WHAT NEWSPEOPLE SHOULD KNOW AND THE PUBLIC SHOULD EXPECT (4th ed. 2021).

questions at every level."[23] A stenographer takes down a statement and publishes it; a journalist does not.

The Department's restrictions on "soliciting" or "induc[ing]" information so severely restrict this essential newsgathering activity that they could not be accepted by most journalists working at the Pentagon, regardless of their editorial or political viewpoint. P.I.-J.A. at 10 (P.I. Op.). The Department may impose a duty of confidentiality on its Pentagon employees, and does so, but it may not restrict reporters at the Pentagon from engaging in the "routine reporting techniques" of "asking persons questions, including those with confidential or restricted information." *Nicholson v. McClatchy Newspapers*, 177 Cal. App. 3d 509, 519-20 (Ct. App. 1986).

The Department defends the Interim Policy's restrictions on asking questions by claiming that six "safe harbor" provisions cure problems the district court found with the October Policy. S.J.-J.A. at 356 (Compliance Op.); P.I.-J.A. at 406-07, ¶¶ 28-29 (Valdez Decl.). They do not. The safe harbors essentially exempt: 1) asking questions of those authorized to

---

[23] Neiman Watchdog Project, *About Us* (May 24, 2004), https://perma.cc/FQB3-MZ9H.

speak, 2) receiving information entirely unsolicited, 3) publicly calling for tips, but only if the call is not directed to Department employees, 4) independently developing source relationships (but not permitting source questions about information not preapproved for disclosure); 5) filing FOIA requests, and 6) asking an employee for information a journalist does not think the employee is unauthorized to disclose (a useless exemption given the Department's position that Pentagon employees are not authorized to disclose anything not preapproved for disclosure). P.I.-J.A. at 102 (Interim Policy).

None of these exemptions *permits* the routine step of asking questions of a person known to be in possession of sensitive information, an essential part of accountability journalism. They do not allow a reporter to "pursue original stories that deserve attention, rather than track the agendas and announcements of officials," a hallmark of effective journalism.[24] And they do not assure the ability to independently verify information across multiple sources, a basic step

[24] Jane Elizabeth, *Effective Accountability Journalists Find Their Own Way and Direct Their Own Work*, AM. PRESS INST. (Dec. 20, 2016), https://perma.cc/35MS-K43Q.

that "separates journalism from "propaganda, advertising, fiction, or entertainment."[25]

The Department's restrictions on seeking out information are patently unreasonable because they impede these fundamentally necessary, routine reporting activities. As a *New York Times* editor testified, a Pentagon reporter must be able to "contextualize, investigate, and fact-check the Department's official pronouncements," and this requires asking questions about information "that may contradict or cast doubt on Department leaders' statements." P.I.-J.A. at 470, ¶ 5 (Stevenson Decl.).

### B. Requiring Reporters to be Escorted at All Times Unreasonably Obstructs Newsgathering

The Interim Policy did more than simply rephrase the October Policy's restrictions on soliciting information. It moved the reporters' workspace outside the building, prohibited credentialed reporters from entering the Pentagon without an invitation or a prearranged interview, and required journalists to be escorted at all times inside the building—

[25] Kovach & Rosenstiel, *supra* note 22.

a commonplace practice in authoritarian countries like China,[26] North Korea,[27] and Iran,[28] that has no place in a democracy with a constitutionally guaranteed free press. These additional impediments serve the same purpose and have the same effect as the restrictions on asking questions: they thwart newsgathering.

Until now, obtaining a Pentagon press pass meant a physical space to work with unescorted access to the Press Briefing Room and the corridors linking the press offices of the various military services scattered throughout the building. P.I-J.A. at 6 (P.I. Op.). It enabled reporters to cover press briefings, even when called on short notice, ask questions of Department officials "before, during, and after those briefings," and participate in "organic semiformal and informal conversations with Department officials and personnel." *Id.* The ability

---

[26] Matt Schiavenza, *Why It's So Difficult for Journalists To Report From Xinjiang*, ASIA SOC'Y (May 23, 2019), https://perma.cc/UJR3-WSNK.

