**[ORAL ARGUMENT NOT YET SCHEDULED]**

**No. 26-5253**

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

NEW YORK TIMES COMPANY, et al.,

Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF DEFENSE, also known as DEPARTMENT OF WAR, et al.,

Defendants-Appellants.

On Appeal from the United States District Court for the District of Columbia

# REPLY BRIEF FOR APPELLANTS


BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

BRAD HINSHELWOOD
JACK STARCHER
SEAN R. JANDA
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3388*

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION AND SUMMARY .......... 1

ARGUMENT .......... 3

I. Plaintiffs' Retaliation Claim Lacks Merit .......... 3

A. The Generally Applicable Escort Requirement Is Not an Adverse Action Targeted Against Plaintiffs .......... 3

B. The Escort Requirement Would Not Deter a Reasonable Journalist .......... 12

C. Plaintiffs Have Not Established That Their Protected Activity Was the Cause of the Escort Requirement .......... 16

II. Plaintiffs' Alternative Claims Provide No Basis for Affirming the Preliminary Injunction .......... 21

A. The Escort Requirement Constitutionally Regulates Access to the Pentagon .......... 22

B. The Escort Requirement Comports with the APA .......... 29

III. The Equitable Factors Counsel Against the Preliminary Injunction .......... 31

CONCLUSION .......... 34

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*AFDI v. WMATA*,
901 F.3d 356 (D.C. Cir. 2018) .......... 28, 29

*Americans for Prosperity Found. v. Albence*,
2026 WL 2563151 (3d Cir. Aug. 31, 2026) .......... 32, 33

*Ateba v. Leavitt*,
133 F.4th 114 (D.C. Cir. 2025) .......... 13, 22, 23, 25

*Baltimore Sun Co. v. Ehrlich*,
437 F.3d 410 (4th Cir. 2006) .......... 12, 14

*Blankenship v. Manchin*,
471 F.3d 523 (4th Cir. 2006) .......... 15

*Brown v. Califano*,
627 F.2d 1221 (D.C. Cir. 1980) .......... 28-29

*Dahlstrom v. Sun-Times Media, LLC*,
777 F.3d 937 (7th Cir. 2015) .......... 26

*Department of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) .......... 7

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) .......... 29, 30

*First Choice Women's Res. Ctrs., Inc. v. Davenport*,
608 U.S. 174 (2026) .......... 31

*Flynt v. Rumsfeld*,
355 F.3d 697 (D.C. Cir. 2004) .......... 24, 27, 29

*Flytenow, Inc. v. FAA*,
808 F.3d 882 (D.C. Cir. 2015) .......... 6

*Fund for Animals, Inc. v. Lujan*,
962 F.2d 1391 (9th Cir. 1992) ........................................ 20

*Global Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) ........................................ 11

*Green v. U.S. Dep't of Just.*,
111 F.4th 81 (D.C. Cir. 2024) ........................................ 27

*Grossbaum v. Indianapolis-Marion Cnty. Bldg. Auth.*,
100 F.3d 1287 (7th Cir. 1996) ........................................ 3, 5, 8, 9

*Houston Cmty. Coll. Sys. v. Wilson*,
595 U.S. 468 (2022) ........................................ 5, 14

*Kane v. De Blasio*,
19 F.4th 152 (2d Cir. 2021) ........................................ 9

*Karem v. Trump*,
960 F.3d 656 (D.C. Cir. 2020) ........................................ 31-32

*Koala v. Khosla*,
931 F.3d 887 (9th Cir. 2019) ........................................ 9-10

*Lozman v. City of Riviera Beach*,
585 U.S. 87 (2018) ........................................ 5

*Martin v. Department of Just.*,
488 F.3d 446 (D.C. Cir. 2007) ........................................ 20

*National Ass'n of Home Builders v. EPA*,
786 F.3d 34 (D.C. Cir. 2015) ........................................ 20

*New York Times Co. v. Department of Def.*,
824 F. Supp. 3d 27 (D.D.C. 2026) ........................................ 19

*New York Times Co. v. U.S. Dep't of Def.*,
2026 WL 1179440 (D.C. Cir. Apr. 27, 2026) ........................................ 7

*Nieves v. Bartlett*,
587 U.S. 391 (2019) ........................................................................................ 6

*Personnel Adm'r v. Feeney*,
442 U.S. 256 (1979) ........................................................................................ 9

*Price v. Garland*,
45 F.4th 1059 (D.C. Cir. 2022) ........................................................................ 26

*Rhea Lana, Inc. v. United States*,
925 F.3d 521 (D.C. Cir. 2019) ......................................................................... 31

*Sherley v. Sebelius*,
644 F.3d 388 (D.C. Cir. 2011) ......................................................................... 21

*Tao v. Freeh*,
27 F.3d 635 (D.C. Cir. 1994) ........................................................................... 15

*Thompson v. North Am. Stainless, LP*,
562 U.S. 170 (2011) ........................................................................................ 4

*United States v. Nassif*,
97 F.4th 968 (D.C. Cir. 2024) .................................................................. 23, 28

*Wayte v. United States*,
470 U.S. 598 (1985) ........................................................................................ 6

*Yee v. City of Escondido*,
503 U.S. 519 (1992) ........................................................................................ 11

