ORAL ARGUMENT NOT YET SCHEDULED

**No. 26-5253**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

NEW YORK TIMES COMPANY, *et al.*,

*Plaintiffs–Appellees*,

v.

DEPARTMENT OF DEFENSE A/K/A DEPARTMENT OF WAR, *et al.*,

*Defendants–Appellants.*

On appeal from the United States District Court for the
District of Columbia — No. 26-CV-1690 (Friedman, J.)

**BRIEF OF THE KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES**

Katherine Fallow
Jake Karr
Jameel Jaffer
Alex Abdo
Knight First Amendment Institute at
Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
katie.fallow@knightcolumbia.org

*Counsel for* Amicus Curiae

**Certificate as to Parties, Rulings, and Related Cases**

Pursuant to D.C. Circuit Rule 28, the undersigned counsel certifies as follows:

**(A) Parties and *Amici***

The parties include Plaintiffs, the New York Times Company and Julian E. Barnes, and Defendants, Department of Defense a/k/a Department of War, Pete Hegseth, in his official capacity as Secretary of Defense, and Sean Parnell, in his official capacity as Chief Pentagon Spokesman.

The State of New York, the Reporters Committee for Freedom and of the Press and 23 Media Organizations, the American Civil Liberties Union and American Civil Liberties Union of the District of Columbia, and the Pentagon Press Association submitted *amicus* briefs in district court Case No. 25-CV-4218 (D.D.C.). The Pentagon Press Association submitted *amicus* briefs before the special panels appointed by this Court to address the government's motions for stays pending appeal in Case Nos. 26-5113 and 26-5253 (D.C. Cir.).

**(B) Rulings Under Review**

The ruling under review is an Opinion issued by the Honorable Paul L. Friedman on June 30, 2026, granting Plaintiffs' motion for a preliminary injunction in Case No. 26-CV-1690, 2026 WL 1872765 (D.D.C. June 30, 2026).

**(C) Related Cases**

This case was not previously before this Court or any other court, except the district court and the special panel appointed by this Court to address the government's motion for a stay pending appeal. Case Nos. 26-5113 and 26-5253 are pending related cases in this Court.

Dated: September 11, 2026

*/s/ Katherine Fallow*
Katherine Fallow

**Certificate Regarding Separate Briefing**

Pursuant to D.C. Circuit Rule 29(d), the undersigned counsel certifies that a separate brief is necessary. Counsel has coordinated with other *amici* supporting Plaintiffs, the New York Times Company and Julian E. Barnes, and sought to ensure that this brief will aid in the Court's consideration of the case by raising novel points not made by Plaintiffs or other *amici*. In particular, as an organization devoted to free speech and the press, *amicus* is in a unique position to provide the Court with broader context for the history of and First Amendment values underlying the public forum doctrine and to explain the importance of its application in this case for civic discourse and democratic self-governance.

Dated: September 11, 2026

*/s/ Katherine Fallow*
Katherine Fallow

## Corporate Disclosure Statement

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 28(a)(1)(A), *amicus curiae* the Knight First Amendment Institute at Columbia University certifies that it has no parent corporations and that no publicly held corporation owns 10 percent or more of its stock.

## Table of Contents


Certificate as to Parties, Rulings, and Related Cases .............................................i

Certificate Regarding Separate Briefing ............................................................ iii

Corporate Disclosure Statement ..........................................................................iv

Table of Authorities ............................................................................................vi

Glossary ...............................................................................................................ix

Interest of *Amicus Curiae* ....................................................................................1

Background ............................................................................................................1

Summary of Argument ..........................................................................................5

Argument ...............................................................................................................8

I. The public forum doctrine underwrites self-government by ensuring the availability and integrity of spaces in which expressive activity important to our democracy takes place. ..................................................8

II. The requirements of viewpoint neutrality and reasonableness guard against government attempts to censor or distort expressive activity in limited and nonpublic forums. ..............................................................12

III. The Interim Policy imposes viewpoint-based and unreasonable restrictions on newsgathering and reporting by the Pentagon press corps in a forum essential for democratic accountability. .......................16

Conclusion ...........................................................................................................20

Certificate of Compliance ....................................................................................22

Certificate of Service ...........................................................................................23

## Table of Authorities

### Cases

*Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth., WMATA*, 901 F.3d 356 (D.C. Cir. 2018) ............................................14, 17, 18

*Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666 (1998)................12, 13, 15

*Ateba v. Leavitt*, 133 F.4th 114 (D.C. Cir. 2025) .......................................11, 15, 16

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788 (1985) ........................................................................6, 10, 11, 13, 15, 17

*Garrison v. Louisiana*, 379 U.S. 64 (1964)..........................................................8

*Greer v. Spock*, 424 U.S. 828 (1976) ..........................................................12, 15

*Hague v. CIO*, 307 U.S. 496 (1939)..................................................................6, 9

*Houchins v. KQED, Inc.*, 438 U.S. 1 (1978) .........................................................5

*Iancu v. Brunetti*, 588 U.S. 388 (2019) ..............................................................13

*Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672 (1992) .................................................................................................11

*Koala v. Khosla*, 931 F.3d 887 (9th Cir. 2019).....................................................14

*Matal v. Tam*, 582 U.S. 218 (2017)......................................................................13

*McCullen v. Coakley*, 573 U.S. 464 (2014) .........................................................11

*Meza v. Renaud*, 9 F.4th 930 (D.C. Cir. 2021).......................................................7

*Mills v. Alabama*, 384 U.S. 214 (1966)...................................................................8

*Minn. Voters All. v. Mansky*, 585 U.S. 1 (2018) ...................................................12

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) ...................................................13

*N.Y. Times Co. v. Dep't of Def.*, 824 F. Supp. 3d 27 (D.D.C. 2026) ..........1, 2, 4, 19

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964) ..................................................10

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37 (1983) ....11, 13, 14

*PETA v. Tabak*, 109 F.4th 627 (D.C. Cir. 2024) ..............................................15, 18

*Police Dep't of City of Chi. v. Mosley*, 408 U.S. 92 (1972) ...................................13

*Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65 (1st Cir. 2004).............................14

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995) ....10, 13, 15

*Roth v. United States*, 354 U.S. 476 (1957) ..........................................................10

*Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975) ...........................................16

*Stromberg v. California*, 283 U.S. 359 (1931) ....................................................5, 8

*Student Gov't Ass'n v. Bd. of Trs. of Univ. of Mass.*, 868 F.2d 473 (1st Cir. 1989) ..........................................................................................13, 14

*Terminiello v. City of Chicago*, 337 U.S. 1 (1949) ..................................................9

*Thomas v. Chi. Park Dist.*, 534 U.S. 316 (2002) ...................................................16

*United States v. Griefen*, 200 F.3d 1256 (9th Cir. 2000) .......................................14

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015) ............................................................................................6, 10

**Other Authorities**

Alexander Meiklejohn, *Political Freedom: The Constitutional Powers of the People* (1948) .........................................................................13

*From the Archives: CBS News Broadcast from Pentagon on D-Day*, CBS News (Oct. 17, 2025), https://perma.cc/8MLB-XZZ8 ................................2

Harry Kalven, Jr., *The Concept of the Public Forum:* Cox v. Louisiana, 1965 Sup. Ct. Rev. 1...................................................................9

John D. Inazu, *The First Amendment's Public Forum*, 56 Wm. & Mary L. Rev. 1159 (2015)....................9

Natasha Bertrand, Katie Bo Lillis & Zachary Cohen, *Exclusive: Early US Intel Assessment Suggests Strikes on Iran Did Not Destroy Nuclear Sites, Sources Say*, CNN (June 25, 2025), https://perma.cc/FB7C-FMPD ....................2

# Glossary

| | |
|---|---|
| PFAC | Pentagon Facilities Alternate Credential |

## Interest of *Amicus Curiae*[1]

The Knight First Amendment Institute at Columbia University ("Knight Institute") is a non-partisan, not-for-profit organization that works to defend the freedoms of speech and the press through strategic litigation, research, and public education. The Institute's aim is to promote a system of free expression that is open and inclusive, that broadens and elevates public discourse, and that fosters creativity, accountability, and effective self-government. The Institute is committed to protecting the integrity and vitality of expressive spaces in which citizens and their proxies in the press can communicate with each other and government representatives about matters of public concern.