[27] Anna Fifield, *I Went to North Korea and Was Told I Ask Too Many Questions*, WASH. POST (May 11, 2016), https://perma.cc/9FWG-DH2N; Sue-Lin Wong, *Woken Up Before 5 a.m. to See North Korea's Leader, Five Hours Later*, REUTERS (Apr. 13, 2017), https://perma.cc/UKD7-QVTY.

[28] Dexter Filkins, *The Twilight of the Iranian Revolution*, NEW YORKER (May 18, 2020), https://perma.cc/6A6T-3QHP.

to walk freely in unsecured areas of the Pentagon "enhanced the depth, detail, and quality" of reporting by the press corps. P.I.-J.A. at 470, ¶ 4 (Stevenson Decl.).

Requiring a constant escort changes everything. Most experienced military journalists no longer find it useful to work at the Pentagon because a Pentagon press pass is now "essentially worthless." P.I.-J.A. at 363, ¶ 31 (Barnes Decl.). As Judge Childs recognized in opposing a stay of the district court's order enjoining the escort requirement, "[r]eporters can hardly verify sources, gather information, or speak candidly with Department personnel with an escort looming over their shoulders." *New York Times Co. v. DOD*, No. 26-5113, 2026 WL 1179440, at *6 (D.C. Cir. Apr. 27, 2026) (Childs, J., dissenting).

The Interim Policy's substantial obstructions of newsgathering are well-documented in the record, and include:

**1. Impeding basic investigation and fact-checking.**

Journalism "is a discipline of verification."[29] Investigative reporting is diligent, time-consuming work that requires access to knowledgeable sources. At the Pentagon, this means access to the personnel responsible

[29] Kovach & Rosenstiel, *supra* note 22.

for speaking with the press, and they are dispersed throughout the building's vast network of hallways. *See* P.I.-J.A. at 375-76, ¶¶ 7-8 (Meagher Decl.).

The Pentagon houses the Public Affairs Offices ("PAOs") of the Department of Defense, Joint Staff, Army, Navy, Air Force, and Marine Corps; each of these six offices is located in a different part of the building, and each is staffed by multiple Public Affairs officials with different subject matter expertise. *Id.*; S.J.-J.A. at 311-312, ¶¶ 14-15 (Barnes Supp. Decl.). These officials' primary job is to inform reporters about Department operations and explain its array of programs, policies, plans, and priorities. To do their job, reporters need routine access to these subject-matter experts. The Interim Policy makes this unfeasible.

Under the press escort requirement, fact-checking with the Pentagon's subject-matter experts involves repeated, time-consuming escorted trips between the offsite workroom and the PAOs. Each visit requires calls or emails to schedule an appointment, arranging an escort and waiting for the escort to arrive, traveling to the PAO, and returning to the offsite workroom to start the process all over to arrange a confirmation or follow-up meeting with a different PAO. S.J.-J.A. at 330,

¶ 8 (Barnes Third Supp. Decl.). As Plaintiff Julian Barnes explained, this lengthy process "does not allow for meaningful engagement with Department personnel on a timeline consistent with news reporting." *Id.*

**2. Preventing the frequent contact and informal conversations vital to effective reporting.**

Beyond the unworkable time constraints imposed, the escort mandate precludes the frequent contact and spontaneous conversations needed for the attributes of effective journalism to develop.

Possessing a sufficient knowledge base. Effective journalism requires knowledgeable reporters "who ask the right questions, who have a full understanding of what they are looking for, and who can recognize what rings true and what doesn't."[30] This requires reporters covering the Pentagon to be "knowledgeable and informed about the Department and … understand military culture." P.I.-J.A. at 387, ¶ 20 (Williams Decl.). Pentagon reporters gain this knowledge "by working in the building regularly, asking questions, and talking to people face to face." *Id.* Just to appreciate the scope of the Department's activities requires sustained

[30] Neiman Watchdog Project, *supra* note 23.

interaction with the officials who carry out this work. S.J.-J.A. at 65, ¶ 20 (Burns Decl.).