**Statutes:**

10 U.S.C. § 2674 ............................................................................................. 22

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| Department | Department of War |
| J.A. | Joint Appendix |
| PFAC | Pentagon Facility Alternate Credential |
| Secretary | Secretary of War |

## INTRODUCTION AND SUMMARY

The district court preliminarily enjoined as to plaintiffs a policy requiring that journalists be escorted by Department of War personnel inside the Pentagon. That policy reflects the Department's determination that the requirement is necessary to safeguard classified and other sensitive information, the unauthorized disclosure of which could be catastrophic. And it imposes only a minor inconvenience on plaintiffs and all other journalists (regardless of the content of their reporting) who wish to access the Pentagon. As the government has explained, the injunction—which rests on the proposition that the neutral and generally applicable escort requirement somehow constitutes retaliation against plaintiffs—is erroneous on the merits, is unsupported by the equities, and should be reversed.

Plaintiffs fail to defend the district court's contortion of the retaliation framework to fit this case. They do not properly justify that contortion as a matter of first principles, and they (yet again) fail to identify any case from any court accepting the proposition that a neutral and generally applicable regulation could constitute unconstitutional retaliation.

Beyond those flaws, plaintiffs' contention that the escort requirement is a retaliatory adverse action falls flat. Plaintiffs chiefly parrot the district

court's analysis, with no serious attempt to engage with the government's explanation for why that analysis falters at each step. And they nowhere grapple with the untenable consequences of their arguments, which would functionally prohibit the Department from neutrally regulating journalists' access to the Pentagon, even though that secure building houses all manner of sensitive functions.

Perhaps recognizing these flaws, plaintiffs spend much of their brief advancing alternative bases for the injunction. But this Court has an established rule—unmentioned by plaintiffs—against affirming preliminary injunctions on grounds not reached by the district court.

Regardless, plaintiffs' other claims are wrong on the merits. Plaintiffs' argument that the escort requirement violates the APA simply repackages arguments they make in support of their retaliation claim, which do not improve with repetition. Plaintiffs also contend that the escort requirement is an unreasonable and viewpoint discriminatory restriction on access to the Pentagon. That erroneous contention relies on plaintiffs' attempt to elide that the purpose of the Pentagon is to enable the orderly and efficient conduct of the Department's business, not to facilitate journalists' access, and

on a serious misunderstanding about the proper application of First Amendment standards in this context.

The preliminary injunction should be reversed.

## ARGUMENT

### I. Plaintiffs' Retaliation Claim Lacks Merit

#### A. The Generally Applicable Escort Requirement Is Not an Adverse Action Targeted Against Plaintiffs

The escort requirement is a facially neutral condition of access to the Pentagon, which plaintiffs do not dispute has been applied even-handedly by the Department. Adoption of such a neutral and generally applicable regulation is not an adverse action targeted at any speaker and, thus, cannot constitute impermissible retaliation. Plaintiffs have no persuasive response.

1. Plaintiffs' attempt to assert a retaliation claim challenging a neutral and generally applicable regulation "fundamentally misconceive[s] the nature of" such claims, which are available only to challenge individualized "discretionary government actions." *Grossbaum v. Indianapolis-Marion Cnty. Bldg. Auth.*, 100 F.3d 1287, 1294 (7th Cir. 1996). Plaintiffs fail to identify any case from any court concluding to the contrary or holding a generally applicable regulation invalid as impermissible retaliation.

Instead, plaintiffs' primary conceptual response is to contend that any "real" "penalty" or "punishment"—even one imposed on a "[g]roup"—may support a retaliation claim. Br.28-29. But that only underscores the point. Of course, the government may not immunize itself from retaliation claims by punishing multiple speakers (or by punishing, for example, the fiancé of the targeted speaker, *see Thompson v. North Am. Stainless, LP*, 562 U.S. 170, 174 (2011) (cited at Br.29)). But the adoption of a neutral, prospective regulation does not reflect the imposition of a "penalty" or "punishment" at all; it would, for example, be unnatural to speak of Congress "punishing" or "penalizing" an industry by imposing forward-looking regulatory burdens. The escort requirement may impose burdens on all journalists, but it does not punish or penalize (or reflect "adverse action" targeted at) any of them.

Plaintiffs further miss the point when they observe (Br.30) that retaliation may occur after the protected conduct when the speaker can no longer self-censor. The relevant point is not that the escort requirement post-dated plaintiffs' expressive activity. It is that the requirement applies even-handedly to all PFAC-holding journalists. And because the requirement applies to everybody, it cannot "materially inhibit[]" any

journalist's willingness "to speak freely." *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 479 (2022).

Nor do plaintiffs have a compelling response to *Grossbaum*'s observation that concerns of retaliation and chill have purchase in the context of "individualized, discretionary government actions," not in the context of "government rules that affect both majority and minority alike." 100 F.3d at 1296. They state that an "official retaliatory policy" may be more "troubling and potent" than one-off retaliation. Br.31 (quoting *Lozman v. City of Riviera Beach*, 585 U.S. 87, 100 (2018)). True, but irrelevant. An "official policy" to retaliate against a specific entity may, of course, support a retaliation claim. *Cf. Lozman*, 585 U.S. at 99-100 (discussing plaintiff's allegation that the government "formed a premeditated plan to intimidate him" and "executed that plan by ordering his arrest" at a city council meeting). But plaintiffs have no explanation for how neutral rules applicable to all give rise to the same concerns.