## Background

Since World War II, the Department of Defense (the "Department") has opened up spaces within the Pentagon for journalists to gather news and provide the American public with accurate and timely reporting on the U.S. military, including "during some of the most consequential moments in American history." *N.Y. Times Co. v. Dep't of Def.* ("*NYT I*"), 824 F. Supp. 3d 27, 34 (D.D.C. 2026). During this

[1] No counsel for a party authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund the preparation or submission of the brief. No person other than *amicus curiae*, its members, or its counsel contributed money that was intended to fund the preparation or submission of the brief. The parties have consented to the filing of this *amicus* brief.

time, the Department has permitted credentialed journalists to freely enter and move about non-secure areas of the Pentagon, to attend and ask questions at press conferences, to pursue leads, and to speak with sources. *Id.* at 34–35. The government has also provided the Pentagon press corps with dedicated workspace, enabling them to report out the news in real time. *Id.* at 35. Utilizing this forum, journalists have long trekked the halls of the Pentagon, one of the world's largest buildings, to inform and serve the public—from sharing updates during D-Day, to offering eyewitness accounts of the 9/11 attacks, and to questioning the official narrative surrounding recent U.S. military strikes on Iran's nuclear facilities. *See* Statement of Undisputed Material Facts in Supp. of Pls.' Mot. Summ. J. ¶ 4, *NYT I*, 824 F. Supp. 3d 27, ECF No. 10-36.[2] As the district court observed—and the Department itself has acknowledged—"[t]he regular presence" of credentialed journalists "at the Pentagon has enhanced the ability of journalists and news organizations to keep Americans informed about the U.S. military while posing no security or safety risk to Department property or personnel." *NYT I*, 824 F. Supp. 3d at 35; *see also* J.A. 12 (Dist. Ct. Op. 10).

[2] *From the Archives: CBS News Broadcast from Pentagon on D-Day*, CBS News (Oct. 17, 2025), https://perma.cc/8MLB-XZZ8; Natasha Bertrand, Katie Bo Lillis & Zachary Cohen, *Exclusive: Early US Intel Assessment Suggests Strikes on Iran Did Not Destroy Nuclear Sites, Sources Say*, CNN (June 25, 2025), https://perma.cc/FB7C-FMPD.

Over the past two years, however, the government has launched a barrage of new policies to restrict and retaliate against independent reporting by members of the Pentagon press corps. In January 2025, for example, disfavored media outlets—including the *New York Times*—were evicted from their dedicated workspaces. *See* J.A. 8 (Dist. Ct. Op. 6). In May 2025, journalists were prohibited from entering unescorted into certain areas of the Pentagon to which they previously enjoyed unfettered access, like the gym. *See* J.A. 9 (Dist. Ct. Op. 7); J.A. 247–48 (May Mem.).

Beginning in September 2025, the Department announced a series of policies seeking to impose significantly greater restrictions on the ability of journalists to access the Pentagon and gather information from government officials and employees. The first policy that the Department proposed provoked a public backlash that led to negotiations with representatives of the Pentagon press corps. *See* J.A. 9 (Dist. Ct. Op. 7). But in October 2025, the Department doubled down, issuing a final policy (the "October Policy") that provided that the government may deem a journalist a "security or safety risk"—and then deny, revoke, or refuse to renew the journalist's press pass (known as a "Pentagon Facilities Alternate Credential" or "PFAC")—if the journalist "solicit[s]" "non-public information" from Pentagon personnel. J.A. 10 (Dist. Ct. Op. 8). As the district court held, this credentialing policy would have effectively forced members of the Pentagon press

corps to pledge not to engage in standard, lawful reporting practices. *NYT I*, 824 F. Supp. 3d at 44–45, 51. Plaintiffs challenged the October Policy in *NYT I*, and the district court held the credentialing policy unconstitutional on multiple grounds (which the government does not challenge on appeal). Days later, the Department announced the Interim Policy, which Plaintiffs challenged separately in the instant lawsuit, *N.Y. Times Co. v. Dep't of Def.* ("*NYT II*"), No. 26-CV-1690 (D.D.C.), No. 26-5253 (D.C. Cir.).