Developing relationships of trust. It is a textbook principle that "getting to know sources face-to-face is vital to finding accountability stories and doing strong reporting."[31] Freely accessing unsecured areas of the Pentagon, including cafeterias, coffee shops, barbershops, and other public areas, provides opportunities for the informal, face-to-face conversations that allow reporters to build professional relationships with the mid-ranking and senior officials who can provide helpful context and insight into developing issues. *See* S.J.-J.A. at 54, ¶¶ 9-10 (Barnes Decl.); S.J.-J.A. at 74, ¶ 8 (Williams Decl.); P.I.-J.A. at 375, ¶ 6 (Meagher Decl.). These informal relationships are invaluable in allowing journalists to report news in a timely, accurate, and appropriately nuanced manner. S.J.-J.A. at 61-62, ¶ 11 (Burns Decl.).

Examples are legion of important stories developed, verified, and contextualized by reporters able to do so only because they had trusted Pentagon sources. For example, last March, Reuters reporters with years

[31] Jane Elizabeth, *Effective Accountability Journalists Spend Considerable Time Building Relationships With Sources and Readers*, AM. PRESS INST. (Dec. 20, 2016), https://perma.cc/W4VM-HZPW.

of experience at the Pentagon broke an important story about the Department's investigation into a missile strike on a girls' school in Iran that found likely U.S. responsibility.[32] The Department has still not acknowledged responsibility months later, a break from precedent for such a serious incident that has caused members of Congress to express frustration with the Department's stonewalling.[33] Reporting this story required deep sourcing, and the facts would still be unknown if Reuters had to wait for an authorized release or could only speak with officials in front of a Pentagon escort.

Such carefully sourced stories the public needs to know continue to be broken by experienced reporters with existing relationships. *See, e.g.*, Alex Horton & Tara Copp, *Military Leaders Warn Hegseth Against Extending Iran War Operations*, WASH. POST (Aug. 30, 2026) (disclosing concerns of military leaders about the weakening of U.S. military

---

[32] Phil Stewart & Idrees Ali, *Exclusive: US Investigation Points to Likely US Responsibility in Iran School Strike, Sources Say*, REUTERS (Mar. 6, 2026), https://perma.cc/FPE6-GFX7.

[33] Press Release, Kirsten Gillibrand, *Gillibrand, Colleagues Demand Pentagon Release Long-Awaited Report on U.S. Bombing of Iranian Elementary School* (July 13, 2026), https://perma.cc/H9HT-FWE3.

capabilities from prolonged Middle East operations);[34] Dan Lamothe & Tara Copp, *Pentagon Secretly Installs Military Influencers in Civilian Roles*, WASH. POST (Aug. 30, 2026) (describing payments to conservative veterans with large online followings to amplify Department positions).[35]

Facilitating two-way communication. Trust between journalists and Department officials is mutually beneficial.[36] Former Pentagon press spokesman Pete Williams, for example, testified that having the trust of Pentagon reporters allowed him to get specific information held back when its immediate disclosure would have damaged operational security. S.J.-J.A. at 74, ¶ 8 (Williams Decl.). Such relationships were similarly invaluable when the Department needed to counter misinformation propagated by foreign adversaries and prevent it from spreading. P.I.-J.A. at 378, ¶ 13 (Meagher Decl.). Casual opportunities to ask questions also serve the Department's interests by giving it a sense of how the public might interpret policy decisions, enabling early correction of misunderstandings, and helping get the Department's views out. S.J.-

[34] https://perma.cc/XWA5-23XJ.

[35] https://perma.cc/P67T-NZ7U.

[36] *See* VOGEL, *supra* note 5, at 278-79.

J.A. at 73-74, ¶¶ 6-7 (Williams Decl.); P.I.-J.A. at 377-78, ¶ 12 (Meagher Decl.); S.J.-J.A. at 61-62, ¶¶ 8, 21 (Burns Decl.).

A constant escort precludes the casual encounters and off-the-record conversations needed to develop these attributes of an effective journalist.