2. Allowing retaliation claims to challenge neutral prospective policies would be particularly problematic because it would risk paralyzing the government's ability to neutrally regulate in support of legitimate interests. *See* Opening Br.27-30. That is particularly true because protected activity

will often be a valid consideration underlying official action—a principle that is not limited to the context of police officers' split-second decisions, *contra* Br.41; *see, e.g.*, *Flytenow, Inc. v. FAA*, 808 F.3d 882, 894 (D.C. Cir. 2015); *Wayte v. United States*, 470 U.S. 598, 612-13 (1985). As a result, retaliation claims against generally applicable policies will often be "easy to allege and hard to disprove," and permitting them would subject the government to "overwhelming litigation risks." *Nieves v. Bartlett*, 587 U.S. 391, 403-04 (2019) (quotation omitted). And allowing plaintiffs to leverage retaliation claims to pretermit the government's ability to regulate altogether would plainly "'paralyze' government" more than allowing "suits challenging" individualized actions. Br.31.

This suit illustrates the untenable results of plaintiffs' capacious understanding of retaliation claims. The district court did not conclude that the escort requirement was substantively unlawful. Nonetheless, it accepted plaintiffs' contention that the requirement reflects retaliation for plaintiffs' journalistic activity and for their previous suit. But it should be indisputable that the Department has an interest in safeguarding classified and sensitive information and, thus, may consider how journalists have previously acquired such information in fashioning access restrictions. And it is a bedrock

principle that "an agency may respond to an adverse ruling by adopting a revised policy." *New York Times Co. v. U.S. Dep't of Def.*, 2026 WL 1179440, at *3 (D.C. Cir. Apr. 27, 2026) (per curiam).

There would thus be nothing constitutionally impermissible about the Department's considering the previous lawsuit or the contours of journalists' activities in the Pentagon in determining how to tailor its policies. *Cf. Department of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20-21 (2020). But under the district court's reasoning, plaintiffs' arguments could apply to any access restrictions adopted by the Department—no matter how reasonable, neutral, and generally applicable. That is not how the First Amendment operates.

3. Plaintiffs are also wrong (Br.31-34) that the escort requirement—which they concede applies facially and in practice to all PFAC-holding journalists—is not neutral and generally applicable.

As to neutrality, plaintiffs wrongly assert that the requirement is not neutral because it disproportionately burdens "reporters who wish to ask follow-up questions" and engage in other journalistic practices made more difficult by the escort requirement. Br.31-32. Plaintiffs' argument is premised on the assumption that a reporter's viewpoint is correlated with

her desire to engage in the practices made more difficult by the requirement. But plaintiffs cite nothing in the record supporting that assumption. Nor is it obvious that a journalist's desire to (for example) ask follow-up questions or engage in "spontaneous conversations" with Department officials or "develop relationships with sources" inside the Department, J.A. 20-24, would have any meaningful relationship with the viewpoint espoused in her journalism.

In any event, every regulation imposes more burdens on those who wish to engage in regulated activity than on those who do not. Thus, for example, the prohibition on displays in *Grossbaum* burdened groups that wished to erect displays more than those that did not. But that feature of all regulations does not render every regulation non-neutral, at least so long as it is not so "narrow[]" as to be plainly targeted at some specific group. 100 F.3d at 1298 n.10 (cited at Br.32). And, in that respect, the escort requirement is unlike the "hugely disproportionate" but facially neutral regulation hypothesized in *Grossbaum*: one prohibiting groups "from displaying nine-pronged candelabra," whose discrimination "against Jewish displays" would be plain. *Id.*; *cf. Personnel Adm'r v. Feeney*, 442 U.S. 256, 272 (1979) ("ostensibly neutral" regulation may be invalid if an "obvious pretext" for discrimination).

As to general applicability, plaintiffs complain (Br.33-34) that the escort requirement applies only to journalists and not others wishing to access the Pentagon. That fundamentally misunderstands the concept of general applicability. For purposes of access to a secure government facility, journalists are not similarly situated to the Department's employees or contractor personnel working in the building. And a regulation need not "apply to all people, everywhere, at all times, to be 'generally applicable,'" so long as it "applies to an entire *class* of people" evenly. *Kane v. De Blasio*, 19 F.4th 152, 166 (2d Cir. 2021) (per curiam). That the regulation here is applied even-handedly to similarly situated entities—all members of the press—is dispositive.

Thus, in *Grossbaum*, the generally applicable prohibition barred private—but not government-sponsored—displays. *See* 100 F.3d at 1290. Here, similarly, the escort requirement applies to everybody wishing to access the Pentagon with a journalist PFAC. That class-wide regulation is generally applicable in the relevant sense, and it cannot properly be described as an adverse action targeted at plaintiffs. It is, conversely, unlike the targeted adverse action at issue in *Koala v. Khosla*, 931 F.3d 887, 904

(9th Cir. 2019), where a university withdrew funding only from a limited subset of similarly situated student organizations.