The Interim Policy includes two significant restrictions at issue here. First, the Interim Policy imposes a new escort requirement, under which journalists in possession of a PFAC are allowed to enter the Pentagon only with advanced permission, to meet with hand-picked representatives, and when accompanied by a government minder. *See* J.A. 22–24 (Dist. Ct. Op. 20–22); J.A. 101–02 (Interim Policy 10–11). Second, the Interim Policy imposes a "revised" credentialing policy in order to receive a PFAC, under which journalists must pledge to refrain from "encouraging, inducing, or requesting" information from a government official that they know the official is not authorized to provide, and the Department will presume such knowledge if a journalist offers to provide anonymity to a source. J.A. 101 (Interim Policy 10). Journalists already in possession of a PFAC stand to lose it if the Department determines that they have engaged in any such conduct. J.A. 103 (Interim Policy 12).

## Summary of Argument

For over eighty years, journalists covering the Pentagon have played a vital role in ensuring that Americans have access to timely, accurate, and independently reported information about the U.S. military. During that time, the Department of Defense has intentionally opened up certain spaces within the Pentagon for credentialed members of the press to speak to and hear from government officials, gather news, and report the news to the public. By doing so, the Department has created a First Amendment–protected forum in which members of the Pentagon press corps have served as the public's "eyes and ears." *Houchins v. KQED, Inc.*, 438 U.S. 1, 8 (1978).

The First Amendment promotes multiple values—the search for truth, individual autonomy, tolerance, and accountability, among them—but it is intended first and foremost to serve democratic self-government. It is intended to protect the free discussion of public figures and public affairs "to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means." *Stromberg v. California*, 283 U.S. 359, 369 (1931). The public forum doctrine serves this purpose by ensuring both the availability and the integrity of certain spaces in which speech important to our democracy takes place. The Supreme Court developed this doctrine in relation to spaces like parks and sidewalks that, "time out of mind, have been used for purposes of assembly, communicating

thoughts between citizens, and discussing public questions." *Hague v. CIO*, 307 U.S. 496, 515 (1939). The Court has since applied the doctrine to a wide range of government-controlled spaces made available to the public or press for expressive activity.

The public forum doctrine protects expressive spaces from government distortion or restriction in two important respects. First, the doctrine flatly forbids viewpoint discrimination in any type of forum, and courts carefully scrutinize government restrictions on speech or speakers to ensure that they do not suppress protected activity based on viewpoint. Second, the doctrine requires that any restrictions on speech or speakers in a forum meet a level of heightened scrutiny, depending on the nature of the forum. In nonpublic forums—the type that the parties agree is at issue here—the restrictions must be viewpoint neutral and reasonable in light of the forum's purpose.[3]

The Interim Policy violates the public forum doctrine. The escort requirement drastically restricts journalists' ability to access the Pentagon press spaces and

---

[3] The parties have not disputed that the Pentagon press spaces constitute a nonpublic forum. *See* Defs.' Br. 29; Pls.' Br. 20. *Amicus* respectfully submits, however, that these spaces are best characterized as a limited public forum because the government has opened them up for a certain group to engage in expressive activity. *See Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215 (2015). Nevertheless, the level of scrutiny is the same for both limited and nonpublic forums, *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985), and so *amicus* considers the relevant forum here to be a nonpublic forum for purposes of this brief.

engage in newsgathering and reporting from those spaces, and the record makes clear that the Department imposed this restriction to deter journalists from reporting independently about the government. The escort requirement is also unreasonable because it is inconsistent with and will undermine the expressive purposes of the forum—to facilitate newsgathering and reporting that informs and serves the public.[4] The revised credentialing policy, meanwhile, was motivated by the same animus toward the Pentagon press corps and imposes unreasonable restraints on its members, discouraging them from engaging in protected journalistic activities and providing government officials with unbridled discretion to engage in arbitrary or viewpoint-discriminatory enforcement against those activities.

Particularly during times of war and conflict, the Pentagon press corps has provided the public with crucial, independent, and fact-based reporting on the actions of our military's leaders. The Interim Policy threatens to end this tradition of independent reporting on matters of the utmost national importance, and to reduce members of the Pentagon press corps to nothing more than official stenographers. But the right to access and participate in public forums without being required to

[4] For the reasons stated by Plaintiffs and the court below, *amicus* agrees that the escort requirement violates the First Amendment because it constitutes retaliation against protected speech. Pls.' Br. 22–42; J.A. 18–33 (Dist. Ct. Op. 16–31). *Amicus* writes to further explain why this requirement—along with the credentialing policy at issue on appeal in *NYT I*—additionally violates the First Amendment's public forum doctrine. *See Meza v. Renaud*, 9 F.4th 930, 933 (D.C. Cir. 2021) ("[W]e generally may affirm on any ground supported by the record.").

kowtow to authority is not just protected by the First Amendment—it is a hallmark of democracy.