#### 3. Frustrating timely and accurate reporting during periods of crisis.

Imposing the escort requirement also impedes the ability to assemble reporters quickly in moments of crisis, or to respond to breaking news. *See* P.I.-J.A. at 377, ¶ 11 (Meagher Decl.) (describing importance of prompt briefings to address high-altitude Chinese balloon circumnavigating the U.S. that became the focus of intense public concern). In such situations, briefings are called on very short notice, as little as an hour, P.I.-J.A. at 20 (P.I. Op.). Placing credentialed journalists off-premises and requiring escorted access significantly curtails journalists' ability to attend such sessions. This undermines timely and accurate reporting when the public need for information is highest. S.J.-J.A. at 73-75, ¶¶ 6-7 (Williams Dec. 19, 2025 Decl.).

The new Policies similarly complicate the Department's ability to reach reporters to prevent the spread of false information when time is

of the essence. Former Pentagon spokesman Chris Meagher recounts one instance in which a reporter incorrectly attributed an overseas strike to the United States. A worker in the Department's press office "was able to run down the hallway, find that reporter, and provide the reporter with accurate information," something that is not possible under the new Policies. P.I.-J.A. at 378, ¶ 13 (Meagher Decl.); *see also* P.I.-J.A. at 385-86, ¶ 16 (Williams Decl.) (describing the "essential" value to the Department of having reporters "close at hand").

#### 4. Limiting access to entirely unsecured areas of the building open to others.

The Interim Policy is unreasonable for the further reason that it singles out reporters and denies them access to large areas of the Pentagon that are freely accessible to others who lack security clearances. The Pentagon is one of the world's largest office buildings, with over 17.5 miles of corridors and six-and-one-half million square feet of office space. P.I.-J.A. at 7 (P.I. Op.). It includes areas that "resemble a mall and are often crowded with visitors and non-military employees." P.I.-J.A. at 5 (P.I. Op.). An estimated 3,000 "non-defense support personnel" with no security clearance have unescorted access every day

to these areas, access now denied to reporters.[37] As the district court recognized, restricting reporters' access to a greater extent than that of baristas and short-order cooks is a perverse reading of the First Amendment, which distinctly singles out the press for protection. P.I.-J.A. at 32.

While generally applicable laws that impose no more than an incidental burden on newsgathering do not offend the First Amendment, *see Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991), the escort requirement is not generally applicable. *Minneapolis Star & Trib. Co. v. Minn. Com'r of Revenue*, 460 U.S. 575, 591 (1983). In *Minneapolis Star*, the Court found that a state tax on ink and paper used only by newspapers violated the First Amendment both because it applied only to the press and its impact was felt primarily by a small group of large newspapers. *Id.* at 582, 591. In similar fashion, the new escort requirement applies only to journalists and not others who lack security clearances, and its impact is felt primarily by journalists who do investigative reporting and not pro-Trump activists and self-described

---

[37] *See Pentagon – Air Force: Installation Details*, MIL. INSTALLATIONS (last visited Apr. 16, 2026), https://perma.cc/V4A8-BARU; PI-J.A. at 5 (P.I. Op.).

journalists with no intent to comment critically on the Department. *See* S.J.-J.A. at 214-15 (S.J. Op.).

Targeting the escort requirement at journalists is particularly impermissible given the absence of any incident or record fact suggesting that their unescorted press access poses a unique risk.[38] The journalists who work there recognize the Pentagon's "well-known security boundaries" and have "scrupulously respected" them. P.I.-J.A. at 368, ¶ 14 (Burns Decl.). Department press officers across administrations and across party lines have attested to the absence of any security or safety incident arising from the presence of credentialed journalists in the building. *See* P.I.-J.A. at 384, ¶ 12 (Williams Decl.) (during Defense Secretary Cheney's leadership); P.I.-J.A. at 377, ¶ 10 (Meagher Decl.) (during Defense Secretary Austin's leadership). The Department has presented nothing to the contrary.