Moreover, plaintiffs elide that the baseline rule is that members of the public may not access the Pentagon at all without an invitation from authorized personnel. The Department has established a special process providing journalists with access that the public writ large does not receive. *See* Opening Br.4-5. Any regulation of that special access—including the longstanding regulations identified and not challenged by plaintiffs that, for example, require an applicant to "confirm employment with a news organization" to receive a PFAC, Br.6—will necessarily apply only to journalists. But that does not render those regulations (which are, again, in service of providing journalists access that the general public lacks) impermissibly discriminatory.

4. Finally, plaintiffs err in asserting that this argument—which formed the basis of this Court's stay order, *see* Order 2 (July 16, 2026)—was forfeited in district court. As plaintiffs admit (Br.27), the government contended in district court that the escort requirement does not constitute a material adverse action. The government is free to "make any argument in

support of" that contention and is "not limited to the precise arguments [it] made below." *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992).

Moreover, once a "claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Global Health Council v. Trump*, 153 F.4th 1, 13 (D.C. Cir. 2025) (quotation omitted). Here, plaintiffs "seek to pursue" a First Amendment retaliation claim; the Court "must therefore determine the scope of any such" claim. *Id.* at 14. Whether such a claim may properly be brought to challenge a neutral and generally applicable regulation is "antecedent to and ultimately dispositive of" the question whether plaintiffs are entitled to relief on their retaliation claim. *Id.* at 13-14 (quotation omitted). It is thus properly before this Court.

Finally, plaintiffs identify no prejudice from the asserted forfeiture. To the contrary, the argument was fully raised in the government's brief (as well as the stay briefing) and plaintiffs responded in their brief, thus "providing [the Court] with adversarial briefing." *Global Health Council*, 153 F.4th at 14.

### B. The Escort Requirement Would Not Deter a Reasonable Journalist

1. Plaintiffs are unable to rehabilitate the district court's conclusion that a reasonable journalist could be chilled by a mere escort requirement—much less by this escort requirement, applicable to all journalists. Plaintiffs primarily (Br.24-25) repeat the court's conclusion that the escort requirement makes it more challenging to engage in reporting activities. But—as plaintiffs do not dispute—any access restriction on federal property could be described as similarly burdening reporters' ability to engage with potential sources. And the government has already explained how focusing on such regulatory burdens rather than on any chill reflects a category error. *See* Opening Br.34-36.

Plaintiffs do not even attempt to explain how—or identify any evidence in the record supporting the conclusion that—a reasonable journalist in the "'rough and tumble' political arena" would be chilled by a minor restriction on access to government property. *Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 419 (4th Cir. 2006). Nor do plaintiffs have any persuasive response to the cases cited in the government's opening brief.

Plaintiffs dismiss *Ehrlich* as involving government officials' "choice whether to speak with a reporter" rather than the reporter's right "to pursue

such conversations at all." Br.26. But those are two sides of the same coin. If the Department directed all Department employees not to speak with plaintiffs (and only plaintiffs), plaintiffs surely would not be mollified. Given that such targeted (and, in *Ehrlich*, state Executive Branch-wide) restrictions on access would not chill a reasonable journalist, it follows *a fortiori* that no such chill is caused by the escort requirement's neutral, generally applicable, and less severe restrictions on access to a single government building otherwise closed to the public.

Plaintiffs observe (Br.26) that *Ateba v. Leavitt*, 133 F.4th 114, 121 (D.C. Cir. 2025), "was not a retaliation case," but that does not address the substance of *Ateba*'s analysis, which reflected the Court's recognition that escort requirements are minor inconveniences. And although plaintiffs note that the requirement in *Ateba* was more limited in some ways, it was more burdensome in other relevant ways: it applied only to a limited subset of journalists and required plaintiff to wait "up to 45 minutes" at the White House gate for his escort. *Id.* at 117.

Plaintiffs' observation (Br.25) that the relevant test is objective misses the point, which is that no journalist could reasonably be chilled by the requirement. Of course, it only confirms the error of plaintiffs' position that

neither plaintiffs nor any other journalist they can identify has in fact self-censored in response to the requirement.

2. Unable to identify any legally meaningful chill, plaintiffs attempt to water down the relevant test and seek refuge in the purportedly high standard of review. Those efforts are unavailing.

Plaintiffs' contention that the relevant "bar is not a high one" and could be met by "an act of retaliation as trivial as failing to hold a birthday party," Br.23 (quotation omitted), is incorrect here. For one, the Supreme Court has recently reiterated the importance of the adverse-action requirement as a mechanism for separating out immaterial slights from truly actionable claims. *Wilson*, 595 U.S. at 477-78. That requirement is especially important in this context. Otherwise, the court risks improperly "constitutionaliz[ing] virtually every day-to-day interchange between the press" and the Department. *Ehrlich*, 437 F.3d at 417. And allowing any minor regulatory burden of access to support a retaliation claim in this context would be fundamentally incompatible with the Pentagon's status as a nonpublic forum. *See* Opening Br.29-30, 35-36.

Moreover, regardless whether a lower standard may apply in the context of a government employee facing alleged harassment from her

employer, *cf. Tao v. Freeh*, 27 F.3d 635, 639 (D.C. Cir. 1994), plaintiffs are reporters seeking access to a secure government facility. That context matters. If the Department were to hold birthday parties for some reporters but not others, no journalist would reasonably self-censor in hopes of getting a party. Similarly, no reasonable journalist in this context would be chilled by the possibility that he might be subject to neutral access restrictions. *Cf. Blankenship v. Manchin*, 471 F.3d 523, 532 (4th Cir. 2006) (explaining that the "typical reporter" is accustomed to fighting for access such that even discriminatory access restrictions do "not sufficiently impair the status quo as to chill speech").