## Argument

### I. The public forum doctrine underwrites self-government by ensuring the availability and integrity of spaces in which expressive activity important to our democracy takes place.

The public forum questions at the heart of this case implicate not just the First Amendment rights of the *New York Times*, its reporters, and the wider Pentagon press corps, but also the right of the American public to receive speech that is essential to democratic self-governance, free from government censorship or distortion.

A central purpose of the First Amendment's speech clause is to facilitate and protect self-government. The Supreme Court has long endorsed the "practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs," including "discussions of candidates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes." *Mills v. Alabama*, 384 U.S. 214, 218–19 (1966); *see also Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964) ("[S]peech concerning public affairs is more than self-expression; it is the essence of self-government."). A "fundamental principle of our constitutional system" is the "maintenance of the opportunity for free political discussion," *Stromberg*, 283 U.S.

at 369, and it is "one of the chief distinctions that sets us apart from totalitarian regimes," *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949). The public forum doctrine effectuates this central First Amendment value by ensuring the availability of spaces for the discourse necessary to democracy, and by shielding those spaces from government manipulation.

The public forum doctrine evolved from the Supreme Court's recognition, nearly a century ago, that certain government-controlled spaces must be preserved for the public to engage in expressive activities that are important to democracy. Thus, traditional public forums—including parks, streets, and sidewalks—are spaces that "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague*, 307 U.S. at 515. "Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens." *Id.*; *see also* Harry Kalven, Jr., *The Concept of the Public Forum:* Cox v. Louisiana, 1965 Sup. Ct. Rev. 1, 11–12 (noting that "in an open democratic society the streets, the parks, and other public places are an important facility for public discussion and political process. They are in brief a public forum that the citizen can commandeer; the generosity and empathy with which such facilities are made available is an index of freedom"); John D. Inazu, *The First Amendment's Public Forum*, 56 Wm. & Mary L. Rev. 1159, 1165 (2015) ("The

ideal of the public forum represents one of the most important aspects of a healthy democracy. It signifies a willingness to tolerate dissent, discomfort, and even instability." (emphasis omitted)). These forums are indispensable to civic discourse and democratic self-governance, assuring the "interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States*, 354 U.S. 476, 484 (1957). They allow people with different views to participate in our "profound national commitment" to "debate on public issues" that is "uninhibited, robust, and wide-open"—and to do so without "any kind of authoritative selection." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

Since *Hague*, the Supreme Court has extended the public forum doctrine beyond traditional public forums to embrace a wide range of other tangible and intangible government-controlled spaces. In doing so, it has recognized other categories of protected forums. First, "designated" public forums are spaces that the government intentionally opens up "for use by the public at large for assembly and speech." *Cornelius*, 473 U.S. at 802; *see also Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Second, "limited" public forums are spaces that the government has opened to "certain groups or for the discussion of certain topics." *Walker*, 576 U.S. at 215 (quoting *Rosenberger*, 515 U.S. at 829). Third, "nonpublic" forums encompass "all remaining" government-controlled spaces, "[w]here the government is acting as a proprietor, managing its internal operations."

*Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678–79 (1992). This Court has held that nonpublic forums include spaces where the government "provides selective access for individual speakers" in otherwise restricted spaces. *Ateba v. Leavitt*, 133 F.4th 114, 122 (D.C. Cir. 2025) (citation and quotation marks omitted). And even where the government has not explicitly offered up a space "for purposes of providing a forum for expressive activity," that space may nevertheless constitute a nonpublic forum if "such activity occurs" there. *Cornelius*, 473 U.S. at 805.

The public forum doctrine ensures the integrity of these spaces by requiring that government restrictions on expressive activity within them satisfy First Amendment scrutiny. The applicable level of scrutiny depends on the type of forum the government has created. *See Ateba*, 133 F.4th at 121. In both traditional and designated public forums, restrictions that discriminate based on content are subject to strict scrutiny. *See McCullen v. Coakley*, 573 U.S. 464, 478 (2014); *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983). In limited public forums and nonpublic forums, restrictions must be viewpoint neutral and reasonable "in the light of the purpose of the forum and all the surrounding circumstances." *Cornelius*, 473 U.S. at 809.