---

[38] Laws regulating conduct that distinctly burden Press Clause rights do not escape strict scrutiny as "generally applicable" if they permit others to engage in the conduct in ways that implicate the government's interests similarly. *See* Amanda Shanor, *The Constitutional Exceptionalism of Religion & the Press*, *in* THE FUTURE OF PRESS FREEDOM: DEMOCRACY, LAW, AND THE NEWS IN CHANGING TIMES 170-181 (RonNell Anderson Jones & Sonja R. West eds., Cambridge Univ. Press 2025).

### C. The Department Provided No Plausible Justification for Its New Obstruction of Newsgathering

So long as the Pentagon is open to journalists, the Press Clause, at a minimum, prohibits the Department from imposing restrictions on newsgathering that are "more arduous than necessary." *Sherrill v. Knight*, 569 F.2d 124, 129-30 (D.C. Cir. 1977). Yet, the Department has never plausibly demonstrated any need for its new restrictions. It has identified no security breach, new security threat, or specific concern that might justify such severe restrictions on routine newsgathering.

In its summary judgment ruling, the district court found that the regular presence of credentialed journalists at the Pentagon has "pos[ed] no security or safety risk to Department property or personnel," S.J. Order at 5, and testimony from two former Department press spokesmen supports this finding. *See* P.I.-J.A. at 378, 380, ¶¶ 14, 18 (Meagher Decl.); P.I.-J.A. at 387, ¶ 21 (Williams Decl.). Nevertheless, in an effort to establish a national security justification for the substitute provisions of its Interim Policy, the Department provided a declaration stating that journalists asked the Pentagon Press Operations Office ("PPO") about "sensitive or classified" information "on a regular basis" before they were forced out of the building last October, but after October the frequency

"dropped dramatically." P.I.-J.A. at 421-22, ¶¶ 4, 8 (Parnell Decl.). This hopelessly vague, impressionistic claim fails to demonstrate any national security need for new restrictions on Pentagon reporters.

The decline in questions to the PPO is as likely to reflect that checking facts with *this* press office had become all but useless given the Department's hostility to the press (*see, infra,* Section III), as it is to be a manifestation of the decline in access after reporters were expelled—a basic confusion of correlation and causation. Moreover, the assertion about "regular" receipt of questions concerning "sensitive or classified" information establishes nothing about national security risk given the undefined reference to "sensitive" information and the routine classification of humdrum information.[39] Reporters often ask about potentially classified information to elicit any Department concern and avoid inadvertent harm, a practice the Department encourages. *See* S.J.-

[39] It has long been recognized that as much as 50% of classified information is improperly classified *E.g., Too Many Secrets: Overclassification as a Barrier to Critical Information Sharing, Hearing Before the Subcomm. on National Security, Emerging Threats, and International Relations of the Comm. on Government Reform,* 108th Cong. 263 at 82-83 (2004) (statement of J. William Leonard, Director, Information Security Oversight Office, National Archives and Records Administration).

J.A. 366 at ¶ 6 (Wilson Decl.). The Department makes no claim that any question asked of the PPO resulted in a story that created a national security risk.

In preliminarily enjoining the Interim Policy, the district court found the national security justification "suspicious" since the Department failed to raise it when the Interim Policy was first challenged as a violation of the summary judgment order, and "facially dubious" because reporters do not have access to sensitive or classified information simply by being in the building unescorted. P.I.-J.A. at 28-30. In the context of the Interim Policy's hasty adoption and its shifting sands justification, the district court correctly found the Department had no "facially sound, nonretaliatory basis" for imposing it. P.I.-J.A. at 33.

## III. THE DEPARTMENT IMPOSED THE NEW RESTRICTIONS TO SUPPRESS UNFAVORABLE INFORMATION AND STIFLE CRITICISM

The Press Policies are unconstitutional for an independent reason. The First Amendment prohibits the Department from restricting newsgathering at the Pentagon "merely because public officials oppose the speaker's view." *Mansky*, 585 U.S. at 12 (citing *Perry Ed. Assn.* 460 U.S. 37, 46 (1983)). The Department contends that its new Policies do not

violate this constitutional constraint because they apply uniformly to all credentialed journalists, Appellants' P.I. Brief at 10, but the factual record leaves no doubt that the restrictions were imposed to impede embarrassing or unfavorable disclosures and suppress criticism, *see* P.I-J.A. at 23-24 (P.I. Op.). This is classic viewpoint discrimination.