Nor do plaintiffs benefit by invoking clear error review. Although the question whether a particular action is sufficiently adverse to support a retaliation claim may sometimes be factual in nature, the court here improperly allowed regulatory burdens to stand in for the required chill and failed to take any serious account of the context of reporters seeking access to the Pentagon. Those are fundamentally legal errors subject to de novo review. And even if they did constitute the resolution of factual questions, the court's analysis would be clearly erroneous for the reasons explained.

### C. Plaintiffs Have Not Established That Their Protected Activity Was the Cause of the Escort Requirement

Plaintiffs do not dispute that they must establish that their protected activity was the but-for cause of the Department's decision to adopt the escort requirement. Nor do they dispute that the Department's articulated national-security explanation is entitled to the presumption of regularity. Plaintiffs fail to overcome that presumption.

1. Plaintiffs primarily ask this Court to disregard the Department's articulated explanation for the escort requirement because it "is plainly pretextual." Br.37. That is incorrect.

In many respects, plaintiffs simply repeat the district court's skepticism, complaining that the explanation provided through sworn declarations in litigation was not in the policy itself and does not take account of the purportedly limited effect of the court's original judgment. Br.37-38. The government has already explained the error in those arguments, *see* Opening Br.44-48, and plaintiffs nowhere engage with that explanation.

Beyond that, plaintiffs try to manufacture daylight between the rationale stated in the March Policy (which discussed how the district court's judgment removed the Department's ability to effectively screen reporters for security risks) and the more robust explanation articulated in the

Department's declarations (which has additionally focused on reporters' ability to leverage unescorted access to obtain sensitive information), asserting that those concerns "ha[ve] nothing to do" with each other. Br.38-39.

That is plainly wrong. Confidence that the Department could screen out (or revoke the credentials of) reporters who may seek to leverage their physical access to obtain sensitive information would naturally lead to fewer concerns about allowing reporters to enjoy more freedom inside the Pentagon. That is exactly the connection drawn in the March Policy itself: in light of the district court's vacatur of the October Policy, which the Department believed limited its ability to effectively screen journalists "for security risks," the Department did not believe that "unescorted access" could "be responsibly maintained." J.A. 90. And that intuitive connection also answers plaintiffs' "basic question" regarding why the Department did not implement the escort requirement before March, Br.39: because it believed the October Policy's requirements provided sufficient assurances that journalists who agreed to the Policy would not leverage their access into pursuing the unauthorized disclosure of sensitive information.

Plaintiffs' assertions (Br.40) about the effects of the policy on their own reporting or the purportedly "facially dubious" rationale for the policy do not hold up, for reasons the government has already explained and plaintiffs do not refute. *See* Opening Br.48-51. And plaintiffs' suggestion that the Department's rationale must be pretextual because it relies on an accounting of press office inquiries rather than on direct data about publication of sensitive information is undermined by plaintiffs' own record evidence. Plaintiffs aver that it is their "practice to always engage with Public Affairs officials at the Department before publishing any story that has potentially sensitive or disputed elements." J.A. 476-77. Given such journalistic practices, it was plainly reasonable—and certainly not evidence of pretext—for the Department to rely primarily on its own press officers' experiences rather than attempting to undertake some new study of publications.

2. Plaintiffs' attempt to identify other evidence linking the escort requirement to a purported retaliatory intent is no more persuasive. Although plaintiffs parrot the district court in identifying (Br.34-36) various statements from various officials at various times expressing disagreement with plaintiffs' (and other media's) reporting, plaintiffs do not dispute that none of those statements suggests any direct link between plaintiffs'

reporting and the escort requirement. And plaintiffs hardly demonstrate a compelling "breadth and depth" of animus, Br.36, by cherry-picking isolated statements from different officials months apart.

Nor do plaintiffs make headway by emphasizing (Br.36) the timing of the March Policy. As the government has already explained, that timing demonstrates only that the Department was responding to the vacuum created by the district court's vacatur of the October Policy. *See* Opening Br.52. Plaintiffs elide the relevant facts when they state that the March Policy was adopted "immediately after" access was ordered restored for "only" the Times' reporters. Br.36. Although the court's injunction addressed only plaintiffs' access, the court universally vacated the challenged provisions of the October Policy, which necessarily affected their application to other journalists. *See New York Times Co. v. Department of Def.*, 824 F. Supp. 3d 27, 56 (D.D.C. 2026).

Plaintiffs' invocation of preclusion is similarly unavailing. Br.35. Plaintiffs do not appear to suggest that anything about the first judgment precludes the government from defending the escort requirement or the revised March Policy on their own terms—and for good reason. Preclusion applies only to a specific "issue of fact or law" that is identical between two

suits, *National Ass'n of Home Builders v. EPA*, 786 F.3d 34, 41 (D.C. Cir. 2015) (quotation omitted), not merely to issues that are "similar," *Fund for Animals, Inc. v. Lujan*, 962 F.2d 1391, 1399 (9th Cir. 1992). Any issue concerning the motives or legality of the October Policy is necessarily not identical to issues presented in this suit regarding the legality of the revised March Policy.