## II. The requirements of viewpoint neutrality and reasonableness guard against government attempts to censor or distort expressive activity in limited and nonpublic forums.

The First Amendment protects limited and nonpublic forums from discrimination against disfavored viewpoints and any other unreasonable restrictions on expressive activity. *Minn. Voters All. v. Mansky*, 585 U.S. 1, 12 (2018) (restrictions must be "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view"). While the government "has power to preserve the property under its control for the use to which it is lawfully dedicated," *Greer v. Spock*, 424 U.S. 828, 836–37 (1976) (internal citation omitted), when the government opens up any property for limited expressive activity by members of the public or the press, the public forum doctrine imposes these two restraints on the government's ability to restrict that activity, *see, e.g.*, *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 682 (1998) ("[N]onpublic forum status does not mean that the government can restrict speech in whatever way it likes." (citation and quotation marks omitted)). The viewpoint neutrality and reasonableness requirements serve as checks against officials exploiting their power over government property to manipulate private expression and control civic discourse.

The foundation of the public forum doctrine is its flat prohibition on viewpoint discrimination, which is impermissible in any forum. *See Matal v. Tam*, 582 U.S.

218, 243 (2017); *Rosenberger*, 515 U.S. at 829. Because viewpoint discrimination is "poison to a free society," *Iancu v. Brunetti*, 588 U.S. 388, 399 (2019) (Alito, J., concurring), the "government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views," *Police Dep't of City of Chi. v. Mosley*, 408 U.S. 92, 96 & n.4 (1972) (quoting Alexander Meiklejohn, *Political Freedom: The Constitutional Powers of the People* 27 (1948)); *cf. Moody v. NetChoice, LLC*, 603 U.S. 707, 740–41 (2024) ("[A] State may not interfere with private actors' speech to advance its own vision of ideological balance."). The Supreme Court has thus policed viewpoint discrimination even in nonpublic forums such as a charity drive for federal employees and military personnel, *Cornelius*, 473 U.S. at 812–13, a candidate debate broadcast on public television, *Forbes*, 523 U.S. at 682, and public school teacher mailboxes, *Perry*, 460 U.S. at 46, 49.

To protect the freedom of thought and speech that are essential to democracy, the government must consistently adhere to viewpoint neutrality in its operation of a forum. This means that the government is prohibited from singling out specific speakers for exclusion from a forum based on their viewpoints. *See Cornelius*, 473 U.S. at 806 ("[T]he government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses . . . ."); *Student Gov't Ass'n v. Bd. of Trs. of Univ. of Mass.*, 868 F.2d 473, 480 (1st Cir. 1989) ("Once the

state has created a forum, it may not condition access to the forum on the content of the message to be communicated . . . ."). It also means that the government may not "change the nature of a forum in order to deny access to a particular speaker or point of view." *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth., WMATA* ("*WMATA*"), 901 F.3d 356, 365 (D.C. Cir. 2018); *see also, e.g.*, *Koala v. Khosla*, 931 F.3d 887, 904 (9th Cir. 2019) (The government may not "define a forum one way at its inception, then redefine it in response to speech it deems offensive."). And it means that the government may not "close the forum . . . to suppress a disfavored view," *WMATA*, 901 F.3d at 365, "even if it was not required to create the forum in the first place," *Perry*, 460 U.S. at 45–46; *see also, e.g.*, *Student Gov't Ass'n*, 868 F.2d at 480 ("Once the state has created a forum, it may not condition access to the forum on the content of the message to be communicated, or close the forum solely because it disagrees with the messages being communicated in it."). The government may only change or close a forum "in good faith," *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 77 (1st Cir. 2004) (emphasis omitted), and not for any "disguised impermissible purpose," *United States v. Griefen*, 200 F.3d 1256, 1262, 1265 (9th Cir. 2000) (explaining that forum closure is impermissible where its "true purpose . . . was to silence disfavored speech or speaker"). Were it otherwise, the public forum doctrine would be reduced to absurdity—encouraging the government to discriminate with a sledge hammer where it is prohibited from discriminating with

a scalpel. *Cf. Rosenberger*, 515 U.S. at 831 ("[E]xclusion of several views . . . is just as offensive to the First Amendment as exclusion of only one. . . . [When] multiple voices are silenced . . . the debate is skewed in multiple ways.").