As the district court recognized, a facially neutral policy is still viewpoint-discriminatory when it is imposed to suppress certain viewpoints. S.J.-J.A. at 232 (citing *Cornelius v. NAACP*, 473 U.S. 788, 812 (1985); *Sorrell v. IMS Health, Inc.*, 564 U.S. 522, 566 (2011); and *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). In *Grosjean v. American Press Co.*, for example, a facially neutral regulation of all large circulation newspapers was struck down because the legislative history and facts of the litigation showed that the law was a calculated device to limit the circulation of newspapers critical of Sen. Huey Long. 297 U.S. 233, 250 (1936). A regulation's neutral text or scope does not immunize it where the government's objective is to burden a disfavored viewpoint.

The district court correctly found such viewpoint discrimination in striking down the October Order—not discrimination based on "political viewpoint," but discrimination based on whether a reporter "is willing to

publish only stories that are favorable to or spoon-fed by Department leadership." S.J.-J.A. at 233. The record here is "replete with undisputed evidence" that the newsgathering restrictions were imposed to impede unfavorable reporting and criticism. *See* S.J.-J.A. at 230 (S.J. Op.); P.I.-J.A. at 16-17 (P.I. Op.). The district court cataloged a stream of "vitriolic" attacks by Secretary Hegseth expressing disdain for the press. P.I-J.A. at 16-17, 25-26; S.J.-A.J. at 230-31. These attacks continue to this day.[40]

The Department's effort to prevent reporters from discovering unflattering facts and to suppress criticism is precisely what the Press Clause prohibits. The Founders guaranteed the "freedom… of the press" because they recognized that press scrutiny of government officials inevitably invites retaliation.[41] The Press Clause protects reporters so they can "acquire enough information to pass judgment on the actions of government" and disseminate that information and judgment in support

---

[40] *C.f.*, Julia Manchester, *Trump on Talk of Hegseth 2028 Run: 'It's Very Early to Talk About That'*, THE HILL (Aug. 31, 2026), https://perma.cc/6FZJ-8HMU (accusing NBC of lying with "anonymous 'sources'").

[41] RonNell Andersen Jones, *Press Speakers and the First Amendment Rights of Listeners*, 90 U. COLO. L. REV. 499, 543 (2019); Sonja West, *The Stealth Press Clause*, 48 GA. L. REV. 729, 753 (2014).

of the People's ultimate "veto" over government power.[42] The Department's policies aim to obstruct just that.

## IV. THE DEPARTMENT'S NEWSGATHERING RESTRICTIONS DEPRIVE THE PUBLIC OF VITAL INFORMATION

The new restrictions on newsgathering not only trample reporters' rights, they also deprive the public of information about military operations at a time when active combat is underway in both hemispheres. Given the cumbersome process of assembling the reporters who now lack press passes, Secretary Hegseth held only eight briefings at the Pentagon Press Room in the first six weeks of the 2026 Iran war, compared to more than 30 in the first five weeks of the 2003 Iraq war.[43] He has not held a press conference in the briefing room since May 5, 2026,[44] despite near-daily military activity occurring in the Middle East and the Caribbean.[45]

---

[42] Blasi, *supra* note 20, at 541.

[43] Helene Cooper, *On the War Against Iran, the Pentagon Has Said Little*, N.Y. TIMES (Jul. 16, 2026), https://perma.cc/BS8G-FFXX.

[44] *See Wartime Pentagon Goes Two-Plus Months Without Media Briefing*, U.S. PRESS FREEDOM TRACKER (Jul. 20, 2026), https://perma.cc/B67E-9A5A.