Applying preclusion to restrict the government's defense of the March Policy would also "work a basic unfairness." *Martin v. Department of Just.*, 488 F.3d 446, 454 (D.C. Cir. 2007) (quotation omitted). As explained, it is a basic tenet of administrative law that an agency may respond to an adverse ruling by issuing a new policy attempting to achieve similar ends. Here, the Department responded to the original judgment invalidating the October Policy by issuing the revised March Policy. Relying on the court's original judgment to foreclose any defense of the new policy—or, alternatively, forcing the Department to continue defending the now-superseded October Policy simply to avoid that possibility—would be incompatible with the agency's fundamental authority to revise its policy and would risk burdening the parties and the courts with unnecessary litigation.

## II. Plaintiffs' Alternative Claims Provide No Basis for Affirming the Preliminary Injunction

The district court's preliminary injunction rested solely on plaintiffs' retaliation claim. Plaintiffs contend, however, that this Court should affirm the injunction based on their other claims that the requirement is an unconstitutional restriction on access to the Pentagon and that the requirement does not comport with the APA.

That contention is misplaced in the context of preliminary injunction. The "decision whether to grant a preliminary injunction is a matter of discretion, not a question of right," and so this Court will not "uphold[] a preliminary injunction based upon a legal theory not embraced by the district court." *Sherley v. Sebelius*, 644 F.3d 388, 398 (D.C. Cir. 2011). Instead, "in every such case, it is for the district court to determine, in the first instance, whether the plaintiffs' showing on a particular claim warrants preliminary injunctive relief." *Id.* That logic has particular force here, where the district court's equitable analysis turned heavily on the specific nature of plaintiffs' retaliation claim.

In any event, plaintiffs' alternative contentions likewise fail.

### A. The Escort Requirement Constitutionally Regulates Access to the Pentagon

1. As plaintiffs concede (Br.42), the Pentagon is (at most) a nonpublic forum—"government property that is not by tradition or designation a forum for public communication," *Ateba*, 133 F.4th at 121-22 (quotation omitted). The established rule for such fora is that the government is "not required to open" them "for any speech at all," but if it does, access "can be restricted as long as the restrictions are viewpoint neutral and reasonable." *Id.* at 122-23 (quotation omitted). The government maintains "substantial leeway to regulate access to a nonpublic forum," and the Supreme Court "has upheld a range of restrictions that were justified in light of the forum's purpose." *Id.* at 123.

The escort requirement plainly meets those requirements. The requirement applies equally to all PFAC-holding journalists, regardless of the content of their reporting. The requirement is also reasonable. It is predicated on the Department's determination that previous unescorted access had contributed to frequent unauthorized disclosures of sensitive information. J.A. 421-22. The Secretary is charged with ensuring the safe, efficient, and secure operation of the Pentagon, *see* 10 U.S.C. § 2674, a secure federal building that houses extremely sensitive work. It is plainly consistent

with those responsibilities—and the Pentagon's nature—for the Department to adopt access restrictions designed to safeguard sensitive materials from unauthorized disclosure. That is particularly true given that the requirement continues to permit PFAC holders to access the Pentagon to attend briefings and interview Department officials as necessary. J.A. 393-94.

2. Plaintiffs err in arguing (Br.43-44) that the escort requirement is constitutionally unreasonable. They assert that it is inconsistent with the purpose of "a forum intended to facilitate fact-based, independent reporting." Br.43. That is nonsensical on its face. Like other federal office buildings, the Pentagon's primary function is to provide a secure and orderly environment for the Department's sensitive functions—not to "facilitate" plaintiffs' reporting. The relevant question is thus whether the escort requirement is "reasonable in light of the government's interest in preserving the" Pentagon "for the use to which [it is] lawfully dedicated." *United States v. Nassif*, 97 F.4th 968, 978 (D.C. Cir. 2024) (quotation omitted). And plaintiffs have no serious argument that the escort requirement is unreasonable in light of the Pentagon's actual purpose.

In any event, as with any nonpublic forum, restrictions need not be the least restrictive to "pass constitutional muster." *Ateba*, 133 F.4th at 123. And

plaintiffs cite nothing in the record supporting the conclusion that unescorted physical access is somehow necessary for them to conduct "fact-based, independent reporting." To the contrary, plaintiffs assert that they continued to obtain as much nonpublic information even when they stopped accessing the building altogether. *See* J.A. 31. The more modest restrictions reflected in the escort requirement are plainly consistent with plaintiffs' ability to engage in reporting. That is particularly true given that the First Amendment indisputably does not create any "right of access" to federal buildings like the Pentagon simply because "such access might lead to more thorough or better reporting." *Flynt v. Rumsfeld*, 355 F.3d 697, 703 (D.C. Cir. 2004) (quotation omitted). Plaintiffs cannot create a back-door right to such access through claims that restrictions are unreasonable any time they impair journalists' activities.

Plaintiffs' attempt (Br.44) to second-guess the Department's determination regarding the risks of unescorted access fares no better. Their assertion that reporters previously maintained unescorted access without incident is undermined by the Department's experience of PFAC holders' regularly—"often monthly, and sometimes multiple times per month," J.A. 421—obtaining classified, controlled, and other highly sensitive information.