The reasonableness requirement provides additional reinforcement for the integrity of limited and nonpublic forums. The reasonableness of a restriction is judged "in light of the purpose served by the forum," *Cornelius*, 473 U.S. at 806, and such a restriction is reasonable only "if it preserves the purposes of that [] forum," *Rosenberger*, 515 U.S. at 829–30 (1995). In forums that are compatabile with or intended for expressive activity, therefore, reasonableness is "necessarily a more demanding test than in forums that have a primary purpose that is less compatible with expressive activity." *PETA v. Tabak*, 109 F.4th 627, 636 (D.C. Cir. 2024). No matter the other uses to which a space may be dedicated, then, when the government intentionally hosts private expressive activity in the space, the public forum doctrine prohibits the government from taking steps that would undermine that activity. *See Forbes*, 523 U.S. at 682; *Greer*, 424 U.S. at 836–37.

A forum restriction that grants too much discretion to official decisionmakers is per se unreasonable because it permits arbitrary enforcement that undermines the expressive integrity of the forum. *See Ateba*, 133 F.4th at 124 ("[A] violation of the unbridled discretion doctrine is generally unreasonable under the First Amendment."). Unbridled discretion allows the government to retaliate selectively

against speakers it disfavors. Perhaps more insidiously, the specter of enforcement chills the forum's remaining speakers, who cannot know what expressive activity might get them excluded from the forum. As the Supreme Court has recognized, "[t]he danger of censorship and of abridgment of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975). Restrictions in limited and nonpublic forums must thus be "reasonably specific and objective, and . . . not leave the decision 'to the whim of the administrator.'" *Ateba*, 133 F.4th at 125 (quoting *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 324 (2002)).

## III. The Interim Policy imposes viewpoint-based and unreasonable restrictions on newsgathering and reporting by the Pentagon press corps in a forum essential for democratic accountability.

The Interim Policy violates the public forum doctrine. The escort requirement was motivated by viewpoint-based animus against the independent reporting of the Pentagon press corps and it unreasonably restricts this reporting through unprecedented and unnecessary surveillance of newsgathering. The revised credentialing policy is infected by the same impermissible viewpoint discrimination and it unreasonably discourages protected journalistic activities, while encouraging arbitrary and viewpoint-discriminatory enforcement against those activities.

The escort requirement amounts to a drastic restriction on the ability of journalists to engage in expressive activity in the forum of the Pentagon press spaces.

Previously, credentialed journalists were able to engage in informal interactions with Pentagon personnel, to make independent observations, and to ask questions outside the constant surveillance of government minders—that is, they were able to engage in the regular and protected practices of journalism. J.A. 6–7, 19–22 (Dist. Ct. Op. 4–5, 17–20). No longer. In fact, "the default is that reporters are not present within the Pentagon." J.A. 22 (Dist. Ct. Op. 20). They are permitted entry—if at all—only with advanced permission, to meet with hand-picked representatives, and when accompanied by a government minder. J.A. 22–24 (Dist. Ct. Op. 20–22); J.A. 101–02 (Interim Policy 10–11).

These requirements were "impermissibly motivated," *Cornelius*, 473 U.S. at 812–13, by Pentagon officials' desire to shut down critical reporting. Newly adopted restrictions that appear "facially neutral" may nevertheless "conceal a bias against the viewpoint advanced by the [restricted] speakers," *id.*, and courts consider extrinsic evidence to determine whether a given restriction was driven by such bias, *WMATA*, 901 F.3d at 365 (noting that "seeming viewpoint neutrality" can "mask[] insidious bias").

As the district court found, the evidence of bias here is overwhelming. Before the Pentagon announced the October Policy and then the Interim Policy, senior government officials engaged in a monthslong campaign of retaliatory actions and rhetorical attacks against Plaintiffs and other longtime members of the press corps.