[45] *See* Jeremy Chin, Margaret Lin & Aidan Arasasingham, *Timeline of Boat Strikes and Related Actions*, JUST SEC. (Aug. 26, 2026), https://perma.cc/8N5F-EFFX; *Collection: Iran, Israel and the United*

Without reporters in the building to probe and push for answers, the public lacks important details on the number of U.S. troops injured, how they were injured, or the nature of their injuries. Equally missing are details on the number of U.S. facilities attacked and the extent of the damage.[46] The public is similarly deprived of essential facts concerning deadly attacks on fishing boats ongoing in both the Caribbean and the Pacific Ocean.

The Pentagon press corps needs routine access to provide timely, correct, and comprehensive information that the military itself neglects to provide or is unable to convey in a meaningful way.[47] The new Press Policies block experienced reporters with different areas of expertise and

*States at War (2025-2026 Operations)*, JUST SEC. (Aug. 5, 2026), https://perma.cc/7T7C-WLUW.

[46] *See, e.g.*, Eric Schmitt, *Pentagon Withheld Dozens of U.S. Military Injuries in Iran War*, N.Y. TIMES (Jul. 20, 2026), https://perma.cc/VRQ7-7QJY (reporting Pentagon's past failure to disclose three Iran strikes injuring dozens of troops and destroying helicopters).

[47] *See, e.g.*, Col. Ryan Dowdy, *The Military and the Media: A Match Made In…Necessity?*, WARROOM: ONLINE J. (Oct. 1, 2019), https://perma.cc/6YZT-KJ8L (“The media is essential in achieving accountability and regaining the trust of those we serve.”); Zachary D. Streit, *Investigative Journalism and National Security*, 5 CARDOZO PUB. L. POL'Y & ETHICS J. 75, 84-86 (2006) (explaining how the Department's “zealous commitment to secrecy” ends up subverting information that would aid national security).

varied interests from the opportunity "to ask timely follow-up questions, attend short-notice briefings, and engage in the informal and semi-formal interactions" that have long produced the vital details needed by the American public. S.J.-J.A. at 64, ¶ 18 (Burns Decl.). The net effect was evident during capture of Venezuelan leader Nicolas Maduro and his wife, when lack of access to officials in the Pentagon directly impacted the information reported to the American public. S.J.-J.A. at 57-58, ¶ 20 (Barnes Decl.).

The public relies on Pentagon reporting to learn how our military power is being used in their name, how Department leadership is performing, and how their tax dollars are being spent. The Department's new Policies impose significant barriers on Pentagon reporters, obstructing them from carrying out their First Amendment charge to "bear the secrets of government and inform the people." *New York Times Co v. United States.*, 403 U.S. at 717 (Black, J., concurring).

## CONCLUSION

For all the foregoing reasons, *Amicus* Pentagon Press Association respectfully urges this Court to affirm the district court.

Dated: September 11, 2026

Respectfully submitted,

/s/ *David A. Schulz*
David A. Schulz (#459197)
JOHN LANGFORD
CHRISTINA LEE
MEDIA FREEDOM & INFORMATION ACCESS CLINIC
YALE LAW SCHOOL[48]
127 Wall Street
New Haven, CT 06520
(212) 850-6103
david.schulz@yale.edu

*Counsel for Amicus Curiae Pentagon Press Association*

[48] Yale Law School students, Rose Conlon, Stephanie Lai, Taylor Maas, and Tony Sjodin, contributed significantly to the preparation of this brief. The views expressed herein do not purport to represent the institutional views of Yale Law School, if any.

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 6,486 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f).

2. It complies with the typeface requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface in 14-point Century Schoolbook typeface.

Date: September 11, 2026

/s/ *David A. Schulz*
David A. Schulz

## CERTIFICATE OF SERVICE

I certify that on September 11, 2026, I electronically filed the foregoing Notice with the United States Court of Appeals for the District of Columbia Circuit, using the appellate CM/ECF system. All parties are registered CM/ECF users, and service upon them will be accomplished by the appellate CM/ECF system.

Date: September 11, 2026

/s/ *David A. Schulz*
David A. Schulz