Nor do plaintiffs make any headway in their claim (Br.44) that the restriction is unreasonable because it applies only to journalists. Access to a nonpublic forum may be restricted "based even on subject matter and speaker identity" so long as the restrictions are reasonable and viewpoint neutral. *Ateba*, 133 F.4th at 123 (quotation omitted). The government has already explained why the Department reasonably concluded that journalists—whose job, in plaintiffs' own telling, necessarily entails pursuing and disclosing sensitive information—pose more of a risk to information security than baristas or cafeteria workers. *See* Opening Br.51-52.

3. Plaintiffs are also wrong to argue (Br.45-48) that the escort requirement is viewpoint discriminatory despite applying equally to all journalists. Plaintiffs contend that the requirement's "purpose and effect" is to discriminate against journalists with the "view" that "journalism in the public interest requires more than repeating spoon-fed official pronouncements." Br.47. Plaintiffs also contend that preclusion principles prevent the Department from contesting various issues regarding the October Policy. Br.45-46. But plaintiffs' resort to preclusion is no more availing here than in the context of their retaliation claim, and their substantive contention is wrong on all levels.

For one, plaintiffs' complaints misunderstand the nature of the requirement. The Pentagon is not a forum for, and the requirement does not regulate, any journalist's expressive activity. Instead, the Department has permitted journalists—including plaintiffs—special access to the Pentagon for the purpose of gathering information to shape their reporting. That newsgathering "is not itself a communicative activity; it is merely a step in the creation of speech that will be communicated at some other time" in "some other location." *Price v. Garland*, 45 F.4th 1059, 1070 (D.C. Cir. 2022).

Nor can plaintiffs assert a right to access information within the Pentagon simply because that access might facilitate or enable their later communicative activity. To the contrary, "the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally," and "generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news." *Dahlstrom v. Sun-Times Media, LLC*, 777 F.3d 937, 946 (7th Cir. 2015) (quotation omitted). Courts have thus repeatedly rejected claims of First Amendment injury from the government's restriction of the public's (including journalists') access to government information. *See id.* And that

accords with this Court's recognition in *Flynt* that the government is under no obligation to facilitate journalists' access to buildings like the Pentagon even if that access might lead to better reporting. 355 F.3d at 703.

Those principles together illuminate the error in plaintiffs' conception of the burdens imposed by the escort requirement. The requirement does not itself regulate any journalist's reporting, nor does it regulate access based on the content or viewpoint of any journalist's reporting. Instead, it even-handedly regulates all journalists' access to the Department's own building and the information contained therein. No journalist—including plaintiffs—can assert a First Amendment right to such access. Plaintiffs cannot generate a cognizable First Amendment injury on the theory that regulating their access to information within the Pentagon will have some down-the-line effect on their reporting, particularly where that theory rests entirely on unsupported speculation that the requirement will have disparate such effects on their or other "legacy" media's reporting. *Cf. Green v. U.S. Dep't of Just.*, 111 F.4th 81, 98 (D.C. Cir. 2024) (rejecting the proposition that "a theatre critic wishing to run a photograph with his review" could be entitled to a First Amendment-based exemption from a "theater's no-photographing rule").

Moreover, the gerrymandered "view" hypothesized by plaintiffs is not a protected viewpoint in any relevant sense. If plaintiffs mean to say that the escort requirement discriminates against journalists who would prefer to engage in spontaneous conversations with officials or other activities facilitated by unescorted access, any neutral restriction could be framed to have such effects. Thus, for example, the statutory restriction on demonstrations within the Capitol plainly has more of a practical effect on those who wish to demonstrate in the Capitol than on those who do not. But because that "statute's plain text" applies to all demonstrations or parades "regardless of any viewpoint," the statute does not "discriminate[] on the basis of viewpoint." *Nassif*, 97 F.4th at 978. So too here.

Regardless, it is not at all clear that a facially neutral restriction on a nonpublic forum may be "challenged on the ground that it was intended *sub silentio* to suppress the views of a particular" speaker. *AFDI v. WMATA*, 901 F.3d 356, 365 (D.C. Cir. 2018). Even if such claims were viable, plaintiffs would be required to demonstrate that the burdens fall unduly on particular speakers or viewpoints (which they have not done) and that "the fit between" the escort requirement and the articulated national-security rationale "is loose or nonexistent." *Id.* at 366 (quotation omitted); *cf. Brown v. Califano*,

627 F.2d 1221, 1234-35 (D.C. Cir. 1980). For the reasons already explained, the fit here between the escort requirement and the national-security rationale articulated by the Department is plainly reasonable. And the lack of actionable viewpoint suppression is only further confirmed by the undisputed "evenhandedness in the Government's actions after the" restrictions were implemented. *AFDI*, 901 F.3d at 366.

Finally, plaintiffs underscore the error in their position when they assert that the Department's desire to protect sensitive information "is not [a] neutral" justification because "[a]ttempting to prevent journalists from publishing unapproved information" is "itself viewpoint discrimination." Br.47. The desire to obtain unauthorized disclosures of information is not a "viewpoint." And it should hardly need stating that the Department's desire to safeguard classified and other sensitive information is a constitutionally permissible motive underlying access restrictions. *Cf. Flynt*, 355 F.3d at 703.