J.A. 7–12 (Dist. Ct. Op. 5–10); Pls.' Br. 8–18 (citing numerous examples in the record); *see WMATA*, 901 F.3d at 366 (explaining that "retrospective" evidence—including "statements by government officials," whether "the Government had repeatedly been found to have engaged in viewpoint discrimination" in the past, and the "specific sequence of events leading up to the challenged [restrictions]"—can be probative of government intent). After this unprecedented interference in the forum, the district these officials have—at least temporarily—achieved their transparently desired result: a pliant Pentagon press corps willing to toe the party line. J.A. 9–11, 16–17 (Dist. Ct. Op. 7–9, 14–15); *see WMATA*, 901 F.3d at 366 (explaining that "prospective" evidence—including "a lack of evenhandness in the Government's [subsequent] actions" and "post-hoc rationalization[s]"—can also be probative of government intent).

The escort requirement is also unreasonable in light of the expressive purposes of the Pentagon press spaces—a forum created by the Department for journalists to gather newsworthy information from the government and accurately and independently report out what they learn to the public. *See PETA*, 109 F.4th at 636 (explaining that reasonableness is a "more demanding test" in a forum that is compatible with and intended for expressive activity). Possession of a PFAC has always allowed reporters to gather news and report from within the Pentagon without a government minder surveilling their work and conversations with Pentagon

personnel. That aspect of the forum is a necessary part of reporting independently, rather than just recording the official government line. A press that must toil under the watchful eye of a government censor is anything but free, and journalists who must ask for permission to transcribe official pronouncements are performing anything but journalism. The escort requirement's significant restrictions on the ability of journalists to report independently from the Pentagon are unreasonable in light of the purposes of the forum, and, as Plaintiffs have explained, are not justified by any legitimate government concerns. Pls.' Br. 34–42; *see* J.A. 24–33 (Dist. Ct. Op. 22–31).

The revised credentialing policy is similarly unconstitutional, failing to cure any of the infirmities that the district court correctly identified in its uncontested analysis of the October Policy. *See NYT I*, 824 F. Supp. 3d at 41–52. It is infected by the same viewpoint-based discrimination that motivated the original credentialing policy as well as the escort requirement at issue here. *See id.* at 47–49; J.A. 24–33 (Dist. Ct. Op. 22–31); Pls.' Br. 45–47. And it is unreasonable because it is plainly inconsistent with the purposes of the forum. The revised credentialing policy undermines journalists' expressive activity within the forum by discouraging them from using some of the standard—and lawful—tools of their trade. Journalists cannot know when "asking questions" of Pentagon personnel might, in the government's view, constitute "intentionally encouraging, inducing, or requesting"

information, barring their entry to the building or leading to the revocation of their PFAC altogether. J.A. 101–02 (Interim Policy 10–11). The Interim Policy does not even purport to limit its scope to interactions that journalists might have while physically present at the Pentagon. J.A. 101–02 (Interim Policy 10–11). The requirements also presumptively cast suspicion on one of the foundations of reporter-source relationship—guarantees of anonymity and confidentiality. J.A. 101 (Interim Policy 10). As a result of these capacious and vague provisions, the revised credentialing policy invites government officials to engage in selective enforcement, targeting journalists who use these tools in ways that they do not like and subjecting them to a revocation process in which they may be presumed guilty and carry the burden of proving their innocence—with "[a]ny doubt[s] . . . resolved in favor of" the government. J.A. 103–04 (Interim Policy 12–13). The revised credentialing policy thus violates the public forum doctrine as both a viewpoint-discriminatory and unreasonable set of restrictions on the Pentagon press corps.

## Conclusion

For the foregoing reasons, *amicus* respectfully urges this Court to affirm the district court.

Dated: September 11, 2026

Respectfully submitted,

*/s/ Katherine Fallow*

Katherine Fallow
Jake Karr

Jameel Jaffer
Alex Abdo
Knight First Amendment Institute at
Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
katie.fallow@knightcolumbia.org

*Counsel for* Amicus Curiae

**Certificate of Compliance**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), it contains 4,855 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Microsoft Word in 14-point Times New Roman font, a proportionally spaced typeface.

Dated: September 11, 2026

*/s/ Katherine Fallow*
Katherine Fallow

**Certificate of Service**

I certify that on September 11, 2026, I electronically filed the foregoing with the Clerk of the U.S. Court of Appeals for the D.C. Circuit via the Court's CM/ECF system. Counsel for all parties will be electronically served via the Court's CM/ECF system.

Dated: September 11, 2026

*/s/ Katherine Fallow*
Katherine Fallow