### B. The Escort Requirement Comports with the APA

The Department's issuance of the escort requirement comports with the APA's reasoned decisionmaking requirements. The APA requires only "that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "Judicial review under

that standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *Id.* The rationales the Department has offered more than meet these requirements, particularly in the context of the agency's informal regulation of access to its own property.

Plaintiffs' scattershot attacks on the reasonableness of the agency's decisionmaking (Br.48-52) simply repackage arguments advanced in support of their First Amendment claims, and they are no more persuasive here. The Department reasonably connected its rationale to the problems caused by the district court's vacatur of the October Policy. *See* Opening Br.45-48. There is no serious mismatch between the rationale and the requirement. *See* Opening Br.48-52. The Department explained why it believed unescorted access in particular was the cause of unauthorized disclosures. *See* Opening Br.38-39. And—given plaintiffs' own asserted experiences—it is clear that the Department reasonably understood that journalists could continue to engage in bona fide reporting even while subject to an escort requirement. *See* Opening Br.54-55.

Nor are plaintiffs correct (Br.49) that this Court cannot consider the declarations fleshing out the agency's rationale. As this Court has explained, a reviewing court may consider declarations that "accurately reflect[] the

contemporaneous reasoning of the Department" as part of APA review, as is true here. *Rhea Lana, Inc. v. United States*, 925 F.3d 521, 524 (D.C. Cir. 2019). Sean Parnell—"the decisionmaker who promulgated" the March Policy—has provided a declaration with the relevant reasoning. *See* J.A. 420. As "the relevant agency decisionmaker," his reasoning is "the proper subject of [the Court's] review." *Rhea Lana*, 925 F.3d at 524. And the declarations "illuminate the reasons that are already implicit in the internal materials," as explained, rather than advancing some "entirely new theory." *Id.* (alterations and quotation omitted).

## III. The Equitable Factors Counsel Against the Preliminary Injunction

1. Plaintiffs have failed to demonstrate any serious irreparable harm from the escort requirement. Plaintiffs repeat the district court's conclusion that any purported constitutional violation reflects irreparable harm. But plaintiffs cite no case finding irreparable injury based purely on abstract constitutional harm without an accompanying concrete adverse effect. *See First Choice Women's Res. Ctrs., Inc. v. Davenport*, 608 U.S. 174, 193 (2026) (finding First Amendment injury from subpoena that would reasonably chill organization's donors from associating with organization and induce organization "to trim its protected advocacy"); *Karem v. Trump*, 960 F.3d

656, 667-68 (D.C. Cir. 2020) (finding irreparable harm where plaintiff's hard-pass access to White House was suspended). In the absence of any actual chill or other substantial, concrete harm to plaintiffs, their invocation of the First Amendment cannot itself establish the requisite irreparable harm. And, at the least, plaintiffs' assertions about the presumption of constitutional injury say nothing about that injury's "probability or degree," *Americans for Prosperity Found. v. Albence*, 2026 WL 2563151, at *4 (3d Cir. Aug. 31, 2026), such that any abstract injury would be easily outweighed by the concrete harms to the government and the public.

Separately, plaintiffs' passing suggestion (Br.52-53) that the escort requirement has caused some substantial concrete harm to their newsgathering is unavailing. The government has already explained that this conclusion is implausible on its face and is impossible to square with plaintiffs' repeated assertions that they have continued to obtain and publish just as much—if not more—nonpublic information. *See* Opening Br.54-55. Plaintiffs have no response.

2. As to the balance of the equities and the public interest, plaintiffs do not dispute that the unauthorized disclosure of classified and sensitive information may result in grave harm to the Nation's security. Instead,

plaintiffs briefly contend (Br.55) that the link between the escort requirement and the unauthorized disclosure of sensitive information is "dubious and unsupported." But the Department has explained in a detailed and reasonable fashion its determination that allowing journalists unescorted access has previously resulted in the regular unauthorized dissemination of sensitive information. *See* Opening Br.58-59; *see also* J.A. 421-23. Particularly in this preliminary posture, *Albence*, 2026 WL 2563151, at *2, the risk that unescorted access will lead to additional disclosures of controlled and classified information—with all the attendant undisputed harms—more than outweighs the inconvenience that the escort requirement may cause plaintiffs.

Plaintiffs also repeat the district court's error by entirely discounting the government's and the public's interests because they believe they are likely to succeed on the merits. Br.54. In so doing, plaintiffs state only that this Court "routinely"—based on three cases over the last thirteen years—commits the same mistake. Br.54. But plaintiffs nowhere attempt to explain how this mode of analysis is consistent with the preliminary injunction framework or with the Supreme Court's recognition that the equities alone may warrant denying a preliminary injunction. *See* Opening Br.61-62. Nor do

plaintiffs assert that this Court has considered and rejected arguments like those the government has advanced in this case or that stare decisis compels that result.

## CONCLUSION

The district court's preliminary injunction should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

BRAD HINSHELWOOD
JACK STARCHER

*/s/ Sean R. Janda*
SEAN R. JANDA
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3388*
*sean.r.janda@usdoj.gov*

September 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6495 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in CenturyExpd BT 14-point font, a proportionally spaced typeface.

*/s/ Sean R. Janda*
Sean R. Janda